FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

2005 JUL 27  PM 12: 52

CLERK

| | |
|---|---|
| **EUGENE LIGER, ET AL.** | **CIVIL ACTION NO. 05-1969** |
| | CS-1969 |
| **Plaintiffs in a Collective Action** | |
| | **SECTION C** |
| **VERSUS** | |
| | **MAGISTRATE 05** |
| **NEW ORLEANS HORNETS NBA** | |
| **LIMITED PARTNERSHIP** | |
| | |
| **Defendant** | |

FILED:_____

_____
DEPUTY CLERK

## MOTION FOR PROTECTIVE ORDER, SANCTIONS, AND CORRECTIVE ACTION

**NOW INTO COURT**, through undersigned counsel, come named plaintiffs Eugene Liger,

et al, ("Collective Action Plaintiffs" or "Plaintiffs"), who hereby move this Honorable court for a

Protective Order, Sanctions, and Corrective Action to address threats and misrepresentations made

by the Hornets to prospective and current members of this collective action.

Plaintiffs request a hearing on this Protective Order as soon as possible. If this matter cannot

be heard on an expedited basis, Plaintiffs request that this matter be heard no later than August 17,

2005, the date provided by Judge Berrigan's Court for a hearing on the Motion to Conditionally

Certify the Collective Action.

For the reasons set forth more fully in the attached Memorandum, Plaintiffs request that this

Court grant their Motion for a Protective Order, ordering the New Orleans Hornets to cease and

desist from all threatening, harassing, or misrepresentative behavior towards plaintiffs and

prospective class members of this collective action.

N0019631.WPD

Fee_____
Process_____
Dkrd_____
CtRmDep____
Doc. No_____

Dockets.Justia.com

Plaintiffs also request that this Court sanction the Hornets' for their conduct, with such sanctions including monetary penalties, attorneys fees, and costs.

Plaintiffs also request that this Court enforce non-monetary sanctions against the Hornets, including, but not limited to, the delivery of a corrective notice to all prospective class members who are currently employed by the New Orleans Hornets.

Respectfully submitted, this _27th_ day of ___July___, 2005.

_____

**STEWART E. NILES, JR.  (10004)**
**DANIEL E. BURAS, JR. (26226)**
**LAWRENCE J. CENTOLA (27402)**
NILES, SALAS, BOURQUE & FONTANA, L.C.
909 Poydras Street, 35th Floor
New Orleans, Louisiana 70112
Telephone (504) 310-8550
Facsimile (504) 310-8595
Attorneys for Plaintiffs

**and**

**ALAN F. KANSAS (27725)**
Kansas & Kansas, L.L.C.
1743 Stumpf Blvd., Suite 200
Gretna, LA 70054-1330
Co-Counsel for Plaintiff, Samuel Tobias Steinmetz

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this day been faxed or mailed, postage prepaid and properly addressed, to all counsel of record in these proceedings, this _27_ day of ___July___, 2005.

_____

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

EUGENE LIGER, ET AL.

    Plaintiffs in a Collective Action

VERSUS

NEW ORLEANS HORNETS NBA
LIMITED PARTNERSHIP

    Defendant

CIVIL ACTION NO. 05-1969

SECTION C

MAGISTRATE 05

FILED:_____

                                   DEPUTY CLERK

### MEMORANDUM IN SUPPORT OF PLAINTIFFS'
### MOTION FOR PROTECTIVE ORDER, SANCTIONS, AND CORRECTIVE ACTION

MAY IT PLEASE THE COURT:

    The New Orleans Hornets have threatened, isolated, and provided erroneous information to current and prospective members of this collective action in an effort to dissuade potential plaintiffs from joining this litigation. Such action is expressly prohibited by law and by the Supreme Court. This Court must sanction the Hornets and take any and all corrective action available to ensure that the sanctity of these proceedings are not permanently tainted by the inappropriate conduct of the defendant.

I.      **SUMMARY OF THE BASIS FOR THIS MOTION FOR PROTECTIVE ORDER, SANCTIONS, AND CORRECTIVE ACTION.**

A.     On May 25, 2005, Kristy McKearn, Chief Strategic Officer for the New Orleans Hornets, advised a Sales Account Executive, Chris Stant, that current and former employees of the Hornets

N0019631.WPD

who participated in this litigation would be retaliated against. <u>See</u>, Exhibit "A".

B.    On May 30, 2005, Paul Mott, the President of the New Orleans Hornets, sent an e-mail prohibiting current employees from communicating with any employee who left the company in the last 60 days. This communication necessarily prohibited communications with numerous Plaintiffs. <u>See</u>, Exhibit "C"; Request for e-mail.

