

DANIEL E. BURAS JR.

PLEASE REPLY TO:

P.O. Box 5350
COVINGTON, LA 70434-5350
985.871.0800   *phone*
985.871.0899   *fax*
dburas@daiglefisse.com

30 August 2007

*Via Facsimile and E-mail*
Ms. Jennifer Anderson
Jones Walker
8555 United Plaza Blvd.
Four United Plaza
Baton Rouge, LA 70809-7000

*via Facsimile and E-mail*
Ms. Jane Heidingsfelder
Jones Walker
201 St. Charles Avenue
New Orleans, LA 70170

RE:   Hornets Litigation -
      USDC, EDLA, C.A. No. 05-1969 (5);
      DFK: 905-01

Dear Counsel:

Please review the following deficiencies in the Hornet's discovery responses and contact me before 4:30 p.m. today to discuss.

Further review of the Hornets responses to the document discovery ordered produced by Magistrate Chasez demonstrates that the Hornets have not produced the ordered information.

**General Deficiencies**

1.   Neither the Court nor the Federal Rules require Plaintiffs to request specific documents and/or computer records by name. The Hornets, not the Plaintiffs, know what file systems, databases, records, and names of documents might contain the information requested by Plaintiffs. It is Defendant's responsibility to investigate and obtain the file names and system names that might be responsive to Plaintiff discovery requests, especially when this information is ordered produced by the Court. Documents responsive to the general categories of documents described by Plaintiffs must be produced even if the specific systems or computer programs have not been named.

2.   The Hornets have objected to and/or claimed that they do not possess documents in this matter and have ignored those requirements of Rule 34 mandating that a Defendant produce documents that are under their custody or control. Accordingly, all information responsive to any discovery request that is maintained at the offices of the accountants or attorneys retained by the Hornets must be produced. It is the Hornets' obligation to identify, retrieve,



      and produce these documents. To date, no such documents have been produced except for one set of documents obtained from the NBA.

3. Summary information is not acceptable. Plaintiffs have specifically alleged in the litigation against the New Orleans Hornets that the financial and ticket sales information for the team has been corrupted through intentional manipulation of the underlying data. See the Complaints filed in federal court and in state court for confirmation. Accordingly, summary information set forth in documents the Hornets have elected to produce in this litigation may or may not be valid. The underlying data has been requested in almost all instances to verify the information reported in summaries produced. In almost all cases, supporting documentation has not been provided by the Hornets.

4. The information produced to date proves that the Hornets have not conducted a proper investigation and review of the electronic storage & communication systems of the Hornets. No e-mails except those printed in hard copy or in penny Middleton's saved files have been produced. Defendants identified documents to include electronic documents and e-mails. Accordingly, the Hornets have not complied with the Court's order to produce this information.

**Specific Objections.**

**As to Request No. 1:**

**Defendants were to produce copies of any exhibits that the Hornets will rely upon to support any defense to this litigation.**

The Hornets have produced no financial or revenue data for the year 2001 and have produced only partial revenue data for the year 2002.

The Hornets have provided no audited financial statements for any years.

The Hornets have only produced Operating Account summaries for the time period of June 2003 through March of 2005.

The Hornets have produced no documents identifying which months were selected and/or the yearly basis used the Hornets used in their calculations for determining that the Hornets met the 66% test for purposes of the Amusement/recreation exemption.

The Hornets have not produced any data related to Commission Compensation Committee meetings related to sales commissions paid to employees.

Correspondence received from the Hornets indicates that all money received by the Hornets will be considered retail sales. Supporting documentation for any alleged retail sale has not been provided.

If any of the aforementioned information is maintained at the offices of the accountants or attorneys retained by the Hornets on behalf of the Hornets, the Hornets are obligated to retrieve and produce these documents. To date, no such documents have been produced.

**As to Request No. 5:**

**The Hornets were to produce copies of all financial, revenue, and/or ticket sales information provided to the NBA since 2002.**

The New Orleans Hornets produced no information subject to this request until approximately one hour before the hearing on the Motion for Contempt and Sanctions and Motion to Compel that took place on 29 August 2007. Said information was therefore produced 12 days late.

