## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| EUGENE LIGER, ET AL, | * | CIVIL ACTION NO. 05-1969 |
| **Plaintiffs in a Collective Action** | * | |
| | * | SECTION C |
| | * | |
| versus | * | MAGISTRATE 05 |
| | * | |
| NEW ORLEANS HORNETS NBA LIMITED | * | |
| PARTNERSHIP, | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR CONTEMPT AND SANCTIONS</u>

**MAY IT PLEASE THE COURT**:

Plaintiffs have been ambushed by the Hornets through an untimely, eleventh hour disclosure of a "roomful" of financial records, 70 boxes of newly discovered records, and the admission that no documents under the custody or control of the Hornets have been produced in this litigation until now. The entire landscape of this litigation has profoundly changed because of this egregious and bad faith conduct of the Hornets that now renders false all prior representations made by the Hornets regarding the completeness and accuracy of all prior discovery responses made over the last two years.

The cavalier attitude with which the New Orleans Hornets NBA Limited Partnership have blatantly ignored the Orders of this Court and the Federal Rules of Civil Procedure are well documented. Now, less than three months before trial, new developments require this Court to strike the answer and defenses of the Hornets and enter a default judgment in favor of the Plaintiffs to preserve the integrity of this Court's



EXHIBIT
C

Dockets.Justia.com

decisions and to prevent Plaintiffs from being irreparably harmed by the misconduct of the Hornets.

For over two years, the Hornets have undermined the discovery process by misrepresenting to Plaintiffs and this Court that documents, data, and other information requested by Plaintiffs did not exist. Most information that the Hornets denied the existence of certain documents addressing finances, ticket revenue, ticket sales information, plaintiff sales information, and other specific information related to alleged defenses asserted by the Hornets. The Hornets made this representation through multiple signed pleadings, in oral arguments to the Court, and in response to Court Orders. The facts learned within the last week prove that most of the information did exist, but the Hornets willfully chose not to produce this information for two years.

At the Motion for Contempt hearing on August 29, 2007, Magistrate Chasez directed Plaintiffs to notify the Court and the Hornets of any responses not fully and completely answered by the Hornets in accordance with the Court's August 3, 2007 order. On August 30, 2007, Plaintiffs faxed the Hornets a ten page letter setting forth both general and specific categories of documents that were not produced. See Exhibit A. On August 31, 2007, the Hornets and Plaintiffs engaged in a three hour telephone conference to discuss the Hornets' violation of the Court's Order. **During this conference, the Hornets made astonishing admissions confirming that they are guilty of willful and egregious violations of the Orders of this Court and the rules of discovery since the case was first filed**.

**At approximately 3:00PM on September 5, 2007, Jennifer Anderson called undersigned counsel and advised Plaintiffs the defendant miraculously located a**

**whole roomful of records and 70 boxes of documents that the Hornets recently discovered. The Hornets told Plaintiffs that at least three full bankers boxes of responsive documents have now been identified. In addition to this grossly untimely discovery of documents, the Hornets also claimed that it located a "voluminous" section of financial records so large in size that counsel for the Hornets advised that these documents will be made available for inspection at the offices of Jones Walker. That these documents were only just located or identified is contemptuous.**

The Hornets have lost all credibility in this case. This is precisely the ambush tactic that Plaintiffs warned the Court that the Hornets were planning. The Court has repeatedly given the Hornets the benefit of the doubt based on clear and direct assurances that no other documents existed in this case. All representations made by the Hornets to the Court about the completeness of any response were false. The Court must impose the severest of sanctions against the Hornets for their bad faith handling of this case. Unless the Court takes immediate and severe steps to ensure the integrity of this litigation, the Court will effectively allow the Hornets to undermine all of the planning, expenses, and work performed by Plaintiffs based on the presumed truthfulness of the Hornets discovery responses to the Court and to Plaintiffs. The truth is apparent to all who wish to see it – for over two years the Hornets willfully and intentionally failed to conduct an adequate investigation of any discovery matter in this litigation and then misrepresented their investigation to the Court. **Every representation about the completeness and adequacy of all prior discovery responses made by the Hornets' to both Plaintiffs and the Court since this claim was first filed was clearly false.**

Neither the Court nor Plaintiffs should place any credibility in the Hornets'

response that all responsive documents have now been disclosed. This misrepresentation has been made several times before. The Court cannot allow this type of discovery abuse to continue.

**If the Court does not strike the defenses of the Hornets to send a message to this belligerent defendant who callously and blatantly ignored the federal rules of discovery and orders of the Court, this Court will be effectively rewarding the Hornets for their misconduct.** Plaintiffs must not be forced to rework their entire case because of this latest disclosure of thousands of pages of "newly discovered" documents.

