# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EUGENE LIGER, ET AL.**                              **CIVIL ACTION NO.  05-1969**

**VERSUS**                                            **SECTION "C"**

**NEW ORLEANS HORNETS NBA LIMITED**                   **MAGISTRATE 05**
**PARTNERSHIP**

### MEMORANDUM IN OPPOSITION TO PLAINTIFFS' SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR CONTEMPT AND SANCTIONS, <u>INCLUDING MOTION TO STRIKE DEFENSES, AND ATTORNEY'S FEES</u>

**MAY IT PLEASE THE COURT:**

I.    <u>Introduction</u>

    The Court is once again tasked with sorting out Plaintiffs' caustic accusations and misrepresentations from the facts and evidence (none of which were presented in Plaintiffs' Second Supplemental Memorandum) in order to address their endless discovery complaints. The Plaintiffs have repeatedly used the discovery process and discovery motions as a litigation tactic in this lawsuit, rather than as a manner of resolving any legitimate discovery dispute. This lawsuit was filed on May 27, 2005, (Rec. Doc. 1), and only two months later the Plaintiffs filed their first discovery motion (Rec. Doc. 24) and made their first request for sanctions (Rec. Docs. 18 and 24). Although Plaintiffs waited for nearly two years to challenge the sufficiency of the Hornets' objections to their discovery requests, since doing so they have asked for expedited consideration of almost every motion they have filed, have repeatedly sought unwarranted orders and sanctions from the Court, and most recently have asked for the most draconian of sanctions, including dismissal of the Hornets' defenses, default judgment in their favor, and $50,000 to hire an expert to review the Hornets' documents.

{N1718939.1}

In spite of Plaintiffs' use of the discovery process and motions (including motions for sanctions) as a litigation tactic, the Plaintiffs have failed to produce any evidence that the Hornets have violated any discovery obligation or Court order, much less any evidence of bad faith  or willful non-compliance with any discovery rule or order. In the absence of such evidence, the Plaintiffs have attempted to mischaracterize a good faith supplementation of discovery under Federal Rule of Civil Procedure 26(e) as sinister discovery conduct. The discovery rules require a party to promptly correct or supplement a prior disclosure upon learning that it is inaccurate or incomplete in any way. The rules do not (and cannot) penalize a party for compliance with such an express requirement. The Hornets' discovery of potentially responsive documents transferred to a storage facility in the course of their recent return to New Orleans was in good faith (there is no evidence otherwise), and the Plaintiffs' assertion that this is "contemptuous" behavior is unsupported and reckless. The Hornets promptly disclosed the discovery to Plaintiffs' counsel and the Court, and began reviewing and supplementing their prior discovery responses in accordance with Rule 26(e). The Plaintiffs have failed to carry their heavy burden of proving that any discovery violation has occurred, much less that any of the severe sanctions they demand are warranted.

The Hornets complied with this Court's instruction to produce corporate representatives to answer questions regarding the organization's efforts to provide information and documents for discovery purposes in this litigation. The Plaintiffs, not the Hornets, chose to limit their examination of the four witnesses presented solely to questions about such discovery efforts. In so doing, it is clear that Plaintiffs failed to gain a substantive understanding about the Hornets' organization and documents, which contributes to the misinformation upon which their current discovery motion is based. The four Hornets' representatives endured nearly three full days of

repetitive questions about pleadings and formal written discovery requests and the information and documents they have provided to counsel in this case during the last two years. The result is testimony that not only fails to support the Plaintiffs' allegations, but in fact demonstrates that the Hornets have diligently searched for and produced information and documents, <u>now numbering approximately 7,000 in physical form and tens of thousands in electronic form</u>, since this lawsuit was filed.[1] The Hornets did so under the most difficult of circumstances, including the worst natural disaster to strike this country only two months after the lawsuit was filed and two subsequent relocations of its offices, records, and personnel, the hardship of which resulted in personnel changes at all levels. The Plaintiffs have failed, however, to identify any relevant and responsive documents that have not been disclosed or produced in this litigation.

The Plaintiffs waited for nearly two years to challenge the sufficiency of the Hornets' discovery responses and objections to the discovery requests propounded in the fall of 2005. It was their delay that caused discovery activity in the recent months, although certainly all of the activity occurred within the original discovery period and did not prejudice or harm Plaintiffs in any way. Plaintiffs have now moved for and obtained a continuance of the trial and all deadlines in this case. The Hornets did not oppose their request. Under these circumstances, although the Plaintiffs have failed to prove a violation of any discovery rule or order, the Plaintiffs could not demonstrate any prejudice or harm in any event. This Court should deny the Plaintiffs' motion and instruct the Plaintiffs to cooperate in and proceed with discovery on the merits of the case, and admonish their counsel for using unsupported discovery motions as a tactic, for the use of

---

[1] The sheer volume and the nature of the documents produced in this case alone demonstrate that the Hornets have not withheld or refused to produce documents, as Plaintiffs' persistently allege.

invective and rhetoric in doing so, and for needlessly increasing the cost and burden of this litigation in the process.

It is time to move on the merits of what is an ordinary wage and hour case involving a handful of former employees of an employer and to cease the waste of this Court's and the parties' resources on discovery complaints that have no basis in fact or law.

