RICHARD L. WITMEYER    CondenseIt™    September 20, 2007

Page 1

```
       CIVIL DISTRICT COURT
      FOR THE PARISH OF ORLEANS
         STATE OF LOUISIANA

IVAN HINSON, JESSICA BERRY,   * NO. 05-10068
EUGENE LIGER, ANTHONY "TONY"  *
MARTIN, ADAM NASH, CHRIS      * DIVISION "L"
CARTER, CHRIS STANT, AND      *
SAMUEL TOBIAS STEINMETZ       *
                              *
   versus                     *
                              *
NEW ORLEANS HORNETS NBA       *
LIMITED PARTNERSHIP           *
                              *
* * * * * * * * * * *
```

1442 Deposition of THE NEW ORLEANS HORNETS, through its designated representative, RICHARD L. WITMEYER, 344 St. Joseph Street, Apartment 339, New Orleans, Louisiana 70130, taken in the offices of Jones Walker, 201 St. Charles Avenue, New Orleans, Louisiana 70170, on Thursday, the 20th day of September, 2007, commencing at 11:17 a.m.

APPEARANCES:

DAIGLE, FISSE & KESSENICH, PLC
(By: Daniel E. Buras, Jr., Esquire)
227 Highway 21
Madisonville, Louisiana 70447

     -and-

NILES, BOURQUE & FONTANA
(By: Bryan J. Knight, Esquire)
909 Poydras Street, Suite 3500
New Orleans, Louisiana 70112

   ATTORNEYS FOR THE PLAINTIFFS

Page 2

APPEARANCES (continued):

JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE
(By: Jennifer L. Anderson, Esquire)
Place St. Charles - 50th Floor
201 St. Charles Avenue
New Orleans, Louisiana 70170

   ATTORNEYS FOR THE DEFENDANT

REPORTED BY:

LISA BODE, CSR
Certified Shorthand Reporter


          EXAMINATION INDEX
                                   Page
EXAMINATION BY MR. BURAS:      6
EXAMINATION BY MS. ANDERSON:   108

             * * *

Page 3

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under Article 1421, et. seq, of the Louisiana Code of Civil Procedure for all purposes, in accordance with law;

That the formality of reading and signing is specifically not waived;

That the formalities of filing, sealing, and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence at the time of the trial of this matter.

          *   *   *   *

LISA BODE, Certified Shorthand Reporter, State of Louisiana, officiated in administering the oath to the witness.

Page 4

MS. ANDERSON:
  I'm happy to help narrow this by giving you some idea as to what his role was on the chain of evidence issues. If you would like --
MR. BURAS:
  Yes.
MS. ANDERSON:
  -- me to do that, just let me know. I can do it outside of his presence, if you would prefer that.
MR. BURAS:
  Let's do it outside of his presence and we can narrow it down.
MS. ANDERSON:
  I think it will help narrow it a little bit.
MR. BURAS:
  Absolutely.
MS. ANDERSON:
  Will you step out for just a second.

THE WITNESS:
  Sure.

Page 5

1   (Discussion off the record.)
2   MS. ANDERSON:
3     His role -- Well, as you know,
4   he was a putative collective action member
5   at some point and then later moved into
6   management. His role recently has been to
7   get additional Archtics information, all of
8   which was produced, I believe, with the
9   August 17 production. That's all I can
10  remember. Certainly ask him more, but I
11  believe that's the area regarding chain of
12  evidence where he'll have some knowledge.
13  MR. BURAS:
14    Then just to give you a heads
15  up, what I'm going to do is ask him when he
16  moved into management, ask him if he
17  maintained any type of records such as this,
18  and who maintained them in his office to the
19  best of his knowledge, specifically, the
20  time sheets that you have in front of you
21  and ask him when he was first asked for
22  information how it was asked then. So if he
23  narrows the scope to August of 2007 the
24  deposition is going to go quickly.
25  MS. ANDERSON:

