Page 1

```
 1          CIVIL DISTRICT COURT
           FOR THE PARISH OF ORLEANS
 2             STATE OF LOUISIANA

 3

 4   IVAN HINSON, JESSICA BERRY,   *  NO. 05-10068
     EUGENE LIGER, ANTHONY "TONY"  *
 5   MARTIN, ADAM NASH, CHRIS      *  DIVISION "L"
     CARTER, CHRIS STANT, AND      *
 6   SAMUEL TOBIAS STEINMETZ       *
                                   *
 7                                 *
         versus                    *
 8                                 *
                                   *
 9   NEW ORLEANS HORNETS NBA       *
     LIMITED PARTNERSHIP           *
10                                 *
11   * * * * * * * * * * *

12

13       1442 Deposition of THE NEW ORLEANS
     HORNETS, through its designated
14   representative, DANIEL L. CRUMB, 5104 Toby
     Lane, Kenner, Louisiana 70065, taken in the
15   offices of Jones Walker, 201 St. Charles
     Avenue, New Orleans, New Orleans 70170, on
16   Thursday, the 20th day of September, 2007,
     commencing at 2:09 p.m.
17

18   APPEARANCES:

19       DAIGLE, FISSE & KESSENICH, PLC
         (By:  Daniel E. Buras, Jr., Esquire)
20       227 Highway 21
         Madisonville, Louisiana  70447
21
                  -and-
22
         NILES, BOURQUE & FONTANA
23       (By:  Bryan J. Knight, Esquire)
         909 Poydras Street, Suite 3500
24       New Orleans, Louisiana  70112

25       ATTORNEYS FOR THE PLAINTIFFS
```

Page 2

```
 1   APPEARANCES (continued):

 2   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE
 3   (By:  Jennifer L. Anderson, Esquire)
     Place St. Charles - 50th Floor
 4   201 St. Charles Avenue
     New Orleans, Louisiana  70170
 5
         ATTORNEYS FOR THE DEFENDANT
 6

 7

 8   REPORTED BY:

 9   LISA BODE, CSR
     Certified Shorthand Reporter
10

11

12

13         EXAMINATION INDEX
                           Page
14   EXAMINATION BY MR. BURAS:    4, 148, 175

15   EXAMINATION BY MS. ANDERSON:  139, 171, 175

16

17         * * *

18      EXHIBIT INDEX

19   Exhibit No. 23 -
        Documents Bates numbered D6700 through
20      D6732 entitled "Consolidated Detail
        Income Statement by Month" and BRI
21      reports

22         * * *

23

24

25
```

Page 3

```
 1          S T I P U L A T I O N

 2

 3       IT IS STIPULATED AND AGREED by and

 4   between counsel for the parties hereto that

 5   the deposition of the aforementioned witness

 6   is hereby being taken under Article 1421,

 7   et. seq, of the Louisiana Code of Civil

 8   Procedure for all purposes, in accordance

 9   with law;

10       That the formality of reading and

11   signing is specifically not waived;

12       That the formalities of filing,

13   sealing, and certification are specifically

14   waived;

15       That all objections, save those as to

16   the form of the question and the

17   responsiveness of the answer, are hereby

18   reserved until such time as this deposition,

19   or any part thereof, may be used or sought

20   to be used in evidence at the time of the

21   trial of this matter.

22          *   *   *   *

23       LISA BODE, Certified Shorthand

24   Reporter, State of Louisiana, officiated in

25   administering the oath to the witness.
```

Page 4

```
 1          DANIEL L. CRUMB,

 2   after having been first duly sworn by the

 3   above-mentioned Certified Shorthand Reporter

 4   was examined and testified as follows:

 5   EXAMINATION BY MR. BURAS:

 6       Q.  Good afternoon, Mr. Crumb.

 7       A.  Good afternoon.

 8       Q.  Are you aware that you have been

 9   designated as a chain of custody witness to

10   testify on the investigations conducted by

11   the Hornets into various discovery requests

12   propounded by plaintiffs or sent by

13   plaintiffs to the Hornets in this case?

14       A.  Yes.  Now, can I ask you what

15   you mean by investigations?

16       Q.  Yes, sir, you can.  What I would

17   like to know and the purpose of this

18   deposition is going to be to find out what

19   topics or information you were asked to

20   provide and what steps you took to

21   personally investigate this information or

22   what steps you took in directing others to

23   investigate these matters.

24       A.  Okay.

25       Q.  And so with that groundwork
```

DANIEL L. CRUMB          CondenseIt™          September 20, 2007

Page 5

1  being said, there are just some basic rules.
2  I don't know if you've ever been deposed
3  before.
4      A.  I have.
5      Q.  If you don't understand
6  something that I'm asking, by all means,
7  please tell me and I'll try to restate the
8  question.  If I can't, sometimes the
9  questions are just hard, and I'll do my
10  best.  However, if you answer a question
11  that I've asked, I'm going to assume you
12  understood my question.
13      A.  Uh-huh (Indicating
14  affirmatively).
15      Q.  Counsel is going to object
16  occasionally throughout this deposition.
17  Unless she tells you not to answer the
18  question, go ahead and answer my question
19  after she makes the objection.
20          With that groundwork, I'm going
21  to show you a series of exhibits during this
22  deposition, as well, that have been
23  previously marked.  It's some of the
24  discovery requests that have been submitted
25  in this case.  I'm going to ask you basic

Page 6

1  groundwork questions, have you seen them,
2  when did you see them, issues like that.
3  Hopefully, that won't take very long.
4          It's my understanding based on
5  what Ms. Anderson told me that you were not
6  hired by the Hornets until June of 2007; is
7  that correct?
8      A.  Correct.  It was June 25th, I
9  think was my start date, of 2007.
10      Q.  Where were you working before
11  June 25th?
12      A.  Abita Springs Water Company.
13      Q.  What were you doing with Abita
14  Springs?
15      A.  I was the chief financial
16  officer.
17      Q.  Were you specifically hired to
18  be the CFO of the Hornets?
19      A.  That's correct.  Vice-president
20  of finance is my official title.
21      Q.  Any job duty distinction between
22  vice-president of finance and CFO?
23      A.  No.
24      Q.  Who was the previous VP of
25  finance with the Hornets?

