SAMUEL RUSSO                CondenseIt!™                            9/12/07

**Page 1**

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA


EUGENE LIGER, ET AL          NO. 05-1969

VERSUS                       SECTION "C"

NEW ORLEANS HORNETS NBA
LIMITED PARTNERSHIP




        30(b)(6) deposition of SAMUEL
RUSSO, taken at JONES, WALKER, WAECHTER,
POITEVENT, CARRERE & DENEGRE, Attorneys at
Law, 201 St. Charles Avenue, 47th Floor,
New Orleans, Louisiana 70170, taken on
Wednesday, September 12, 2007.



REPORTED BY:
    KIM A. PRESCOTT,
    Certified Court Reporter
```

**Page 2**

```
APPEARANCES:
    Representing the Plaintiffs:

        DAIGLE, FISSE & KESSENICH
    BY: DANIEL E. BURAS, JR., ESQUIRE
        227 Highway 21
        Madisonville, Louisiana  70447

              AND

        NILES, BOURQUE & FONTANA
    BY: BRIAN KNIGHT, ESQUIRE
        909 Poydras Street
        Suite 3500
        New Orleans, Louisiana  70112


    Representing the Defendants:

        JONES, WALKER, WAECHETER,
        POITEVENT, CARRERE & DENEGRE
    BY: JENNIFER L. ANDERSON, ESQUIRE
              AND
        JANE HEIDINGSFELDER, ESQUIRE
        8555 United Plaza Boulevard
        Four United Plaza
        Baton Rouge, Louisiana  70809




REPORTED BY:
    KIM A. PRESCOTT,
    CERTIFIED COURT REPORTER
```

**Page 3**

```
                I N D E X

                                  PAGE

CAPTION                            1

APPEARANCES                        2

AGREEMENT OF COUNSEL               4

EXAMINATION BY:

