DONNA PIERRE ROCHON    CondenseIt!™    9/12/07

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2           EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
 6   EUGENE LIGER, ET AL      NO. 05-1969
 7   VERSUS                   SECTION "C"
 8
 9   NEW ORLEANS HORNETS NBA
     LIMITED PARTNERSHIP
10
11
12
13
14        30(b)(6) deposition (chain of
15   evidence) of DONNA PIERRE ROCHON, taken at
16   JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
17   DENEGRE, Attorneys at Law, 201 St. Charles
18   Avenue, 47th Floor, New Orleans, Louisiana
19   70170, taken on Wednesday, September 12,
20   2007.
21
22
23   REPORTED BY:
24        KIM A. PRESCOTT,
          Certified Court Reporter
25
```

Page 2

```
 1   APPEARANCES:
 2       Representing the Plaintiffs:
 3       DAIGLE, FISSE & KESSENICH
     BY: DANIEL E. BURAS, JR., ESQUIRE
 4       227 Highway 21
         Madisonville, Louisiana 70447
 5
                AND
 6
         NILES, BOURQUE & FONTANA
 7   BY: BRIAN KNIGHT, ESQUIRE
         909 Poydras Street
 8       Suite 3500
         New Orleans, Louisiana 70112
 9
10
11       Representing the Defendants:
         JONES, WALKER, WAECHTER,
12       POITEVENT, CARRERE & DENEGRE
     BY: JENNIFER L. ANDERSON, ESQUIRE
13              AND
         JANE HEIDINGSFELDER, ESQUIRE
14       8555 United Plaza Boulevard
         Four United Plaza
15       Baton Rouge, Louisiana 70809
16
17
     ALSO PRESENT:
18       SAMUEL RUSSO
19
     REPORTED BY:
20       KIM A. PRESCOTT,
         CERTIFIED COURT REPORTER
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3                              PAGE
 4
 5   CAPTION                    1
 6
 7   APPEARANCES                2
 8
 9   AGREEMENT OF COUNSEL       4
10
11   EXAMINATION BY:
12
13       MR. BURAS, ESQUIRE     5
14
15   REPORTER'S CERTIFICATE     243
```

Page 4

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the above-named witness is hereby being taken under the Louisiana Federal Rules of Civil Procedure in accordance with the Code.

All formalities, including those of sealing, certification and filing are hereby waived. The witness reserves the right to read and sign the deposition.

All objections, except those as to the form of the questions and the responsiveness of the answers, are reserved until the time of the trial of this cause.

    * * *

KIM A. PRESCOTT, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.


EXHIBIT 4

BORRELLO COURT REPORTING, INC. (504) 301-9631    Page 1 - Page 4

Page 5

1    DONNA PIERRE ROCHON,
2  1111 Lawrence Street, Lutcher, Louisiana
3  70071, who, after having been first duly
4  sworn by the Court Reporter, was examined
5  and testified on her oath as follows:
6         EXAMINATION
7  BY MR. BURAS:
8    Q  Ma'am, would you please state your
9  full name for the record?
10   A  Donna Pierre Rochon.
11   Q  Where are you currently employed,
12 Miss Rochon?
13   A  New Orleans Hornets.
14   Q  What's your current position?
15   A  Director of Human Resources.
16   Q  How long have you held that
17 position?
18   A  About two years.
19   Q  Do you remember when you were first
20 hired?
21   A  August 22nd.
22   Q  Were you hired specifically to be
23 the Director of Human Resources?
24   A  Yes.
25   Q  Did you hold any position with the

Page 6

1  Hornets before August of 2005?
2    A  As a temporary employee.
3    Q  What departments did you work in
4  with the Hornets as a temporary employee?
5    A  Human Resources.
6    Q  Who was your direct supervisor?
7    A  Kristy McKearn.
8    Q  Who is Miss McKearn?
9    A  Say it again, please.
10   Q  Who is Miss McKearn?
11   A  She was my supervisor.
12   Q  Was she the Director of Human
13 Resources before you?
14   A  No.  Her title was vice president
15 corporate affairs, strategic planning and
16 business operations.
17   Q  You indicated corporate affairs,
18 strategic planning and business operations.
19 All three or one of those three?
20   A  All three.
21   Q  When did you become a temporary
22 employee with the Hornets?
23   A  May 9.
24   Q  Did you have any supervisors other
25 than Miss McKearn?

Page 7

1    A  No.
2    Q  Are you aware that you've been
3  identified by the New Orleans Hornets to
4  testify on chain of evidence questions
5  related to the discovery in this case?
6    A  Yes.
7    Q  When did you first become aware
8  that you would be testifying in this case?
9    A  Yesterday.
10   Q  Are you aware that plaintiffs filed
11 a motion for contempt and sanctions against
12 the Hornets for failure to fully, timely and
13 accurately respond to the discovery requests
14 in this litigation?
15   A  Say it again, please.
16   Q  Are you aware that plaintiffs in
17 this case filed a motion for contempt and
18 sanctions against the Hornets for their
19 failure to timely, fully and accurately
20 respond to discovery requests in this
21 litigation?
22      MS. ANDERSON:
23         Just object to the form of the
24      question.  Assumes facts not in
25      evidence.

Page 8

1  BY MR. BURAS:
2    Q  Answer the question, ma'am.
3       MS. ANDERSON:
4          You can still answer the
5       question if you understand it.
6       THE WITNESS:
7          I don't understand the
8       question.  I'm sorry.
9  BY MR. BURAS:
10   Q  Do you know that there is currently
11 a motion pending before the court seeking
12 contempt and sanctions against the Hornets?
13   A  No.
14   Q  Are you aware or were you ever told
15 that the reason that we have a motion pending
16 before the court or that the reason you're
17 testifying today is because plaintiffs have
18 alleged that the Hornets failed to timely,
19 fully and accurately respond to discovery in
20 this litigation?
21   A  Repeat that question again, please.
22   Q  All right.  Are you aware that the
23 reason you're being presented as a deponent
24 to testify about chain of evidence questions
25 is because plaintiffs have alleged that the

Page 13

1  I'll have to take the long way.
2     A  I'm sorry. I was trying to
3  understand your question.