C.    Shortly after the May 30, 2005 e-mail was sent by Mr. Mott, Hornets management made misrepresentations to current employees about this collective action. In June of 2005, Marie Parenti, the Hornets' Director of Fan Relations and Premium Seat Services, advised her fan relations employees that "The overtime suit is not going well for the Plaintiffs and that the Court was bout to dismiss their claims." <u>See</u> Exhibit "B" Affidavit of Penny Middleton. This statement was patently false and was made at a time before any responsive pleadings had been filed by the Hornets.

D.    Steve Martin, the Hornets Senior Vice President of Communications and Community Affairs, through one of his employees, contacted a current member of this lawsuit. During these communications, the named plaintiff, was advised that Mr. Martin "hoped that Chris knew what he was doing" because he was "worried" about Stant's decision to join this suit. <u>See</u> Exhibit "A".

These and other communications and actions by the Hornets to prospective class members are wholly inappropriate because they tend to:

•    Threaten employees who explore their overtime rights;

•    Suggest that an employee's job status will be jeopardized if the employee communicates with others about this overtime lawsuit;

•    Mislead current employees about their rights and the status of this claim;

•    Isolate and mistreat employees in violation of 29 U.S.C. §215; and

- Attempts to tap into deep rooted fears of current employees by preying on the mistaken belief that they can be legally fired or otherwise retaliated against if they join this suit.

In addition, the Hornets' communications are an improper end run around this Court's authority through the collective action process to fully and accurately notify current and former employees about their rights under the Fair Labor Standards Act.

Plaintiffs seek a protective order prohibiting the Hornets and their counsel from communicating with the prospective class members about this lawsuit. Plaintiffs also seek monetary and non-monetary sanctions (in the form of an expedited hearing, a corrective letter, and a tolling of the statute of limitations as to all prospective class members as of May 27, 2005) to correct the damage already caused by the Hornets.

## II.    **CASE HISTORY**

Plaintiffs filed this Collective Action on May 27, 2005 to recover unpaid overtime wages owed to Plaintiffs and similarly situated employees.[1]  The named plaintiffs and those similarly situated were, or are, employees of the Hornets.  Since 2002, the Hornets have established a pattern and practice of routinely requiring plaintiffs and those similarly situated to work hundreds, and sometimes thousands of overtime hours, without receipt of overtime compensation. Plaintiffs will prove that the Hornets ignored specific Department of Labor Opinions that contradict the defenses asserted in this litigation. See , e.g., WH-472. 1978 WL 51434.  Attached hereto as Exhibit "D". The named plaintiffs, and those similarly situated, were all classified by defendants as nonexempt

---

[1] As the Court is aware, the Fair Labor Standards Act (FLSA) provides for opt-in "collective actions" rather than Rule 23 class actions. 29 U.S.C. § 216(b). Would be plaintiffs must affirmatively "opt-in" to the lawsuit by filing a "consent" to participate in the litigation. Id.

employees under the FLSA.[2] Moreover, Plaintiffs will provide testimony and documents proving that the Hornets were both aware of and admitted that all non-exempt employees were entitled to overtime compensation, but then ordered management to deny overtime payment to those employees. See, e.g., Exhibits "A","C" and "E".

On June 24, 2005, Plaintiffs and Defense counsel conducted a Rule 26(f) meeting and discussed Plaintiffs concerns with threats and other inappropriate behavior engaged in by the Hornets. See Exhibit "F". On July 12, 2005, the Hornets answered Plaintiffs' Complaint[3].

During the preparation of the attached Rule 26(f) memorandum, Plaintiffs counsel explained why the threats and misrepresentations by the Hornets were inappropriately jeopardizing the claims of prospective plaintiffs. See Exhibit F. Plaintiffs counsel explained that under the FLSA, either a two year or a three year statute of limitations will be applicable to a plaintiffs' recovery of unpaid overtime benefits, and that defendant was attempting to delay in order to receive a financial benefit and because of the statute of limitation was inappropriate.[4] See Exhibit "F"

The reason for plaintiffs' request for early recognition of this collective action and mailing of a notice of the right to opt into the case, is that unlike a FRCP 23 class action, the statute of limitations continues to run against possible FLSA collective action members until they affirmatively

---

[2] The Hornets admitted that Plaintiffs and similarly situated employees were Non-Exempt employees who were entitled to overtime in a spreadsheet prepared in August of 2004. See Exhibit M, previously attached to Plaintiffs' Second Amended Complaint and Jury Trial Request; Exhibit ___, Middleton Affidavit. The significance of the classification as nonexempt is that, under the FLSA, it is undisputed that nonexempt employees (with rare exceptions which are not applicable here) are entitled to be paid at overtime rates when they worked in excess of 40 hours in a workweek. 29 USC 207(a); 29 CFR 778.100-101.