Plaintiffs have alleged that the New Orleans Hornets manipulated tickets sales and/or revenue data during the 2003-2004 and/or the 2004-2005 seasons to allow the team to avoid a multi-million dollar penalty from the NBA. No information related to this topic has been produced.

The New Orleans Hornets sent daily ticket sales reports to the NBA following each home game. Plaintiffs do not know how this information was transmitted, only that it was transmitted after each game. No information related to this topic was provided.

Upon information and belief, the NBA conducted audits of the ticket systems for the New Orleans Hornets. No information concerning any audits was produced in this matter. Whether this information is maintained at the Hornets' offices or at the offices of the Hornets attorneys or CPAs, it should have been produced.

**As to Request No. 8:**

**The Hornets were to produce copies of all financial, revenue, and/or ticket sales information provided to the State of Louisiana since 2002.**

It was confirmed at yesterday's hearing that the Hornets have not produced the affidavit or any of the supporting documentation that was provided to the State to obtain millions of dollars in rebates under the Louisiana Quality Jobs Program. Since the Hornets received at least two multi-million dollar payments from the state, at least two separate sets of documents were submitted to the state under the terms of the Quality Jobs Program law. None were produced. If this information is maintained at the offices of the accountants or attorneys retained by the Hornets on behalf of the Hornets, the Hornets are obligated to retrieve and produce these documents. To date, no such documents have been produced.

In addition to this information, the incentive contract that the Hornets entered into with the State of Louisiana has not been produced. To date, the only document

produced is an unsigned copy of a two page document that references the larger agreement.

### As to Request No. 11:

**The Hornets were to produce copies of all financial, revenue, and/or ticket sales information provided to the City of New Orleans since 2002.**

Public records have indicated that the City of New Orleans provided the New Orleans Hornets with rebates, payments, and other tax incentives and/or tax breaks since the team came to New Orleans.

The New Orleans Hornets claim that they are a retail operation. No retail sales tax records have been produced in this litigation.

For several years the media has reported that the New Orleans Hornets have entered into several "deals" related to practice facilities at various locations other than the New Orleans Arena. No information related to any of these deals has been produced. Whether the Hornets or their attorneys possess this information, it must be produced.

Public reports indicated that the New Orleans City Council offered the Hornets $6.5 as part of their relocation package from Charlotte to New Orleans. No documents reflecting any payment from the City of New Orleans has been produced.

In 2004 the Hornets entered into negotiations with the New Orleans City Council and Councilwoman Cynthia Willard Lewis for release millions of dollars in payments for a new practice facility. Public comments made by Councilwoman Willard-Lewis specifically mentioned public availability of the practice facilities and other issues related to fiscal aspects of the project. The New Orleans Hornets produced no information related to any financial or public availability information provided to the City. If this information is in the possession of the Hornets attorneys, it must be disclosed.

### As to Request No. 15:

**The Hornets were to produce copies of all Archtics Notes entered into the database by any Plaintiff.**

The disc provided by the New Orleans Hornets reportedly containing Archtics information ordered to be produced is corrupted and cannot be opened by Plaintiffs. Plaintiffs hereby request a printout of the information contained in DEF Docs 3456 - 4564.

**As to Request No. 18:**

**The Hornets were to produce copies of the contents of Penny Middleton's computer on her "P" drive.**

Plaintiffs have raised their objections to all redacted information related to the document reflecting non-exempt employees. Based on the Hornets' confirmation that the redacted information is identical to a document already produced, Plaintiffs accept that this document is identical to the document already produced.

Plaintiffs hereby object to the redaction of individual information redacted on documents 2874-2881 and 2909-2912. If this information was actually provided to the State of Louisiana pursuant to the Quality Jobs Program, Plaintiffs object to the classification of any part of this document as confidential and subject to a protective order because it is a matter of public records. To the extent that social security numbers are redacted to protect the identities of individual employees, Plaintiffs will agree to the redaction of social security numbers.

**As to Request No. 19:**

**The Hornets were to produce copies of all documents distinguishing or otherwise identifying amounts paid to any Plaintiff resulting from commission sales.**

The Hornets have produced only limited information contained in payroll records and have failed to expand their search to include all relevant documents. The Hornets' limitation of their search to personnel records has ignored Plaintiffs' allegations that they were not paid thousands of dollars for sales that they made, but for which they did not receive commissions.