Plaintiffs have already been irreparably harmed by the Hornets tactics in this litigation. There is no way that counsel for Plaintiffs can adequately prepare and take the 30(b)(6) deposition of the Hornets when thousands of pages of documents have not yet been produced, including "volumes" of financial records that are only available upon inspection and review. At the same time, Plaintiffs can no longer delay the 30(b)(6) deposition because of time delays associated with trial preparation. Plaintiffs do not want to continue this trial. Plaintiffs have already waited long enough to receive the wages that they have not been paid.

It would be a travesty of justice to allow the Hornets to succeed in ambushing Plaintiffs with documents that should have been produced two years ago on the eve of the 30(b)(6) deposition. Further delays are unacceptable and only prejudice Plaintiffs. **Striking the Hornets' defenses and entering default judgment is the only valid option that the Court can implement under these circumstances. Anything less would be equivalent to sanctioning Plaintiffs for the Hornets' misconduct.**

It is well settled in the Fifth Circuit that a district court is well within its powers if

4

it dismisses the defenses of a defendant like the Hornets who have consistently displayed a flagrant refusal to comply with the discovery process and the Orders of the district court. See Emerick v. Fenick Industries, Inc., 539 F.2d 1379, 80 (5th Cir. 1976) (when a recalcitrant party has unscrupulously delayed the discovery process and demonstrated a "flagrant bad faith and callous disregard of its responsibilities, the district court's choice of the extreme sanction is not an abuse of discretion."). An appellate court would limit its review of the district court's decision to strike defenses based solely on a determination of whether that party's conduct was so flagrant as to justify striking its pleadings. Id. Any single section of the attached memoranda is sufficient to justify the imposition of severe sanctions. Taken as a whole, however, there is overwhelming evidence confirming that the Hornets have jeopardized the integrity of the Court and the judicial process through their misconduct. It is only through the deterrent aspects of Rule 37(b)(2) sanctions that the court can protect Plaintiffs, the Court's integrity, and the discovery orders of other Courts from Defendants who otherwise would feel free to flout the Orders of this Court. Id.

I.    **THE HORNETS ADMITTED TO FACTS CONFIRMING THAT DEFENDANT CANNOT CERTIFY THAT ANY DISCOVERY RESPONSE GIVEN BY THE HORNETS SINCE THIS LITIGATION WAS FILED IS COMPLETE OR ACCURATE.**

In addition to the thousands of pages of information that the Hornets now claim they will produce, other damning information regarding the Hornets' callous disregard for the rules of discovery came from admissions made by the Hornets on August 31, 2007. The Hornets admitted that the team did not produce any documents or answers responsive to ANY discovery request since this litigation was first filed if the responsive information was not <u>physically located</u> in the Hornets offices. The Hornets admitted that

they conducted no investigations of persons, lawfirms, attorneys, accountants, accounting firms, advertising firms, consultants, or any other third parties who may have Hornets documents responsive to the discovery requests sent by Plaintiffs since July of 2005, regardless of whether those documents were under the legal control of the Hornets. In fact, counsel for the Hornets claimed that there existed no legal authority requiring the Hornets to obtain any such information responsive to any discovery request. **The admission applies to all discovery responses in this matter, not just those discovery requests that the Court has ordered produced in two separate orders.**

Clearly, the Hornets have systematically adopted a practice of delaying discovery, misrepresenting answers to the court, and knowingly conducting sub-standard investigations in response to Court Orders and discovery requests since this suit was first filed. This court must impose severe sanctions on the Hornets because that ALL responses to ALL discovery propounded by Plaintiffs, including those wherein the Court compelled the Hornets to answer discovery, were incomplete, inaccurate, and/or misleading. The Hornets cannot be permitted to benefit from two years of responses that they knowingly and willfully misrepresented to the Court and Plaintiffs to be true, complete and accurate responses. Now that the Hornets have admitted that no prior response to any request included any information that may have been contained in any materials the Hornets gave to third parties under their control,[1] every discovery response previously answered by the Hornets is meaningless.

The Hornets made no effort to obtain documents from other attorneys **in defense counsel's own firm** that may be responsive to Plaintiffs' discovery requests and the Orders of this Court. The Hornets bad faith refusal to produce documents that were

---

[1]  Current trial counsel in this litigation are not included amongst attorneys with information not provided.

6

located in the **same law firm as their trial counsel** warrants dismissal of the Hornets defenses. This blatant violation clearly proves that the Hornets intentionally chose not to produce information readily available to the Hornets.

The Hornets also failed to identify or produce any documents in the possession of any other attorneys that the Hornets may have used over the last five years. To date, no other attorneys or law firms have been identified.

The Hornets cavalierly admitted that no financial documents under their control were produced in this litigation unless the documents were physically located in the Hornets' offices.[2]   No efforts were made by the Hornets to obtain any financial documents from any persons maintaining any records for the Hornets regardless of whether the Hornets controlled the production of these documents. In fact, the Hornets moved to quash the subpoena issued by Plaintiffs to KPMG, the Hornets' accounting firm.