## II.    Plaintiffs Have Failed to Carry Their Heavy Burden in Proving Any Factual or Legal Basis for the Unwarranted and Draconian Sanctions They Seek

Plaintiffs have requested the most severe and draconian sanctions against the Hornets without any basis in fact or law. In fact, Plaintiffs request Rule 37(b)(2) sanctions for failure to comply with various Court orders, but they fail to specify the orders, the terms at issue, or any conduct allegedly in violation thereof.   Rather, the facts presented by the Hornets in this memorandum and through the "chain of evidence" depositions, make clear that the Hornets have not violated any Order of this Court and have made every reasonable effort to provide all responsive information and documents to Plaintiffs in accordance with the discovery rules, deadlines, and Court's orders.  Thus, Plaintiffs' motion should be denied.

Further, the drastic sanctions requested by the Plaintiffs including withdrawal of the Hornets' defenses, refusal to admit evidence to support the Hornets' defenses, and a default judgment are difficult to justify even in cases where there is evidence of a discovery violation. The Fifth Circuit has repeatedly held that such sanctions are "draconian" and only to be used as a "remedy of last resort."  *Batson v. Neal Spelce Assoc., Inc.,* 765 F.2d 511, 515 (5th Cir. 1985). The Fifth Circuit has recognized that the law favors the resolution of legal claims on their merits and that penalties such as those requested by Plaintiffs would deprive the Hornets of the opportunity to defend the claims against them.   *In re Dierschke,* 975 F.2d 181, 183 (5th Cir. 1992).   Fifth Circuit precedent clearly states that "sanctions should not be used lightly, and

should be used as a lethal weapon only under extreme circumstances." *EEOC v. General Dynamics Corp.,* 999 F.2d 113, 119 (5th Cir. 1993). This case does not involve the "extreme circumstances" required by the Fifth Circuit to justify the "lethal weapon" Plaintiffs ask this Court to use against the Hornets, and any suggestion to the contrary is absurd. At worst, as this Court previously suggested, the recent discovery activity results from a combination of both the Plaintiffs' failure to challenge the sufficiency of the Hornets' discovery objections for approximately two years, and the Hornets' election to assert objections rather than to seek a protective order earlier in the discovery process to resolve the dispute regarding the scope of Plaintiffs' discovery requests. These circumstances are neither extreme, nor attributable to any bad faith or willful discovery conduct of the Hornets.

The Fifth Circuit has articulated several factors that must be present before a court may take action that would in essence dismiss a case with prejudice or result in a default judgment against a party. First, dismissal or default is typically appropriate only in when a party has willfully or in bad faith refused to comply with a Court order and when such refusal is accompanied by a clear record of intentional delay or contumacious conduct. *Gayden v. Galveston County, Texas,* 178 F.R.D. 134, 136 (S.D. Tex. 1998) citing *Coane v. Ferrara Pan Candy Co.,* 898 F.2d 1030, 1032 (5th Cir. 1990). "Contumacious" is defined as "obstinately disobedient or insubordinate." *Id.* citing *Gist v. Lugo,* 165 F.R.D. 474, 478 (E.D. Tex. 1996). The fact that the Hornets have produced tens of thousands of documents in this litigation, all within the discovery period and months before cut-offs and trial, simply cannot be viewed as "obstinately disobedient or insubordinate." To impost such severe sanctions, the court must also find that lesser sanctions are warranted, but would be futile. *Id.* citing *Coane,* 898 F.2d at 1032. Finally, the Fifth Circuit has required that at least one of the following three aggravating factors

be present: 1. that the delay was caused by the party and not its attorney; 2. actual prejudice to the complaining party; or 3. that the delay was caused by intentional conduct. *Id.* at 137 citing *Berry v. CIGNA/RSI-CIGNA,* 975 F.2d 1188, 1191 (5th Cir. 1992). Dismissal/default judgment is reserved only for the most egregious circumstances, which simply are not present here. *Id.*

As shown by the evidence referenced below, the Hornets discharged their discovery obligations in good faith, diligently searching for and producing documents under what at times were very difficult circumstances, resulting in the production of thousands of pages of documents before the Plaintiffs' most recent round of discovery motions. The evidence, when viewed fairly and reasonably, does not support any finding of a discovery violation or an award of sanctions.

### III. The Hornets Discharged Their Discovery Obligations In Good Faith by Diligently Searching for and Producing Thousands of Documents in this Litigation

In compliance with this Court's September 10, 2007, Minute Entry (Rec. Doc. 127), the Hornets identified the following four 30(b)(6) representatives to testify as to the documents searched for and produced in this litigation: Donna Rochon, Director of Human Resources; Sam Russo, Executive Vice President of Operations; Dan Crumb, Vice President of Finance, and; Rich Witmeyer, Director of Suite Sales and Service. See Exhibit 1, September 11, 2007, letter from Jane Heidingsfelder to Dan Buras.[2] The Plaintiffs mischaracterize the Court's Minute Entry as giving the Hornets a "final chance to prove the reasonableness" of their "investigation and due diligence" in responding to discovery. The Court's Minute Entry says no such thing, however. Each of the witnesses produced by the Hornets provided testimony regarding the Hornets' search

---

[2] The Hornets also identified the names and job titles of individuals who previously assisted in searching for and producing documents for discovery purposes in this litigation, but who are no longer employed by the Hornets. See Exhibit 2, September 12, 2007, letter from Jane Heidingsfelder to Dan Buras. Many of these individuals were previously disclosed to Plaintiffs through initial disclosures, discovery responses, or documents produced in this litigation.

for and production of documents for the purpose of discovery in this case.[3] The Plaintiffs'
allegation that none of the witnesses could testify on the "chain of evidence" questions is refuted
by the transcripts of their testimony, which have been available for weeks, but which the
Plaintiffs conspicuously failed to provide to the Court.[4]

A.    **The Hornets Took Reasonable Steps To Ensure That Documents Relevant to This Litigation Were Preserved and That Documents Needed for Discovery Were Produced**

This lawsuit was filed on May 27, 2005 (Rec. Doc. 1). Mr. Russo testified that shortly
thereafter, in approximately June or July of 2005, he attended a group meeting at the Hornets'
offices regarding the litigation that included executives and directors. (See Exhibit 3, excerpts

---

[3] The Court's September 10, 2007, Minute Entry provides that:

> At the upcoming Rule 30(b)(6) deposition of defendant, plaintiffs are to develop a "chain of evidence" of the documents that have thus far been produced in this case in terms of the identity of the person(s) who searched for the documents, when they were given the order to search, the parameters of the search that was undertaken, the results of the search, and the location(s) of any additional responsive document.