Page 6

1     Right. And I think, again, he
2   would have helped generate all the Archtics
3   stuff that we produced recently, which I
4   think was produced in like an Excel -- it
5   was all the notes in the Excel format.
6   MR. BURAS:
7     Okay.
8   MS. ANDERSON:
9     And there may have been
10  something else, but that's the main thing.
11  MR. BURAS:
12    I'll find that out. That's not
13  a problem. But if that's what it's limited
14  to it will be quick.
15    (Whereupon, Mr. Witmeyer
16  rejoined the proceedings.)
17    RICHARD L. WITMEYER,
18  after having been first duly sworn by the
19  above-mentioned Certified Shorthand Reporter
20  was examined and testified as follows:
21  EXAMINATION BY MR. BURAS:
22  Q.  Hi, Rich. My name is Dan Buras.
23  I represent some plaintiffs in the overtime
24  and commission cases filed against the New
25  Orleans Hornets. This is Bryan Knight. He

Page 7

1   also represents some additional plaintiffs
2   in this case.
3     What is your full name, Mr.
4   Witmeyer?
5   A.  Richard Leslie Witmeyer.
6   Q.  How long have you been employed
7   by the Hornets?
8   A.  Five years.
9   Q.  When did you first get hired by
10  the Hornets?
11  A.  2002.
12  Q.  When in 2002?
13  A.  January 28th, I believe.
14  Q.  Where did you work before
15  January 28th, 2002?
16  A.  The Orlando Magic.
17  Q.  What did you do for the Magic?
18  A.  Most recently, I sold tickets.
19  Q.  Were you a manager or were you a
20  ticket sales employee?
21  A.  Ticket sales employee.
22  Q.  When you were hired in January
23  28th, 2002, did you work in New Orleans or
24  in Charlotte?
25  A.  New Orleans.

Page 8

1   Q.  What did you do in New Orleans?
2   A.  Helped with the relocation of
3   the team, mostly ticket sales.
4   Q.  Were you one of the four
5   individuals who came to New Orleans to help
6   sell tickets to meet the NBA's goal?
7   A.  Yes.
8   Q.  Who were the other three people?
9   A.  Eric Hodges -- Different people
10  came in at different times. Then Chris
11  Zaber came in and Chase Jones -- I'm sorry
12  -- Chase Gardner.
13  Q.  Do you know who Peter Thomas is?
14  A.  Yes. Peter came in later on.
15  And there was actually another gentleman, Ed
16  Minniger (phonetic).
17  Q.  Ed Minniger?
18  A.  Ed Minniger.
19  MS. ANDERSON:
20    Were there five originally or
21  four? I'm confused.
22  THE WITNESS:
23    There were actually up to --
24  depending on the time frame, up to six. I
25  started in January. Chase and Ed came in

Page 9

1  February, mid to late February. Chris Zaber
2  came in March. Peter Thomas came early
3  April. And Eric Hodges came with me, early
4  January.
5  EXAMINATION BY MR. BURAS:
6      Q.  Who is -- Is his last name
7  Herzog, John Herzog?
8      A.  Herzog.
9      Q.  Was he in part of this group or
10  no?
11     A.  He was hired, I believe, in July
12  that summer, after the relocation was
13  approved.
14     Q.  What was your position you were
15  hired for?
16     A.  Initially, I was a consultant.
17     Q.  You were not an employee
18  initially?
19     A.  Correct.
20     Q.  Who were you a consultant with,
21  an independent company or --
22     A.  Yes. I was a self-employed --
23  it was -- the way it was set up at the time.
24     Q.  When did you become a Hornets
25  employee?