Page 7

1      A.  Brice Collier.
2      Q.  All right, sir.  When did you
3  first learn about this litigation?
4      A.  I learned -- It would have been
5  probably the first week of July, shortly
6  after I started.
7      Q.  Who told you about this
8  litigation?
9      A.  We had a meeting which Jennifer
10  Anderson and Jane Heidingsfelder were with
11  us.
12      MS. ANDERSON:
13          I just want to caution the
14  witness not to reveal the substance of any
15  communications between counsel.  There are
16  certain things that you can say, and we'll
17  tell you that, but I just want to make sure
18  you don't disclose the substance of
19  conversations between you and counsel.
20      THE WITNESS:
21          Okay.
22  EXAMINATION BY MR. BURAS:
23      Q.  During the course of depositions
24  earlier today, we received a series of
25  documents marked as D6700 through D6732.

Page 8

1      MR. BURAS:
2          Counsel, if you have a copy of
3  these to give to him, we're going to mark
4  this as Exhibit 23.
5  EXAMINATION BY MR. BURAS:
6      Q.  Mr. Crumb, have you ever seen
7  this document before?
8      A.  Yes, I have.
9      Q.  What is that document?
10      A.  It's a monthly detail income
11  statement.
12      Q.  Did you produce this document to
13  counsel?
14      A.  Yes, I did.
15      Q.  When did you first produce this
16  document to counsel?
17      MS. ANDERSON:
18          Read it all, if you need to.
19      A.  It was early September of 2007.
20  The date that this was actually produced was
21  September 11th, is what it says that it was
22  generated.
23  EXAMINATION BY MR. BURAS:
24      Q.  Where does it say it was
25  generated on September 11th, sir?

DANIEL L. CRUMB                    CondenseIt™                    September 20, 2007

Page 13

1   A.   What do you mean?  Do you mean
2   have I been asked to provide certain
3   information?  Can you rephrase?
4   Q.   Yes, sir.  I'm asking at any
5   time since you were first hired have you
6   ever been provided with a document, be it in
7   the form of a correspondence, a letter,
8   memo, or a list of information that Hornets'
9   counsel advised you plaintiffs need this
10  information from the Hornets?
11  A.   I'm sure I would have -- I'm
12  sure there may have been an e-mail.  I know
13  that our accounts are requested certain
14  information.  I don't remember right off the
15  top of my head what form, whether it was an
16  e-mail or what it was, but I know I've been
17  requested to provide information.
18  Q.   And that's my question.  When
19  you were requested to provide information by
20  counsel was it specific requests for
21  specific types of information?
22  A.   There were -- There were
23  requests for financial statements and things
24  of that nature, bank statements, that kind
25  of thing.

Page 14

1   Q.   Do the Hornets maintain copies
2   of their bank statements?
3   A.   We do have copies of our bank
4   statements, yes.
5   Q.   Did you produce the Hornets'
6   copies of those bank statements?
7   A.   No.
8   Q.   What copies of bank statements
9   have the Hornets produced in this case?
10  A.   I got them from Capital One.
11  Q.   When did you first request a
12  copy of those documents?
13  A.   It was early July of 2007.
14  Q.   What parameters were placed on
15  you regarding the documents that needed to
16  be produced when you requested those
17  documents from Capital One?
18  MS. ANDERSON:
19      Objection.  Form.  Assumes facts
20  not in evidence.
21  A.   Could you -- I'm not clear as to
22  what you're asking for.
23  EXAMINATION BY MR. BURAS:
24  Q.   Sure.  When you requested
25  documents from Capital One, how did you know

Page 15

1   what type of documents or accounts to
2   request information from?
3   A.   I requested information from a
4   certain point to, I believe it was, 2005,
5   2002 to 2005, I believe is what I requested
6   monthly bank statements.
7   Q.   It's my understanding from
8   statements made by not Ms. Anderson but
9   other Hornets' counsel in this case that the
10  Hornets have approximately six different
11  bank accounts; is that correct?
12  A.   Correct.
13  Q.   Records have only been produced
14  for two of those bank accounts.  Are you
15  aware of that, sir?
16  A.   Yes.
17  Q.   What type of records have not
18  been produced by the Hornets as far as bank
19  accounts go?
20  A.   We have a 401(k) bank account.
21  We have an aviation payroll bank account.
22  We have, I believe, a cafeteria plan bank
23  account.  I don't know off the top of my
24  head what the fourth one is.
25  Q.   I'm going to refer you to a

Page 16

1   document that's been previously marked as
2   Exhibit 18.  I'm going to represent to you
3   that the document that's been marked as
4   Exhibit 18 is a list of ten names of
5   individuals who previously assisted the
6   Hornets with their investigation of
7   plaintiffs' request in this matter.  I want
8   you to take a look at this document and tell
9   me if you have contacted any of the
10  individuals on that list to discuss their
11  investigation of this matter with them.
12  A.   Yes.
13  Q.   Who have you contacted?
14  A.   Greg King.
15  Q.   When did you contact him?
16  A.   It would have been various times
17  in July, August, probably September.
18  Q.   Do you remember what you
19  discussed with Mr. King and when you had
20  those discussions?
21  A.   The most recent, I had asked him
22  as far as what information was provided to
23  the City of Oklahoma, you know, what was
24  requested or provided to them.  And that was
25  in September.

DANIEL L. CRUMB                 CondenseIt™                September 20, 2007

Page 17

1    Q.  Do you remember when in
2  September, sir?
3    A.  I don't remember the exact date,
4  but I know it was recently.  It was sometime
5  in September.
6    Q.  Did he tell you what information
7  they produced to Oklahoma City?
8    A.  Yes.
9    Q.  Do you have copies of the
10  information that was produced to Oklahoma
11  City?
12    A.  I don't.  I don't have it with
13  me.
14    Q.  Have you looked for copies of
15  that information?
16    A.  As I recall, we have -- we have
17  the information.  As I recall, it was
18  basically BRI reports.  The City of Oklahoma
19  had basically requested to -- at the end of
20  each -- at the end of the -- they wanted to
21  have that information, and I believe the
22  only thing we provided to them was BRI
23  reports.  And then they also did an audit.
24  They sent Grant Thornton to do an audit
25  after each season.  I believe it was 30 days

Page 18

1  after the season they would go in and do an
2  audit to obtain or verify the local revenue
3  number.
4    Q.  Who's Grant Thornton?
5    A.  It's a CPA firm.
6    Q.  Is it located in Oklahoma City
7  area?
8    A.  I think they're a national firm.
9    Q.  Did the Hornets get a copy of
10  the audit report conducted by Grant
11  Thornton?
12    A.  I'm not aware.  I don't know.
13    Q.  Have you ever asked Grant
14  Thornton for a copy of this report?
15    A.  No, I haven't.
16    Q.  Was a copy of the Grant Thornton
17  report submitted to Oklahoma City?
18    A.  I'm not aware if it was or not.
19    Q.  Have you provided any documents
20  that were submitted to Oklahoma City to
21  counsel in this case?
22    A.  The BRI reports are the only
23  ones that I recall.
24    Q.  You've produced those to
25  counsel?