    MR. BURAS, ESQUIRE             5

REPORTER'S CERTIFICATE            65
```

**Page 4**

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the above-named witness is hereby being taken under the Louisiana Federal Rules of Civil Procedure in accordance with the Code.

All formalities, including those of sealing, certification and filing are hereby waived. The witness reserves the right to read and sign the deposition.

All objections, except those as to the form of the questions and the responsiveness of the answers, are reserved until the time of the trial of this cause.

\* \* \*

KIM A. PRESCOTT, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

BORRELLO COURT REPORTING, INC. (504) 301-9631      EXHIBIT 3      Page 1 - Page 4



SAMUEL RUSSO                    CondenseIt!™                        9/12/07

Page 21

1   A  That's correct.
2      MS. HEIDINGSFELDER:
3         Ever or before August 5th
4   of 2005?
5      MR. BURAS:
6         He indicated he has never
7   been asked to produce this
8   information.
9      THE WITNESS:
10        As it relates to payrolls
11  and stuff.
12  BY MR. BURAS:
13  Q  Sir, you've reviewed each of the
14  categories that we previously circled and is
15  your answer the same for all categories or
16  do I have to go through each one?
17  A  I'll read them again but --
18  Q  Same answer, sir?
19  A  Uh-huh (affirmative response).
20  Same answer.
21  Q  All right, sir. At this point I'm
22  going to ask you to take a look at a document
23  that has not been previously identified. I'm
24  going to mark it as an exhibit. It's going
25  to be Plaintiff's Second Set of Requests for

Page 22

1   Production of Documents which is a set of
2   documents which was issued after the initial
3   expedited set.
4       So I'm going to hand you a document
5   marked as Exhibit 10. What I would like for
6   you to do is tell me if you have ever seen
7   this document before?
8   A  I think I may have seen this one
9   before.
10  Q  Sir, do you remember when you last
11  saw this document or first saw this document?
12  A  I can't remember first or last.
13  Q  All right sir. Can you give me a
14  range? Was it in 2005?
15  A  I don't believe.
16  Q  Was it last week?
17  A  It may have been last week.
18  Q  Is that the first time?
19  A  Yeah, uh-huh (affirmative
20  response).
21  Q  Do you remember which day last week
22  you may have seen this document?
23  A  I haven't seen this document.
24  Q  So you didn't see this document
25  last week?

Page 23

1   A  No.
2   Q  Have you ever seen a document
3   provided by your attorneys or anyone else
4   that you worked with summarizing their
5   request for information that are set forth
6   in this document?
7   A  No.
8   Q  I want you to take a look at Page 4
9   of this document, sir, and there's a
10  paragraph that's been bolded and indicates
11  demand is hereby made for defendant to notify
12  all necessary employees, agents, consultants,
13  contractors and/or all other necessary
14  persons or entities to cease and desist all
15  document destruction, purges, computer dumps,
16  e-mail destruction, sale or destruction of
17  computer hard drives, modification of saved
18  documentation, and all other actions that
19  will cause or may likely cause a destruction
20  or modification of information relevant to
21  this litigation. Do you see that paragraph,
22  sir?
23  A  Uh-huh (affirmative response).
24  Q  Did you take any action as the
25  Senior V. P. of Special Projects to ensure

Page 24

1   that no documents were destroyed?
2   A  In my world, yes.
3   Q  Were you notified by someone that
4   you had to take these steps?
5   A  Yes.
6   Q  Who notified you?
7   A  I believe counsel did.
8   Q  Was it personal to you, sir, or
9   was it to a group of Hornets employees?
10  A  To a group.
11  Q  Do you remember which persons were
12  in that group?
13  A  I don't.
14  Q  When did this conversation take
15  place or these instructions?
16  A  Probably in June or July of 2005.
17  Q  Was this message communicated to
18  you over a conference call or was it in
19  person?
20  A  It was in person.
21  Q  Was this to a large group of people
22  or was it to a small group of people that
23  this instruction was given?
24  A  It was given to I believe V.P.'s,
25  directors.

BORRELLO COURT REPORTING, INC.  (504) 301-9631          Page 21 - Page 24

Page 25

1  Q I apologize. I don't know if that
2  would be a large group or small group at the
3  Hornets.
4  A Medium.
5  Q About ten people?
6  A Yeah.
7  Q Twenty people? About ten people?
8  A Yes.
9  Q Was there any written instruction
10 provided to you at that time regarding what
11 documents you should -- excuse me -- what
12 steps you should take in response to this
13 document destruction?
14 A No.
15 Q Do you remember specifically what
16 you were told?
17 A This paragraph right here
18 (indicating).
19 Q Were you handed a copy of a
20 document with this paragraph or were you
21 verbally told?
22 A We may have been handed a copy of
23 that. I don't remember.
24 Q All right. During your role as
25 Senior V.P. of Special Projects, do you have

Page 26

1  any part or were any of your responsibilities
2  or duties involved with document retention
3  policies of the New Orleans Hornets?
4  A No.
5  Q Were you in charge of the IT
6  Department?
7  A No.
8  Q Did you have any written policies
9  or procedures that you provided to persons
10 who worked under you whether you were V.P.
11 of Operations, V.P. of Business Ops. or V.P.
12 of Special Projects?
13 A That's pretty broad.
14 Q Strike that. Did you have any
15 document retention policies that you issued
16 to your employees while you served in your