4     Q  No. No. No.
5        MS. ANDERSON:
6            And I object to the comment.
7  BY MR. BURAS:
8     Q  Did you help the Hornets prepare
9  any responses to any discovery requests prior
10 to June of 2007?
11    A  No.
12    Q  Did you help the Hornets
13 investigate any discovery requests provided
14 to plaintiffs prior to June of 2007?
15    A  Can you clarify, please, what you
16 mean by investigate?
17    Q  That is a question I don't know the
18 answer to, ma'am. I'm trying to find out
19 what role you played in providing information
20 to your attorneys related to the responses
21 that they provided to plaintiffs in this
22 litigation.
23    A  Okay.
24    Q  What was your role and when did you
25 first conduct any investigation pursuant to

Page 14

1  that role in this litigation?
2     A  My role was to provide or produce
3  information as requested.
4     Q  When were you told that that was
5  your role in this investigation?
6        MS. ANDERSON:
7            Objection; form.
8        THE WITNESS:
9            Sometime around the hurricane
10           or right after the hurricane.
11 BY MR. BURAS:
12    Q  So around August of 2005 or was it
13 thereafter?
14    A  Probably thereafter.
15    Q  When the hurricane struck the city,
16 did you evacuate to Oklahoma City?
17    A  Yes, I did.
18    Q  When did you return to the city?
19    A  On a permanent basis?
20    Q  Yes.
21    A  Or temporary?
22    Q  We will do both.
23    A  June of this year.
24    Q  June of this year you permanently.
25 On a temporary, were you working for the

Page 15

1  Hornets in their offices between the time
2  of the hurricane and June of 2007?
3     A  I'm sorry. Repeat that question
4  again, please.
5     Q  Sure you. You indicated that you
6  permanently returned to New Orleans in June
7  of 2007.
8     A  Correct.
9     Q  Between the time the hurricane
10 struck the city and June of 2007 you
11 indicated -- and I don't want to -- did you
12 return to the city on a temporary basis
13 during that interim?
14    A  Yes.
15    Q  Was it for work purposes?
16    A  Yes.
17    Q  All right. Where did you perform
18 your work responsibilities between the
19 hurricane and June of 2007 on those temporary
20 returns to the city?
21    A  I was at the 1615 Poydras Street
22 office to locate documents.
23    Q  Have you ever seen a copy of the
24 complaint filed in Federal Court related to
25 this case?

Page 16

1     A  No.
2     Q  Have you ever seen a copy of the
3  petition for damages filed in State Court
4  related to this case?
5     A  No.
6     Q  Do you know what the allegations
7  raised by plaintiffs are in these cases?
8     A  No.
9     Q  When was the first time you were
10 asked to provide information on behalf of the
11 Hornets related to any discovery requests
12 sent by plaintiffs to the Hornets in this
13 case?
14       MS. ANDERSON:
15           Objection; form.
16       THE WITNESS:
17           Repeat the question, please,
18       or clarify.
19       MR. BURAS:
20           Read it back, please.
21       (Court reporter read back the last
22       question.)
23       THE WITNESS:
24           Right around the hurricane.
25 BY MR. BURAS:

Page 25

1    I'm going to answer that one
2    for her because it's a complicated
3    question.
4    MR. BURAS:
5        Okay.
6    MS. ANDERSON:
7        I will refer you to our
8    September 11, 2007, letter which
9    I will attach as an exhibit --
10   MR. BURAS:
11       No objection.
12   MS. ANDERSON:
13       -- to this deposition as
14   Exhibit 1 indicating that Miss
15   Rochon is being only submitted
16   on the so-called chain of evidence
17   issues. She has not been
18   designated yet as a substantive
19   witness and here's a copy of
20   Exhibit 1.
21   BY MR. BURAS:
22   Q  Let's start off with the initial
23   disclosure.
24   MS. ANDERSON:
25       The witness has in front of

Page 26

1    her the initial disclosure.
2    MR. BURAS:
3        Counsel, this is the one I'm
4    going to mark as Defendant's
5    Exhibit -- excuse me, Rochon
6    Exhibit 2. This copy is for you.
7    This is the one we're actually
8    going to use.
9    MS. ANDERSON:
10       I will give you this one to
11   look at just so we're clear.
12   BY MR. BURAS:
13   Q  Ma'am, have you seen this document
14   before? What I handed you is the Hornets
15   initial disclosure which is dated on the last
16   page July. Have you ever seen this document
17   before?
18   A  No.
19   Q  When is the first time -- strike
20   that. I believe you indicated the first time
21   you were asked to assist the Hornets
22   investigating any responses or assist the
23   Hornets in preparing any responses to
24   discovery to plaintiffs was in August of
25   2005?

Page 27

1    MS. ANDERSON:
2        Objection; form.
3    THE WITNESS:
4        No.
5    BY MR. BURAS:
6    Q  When is the first time you were
7    asked to assist the Hornets in investigating
8    any responses to plaintiffs' discovery
9    responses?
10   MS. ANDERSON:
11       Objection; form.
12   THE WITNESS:
13       It was around the hurricane.
14       Specific date, I don't remember.
15       I'm sorry.
16   BY MR. BURAS:
17   Q  That's fair enough. Prior to
18   receiving -- excuse me. Prior to plaintiffs
19   propounding any discovery responses to the
20   Hornets, the Hornets provided something
21   called initial disclosures which are set
22   forth here. Were you asked to assist the
23   Hornets preparing any information that is
24   set forth in these initial disclosures?
25   A  It's possible.

Page 28

1    Q  But you don't remember as you sit
2    here today?
3    A  No. I'm sorry. I don't
4    specifically.
5    Q  I want you to take a look at
6    Section A. It identifies five individuals as
7    people likely to have discovery information
8    that defendants may use to support its
9    defenses. Do you see that section, ma'am?
10   A  Yes.
11   Q  Your name is not identified as one
12   of these five people, is it?