[3] A Request for An Expedited Hearing and Motion to Certify a Collective Action Pursuant to §216(b) of the FLSA and to Approve a Proposed Notification to All Putative Collective Action Members will soon be filed.

[4]In this action, however, Plaintiffs contend that the evidence will show that the Hornets knew that Plaintiffs and similarly situated employees were entitled to overtime pay, or acted with reckless and/or wilful ignorance of their obligation to pay overtime compensation; thereby, expanding the applicable statute of limitations to three years.

opt into this matter.[5]  Because the FLSA is, under § 216(b), an "opt-in" action instead of an "opt-out"

action (like FRCP 23 actions) prescription, or the statute of limitation period, is not interrupted for

potential collection action members by the mere filing of the lawsuit by the named plaintiffs.  See

as examples Crown, Cork & Seal Co. v. Parker, 103 S.Ct. 2392 (1983); Eisen v. Carlisle &

Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L Ed 2d 732 (1974).  Under 29 USC 256 (portal to Portal

Act), it provides as follows:

> In determining when an action is commenced for the purposes of section 255 of this title, an action commended on or after May 14, 1947 under the Fair labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], the Walsh-Healy Act [41 U.S.C.A. § 35 et seq.], or the Bacon-Davis Act [40 U.S.C.A. § 276a et seq.], shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, or the Bacon-Davis Act, it shall be considered to be commenced in the case of any individual claimant -
>
>> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>>
>> (b) if such written consent was not so filed or if his name did not so appear - on the subsequent date on which such written consent is filed in the court in which the action was commenced. (Emphasis added.)

In commenting on this language, the courts have routinely held that the statute of limitations

continues to run against potential collective action members until they affirmatively opt into the

matter individually by filing a written consent form (after receipt of notice).  See Perella v. Colonial

---

[5]In a FRCP 23 action, prescription is interrupted against all potential class members when the suit if filed.  That is not the case under the FLSA.

Transit, Inc., 148 FRD 147 (W.D. Penn. 1991); Kuhn v. Philadelphia Electric, 487 F. Supp. 974 (E.D. Penn. 1980); Kulik v. Superior Pine Specialties Co., 745 F. 2d 47 (3rd Cir. 1984); Lee v. Vance Executive Protection, Inc. 7 Fed. Appx. 160 (4th Cir. 2001). As the Court wrote in Perella, supra, page 149:

> The statutory language makes it clear that the filing of the consent may come after the filing of the complaint, but that a claim is not asserted, for purposes of the state of limitations, until both the complaint and the claimant's individual written consent are filed.[6]

See also Wertheim v. State of Arizona, 1993 WL 603552 (D. Ariz. 1993). Therefore, unlike a Rule 23 complaint, the filing of he collective action lawsuit will itself not interrupt the statute of limitations from running against potential collection action members. As a result, an early conditional certification with an approval of notice allows potential collective action members to opt into the case, file their consent form, and interrupt the running of the statute of limitations against them.

Whether a two or three year statute of limitations is applicable, the Hornets are receiving a financial benefit from the threatening and/or misleading statements made to current and former employees. In August of 2002 the maximum three year statute of limitations will begin expiring on the claims of each Plaintiff who does not join this litigation. The two year statute of limitations is expiring on a daily basis. Thus, each day that the Hornets dissuade Plaintiffs from joining this litigation through duress or deception benefits the Hornets financially as the amount of claims for each prospective Plaintiff is lessened for each day that the statute of limitations runs on those claims.

What makes the legal effects of the Hornets's attempts to discourage current and former

---

[6]The same rule applies to actions under the ADEA. Sperling v. Hoffman-LaRoche, Inc., 24 F. 3d 463 (3rd Cir. 1994).

employees from joining this litigation more egregious is the Hornets' obvious efforts to limit each prospective plaintiff's knowledge of their rights. The Hornets are discouraging certain similarly situated employees from joining this litigation through threats, insinuation, and other means of misrepresentation. **The practical effect of this misconduct is that the Hornets will financially benefit because the team will owe less money to similarly situated employees who join the suit at a later date and time after those prospective plaintiffs are accurately advised of their rights**.[7]

III.     **LAW AND ARGUMENT**

When the Hornets unilaterally act to dissuade persons from joining this collective action through threats and misrepresentations, the judicial process is thwarted and innocent class members lose their rights. This Court must protect the purpose and procedural mechanics of collective actions against conduct designed to undermine the process. It is the job of the Court to safeguard the rights of unnamed and unknown prospective plaintiffs in this collective action. See Hoffman-LaRoche v. Sperling, 493 U.S. 165 (1989); Belt v. Emcare, 299 F. Supp. 2d 664 (W.D. Tex 2004).