The Hornets have produced no documents or information related to the sales database that was used by all sales employees to track their sales activity on customer and prospective customer accounts. To date, the Hornets have not even identified that this database exists.

The Hornets have not produced any information related to decisions rendered by the Commission Compensation Committee, the organizational body that is contractually obligated to determine commission payments and render decisions related to commission disputes involving sales personnel pursuant to the terms and conditions of Plaintiffs' Commission Compensation Agreements.

Although the Hornets maintained the database and/or storage for all e-mails, the Hornets have produced no e-mails or other documents sent by any Plaintiffs to sales directors or sales managers wherein disputes regarding commission sales were discussed.

No e-mails, documents, or other memos were produced directing the personnel department or the finance department to credit any Plaintiff with any sale.

The Hornets have not identified any documents produced by Adrianna Johnson wherein she tracked ticket sales of each employee per discussions with the Court.

### As to No. 20:

**The Hornets were to identify which specific documents are responsive to each of this requests subparts, A-L.**

The Hornets failed to respond to this order of the Court. Rather than responding to each requested subpart, the Hornets submitted a paragraph response that was not specific to any subpart.

### As to Request No. 22:

**The Hornets were to produce all documents identifying any revenue received from the State of Louisiana or the City of New Orleans related to payments received by the Hornets to remain in New Orleans.**

The discussions related to No. 8 and No 11 above set forth several areas that may be responsive to this request.

To date, the Hornets have only produced a single two page, unsigned agreement that refers to another larger, more incentive laden contract. The larger, incentive laden contract was not produced.

Media documents indicate that the state pays over $1,000,000 in costs associated with the New Orleans Arena. No documents reflecting this agreement or payments received by the Hornets pursuant to any such agreement have been produced.

In addition to the larger incentive laden contract that the Hornets signed to move to Louisiana that has not been produced, the Hornets entered into a contract with the Louisiana Board of Commerce and Industry or its Successors through which the Hornets obtained millions of dollars through the Louisiana Quality Jobs Program.

No documents reflecting any agreements with the New Orleans City Council or the City of New Orleans to pay money or build facilities for the Hornets have been produced.

The State of Louisiana has negotiated through SMG and/or the Superdome Commission. No agreements entered into by the Hornets through which they derived benefits or revenue has been produced.

### As to Request No. 28

**The Hornets were directed to supplements it response to state that there were no written job descriptions that existed contemporaneously with plaintiffs' employment above and beyond what may have been contained in the personnel files that were previously produced.**

The Hornets ignored the Court's Order despite confirmation during the hearing that the information produced in exhibits D984-993 was not contemporaneous with the Plaintiffs in this matter. Upon information and belief, the above referenced documents were printed in 2004/2005 and were not particular to any plaintiff.

### As to Request No. 29

**The Court directed Plaintiffs to obtain information related to all documents substantiating the Hornets' claim that they are exempt from overtime law under the recreational or amusement exemption during the 30(b) (6) deposition.**

However, Plaintiffs restate their earlier demands that this information should have been produced pursuant to the earlier orders of the court. In particular, the 12 months period and the months selected by the Hornets for purposes of calculating their 66 2/3% revenue burden must be identified to Plaintiffs.

### As to No. 38:

**The Hornets were directed to produce a copy of all Archtics Notes entries for each plaintiff for the entire period of employment for each Plaintiff.**

As was discussed above, the disc provided by the Hornets is corrupted and no documents can be obtained from the disc.

### As to No. 40

**The Hornets were directed to produce or provide a privilege log related to all e-mails, memos, correspondence, notes, or other documents sent by or prepared by 17 identified persons related to overtime compensation or comp time.**

The Hornets did not identify a single document in response to this request despite admissions in earlier affidavits that the Hornets received e-mails and memoranda from the Director of Human Resources and Personnel on this issue.

In addition multiple communications from Ms. Middleton on this issue that are in the Hornets' possession and control, in the fall of 2004 all employees were advised that they were to track their time to ensure that they did not work more than 40 hours a week. Plaintiffs received these communications from their superiors. Although this

lasted only for a short time, it clearly reflected discussions that originated with Ms. Middleton's inquiries.