The Hornets have denied the existence of any advertising materials related to Select-A-Seat events and other advertised non-basketball related events hosted by the Hornets. The Hornets have not identified or produced any documents from any advertising firm that they used to market and publicize these events, and have not identified the marketing or advertising firm used.

The Hornets refused to produce, identify, or admit the existence of a database **in their possession** containing the prospective sales notes of Plaintiffs since this matter was first filed. Since July of 2005, the Hornets have represented to the Court and Plaintiffs

---

[2]   The sole exception was the Hornets' production on August 29, 2007 of an annual summary of financial data provided to the NBA that the Hornets alleged they received from the league offices. In addition, on September 5, 2007 the Hornets indicated that they would produce the KPMG records TWO years after they were first requested and three weeks after they were ordered produced by the Court.

that no such information existed. On August 31, 2007, the Hornets admitted that an entire database with information relevant to the sales activities of Plaintiffs has been omitted from all discovery responses previously given by the Hornets.  The Hornets now claim that this database will be produced. This clearly demonstrates a callous disregard for the Orders of this Court and the rules of discovery.

The Hornets admitted to Plaintiffs that the team conducted only a cursory investigation as to any discovery requests the Hornets felt were overbroad (most of the discovery request were ordered produced by the Court on August 3, 2007).  However, **from August of 2005 until the Court ordered the documents produced on August 3, 2007, the Hornets allowed the evidence and witnesses to disappear**. The Hornets now claim that any alleged deficiencies in responses provided over the last month were caused by turnover within the organization over the last two years rather than by the teams' own negligent investigation.

The Hornets admitted that they did not produce documents broadly requested by Plaintiffs unless the documents were specifically requested by name.  The prospective sales database discussed above is one example. Another is Plaintiffs request for all financial, revenue, or ticket documents provided to the NBA. The Hornets did not produce or acknowledge the existence of any e-mails or other documents provided by the Hornets to the NBA after each home game with this information.  During the August 31, 2007 hearing, the Hornets advised Plaintiffs that they would **initiate** an investigation into the existence of these documents **– two years after they were first requested and over one month after the Court ordered them produced.**

8

Similarly, no information provided by the Hornets to obtain millions of dollars from the State of Louisiana or the City of New Orleans. Interestingly, the Hornets claim that all such money was retail in nature, although at least one statute under which the Hornets obtained millions of dollars indicates that it was for a tax rebate. Moreover, certain statutes under which the Hornets obtained millions of dollars required the Hornets to produce information directly at issue in this litigation such as hours worked, rates of pay, weeks of employment, and the situs where employees worked.

Plaintiffs have alleged since they first filed suit that the financial information contained in the Hornets financial and computer databases was corrupted by inappropriate actions by various Hornets employees. The Hornets have now presented no less than 5 different sets of financial figures related to revenue generated by the team. Counsel for the Hornets has now indicated that a sixth set of financial data may soon be presented. Media reports indicate that the Hornets reported a seventh revenue figure to Oklahoma City, but the Hornets have refused to produce this information. No supporting or underlying data for any of the six – seven sets of financial data has been provided.

Further exacerbating the Hornets' conflicting revenue figures is the teams' refusal to comply with Court orders requiring the Hornets to clarify to Plaintiffs which data the Hornets will rely upon to prove their affirmative defenses.

Similarly, the Hornets refuse to provide information regarding which months the Hornets will use to support their 66 2/3% revenue test required under the Amusement/recreation exemption defense.

The law clearly and unambiguously requires the Hornets to obtain and produce documents beyond those that they physically possessed.

9

**Rule 34(a) of the Federal Rules of Civil Procedure, states that "[a]ny party may serve on any other party a request (1) to produce ... any designated documents ... which are in the possession, custody, or control of the party upon whom the request is served." FRCP Rule 34(a). Federal courts have consistently held that documents are deemed to be within the "possession, custody, or control" of a party for purposes of <u>Rule 34</u> if the party has actual possession, custody, or control, *or has the legal right to obtain the documents on demand* or has the practical ability to obtain the documents from a non-party to the action.**

Typically what must be shown is a relationship, either because of some affiliation, employment or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession. **The applicable test is whether the litigant has the ability to obtain the documents on request to a related party, either as a matter of law or as a matter of practical fact.**

Generally a "party is charged with knowledge of what its agents know or what is in records available to it." *See <u>Poole v. Textron, Inc.</u> 192 F.R.D. 494, 501 (D.Md.).* <u>Rule 34</u> is broadly construed and documents within a party's control are subject to discovery even if owned by a nonparty. *See <u>Commerce and Industry Insurance Co. v. Grinnell Corp., 2001 WL 96377 * 3 (E.D.La.).</u>* The burden is on the party seeking discovery to make a showing that the other party has control over the material sought. When determining the sufficiency of control of sought. When determining the sufficiency of control of material for purposes of <u>Rule 34</u>, the nature of the relationship between the party and the non-party is the key. *See <u>Goh v. Baldor Electric Co., 1999 WL 20943 at * 2 (N.D.Tex.).</u>*

<u>U.S. ex rel Stewart v. Louisiana Clinic</u>, 2003 WL 21283944 (E.D. La. 2003); <u>Commerce & Industry Ins. Co. v. Grinnell Corp.</u>, 2001 WL 96377 (EDLA 2001). A client who gives or stores documents with their agent, attorney, accountant, or CPA has the legal right to obtain those documents upon request. Therefore, the Hornets must produce these documents.