Plaintiffs again misrepresent this Court's Minute Entry by claiming that the Court ordered the "Hornets to develop a Chain of Evidence" regarding such documents. A simple review of the Court's Minute Entry reveals that it was the "plaintiffs" who were required to develop this evidence for the purpose of their pending discovery motion. This is yet another example of the many misrepresentations made by the Plaintiffs' counsel on the record of this action, for which they should be admonished if the Rules of Professionalism of this Court mean anything.

[4] Plaintiffs' counsel also claims that Hornets' counsel designated Mr. Crumb and Mr. Witmeyer as 30(b)(6) witnesses on "chain of evidence" issues, but then stated that neither could testify about such issues. This is a blatant misrepresentation and is not supported by any evidence. Plaintiffs also state that they have only examined Mr. Russo and Ms. Rochon, which was true as of the time their premature pleading was filed. Subsequently, Plaintiffs examined Mr. Crumb and Mr. Witmeyer, both of whom testified as to their involvement in searching for and providing documents for the purpose of discovery in this case, which is why they were designated as 30(b)(6) witnesses on the issues and which is contrary to Plaintiffs' counsel's misrepresentation.

from 30(b)(6) Deposition, Sam Russo, 9/12/07, Vol. 1, pp. 21-25.)  The group was instructed by counsel to:

> Notify all necessary employees, agents, consultants, contractors and/or all other necessary persons or entities to cease and desist all document destruction, purges, computer dumps, e-mail destruction, sale or destruction of computer hard drives, modification of saved documentation, and all other actions that will cause or may likely cause a destruction or modification of information relevant to this litigation.

(Russo, Vol. 1, p. 23.) In fact, when presented during the deposition with a copy of this "instruction" as stated in Plaintiffs' discovery requests, Mr. Russo recalled the instruction and the discussion of preserving documents and information from this group meeting of executives and directors at the inception of this litigation. (Russo, Vol. I, pp. 24-25.) Mr. Russo complied with the instruction. *Id.*

**B.**     **Donna Rochon, Director of Human Resources, Searched for and Produced Voluminous Human Resources Records Beginning in 2005 and Throughout This Litigation**

Plaintiffs' characterization of Ms. Rochon's involvement in searching for and providing documents for use in discovery as "minimal" is grossly inaccurate. Of course, the Plaintiffs have failed to provide this Court with any evidence to support their characterization of Ms. Rochon's testimony or to provide the deposition transcripts to the Court (as they stated they would). The record of Ms. Rochon's testimony demonstrates an entirely different picture than that the Plaintiffs have attempted to paint. Mr. Russo explained that when this litigation was initiated, Kristy McKearn, then the Vice President of Corporate Affairs, Strategic Planning, and Business Operations, was the point of contact for the Hornets' outside counsel for litigation purposes. (Russo, Vol. I, p. 28; See Exhibit 4, 30(b)(6) Deposition, Donna Rochon, 9/12/07, Vol. I, p. 5.)

When Ms. McKearn asked Mr. Russo for documents, he would produced them.[5] (Russo, Vol. I, pp. 28-30.)

Ms. Rochon is the Hornets' Director of Human Resources, a position she has held for approximately two years, since August 22, 2005 (less than two months after this lawsuit was filed and only days before Hurricane Katrina force the City's and the Hornets' evacuation). (Rochon, Vol. I, p. 5.) Ms. Rochon worked for the Hornets as a temporary employee in the Human Resources Department reporting directly to Ms. McKearn from May 9, 2005, until she was hired as the Director of Human Resources. (Rochon, Vol. I, pp. 5-6.) Plaintiffs point out that neither Mr. Russo nor Ms. Rochon were a "point person" for the purpose of searching for and providing discovery in this litigation, and appear to suggest that this is somehow surprising. In fact, it is not surprising at all because Ms. McKearn, who was Ms. Rochon's direct supervisor and an executive like Mr. Russo, was the point person. Thus, as Ms. Rochon and Mr. Russo explained, they searched for and produced documents pursuant to Ms. McKearn's requests. (Rochon, Vol. I, pp. 13-14.)

As requested by her direct supervisor or the Hornets' outside counsel during the course of this litigation, Ms. Rochon has searched for and provided documents and information responsive to those requests. (Rochon, Vol. I, pp. 63-64). The first time Ms. Rochon recalls being asked to provide information related to the Plaintiffs' discovery requests was around the time Hurricane

---

[5] Because this litigation was initiated shortly before Hurricane Katrina, more than two years ago, and due to the chaos and dislocation caused by the disaster to the business and residents of the City of New Orleans, including the Hornets' organization, precise dates and details regarding conversations and activities related to the search for and production of documents could not always be specifically recalled, understandably. (Russo, Vol. I, pp. 28-29; Rochon, Vol. I, pp. 122-123, 150-154). However, the corporate representatives provided more than sufficient information about the efforts to search for and produce documents to demonstrate the reasonableness of the Hornets' discovery efforts and to refute the Plaintiffs' accusations of bad faith and willful non-compliance with discovery rules, deadlines, and orders.