Page 10

1      A.  July of '02.
2      Q.  What were you hired to do when
3  you became an employee?
4      A.  Ticket sales account executive.
5      Q.  Say again.
6      A.  Ticket sales account executive.
7      Q.  At any point in time did you
8  receive any promotions?
9      A.  Yes.
10     Q.  What was the first promotion you
11  received?
12     A.  Senior account executive.
13     Q.  When did you get that?
14     A.  Probably would have been
15  December of '02.
16     Q.  It's my understanding you're now
17  a manager for the Hornets; is that correct?
18     A.  A director.
19     Q.  Director?
20     A.  (Nods head affirmatively).
21     Q.  What is you current position?
22     A.  Director of suite sales and
23  services.
24     Q.  When did you receive that
25  promotion?

Page 11

1      A.  March of this year.
2      Q.  Between December of 2002 and
3  March of 2006 did you receive any other
4  promotions with the Hornets?
5      A.  Yes.
6      Q.  When?
7      A.  2005.
8      Q.  All right.
9      A.  Fan experience manager.
10     Q.  Was that a full-time position?
11     A.  Yes.
12     Q.  When in 2005?
13     A.  In November.
14     Q.  Did you have any direct reports?
15     A.  Yes.
16     Q.  How many?
17     A.  Fluctuated anywhere from four to
18  eight.
19     Q.  Were any sales personnel
20  directly reporting to you in November of
21  2005?
22     A.  No.
23     Q.  When is the first time a sales
24  employee directly reported to you?
25     A.  In March.

Page 12

1      Q.  Is Will Bryant one of your
2  direct reports?
3      A.  Yes.
4      Q.  When you worked for the Orlando
5  Magic did you receive overtime?
6      A.  No.
7  MS. ANDERSON:
8          I'm just going to object. I
9  think you're going beyond the scope of the
10  chain of evidence issues at this point.
11 MR. BURAS:
12         Okay. I'll pull it back.
13 MS. ANDERSON:
14         It's okay. You can go forward.
15 I just wanted to get us back on track, if we
16 were getting off track.
17 EXAMINATION BY MR. BURAS:
18     Q.  When is the first time you
19 learned of this lawsuit?
20     A.  I don't recall a specific date.
21 It would have been 2005.
22     Q.  How did you learn about the
23 lawsuit?
24     A.  Just sort of talk among sales
25 reps.

RICHARD L. WITMEYER           CondenseIt™           September 20, 2007

Page 17

1  EXAMINATION BY MR. BURAS:
2      Q. Just for procedure, when I ask a
3  question, counsel is going to object
4  usually. And when that happens, unless she
5  tells you not to answer the question, she's
6  noting an objection for the record. You can
7  go ahead and continue to answer the question
8  if you understand what I'm asking. If at
9  any point in time my questions get garbled
10 or you don't understand what I'm asking for,
11 please let me know and I'll try to rephrase
12 the question. If at any point in time you
13 need to take a break for any reason, you're
14 in charge of the deposition. You tell me
15 when you need to take a break. That's when
16 we take a break. We'll go as long as we
17 have to, but if you need to take a break for
18 the restroom, by all means, please do that.
19     MS. ANDERSON:
20         I may assert objections from
21 time to time. Unless I tell you not to
22 answer a question, you should go ahead and
23 answer it if you understand it. If you
24 don't, make sure you ask him for
25 clarification. Okay?

Page 18

1      THE WITNESS:
2          Great.
3  EXAMINATION BY MR. BURAS:
4      Q. How did you become involved with
5  the investigation of any issues related to
6  this case?
7      MS. ANDERSON:
8          Objection. Form.
9      A. Our director of ticket
10 operations had resigned, and I was the one
11 most familiar to try to produce the reports
12 that had been asked.
13 EXAMINATION BY MR. BURAS:
14     Q. Who specifically asked you to
15 look for anything in this case?
16     A. Our attorneys.
17     Q. Was it Ms. Anderson or Ms.
18 Heidingsfelder?
19     A. Ms. Heidingsfelder.
20     Q. What did --
21     MS. ANDERSON:
22         I just want to go ahead and put
23 a cautionary note out. I'm instructing you
24 not to reveal the substance of any
25 communications between you and attorneys for