Page 19

1    A.  No.  I gave them to counsel.
2    Q.  That's what I mean.  When I say
3  "produced," I'm sorry for using legal
4  jargon.  And please, if I ask a question
5  like that, please correct me.  It's just old
6  habits sometimes.
7        Have you given copies of the BRI
8  information that you produced to Oklahoma
9  City to counsel?
10    A.  Yeah.  I've given copies of BRI
11  reports to our counsel.
12    Q.  Do you know when you gave this
13  information to counsel?
14    A.  Probably August, September time
15  frame.
16    Q.  Counsel has produced in this
17  case a series of reports from the NBA.  Are
18  these BRI reports produced to Oklahoma City
19  different from the reports that were
20  provided to counsel by the NBA?
21    A.  No.  They're the same.
22    Q.  Do the Hornets have copies of
23  any documents they specifically produced to
24  Oklahoma City?
25    A.  I'm not aware of anything that

Page 20

1  was specific -- I don't know.  I can't
2  answer that question as to what was
3  specifically produced, if they -- if we have
4  copies of that.
5    Q.  Have you ever been asked to look
6  for this information?
7    A.  Yes.
8    Q.  Where have you looked?
9    A.  Basically, I've looked on our
10  computers, and the quickest way for me to
11  find it was to just request it from the NBA.
12    Q.  So the information that the NBA
13  has submitted is -- I'm just trying to make
14  sure I understand.  The information that the
15  Hornets received from the NBA has what
16  relationship to the Oklahoma City report?
17    A.  As far as the BRI report?
18    Q.  Yes, sir.
19    A.  It's the same thing.  Yeah.
20  It's the same thing.
21    Q.  What CPA firm did the Hornets
22  use while they were in New Orleans?
23    A.  KPMG.
24    Q.  Do you have copies of the
25  various financial audits conducted by KPMG

Page 21

1  on the Hornets organization since 2002?
2      A.  Yes.
3      Q.  How long have the Hornets had
4  possession of the KPMG audits?
5      A.  I don't know.
6      Q.  Are they stored in file folders
7  in the Hornets' offices, sir?
8      A.  We have some -- We have some
9  audit reports in our folders.  Some I had to
10  request from them.
11      Q.  Have all audits reports from
12  2002 to the present been produced in this
13  case, sir?
14      A.  Yes.
15      Q.  When were those documents
16  produced?
17      A.  Again, probably would have been
18  in July, September, July through September
19  time frame, at various times.
20      Q.  Whether or not it happened in
21  July, August, or September may be relevant
22  in this situation.  I'd like you to take a
23  moment.  If you can recall, please let me
24  know when.  But when were these documents
25  specifically produced to counsel?

Page 22

1      MS. ANDERSON:
2          Objection.  Form.
3      A.  Again, I really -- with the
4  various information requests and the fact
5  that I was brand-new and I had just started,
6  there was a lot of things that, you know, I
7  do on a daily basis, and I just -- you know,
8  I can't pin down the exact time when those
9  documents came in.  I could certainly look
10  to find out.
11  EXAMINATION BY MR. BURAS:
12      Q.  I'm going to make a
13  representation to you and see if maybe this
14  jogs your memory.  On or about August 30th
15  of this year I sent correspondence to
16  counsel advising her that it did not look
17  like we had received information from any
18  third parties who might have information
19  regarding Hornets' financials such as
20  accounting firms.
21          Do you recall whether or not at
22  any point in time in the Labor Day time
23  period you were requested by counsel to
24  provide copies of your KPMG reports?
25      A.  I really don't remember.

Page 23

1      Q.  Do you have any idea why the
2  KPMG reports have not been produced prior to
3  your production of these documents in 2007?
4      A.  No.
5      MS. ANDERSON:
6          Objection.  Form.
7  EXAMINATION BY MR. BURAS:
8      Q.  Other than Mr. King -- Let's go
9  back to Mr. -- was it King?
10      A.  Uh-huh (Indicating
11  affirmatively).  Yes.
12      Q.  You said you spoke with him
13  several times.  Last time was in September
14  regarding the Oklahoma City documents.  What
15  did Mr. King tell you about the Oklahoma
16  City documents specifically?
17      A.  Well, he said that we would have
18  provided the BRI reports, and then he also
19  discussed at the end of the season that we
20  had -- that they had an audit that was
21  performed in Oklahoma City.  You know, I
22  don't know what scope of audit, but they
23  basically came in and audited the revenue,
24  local revenue number, and that's -- and it
25  was basically 30 days or so after the season

Page 24

1  ended, and that it was.  They were in for a
2  couple of days, and that was the extent of
3  it.
4      Q.  And just to make sure, I don't
5  mean to repeat myself, but have you ever
6  requested or have the Hornets ever requested
7  a copy of any of the Grant Thornton audits
8  that were conducted while the team was in
9  Oklahoma City?
10      A.  I'm not aware of that.
11      Q.  You're not aware of it or it
12  hasn't happened?
13      A.  I'm not aware of anybody -- I
14  know I haven't requested any documents from
15  Grant Thornton.
16      Q.  Have you ever directed anyone
17  working for you to --
18      A.  No.
19      Q.  -- produce any documents?
20      A.  (Shakes head negatively).
21      Q.  Other than your conversation
22  with Mr. King in September, have you had any
23  other conversation with him about his
24  investigation?
25      A.  Again, what do you mean by

DANIEL L. CRUMB                    CondenseIt™                    September 20, 2007