17 capacity in any of those three previous
18 positions?
19 A As it pertains to destruction -- as
20 it pertains to this paragraph?
21 Q We can limit it to -- do you have
22 any document retention policies in general
23 and then specific to this paragraph will be
24 my next question?
25 A We don't have any.

Page 27

1  Q You don't have any specific
2  document retention policies?
3  A Correct.
4  Q As specific as it relates to this
5  paragraph, do you know what steps were taken
6  by you or at your direction to ensure that
7  other employees or sub managers who were not
8  invited to this meeting made sure they did
9  not destroy any such documents?
10 A Just my own personal stuff. That's
11 all. I had no direct reports at that time as
12 Senior V.P. of Special Projects.
13 Q Okay. Sir, have you had an
14 opportunity to take a look at the various
15 Requests for Production to tell me whether
16 or not you were specifically asked to
17 investigate any of these matters? And, if
18 you were, when was the first time you were
19 asked to investigate them? We can take a
20 moment while you take a look at this or we
21 can do it in general. I can go point by
22 point or you can try to limit the inquiry.
23    MS. ANDERSON:
24      Do you want to try reading
25      through them yourself, Sam?

Page 28

1     THE WITNESS:
2        That's what I'm doing.
3     MR. BURAS:
4        Let's go off the record while
5        he's doing it.
6        (WHEREUPON: A brief discussion was
7        held off the record.)
8  BY MR. BURAS:
9  Q All right, sir. Do you have any
10 questions based on your review or are you
11 still reviewing the document?
12 A No, I haven't read them all yet --
13 Q Okay.
14 A -- but, for the most part, again,
15 we're into a lot of financial reports here
16 which I had no part in. The first item there
17 is pretty broad and pretty wide open like
18 anything we ever do, and since Kristy McKearn
19 was the point person and her office was next
20 to mine, occasionally she would walk in and
21 say do you have a copy of something and I
22 would make a copy for her and give it to
23 her. I can't remember which documents they
24 were or they weren't. I mean it's two years
25 and one big hurricane and I can't -- I can't

Page 29

1 remember every document that I did that for.
2    Q  Well, as it relates to number one,
3 what type of documents were you maintaining
4 in your office at that time?  Were you pretty
5 much the historian for the organization?
6    A  Yeah.  Historian!
7    Q  I don't mean that in a negative
8 way.  I mean that in a good way.
9        MS. ANDERSON:
10           I told you they were going to
11        be rude!
12       THE WITNESS:
13           Why don't we just change the
14        title again and I can fade into the
15        sunset in this story.  I would have
16        copies of the schedule -- okay? --
17        things like that.  I would have a
18        copy of the three-month calendar at
19        the arena because, as my position
20        of special projects, I was the
21        liaison with the arena so things
22        like that.
23           So I would, you know, supply
24        her with, you know, things like
25        that, nothing, you know, as it

Page 30

1        relates to the financial aspect of
2        any of these questions.
3 BY MR. BURAS:
4    Q  All right.  Let's just speak
5 specifically about the game schedule.  You're
6 talking about the pre-season and regular game
7 schedules?
8    A  Right, uh-huh (affirmative
9 response).
10   Q  You produced copies of that to
11 Kristy McKearn?
12   A  Right, uh-huh (affirmative
13 response).
14   Q  Do you remember doing that or you
15 just assume you did that?
16   A  I'm just assuming.  I mean I don't
17 remember specifically but that would be one
18 thing that I would have done.
19   Q  If Kristy had come to you that is
20 the type of document -- was it known in the
21 organization you would be the person who had
22 these documents?
23   A  Yes.
24   Q  Do you remember if Kristy
25 interviewed you to find out what documents

Page 31

1 you might have had responsive to this?  Do
2 you remember a specific instance where she
3 interviewed you?
4    A  No.
5        MS. ANDERSON:
6           Make sure you don't speculate
7        or assume.  Tell him what you
8        know.  Okay?
9        THE WITNESS:
10          All right.  Okay.
11 BY MR. BURAS:
12   Q  You indicated you were the person
13 who maintained a calendar of the arena.  I
14 don't know what --
15   A  I did not maintain a calendar.  I
16 was the person the arena would send a
17 three-month calendar to and I would
18 distribute it.
19   Q  What's the three-month calendar?
20   A  Events at the arena and Superdome
21 for the next three months.
22   Q  Was it specific to the Hornets or
23 any event?
24   A  Any event.
25   Q  Do you remember producing this to

Page 32

1 Kristy?
2    A  Not in hard copy form, no.
3    Q  Did you have an electronic copy of
4 it as well?
5    A  That's how I distributed it.
6    Q  You received electronic copies
7 every three months or how often would you
8 receive these copies?
9    A  Yeah, every three months.
10   Q  You would disseminate it throughout
11 the organization?
12   A  Yeah.
13   Q  And Kristy is one of the people who
14 would have received this?
15   A  Uh-huh (affirmative response).
16   Q  And, as you sit here, do you know
17 if Kristy provided you any information --
18 Kristy asked for any information related to
19 this three-month calendar in response to any
20 of your requests in this litigation?
21   A  No.
22   Q  Since August of 2005, do you
23 remember Kristy ever asking you for copies
24 of e-mails or hard copies of documents
25 responsive to the three-month calendar at