13   A  Correct.
14   Q  You were employed by the Hornets at
15   the time that these initial disclosures were
16   sent on a temporary basis. I believe that's
17   your previous testimony; correct?
18   A  That is correct.
19   Q  Did you meet with any attorneys
20   prior to July 21st, 2005, to discuss any
21   issues related to this litigation?
22   A  No.
23   Q  Were you aware of this litigation
24   in July of 2005?
25   A  Not specifically.

**Page 29**

1  Q  What do you mean not specifically?
2  A  I was not brought into any meeting
3  and informed about anything on that.
4  Q  But you were aware that the -- I
5  don't understand what you mean not
6  specifically. Does this mean that you were
7  aware there was litigation ongoing against
8  the Hornets at that time?
9  A  There was something going on but I
10 didn't know what it was.
11 Q  Okay. When is the first time you
12 found out what the litigation against the
13 Hornets involved?
14 A  It was after the hurricane.
15 Q  Okay. So prior to -- at the time
16 these initial disclosures were prepared on
17 or around the 21st of July 2005 -- that's
18 when they were provided to plaintiffs --
19 you played no role whatsoever in the
20 investigation of any information set forth
21 in this document; is that correct?
22      MS. ANDERSON:
23         Objection; form. Already
24      asked and answered. The question
25      is incorrect.

**Page 30**

1  BY MR. BURAS:
2  Q  You can answer.
3  A  And your question is -- again,
4  please, for clarification.
5  Q  My question is: Did you play any
6  role -- strike that. My question is to
7  confirm that you did not play any role in
8  the provision of any information set forth
9  in these initial disclosures; is that
10 correct?
11     MS. ANDERSON:
12        Object; form. And asked and
13     answered.
14     THE WITNESS:
15        No.
16 BY MR. BURAS:
17 Q  What was your role as a temporary
18 employee working under Miss McKearn?
19 A  To do the payroll for the staff and
20 to handle some of the H.R. responsibilities,
21 benefits, workers' compensation.
22 Q  Where did you work before May of
23 2005?
24 A  Ruth Chris Steakhouse.
25 Q  What did you do at Ruth Chris?

**Page 31**

1  A  Payroll supervisor.
2  Q  Ma'am, I'm finished with this
3  document. All right. I'm going to hand you
4  now a copy of this. This is going to be
5  Judge Berrigan -- the transcript of Judge
6  Berrigan's hearing.
7      MS. ANDERSON:
8         This is in the stack?
9      MR. BURAS:
10        It should be in that stack.
11     MS. ANDERSON:
12        Give me a minute to find it.
13     MS. HEIDINGSFELDER:
14        Which hearing is this?
15     MS. ANDERSON:
16        Is this the partial summary
17     judgment hearing?
18     MR. BURAS:
19        Negative. This is the August
20     17th, 2005, certification hearing.
21     MS. ANDERSON:
22        Okay. All right. I have it.
23 BY MR. BURAS:
24 Q  Ma'am, I'm going to give you a
25 document that's been marked as Rochon Exhibit

**Page 32**

1  3 which is the August 17th, 2005, transcript
2  related to certification hearing regarding
3  the overtime claims filed by plaintiffs in
4  this case.
5      I want you to take a look and turn
6  to the page which up at the upper left corner
7  is marked Page 13. You can take a moment to
8  review the document, ma'am.
9  A  (Witness complies.)
10     MS. ANDERSON:
11        At this point I just want to
12     lodge an objection for the record
13     that the scope of the questions
14     being asked in this case do not
15     relate to the pending motion for
16     contempt and sanctions which does
17     not reference any prior discovery
18     responses or prior disclosures in
19     this case. I just want to note
20     that for the record. I'm not
21     limiting your ability to ask
22     questions or this witness' ability
23     to testify.
24     MR. BURAS:
25        I believe my motion papers

Page 33

1    encompass all of these issues as
2    well.
3  BY MR. BURAS:
4    Q  All right, ma'am. Tell me when you
5  are ready.
6    MS. ANDERSON:
7       I'm sorry, Dan. Which page
8    did you call her attention to?
9    MR. BURAS:
10      It's going to be actually
11   the bottom of Page 12 and then
12   through the middle part of Page
13   13.
14   MS. ANDERSON:
15      Okay. So read it at least
16   that part, the bottom of 12 through
17   the middle of 13.
18 BY MR. BURAS:
19   Q  Ma'am, if you need more time to
20 read it, you tell me.
21   MS. ANDERSON:
22      That was going to be my note
23   exactly. You read whatever you
24   need to read and let us know when
25   you're done.

Page 34

1    MR. BURAS:
2       Let's go off the record for
3    just one minute while she's reading
4    the document.
5    (WHEREUPON: A brief discussion was
6    held off the record.)
7    THE WITNESS::
8       Are we starting on Page 12?
9  BY MR. BURAS:
10   Q  Yes. Okay, ma'am. On Page 12 Miss
11 Anderson responded to a question from the
12 court. The court asks: "No matter what we
13 call all of these categories or how we rename
14 them, in fact, it's only going to involve
15 about ninety more people?"
16      And Miss Anderson responded, "I
17 don't have a precise take on the number, but
18 there's been a turnover in the last three
19 years. My impression is that it's larger
20 than ninety, but I do have a couple of points
21 to make in response to Mr. Niles' concerns.
22 First of all, there is a solution to the
23 issue of job title change. He makes the
24 point that someone who may be a Fan Relations
25 Representative in 2005 which is called a Fan

Page 35

1  Development in 2004. The Hornets can produce
2  all of the prior job titles and names for a
3  particular position and thereby capturing
4  anybody who would have served in that role if
5  they are identified as a non-exempt position
6  that's at issue in this case now." Do you
7  see that, ma'am?
8    A  Yes.
9    Q  At any point in time after August
10 17th of 2005, were you asked to provide a
11 list of all of the different job titles or
12 names of particular positions including all
13 of the job title name changes since the
14 Hornets -- that involved any of the non-
15 exempt categories in this litigation?
16   A  Yes.
17   Q  When were you first asked to
18 provide that information?
19   A  After the hurricane.
20   Q  How were you asked to provide this
21 information?