A.     **District Court Have an Obligation to Protect the Rights of Prospective Class Members.**

The Hornets have undermined and subverted the Court's ability to ensure and oversee a fair, unbiased and neutral notification of prospective class members in this Collective Action by engaging in a series of unilateral communications and misrepresentations that have already discouraged prospective plaintiffs from exercising their rights under the FLSA. Rectification of this disinformation campaign, if at all possible, will take considerable time and effort, which will work

---

[7] Plaintiffs do not represent that current counsel for the Hornets have played any role in the threats and misrepresentations made by the Hornets to similarly situated employees. Of note, however, counsel for the Hornets would not agree to waive the statute of limitations defense after being notified that the Hornets made threats and misrepresentations discouraging prospective plaintiffs from joining this litigation. See Exhibit "F".

to the ultimate detriment of class members whose claims are not made, and as to whom the statute of limitations may not be tolled, until they file a written consent to "opt-in" to this action. Plaintiffs have moved for an expedited hearing on their Motion for conditional certification of a class action in an effort to limit the effects of the Hornets' misinformation campaign. Nevertheless, additional action may be necessary to offset the damage already done.

Generally, under Federal Rule of Civil Procedure 23(c), the district court bears responsibility to direct the "best notice practicable" to class members and to safeguard those members from unauthorized, misleading communications from the parties or their counsel. See, Erhardt v. Prudential Group, Inc., 629 F.2d 843, 846 (2d Cir. 1980). In Hoffman-LaRoche, Inc. v. Sperling, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), the United States Supreme Court held district courts have discretion, in appropriate cases, to implement § 16(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), by facilitating notice to potential class members. In so holding, the Supreme Court observed:

> Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure. It follows that, once an [FLSA] action is filed, the court has a managerial responsibility to oversee the joiner of additional parties to assure that the task is accomplished in an efficient and proper way.

Id. at 170-71, 110 S.Ct. at 486, 107 L.Ed.2d at 488-89. As the Sperling Court noted, judicial oversight of the contents of the notice helps protect against misleading communications to potential class members because the court resolves any disputes about the contents of the notice prior to its distribution. Sperling, 493 U.S. at 171, 110 S.Ct. at 486-87, 107 L.Ed.2d at 488.

N0019631.WPD

8

The Hornets will likely suggest that the Court cannot act to restrain the team from communicating with its own employees. However, as noted above, the seminal case governing collective actions held that "a district court has both the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties" because of potential for abuse. See Hoffman-Laroche, Inc. v. Sperling, 493 U.S. at 171. In Hoffman-Laroche, the potential for "misleading communications" was specifically identified by the Supreme Court as an abuse to be guarded against by the District Court. Id. In this case, the issuance of a warning against misleading communications is even more important because there exist multiple examples of misleading and/or false communications that have already been disseminated to prospective class members by the Hornets.

The Supreme Court noted the heightened potential for abuse in the employer-employee context. In so doing, the Supreme Court cautioned that any evaluation of communications in the employer-employee context "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." NLRB v. Gissel Packing Co., 23 L. Ed. 547, 617-18 (1969). The employer-employee relationship is different from that involving an independent person who "may be freer to listen more objectively . . ." Id. Thus, such communications must be evaluated and monitored because of the heightened potential for coercion. Id. see also Abdallah v. Coca-Cola Co., 186 F.R.D. 672, 678 (N.D. Ga. 1999)("Coca-Cola has not given the Court any reason to suspect that it will attempt to mislead its employees and coerce them into non-participation in this case. But simple reality suggests the danger of coercion is real and justifies the imposition of limitations on Coca-Cola's communications with

potential class members."). Thus, any suggestion that this Court cannot exercise its power to control this collective action by preventing the Hornets from issuing misleading communications is without merit.