Furthermore, the policy and procedure of the New Orleans Hornets while in Charlotte was to give employees time off if they worked more than 40 hours a week. Whether this was properly classified as "comp" time is irrelevant because that is the term used by the Hornets when the team was in New Orleans during meetings discussing overtime in 2004.

Multiple Plaintiffs approached the director of human resources regarding overtime payments. No e-mail communications with Ms. Middleton and any Plaintiff or notes taken by Ms. Middleton were produced.

It is clear that no e-mail or computer system searches were performed by the Hornets on this topic.

### As to No. 42

**The Hornets were directed to supplement its response to produce any additional responsive information or notes related to 28 identified customers.**

The Hornets have produced no documents related to compensation committee reports directing payment to any sales person for these customers.

The Hornets have produced no e-mails, memos, or other document directing the personnel department or finance department to pay any sales person for the sale of tickets to the identified persons.

The Hornets have produced no data from their sales databases other than Archtics reflecting Plaintiffs' actions in selling these accounts.

### As to No. 43:

**The Hornets were directed to supplement its response to provide documents bearing upon how Plaintiffs were compensated from Toys for Toys.**

The Hornets responded that they had no responsive documents.

Plaintiffs do not doubt that this is true because the allegation in this case is that Plaintiffs were not compensated for Toys for Tots ticket sales.

The Court clearly expected the Hornets to respond that they did not compensate Plaintiffs for Toys for Tots ticket sales.

### As to No. 45

**The Hornets were ordered to supplement its response to state that all responsive documents have been produced.**

However, not one e-mail was produced that was sent to any Director of Ticket Operations or any of the Ticket Operations employees directing them to change the designated account representative. Plaintiffs received such e-mails during their tenure with the Hornets.

The Hornets clearly have not searched any e-mail databases or document storage databases to obtain this information that exists in their computer systems.

### As to No. 50

**The Hornets were ordered to respond if other employees were performing functions that Plaintiffs performed.**

The Hornets did not respond to the Court's order. Instead, the Hornets directed plaintiffs to job descriptions that do discuss or mention any of the current positions or job titles.

## INTERROGATORY DEFICIENCIES

Upon further review of the interrogatory responses, the following deficiencies were revealed.

### As to Int. No. 10:

**The Court ordered the Hornets to provide charts of organization from 2002 until the date all Plaintiffs' employment ended.**

The Hornets referred Plaintiffs to a 2005 organizational chart. No information from 2002-2004 was provided, nor were any changes in management that took place in 2005.

### As to Int No. 12 & 13

**The Court ordered the hornets to identify all facts and evidence that the Hornets will rely upon to substantiate the team's claim that any Plaintiff is exempt from the FLSA's overtime provisions.**

Although the Hornets specifically discuss the two thirds test in their response, the Hornets failed to identify the annual basis or the months that the Hornets selected to meet their 66 2/3% threshold under the Amusement/recreation exemption.

### As to Int No. 29:

**The Hornets were directed to provide the dates of Select-A-Seat events.**

The Hornets answered that they did not have this information. This is untrue and subject to the spoliation rules of the Court. The dates of Select-A-Seat events used to be advertised on the Hornets website during the summer of 2005. This information is no longer on the website and has been removed since the filing of this litigation.

The Hornets organized select-a-seat events each year of their existence in New Orleans. These events were advertised in the newspaper and other media. For the reasons set forth above regarding the Hornets failure to properly investigate electronic records, Plaintiffs contend that the Hornets response is unacceptable.

### As to No. 43

**The Hornets were directed to identify all persons other than Barbara Booth who calculated, attempted to calculate, and/or determined the commissions owed to any named Plaintiff on accounts paid in full after their last day of employment with the Hornets.**

The Hornets ignored the direction of the Court and responded only that different persons performed these duties including sales directors and various individuals in the accounting and payroll areas of the organization. No individuals were identified.

Regards,

Dan Buras

DEB/ral

cc:  Bryan Knight
     Stewart Niles
     Elvige Cassard