The Hornets clearly, overtly, and flagrantly violated this Court's Orders pursuant to Federal Rule 34's "custody, or control" requirement since the outset of this litigation. Through willful and intentional omissions of all such information the Hornets were able

to mislead the Court and Plaintiffs on all issues in this litigation. The Hornets' misconduct is clear, indefensible, and should subject the team to severe sanctions.

The aforementioned conduct is indefensible and reprehensible. This conduct demands that the Court impose the severest of sanctions against the Hornets, up to and including that default judgment be entered against the Hornets in this matter.

## II.    **THE HORNETS FLAGRANTLY DISREGARDED THE COURT'S AUGUST 3, 2007 ORDER BECAUSE IT DID NOT PRODUCE ALL RESPONSIVE DOCUMENTS.**

No defendant should be allowed to openly defy the order of a federal judge as the Hornets have attempted to do in this matter.  The Hornets now admit that thousands of pages of responsive documents wee not produced.  There can be no clearer evidence of a defendant's ruthless and callous violation of a Court order. The Hornets defenses must be stricken based on their blatant refusal to produce information in accordance with this Court's August 3, 2007 Order.

It is <u>uncontroverted</u> that the Hornets significantly and brazenly violated this Court's August 3, 2007 Order.  Counsel for the Hornets admitted that there exist multiple categories of documents that have still not yet been produced to Plaintiffs – at least three banker boxes worth of documents to date.  The unproduced documents are not singular pages that the Hornets overlooked in their production efforts. Entire classes of documents, including ALL documents that the Hornets gave to attorneys other than the trial attorneys in the present litigation were not produced.  Just as egregious was the Hornets' decision to withhold the identities of these third parties from Plaintiffs, thereby preventing Plaintiffs from discovering the extent of the deception against this Court and Plaintiffs.

In addition to aforementioned general deficiencies, the following specific violations of the Court's August 3, 2007 Order – deficiencies related to nearly every item ordered produced - were identified:

**As to Request No. 1: Defendants were to produce copies of any exhibits that the Hornets will rely upon to support any defense to this litigation.**

The Hornets have produced no financial or revenue data for the year 2001 and have produced only partial revenue data for the year 2002 and 2005.   The Hornets provided no audited financial statements for any years. The Hornets produced incomplete Operating Account summaries for the time period of June 2003 through March of 2005. The Hornets produced no documents identifying which months were selected and/or the yearly basis used the Hornets used in their calculations for determining that the Hornets met the 66% test for purposes of the Amusement/recreation exemption.   The Hornets have not produced any data related to Commission Compensation Committee meetings related to sales commissions paid to employees as is required in Plaintiffs' Commission Compensation Agreements.   Correspondence received from the Hornets indicates that all money received by the Hornets will be considered retail sales.   Supporting documentation for any alleged retail sale has not been provided.

**As to Request No. 5: The Hornets were to produce copies of all financial, revenue, and/or ticket sales information provided to the NBA since 2002.**

The New Orleans Hornets produced no information subject to this request until approximately one hour before the hearing on the Motion for Contempt and Sanctions and Motion to Compel that took place on 29 August 2007.   Said information was therefore produced 12 days late.   All discovery has been withheld related to Plaintiffs allegation that the New Orleans Hornets manipulated tickets sales and/or revenue data

12

during the 2003-2004 and/or the 2004-2005 seasons to allow the team to avoid a multi-million dollar penalty from the NBA. All evidence has been withheld regarding the daily ticket sales reports sent by the Hornets to the NBA following each home game. All information of NBA audits of ticket and revenue data has been withheld.

**As to Request No. 8**: **The Hornets were to produce copies of all financial, revenue, and/or ticket sales information provided to the State of Louisiana since 2002.**

The Hornets withheld all evidence submitted to the State of Louisiana to obtain at least two multi-million dollar payments from the state. The Hornets have withheld all evidence of any retail sales tax records related to their retail sales functions. The Hornets have withheld all information related to the incentive contract that the Hornets entered into with the State of. To date, the only document produced is an unsigned copy of a two page document that references the larger agreement.