Katrina made landfall, which occurred August 29, 2005. (Rochon, Vol. I, pp. 15-16, 52-53.) Ms. Rochon provided information at the request of her direct supervisor, Ms. McKearn and/or the Hornets' outside counsel. (Rochon, Vol. I, pp. 52-53.) Ms. Rochon also assisted in providing a list of job titles for potential collective action members in this litigation around the time of Hurricane Katrina in response to a verbal request from counsel. (Rochon, Vol. I, pp. 35-38.) Ms. Rochon researched active and inactive personnel files to obtain the information requested. *Id.*

After Hurricane Katrina forced the evacuation of the City of New Orleans and, ultimately, the temporary relocation of the Hornets to the Oklahoma City, Ms. Rochon relocated to Oklahoma City. (Rochon, Vol. I, pp. 13-15.) Ms. Rochon took active Hornets employees' personnel files with her to Oklahoma City during the temporary relocation. (Rochon, Vol. I, pp. 38-39.) However, Ms. Rochon returned to the Hornets' offices at 1615 Poydras Street on several occasions for the purpose of locating documents requested in connection with this litigation, specifically in approximately December of 2005 and March and May of 2006. (Rochon, Vol. I, pp. 38-39, 111-113). Ms. Rochon returned to New Orleans in December of 2005 to research job titles in inactive employees' personnel files. (Rochon, Vol. I, pp. 38-39.) She was provided with a list of names of individuals by counsel to assist in her search. (Rochon, Vol. I, p. 39.) Ms. Rochon retrieved personnel files, payroll files, and commission reports at that time in December of 2005. (Rochon, Vol. I, pp. 39-40.) Ms. Rochon searched for commissions reports and information by reviewing the physical payroll records, payroll register, and back-up documents, which are maintained in that form in the Human Resources Department. (Rochon, Vol. I, pp. 64-65, 84.) When Ms. Rochon could not locate information she anticipated she might find, she searched old files, storage files, and files located off-site. (Rochon, Vol. I, pp. 65-66). Ms. Rochon searched for commissions reports in 2005 and 2006 in the payroll and other files

maintained in the Human Resources Department, where they should have been located. (Rochon, Vol. I, pp. 84-86.) Ms. Rochon also searched for employment contracts, compensation agreements, and other contracts relating to Plaintiffs in their personnel files in 2006. (Rochon, Vol. I, pp. 102-105.) The inactive employee files were maintained in locked file cabinets near the Human Resources Department. (Rochon, Vol. I, pp. 66-67). Ms. Rochon also conducted a search of her assigned computer for information requested in connection with discovery in this litigation. (Rochon, Vol. I, pp. 120-121.)

Ms. Rochon specifically remembers her involvement in searching and providing documents in December of 2005 because she did so during her Christmas vacation immediately following Hurricane Katrina and its aftermath. *Id.* The fact that the Hornets' Director of Human Resources returned to its New Orleans' offices during her Christmas vacation under such extraordinary circumstances, specifically the hardships faced by her personally and the organization, to search for and produce documents requested by the Plaintiffs in this case not only demonstrates the good faith exercised by the Hornets in complying with their discovery obligations, it exposes just how frivolous Plaintiffs' demand for any sanctions, much less such draconian sanctions, really is.

Ms. Rochon explained that she recently learned of a request for documents from the Plaintiffs and a question about whether certain accounting records had been located or produced. (Rochon, Vol. I, p. 68.) In response to that request, on September 4, 2007, Ms. Rochon, accompanied by a paralegal and outside counsel, began researching documents in a large number of unlabeled, stacked boxes that recently had been moved to an off-site storage facility. (Rochon, Vol. I, pp. 68-75.) Ms. Rochon was instructed to search for any documents that might pertain to the litigation, and she had the assistance of a paralegal and outside counsel in order to identify

such documents. (Rochon, Vol. I, pp. 71-72, 155.) The documents were moved into the off-site storage facility in mid-2007 in order to accommodate the Hornets' relocation from Oklahoma City to New Orleans. (Rochon, Vol. I, pp. 69-70.) As of the time of her testimony for the purpose of the 30(b)(6) deposition, the search had not been completed. (Rochon, Vol. I, p. 71.).

Ms. Rochon was made aware of a recent allegation in connection with this litigation that a former accounting employee of the Hornets, Adrianna Johnston, maintained a binder containing commission reports for sales employees. (Rochon, Vol. I, pp. 87-89.) However, Ms. Rochon does not have any knowledge that Ms. Johnston maintained such a binder and has not located such a binder, even in her September 2007 search of the unlabeled boxes in storage. *Id.* Ms. Rochon specifically testified that payroll records, including commissions reports, should not have been maintained in accounting (rather, they should have been maintained in Human Resources) and that she would not have expected such records to be maintained in accounting. (Rochon, Vol. I, p. 89.) Likewise, Ms. Rochon testified that commissions reports were expected to be maintained in physical form in the payroll files in the Human Resources Department, and that she would not have searched for them or expected them to be maintained on the computer system. (Rochon, Vol. I, pp. 91-92.) Ms. Rochon reiterated that she would not expect Human Resources records, including payroll records and commissions reports, to be maintained in accounting, on the computer system, or anywhere else since they were sent to her and maintained in physical form in Human Resources. (Rochon, Vol. I, pp. 61, 83-87, 89-91, 94.) Ms. Rochon also has conducted additional searches of files in order to ensure that she has provided all the documents requested in connection with this litigation. (Rochon, Vol. I, pp. 102-107.)