Page 19

1  the Hornets. You can answer yes/no
2  questions and things about dates, but I just
3  want to make sure you don't volunteer
4  anything that's the substance of a
5  privileged attorney-client communication.
6  EXAMINATION BY MR. BURAS:
7      Q. To the extent my next question
8  is directly going to seek that information,
9  what did Ms. Heidingsfelder tell you to look
10 for?
11     MR. BURAS:
12         That information, I believe, is
13 specifically covered by the Court's order.
14     MS. ANDERSON:
15         Yes. I think he can answer what
16 he was asked to look for.
17 EXAMINATION BY MR. BURAS:
18     Q. What did Ms. Heidingsfelder ask
19 you to look for?
20     A. To see if it was possible to
21 determine who was paid commission on
22 specific accounts.
23     Q. Is that all she asked you to
24 look for?
25     A. That I recall, yes.

Page 20

1      Q. Were you given a list of the
2  accounts, of the specific accounts in
3  question?
4      A. Yes.
5      Q. Was it customer accounts or
6  former sales employee accounts?
7      A. I don't understand.
8      Q. Were you given a list of
9  specific customers and told to find out who
10 received commissions on those accounts?
11     A. Yes.
12     Q. At any point in time were you
13 asked to provide information related to
14 account activity?
15     A. Yes.
16     Q. When were you first asked to
17 provide information related to sales
18 personnel account activities?
19     A. They were the same time.
20     Q. Same time?
21     A. (Nods head affirmatively).
22     Q. So you were asked to provide two
23 things, then?
24     A. Yes.
25     Q. Other than the specific customer

Borrello Court Reporters  (504) 301-9631           Page 17 - Page 20

Page 37

1  Q. Yes.
2  A. No.
3  Q. Would you be alerted by your
4  management or was it common knowledge that
5  when one of your sales employees departed
6  that you may have been given additional
7  accounts?
8  A. It was common knowledge. It was
9  -- We would be told.
10  Q. You would be told by your sales
11  manager or director?
12  A. Manager, yes.
13  Q. You would be told this verbally
14  or would it be in an e-mail communication?
15  A. Verbally. And not specific
16  accounts, just that they had been
17  redistributed so then you could go look and
18  see what --
19  Q. So if you ran a report on July
20  31st for all of Rich Witmeyer's accounts, at
21  the beginning of July 31st, and at the end
22  of July 31st another sales employee stopped
23  working for the Hornets and on August 1st
24  you ran another sales report, assuming that
25  the information was changed simultaneously,

Page 38

1  would the report on July 31st and August 1st
2  be different?
3  MS. ANDERSON:
4     Objection. Form.
5  A. Yes.
6  EXAMINATION BY MR. BURAS:
7  Q. You would be able to tell on
8  August 1st which accounts you had that you
9  did not have on July 31st, correct?
10  A. Correct.
11  Q. Is there any way today to look
12  at the Archtics system before an employee
13  left, stopped working for the Hornets, to
14  determine what accounts that employee had on
15  the last day he worked for the Hornets?
16  A. None that we've been able to
17  find.
18  Q. Is there any record in Archtics
19  that would define the date a sales
20  representative was assigned to manage a
21  particular account?
22  A. None that we've been able to
23  find.
24  Q. Have you ever contacted Archtics
25  or ticket master to find out if you can

Page 39

1  obtain this information?
2  A. The organization has.
3  Q. Who within the organization has
4  requested that?
5  A. Steve. I'm not even sure of his
6  last name. He just started working with us.
7  Q. What department does Steve work
8  in?
9  A. Ticket operations.
10  Q. How do you know Steve contacted
11  someone about this information?
12  A. He told me.
13  Q. When did he tell you this?
14  A. Mid August.
15  Q. Do you know whether or not Steve
16  received any written communications from any
17  of these third parties regarding these
18  Archtics searches you were performing?
19  MS. ANDERSON:
20     Objection. Form.
21  A. He told me he had called.
22  EXAMINATION BY MR. BURAS:
23  Q. He said it was a telephone call?
24  A. Yes.
25  Q. Did you ask him if he had any