---

**Page 25**

1  investigation?
2     Q.  What steps did Mr. King take to
3  provide information relevant to the defenses
4  asserted by the Hornets in this case or
5  plaintiffs' request for production of
6  documents in this case?
7     MS. ANDERSON:
8        Objection.  Form.
9     A.  The only questions I asked were
10  in relation to, you know, anything supplied
11  to Oklahoma City.
12  EXAMINATION BY MR. BURAS:
13     Q.  Other than Oklahoma City
14  questions that took place in September, had
15  you had any previous conversations with Mr.
16  King about Oklahoma City documents?
17     A.  Can you repeat the question
18  again?
19     Q.  Sure.  I believe you indicated
20  that the conversation with Mr. King took
21  place in September related to the documents
22  provided to Oklahoma City.  You indicated
23  that you had conversations with Mr. King
24  between July, August, and September.
25        Did you have more than one

---

**Page 26**

1  conversation or just one conversation?
2     A.  I've had probably a couple of
3  conversations with Mr. King.
4     Q.  Other than the conversation in
5  September regarding the Oklahoma City
6  documents, what was the content and subject
7  matter of the other conversations you had
8  with Mr. King?
9     A.  I -- From time to time I've
10  asked him for various -- where various
11  financial information would have been kept
12  on the servers or, you know, in various --
13  you know, the office would have them.
14     Q.  Would this information have been
15  communicated in electronic format or over
16  the telephone?
17     A.  Typically, I would talk to him
18  over the phone.
19     Q.  Do you remember any specific
20  category of documents you were looking for
21  on the server?
22     A.  The BRI reports.
23     Q.  Anything else?
24     A.  Financial statements.  That
25  probably would have been the extent of it

---

**Page 27**

1  that I can remember.
2     Q.  All right, sir.  Are you aware
3  that the New Orleans Hornets previously were
4  located in Charlotte before the team moved
5  to New Orleans?
6     A.  Yes.
7     Q.  Do you have access to any of the
8  Charlotte team financial records?
9     A.  I -- I have not been able -- I
10  have not gotten any Charlotte financial
11  records.
12     Q.  When you say you have not gotten
13  those, does that mean you've never looked
14  for them?
15     A.  No.  I have.  But I have not --
16  I have not been able to get Charlotte
17  financial records other than the financial
18  statements themselves.
19     Q.  Where were the financial
20  statements from Charlotte located in the
21  Hornets?
22     A.  They were on a server.
23     Q.  Were these KPMG statements?
24     A.  No.  These were internal Solomon
25  statements, internally prepared.

---

**Page 28**

1     Q.  Do you know who the Hornets
2  accounting firm was in Charlotte?
3     A.  KPMG.
4     Q.  Do you know whether Mr. Brice
5  Collier knew that the Hornets used KPMG as
6  their accounting firm?
7     A.  At what time?
8     Q.  When Mr. Collier was serving as
9  the CFO.
10     A.  Yes.
11     Q.  Have you ever asked Mr. Collier
12  why he did not produce any of the KPMG
13  audited financials?
14     A.  No.
15     Q.  Have you had any conversations
16  with Mr. Collier about his investigation
17  conducted on behalf of the Hornets?
18     A.  His investigation, again, when
19  you're saying investigation --
20     Q.  Sir, all I'm trying to find out
21  is what documents he looked for and where he
22  looked for them.
23     A.  No, I haven't had any
24  discussions with Mr. Collier on that.
25     Q.  Have you reviewed any documents

---

Page 49

1  A.  The issues that I --
2  Q.  Related to the --
3  A.  -- requested information?
4  Q.  -- Quality Jobs Program.
5  A.  Oh, Quality Jobs?
6  Ms. ANDERSON:
7        Just make sure you don't talk
8  over each other.
9  EXAMINATION BY MR. BURAS:
10  Q.  I'm sorry about that.  When you
11  do depositions it's not like conversation,
12  where you can kind of talk back and forth,
13  and that's my apologies for doing that, sir.
14  A.  I understand.  Randy Serpas.
15  Q.  Do you know who Mr. Gary
16  Dressler is?
17  A.  I know who he is.
18  Q.  Is he one of the representatives
19  who also handles these matters for KPMG on
20  behalf of the Hornets?
21  A.  I'm not aware of whether he does
22  or not.  The only person I've dealt with
23  regarding this is Randy Serpas.
24  Q.  All right, sir.  Have you ever
25  calculated how much money the New Orleans

Page 50

1  Hornets have received from the Quality Jobs
2  Program since the team came to New Orleans?
3  A.  No, I haven't calculated the
4  total amount.
5  Q.  Do you know whether or not the
6  Hornets have produced documents from which
7  plaintiffs can calculate the amount of money
8  that the Hornets have received from the
9  Quality Jobs Program since the team came to
10  New Orleans?
11  A.  I'm -- I'm not aware of what's
12  been produced in regards to how you can
13  calculate that.
14  Q.  Do you know or are you able to
15  testify as to all of the financial
16  information that has been produced by the
17  Hornets to date in this case?
18  MS. ANDERSON:
19        Objection.  Form.  That's a
20  vague question.
21  A.  Yeah.  I don't understand
22  exactly --
23  EXAMINATION BY MR. BURAS:
24  Q.  Do you know what financial
25  information the Hornets have produced and

Page 51

1  have not produced in this case?
2  A.  No.
3  Q.  As we sit here today, are you
4  certain that all financial information for
5  the Hornets has been produced in this
6  litigation?
7  MS. ANDERSON:
8        I just have to lodge an
9  objection and note that we have an ongoing
10  review and production of documents in
11  storage.  So to the extent that there's
12  something in there that has not been
13  provided that you all haven't looked at --
14  A.  I'm not aware.  I've just been
15  here for three months.  I don't know what's
16  been requested before me, what's been
17  supplied as far as -- And I know there was a
18  lot of document requests.  I really can't
19  answer what's been -- if there are things
20  that haven't been provided.
21  EXAMINATION BY MR. BURAS:
22  Q.  All right, sir.  Are you aware
23  that one of the reasons you were produced as
24  a witness was to testify as the Hornets'
25  representative to discuss the chain of

Page 52

1  custody of all the documents that have been
2  produced by the Hornets?  And I've limited
3  your request to financial issues.
4  MS. ANDERSON:
5        Objection.  Form.  And that's
6  not an accurate statement.
7        Subject to that, if you can
8  answer that question, go ahead.
9  A.  Can you split it into -- ask me
10  just one question at a time?
11  EXAMINATION BY MR. BURAS:
12  Q.  Yes, sir.  Have all of the
13  requests for information that you've
14  received since you joined the Hornets, have
15  those requests been limited to financial
16  information requests by counsel?
17  A.  Yes.
18  Q.  Have you investigated any other
19  matters such as any Human Resources related
20  matter?
21  A.  What do you mean by Human
22  Resources related matter?
23  Q.  Personnel records.
24  A.  I have not looked at personnel
25  records.