22   A  Please clarify that question.
23   Q  What I want to know: Did you
24 receive a letter? Was it an e-mail? Was
25 it a personal phone call? Was it a

Page 36

1  face-to-face visit? How were you told and
2  in what form were you told to -- strike
3  that. How were you asked to give this
4  information? What was the manner in which
5  the communication was transmitted to you?
6    A  Telephone call from counsel.
7    Q  Do you remember as you sit here
8  today what you were asked to do; what
9  information you were asked to collect?
10   A  In reference to?
11   Q  In reference to that phone call
12 related to Pages 12 and 13 I just showed
13 you.
14   A  Just provide the job titles for
15 non-exempt positions.
16   Q  Were you asked to provide the
17 current job titles?
18   A  I don't recall.
19   Q  Do you know if you were asked to
20 go back and research all of the prior job
21 titles of these positions?
22   A  I don't recall that either.
23   Q  Do you know if you actually
24 investigated the prior job titles of any
25 of the categories of employees at issue

Page 37

1  in this litigation?
2  A  Yes.
3  Q  When did you conduct that
4  investigation?
5  A  Sometime after the hurricane.
6  Q  Do you remember when after the
7  hurricane?
8  A  No.
9  Q  Was it in 2005?
10 A  I don't remember.
11 Q  All right. I just want to clarify
12 the record. Do you remember -- was it more
13 likely to be in 2006 or was it more likely
14 to have occurred in the months after the
15 hurricane in 2005?
16    MS. ANDERSON:
17       Objection. Asked and
18       answered. She said she didn't
19       remember.
20    THE WITNESS:
21       I don't know.
22 BY MR. BURAS:
23 Q  How did you collect this
24 information?
25 A  Went back through the files.

Page 38

1  Q  What files?
2  A  The personnel files.
3  Q  How far back did the personnel
4  files go back in the Hornets' personnel
5  department?
6  A  At least 2002.
7  Q  Did you take the personnel files
8  with you when you moved to Oklahoma City?
9  A  Which ones, active or terms?
10 Q  That's my question to you. If
11 it's limited, you tell me.
12 A  It was limited.
13 Q  Which personnel files did you take
14 with you?
15 A  I took active files with me.
16 Q  When you conducted your
17 investigation, did you only review active
18 files to determine the different job titles
19 handed to various types or categories of
20 employees involved in this litigation?
21 A  No.
22 Q  So you also conducted an
23 investigation into the inactive files or
24 the employees who were no longer with the
25 Hornets; correct?

Page 39

1  A  Yes. And I did that by coming back
2  down here to do so.
3  Q  When is the first time you remember
4  coming back to New Orleans to investigate the
5  personnel files for the purpose of
6  identifying the job titles or names of
7  positions that may have changed in this case?
8  A  December of 2005.
9  Q  When you conducted your
10 investigation in December of 2005, which
11 files did you look for?
12 A  I believe I was provided a list and
13 I looked for those files that was on that
14 list.
15 Q  You were provided a list of what?
16 A  Names, plaintiffs.
17 Q  Who provided you with this list?
18 A  Legal counsel.
19 Q  So when you returned -- let me make
20 sure I understand. In December of 2005 when
21 you returned to New Orleans, you investigated
22 or reviewed documents related to the list of
23 plaintiffs involved in this litigation?
24 A  Not reviewed but pulled, retrieved
25 files or pulled documents.

Page 40

1  Q  What documents did you pull or
2  retrieve?
3  A  Commission reports, payroll
4  records.
5  Q  Anything else?
6  A  Personnel files. That's all I
7  remember.
8  Q  That's all that you remember?
9  A  Yes.
10 Q  Was there anything else or is that
11 all you remember?
12 A  That's all I remember at the
13 moment. That was my Christmas vacation.
14 That's how I remember specifically.
15    MS. ANDERSON:
16       Make sure you speak up. I
17       don't know if she's having any
18       trouble hearing you, but you're
19       pretty quiet.
20 BY MR. BURAS:
21 Q  In December of 2005, did you also
22 investigate the identities of any name
23 changes or category changes of classes of
24 employees; for example, if the Fan
25 Relation -- I believe the example in here

Page 89

1 records?
2  A  No.
3  Q  Where did you look for those
4 records?
5  A  In that storage.
6  Q  When is the first time you were
7 made aware of plaintiffs' allegations that
8 Adrianna Johnston may have maintained a
9 record such as we discussed?
10  A  That Friday before Labor Day
11 weekend.
12  Q  August, September of 2007?
13  A  Yes.
14  Q  Prior to that, you had never looked
15 for this document?
16  A  No.
17  Q  Prior to that, you had never been
18 asked to look for this document?
19  A  No, and I wouldn't have thought of
20 anything being for payroll in accounting.
21  Q  Since August 31st, 2007, other
22 than looking for records in the storage
23 department, have you gone to the other
24 departments within the Hornets to try to
25 find information related to the commissions

Page 90

1 that may be owed or commission reports
2 that might have been prepared for any sales
3 personnel working for the Hornets?
4  A  Can you repeat that question a
5 little slower this time? I'm sorry.
6  Q  Yes, ma'am. Since August 31st,
7 2007, have you gone to any other departments
8 within the Hornets organization to determine
9 whether or not they might have maintained
10 commission information relevant to plaintiffs
11 or any other sales employees that are
12 employed by the Hornets?
13  A  No.
14  Q  Have you ever requested that an
15 electronic search be conducted for records
16 in the Hornets IT or information computer
17 systems for information that may be
18 responsive to commission records maintained
19 by anyone other than yourself for commission
20 payments of any sales personnel working with
21 the Hornets?
22  A  And I apologize. I have to ask you
23 to repeat that.
24  Q  I'm going to rephrase that only
25 because the beep threw me off.

Page 91

1  A  It threw me off.
2  Q  Since August 31st, 2007, have you
3 requested the IT Department conduct a search
4 of the Hornets' computer systems to determine
5 if any other employee or department within
6 the Hornets organization has maintained a
7 record of commissions that may be owed to any
8 sales employees at any period of time since
9 the team moved to New Orleans?