The Hornets have employed a combination of direct and indirect threats, forced isolation and disinformation campaign to dissuade class members from joining this collective action. As a practical matter, the combined effects of this pernicious behavior has tapped into the deep rooted fears of employees who believe that termination or retribution is an option should they elect to confront their employer in an effort to recover overtime compensation already earned by these employees. See Belt, 299 F. Supp. 2d. At 666-667. Thus, the Hornets have not only caused immediate damage to plaintiffs who are waiting to file suit, but the team has also severely endangered this Court's ability to construct a notification to prospective class members that can shed the taint of corruption already smeared on this case by the Hornets.

As noted in Waldo v. Lakeshore Estates, Inc., 433 F. Supp. 782, 790-91 (E.D. La. 1977):

> Unapproved communications to class members that misrepresent the status or effect of the pending action have an obvious potential for confusion and/or adversely affecting the administration of justice. Particularly, should such communications seem vested with official authority, there arises not only the risk of subsequent disenchantment with the judicial process, but also the danger that individuals will be induced to act to their detriment in reliance upon misinformation and/or falsehoods. Thus entailed in this abuse is something more than a general interest in orderly process which is shared by the court and the public; there is the added interest of the individual in achieving a full and fair judicial remedy. To this extent, it is important to recognize the need for restricting free expression where such presents a "reasonable likelihood" of endangering the individual's constitutional guarantee of a fair trial. (citations omitted).

The following actions engaged in by the Hornets are textbook examples of the type of coercive,

misrepresentative, and intimidating influences an employer like the Hornets must not be allowed to wield in a collective action.

### a.    The Hornets Threatened Any Current or Former Employee Who Participates in this Collective Action.

Hornets executives clearly and unambiguously told current and former employees that the Hornets would retaliate against any employee who joined this litigation. Kristy McKearn, the New Orleans Hornets' Chief Strategic Officer, had the following exchange with Chris Stant, a Hornets' Account Executive about this overtime litigation:

Stant:  "I heard there are some past and present employees involved in this."

McKearn:  "Whoever the present employees are, they won't be here for long."

See Exhibit "A". When Ms. McKearn discussed Mr. Stant's interest in the overtime litigation, she stated:

> "This is not something you want to put your name on, because you
> will never get a good reference of this place."

See Exhibit "A". **These direct threats against persons who participate in this overtime litigation are expressly prohibited under § 216 of the FLSA.**   Nevertheless, prospective opt-in plaintiffs may now believe that a decision to join this litigation will have adverse job consequences.

### b.    The President of the Hornets Sent an E-mail to All Current Employees on May 31, 2005 Forbidding Them from Speaking to Persons Who May Have Knowledge of this Lawsuit.

Less than one week after Kristy McKearn threatened to fire any employee who joined this lawsuit, Paul Mott, the current President of the New Orleans Hornets, sent an e-mail to all current Hornets employees that foreclosed a potential source of information about this litigation. In this e-

mail, Mr. Mott forbade any current employee from speaking with or contacting any employee who left the company within the last 60 days. Coupled with Ms. McKearn's direct threat made less than a week earlier, the Hornets made their position clear: any employee who contacted a former employee about the overtime suit would be terminated. Again, such threats are directly violative of 29 U.S.C. 216. This e-mail has been requested from Defendants but has not yet been produced. See Exhibit "C".

c.     **After Foreclosing Other Avenues of Information, The Hornets Engaged in a Misrepresentation Campaign to Dissuade Prospective Plaintiffs from Joining this Litigation**.

On at least three occasions, the Hornets provided false or materially misrepresented facts that dissuaded prospective plaintiffs from joining this litigation. As a result, prospective class members have been severely tainted and infected with false information and perceptions spread by the Hornets.

I.     The Director of Fan Relations Misrepresented the Opinions of this Court and the Status of this Case.

After directly threatening and then prohibiting current employees from obtaining information about this lawsuit, the Hornets engaged in a misinformation campaign. The statements made by Marie Parenti reek of bad faith. Marie Parenti, the Hornets' Director of Fan Relations and Premium Seat Services, advised her fan relations employees that the overtime suit was not going well for the Plaintiffs, and that the Court was about to dismiss this claim. See Exhibit "C". As both the Court and the Hornets are well aware, there has been no pleading of any kind filed by the Hornets that might effectuate dismissal of this claim. Because of her position as a director of the Hornets, and because the Hornets attempted to foreclose other avenues of information, the misrepresentations

made by Marie Parenti to her subordinates carried with them the air of authority and insider knowledge. See, e.g.., Belt, 299 F.Supp. 2d at 666-667. Not surprisingly, no fan relations employees have joined this lawsuit since Parenti made these misrepresentations. Of note, all fan relations employees were identified as non-exempt employees entitled to overtime pay **by the Hornets** in August of 2004. See Exhibits "B", "E".