**As to Request No. 11**: **The Hornets were to produce copies of all financial, revenue, and/or ticket sales information provided to the City of New Orleans since 2002.**

The Hornets have withheld all evidence of rebates, payments, and other tax incentives and/or tax breaks provided by the City of New Orleans since the team came to New Orleans. The Hornets have withheld all local retail sales tax records supporting their allegations that the teams is a retail operation. The Hornets have withheld all financial and revenue data provided to the City of New Orleans during negotiations for a $6.5 million practice facility. No information provided to the City of New Orleans

related to public availability of the practice facilities and other issues related to fiscal aspects of the team's practice facility were disclosed.

**As to Request No. 19:  The Hornets were to produce copies of all documents distinguishing or otherwise identifying amounts paid to any Plaintiff resulting from commission sales.**

The Hornets have produced only limited information contained in payroll records and have failed to expand their search to include all relevant documents.  The withheld a database of information proving that Plaintiffs are entitled to commissions. The Hornets withheld all information related to decisions rendered by the Commission Compensation Committee.  The Hornets withheld all e-mails or other documents sent by any Plaintiffs to sales directors or sales managers wherein disputes regarding commission sales were discussed.  The Hornets withheld all e-mails, documents, or other memos directing the personnel department or the finance department to credit any Plaintiff with any sale.  The Hornets failed to produce a binder of documents prepared by their former finance manager, Adriana Johnson.

**As to Request No. 22:    The Hornets were to produce all documents identifying any revenue received from the State of Louisiana or the City of New Orleans related to payments received by the Hornets to remain in New Orleans.**

The discussions related to No. 8 and No 11 above set forth several topics confirming that the Hornets violated this part of the Order as well. In addition, the Hornets refused to produce any executed documents with the State and have produced only a single two page, unsigned agreement that refers to another larger, more incentive laden contract with the State. The Hornets withheld all documents related to over

14

$1,000,000 in Arena costs regularly paid by the State. The Hornets withheld all documents related to money received from or financial revenue provided to SMG and/or the Superdome Commission.

**As to Request No. 29:** **The Court directed Plaintiffs to obtain information related to all documents substantiating the Hornets' claim that they are exempt from overtime law under the recreational or amusement exemption during the 30(b) (6) deposition.**

The Hornets refuse to clarify the basis of this exemption. In particular, the time period that the Hornets claim they were in operation, the months selected by the Hornets for purposes of calculating their 66 2/3% revenue test, or any information or leases related to the offices and sites where the Hornets employed people have been produced.

**As to No. 40:** **The Hornets were directed to produce or provide a privilege log related to all e-mails, memos, correspondence, notes, or other documents sent by or prepared by 17 identified persons related to overtime compensation or comp time.**

The Hornets admittedly withheld all information on this subject unless the word "overtime" was specifically used in the e-mail or document. For example, in the fall of 2004 all employees were advised that they were to track their time to ensure that they did not work more than 40 hours a week. Plaintiffs received these communications from their superiors. The Hornets claimed during discussions with Plaintiffs that any documents or e-mails mentioning a 40 hour work week limitation were not responsive to any Plaintiff request because it did not specifically mention the word overtime.

**As to No. 42**: **The Hornets were directed to supplement its response to produce any additional responsive information or notes related to 28 identified customers**.

The Hornets withheld all information related to compensation committee reports directing payment to any sales person for these customers. The Hornets withheld all e-mails, memos, or other document directing the personnel department or finance department to pay any sales person for the sale of tickets to the identified persons. The Hornets withheld all sales data from the "newly discovered" sales database.

**As to No. 43**:  **The Hornets were directed to supplement its response to provide documents bearing upon how Plaintiffs were compensated from Toys for Toys.**

The Hornets withheld all responsive information and produced only limited descriptions of the Hornets Toys for Tots campaign previously produced by Plaintiffs

**As to No. 45:** **The Hornets were ordered to supplement its response to state that all responsive documents related to the Toys for Tots campaign have been produced.**

The Hornets have withheld e-mails sent by Hornets management to sales employees or e-mails from any sales employee. Moreover, all information related to the actual delivery of any tickets or money to the Toys for Tots program have been withheld.

**As to No. 50:** **The Hornets were ordered to respond if other employees were performing functions that Plaintiffs performed**.

The Hornets did not respond to the Court's order.

Upon further review of the interrogatory responses, the following deficiencies were revealed.

**As to Int. No. 10**:  **The Court ordered the Hornets to provide charts of organization from 2002 until the date all Plaintiffs' employment ended.**

The Hornets withheld all organizational information other than for the year 2005.

**As to Int No. 12 & 13**:  **The Court ordered the hornets to identify all facts and evidence that the Hornets will rely upon to substantiate the team's claim that any Plaintiff is exempt from the FLSA's overtime provisions.**

The Hornets have openly refused to identify the financial records or the months that the Hornets selected to meet their 66 2/3% threshold under the Amusement/recreation exemption.

**As to Int No. 29**:  **The Hornets were directed to provide the dates of Select-A-Seat events.**

The Hornets continue to withhold all information related to the dates of Select-A-Seat Events.   Any response that this information does not exist is subjects the Defendant to a spoliation claim. The dates of Select-A-Seat events were advertised on the Hornets website during the summer of 2005 after this litigation had been filed.  This information is no longer on the Hornet's website and the Hornets now claim it does not exist.