Ms. Rochon's testimony about her document searches and production reflect the reasonableness of the Hornets' discovery efforts, directly and as directed by Ms. McKearn, the

former Vice President of Corporate Affairs, Strategic Planning, and Business Development and her direct supervisor. The information retrieved by Ms. Rochon was in response to Plaintiffs' discovery requests and the requests of her direct supervisor and legal counsel. (Rochon, Vol. I, pp. 55-56.) Ms. Rochon provided all of the documents that comprised the files she was asked to locate either to Ms. McKearn or the Hornets' outside counsel. (Rochon, Vol. I, pp. 59-61, 63-64.) Ms. Rochon testified that the Human Resources Department was the custodian of the personnel and payroll files, and commission reports, and that these files should not have been, and were not expected to have been, maintained in any other location in the organization. (Rochon, Vol. I, pp. 61, 83-87, 134-137; 150-154.) To the best of her knowledge, Ms. Rochon has provided all of the documents requested of her in connection with this litigation, including documents related to personnel records, payroll records, and commissions related to the Plaintiffs. *Id.*

This evidence demonstrates that the Hornets have discharge their discovery obligations in this case in good faith, and refutes the Plaintiffs' unsupported allegations.

### C.    Rich Witmeyer, the Director of Suite Sales and Services, Searched for and Produced Voluminous Archtics Records in This Litigation

Although Plaintiffs assert that it would be a "complete waste of time and resources for Plaintiffs to depose [Mr. Crumb] and Mr. Witmeyer on any chain of evidence issues," (Rec. Doc. 143, p. 12) Mr. Witmeyer in fact testified that in the short time he has been in management with the Hornets, he has performed numerous searches for information and documents in connection with discovery in this litigation.  This again illustrates that the Hornets took the Plaintiffs' requests and the Court's orders seriously and diligently attempted to respond to discovery requests.

Plaintiffs' counsel also misrepresents that counsel for the Hornets advised Plaintiffs' counsel that the deposition of Mr. Witmeyer would not be "useful" (Rec. Doc. P. 11). This is false. In reality, Hornets' counsel simply explained that based on Mr. Witmeyer's shorter tenure in management, he may not have as much information as Ms. Rochon or Mr. Russo and, thus, for planning purposes it should be noted that his testimony may not last as long. Hornets' counsel expressly designated Mr. Witmeyer as a 30(b)(6) witness, however, based on his knowledge of Archtics and other information, and his assistance in searching for and producing that information in this litigation.

Mr. Witmeyer began working for the Hornets on January 28, 2002 as a ticket sales employee. (See Exhibit 5, 30(b)(6) Deposition, Rich Witmeyer, 9/20/07, p. 7). In July 2002, he was hired as a full time employee and became a Ticket Sales Account Executive. (Witmeyer, p. 10). He was a co-employee and worked alongside with many of the Plaintiffs in this case. Mr. Witmeyer was eventually promoted to the Director of Suite Sales and Services in March, 2007, and for the first time had sales personnel reporting to him. (Witmeyer, pp. 10-11).

Because Mr. Witmeyer was the employee most familiar with Archtics at the time, he was asked by Hornets' counsel in early August 2007 to run reports that would be responsive to the requests made by the Plaintiffs regarding alleged outstanding discovery.[6] (Witmeyer, p. 18). Counsel for the Hornets provided Mr. Witmeyer with a copy of the discovery requests with respect to Archtics and asked him to locate any responsive documents. (Witmeyer, p. 70). He was also given a list of the Plaintiffs and of certain accounts referenced in the discovery requests and was specifically asked to run reports that might reflect or assist in determining who was paid commissions on each account. (Witmeyer, pp. 18-19).

---

[6] Counsel for the Hornets had previously requested such information from the Director of Ticket Sales, but she resigned before providing the requested information. (Witmeyer, p. 18).

In response to the requests, Mr. Witmeyer ran reports to determine the sales activity of each Plaintiff, specifically the Archtics Notes entered by each Plaintiff. (Witmeyer, p. 18).  Mr. Witmeyer searched Archtics, his own computer, and had a conference with the IT department regarding information requested about Toys for Tots and the Pepsi Four Pak campaign. (Witmeyer, pp. 21, 58, 72).  He was unable to locate any responsive documents.  *Id.*  Mr. Witmeyer testified that he searched but was unable to run a report to show what accounts an employee was assigned to on the date he or she stopped working for the Hornets, as was requested by Plaintiffs. (Witmeyer, p. 38).  Mr. Witmeyer contacted his ticket operations director who then contacted Ticket Master to determine if such a report existed or if this information could be obtained through Archtics, which is a Ticket Master system. (Witmeyer, pp. 38-39).  Ticket Master advised Mr. Witmeyer that no report could be run to reflect the information requested and that the information could not be obtained. *Id.*

Based on the searches performed by Mr. Witmeyer, on August 17, 2007, the Hornets produced all of the Archtics Notes for the Plaintiffs, Bates Nos. 3456-4567.  The Hornets had previously produced Archtics related information on June 10, 2006, specifically, Customer Account Information, Bates Nos. 1583-1670; Change Journals, Bates Nos. 1671-1781; and Seats-Sold for the Plaintiffs, Bates Nos. 1769-1839.  Thus, Mr. Witmeyer's testimony, along with the prior productions by the Hornets in this case, demonstrate the Hornets' good faith discovery efforts in searching for and producing the information requested by Plaintiffs in this litigation.