Page 40

1  documents or was directed to any Web sites
2  or other potential source of information
3  that might help you with your searches?
4  A. He didn't say he had.
5  Q. Did you ask him those questions?
6  A. No.
7  Q. Are there any Web sites that you
8  referred to that would explain different
9  types of Archtics searches you could perform
10  to find the information plaintiffs have
11  requested?
12  A. There's none that I'm aware of.
13  Q. In or around March to May 2003
14  time period do you recall a time that Joe
15  Andrade redistributed all of the renewal
16  accounts the various sales employees were
17  managing at that time?
18  MS. ANDERSON:
19     Objection. Form.
20  A. I remember there was a
21  redistribution of house accounts at that
22  time.
23  EXAMINATION BY MR. BURAS:
24  Q. And you were one of the four
25  people who received the majority of those

Page 57

1  Q. Was there an event in Archtics
2  built to reflect Toys for Tots?
3  A. Not that I could find.
4  Q. There was a Toys for Tots
5  solicitation campaign, though, correct?
6  MS. ANDERSON:
7    Objection. Form.
8  A. Actually, I believe it was the
9  Mayor's Toy Drive, but it was referred --
10 would have been referred to, probably, as
11 Toys for Tots, generic.
12 EXAMINATION BY MR. BURAS:
13 Q. Did you produce any information
14 accounts related to Toys for Tots and/or the
15 Mayor's Toy Drive that you just identified?
16 A. Did I produce any information?
17 Q. Yes.
18 A. No.
19 Q. You didn't produce any records?
20 A. No. I was unable to find any.
21 Q. Did you take a look at any
22 e-mails that you might have personally
23 received at any point in time since you
24 began working for the Hornets to determine
25 if you ever received an e-mail with

Page 58

1  information related to the Toys for Tots/
2  Mayor's Toy Drive programs?
3  A. I could not find any. I looked
4  and I couldn't find any.
5  Q. Did you request the IT
6  department search for any information
7  related to the Toys for Tots program and/or
8  the Mayor's Toy Drive?
9  A. I asked the IT department how
10 far back our e-mail records went.
11 Q. And what did they tell you?
12 A. They couldn't find anything
13 pre-Katrina.
14 Q. So you have no information
15 pre-Katrina?
16 A. That I could find.
17 Q. Who at the IT department told
18 you this?
19 A. Christian Green.
20 Q. When did Christian Green begin
21 working in the IT department?
22 A. September of '05.
23 Q. Who is Tim Spero?
24 A. Our former director of IT.
25 Q. When did Tim Spero stop working

Page 59

1  for the Hornets?
2  A. I don't recall the exact date.
3  Q. Was it after Hurricane Katrina?
4  A. Yes. He was briefly in Oklahoma
5  City.
6  Q. Do you know what investigation,
7  if any, Tim Spero conducted to find any
8  information responsive to Toys for Tots,
9  sales activity, or who was paid commissions?
10 A. I do not know.
11 Q. Let me just run through some
12 documents just to confirm what I believe
13 you've already said. I'm going to hand you
14 a copy of a document that's identified as
15 Exhibit 2, the Initial Disclosures. The
16 Hornets identified five persons who were
17 likely to have discoverable information
18 defendant may use to support its defenses.
19    You were not identified as one
20 of these five individuals, are you?
21 MS. ANDERSON:
22    Take your time. Read the
23 document.
24 A. I don't see myself identified,
25 no.