DANIEL L. CRUMB                    CondenseIt™                    September 20, 2007

Page 65

1    Q.  I'd like for you to take a look,
2  sir, at a document that has been marked as
3  Exhibit 10.  It should be the next one on
4  that list.  I'm trying to go in order.
5        Have you ever seen a copy of
6  plaintiffs' second set of requests for
7  production of documents?
8    MR. BURAS:
9        Sir, while you're reviewing
10  that, just to save time, if you could get
11  him a copy of Exhibit 20.  That's the
12  Hornets' latest response to this request for
13  production of documents.
14    MS. ANDERSON:
15        I'm going to have to ask him.  I
16  don't know which one it is.  I'm not
17  positive.
18  EXAMINATION BY MR. BURAS:
19    Q.  Sir, before you start looking at
20  Exhibit 20, have you ever seen a copy of
21  Exhibit 10 before?
22    A.  I don't remember seeing this.
23    Q.  Okay.
24    A.  I don't recall -- I don't
25  remember seeing this.

Page 66

1    Q.  Okay, sir.  I want you to take a
2  look on Exhibit 20, take a look at number --
3    MS. ANDERSON:
4        The one he said he hadn't seen?
5    MR. BURAS:
6        Yes.
7  EXAMINATION BY MR. BURAS:
8    Q.  Take a look at Request for
9  Production No. 5, copies of all financial,
10  revenue, or ticket sales information
11  provided to the National Basketball
12  Association since 2002.  I believe you've
13  already testified that there exists reports
14  that were provided on a weekly basis to the
15  NBA related to ticket sales, correct?
16    A.  Yes.
17    Q.  You've also indicated that there
18  were -- I've suggested and you cannot verify
19  or deny the existence of postgame reports
20  that were provided to the NBA related to the
21  same financial and ticket revenue
22  information, correct?
23    A.  Yes.
24    Q.  And that no searches have been
25  conducted to find any information related to

Page 67

1  e-mails or other documents that might
2  confirm other information that might have
3  been submitted to the NBA regarding the
4  ticket, financial, or revenue data, correct?
5    MS. ANDERSON:
6        By him.
7    A.  Yeah.  I have not.
8  EXAMINATION BY MR. BURAS:
9    Q.  You have not verified and you
10  cannot verify that any e-mail searches have
11  been conducted to find out if any of your
12  predecessors might have submitted similar
13  information, correct?
14    A.  Yes.
15    Q.  And to date you've never looked
16  for that information, correct?
17    A.  Yes.
18    Q.  Do you know if all memos or
19  other information that might have been
20  submitted to the NBA along with any BRI
21  reports, such as documents, cover letters,
22  other information or follow-up requests from
23  the NBA regarding any of the BRI reports or
24  information submitted to the NBA have been
25  produced in this case?

Page 68

1    A.  I'm not aware.  Could you be
2  more specific in the question?
3    Q.  Sure.  None of the information
4  specifically transmitted by the Hornets has
5  been produced in this case.  That's my
6  statement.
7    MS. ANDERSON:
8        Objection.  Form.
9  EXAMINATION BY MR. BURAS:
10    Q.  What you've told me and what my
11  understanding is from counsel is that the
12  information related to the BRI reports has
13  been obtained by the Hornets from the NBA;
14  is that correct, sir?
15    A.  Yes.
16    Q.  No correspondence, documents,
17  e-mails, or other information that may have
18  been transmitted by the Hornets to the NBA
19  has been produced other than copies of the
20  actual reports.  Would you agree with that,
21  sir?
22    A.  The only thing I'm aware of is
23  the BRI reports being produced.
24    Q.  To date have you discussed or
25  looked for any correspondence, e-mails, or

DANIEL L. CRUMB                    CondenseIt™                    September 20, 2007

**Page 69**

1  other type of documents that may have been
2  submitted to the Hornets by the NBA or by
3  the Hornets to the NBA related to any
4  financial, ticket, or revenue information
5  since the team first came to New Orleans?
6      A.  No.
7      Q.  You never looked for this
8  information?
9      A.  I've looked for it, but I
10 haven't -- I haven't seen any information.
11     Q.  No cover letters that might have
12 been submitted with any documents to the
13 NBA?
14     A.  I haven't seen any cover letters
15 that we've submitted.
16     Q.  Have you looked for them, sir?
17     A.  I've looked at various reports.
18 You know, I've looked in searching for
19 various things on the computer, but I
20 haven't seen any cover letters or anything
21 like that.
22     Q.  And my specific question is have
23 you searched your predecessors' electronic
24 data and/or hard copies to determine if this
25 information exists?

**Page 70**

1      A.  No, I haven't.
2      Q.  Do you know if the Hornets have
3  ever conducted a search to see if any of
4  this information exists?
5      A.  I don't know.
6      Q.  Have you ever specifically
7  requested that such a search be conducted?
8      A.  No.
9      Q.  Do you know whether or not the
10 NBA has ever submitted a request for
11 additional information to the New Orleans
12 Hornets?
13     A.  I don't know.  You --
14     Q.  Are you aware that the NBA
15 conducted an audit of the Hornets' ticket
16 process in 2005?
17     A.  No, I'm not aware of that.
18     Q.  Do you have any documents or
19 evidence regarding or related to the
20 investigation conducted by the NBA of the
21 Hornets' ticket processes?
22     A.  No.
23     Q.  Have you ever looked for that
24 information?
25     A.  No.