10  A  No.
11  Q  To the best of your knowledge that
12 information may exist on a computer system
13 but it's never been looked for?
14  A  I have no idea.
15  Q  You don't know because it's never
16 been looked for; correct?
17  A  I don't know because I wouldn't
18 expect it to be there, nor do I know anything
19 about it.
20     MR. BURAS:
21        Object to being unresponsive.
22 BY MR. BURAS:
23  Q  Do you know if anyone from the
24 Hornets has ever looked for this information
25 on the computer systems?

Page 92

1  A  No.
2  Q  You don't know or it has not been
3 looked for?
4  A  I don't know.
5  Q  Have you ever requested that anyone
6 look for this information on the IT systems?
7     MS. ANDERSON:
8        Objection. Asked and answer.
9     THE WITNESS:
10        No.
11 BY MR. BURAS:
12  Q  Have you ever asked anyone to look
13 for this information or direct anyone from
14 the IT department to look for this
15 information?
16  A  I don't know why I would want to do
17 that or do that if all commissions are coming
18 to me in a hard copy.
19  Q  Did Adrianna Johnston work in the
20 payroll department?
21  A  Not that I know of.
22  Q  If Adrianna Johnston was
23 maintaining a record, it would have been a
24 record maintained outside of the resource
25 department and payroll department?

Page 93

1  A  I suppose if she did. I don't
2  know. I was not there at the time Adrianna
3  was there and, unfortunately, there wasn't
4  anyone to go to in accounting. We did not
5  have a CFO.
6  Q  Do you know if the prior CFO,
7  Barbara Booth, maintained a copy of
8  commissions that were owed to employees?
9  A  I do not.
10  Q  Would you look for those records?
11  A  I would not expect payroll records
12  to be in accounting if, in fact, H.R. was.
13  Q  Did you personally look for any
14  such records that Miss Barbara Booth may have
15  maintained?
16  A  I was unaware any existed or did
17  exist. I don't know. I did not look.
18  Q  That is my question. Did you
19  direct anyone to look for records that
20  Barbara Booth may or may not have maintained
21  related to commission sales -- commissions
22  that may have been owed to sales employees of
23  the Hornets?
24  A  No.
25  Q  So other than records that were

Page 94

1  physically maintained in the Hornets Human
2  Resources Department related to commissions,
3  you have not personally looked for, nor
4  instructed another person to look for
5  records that might relate to commissions
6  owed to sales employees; is that correct?
7  A  That is correct. To the point that
8  once we were told or informed that plaintiffs
9  alleged Adrianna maintained some type of
10  record, we looked or went to the storage
11  facility to look for those documents. Prior
12  to that, no.
13  Q  So until August -- the Human
14  Resources Department is the only department
15  you looked for these records until August
16  31st, 2007?
17  A  Correct. I would not expect them
18  to be anyplace else.
19     MR. BURAS:
20        Move to strike that. Object
21     as unresponsive.
22  BY MR. BURAS:
23  Q  #7, please produce a copy of the
24  Archtics sales records reflecting all work
25  performed by any plaintiff on any tickets

Page 95

1  sold, but not paid in full, during the
2  plaintiff's time of employment with
3  defendant.
4        Did you look for information
5  responsive to this Request for Production?
6  A  No.
7  Q  Did you direct anyone to look for
8  information responsive to this Request for
9  Production?
10  A  No.
11  Q  Do you know where this information
12  might be maintained?
13  A  No.
14  Q  #8, please produce a copy of any
15  documents reflecting commissions paid to any
16  plaintiff for any tickets sold by plaintiff
17  while employed by defendant, but where the
18  tickets were not paid in full until after
19  plaintiff stopped working for defendant.
20        I need you to read that one because
21  the wording is particular.
22     MS. ANDERSON:
23        Yeah.
24     THE WITNESS:
25        (Witness complies.) Okay.

Page 96

1        And your question is?
2  BY MR. BURAS:
3  Q  Were you asked to look for
4  information responsive to this Request for
5  Production?
6  A  No.
7  Q  Did you ever direct anyone to look
8  for information with regards to this Request
9  for Production?
10  A  No.
11  Q  All right. Are you aware that the
12  plaintiffs have made an allegation that they
13  would receive deposits on ticket purchases
14  from perspective -- excuse me, from ticket
15  holders; they would deposit money into the
16  account, but then before the tickets
17  were paid in full, they were either
18  terminated and/or stopped working for the
19  Hornets? Are you aware that is one of the
20  factual allegations made in this case?
21     MS. ANDERSON:
22        Objection; form.
23     THE WITNESS:
24        No.
25  BY MR. BURAS:

Page 101

1  Q  Did you request that anyone else
2  produce information that might be responsive
3  to #10?
4  A  Say it again, please.
5  Q  Did you ever request or direct
6  someone to look for information responsive to
7  #10?
8  A  No.
9  Q  Did your legal counsel or your
10 supervisor ever ask you to find any
11 information responsive to #10?
12 A  No.
13 Q  All right. Were you ever asked as
14 to #11 to produce copies of all Archtics
15 reports and documents reflecting sales
16 credited to Joe Andrade, Mark Mouton, David
17 Burke, Brendon Donahue or Chris Zaber since
18 June of 2002?
19 A  No.
20 Q  You were not asked to produce this
21 information?
22 A  I don't have access to Archtics.
23 Q  It's fair to say you didn't
24 personally look for it, nor did you request
25 anyone else look for this information since

Page 102

1  you didn't have access to Archtics; correct?
2  A  Correct.
3  Q  All right. #12, please produce
4  copies of employment contracts, compensation
5  agreements or other contracts between
6  defendant and any plaintiff.
7     Were you asked to produce this
8  information?
9  A  Yes, I was asked to produce
10 information.
11 Q  Were you specifically asked to
12 produce the information requested in #12?
13 A  Specifically for one plaintiff or
14 any plaintiff?
15 Q  For any plaintiff.
16 A  Yes.
17 Q  You've seen the language that's set
18 forth in #12 that says please produce?