> ii. The Senior Vice President of Communications and Community Affairs Steve Martin Advised Plaintiffs that Joining this Suit was Dangerous for Their Careers.

Steve Martin, the Hornets' Senior Vice President of Communications and Community Affairs, through one of his employees, contacted a current member of this lawsuit. During these communications, Chris Stant was advised that Mr. Martin "hoped that Chris knew what he was doing" because he was "worried" about Stant's decision to join this lawsuit. See Exhibit "A". Direct physical threats were not implied by this comment, but the potential for retaliation by the Hornets was clearly implicated. Of note, this communication from Martin to Stant occurred after counsel for the Hornets assured that no further acts, communications of intimidation or retaliation would occur. Persons entitled to overtime pay who join this lawsuit are still being targeted by the Hornets. Apparently the Hornets will not be controlled by law or by counsel.

**B.**     **Threats and Misleading Communications with Prospective Class Members Warrant Protection and Sanctions**.

This Court cannot allow the Hornets to benefit from their threatening, manipulative and retaliatory conduct. The clear intent of each of the aforementioned actions is clearly designed to limit the number of prospective class members who join this litigation through inappropriate means and to harass employees in the suit. The Hornets intended to undermine the purposes of this

collective action by encouraging absent class members not to join by preying on the fears and concerns of those persons. The Hornets must not be allowed to undermine the judicial process through their misconduct. See Waldo v. Lakeshore Estates, Inc., 433 F. Supp. 782, 790-91 (E.D. La. 1977); Belt v. Emcare, 299 F.Supp. 2d 664 (W.D. Tex 2004).

## C.    Unapproved and Misleading Communications with Class Members Warrant Protection and Sanctions

Defendants request that Exhibit "B", a Notice to Hornets Employees, be approved and delivered by the Court to all current Hornets employees in an attempt to remediate the damage that has already been caused by the actions of the Hornets. See Exhibit "G". "Unapproved notice to class members which are factually or legally incomplete lack objectivity and neutrality...[and] will surely result in confusion and adversely affect the administrations of justice." Erhardt, 629 F.2d at 846. Further, the solicitation of exclusions from a pending class action by a defendant constitutes a serious challenge to the authority of the Court to maintain control over communications with class members. See 3 Newberg on Class Actions § 15.19 (3d ed. 1992). "Unsupervised unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from these statements could well be irreparable." Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1203 (11th Cir. 1985) (citing Zarate v. Younglove, 86 F.R.D. 80, 90 (C.D. Cal. 1980)). Such conduct warrants restraint.[8]

_____

[8]Since the United States Supreme Court's decision in Gulf Oil Co. v. Bernard, 452, U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), courts have tended to view requests for orders prohibiting contact with class members skeptically in light of possible First Amendment "prior restraint" issues. Nonetheless, such First Amendment concerns fall by the wayside when the speech to be protected is misleading and deceptive, as is the case with the Hornets' actions. See e.g. Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1204 (11th Cir. 1985) ("As a threshold

In <u>Kleiner v. First National Bank of Atlanta</u>, a class of bank customers filed suit against defendant on various causes of action. Prior to the opt-out deadline, defendant began soliciting exclusions from the class from potential class members through a covert telephone campaign. Upon learning of defendant's solicitation campaign, the district court enjoined defendants from further contacts with potential class members. Defendant's solicitation campaign was found to violate the district court's class notice order, as well as the Model Rules of Professional Conduct regarding contact with persons known to be represented by counsel.

In redressing defendant's actions, the district court imposed sanctions, which included a monetary penalty against defendant's attorneys in the amount of $50,000, disqualification of counsel from participating in further proceedings in the litigation, and an assessment against defendant of the class attorney's fees and costs in the approximately amount of $60,000. The district court also extended the "opt-in" period for prospective plaintiffs. Finally, the district court ruled that the exclusion requests completed by class members would be voidable following entry of judgment. In upholding the district court's decision, th appellate court observed that "[w]hen confronted with claims pressed by a plaintiff class, it is obviously in defendant's interest to diminish the size of the class and thus the range of potential liability by soliciting exclusion requests." <u>Kleiner</u>, 751 F.2d at

---

matter, untruthful or misleading speech has no claim on first amendment immunity. Commercial speech merits constitutional safeguards only to the extent it is accurate....No constitutional objection thus inheres in banning 'forms of [commercial] communications more likely to deceive the public than to inform it...'" (citations omitted)); <u>In re Asbestos School Litigation</u>, 115 F.R.D. 22, 25 (E.D.Penn. 1987) ("Commercial speech must concern lawful activity and not be misleading for it to be constitutionally protected. <u>Bolger v. Youngs Drug Products Corp.</u>, 463 U.S. 60, 68, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983)."), order vacated in part, 842 F.2d 671 (3d Cir. 1988); <u>Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council</u>, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (holding the government may control speech that is deceptive or misleading in the commercial context).