**As to No. 43:** **The Hornets were directed to identify all persons other than Barbara Booth who calculated, attempted to calculate, and/or determined the commissions owed to any named Plaintiff on accounts paid in full after their last day of employment with the Hornets.**

The Hornets blatantly ignored the direction of the Court and responded only that different persons performed these duties including sales directors and various individuals in the accounting and payroll areas of the organization

Plaintiffs re-urge this Court to utilize all tools set forth in Rule 37 to prevent the Hornets from being rewarded from their misconduct. The clear history of this case demonstrates that the Hornets have consistently prevented Plaintiffs from obtaining information specifically related to the Hornets' exemption defenses. Accordingly, and at a minimum, the Court must strike the Amusement/Recreation defense and the Retail Sales Exemption defenses alleged by the New Orleans Hornets to ensure that the Hornets do not benefit from their willful and egregious discovery delays and violations of Court orders. The lack of respect for this Court's Order was so apparent that this Court must respond swiftly to ensure that the Rule of Law is maintained. Disclosure of this information at this late date in the litigation cannot be tolerated. Their reprehensible behavior requires the most urgent and harsh response available to prevent the Hornets and future defendants from ignoring the powers of this Court.

## A. THE HORNETS LAST MINUTE DISCLOSURE OF REAMS OF DOCUMENTS AND REVISED DISCOVERY RESPONSES ARE A POTENTIALLY DEVASTATING AMBUSH TACTIC.

Plaintiffs and this Court have been sandbagged. This Court cannot allow the Hornets to undermine years of trial preparation and strategy through their last second disclosure of hundreds, and perhaps thousands of pages of documents that Plaintiffs first requested in the summer of 2005. The Hornets have repeatedly represented that all documents were disclosed, that their answers to discovery were correct, and that no other

information relevant to this case existed. This is unquestionably false, and has been since the Hornets submitted their first response to discovery.

We are now less than three months until trial, less than two weeks from producing expert reports, we have sought these documents for two years, we've been told for two years that they didn't exist. Now the Hornets are attempting to produce "non-existent" documents so late in the game that Plaintiffs cannot realistically do anything with them. The Hornets have clearly used delay tactics from the start, and if their defenses aren't struck, their callous disregard for this Court's Orders and their delay tactics have worked.

B. **THE HORNETS RECREATION AND AMUSEMENT EXEMPTION MUST BE STRUCK BECAUSE THE HORNETS REFUSE TO PRODUCE SUPPORTING DOCUMENTATION REGARDING THE LOCATIONS WHERE EMPLOYEES WORKED.**

Plaintiffs have contended from the outset of this litigation that the Amusement/recreation exemption does not apply in this case. To the extent that it did apply to a limited aspect of Basketball Operations division, Plaintiffs have consistently sought information regarding the location where the Hornets employed and operated.

The Hornets refuse to produce evidence of locations where the Hornets operated at any time relevant to this litigation, a critical element of their Recreation and Amusement defense. The Hornets refused to identify any leases, office addresses, or other documents or information that would identify the various locations where employees performed their job duties. To date, the Hornets have avoided all requests to identify the physical locations where their team's employees performed their job duties. The Court has repeatedly ordered the Hornets to produce this information. No such information has been provided. More specifically, the Hornets violated the Court's order

to produce this information in Interrogatory No. 23. Accordingly, it is time that that the Court prevent the Hornets from raising this defense.

### C. THE HORNETS RECREATION AND AMUSEMENT EXEMPTION MUST BE STRUCK BECAUSE THE HORNETS REFUSE TO IDENTIFY THE MONTHS OR PERIODS THAT THE HORNETS WILL USE TO MEET THE 2/3 TEST.

The Hornets refused to identify which financial data they will rely upon or which months they have selected to prove that they meet the 2/3 receipts test set forth in the Amusement/Recreation exemption. The Court ordered the Hornets to produce this information in response to Interrogatory No. 23. The Hornets have responded by confirming that they have not, and will not, produce this information. They must be sanctioned for their belligerence.

### III. THE HORNETS CLAIMED AS A DEFENSE TO THEIR DISCOVERY DEFICIENCIES THAT THE HORNETS SHOULD HAVE COMPELLED THEM SOONER.

Astonishingly, the Hornets asserted as a defense to their discovery deficiencies that Plaintiffs should have compelled them sooner. Ignoring their affirmative duty to comply with the federal rules absent a court order, the Hornets used the absence of a Motion to Compel as a basis for contending that the team's failure to fully, completely, and truthfully answer discovery requests for over two years was Plaintiffs fault. This outrageous statement proves that the Hornets had no intention of providing adequate, complete, and truthful answers to discovery absent Court intervention. Severe sanctions should be imposed on the Hornets for their willful and intentional refusal to respond fully and completely to Plaintiffs' discovery.