**D.** **Dan Crumb, the Vice President of Finance, Searched for and Produced Numerous Financial Documents in Response to Plaintiffs' Discovery Requests**

As with Mr. Witmeyer, Plaintiffs claim that it would be a "complete waste of time and resources for Plaintiffs to depose Mr. Crumb on any chain of evidence issues," (Rec. Doc. 143, p. 12) Mr. Crumb testified, however, that in the short time he has been employed by the Hornets, he searched for numerous financial documents and other information in connection with discovery in this litigation. This again illustrates that the Hornets took the Plaintiffs' requests and the Court's orders seriously and diligently attempted to respond to discovery requests.

Again, in yet another misrepresentation by Plaintiffs' counsel, counsel stated that counsel for the Hornets advised Plaintiffs' counsel that the deposition of Mr. Crumb would not be "useful." (Rec. Doc. P. 11). This is false. In fact, counsel for the Hornets merely stated that Mr. Crumb may not have as much information as longer-term employees due to his recent hire, and therefore, for planning purposes, it should be noted that his testimony may not take as long as some of the other witnesses.

Mr. Crumb began working for the Hornets on or about June 25, 2007, as the Vice President of Finance. (See Exhibit 6, 30(b)(6) Deposition, Dan Crumb, 9/20/07, p. 6). Almost immediately after Mr. Crumb was hired by the Hornets, in about the first week of July, he met with counsel to discuss the litigation. (Crumb, p. 7). Mr. Crumb was generally asked for financial documents responsive to Plaintiffs' discovery requests. *Id.*

Mr. Crumb was specifically asked by counsel for the bank statements of the Hornets reflecting to their income and revenue. (Crumb, p. 13). He asked the bank, Capital One, to provide him with the bank statements for the applicable years because this would be the fastest

way to obtain the documents. (Crumb, pp. 14-15).   Mr. Crumb immediately provided such information to counsel.  As requested, Mr. Crumb also searched for the financial documents given to the City of Oklahoma in conjunction with the Hornets' temporary relocation.  (Crumb, p. 16).  Mr. Crumb contacted Greg King, the Hornets' former Vice President of Finance, to help locate the responsive documents. (Crumb, p. 16).  Mr. Crumb learned that the same Basketball Revenue Income ("BRI") reports that were provided to the NBA were also provided to Oklahoma City. (Crumb, p. 19).  The BRI reports are financial reports that are generated from the Hornets' financial statements (which have already been produced in this litigation) and are provided to the NBA. (Crumb, p. 72). Mr. Crumb asked the NBA for a copy of the BRI reports the Hornets had provided the NBA because he did not have easy access to the reports and this would expedite the production of the documents. (Crumb, p. 19).  As soon as he received these financial reports, Mr. Crumb provided the documents to counsel. (Mr. Crumb, p. 19).  Mr. Crumb searched for any other documents provided by the Hornets to the NBA, including correspondence or emails, but he was unable to locate any additional documents. (Crumb, pp. 68-69).

Mr. Crumb testified that he frequently called Mr. King to determine the location of certain documents, either physically in the office or on the server. (Crumb, p. 26).  Specifically, Mr. Crumb asked Mr. King where the financial statements from Charlotte were located because he was unable to find them in his search. (Crumb, p. 27).  In response to the request for additional financial documents, Mr. Crumb provided counsel with the financial audit reports prepared by the Hornets' accounting firm, KPMG. (Crumb, p. 20).  Mr. Crumb was able to locate some of these reports at the Hornets office and he requested the others directly from KPMG. (Crumb, p. 21).

Mr. Crumb testified that since he has been employed, he has provided counsel with all of the Hornets' financial statements showing revenue received. (Crumb, p. 52). The financial statements, including the monthly consolidated income statements, show the amount and source of **all** revenue received by the Hornets for each month since 2002. (Crumb, pp. 92-93, 99). This includes, but it not limited to: revenue from the state, ticket sales revenue, parking revenue, sponsorship revenue, concession revenue, broadcast revenue, and other sources. (Crumb, pp. 99, 143, 156). These statements show revenue based on an accrual method of accounting which is the accounting method used by the Hornets. (Crumb, p. 100). Mr. Crumb was also asked for and provided cash reports to counsel. (Crumb, p. 60). These reports detail by the date the cash disbursements and deposits received and made by the Hornets. (Crumb, p. 62). The cash reports show revenue based on a cash method of accounting. (Crumb, p. 100). Therefore, based on the production of these reports, the Hornets have produced all of the revenue reports, on both the cash and accrual methods, for each month in the applicable time period. Thus, the Plaintiffs have all of the applicable financial information with respect to the Hornets' amusement and recreation defense.

Mr. Crumb also looked for information and documents related to incentives provided by the City of New Orleans or the State of Louisiana to the Hornets. (Crumb, p. 80). In response, he provided information to counsel regarding revenue received from the state. (Crumb, p. 107).

Based on the numerous and detailed searches that Mr. Crumb performed, in addition to the financial documents previously produced, the Hornets produced: the Arena Naming Rights letter, Bates Nos. 4589-4590; Combined Financial Statements, Bates Nos. 4635-4644; BRI Reports, Bates Nos. 4645-4676; Monthly Consolidated Income Statements, Bates Nos. 4678-

4684, 6700-6732; Audited Financial Statements, Bates Nos. 4685-4761; Bank Statements, Bates Nos. 1895-2438 and 4762-4859; Cash Reports, Bates Nos. 4762-4859.