Page 60

1  EXAMINATION BY MR. BURAS:
2  Q. Have you ever seen this document
3  before today?
4  A. I don't recognize this document.
5  Q. Have you contacted any of the
6  identified five individuals to determine
7  what investigation, if any, they conducted
8  to find any information responsive to any
9  request made by plaintiffs for information
10 in this case?
11 A. Can you repeat that question,
12 please?
13 Q. Yes. Have you contacted any of
14 these individuals at any time since this
15 case was first filed to determine what
16 investigation, if any, they conducted to
17 find or produce any information at all
18 related to this case in response to any
19 request made by plaintiffs?
20 A. No.
21 Q. Exhibit 3, we're not going to
22 use Exhibit 3 on this deposition.
23    Exhibit 4, Plaintiffs' First
24 Request for Production in the state court
25 matter, have you ever seen this document

Page 69

1   -- it's going to take as long as
2   it takes.
3       MS. ANDERSON:
4       But I can't tell you what
5   questions to ask.
6       MR. BURAS:
7       Right. Let's take a two-minute
8   break.
9       (Following a brief recess, the
10  following proceedings were had.)
11      MR. BURAS:
12      Back on the record. I'm going
13  to skip Exhibit 9, not attach that.
14  EXAMINATION BY MR. BURAS:
15      Q. Going to Exhibit 10, which is a
16  copy of Plaintiffs' Second Set of Request
17  for Production of Documents, have you seen
18  this document before?
19      A. Honestly, it looks like 7.
20      MS. ANDERSON:
21      Answer it if you can. Don't
22  guess or speculate.
23      A. Yeah. Not that I recall.
24  EXAMINATION BY MR. BURAS:
25      Q. I want you to turn to Page 12 of

Page 70

1   this exhibit. It identifies approximately
2   28 names of prospective customers that might
3   be at issue in this litigation. Are these
4   the same names that you were asked to
5   investigate by Ms. Heidingsfelder?
6       MS. ANDERSON:
7       Object to the form.
8       A. Yes.
9   EXAMINATION BY MR. BURAS:
10      Q. Did you receive duplicates or
11  photocopies of these pages or is the
12  document you received from Ms.
13  Heidingsfelder a separate letter or document
14  all together?
15      A. It was copies of these pages, I
16  believe.
17      Q. They actually had the 12 on
18  there and the No. 42?
19      A. I don't recall the numbers, but
20  it looked the same, same information.
21      Q. I want you to take a look at
22  Page 14 and look at No. 43. When Ms.
23  Heidingsfelder asked you to produce the
24  information related to the Hornets Toys for
25  Tots fundraising campaign did she

Page 71

1   specifically ask you for all of the
2   different information contained in Sections
3   A through G?
4       A. I don't believe so. I don't
5   recall specifically.
6       Q. As you sit here today, have you
7   ever looked for all of the information set
8   forth in Sections A through G? And to the
9   extent that you looked for the information
10  in one but not another, please just identify
11  which of the letters you've actually looked
12  for information responsive to.
13      MS. ANDERSON:
14      Objection. Form.
15      A. Can you repeat the question?
16  EXAMINATION BY MR. BURAS:
17      Q. Yes. If you have looked for any
18  of the Subsections A through G, which
19  sections have you looked for information
20  responsive to and which sections have you
21  never looked for prior to this deposition?
22      MS. ANDERSON:
23      Objection. Form.
24      A. I was --
25  EXAMINATION BY MR. BURAS:

Page 72

1       Q. Let's do this -- Go ahead.
2       A. I was asked to look for G.
3       Q. Exclusively G?
4       A. I'm going back and looking
5   through them. And if E refers to
6   contributed as ticket sales, then yes, I was
7   asked to look for E.
8       Q. As to sections A, B, C, D, and
9   F, you were not asked to look for any
10  information responsive to those topics,
11  correct?
12      A. Correct.
13      Q. Please read No. 44. Were you
14  ever asked to look for any information
15  responsive to the Hornets' Pepsi Four Pack
16  campaigns?
17      A. Yes.
18      Q. When?
19      A. The same, mid August.
20      Q. So that's the fourth issue that
21  Ms. Heidingsfelder asked you to look for,
22  included Pepsi Four Pack campaign
23  information?
24      A. Uh-huh (Indicating
25  affirmatively).