**Page 71**

1      Q.  Is this the first time you're
2  hearing about this today, sir?
3      A.  Yes.
4      Q.  Have you ever asked any other
5  member of the Hornets organization whether
6  or not there's any additional information
7  that they had in their possession from the
8  NBA related to any ticket or financial data?
9      MS. ANDERSON:
10         Objection.  Form.
11     A.  All right.  Could you repeat
12 that question?
13 EXAMINATION BY MR. BURAS:
14     Q.  Yes, sir.  To date have you
15 asked any other member of the New Orleans
16 Hornets organization whether or not they
17 have any information that might be
18 responsive to plaintiffs' request for any
19 other documents, memos, or any other type of
20 document, such as an e-mail, relating,
21 discussing, or describing revenue, ticket,
22 or financial information requested by the
23 NBA to the Hornets or provided from the
24 Hornets to the NBA?
25     A.  No.

**Page 72**

1      Q.  I know you've indicated that
2  you've produced the BRI reports in this
3  case.  Request No. 7 says produce copies of
4  all supporting financial documentation.
5          What supporting financial
6  documentation would back up the BRI data
7  that was provided to the NBA?
8      A.  That comes from financial
9  statements.
10     Q.  The ones found in the Solomon
11 system?
12     A.  Yes.
13     Q.  Any other information that might
14 have been used to provide this information?
15     A.  That's all that I'm aware of.
16     Q.  Have you looked into the
17 production of BRI reports to determine if
18 there's any other type of information that
19 might be submitted to the NBA or used to
20 prepare the BRI reports?
21     A.  No.
22     Q.  So you don't know whether or not
23 there is any information; is that correct?
24     A.  I don't know what information
25 other than from the financial statements

Page 77

1  Q. Is that correct, sir, you had
2  copies of those contracts?
3  A. I obtained a copy from KPMG.
4  Q. Could the Hornets have obtained
5  copies of this contract from KPMG prior to
6  August 17, 2007 had they requested this
7  information?
8  MS. ANDERSON:
9  Objection. Calls for
10  speculation.
11  A. I don't know. I don't know if
12  we could or couldn't.
13  EXAMINATION BY MR. BURAS:
14  Q. Had you previously requested
15  this information from KPMG?
16  A. Previous to when?
17  Q. Previous to August 17th, 2007.
18  A. I don't remember. I just
19  remember we requesting -- I requested this
20  information at some point around that time
21  frame.
22  Q. Did KPMG give you any trouble in
23  producing this information to you?
24  A. No.
25  Q. Did KPMG respond in a timely

Page 78

1  fashion to your request for this
2  information?
3  A. Yes.
4  Q. Do you have any reason to
5  believe as you sit here today that if any of
6  your predecessors had requested copies of
7  this information from KPMG at any time
8  between 2005 and the present this
9  information could have been produced in a
10  more timely fashion?
11  MS. ANDERSON:
12  Objection. Form.
13  A. I don't know. To be totally
14  honest, I don't know what the circumstances
15  surrounding, you know, Katrina and
16  everything. You know, if this was around
17  the time frame of Katrina that you're
18  talking about, you know, certainly things
19  were very difficult to do in this city.
20  EXAMINATION BY MR. BURAS:
21  Q. I'm well aware of that, sir.
22  I'm from here.
23  In addition to the damage that
24  might --
25  MS. ANDERSON:

Page 79

1  But you didn't live here during
2  Hurricane Katrina, right?
3  MR. BURAS:
4  Pardon me?
5  MS. ANDERSON:
6  You actually didn't live in the
7  city at the time of Hurricane Katrina.
8  MR. BURAS:
9  Actually, I have multiple family
10  members who lost houses both in New Orleans
11  and the city of Chalmette. Counsel, let's
12  not go into our personal family issues
13  related to Hurricane Katrina.
14  MS. ANDERSON:
15  You brought it up.
16  MR. BURAS:
17  Let's take a break.
18  MS. ANDERSON:
19  That's probably a good idea.
20  (Following a brief recess, the
21  following proceedings were had.)
22  EXAMINATION BY MR. BURAS:
23  Q. Sir, it's my understanding from
24  press reports -- and I have no documents
25  provided by the Hornets -- that indicate

Page 80

1  that the State of Louisiana and the Hornets
2  engaged in additional negotiations following
3  Hurricane Katrina for the team to stay in
4  the City of New Orleans; is that correct?
5  A. Yes.
6  Q. Were financial documents or
7  ticket sales information or other types of
8  revenue information provided to the State of
9  Louisiana as part of these negotiations?
10  A. At what time? Because there's
11  been ongoing negotiations.
12  Q. My request for No. 8 says at any
13  time since 2002.
14  A. I can't answer what was --
15  Q. Have you ever looked for
16  information responsive to that question?
17  A. Yes.
18  Q. Do you know whether or not the
19  Hornets have provided financial, revenue,
20  and/or ticket sales information to the State
21  of Louisiana since 2002?
22  A. I can only answer what I've
23  provided.
24  Q. I understand that. Have you
25  ever asked Mr. Shinn whether or not the

DANIEL L. CRUMB                CondenseIt™                September 20, 2007

Page 89

1  know.
2      Q.  Have you ever looked for the
3  information?
4      A.  No, I haven't.
5      Q.  Do you know if there's a certain
6  person at the Hornets who conducted
7  negotiations with the city?
8      A.  At what time frame?
9      Q.  Any time frame you're aware of.
10     A.  Right now I'm not aware of us
11  conducting any currently, any negotiations
12  with the city.  I --
13     Q.  Do you -- Excuse me for
14  interrupting.
15     A.  No, I'm just -- I'm not aware of
16  it right now, currently.
17     Q.  Do you know whether or not the
18  Hornets designated a specific person within
19  the organization, a law firm, an accounting
20  firm, or any other agent or representative
21  to conduct negotiations with the City of New
22  Orleans?
23     A.  Right now, no, I'm not aware of
24  any -- anybody that they've -- that we have
25  -- that we've appointed or contracted with