19 A  No. This is the first time I've
20 seen this language.
21 Q  How did you first learn that you
22 were to look for information related to
23 employment contracts, compensation agreements
24 or other contracts between defendant and any
25 plaintiff?

Page 103

1  A  I was asked by legal counsel to
2  pull the personnel files, if there were
3  anything in that file; if they had not
4  already seen the file to provide those
5  documents.
6  Q  When were you asked to do this?
7  A  Sometime in 2006.
8  Q  I'm sorry?
9  A  It was after the hurricane.
10 Q  Is that the only time that you've
11 gone through each of the employee files of
12 the named plaintiffs in this litigation?
13 A  Yes.
14 Q  So, prior to some period of time in
15 2006, you had produced the records but had
16 not reviewed the records; correct?
17 A  Correct. That is correct.
18 Q  When you reviewed the records in
19 2006, do you remember if it was early 2006 or
20 late 2006?
21 A  No, I do not recall that.
22 Q  Do you know whether you determined
23 that any of the previous personnel records
24 that you had produced had incomplete
25 information at that time?

Page 104

1  A  No, I do not.
2  Q  Had you conducted any searches to
3  confirm that all of the information produced
4  in the previous production of the personnel
5  records contained all relevant information
6  requested by plaintiffs in this case?
7  A  Repeat your question again,
8  please --
9  Q  Sure.
10 A  -- a little slower.
11 Q  When you conducted your review of
12 the information actually in the employee
13 records sometime in 2006, did you confirm at
14 that time that all of the information that
15 had been requested by plaintiffs had actually
16 been produced by the Hornets?
17 A  Yes.
18 Q  All right. Where did you look to
19 determine that all of the information had
20 been previously produced?
21 A  First in the personnel file. If I
22 didn't find anything there, I went back into
23 the section where the rest of the terminated
24 files were to see if there was any paper
25 loose, not within a folder. So physically,

Page 105

1  yes, I looked through all of the terminated
2  files to try to find any additional
3  information.
4     Q  You did not include the off-site-
5  storage investigation at this time?
6     A  No. I wasn't aware that there
7  would be -- all of the files were there, you
8  know, in the office here.
9     Q  I believe your previous --
10    A  We established that.
11    Q  You had not conducted any e-mail
12 investigation or review of information or
13 computer systems of the Hornets to determine
14 if there was additional information
15 responsive to any of the requests?
16    A  To other requests or --
17    Q  Specific to this request.
18    A  To this request?
19       MS. ANDERSON:
20          What item number?
21       THE WITNESS:
22          #12. I'm sorry. Yes -- no.
23       I'm sorry. I lost track. Would
24       you repeat the question?
25 BY MR. BURAS:

Page 106

1     Q  Let's make this -- when you
2  investigated whether or not other contracts,
3  compensation agreements or other contracts
4  between the Hornets and any plaintiffs
5  existed sometime in 2006, did you limit
6  your search to those documents available in
7  the Human Resources Department?
8     A  Yes. I --
9     Q  If you have more information than
10 that, ma'am. I'm sorry to interrupt.
11    A  Yes. Meaning I looked through the
12 personnel record. As far as the no part, if
13 it was not in the personnel folder for that
14 person, I looked through all of the other
15 folders in between the folders in the
16 personnel office, yes.
17    Q  Did you contact Hornets' counsel to
18 determine if they had other records that
19 might be responsive?
20       MS. ANDERSON:
21          Did you say Hornets' counsel?
22       MR. BURAS:
23          Hornets' counsel.
24       THE WITNESS:
25          What do you mean Hornets'

Page 107

1        counsel, Jones, Walker? I'm not
2        sure who you --
3  BY MR. BURAS:
4     Q  Yes, ma'am. Let's start with
5  Jones, Walker.
6     A  That's the only counsel I had.
7  That's why I'm --
8     Q  Let's a start with Jones, Walker.
9  Did you contact Jones, Walker to find out if
10 they had any information that might be
11 responsive to this Request for Production?
12    A  Jones, Walker was asking me to
13 produce the information.
14       MS. ANDERSON:
15          That's the point.
16 BY MR. BURAS:
17    Q  Exactly. I'm just asking you, did
18 you at any point in time ask Jones, Walker to
19 review their own files to determine if they
20 had any information that might be responsive?
21       MS. ANDERSON:
22          Object to the form.
23       THE WITNESS:
24          I guess it's confusing.
25       MR. BURAS:

Page 108

1          Object. It is unresponsive.
2  BY MR. BURAS:
3     Q  It's a yes or no question. Did you
4  ever request your legal counsel review their
5  own files to see if they had any information
6  responsive to the request?
7        MS. ANDERSON:
8           Object to the form.
9        THE WITNESS:
10          I will have to say no.
11 BY MR. BURAS:
12    Q  Did the Hornets use any attorneys
13 other than Jones, Walker?
14    A  No.
15    Q  Are you aware of any other
16 accounting firms or consultants that the
17 Hornets may have used since 2005?
18       MS. ANDERSON:
19          Objection; form.
20       THE WITNESS:
21          Can you clarify your
22       question? I'm not sure I follow
23       it. I'm not sure I understand.
24 BY MR. BURAS:
25    Q  Do you know what accounting firms

### Page 109

1 the Hornets have used since 2005?
2   A  Yes.
3   Q  Did you contact any of those
4 accounting firms to determine if they had
5 any information responsive to any of these
6 Requests for Production?
7   A  No, I did not.
8   Q  What accounting firms did the
9 Hornets use that you're aware of?
10  A  KPMG.
11  Q  Any others?
12  A  That's the only one I know of.
13  Q  Did the Hornets use any payroll
14 services for any company?
15  A  Yes.
16  Q  What payroll service did they use?
17  A  ADP.
18  Q  Did you contact ADP to determine
19 if they had any information that might be
20 responsive to any of these Requests for
21 Production?
22  A  No.
23      MS. ANDERSON:
24          Counsel, by these, are you
25      talking about the ones that are

### Page 110

1       in front of her right now?
2       MR. BURAS:
3           At this point I'm only
4       relating the State Court
5       litigation.