1202. However, a defendant's campaign to dissuade class members from participating in a class action "is a classic example of a major potential abuse which necessitates restraint." Id. at 1206.

Indeed, courts have readily sanctioned defendants that have engaged in unsupervised contacts with class members. See Erhardt, 629 F.2d at 845 (enjoining defendants from further communications with class members; ordering defendants to provide new class notice advising class members that previous decisions to opt out were voidable; and imposing monetary sanctions); Impervious Paint Industries, Inc. v. Ashland Oil, 508 F.Supp. 720, 723-4 (W.D.Ky. 1981) (imposing injunction upon defendant's attorneys prohibiting contact with class members and restoring class members that opted out to the class); In Re Federal Skywalk Cases, 97 F.R.D. 370, 377 (W.D. Mo. 1983) (same); Kleiner, 751 F.2d at 1299 (same).[9] This principal holds true in FLSA collective actions as well. Davis, et al v. Metro Networks Communications, Inc., H-99-1128 (S.D.Tex.) (Judge Lake).

Similar conduct was found to be violative of the purpose of collective actions and was prohibited by the Court in Belt v. Emcare, Inc., 299 F. Supp. 2d 664 (W.D. Tex. 2003). Like Mr. Mott's e-mail and the statements made by Ms. Parenti, the Defendant in Belt sent an unapproved letter to prospective class members that "misrepresented many of the issues in this action in such a way to discourage absent class members from joining the suit." 299 F. Supp. 2d at 666. Like the Hornets, the Defendant in Belt also threatened the job stability of prospective members of the class,

_____

[9]Even in cases where courts have refrained from imposing complete restraints on defendant communications with class members, the courts have recognized that misleading communications or communications designed to influence a class member's decision to participate in the lawsuit are to be prohibited. See e.g., Rankin v. Board of Ed. Of the Wichita Pub. Schs., U.S.D. 259, 174 F.R.D. 695, 697 (D. Kan. 1997); In re Potash Antitrust Litigation, 896 F.Supp. 916, 920 (D. Minn. 1995).

albeit in a much more discreet manner than Ms. McKearn of the Hornets. 299 F.Supp. 2d at 667.

The Court in Belt opined that, "because of the potential for abuses in collective actions, such as unapproved, misleading communications to absent class members, 'a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.'" Belt, 299 F. Supp. 2d at 667, citing Gulf Oil Company v. Bernard, 452 U.S. 89, 100 (1981); Hoffman-LaRoche, Inc. v. Sperling, 493 U.S. at 171. Finding that the Defendant's conduct was misleading, coercive, and an attempt to undermine the collective action, the Court restricted Defendant's right to communicate with prospective plaintiffs about the claim.

In this case, the Hornets have systematically undermined and defied the authority of this Court and the FLSA and have created an environment wherein prospective plaintiffs cannot make a fair and informed decision to join or not join this litigation. Direct threats, overt threats, and misleading statements are precisely the type of conduct that the Court must prevent. Accordingly, the circumstances warrant the issuance of a protective order and corrective action to remedy the abuses of the Hornets.  See Haffer v. Temple University, 115 F.R.D. 506, 512 (E.D. Pa. 1987) (holding that courts routinely issue restraining orders after parties initiate improper communications with class members); accord Hampton Hardware, Inc. v. Cotter & Company, Inc., 156 F.R.D. 630 (N.D. Tex. 1994). The protection of innocent class members must be of tantamount importance when a Defendant engages in this type of inappropriate conduct.

**CONCLUSION**

This Court must sanction the Hornets for using threats, isolationist tactics, and misrepresentations to keep prospective plaintiffs from joining this collection action. It is this Court's

duty to ensure that the collection action process is not corrupted by the actions of a lawless

defendant. Accordingly, the Court should issue the attached Notice to Current Employees, sanction

defendants for its actions, and award Plaintiffs costs and attorneys fees.

Respectfully submitted, this 27ᵗʰ day of ____July____, 2005.