The absurdity of the Hornets' position notwithstanding, this very argument set

forth by the Hornets has already been rejected as a defense to the imposition of severe sanctions by the Fifth Circuit. In <u>McLeod, Alexander, Powel, & Apffel, P.C. v. Quarles</u>, 894 F.2d 1482 (5th Cir. 1990), the Fifth Circuit upheld a district court's decision to strike the answer of a defendant and the subsequent entry of a default judgment against that defendant after finding that the defendant was in bad faith and willfully ignored the discovery process regardless of whether any Court order had been violated. <u>Id</u>. at 1484. The Fifth Circuit rejected the defendant's argument that his egregious failure to comply with discovery did not warrant sanctions because he had not yet violated a court order, stating that a party can be subject to the imposition of severe sanctions based solely on that party's refusal to comply with the federal rules of civil procedure. <u>Id</u>. Thus, the Court in the present matter would be justified in striking the defenses of the Hornets based exclusively on their non-responsiveness to discovery for over two years. That the Hornets also violated several Orders of the Court would make the Court's imposition of severe sanctions bulletproof on appeal.

## IV.    IT IS UNCONTROVERTED THAT THE HORNETS MISREPRESENTED THAT IT COMPLIED WITH THE COURT'S JULY 2005 ORDER FOR NEARLY TWO YEARS.

In July of 2005 Magistrate Chasez ordered the Hornets to produce multiple categories of documents to Plaintiffs. The Hornets misrepresented to both Plaintiffs and the Court for over two years that all requested documents were produced.

On August 3, 2007, Plaintiffs argued to the Court that the documents produced by the Hornets in response to the July 2005 Order appeared to be incomplete. Again, the Hornets again represented to both the Court and Plaintiffs that all requested documentation had been produced.

On August 31, 2007, the Hornets finally admitted that none of the team's responses to any discovery request included any information that may have been be contained in any accountant, lawyer, consultant, or other files of persons over whom the Hornets should have requested the information.

**THE COURT'S JULY 2005 ORDER.** The documents at issue were some of the most time sensitive and critical documents in this litigation because they specifically related to the overtime claims of Plaintiffs and employees who might assert claims in this collective action.

**Information ordered produced in Expedited RFP number 2:**
Please produce a complete copy of the complete employee files for each Plaintiff, including, but not limited to personnel records; employment contracts, compensation agreements, or other contracts between Defendant and any plaintiff; all termination letters provided to any Plaintiff, whether signed or unsigned.; all payroll registers and payroll logs reflecting wage payments of any kind made to each Plaintiff; all documents distinguishing or otherwise identifying which amounts paid to any Plaintiff resulted from commission sales as opposed to any other form of wages; all payroll or other records setting forth the regular rate of pay for each named plaintiff for each relevant pay period of their employment

**Information ordered produced in Expedited RFP number 3:**
Please produce a copy of all documents describing or setting forth the job duties of each plaintiff during each plaintiffs' term of employment with the Hornets and all documents substantiating Defendant's description of each Plaintiff's job duties.

**Information ordered produced in expedited RFP Number 5:**
Please produce a copy of all time sheets, sign in sheets, or documents tracking or documenting the hours worked by each Plaintiff from their first date of employment through their last date of employment. For any current employee, provide the documentation through the last pay period.

**Information ordered produced in expedited RFP Number 15:**
For each quarter that the draw system of payment was implemented by the Hornets, please produce copies of all documents describing, discussing, or otherwise identifying all employees who received additional commission payments above the draw amount.

**Information ordered produced in expedited RFP Number 16**:
Please produce copies of all documents describing, discussing, or otherwise identifying each Sponsorship, sales, marketing, and/or Select-A-Seat event, where the Hornets allowed or required any Plaintiffs to attend, including the date of the event and the identities of any employees in attendance.

**Information ordered produced in Expedited RFP Number 17**:
Please produce copies of all documents describing, discussing, or otherwise identifying all facts explaining why the Hornets failed to maintain records of hours worked by non-exempt employees.
THE COURT ORDERED DEFENDANT TO PROVIDE ANY POLICY WHICH MIGHT EXIST EXPLAINING WHY THE HORNETS FAILEDTO MAINTAIN RECORDS OF HOURS WORKED BY NON-EXEMPT EMPLOYEES.

**Information ordered produced in expedited RFP Number 18**:
Please produce a copy of all documents reflecting any overtime payments made to any current or former personnel employed by the New Orleans Hornets since June of 2002 in any of the following categories.
a.      inside salespersons;
b.      sales associates;
c.      group account salespersons;
d.      regional account salespersons;
e.      account executive salespersons;
f.      fan relations personnel;
g.      ticket operations personnel;
h.      receptionists

**Information ordered produced in expedited RFP Number 19**:
Please produce all time and earnings cards or sheets, wage rate tables, work time schedules, or order, shipping and billing records, and similar records for each of the identified Plaintiffs.
THE COURT STRUCK SHIPPING OR BILLING RECORDS AND SIMILAR RECORDS.