Again, this evidence refutes the Plaintiffs' unsupported allegations and reflects that the Hornets have diligently searched for and produced documents in response to Plaintiffs' discovery requests. Plaintiffs have only themselves to blame for the two year delay in obtaining information that was the subject of the discovery objections asserted by the Hornets in 2005 response to Plaintiffs' discovery requests. Had they challenged the sufficiency of those objections sooner, the issues raised would have been resolved at an earlier time. Regardless, all of the referenced documents were produced during the discovery period, before cut-offs and months before trial, in accordance with the Federal Rules of Civil Procedure, in good faith, and there is no evidence to the contrary.

## IV.    The Plaintiffs Failed to Present Any Evidence of Specific Relevant or Responsive Documents That Have Not Been Made Available or Produced

Plaintiffs falsely claim that the Hornets are "intentionally withholding evidence related to their financial defenses and have made countless misrepresentations to the Court and to Plaintiffs to mask their contemptuous actions." (Rec. Doc. 139-4, p. 2). Plaintiffs present no evidence to support this statement and, in fact, it is demonstrably false. The Hornets have produced documents reflecting their revenues on a cash and accrual basis for all of the relevant years, specifically: Monthly Consolidated Income Statement, Bates Nos. 1840-1861, produced June 10, 2006 and Bates Nos. 4678-4684, produced September 6, 2007; Bank Account Records, Bates Nos. 1895-2438, produced August 17, 2007; Audited Financial Statement, Bates Nos. 4685-4761, produced September 6, 2007; Cash Reports, Bates Nos. 1862-1884, produced June 10, 2006 and Bates Nos. 4762-4859, produced September 6, 2007; and Monthly Consolidated Income Statement, Bates Nos. 6700-6732, produced September 20, 2007. Plaintiffs are in

possession of these documents, yet they misrepresent to this Court that the Hornets are "intentionally withholding evidence related to their financial defenses." Id. Thus, their discovery motion is not only unsupported, it is based on a misrepresentation of the facts. Plaintiffs' also claim that this alleged intentional withholding of evidence violates numerous Court orders, yet Plaintiffs fail to specify the orders they allegedly refer to or how those orders allegedly have been violated. Again, as the allegedly withheld evidence is in fact in Plaintiffs' possession, their discovery motion in this regard must be denied.

**V.    Plaintiffs' Counsel Have Violated the Code of Professionalism and Should Be Admonished to Comply With Same at the Risk of an Appropriate Sanction**

The U.S. District Court for the Eastern District of Louisiana's Code of Professionalism imposes the following obligations, among others, on counsel:

- I will conduct my self with dignity, civility, courtesy and a sense of fair play.

- I will not engage in personal attacks on other counsel or the court. I will support my profession's efforts to enforce its disciplinary rules and will not make unfounded allegations of unethical conduct about other counsel.

- I will not use the threat of sanctions as a litigation tactic.

- I will cooperate with counsel and the court to reduce the cost of litigation and will readily stipulate to all matters not in dispute.

http://www.laed.uscourts.gov/Attorney/atycode.htm. Plaintiffs' counsel in this case have failed to comply with this Code, however, by routinely filing pleadings that are replete with gross misrepresentations, invective, and vitriol; making accusations of sanctionable and contemptuous conduct without any evidentiary or legal basis; regularly seeking unwarranted and extraordinary procedures and relief (such as requests for expedited proceedings and draconian discovery sanctions) as a litigation tactic; and refusing to cooperate with opposing counsel to aid in the

progress of the action and to reduce litigation costs. By way of example only, the Hornets refer the Court to the following conduct by Plaintiffs' counsel in derogation of these Rules.

In their Opposed Supplemental and Amended Motion to Continue Trial and All Cutoff Dates, Plaintiffs' counsel asserted that the Hornets have "stonewalled all attempts to discover any facts relevant" to the defenses. (Rec. Doc. 143, p. 1.) This statement is an intentional misrepresentation of the facts. The Hornets asserted in their Answer and Defenses, filed on July 12, 2005, that Plaintiffs are not entitled to overtime on the basis of certain exemptions in the Fair Labor Standards Act. (Rec. Doc. 13.) More specifically, the Hornets rely on the amusement and recreational exemption. Under one of the methods of proving this defense, the employer must show that its revenues for six months during a calendar year do not exceed one-third of its revenues during the other six months of the same calendar year. In support of this defense, the Hornets produced in discovery various documents demonstrating its revenues during the relevant time period, including Monthly Consolidated Income Statements, Bank Account Records, Audited Financial Records and Cash Reports (produced as early as June 10, 2006). The Hornets also produced Plaintiffs' personnel and payroll files (produced as early as July 21, 2005), which contain information relating to Plaintiffs' duties, wages, and schedules and certainly may support the Hornets' defenses to their wage and hour claims. Plaintiffs' counsel are aware of this fact and yet still asserted to the Court, for the purpose of continuing the trial and all other deadlines in the case, that the Hornets have "withheld all evidence of their defenses." This was not a mistake and clearly violates the Rules. Plaintiffs' counsel also have filled their pleadings with invective, vitriol, and personal attacks on the Hornets and their counsel, making accusations of "mock[ing] the power of a Federal Court Magistrate Judge," "willfully sabotag[ing] the judicial process," and refusing even to pay "lip service" to this Court's discovery orders. There simply is no evidence

to support Plaintiffs' counsel's allegations of such serious conduct, and the record reflects that the "dignity, civility, courtesy and a sense of fair play" observed by the Hornets' counsel in their conduct before the Court have not been reciprocated in this case.