Page 90

1  or anything to do negotiations with the
2  city.
3      Q.  All right.  Do you know about
4  before you came on with the Hornets?  Are
5  you aware of any specific person within the
6  Hornets organization, law firm, attorney,
7  accountant, or any other agent that the
8  Hornets used to conduct these negotiations
9  with the city?
10     A.  No.
11     Q.  You've never asked for any
12  information either since you joined the team
13  or before you joined the team related to
14  these issues, correct?
15     A.  Correct.
16     Q.  Have you ever been asked to
17  provide this information?
18     A.  No.
19     Q.  I want you to take a look at
20  Request for Production No. 11 that says:
21  Please produce copies of all financial,
22  revenue, or ticket sales information
23  provided to the City of New Orleans since
24  2002.
25      As you sit here today, can you

Page 91

1  verify that the Hornets do not have any
2  documents responsive to this request?
3      MS. ANDERSON:
4          I'm going to note, again, my
5  ongoing --
6      MR. BURAS:
7          Understood.
8      MS. ANDERSON:
9          -- objection.  The issue is the
10  documents that are currently being reviewed
11  that were recently located in storage.
12     A.  Can you ask your question again?
13  EXAMINATION BY MR. BURAS:
14     Q.  Sure.  As you sit here today,
15  can you verify that the Hornets do not have
16  any documents responsive to this request?
17     A.  No, I cannot verify that.
18     Q.  Has your counsel or any of your
19  superiors within the Hornets organization
20  asked you to produce or locate any
21  information related to financial, revenue,
22  or ticket sales information provided to the
23  City of New Orleans since 2002?
24     A.  No.
25     Q.  Has anyone ever told you who

Page 92

1  might have this information?
2      A.  No.
3      Q.  Have you ever asked anyone where
4  this information might be located?
5      A.  No.
6      Q.  It's my understanding you don't
7  have access to Archtics and do not know how
8  the system works; is that correct?
9      A.  I don't have access to it and I
10  really don't have an understanding of how it
11  works.  I don't -- It's just not something
12  that I work with on a daily basis.
13     Q.  All right, sir.  I want you to
14  take a look at Request for Production
15  No. 21.  It begins on Page 12.  And there's
16  subparts A through I.  For each month since
17  2002 please produce copies of, and we'll
18  start at A, all sources of revenue received
19  by the New Orleans Hornets for each month
20  since 2002.
21      Have the Hornets provided this
22  information to plaintiffs?
23     A.  Yes.
24     Q.  What documents or categories of
25  documents have this information?

DANIEL L. CRUMB                    CondenseIt™                    September 20, 2007

Page 93

1    A.  The monthly financial statement.
2    Q.  That's the only document, sir?
3    A.  That's the only document I'm
4  aware of that we produced -- that I produced
5  was monthly financial statements.
6    Q.  What sources of revenue do the
7  Hornets have?  What are the Hornets' sources
8  of revenue?
9    A.  We've got ticket sales, suite
10  sales, sponsorships.  You have NBA revenue
11  assistance.  You have NBA merchandise,
12  whatever licensed merchandise they sell.
13  Those are the primary -- The main sources
14  are tickets, suites, and sponsorships, you
15  know, sponsor revenue, and then you have --
16  in New Orleans you have concession revenue,
17  concession and parking.
18    MS. ANDERSON:
19        I'm not sure where this is --
20  I'm sorry.  Were you done, Dan?
21    THE WITNESS:
22        Just off the top of my head,
23  that's all I can think of.  I mean, I can
24  look at the statement and tell you.
25    MR. BURAS:

Page 94

1        I haven't had a chance to look
2  at that yet.
3    MS. ANDERSON:
4        I'm not sure where this is
5  going.  But to the extent it's getting
6  substantive, I would object and ask that we
7  get back on track with the chain of evidence
8  issues.
9  EXAMINATION BY MR. BURAS:
10    Q.  Other than the financial
11  statements, are there any other documents
12  such as contracts or agreements that have
13  been in place and/or summaries of sources of
14  information that would identify the sources
15  of revenue for the Hornets other than the
16  financial statement?
17    MS. ANDERSON:
18        Objection.  Form.
19    A.  Okay.  Again, could you break
20  that down for me, just one question at a
21  time?
22  EXAMINATION BY MR. BURAS:
23    Q.  Sure.  You've indicated that the
24  Hornets might have ticket revenue and that
25  would be a source of information.  I believe

Page 95

1  before you indicated that there were ticket
2  reports --
3    A.  Correct.
4    Q.  -- that would detail the revenue
5  received.
6    A.  Correct.
7    Q.  And that information has not
8  been produced, correct?
9    MS. ANDERSON:
10        Objection.  Objection.
11  EXAMINATION BY MR. BURAS:
12    Q.  I'm just trying to make sure I
13  understand.  If I'm incorrect --
14    A.  I haven't produced it.  I
15  produced monthly financial statements.
16    Q.  All right.  You indicated that
17  there's advertising revenue.  Is there an
18  advertising report detailing the amount of
19  advertising revenue and the sources of
20  advertising revenue that the Hornets have
21  received?
22    A.  Well, there's sponsorship
23  revenue.
24    Q.  Sponsorship revenue?
25    A.  Sponsorship revenue.  We do have

Page 96

1  reports.
2    Q.  Related to sponsorship revenue?
3    A.  Yes.
4    Q.  Have you provided information
5  related to sponsorship revenue reports?
6    A.  I have not produced any.
7    Q.  Have you ever been asked to
8  provide that information?
9    A.  No, I don't remember being asked
10  to provide that.
11    Q.  Other than ticket revenue and
12  sponsorship, what other sources of revenue
13  did you say they have?
14    A.  You have parking and
15  concessions.
16    Q.  How is that information provided
17  to the Hornets to let them know how much
18  revenue they were entitled to for parking
19  and concessions?
20    A.  That's provided by SMG.  They
21  have a settlement statement for each game,
22  and they provide us with how much revenue
23  from parking, concessions.
24    Q.  Has that information been
25  provided to plaintiffs in this case?