6       MS. ANDERSON:
7           Got you. Exhibits 4 and 5;
8       correct?
9       MR. BURAS:
10          Yes. I think it's 4 through
11      6, though.
12 BY MR. BURAS:
13  Q  Did the Hornets payroll department
14 use any other outside services other than
15 KPMG and ADP?
16  A  For --
17  Q  For assisting them in the
18 production of the payroll or Human Resources
19 functions.
20      MS. ANDERSON:
21          Object to form.
22      THE WITNESS:
23          Not that I know of.
24 BY MR. BURAS:
25  Q  Did the Hornets use any specific

### Page 111

1 accountants or accounting firms in Oklahoma
2 City other than KPMG and ADP?
3   A  No.
4       MS. ANDERSON:
5           Objection; form.
6 BY MR. BURAS:
7   Q  #13 says please produce copies of
8 all termination letters offered or presented
9 to the plaintiff by the Hornets.
10          Did you personally conduct an
11 investigation to see if the Hornets had any
12 response to #13?
13  A  Yes.
14  Q  When?
15  A  Similar -- at the same time I did
16 the items requested in #12.
17  Q  So sometime in 2006?
18  A  I'm sorry. Yes.
19  Q  And you don't remember if it was
20 early, mid or late 2006; correct?
21  A  No. I'm sorry. I don't.
22  Q  Did you conduct this investigation
23 in Oklahoma City or New Orleans?
24  A  I had to come back to New Orleans.
25  Q  How many times did you come back to

### Page 112

1 New Orleans in 2006 related to work
2 functions?
3   A  Well, let's see. Three times.
4   Q  When? When were those three times?
5   A  Once in December of 2005; it would
6 have been March of '06 and again in May of
7 '06. So, yes, it would have been -- to go
8 back to your question earlier, I guess it
9 would have been the first half of '06. How
10 I remember when you asked is because I had
11 personal business I was taking care of here
12 and I would receive a call and I would try to
13 find the files.
14  Q  Other than the information located
15 in the personnel records, did you look for
16 any other information regarding termination
17 letters at any location?
18  A  Please repeat.
19  Q  Other than the information located
20 in the personnel records, did you look at any
21 other spot or area of the Hornets
22 organization to find out if there were other
23 termination letters or information available
24 to you?
25  A  Yes. Again, as I mentioned, going

Page 113

1 back in between the folders to see if there
2 was something there.
3   Q  Again, you limited your search to
4 the Human Resources Department?
5   A  Yes. I did not expect anyone else
6 to have those documents.
7   Q  Did you contact chief legal counsel
8 for the Hornets to determine whether or not
9 he might have had or she might have had any
10 responsive information?
11   A  Again, legal counsel was asking me
12 for the information so no.
13   Q  Did the Hornets have any internal
14 counsel --
15   A  No.
16   Q  -- after 2005 -- in August of
17 2005?
18      MS. ANDERSON:
19         Make sure you let him finish
20      his question before you answer.
21      THE WITNESS:
22         Yes.
23      MS. ANDERSON:
24         Answer his question.
25      THE WITNESS:

Page 114

1         I apologize.
2 BY MR. BURAS:
3   Q  Did the Hornets have any internal
4 legal counsel in August of 2005?
5   A  No.
6   Q  Do you know who Jack Capella is?
7   A  I've heard the name.
8   Q  Was Jack Capella working for the
9 Hornets in August of 2005?
10   A  No.
11   Q  To the best of your knowledge, the
12 Hornets have not had any internal counsel
13 since August of 2005?
14   A  As far as securing legal counsel in
15 reference --
16   Q  I don't understand your
17 distinction.
18   A  I'm trying to understand your
19 question. I apologize.
20   Q  I guess what I'm trying to find
21 out is: Did the Hornets have -- we in the
22 legal profession deem legal counsel that work
23 internally with the Hornets after August of
24 2005 someone on the Hornets payroll who was
25 deemed general counsel.

Page 115

1   A  During 2005 and during 2006?
2   Q  Any time since 2005.
3   A  Yes, we do have general counsel
4 now.
5   Q  Who is that general counsel?
6   A  Richard House.
7   Q  When did Mr. House begin working
8 for the Hornets?
9   A  August 1, 2007.
10   Q  Did you ever ask Mr. House if he
11 had records that reflect any information
12 responsive to Request for Production #13?
13   A  No.
14   Q  Do you know if Mr. House had access
15 to the records that were maintained
16 previously by Mr. Capella?
17   A  No, I do not.
18   Q  Did you ever ask him if he had
19 access to the records that might have been
20 maintained by Mr. Capella?
21   A  No, I did not.
22   Q  Do you know if any of the records
23 maintained by Mr. Capella were transmitted or
24 transferred to Jones, Walker?
25   A  No, I do not.

Page 116

1   Q  #14, copies of all documents
2 presented to or reviewed with any plaintiff
3 during their exit interviews with defendant.
4 Do you understand what this request is
5 looking for?
6   A  No. Please clarify.
7   Q  Do the Hornets -- when an employee
8 leaves his employment with the Hornets, does
9 that employee have to go through the Human
10 Resources Department?
11   A  Yes.
12   Q  When the employee goes to the Human
13 Resources Department, do you go over any
14 documents or do the Hornets go over any
15 documents with those employees?
16   A  Yes.
17   Q  Do you know what type of documents
18 are generally presented to a departing
19 employee when they leave the Hornets
20 employment?
21   A  Generally the employee is explained
22 when their benefits terminate and when their
23 last paycheck will be paid.
24   Q  How is a terminated employee told
25 what their final paycheck is going to be?

Page 133

1 And we're not putting her
2 up for the personal deposition. It
3 was not noticed or requested. She
4 is only being offered regarding
5 chain of evidence issues.
6 BY MR. BURAS:
7 Q Were you asked to look for the
8 information requested in Request #22 related
9 to all payroll and other records setting
10 forth the percentage commission each named
11 plaintiff was entitled to for each period of
12 employment with defendant?
13 A Excuse me. Your question is?
14 Q Were you asked to look for
15 information responsive to this request?