_____

**STEWART E. NILES, JR.  (10004)**
**DANIEL E. BURAS, JR. (26226)**
**LAWRENCE J. CENTOLA (27402)**
NILES, SALAS, BOURQUE & FONTANA, L.C.
909 Poydras Street, 35ᵗʰ Floor
New Orleans, Louisiana 70112
Telephone (504) 310-8550
Facsimile (504) 310-8595
Attorneys for Plaintiffs

**and**

**ALAN F. KANSAS (27725)**
Kansas & Kansas, L.L.C.
1743 Stumpf Blvd., Suite 200
Gretna, LA 70054-1330
Co-Counsel for Plaintiff, Samuel Tobias Steinmetz

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this day been mailed, postage

prepaid and properly addressed, to all counsel of record in these proceedings, this 27ᵗʰ day of

____July____, 2005.

_____

N0019631.WPD                    18

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EUGENE LIGER, ET AL.** | **CIVIL ACTION NO. 05-1969** |
| **Plaintiffs in a Collective Action** | **SECTION C** |
| **VERSUS** | **MAGISTRATE 05** |
| **NEW ORLEANS HORNETS NBA LIMITED PARTNERSHIP** | |
| **Defendant** | |

FILED:_____

_____
DEPUTY CLERK

### AFFIDAVIT OF CHRIS STANT FOR ATTACHMENT TO PLAINTIFFS' EMERGENCY PROTECTIVE ORDER

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

    **BEFORE ME**, the undersigned Notary, personally came and appeared:

### CHRIS STANT

who after being duly sworn, did depose and state:

1.    I was a sales employee for the New Orleans Hornets NBA Limited Partnership (hereinafter "New Orleans Hornets" or "Hornets").

2.    My job title was Sales Account Executive for the New Orleans Hornets.

3.    I was employed by the Hornets from June 1, 2003 until May 25, 2005.

4.    On or about May 10, 2005, I tendered my resignation to Chris Zaber. Chris told Brendan Donohue. Tim McDougall and Paul Mott learned about my resignation shortly thereafter.

N0019888.WPD

5. During several hours of meetings on May 11, 12, and 13, 2005, Paul Mott, Tim McDougall, and other Hornets executives, repeatedly asked me to remain with the Hornets because of my superior sales performance.

6. I advised Tim, Paul and the others that I could not work with Brendan Donohue because of the unbearable work hours he required, his credibility issues, and his questionable business practices.

7. On May 17, 2005, after several meetings where the Hornets asked me not to resign, I told Chris Zaber to accept my resignation. He did.

8. On May 26, 2005, I went to the Hornets for an exit interview. Christy McKearn was initially the only person at the meeting. In the past, Christy McKearn represented herself to be an attorney. If any Hornets employees had legal questions, we were directed to Christy McKearn. I was also told by a Hornets executive that Christy McKearn was a licensed attorney in another state.

9. Upon meeting Christy McKearn for the exit interview, I saw she was highlighting names from a list of employees. She asked me to check the list with her. The list identified sales, promotions and Fan Relations Employees, which were the names she was highlighting.
I asked: "So what is this about?"
Ms. McKearn said, "This is about people who could come back on us for overtime pay."
I said: "So this is about the Class Action?"
Ms. McKearn said: "What do you know about this?"
I said: "I talked to some people about the Class Action. I did not have much to say."
Ms. McKearn said: "This is not something you want to put your name on, because you will

never get a good reference of this place."

I said: "I heard there are some past and present employees involved in this."

Ms. McKearn said: "Whoever the present employees are, they won't be here for long."

10.     Soon after Christy made this statement, she asked me to speak to a man named Sid Lewis questioned me about whether I was aware of any attorney investigating overtime litigation against the Hornets. I learned that Sid Lewis was the Hornet's outside attorney from the Jones Walker law firm.

11.     During the remainder of my exit interview, Christy McKearn reviewed a document that appeared to be a table with names of current and former employees. Christy McKearn asked me which of the employees were current and which were no longer with the company. I asked why she wanted to know. Christy McKearn confirmed that those employees were entitled to overtime pay.

12.     I did not tell Ms. McKearn or Mr. Lewis that I contacted Mr. Buras and the other attorneys because I did not want them to know, at that time, that I was involved.  I was especially reluctant to say anything after they threatened me and anyone else who might join the suit. Also, I had not received my final check, and I did not want to have my check delayed.

13.     I later recognized the sheet that Kristy McKearn went over with me during my exit interview to be Exhibit M attached to Plaintiffs' Second Amended Complaint.

14.     Since this lawsuit was filed, I have been contacted by current Hornets employees who do not want to be identified because they are scared that they will get fired if they join this suit.

15.     During one conversation with a current Hornets' employee, I was told that Steve Martin "hoped that I knew what I was doing" and that he was worried about my decision to join this