**Information ordered produced in expedited RFP Number 20**:
Please produce all payroll or other records setting forth or explaining the basis of pay for each named plaintiff by indicating the monetary amount paid on a per hour, per day, per week, per piece, commission on sales, or other basis.

**Information ordered produced in expedited RFP Number 21**:
Please produce all payroll or other records setting forth the amount and nature of each payment to each named Plaintiff which Defendant believes is excluded from the "regular rate" of pay

**Information ordered produced in expedited RFP Number 22:**
Please produce all payroll or other records setting forth the hours worked each workday and total hours worked each workweek for each named Plaintiff, including if applicable the total daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation, for each Plaintiff.

**Information ordered produced in expedited RFP Number 24:**
Please produce copies of all documents provided to any Hornets personnel by Penny Middleton regarding overtime compensation or tracking employee hours

**Information ordered produced in expedited RFP Number 25:**
Please produce copies of any and all documents describing, discussing, or setting forth Hornet overtime policies, practices and procedures since 2002, including, but not limited to, Hornet policies, procedures, practices and/or controls in place to track the overtime worked by non-exempt employees

**Information ordered produced in expedited RFP Number 27:**
Please produce copies of any and all documents describing, discussing, or containing communications from the Hornets to employees regarding overtime compensation and/or comp time.
THE COURT ORDERED ANY MEMORANDUM OR OTHER WRITTEN COMMUNICATION FROM MANAGEMENT

**Information ordered produced in expedited RFP Number 28**
Please produce copies of any and all documents describing, discussing, or containing communications regarding all complaints made by any current or former employee regarding payment of overtime compensation

**Information ordered produced in expedited RFP Number 30**
Please produce a copy of all documents, including e-mails, memorandum, computer notes, or other written, recorded, or electronic communications, disseminated by any Hornets manager, supervisor, director, executive, or owner to any employee regarding this overtime litigation since May 27, 2005

Most of these requests were also included in Court's order to produce on August 3, 2007.

On August 28, 2007, the Hornets confirmed the inadequacy of their prior responses when it produced documents on the hard drive of their former Human

24

Resource Director that appear to be a document prepared for submission to the State of Louisiana to obtain millions of dollars under the Louisiana Quality Jobs Program discussed before. Since July of 2005, the Hornets have maintained that they have never tracked any time worked by Plaintiffs or other employees and that all information related to Plaintiffs has already been produced. The Hornets have already asserted to Magistrate Chasez that any information set forth by the Hornets to obtain Quality Jobs Program money was inaccurate and maintained that no hours were tracked by the Hornets. The Hornets have produced none of the actual documents submitted to the State, the relevancy of which are readily apparent.

Finally, the Hornets have admitted that entire databases of sales information related to Plaintiff sales activities have not been produced. Since August of 2005, the Hornets have repeatedly misrepresented to the Court that no additional information related to any Plaintiff exists. Although the database of information has still not been produced, the Hornets' admission that it exists proves that the team violated this Court's Order.

**CONCLUSION**

Federal courts cannot permit a defendant to play games with the federal rules and the orders of the Court. When a defendant like the Hornets engages in a pattern and practice of delays, misrepresentations, and sub-standard investigations, the Court must strike the defenses of that party. In light of yet another clear and unambiguous refusal to comply with the orders of the Court, Plaintiffs again move to the Court to strike all defenses wherein the Hornet's revenues, ticket sales, or financial information are an essential element of the defense. This includes both the Retail Exemption and the

Amusement/recreation defenses asserted by the Hornets. Moreover, at this time Plaintiffs

further request that this Court exercise its authority to enter a default judgment in favor of

Plaintiffs.

Respectfully submitted,

BY:  /s/ Daniel E. Buras, Jr.
HOWARD DAIGLE (#4454)
DANIEL E. BURAS, JR. (#26226) (T.A.)
ELVIGE CASSARD RICHARDS (#19386)
DAIGLE FISSE & KESSENICH, PLC
227 Highway 21
Madisonville, LA  70447
Telephone: 985.871.0800
Facsimile: 985.871.0899
**ATTORNEYS FOR PLAINTIFFS**

STEWART E. NILES, JR. (#10004)
BRYAN J. KNIGHT (#28640)
NILES, BOURQUE & FONTANA, L.C.
909 Poydras Street, 35th Floor
New Orleans, Louisiana 70112
Telephone (504) 310-8550
Facsimile (504) 310-8595
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above motion as been sent to opposing

counsel by placing a copy of same in the U.S. mail, properly addressed, postage prepaid,

or by any other means authorized by law, this 5th day of September 2007.

/s/ Daniel E. Buras, Jr.

26

DANIEL E. BURAS, JR.