The record also reflects that Plaintiffs' counsel have used discovery motions and requests for sanctions as a litigation tactic in this case. Plaintiffs have moved this Court for sanctions numerous times in this case and have repeatedly requested that their Motions be heard on an expedited basis often jamming the Hornets by giving them insufficient time to properly respond. Indeed, in their most recent request, specifically their Second Supplemental Memorandum in Support of Motion for Contempt and Sanctions, Including Motion to Strike Defenses, and Attorney's Fees, Plaintiffs' counsel demand "the most severe sanctions under the Federal Rules of Civil Procedure." (Rec. Doc. 139.)

Further, on September 20, 2007, Plaintiffs' counsel, Dan Buras, accused the Hornets' counsel of violating Federal Rule of Civil Procedure 11. Specifically, in response to the Plaintiffs' Motion to Continue Cutoffs (Rec. Docs. 138 and 146.), Hornets' counsel noted that certain financial documents had been made available to Plaintiffs' counsel since September 6, 2007, but that Plaintiffs' counsel had not yet requested to review or copy them. However, Mr. Buras now claims that the Hornets' counsel has objected and refused to produce the records. This claim, upon which a Rule 11 accusation is based, is false. At the September 10, 2007 hearing, the Hornets' counsel expressly stated to Plaintiffs' counsel that "I've given Mr. Buras a copy of the documents so he can look at it, determine if it's something that he wants or thinks is useful… If they want them [the documents], they can have them." (See Exhibit 7, Transcript from September 10 Hearing, p. 25.) "If you want them… but if he wants it, he can have it." *Id.* at p. 32. Further, the Hornets' counsel produced a sample of the financial documents to Plaintiffs'

counsel on September 6, 2007, and Plaintiffs' counsel made a copy of one of the reports so Plaintiffs' counsel could decide whether they wished to review or copy the entire set of the documents. The Hornets' counsel have made these documents available to Plaintiffs' counsel, and there is no evidence to support such a frivolous Rule 11 accusation.

Plaintiffs' attorneys make blanket accusations about the Hornets yet have failed to present any evidence of such conduct by the Hornets. Indeed, based on the rhetoric in Plaintiffs' pleadings, one would expect that this matter would involve more than a discovery dispute, and certainly more than a dispute over the sufficiency and timing of the production of approximately than 7,000 physical documents and tens of thousands of electronic documents, all of which were produced during the discovery period and months before trial. The attorneys for the Hornets, on the other hand, have conducted themselves in this litigation professionally and with respect for the Court and the legal process, keeping their pleadings free of frivolous accusations, attempting at every turn to avoid needless delays and duplication of these proceedings, and patiently (but almost always on an expedited basis) cooperating with the Court in its effort to resolve the Plaintiffs' endless discovery complaints.

The Hornets' corporate representatives endured nearly three full days of needless and repetitive examination in connection with this discovery matter, and (as the Hornets' attorneys presaged in one of the many discovery hearings requested by Plaintiffs' attorneys thus far) no quantity or quality of discovery will ever satisfy Plaintiffs in this action, because Plaintiffs' attorneys apparently wish to turn this action into one about discovery rather than the merits of the case. If the Rules of Professional Conduct have any meaning, the Court should admonish Plaintiffs' attorneys at a minimum for the invective and vitriol they have interjected into the record and hearings in this matter and require them to conduct themselves professionally at the

risk of an appropriate sanction, including disqualification from participation in this proceeding, for failure to do so.  The Court should do more than disregard the misleading accusations and rhetoric in order to search for the truth—it should reprimand the Plaintiffs' attorneys for their abuse of the litigation process through the repetitive filing of unsupported and harassing discovery motions that have only wasted the resources and time of this Court and the parties.

## VI.  <u>Conclusion</u>

The Plaintiffs have wasted enough of this Court's time with needless discovery disputes. They have asked for and obtained (without opposition from the Hornets) a continuance of all deadlines and trial in this case, and have failed to present any evidence of a discovery violation, much less any evidence warranting the draconian sanctions they seek. This Court should deny their motion and instruct the Plaintiffs' counsel to cooperate in the discovery process and abide by the Rules of Professionalism, at the risk of an appropriate sanction for their failure to do so.

Respectfully submitted,

/s/ Jane H. Heidingsfelder
JENNIFER L. ANDERSON, T.A. (Bar No. 23620)
***Jones, Walker, Waechter, Poitevent,***
  ***Carrère & Denègre, L.L.P.***
Four United Plaza
8555 United Plaza Blvd.
Baton Rouge, LA 70809-7000
Telephone: (225) 248-2000
Facsimile: (225) 248-2010
E-mail: janderson@joneswalker.com

and

SIDNEY F. LEWIS, V (Bar No. 17026)
JANE H. HEIDINGSFELDER (Bar No. 28604)
***Jones, Walker, Waechter, Poitevent,***
  ***Carrère & Denègre, L.L.P.***
201 St. Charles Avenue, 50th Floor
New Orleans, LA 70170-5100

{N1718939.1}

Telephone: (504) 582-8000
Facsimile: (504) 582-8015
E-mail:  slewis@joneswalker.com
E-mail:  jheidingsfelder@joneswalker.com
**COUNSEL FOR DEFENDANT,**
**NEW ORLEANS HORNETS NBA L.P.**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing *Memorandum* has been served on all counsel of record below by the Court's EF/CMF system as a result of their registration for e-noticing and service via same on this 9th day of October, 2007:

Elvige Cassard Richards
Dan Buras
Daigle Fisse, PLC
227 Highway 21
Madisonville, LA 70447
Facsimile:  (985) 871-0899

Stewart E. Niles, Jr.
Bryan Knight
Niles, Bourque & Fontana LLC
909 Poydras Street, Suite 3500
New Orleans, LA  70112
Facsimile:  (504) 310-8590

/s/ Jane H. Heidingsfelder