DANIEL L. CRUMB                    CondenseIt™                    September 20, 2007

Page 97

1    A.  I'm not aware of it.
2    Q.  What other sources of revenue?
3    A.  We have television revenue, the
4  national T.V. and the local T.V.
5    Q.  My understanding is that Cox
6  Network has a contract or at least at some
7  point in time had a contract with the New
8  Orleans Hornets to air their games; is that
9  correct?
10   A.  That is correct.
11   Q.  Cox's agreement with the
12  Hornets, has it been reduced to writing?
13   A.  Yes.
14   Q.  Has a copy of the contract with
15  Cox been produced in this litigation?
16   A.  I don't know if it has or not.
17   Q.  Have you ever been asked to
18  produce this information?
19   A.  I haven't been asked to produce
20  the Cox contract.
21   Q.  The sources of revenue that the
22  team receives from ESPN, AOL Time Warner,
23  any other sources related to national T.V.
24  broadcast, how do the Hornets know how much
25  information they're going to receive from

Page 98

1  each source?
2    A.  As far as the national, anything
3  the NBA has the contract, because those
4  contracts are with the NBA, AOL Time Warner,
5  ESPN -- actually, it's Turner right now.
6  It's not Time Warner anymore.  Those
7  contracts are directly with the NBA.  The
8  NBA provides to us this is what the contract
9  is and this is how much each team is going
10  to receive.
11   Q.  How is that information
12  transmitted from the NBA to each team or to
13  the Hornets specifically?
14   A.  It's circulated through a memo,
15  through a letter.
16   Q.  Has that memo been produced in
17  this litigation?
18   A.  I haven't produced it.
19   Q.  Have you ever been asked to
20  produce it by counsel?
21   A.  No.
22   Q.  Do you have access to those
23  memos?
24   A.  Yes.
25   Q.  All right.  Related to the

Page 99

1  amount of revenue received from each revenue
2  source for each month since 2002, have the
3  Hornets produced all of the information
4  responsive to the request set forth in
5  letter B?
6    A.  Yes.
7    Q.  All right.  What type of
8  document would contain this information?
9    A.  The monthly financial statement,
10  monthly income statement.
11   Q.  Monthly income statement?
12   A.  Income statement, yes.
13   Q.  I noticed there was a
14  consolidated income statement and then a net
15  operating statement based on the operating
16  account.  Which statement are you referring
17  to that would reflect this information?
18   A.  Consolidated income statement.
19   Q.  Is that the consolidated summary
20  income statement?
21   A.  There's a consolidated summary
22  and consolidated detail, and the
23  consolidated detail statement just provides
24  for detail; whereas, the summary is a higher
25  level view.

Page 100

1    Q.  The consolidated summary income
2  statement, it's my understanding, is based
3  on an accrual accounting basis; is that
4  correct?
5    A.  That is correct.
6    Q.  Is the consolidated detail
7  statement also based on accrual-based
8  accounting?
9    A.  Yes.  That's correct.
10   Q.  What reports other than the net
11  operating account statements do the Hornets
12  have that are based on cash-basis
13  accounting?
14   A.  That's -- Just the cash report.
15  We report everything on accrual basis.
16   Q.  Date of receipt for each source
17  of revenue, are you saying that's also
18  located on the consolidated detail reports?
19   A.  It's not going to have the date
20  of each receipt.  It's going to have the
21  revenue for that month, each month.  It will
22  have a total number of revenue for each
23  month.
24   Q.  But it's my understanding that
25  on the accrual-based accounting method if

Page 105

1 road. I'm not aware of any kind of sharing
2 or anything, any monies that they give us.
3     Q. I don't remember what your
4 answer was, but on Request for Production
5 No. 21, have you ever seen this Request for
6 Production No. 21 in any form such as
7 correspondence, e-mails, or other breakouts
8 from this document that may have been
9 submitted to you by your counsel?
10     And just to clarify, by
11 breakout, I mean maybe counsel submitted you
12 an e-mail specifically requesting this
13 information although maybe not identifying
14 it as Request for Production No. 21.
15     A. Counsel has requested --
16     Q. Each category of information?
17     A. No, not each category.
18     Q. Well, maybe we can expedite
19 things. Which categories of information has
20 counsel specifically requested?
21     A. A and B.
22 MS. ANDERSON:
23     Did you say B or D?
24 THE WITNESS:
25     B, as in boy. A and B are the

Page 106

1 ones that I'm aware of.
2 EXAMINATION BY MR. BURAS:
3     Q. C through I, have you ever been
4 specifically asked for that information
5 before?
6     A. I haven't been specifically
7 asked in this form.
8     Q. Do the Hornets receive any money
9 for radio broadcasts?
10     A. We receive television revenue,
11 local television revenue. I'm not aware of
12 whether it's -- radio is lumped into that or
13 not.
14     Q. Have you ever investigated to
15 find this information out?
16     A. No.
17     Q. I think we've already discussed
18 as it relates to letter F. There are
19 sponsorship reports that have not yet been
20 provided to plaintiffs in this case as well;
21 is that correct?
22     A. That I'm aware of.
23     Q. Request No. 22 requests copies
24 of documents identifying the amount of
25 revenue from the State of Louisiana or City

Page 107

1 of New Orleans received by the Hornets for
2 each year since 2002, including date of
3 receipt for each payment. Have the Hornets
4 produced this information to plaintiffs?
5     A. I'm not aware if we've produced
6 it to the plaintiffs.
7     Q. Have you ever been asked to look
8 for that information?
9     A. Yes.
10     Q. When was the first time you were
11 asked to look for this?
12     A. I really don't remember whether
13 it was July or August, September. All I was
14 asked was what type of revenue did we
15 receive from the state.
16     Q. Do you remember what your
17 response was?
18     A. Yeah. We -- What I said was we
19 had the naming rights' revenue. We get 1.9
20 million a year. As long as we don't get a
21 naming rights' sponsor we get 1.9 million a
22 year.
23     Q. Is that information set forth in
24 any type of a document, the names rights'
25 revenue that the Hornets receives?

Page 108

1     A. I'm not aware. I don't know.
2     Q. Have you ever looked for that
3 information?
4     A. No.
5     Q. Do the Hornets have a contract
6 with SMG?
7     A. Yes.
8     Q. Has a copy of that contract ever
9 been produced in this litigation?
10     A. I don't know.
11     Q. Have you ever been asked to
12 produce a copy of it?
13     A. No, I haven't.
14     Q. Do you have a copy of it?
15     A. I don't.
16     Q. Do you know who within the
17 Hornets organization might have a copy of
18 it?
19     A. Yes.
20     Q. Who?
21     A. Sam Russo.
22     Q. Do you know if Mr. Russo was
23 ever asked to produce a copy of it?
24     A. No, I don't know.
25     Q. Asked about Quality Jobs Program