16 A No.
17 Q Did you ever ask anyone to look for
18 information responsive to this request?
19 A No.
20 Q Does your department maintain any
21 records set forth in this request?
22 A No.
23 Q Does your office maintain the
24 commission contracts that each employee
25 signs? The sales employee, I should say?

Page 134

1 A Yes.
2 Q That information would have been
3 located in the Human Resources Department;
4 correct?
5 A Yes.
6 Q It would have been in the personnel
7 files; correct?
8 A Correct.
9 Q So you would have had information
10 responsive to this and you would have
11 provided it to your counsel or your
12 supervisors in other requests; is that
13 correct?
14 A Yes.
15 Q But you were not specifically asked
16 to look for any information related to the
17 actual percentage of commissions each
18 plaintiff was entitled to receive; correct?
19 A It's possible I could have been
20 asked for that information. If it was in
21 their folder or their file, it would have
22 been provided. But to say I actually looked
23 for that -- I was asked to look for a lot of
24 information.
25 Q That's my question, ma'am, and

Page 135

1 that's why before when you said you were not
2 asked to look for it, you're saying you might
3 have looked for it. I just need the answer
4 yes, no or you don't remember.
5 A I don't remember. I'm sorry.
6 Q I believe we talked about earlier
7 in the deposition if you answer a question
8 and you respond, I'm going to assume that you
9 understood my question, and your response is
10 your response under oath. If you're going to
11 change your mind or if your information in
12 your answer is going to change. That's fine
13 if your earlier response was inaccurate, but
14 if you don't understand what I'm asking,
15 please let me know ahead of time because
16 there is no need to backtrack if we don't
17 have to. Okay?
18     #22 the question was: Were you
19 specifically asked to provide information
20 responsive to #22 and your previous response
21 was no. Have you changed your response to
22 yes at this time? I don't understand your
23 response.
24 MS. ANDERSON:
25     Object to form of the

Page 136

1 question.
2 THE WITNESS:
3     My answer is no but as I
4     indicated earlier if it was in
5     the employee file that I submitted
6     or turned over or produced again,
7     I don't know.
8 BY MR. BURAS:
9 Q So other than information that
10 might have been located in the employee
11 files, did you not look for any other
12 information responsive to #22?
13 A Correct.
14 Q What about 23 related to payroll or
15 other records setting forth or explaining the
16 basis of pay for each named plaintiff by
17 indicating the monetary amount paid on a per
18 hour, per day, per week or other basis?
19     Were you asked to provide
20 information responsive to this request?
21 A No.
22 Q #24. Payroll or other records
23 setting forth total wages paid to each named
24 plaintiff for each pay period, including in a
25 separate category any amounts paid in

Page 137

1  commission. Were you asked to look for
2  information relating to #24?
3      A  Yes.
4      Q  Who asked you to look for this
5  information?
6      A  My supervisor.
7      Q  Kristy McKearn?
8      A  Kristy McKearn.
9      Q  Did this take place around --
10     A  Somewhere around the hurricane.
11         MS. ANDERSON:
12             Let him finish his question
13         before you answer. If you talk at
14         the same time, it makes it
15         difficult for her to do her job.
16 BY MR. BURAS:
17     Q  And where did you look for
18 information responsive to #24?
19     A  It was in the payroll register and
20 all of the payroll records.
21     Q  To the best of your knowledge, was
22 all of the information related to plaintiffs
23 in this litigation found responsive to #24?
24     A  Yes.
25     Q  #25 I believe we answered

Page 138

1  accurately in the other ones. Archtics
2  reports, I'm not going to ask that. That's
3  going to include the first request.
4         Now, how are we doing on restroom
5  breaks? You are in charge of all bathroom
6  breaks. If you need to take one, let me
7  know.
8         MR. BURAS:
9             Off the record.
10        MS. ANDERSON:
11            We're done with Exhibits 4, 5
12        and 6 at this point?
13        MR. BURAS:
14            Yes, we're done with 4, 5 and
15        6 at this point.
16        MS. ANDERSON:
17            All right.
18        (WHEREUPON: A lunch break was
19        taken.)
20 BY MR. BURAS:
21     Q  Miss Rochon, I just handed you a
22 document I marked as Exhibit 7. The document
23 is a pleading entitled Plaintiffs' Request
24 for Expedited Production of Documents Related
25 to Emergency Protective Order and Plaintiffs'

Page 139

1  Motion to Certify a Collective Action. Did
2  you have that document?
3      A  Yes.
4      Q  Have you ever seen this document
5  before?
6      A  No.
7      Q  Why don't you take a look at the
8  various requests that are set forth in this
9  document. I believe it is -- there are 30 in
10 number beginning on Page 4 through Page 9.
11 I'm going to be asking you questions about
12 whether or not you were responsible or asked
13 to produce any information responsive to
14 these requests. Before I do that, please
15 turn to Page 10 and I'd like to verify the
16 Certificate of Service that indicates this
17 document was sent to your counsel July 25th,
18 2005; correct?
19     A  Correct.
20     Q  Take a moment. I believe earlier
21 we went over some State Court pleadings. To
22 the extent that any information we went over
23 earlier is duplicative of any information
24 requested in this document, I'm going to try
25 to narrow the scope and try to limit things.

Page 140

1         In addition, just to give you some
2  background, your counsel filed a motion and
3  we discussed this with the court and the
4  court actually limited the request that the
5  Hornets had to respond to pursuant to this
6  Request for Production of Documents.
7         There's a court order dated August
8  2nd, 2005, which specifically discusses which
9  numbers. So as it relates to those numbered
10 documents, I'm going to only ask you
11 questions as to the numbered documents that
12 the court ordered produced. Okay? So you
13 won't know that until I tell you is the
14 reason I'm telling you that.
15     A  Okay.
16        MS. ANDERSON:
17            Do you want her to read the
18        whole set?
19        MR. BURAS:
20            There's no need to unless she
21        wants to at this point.
22        MS. ANDERSON:
23            Just call her attention to a
24        particular number?
25        MR. BURAS: