# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EUGENE LIGER, ET AL** | *****CIVIL ACTION NO. 05-1969** |
| | ***** |
| **Plaintiffs in a Collective Action** | *****SECTION C** |
| | ***** |
| **versus** | *****MAGISTRATE 05** |
| | ***** |
| **NEW ORLEANS HORNETS NBA LIMITED** | ***** |
| **PARTNERSHIP** | ***** |
| | ***** |
| **Defendant** | ***** |
| | ***** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPLY MEMORANDUM IN
## SUPPORT OF MOTION FOR CONTEMPT AND SANCTIONS

### Report To The Court Regarding Chain of Custody Depositions

This Court must severely sanction the Hornets. Enough is enough. The Hornets have repeatedly misrepresented facts to this Court to avoid adverse rulings and sanctions, and continue to do so in their opposition memorandum. The Hornets fail to grasp that the unreasonableness of their actions is not the subjective view of Plaintiffs – it is based on their non-compliance with Court orders. The wayward opinion of this defendant, who now openly contends that violation of Court Orders is reasonable behavior, is absurd. The Hornets have intentionally and purposefully ignored Magistrate Chasez' orders from the outset of this litigation and have not demonstrated that their rebellious attitude towards this Court will stop. The evidence before the Court is clear and overwhelming. The Hornets' have caused and will continue to prejudice Plaintiffs through a persistent pattern and practice of reckless non-compliance that demonstrates a callous disregard for their own misconduct and this Court's Orders. Plaintiffs have proven <u>through the</u>

Hornets' own witnesses that this defendant is one of the most wayward and non-compliant defendants in the history of the Fifth Circuit.[1]

All Hornets responses since 2005 have been derived from individuals who first investigated responses for the Hornets. Many of these Hornets' employees are the same persons whose misconduct was directly implicated in many of the allegations raised by Plaintiffs. Nevertheless, they were appointed by the team to lead the discovery efforts. Essentially, the foxes that guarded the henhouse were asked for documents proving that they ate the chickens. Not surprisingly, no such documents were identified under their watch, and indeed to date such discovery has either just been produced or remains outstanding.

For example, Kristy McKearn, who threatened to take adverse employment action against any employee who joined this suit, was named the Hornets point of contact for all discovery investigations and filtered all requests from Hornets counsel. McKearn failed to contact employees known to have information proving Plaintiffs' damage claims. Other information provided by employees to McKearn was never produced to Plaintiffs.

Three sales managers who caused Plaintiffs to lose commissions, Brendan Donohue, Chris Zaber, and Dave Burke, allegedly were asked to provide all sales documents related to commissions. We now know that entire databases of sales information were omitted and some documents were destroyed. Documents identifying the amount in commissions that Plaintiffs are owed, including documents handed to these individuals by Plaintiffs, have never been produced.

---

[1]  See cases cited in Section I.

Gross misrepresentations about the existence of information or documents that must have been made by these individuals in the early phase of this litigation were relied upon as complete and accurate by Hornets counsel. Presumably without knowledge that answers were incorrect, Hornets' counsel continually repeated to the Court and Plaintiffs these falsities. Subsequent discovery responses and searches relied upon the adulterated facts provided by the aforementioned wrongdoers. All Hornets conduct since this case was first filed has now undermined Plaintiffs' ability to prepare this case for trial.

Only after the Court's August 17, 2007 deadline did the Hornets question the original responses they provided to Plaintiffs and the Court. New searches – limited in scope – revealed the deception perpetrated by the Hornets on both the Court and Plaintiffs. Documents readily available in the Hornets' offices were never investigated. Persons who were known within the organization to have relevant, responsive information were never interviewed. The existence of databases used by all sales employees and reports sent in accordance with NBA rules were denied. In short, Plaintiffs and the Court now know that the first two years of discovery has been sabotaged by the Hornets. This is unacceptable conduct requiring the immediate imposition of severe sanctions.

Astonishingly, armed with the knowledge that the veracity of the original responses were tainted, **the Hornets continue to misrepresent to the court that critical financial documents have been produced when they were not.** Specifically, Plaintiffs' review of all documents produced by the Hornets as of 11 October 2007 confirmed that cash receipt reports and Operating Account summaries have not yet been provided for any time prior to June of 2003. Because this information has not been provided,

Defendant cannot prove its alleged defenses apply in 2002, 2003, or 2004. Accordingly, Plaintiffs request that this Court strike all defenses applicable in those years because of this blatant, overt, and continuing misrepresentation to the Court.

Furthermore, the Hornets have repeatedly promised discovery responses and failed to honor their commitments both prior to and after the filing of Plaintiffs' Motion for Contempt and Sanctions.[2] Since the Motion for Sanctions was filed, the Hornets continue to ignore their discovery obligations. For example, on September 6, 2007, binders containing newly disclosed "batch reports" were requested by Plaintiffs. On September 19, 2007, Plaintiffs reiterated their request for these Batch Reports. To date, none have been provided. Furthermore, since September 12, 2007, the Hornets represented that additional documents would be forthcoming based on the continuing review of boxes in storage. Those documents have also not been produced.

The Hornets continue to make surprise productions of critical documents. The most recent occurred <u>during the 30(b) (6) depositions</u> to deny Plaintiffs the opportunity to properly review documents. **<u>The Hornets previously represented that these documents had been produced or did not exist. All were ordered produced by Court imposed deadlines that had already expired.</u>** The production included 12 pages of overtime records for Plaintiffs, a copy of an updated employee manual dated December 1, 2006 wherein the Hornets <u>admit</u> they owe Plaintiffs overtime pay, and financial records produced minutes before the deposition of the Hornets financial representative. <u>See</u> Ex. A; B; C; and F, 42-44. The timing of this production was clearly

---

[2]    These well documented failures of the Hornets prior to the current motion are included in numerous pages of correspondence attached to Plaintiffs Motion to Compel.

designed to cause the most prejudice to Plaintiffs.[3]    The Hornets chose to produce documents at their own leisure in a blatant attempt to overwhelm Plaintiffs with critical information at the last moment.[4]

In addition to these continuing violations, the Hornets have flaunted the unfair advantages gained through the procrastination tactics employed during Rule 37 conferences that delayed Plaintiffs' decision to file Motions to Compel. The memoranda and letters attached to Plaintiffs' Motion to Compel show that the Hornets repeatedly agreed to produce information to avoid the filing of a Motion to Compel. Because Rule 37 required Plaintiffs to afford the Hornets an opportunity to cure their discovery deficiencies, Plaintiffs were forced to wait until it became clear that the Hornets did not intend to follow through on their prior agreements. Only after the Motion to Compel was filed did the Hornets feign ignorance of the basic civil procedure requirement of producing documents in their "possession, control, or custody." Not surprisingly, the Hornets remain in contempt of Magistrate Chasez' September 10, 2007 Order to produce this information. Accordingly, it is unconscionable for the Hornets to use their own

---

[3]   Magistrate Chasez already stated there is no doubt that Plaintiffs were prejudiced and harmed by the Hornets misbehavior. See BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1051 (11th Cir. 1994) (a party who learned of a discovery violation on the eve of trial suffers prejudice resulting from the time and expense of wasted trial preparation). Plaintiffs were forced to move for a continuance because their trial preparation was undermined by the Hornets' misconduct. The Hornets withheld damages evidence, withheld defense oriented financial records, and admitted that most Hornets' discovery responses are incomplete. Consequently, much of Plaintiffs' trial and expert witness preparation was rendered useless overnight, thereby increasing the time, costs, and resources that Plaintiffs must expend redoing tasks. The cost factor alone makes the imposition of more severe sanctions both appropriate and necessary.

[4]   A party's violation of a time specific order is not cured by subsequent compliance at his leisure. See Young v. Gordon, 330 F.3d 76, 82-83 (1st Cir. 2003). "At the very least, such violations undermine the court's efforts to manage its docket efficiently and effectively." Id. at 83. If a party's disdain for the Court's discovery schedules is effectively "condoned by a slap on the wrist," the Court would lose control over discovery. Id. at 83. "When a party flouts a time-specific order, that purpose is frustrated unless the court sends a strong signal. Imposing a meaningful sanction delivers just such a message." Id., citing Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639, 643 (1976).

deceptive practices as the basis of any effort to avoid sanctions because of the allegedly "delayed" filing of a Motion to Compel. In any event, the Hornets have failed to comply with subsequent orders of the Court, confirming their utter disregard for this Court's orders or any fundamental notions of fairness.

I.    **CASE LAW CONFIRMS THAT SEVERE SANCTIONS ARE WARRANTED**

Pursuant to Magistrate Chasez's Orders, plaintiffs completed the "Chain of Custody" depositions of the Hornets' designated "Chain of Custody" representatives on Thursday, September 20, 2007. True to the Hornets' continuing tactics of delay and avoidance, all four "Chain of Custody" witnesses who testified between September 12-20, 2007 had minimal knowledge regarding the Hornets' efforts to respond to discovery or confirmed that no investigations were conducted.[5] Consequently, the Hornets have still not established a "Chain of Custody" proving that any of their untimely productions or blatant violations of this Court's orders should not be severely sanctioned.

The Hornets' testimony confirmed that documents requested by Plaintiffs have never been looked for, much less produced, despite representations by the Hornets to the contrary. The Hornets have yet to conduct an IT investigation to locate documents that might be available on the Hornets servers. The Hornets have no document retention policy, nor do they know what documents may have been deleted or altered. Documents the Hornets could have easily produced were never requested or produced by the Hornets point of contact. The team has not even attempted to search for entire categories of documents. Proper witnesses were not interviewed and some of those witnesses have

---

[5]    Copies of all depositions are attached in their entirety to capture the full extent of the expressed ignorance of the 30(b)(6) representatives.

deleted relevant information. Additional third party documents ordered produced have yet to be identified or produced.

The Hornets have been afforded ample opportunities to avoid the imposition of more severe sanctions. They consciously elected not to conform their behavior. The Hornets are currently in violation of the Court's order to produce relevant third party documents in the Hornets custody or control. They are currently in violation of the Court's order to produce 30(b) (6) witnesses within seven days of Plaintiffs deposition, but have not offered dates for these depositions until the end of October, 2007. They are currently in violation of Court orders to produce financial records. The Hornets continue to misrepresent what has been produced to the Court. The Hornets failed to conduct an adequate investigation into almost every area of inquiry, or failed to conduct any investigation whatsoever.

The Hornets' intentional failure to comply with multiple warnings by this Court proves that lesser sanctions would be ineffective.[6] While Plaintiffs are aware that all Courts are loathe to impose severe sanctions against an attorney or party, the Hornets' continued violations of this Court's orders have left this Court with no other alternative. This is not a case of an isolated instance of non-compliance - the Hornets have violated nearly every order of this Court. Litigants like the Hornets who repeatedly ignore court orders do so at their own peril. The time for further excuses has passed.

This court's decision to impose severe discovery sanctions will not be overruled by the district court or the Fifth Circuit. When a party is warned repeatedly by a court that further violations of court orders will not be tolerated, a finding that the party directly

---

[6] When a party is repeatedly forewarned that further acts of noncompliance will not be tolerated, dismissal is warranted. Young, 330 F.3d at 81; see also Logic Leasing, 979 F.2d 1535, citing Prince v. Poulos, 876 F.2d 30, 32 (5th Cir.1989) (failure to head warnings shows that lesser sanctions are ineffective).

and willfully violated orders of the court is warranted. The Hornets have not shown an inability to comply, just an unwillingness to comply.[7]

An appellate court would approve <u>severe</u> sanctions under the facts of this case. <u>See</u> <u>Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Intern. Union</u>, 212 F.R.D. 178 (S.D.N.Y. 2003). In <u>Metropolitan</u>, the Court dismissed the defenses of a defendant who engaged in fewer egregious acts than those committed by the Hornets. The Court held:

> "A lawsuit is supposed to be a search for the truth," and the tools employed in that search are the rules of discovery. Our adversary system relies in large part on the good faith and diligence of counsel and the parties in abiding by these rules and conducting themselves and their judicial business honestly.
>
> The judicial system prefers to resolve controversies on the merits. In the ordinary course, lawsuits should not be resolved based on who did what to whom during discovery. Indeed, a result driven by discovery abuse is justified only on the rarest of occasions and then only after the miscreant has demonstrated unquestionable bad faith and has had a last clear chance to comply with the rules.
>
> Some judges come to the bench from academia, some from government service, and some from private practice. Because I came to the bench from private civil practice, I am familiar with the hurly-burly of the discovery process in a hotly-contested civil case, with the existence of sharp elbows, speaking objections, rude responses and with the ever-popular, much-cited Rambo litigation tactics. I am certainly familiar, both from practice and from my time on the bench, with discovery disputes that devolve into arguments about which child threw the first spitball.
>
> **The discovery process in this case, however, transcended the usual clashes between adversaries, sharp elbows, spitballs and even Rambo litigation tactics. This case was qualitatively different. It presented the unfortunate combination of lawyers who completely abdicated their responsibilities under the discovery rules and as officers of the court and clients who lied and, through omission and commission,**

---

[7]    <u>See</u> <u>Logic Leasing & Finance Co. v. Admin. Info. Mgt. Group, Inc.</u>, 979 F.2d 1535 (5th Cir. 1992), citing <u>Adkins v. United States</u>, 816 F.2d 1580, 1582 n. 4 (Fed. Cir. 1987) (burden on disobedient party to justify noncompliance).

**failed to search for and produce documents and, indeed, destroyed evidence-all to the ultimate prejudice of the truth-seeking process**. As confirmed by discovery into the Union's and its counsel's compliance with the Met's discovery requests, **both the lawyers and the clients exhibited utter and complete disregard for the rules of the truth-seeking process in civil discovery**.

Id. at 181 (citations omitted) (emphasis added). Specifically, the Court cited to the following discovery violations identical to those engaged in by the Hornets:

- Defense counsel repeatedly represented to the Court that all documents responsive to plaintiff's document requests had been produced. In fact, a thorough search had never been made and counsel had *no* basis for this representation.

- Defense counsel knew the defendant's files were in disarray and that it had no document retention policy, but failed to cause a retention policy to be adopted to prevent destruction of responsive documents, both paper and electronic.

- Defense counsel failed to explain to the non-lawyer that documents included all electronic documents and any attachments to electronic documents. Furthermore, the defendant's non-lawyer point of contact failed to speak to all persons who might have relevant documents; never followed up with the people he did speak to; and failed to adequately attempt to retrieve deleted e-mails after defense counsel represented that a complete search of these records would be conducted.

- No lawyer ever doubled back to determine what steps were taken by the non-lawyer in charge of document production.[8]

- After plaintiff asserted that defendant's search was inadequate, defense counsel failed to inquire of several important witnesses about missing documents until the night before their depositions.

See Id. at 181-182.

Similarly, the Hornets 30(b)(6) representatives testified that no document retention policy existed and that only vice presidents and officers were notified not to destroy potentially responsive electronic and paper data. The Hornets produced no

---

[8] The Hornets could not explain to the Court what steps were taken by the Hornets to locate document, thus necessitating these Court ordered 30(b)(6) deposition on Chain of Custody issues.

witnesses who could testify that responsive documents or electronic data have not been deleted or otherwise destroyed by the Hornets since this litigation was filed. Witmeyer and Russo's testimony suggests that documents were destroyed. No evidence of any IT document retrieval efforts was presented, despite multiple representations to the Court by counsel that a thorough search revealed no such records. The Hornets failed to produce the non-lawyers who were in charge of providing responsive documents and failed to identify any other Hornets employee who served as the contact after the initial point person stopped working for the Hornets. All evidence confirms that the Hornets' non-lawyer point person conducted only a cursory search for information. Proper witnesses were not interviewed, including the 30(b)(6) witnesses who testified. All evidence suggests that no replacement point of contact was appointed until August 1, 2007. Finally, after repeatedly advising the Court that no other documents existed on at least three occasions in August of 2007, the Hornets have since produced over 4000 pages of documents and have notified Plaintiffs that tens of thousands of more pages of documents have not yet been produced.

As the court in <u>Metropolitan</u> noted:

> Though perhaps technically sufficient for relief under one or the other of the rules or statutes forming the basis of the Met's motion, any one of these discovery failures, standing alone, would not ordinarily move a court to impose the most severe sanction. Here, however, the **combination of outrages** perpetrated by the Union and its counsel, by both omission and commission, impels the most severe sanction in order to (1) remedy the effect of the discovery abuses, *viz.*, prejudicing the Met's ability to plan and prepare its case, (2) punish the parties responsible, and (3) deter similar conduct by others.

<u>Id</u>. at 182 ("The conduct of the Union and its counsel . . . transcended the hurly-burly into gross negligence, recklessness, willfulness and lying.").

Thus, while any one of the Hornets transgressions may not in and of itself warrant the severest of discovery sanctions, this Court must look at the "**combination of outrages**" perpetrated by the Hornets. The holistic overview proves that the most severe sanctions are necessary to 1) remedy the effect of the discovery abuses that forced Plaintiffs to continue this matter because they could not plan or prepare for trial, 2) punish the Hornets for blatant disregard for the rules of discovery and the orders of this Court, and 3) deter similar conduct by others who would challenge the authority of the Court through similar egregious behavior.

The Fifth Circuit has approved dismissal as a sanction in cases with strikingly similar transgressions. In Eastway General Hosp. Ltd v. Eastway Women's Clinic, Inc., 737 F.2d 503 (5th Cir. 1984), the Fifth Circuit upheld the striking of defenses against a defendant who engaged in the following violations of Court orders and discovery:

1)     Failure to timely produce records;
2)     Failure to timely present a 30(b)(6) witness for deposition;
3)     Failure to produce documents after ordered by the court in a motion to compel;
4)     Failure to produce requested documents at a 30(b)(6) depositions;
5)     Failure to heed court warnings at subsequent hearings that further discovery delays and violations would not be tolerated were ignored; and
6)     Failure to produce all documents by the deadline imposed by the Court.

Id. at 503-504.[9]    The Hornets committed nearly every violation engaged in by the sanctioned defendant, plus several others. The Fifth Circuit upheld the District Court's

---

[9]  Based on the defendant's "repeated failure to permit discovery and to obey this Court's orders to provide or permit discovery," the district court struck the Clinic's defenses, issued a permanent injunction in favor of the Hospital, and awarded the Hospital $1,000 for attorney's fees incurred in its unsuccessful discovery efforts. Id. at 504; see also Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003); Tower Ventures, Inc. v. City of Westfield, 296 F.3d 43, 46 (1st Cir.2002) . "The sanction of dismissal is an important part of the armamentarium that the law makes available to trial courts." Young, 330 F.3d at 81, citing Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962).

decision to dismiss the defenses, stating:

> After reviewing the entire record, including the recordings of the chambers conferences held on July 8, 1983 and July 12, 1983, we are convinced that the sanctions imposed were warranted.  <u>Swate's conduct was contumacious and unworthy of an attorney. Further, the actions of the representatives of the defendant Clinic were in bad faith and in callous disregard of the obligations of any party to litigation.</u>  The trial judge's response was within his broad range of discretion.

<u>Id</u>. at 505 (emphasis added).

A third example where dismissal of claim was deemed appropriate for nearly identical acts of misconduct was detailed in an unpublished Fifth Circuit Opinion, <u>Logic Leasing & Finance Co. v. Admin. Info. Mgt. Group, Inc.</u>, 979 F.2d 1535 (5th Cir. 1992). The similarities in the pattern of sanctionable behavior demonstrated by the defiant party in <u>Logic Leasing</u> and the Hornets are startling.  Both demonstrated apathy towards the discovery process from the outset of the litigation by failing to agree to produce all relevant documents, forcing the opposing party to move for expedited document production.  Both failed to produce all documents ordered produced in response to court ordered expedited discovery responses.  In both cases witnesses could not adequately respond to deposition questions because all of that party's documents were not available at the time of the deposition.  Both were initially ordered to cooperate with future discovery by the Court multiple times before sanctions were imposed.  Both attempted to make documents available for inspection rather than actual delivery to the requesting party, and both failed to make documents available in any organized state.[10]  Both were

---

[10]  The Hornets argued to the Court in opposition to Plaintiffs' Motion to Compel on August 3, 2007 that requested documents were produced or had been made available for inspection.  Similar statements were made by the Hornets on August 29, 2007. At both hearings, however, the Hornets failed to advise either the Court or Plaintiffs that Sam Russo had already moved over seventy boxes of unreviewed and potentially responsive documents into unorganized and uncategorized boxes in an offsite storage location.

warned by the Court that they must be forthcoming with all discovery responses going forward, and gave the not-yet sanctioned transgressor a deadline for production. Both were ordered a second time to fully comply with the ordered production of documents and in both the Court warned the sanctioned party that further violations would not be tolerated. Both failed to heed this clear warning. Both attorneys attempted to blame the non-production on their client's inability to understand what was requested. Both failed to produce all documents that they had in their possession, custody, or control.[11] Finally, both failed to adhere to the Court's final warning (in the Hornets' case, to provide knowledgeable witnesses). The Fifth Circuit properly deemed the aforementioned conduct to be "behavior has been the equivalent of contempt" because the "behavior in this litigation has persistently and consistently exceeded the bounds of what any court or any litigants ought to have to tolerate."

The Hornets' misconduct went beyond that of the sanctioned party in Logic Leasing because the sanctioned party in Logic Leasing actually produced some documents in response to the Court's first warning. The Hornets did not, and waited eleven days after the Court ordered deadline to deliver an incomplete set of documents to Plaintiffs. Moreover, whereas the sanctioned party in Logic Leasing admitted that all responsive documents had not been produced on the Court's deadline, the Hornets repeatedly misrepresented to the Court that all documents have been produced.

As is discussed below, the Hornets' blatant refusal to request, obtain, and produce documents in their custody and control for nearly two years, their failure to conduct any reasonable computer searches, their failure to review and produce documents located in

---

[11]   The Hornets refusal to produce documents in their custody or control is even more egregious because on September 10, 2007, Magistrate Chasez ordered the Hornets to produce this information. To date, the Hornets have refused to comply with this order.

plain view in 30-40 filing cabinets, their repeated misrepresentations, and their failure to produce entire categories of documents evidence a clear and callous disregard for their obligations to both the Court and to Plaintiffs. Moreover, the Hornets subsequent disregard for this Court's Order to produce knowledgeable witnesses regarding the discovery investigation proves that the Hornets have still not conducted an adequate investigation and are openly flaunting the Orders of this Court.

II.    **THE HORNETS IGNORED THIS COURT'S ORDER TO PRODUCE KNOWLEDGEABLE WITNESSES.**

On September 10, 2007, the Hornets admitted to Magistrate Chasez that entire categories of documents had not been produced. Hornets counsel could not tell the Court what steps, if any, were taken by the Hornets to investigate and locate the missing documents. Consequently, the Court ordered the Hornets to produce knowledgeable witnesses at the previously scheduled 30(b)(6) depositions who could testify on these topics. The Hornets produced four witnesses: Donna Rochon, Sam Russo, Dan Crumb, and Rich Witmeyer. None had substantial knowledge about the investigations conducted by the Hornets. <u>All</u> witnesses had narrowly limited roles over limited periods of time.

A.    **No Witness Played A Significant Role In The Hornets' Investigation.**

Rochon, Russo, Crumb, and Witmeyer played minor and insignificant roles in the collection and production of documents for the Hornets. They could not offer detailed testimony on any topic related to the investigation of Plaintiffs' discovery requests. They alleged that the scope of their investigations was narrowly focused by Hornets counsel.

Sam Russo was deposed over two days. He testified that he played no role in any

investigation until after the August 17, 2007 deadline had already passed. He also admitted that he deleted documents because he was never asked to produce them.[12]

The Director of Personnel and Human Resources, Donna Rochon, was deposed over three days. Rochon was not employed by the Hornets until May of 2005, knew very little about the claims at issue, found out that she was going to testify at her September 12, 2007 deposition on September 11, 2007, and did not know why she was being deposed. Ex. F, 7-9, 15, 20-22. Rochon did not remember what documents she specifically looked for, but testified that her primary involvement with any production was limited to requests by counsel for personnel and payroll records during her post-Katrina document searches. Ex. E, 8-11, 31-32. She conducted no IT investigations or searches for information not physically contained in the payroll and personnel records. Ex. D, 160-162. In or around September of 2007, Rochon accompanied a Jones Walker paralegal and Ms. Heidingsfelder to a storage unit to locate a commission binder requested by Plaintiffs. Ex. D, 7-9, 20-22. She looked for no other documents until she "found" overtime documents and the Hornets Employee Manual produced on September 20, 2007.

The third 30(b)(6) representative, Rich Witmeyer, the current Director of Suite Sales and Services, was a putative class member who is now a director with the Hornets. His testimony was less than elucidating on almost all relevant points. He played no role in the investigation and production of responsive documents prior to August of 2007. Ex. I, 47. His only knowledge related to his limited search of the Archtics computer system

---

[12]    Although he has been a vice president since 1988, he was not asked to participate in the discovery process until around Labor Day of 2007. Russo assisted counsel to identify the existence and location of information related to the sales database known as CMS in late August 2007. Ex. H, 17-19. He played no role in the investigation of any financial information at any time. Ex. G, 28.

in August of 2007 for: (1) information relative to the commissions paid on the customer accounts specifically identified by plaintiffs; (2) account activity on only the accounts specifically identified by plaintiffs; (3) Archtics information regarding Toys for Tots that omitted more than 75% of the specific information requested by Plaintiffs; and (4) Archtics information regarding the Pepsi Four Pack campaign.[13]  Witmeyer could offer no testimony regarding investigations prior to August of 2007. Ex. I, 25.

The final 30(b)(6) representative, Dan Crumb, was not employed by the Hornets until June of 2007. Ex. J, 6.  Crumb had no knowledge of any events prior to his employment.  He did not know why he was being deposed, was still learning about the Hornets organization and did not know all documents that might be available, much less which documents had been investigated and produced.  Ex. J, 31.  He claimed that all cash receipt documents had been produced.  They were not.

B.    **The Hornets Did Not Produce Any Of The Witnesses Originally Identified In Their Rule 26 Initial Disclosures.**

In 2005, the Hornets identified five persons most likely to have discoverable information about Plaintiffs' claims and the Hornets defenses.  None of the four 30(b)(6) witnesses produced by the Hornets were one of those five persons.  No Chain of Custody witness contacted any of those five individuals to discuss any investigations previously conducted by the Hornets. Ex. G, 9-10; Ex. D, 26-28; Ex. I, 60, Ex. J, 32.

---

[13]    Witmeyer testified that he only searched Archtics for information. He never looked in any other location or database for relevant information, never reviewed plaintiffs' discovery requests to determine what specific information plaintiffs requested, and never searched any non-Archtics databases, computer servers, or other physical locations where responsive information might be maintained. Ex. I, 20-21, 56-58, 69-70, 70-72. Witmeyer's search was <u>never</u> guided by plaintiffs' specific requests. Instead, Witmeyer's August 2007 investigation gathered only those documents specifically requested by <u>Hornets' counsel</u>.

C.    **No Witness Could Testify About Earlier Investigations Conducted By The Hornets**

None of the witnesses produced could testify about the actions taken by the Hornets during prior discovery investigations. **This is the very reason Magistrate Chasez ordered Plaintiffs to take these depositions.** Therefore, this failure is contemptuous and warrants severe sanctions.

1.    **The Hornets failed to produce the "Point Person" who originally conducted the investigation for the Hornets or any witnesses who could testify about her investigation.**

Kristy McKearn was the Hornets' point person who purportedly gathered all information for the Hornets responsive to Plaintiffs' discovery requests until she left the team in November of 2005. Ex. E, 39-40. She was also the individual who threatened to take adverse action against any employee who joined the suit. Nevertheless, the Hornets made it her responsibility to ask different people in the organization for information and documents responsive to Plaintiffs' requests. Ex. G, 18. McKearn reported directly to the former team president, not any of the testifying witnesses. Ex. G, 18-19. No witness had any specific recollection of McKearn asking them for specific documents or information.[14] Not one of the chain of custody witnesses contacted McKearn to find out what steps she took to produce documents or answer discovery requests. Not one witness could testify about what McKearn looked for, where she looked, what she found, or what she produced. None of the witnesses knew whether the Hornets appointed anyone to

---

[14]    Rochon may have been asked for personnel records. Ex. G, 28-29. Witmeyer had no contact with McKearn on these issues because he was a putative class member. Crumb was not hired until two years later.

replace McKearn as the "point of contact" or the identity of the "point of contact."[15] None of the witnesses replaced McKearn as the point of contact.

Plaintiffs recently learned that the Hornets current general counsel, Richard House, has been the team's point of contact at all times relevant to the most recent discovery responses and investigations. House was not produced as a witness, and no witness testified that they have received any specific instructions from House since he became the point of contact.

> ### 2. The Hornets failed to produce any of ten witnesses who allegedly assisted the Hornets with their investigation or any witnesses who could testify about actions taken by these ten persons.

Just minutes before the first 30(b)(6) Chain of Custody deposition began, the Hornets produced to Plaintiffs a list of ten former employees who allegedly helped the Hornets conduct their investigation into discovery responses. None of those former employees were produced as witnesses. Witmeyer, Rochon, and Russo testified that they never contacted any of these ten people to discuss the parameter and scope of any investigation that those ten witnesses conducted. Ex. H, 9-12; Ex. I, 27; Ex. E, 32-34. Crumb contacted two of the ten, but limited his inquiry to a single topic – which documents were produced by the Hornets to Oklahoma City. Ex. J, 16, 25, 29-30.

### D. Most Witnesses Never Saw Plaintiffs' Discovery Pleadings Until The Deposition.

The Hornets designated points of contact to assist Hornets counsel with their discovery investigations. The Hornets points of contact failed to provide persons that

---

[15]    Ex. D, 144-45. Ex. E, 5-6.  Interestingly, Russo was the highest ranking Hornets employee who remained in the New Orleans area after the team went to OKC, but he was never asked to be the liaison or assist with any investigations for the team or Hornets counsel after McKearn left the team. Ex. H, 68-70.

were designated to assist counsel with a copy of Plaintiffs discovery requests. Only one of the Hornets' Chain of Custody deponents may have seen a copy of Plaintiffs' discovery before their depositions. The only witness who admitted that he may have seen the discovery requests **admitted that he ignored the actual request when he conducted his search.**

The Hornets points of contact did not provide any Hornets' witness with a copy of Plaintiffs' Original Requests for Production of Documents that was the subject of this Court's August 2, 2005 Order.[16] Each witness testified that they never saw the requests before their depositions. Each witness confirmed that **they were never asked to investigate or asked to direct someone to investigate and find information in response to any identified request.** For example, when Ms. Rochon produced personnel records, it was in response to a specific request from the Hornets point of contact or counsel for those records, **not based on her review of any discovery request.**

Likewise, the Hornets' points of contact failed to provide most deponents with a copy of Plaintiffs' Second Set of Requests for Production of Documents or Interrogatories that was the subject of this Court's August 3, 2007 Order until their deposition.[17] Russo offered conflicting testimony regarding whether he had ever seen Plaintiffs' discovery requests. However, he clarified that **even if he did see the requests, he never produced any documents in response to any request, never looked for any documents that might be responsive to any request, and never directed anyone else to assist counsel in locating any documents.** Ex. H, 12-16.

---

[16]  Ex. D, 27-28, 139; Ex. G, 21.

[17]  Ex. I, 21-23, 69; Ex. J, 65, 122; Ex. E, 4-5, 34-37. Additionally, no witness saw Plaintiffs' Requests for Admissions or the Hornets responses prior to the deposition.

No Hornets' witness reviewed their 30(b)(6) or 1442 deposition notice to determine if they had produced all documents relevant to their designated areas for testimony. Ex. H, 7-9; Ex. I, 93-95; Ex. J 123-125. Rochon was not identified as a 30(b)(6) or 1442 designee, and only testified as to chain of custody issues. After she was afforded the opportunity to review the notice, she could not state that she did not have other responsive documents because she had never looked for them. Ex. E, 12-14.

Similarly, on August 17, 2005, Ms. Anderson promised Judge Berrigan that she would produce a comprehensive list of all job titles, including any name changes to the various job titles. To date, this information has not been produced. No Hornets witness could testify about the investigation or non-production the documents related this representation. The only witness likely to have access to the necessary information, Rochon, testified that she was never asked to find or prepare this information Ex. D, 32-36, 44-56; Ex. H, 81.[18] This information has **still** not been disclosed.

The Hornets agreed not to waste resources through the duplication of discovery in both the federal and state court proceedings. However, the Hornets points of contact did not provide any of the chain of custody witnesses with any state court discovery requests. All saw these requests for the first time during their depositions. Ex. I, 62-66, 88; Ex. J, 33, 128-129. Rochon may have been asked to provide responses to certain discovery requests but had no specific recollection. Ex. E, 43. Consequently, the Hornets have effectively stymied all state court discovery efforts.

---

[18]  Rochon testified that she was verbally asked by Hornets counsel to "just provide the job titles for non-exempt positions." Ex. D, 36. When she conducted her search for this information, Rochon limited her search to identified plaintiffs. Ex. D, 37-44.

Finally, the Hornets told Magistrate Chasez that they should not be sanctioned because Plaintiffs failed compel the Hornets earlier in the case. This charge ignores Plaintiffs' continual efforts to obtain discovery through Rule 37 conferences for over a year. It also ignores that delays were caused because the Hornets' repeatedly made and broke promises to produce documents and information. In accordance with this strategy of delay and obfuscation , no Hornets' witness was provided with or investigated the deficiencies documented by Plaintiffs between 2006 and 2007.[19]   Plaintiffs did not ask the Court to intervene until the Hornets demonstrated numerous times that they would not fulfill their non-judicial agreements. This Court cannot penalize Plaintiffs for relying on unfulfilled promises made by opposing counsel since the Federal Rules required Plaintiff to give the Hornets the opportunity to comply with the rules of discovery.

III.    **THE HORNETS FAILED TO PRODUCE ENTIRE CATEGORIES OF DOCUMENTS AND MISREPRESENTED ANSWERS TO THE COURT**.

The chain of custody depositions proved that the Hornets repeatedly misrepresented to the Court that all responsive documents had been produced when they were not. In fact, the Hornets did not and have not looked for much of the information requested by Plaintiffs. IT searches were not requested. The Hornets have no document retention system, and relevant files have likely been destroyed. Critical documents have been withheld for two years. Moreover, two years of misrepresentations have been made to masque their non-compliance with Court Orders.

---

[19]   Ex. H, 49; Ex. J, 12, 129-131; Ex. I, 96.

A.    **The Hornets Withheld Information Proving that the Team Tracked Overtime Worked by Non-Exempt Employees since July of 2005.**

This is a case about unpaid overtime.  The Hornets repeatedly represented to both Magistrate Chasez and Judge Berrigan that the Hornets have no obligation to pay overtime or track overtime hours.  This assertion was contradicted by the Hornets 30(b)(6) witnesses and untimely produced documents.  The Hornets admitted during their 30(b)(6) depositions that the Hornets 1) have non-exempt employees; 2) tracked overtime since July of 2005; 3) failed to produce documents related to hours worked and overtime paid to Plaintiffs; 4) have documents on their intranet related to overtime policies that have not been produced; 5) possessed an updated employee manual detailing the Hornets admission of liability to Plaintiffs in this matter since December 1, 2006;  6) failed to produce other policies outlining the Hornets overtime obligations to their employees; or 7) failed to look for responsive documents.[20]

On September 20, 2007, the Hornets surprised Plaintiffs by producing 12 pages of overtime records for Latousha Brown and Ken Kliebert prior to the start of Rochon's third deposition.  See Exhibit A.  The Hornets have repeatedly represented to the Court since 2005 that any such records had already been produced. Ex. D, 125-128.[21]

Another September 20 surprise was the Hornets' production of the December 1, 2006 Employee Manual.  See Ex. B.  The Hornets denied the existence of this manual for

---

[20]    See Ex. D, 174-180. Witmeyer testified that his supervisor told him in 2005 to start tracking his overtime using time sheets that were located on a link on the Hornets intranet. Ex. I, 13-14.  The existence of the intranet was not disclosed for over two years.  Crumb and Rochon testified that they never conducted electronic searches for information that might have been received by their predecessors. Ex. J, 117-118.

[21]    Rochon testified that these documents were provided to counsel after her September 13, 2007 deposition. See Ex. F, 56-58, 73. Ms. Anderson argued that it was appropriate to withhold these documents for a week before disclosing them because the timing of documents productions are irrelevant to fundamental notions of fairness. Ex. F, 53-54, 79-80.

over two years. <u>The Employee Manual admits in explicit detail the Hornets' liability in this overtime litigation on almost each issue where Plaintiffs alleged they were owed overtime.</u>[22]    Rochon confirmed that there was no excuse for the Hornets' failure to produce this document, drafted with the assistance of counsel, since December of 2006. She had ready access to this manual in hard copy form, on the Hornets' intranet, as well as in e-mail format.  Ex. F, 64.[23]   Regardless of what excuses will eventually be fabricated by the Hornets, common sense dictates the reason this document has been withheld because its contents are devastating to the Hornets' case.

Finally, Rochon testified that she possesses other written overtime policies and procedures that she has not produced since at least 2006. Ex. F, 60-63. Since 2005, and at least three times since August 3, 2007, Hornets' have misrepresented to the Court that the Hornets have no such policies and procedures.

B.    **Information The Hornets "Found" In An "Offsite Storage Location" Were Located In File Cabinets In The Hornets Freeport McMoran Offices Until August 2007.**

On September 10, 2007, the Hornets told the Court that the team fortuitously discovered documents after the August 17, 2007 disclosure deadline when some boxes of documents were stumbled upon in an off-site storage facility.  It is true that documents were in a storage facility.  "The rest of the story" proves that the Hornets knowingly misrepresented all facts to the Court through omission.

---

[22]  <u>See</u> Exhibit B, pg. 13 (admitting liability under the FLSA); pg. 14 (admitting that the Hornets have exempt and non-exempt employees); pg 17 (defining overtime rights of non-exempt employees, the team's obligation to track time, and employee rights to lunch breaks); and pg. 18 (defining the volunteer policy).

[23]  On September 10, 2007, the Hornets represented that the only documents not yet produced were those recently identified in a storage facility.  However, Rochon testified that she could have provided a copy of this manual to Plaintiffs at any time after December 1, 2006, but that she was never asked for the manual.

The Hornets knew they had an off-site storage facility in August of 2005 when documents were first ordered produced. Ex. D, 8; Ex. H, 54-55. According to Russo, the documents discovered in the storage facility in 2007 were not in storage in August of 2005. The documents were located in plain view in 30-40 filing cabinets on the 20th floor of the Hornets' offices in the Freeport McMoran building. Ex. H, 57-62. Hornets counsel and Hornets' employees knew exactly where these file cabinets were located. Ex. H, 63; Ex. E, 21-22. No witness testified that documents in these file cabinets were reviewed.

Fortunately, the Hornets' offices in the Freeport McMoran building did not suffer any storm damage. Ex. F, 27. Although the team moved to Oklahoma City after Hurricane Katrina, Russo remained in Louisiana and had the keys and access to these filing cabinets in late 2005. Ex. G, 72-74. Rochon also had unfiltered access to these filing cabinets during her visits to New Orleans in 2005-2006. Ex. E, 18-20. However, neither Rochon nor any other witness could testify that anyone looked for potentially responsive documents in these file cabinets.

In August of 2007, **after Plaintiffs filed their motion to compel**, the documents in the file cabinets were transferred to boxes and were moved to the offsite storage facility. Ex. H, 56-57. **When counsel for the Hornets conducted their investigation to respond to the August 3, 2007 Order related to the Motion to Compel, the Hornets failed to disclose that forty cabinets filled with documents were moved a few days earlier, and failed to acknowledge the existence of any offsite storage unit.**

The shell game related to documents now at the storage facility continues to this day. Since the documents were transferred, the Hornets conducted only narrow searches

for limited documents on a list prepared by defense counsel, led by a Jones Walker paralegal, with the assistance of Ms. Heidingsfelder. Ex D, 69-75; Ex. E, 14-17, 30-31; Ex. F, 69-70. No witness currently knows what documents are at the off-site facility.[24]

C.    **The Hornets Failed to Conduct An IT Search for Documents.**

The Hornets failed to review their extensive electronic communication systems including e-mail, file storage, intranets, large servers, and other electronic databases. All witnesses testified that there <u>may</u> exist e-mails and other documents on the Hornets servers responsive to plaintiffs' discovery requests. No witness could confirm this, however, because the Hornets have not directed the IT department to scour the servers to locate information, documents, or data that may have been deleted from individual inboxes or computers. Topics as relevant as overtime and unpaid commissions have not been investigated.[25]

Importantly, the Hornets have no document retention policies. The Hornets produced no witnesses who knew whether the IT department was ever instructed not to destroy potentially relevant documents.[26] Consequently, many documents have likely been destroyed or altered because the Hornets have no document retention policies or

---

[24]    Rochon testified that her search of the offsite storage facility was limited to locating Adrianna Johnson's commission binder. Ex. E, 23; Ex. F, 32. <u>Defense counsel asserted privilege when Rochon was asked to produce this list</u>. Witmeyer testified that he has <u>never</u> coordinated with Rochon to provide Rochon with any guidance in her ongoing search of the Hornets' storage facilities. Ex. I, 106-107.

[25]    Neither Witmeyer nor Rochon asked IT to search for Plaintiff related documents or e-mails Ex. I, 56; Ex. D, 46-47, 61-64, 80-82. Rochon never looked or asked IT to conduct a search for e-mails or files of former HR directors unless readily available on her servers. Ex. E, 171. No Inside Sales info related to Game Face was investigated. Ex. E, 42-43. Crumb never asked IT to review files or e-mails of former CFOs to determine if those persons had responsive information. Ex. J, 117-118.

[26]    Russo testified that vice presidents and directors were told in June of 2005 not to destroy any documents that might be potentially relevant to this litigation. He does not know if the Hornets relayed this information to other employees, but was never told by the Hornets point of contact what information might be potentially relevant. Ex. G, 21-25.

controls in place to prevent the alteration of potentially relevant documents.[27] For example, the Hornets continued to change the identity of account representatives in Archtics after the litigation was filed, but failed to implement a system to track modifications to this database.[28] No controls exist on the newly produced CMS system documents to prevent customer names and addresses from being modified to prevent identification of sales activity on accounts. Ex. I, 45. Because of the absence of controls and other misrepresentations, critical rate of pay information was likely altered or deleted.[29]

For two years the Hornets denied the existence of any documents related to complaints for unpaid commissions or overtime. To date, however, the Hornets have not conducted thorough IT searches for this information to determine if other HR directors or

---

[27] No witness could provide any testimony regarding Hornets policies and procedures related to IT document retention at any time before or after the litigation was filed. Ex. G, 26-27. Exhibit K is a document prepared by a Jones Walker attorney entitled "Documents, Bad Documents, and Worse Documents: Retaining and Destroying Documents and Data and the Effect of Litigation", by Andrew Lee. The document retention policies and suggestions and recommendations set forth in this Jones Walker paper were not followed by the Hornets. No back-up policies were explained. No Records Management Program was identified. No back-up policies were explained. No e-mail preservation policies were implemented. No litigation hold was placed on document destruction. Based on Jones Walker's interpretation of reasonable document retention behavior, the Hornets are subject to contempt for continued manipulation and deletion of data.

[28] Ex. I, 38. The team also had no written policies or procedures explaining the rules that sales managers or directors must follow when redistributing accounts to other sales employees if a sales employee stopped working for the Hornets both before or after litigation was filed. Ex. I, 35. Witmeyer testified that "a guy named Steve" called Ticketmaster to determine if there existed a way to retrieve the data modified by the Hornets. Witmeyer failed to follow-up with "Steve" prior to his deposition to determine what actions, if any, Ticketmaster recommended the Hornets take to retrieve this critical data. Ex. I, 39-40.

[29] Under these circumstances, this Court must impose sizeable monetary sanctions and prevent all Hornets employees with access to these documents from testifying at time of trial. See U.S. v. Phillip Morris USA, Inc., 327 F. Supp. 2d 21, 24-25 (U.S.D.C. 2004) (a multi-million dollar monetary sanction and a order prohibiting high ranking employees of Defendant from testifying in any capacity at time of trial was appropriate because defendant failed to implement policies and procedures to avoid the loss of potentially relevant e-mail records, marketing plans, and other electronic documents) The Court opined that monetary sanctions were particularly appropriate because the court had no way of knowing what, if any, value those destroyed emails had to Plaintiff's case, making it impossible to fashion a proportional evidentiary sanction that would accurately target the discovery violation. Moreover, it was critical that the Court deter further behavior to show that such conduct will not be tolerated. Phillip Morris, 327 F. Supp. 2d at 25.

employees received complaints from any employees or Plaintiffs. Hornets' witnesses testified that they had no duty to apprise counsel or anyone else about this possible location of information because considered the ordering of such electronic searches to be an "IT function." Ex. I, 54.[30]

Similarly, the Hornets have refused to produce documents regarding after-hours functions that Plaintiffs were required to attend, claiming that this information did not exist. Sam Russo testified that he had copies of the three month calendar at the Arena identifying all Arena events because he acted as the Hornets' liaison with the Arena. Ex. G, 29-30. Russo was never asked for copies of his e-mails by the Hornets point of contact, and he has since deleted those e-mails. Ex. G, 32-35.[31]

**No one knows what information may remain unproduced**. All representations made to the Court regarding the completeness of any response have been contradicted by the 30(b)(6) witness testimony. It is therefore impossible to gauge how much more serious the damage caused to Plaintiffs will be if and when the Hornets finally comply with Court Orders. See In re Prudential Insurance Co., 169 F.R.D. 598, 616 (D.N.J. 1997). As evidenced by their own admissions, testimony, and actions, the Hornets have effectively sabotaged this litigation through their own gross incompetence or intentional refusal to conduct a proper search.

---

[30]    Unless an e-mail was printed and stored in hard copy form in the personnel file of a Plaintiff, the information was not produced. Ex. F, 22-23. Witmeyer admitted that he never conducted any searches of the hard drives of any Plaintiffs to determine whether or not sales related documents existed on those hard drives because he was never asked to do so. Ex. I, 51. Because of this, documents directly relevant to unpaid commissions have not been produced. For example, Witmeyer was unaware that Sam Steinmetz testified that he maintained an Excel spreadsheet that tracked his sales activity on his hard drive. Ex. I, 53. To date, the Hornets have made no effort to search for this document.

[31]    Russo did not know whether the e-mails could be found on the server or whether the Hornets ever attempted to locate those e-mails. Ex. G, 35.

D.    **The Hornets Admitted that Multiple Categories of Financial Documents, Audits, and Financial Data Were Not Produced.**

On August 3, 2007, August 17, 2007, August 29, 2007 and September 10, 2007, the Hornets told Plaintiffs and this Court that all financial documents for the Hornets had been produced. During the depositions, however, the Hornets witnesses admitted that those representations were false. In fact, the Hornets do not know whether all relevant financial records have been produced. The following exchange took place with Hornets CFO, Dan Crumb, and demonstrates the prior lack of candor to the Court.

> Q:    As we sit here today, are you certain that all financial information for the Hornets has been produced in this litigation.
> (objection by counsel)
> A:    **I'm not aware. I've just been here for three months. I don't know what's been requested before me, what's been supplied as far as – And I know there was a lot of document requests. I really can't answer what's been – if there are things that haven't been provided.**

Ex. J, 51.[32] It is impossible to misinterpret Crumb's testimony – the Hornets do not know what has and has not been produced. Astonishingly, in spite of specific testimony given by Crumb, the Hornets' again represented to the Court that all financial documents have been produced in their opposition memo. No defendant should be permitted by a Court to repeatedly make knowingly false statements.

Even when documents were produced, the Hornets could not provide the backup data for the information. Ex. J, 73-74 (did not know all information used to create BRI reports). Additional financial information continues to be "found" and produced.

---

[32]    Crumb did not offer any excuses for the Hornets failure to produce financial information in a more timely fashion prior to his tenure because they were readily accessible. Ex. J, 53-60.

For two years the Hornets disguised that the team provided primarily accrual basis accounting numbers to justify their financial defenses. Ex. J, 100. Because of this accounting tactic, millions of dollars in revenue obtained during the off-season were reported as received during the season. Ex. J, 100-102, 148-151. Actual receipt is a fundamental element to this claim. To date, the Hornets have not proved that cash receipts were produced. Ex. J, 61-62, 102. Other financial documents not produced include: sponsorship revenue reports, SMG settlement reports, COX Cable contracts, memos from the NBA detailing the distribution of National Broadcast revenue, accounts receivable reports, or batch reports Ex. J 96-98, 135-138). **The Hornets admitted that these were critical documents and that Plaintiffs could not analyze cash receipts unless these reports were produced.** Ex. J, 103. The failure to produce this information should require this Court to dismiss all financial based defenses for the years 2002-2004.

In addition to the Hornets' non-production of all cash basis documents, the Hornets admitted during Crumb's deposition that even all accrual based information has not been timely or fully produced.[33] Documents as basic as KPMG financial records were not produced until after the Court's August 17, 2003 cutoff. Ex. J, 20-21. Crumb also admitted that the results of an audit conducted by the Grant Thornton firm in OKC were not produced. Ex. J, 17-18.

Since August of 2005, the Hornets have repeatedly denied to the Court that the Hornets have any e-mails or data related to ticket and revenue data transmitted by the

---

[33] For example, the Hornets failed to produce until September 20, 2007 accrual based Monthly Detailed Income Statements that were readily available on the Hornets' Solomon software system. Ex. J, 7-9. Crumb testified that he was aware that this financial information was requested in July, 2007. Ex. J, 7-9.

Hornets to the NBA. However, the Hornets now admit that <u>it was a league rule to</u> <u>transmit this information.</u>[34] The 30(b)(6) representatives admitted that documents related to e-mailed ticket and revenue reports, called Gate Ticket Receipt reports, do exist, but have never been searched for and may have been deleted. Ex. G, 55, 57; Ex. J, 35-36, 39. In addition to Gate Ticket Receipt reports, weekly Ticket Reports exist but have never been produced. In fact, Crumb testified that he never looked for these documents. Ex. J, 57-59.

E.    **The Hornets Failed to Produce Documents Relevant to Unpaid Commissions that Will Affect Rate Of Pay Issues.**

The Hornets did not pay Plaintiffs all commissions due and owing. Commission related documents are necessary and relevant to determine the rate of overtime pay and other damages owed to Plaintiffs. <u>For two years, the Hornets misrepresented to the Court</u> <u>that all relevant commission documents were produced despite the fact that the Hornets</u> <u>have never conducted a search for many of these documents.</u>

Plaintiffs advised both the Court and the Hornets for over two years that information relevant to unpaid commissions was maintained by Adrianna Johnson in the Hornets' accounting department. For two years, the Hornets have denied the existence of this information. The 30(b) (6) depositions confirmed that the Hornets designated the wrong person to investigate this information. Rochon, the H.R. director, was the designee, but testified that she never looked for Adrianna Johnson's commission

---

[34]  Sam Russo testified that he received e-mails from the Ticket Operations Manager after each home game with ticket and revenue information. Ex. G, 53-54. He did not remember whether he was ever asked to produce this information. Ex. G, 55. **Russo deleted these e-mails.** Ex. G, 55. Russo testified that after April of 2005, the V.P of Finance would have transmitted this information, but he was never asked where any such information might be located and has never assisted with any investigation to locate this information. Ex. G, 58-60. Russo could easily have called Barbara Booth to discuss this information, but was never asked to do so. Ex. G, 61. Russo did not know whether the Hornets ever conducted a search to locate these e-mails. Ex. G, 55-56.

documents because it was absurd for Plaintiffs to insinuate that Ms. Johnson or anyone in accounting might have any sales commission documents. Ex. D, 87-94; Ex. E, 23, Ex. F, 32-36. Witmeyer, a sales employee, testified that it was Hornets policy and procedure for several years for Adrianna Johnson to notify the sales representatives about sales commissions. Ex. I, 75. In fact, it was **common knowledge** within the sales department that Adrianna Johnson frequently and systematically contacted Hornets' sales persons in writing to notify each salesperson of commissions they were due.[35] Because Rochon failed to apprise herself of information that was "common knowledge" to persons in the sales department, Ms. Johnson's binder was never looked for until Labor Day, 2007.

Moreover, in 2004 the sales managers submitted reports to the accounting department regarding sales commissions owed to sales employees. Ex. D, 83-84; Ex. I, 81-83. For two years, the Hornets denied the existence of this information. Witmeyer testified, however, that the Hornets never looked for commission reports or communications regarding commissions generated by any sales department manager - information specifically requested by plaintiffs. Ex. I, 81-83.

Plaintiffs also alleged that they lost thousands of dollars in commissions because accounts that they sold tickets on were redistributed to other sales employees in 2003. T date, the Hornets have produced no information acknowledging that this event took place. Witmeyer confirmed that the Hornets divided "House Accounts" amongst four non-

---

[35]    Q: Did everyone in the sales department know that Adrianna Johnson was submitting these reports to the various sales employees?
    A: Yes, it was common knowledge.
    Q: Common knowledge?
    A: Uh Huh.
    Q: So if you were the director of ticket sales you would know that Adrianna Johnson was providing these reports to the sales employees?
    A: I would think he would – they would – that person would know.
Ex. I, 76-77.

Plaintiff sales employees in 2003. Ex. I, 40-42. The Hornets have never defined the term "house accounts," have never produced any documents related "house accounts," have never previously admitted that this action was taken, and have thereby effectively denied Plaintiffs the opportunity to prove their losses from this misconduct. Ex. I, 40-42.

Other pre-sales activity by a sales rep may have been located exclusively in the CMS database, only recently produced. Ex. I, 49-50. The Hornets told the Court that this database was not used by the Hornets after 2004, yet Hornets witnesses testified that the team knew some sales reps continued to enter information in the CMS database when a sale was completed after 2004. Ex. I, 46-50. The Hornets have never investigated this or other CMS related information and never implemented any controls to ensure that this information was not altered or modified. Ex. I 98-99.[36]

Plaintiffs specifically alleged that commissions owed for premium seats were not paid by the Hornets. Prior discovery responses denied the existence of any documents related to premium seat license agreements. Witmeyer testified, however, that premium seat license agreements are maintained in file cabinets located in the Hornets' offices. Ex. I, 101; Ex. H, 27. In fact, there exists a separate department never before identified by the Hornets that services all premium seat license agreements. Ex. I, 100. The Hornets produced no policies or procedures regarding how and when premium seat license agreements are sent to customers, never disclosed the existence of this service department, and admittedly conducted no investigations to determine whether customers

---

[36] Russo was unaware what steps the Hornets took and personally conducted no investigation to locate documents or evidence to identify any steps taken by sales personnel. Ex. H, 21-22. Neither he nor any other witness could offer any testimony regarding any Hornets investigation on this topic.

were actually sent premium seat license agreements for any Plaintiff accounts. Ex. H, 25-26, 28-32.

Further, Plaintiffs alleged that they did not receive commissions because of a suite sale scam that internally converted individual suite sales by Plaintiffs into lesser paying group ticket sales. Information related to suites that were "comped" by the Hornets was not produced. In fact, the V.P. of Finance testified that he has never been asked to locate this information by any Hornets point of contact. Ex. J, 169-170. [37]

F.    **The Hornets Have Not Produced Financial, Ticket, or Revenue Data Provided to the State or Local Governments**.

Louisiana' taxpayers may be surprised to learn that the Hornets are trying to categorize money received from the state as retail revenue in an effort to deprive their employees of overtime. However, the Hornets refuse to produce financial, ticket, and revenue data that the team gave to, or received from, various state and local governmental agencies to acquire those funds. To date, the Hornets continue to violate Magistrate Chasez' orders by refusing to identify or produce this information.

To hide their non-compliance, the Hornets continue to misrepresent facts to the Court. For example, on September 10, 2007, the Hornets told Magistrate Chasez that the team produced all LA State Quality Jobs Program Documents. The Hornets CFO, however, admitted that all documents were not produced. Ex. J, 40-50. None of the KPMG correspondence to the State was produced by the Hornets, nor was it requested prior to the August 17, 2007 deadline. Ex. J, 109-110. The state's contract with the Hornets has not been produced. Ex. J, 44. Affidavits submitted by the Hornets to the

---

[37] Russo testified that information related to comped suites would be located in game-to-game information or in Archtics, but could not confirm it was produced. Ex. H, 40-41.

state to obtain millions of dollars have not been produced. Ex. D., 204-208. Crumb testified that he has never been asked to look for this information and has requested no IT search to locate this information. Ex. J, 44-48. Documents or data used by to prepare any portion of the affidavits has neither been requested nor produced.[38]

The Hornets refuse to produce information on property leases paid by the Hornets that was recently provided to the State. The Hornets operated more than one physical location, but have produced no documents regarding any office space they occupied. Information, however, was recently provided to the state by the Hornets regarding lease payments for properties used by Hornets. Ex. J, 83-86. None of this information, including SMG contracts or copies of leases for the regional sales offices has been produced. Ex. G, 38; J, 108. In fact, no Hornets witness has ever looked for these documents.

Inducements made by the City of New Orleans and the state to entice the Hornets to come to Louisiana have never been produced. Documents allowing Plaintiffs to determine how much money the team received from the State were not produced. Ex. J, 107. No contracts reflecting any inducements have been produced.

Finally, and perhaps most shockingly, the Hornets CFO disingenuously testified on the afternoon of September 20, 2007 that the Hornets were not engaged in any ongoing negotiations with the City of New Orleans for a practice facility. Ex. J, 89. The Hornets admitted that negotiations for a practice facility took place after Katrina, but denied that those negotiations were still taking place. Ex. J, 79-80. The Hornets then claimed that they did not know whether any financial information was provided to the

---

[38] Ex. F, 49-50. Rochon has never looked for backup data. Rochon admitted on cross-examination by Hornets counsel that she falsified this information. Ex. F, 51-53, 88-89.

city or state during past negotiations because they never looked for this information. Ex.
J, 80-85. **The very night that Crumb denied that the Hornets were in negotiations
related to the practice facility, the local news and ESPN reported that the State
Bond commission approved $14 million in bonds for the Hornets to build a new
practice facility. According to the local news, the City of New Orleans agreed to
contribute $6 million to the project**. See Ex. L, M. To date, no information produced
to the bond commission or any documents to or from the City of State has been produced
to Plaintiffs.

IV.    **THE HORNETS CONTINUE TO UNDERMINE DISCOVERY.**

The New Orleans Hornets are sophisticated, a multi-million dollar entity who
continues to undermine and complicate the discovery process. Hornets general counsel,
Richard House, began working for the Hornets and serving as the team's Point of Contact
on August 1, 2007, before the Court's August 17, 2007 deadline. Ex. D, 115. Since
Plaintiffs filed their Motion to Compel and after House became the point of contact, the
Hornets continue to make knowingly incorrect representations to the Court.

Because Hornets' counsel was provided incorrect and incomplete information by
their client, they improperly and unwittingly put themselves in the middle of the
discovery process by using the erroneous information provided by the Hornets to
investigate information from designated parties. Ex. E, 38-39; Ex. J, 105-106.[39] Counsel

---

[39]    It is clear after two years of litigation that no Jones Walker attorney has been accurately
apprised of the Hornets systems, programs, or operations. The likely cause is the Hornets' refusal
to stop misrepresenting the truth through either omission of falsification of information.
Documents specifically sought in the Motion to Compel related to commissions have never been
requested from witnesses who may have had responsive information. Anderson: That's not how it
happened. I mean, it ought to be clear from the depositions. We didn't give them documents
(discovery requests) that they can't even understand because of the way they're written and say,
"Go get it." Ex. I, 67-68.[39]

then parroted to the Court their client's misrepresentation that documents did not exist, when the Hornets either knew that the documents existed or were grossly negligent in their efforts to locate this information.[40] As has been detailed above, since July of 2005, the Hornets have denied the existence of documents that were readily available to anyone who looked for them.

Even now, two years after the Hornets first made misrepresentations to the Court, the Hornets continue to mislead Plaintiffs. The newly appointed point of contact has apparently disclosed to Hornets counsel that documents were "found" at offsite storage facilities, when the truth is that the Hornets intentionally moved potentially responsive and unreviewed documents **after** Plaintiffs filed their motion to compel. Hornets counsel has represented that investigations have been hampered because the team is in Oklahoma City, when the truth is that one of the most senior vice presidents has been in Louisiana for most of the relevant time periods. Hornets counsel represented that documents do not exist when we now know they do exist.

It has been two years since plaintiffs issued the discovery requests at issue and the Hornets have not yet thoroughly investigated all discovery requests. The intentional and/or gross negligence demonstrated by the Hornets from the outset of this litigation has duped their own attorneys, further impeding the discovery process in this matter for over two years. The errors have not yet been corrected and delays continue to this day.

A. **The Initial Misrepresentations Have Compounded the Prejudice Caused to Plaintiffs.**

---

[40]   For example, Witmeyer never produced any of the readily available requested premium seat licenses because he has never been asked to look for or produce any premium seat licenses. Ex. I, 103-104.

The prejudice to Plaintiffs apparently caused by the initial misrepresentations made by the Hornets to their attorneys has been compounded by two years of misplaced trust in the accuracy of the information first provided.    Plaintiffs counsel asked for information, and Hornets counsel reported the findings of their investigations.  However, because the Hornets apparently lacked candor with their own attorneys, both Plaintiffs and defense counsel worked with inaccurate facts for over two years.    Subsequent investigations conducted by Hornets counsel were ostensibly guided by past misrepresentations made by their clients.  Facts indicate that counsel for the Hornets stopped looking for information that the Hornets said did not exist.[41]  In fact, the 30(b)(6) depositions confirm that the Hornets investigation was so fraught with flawed logic, misrepresentations, and anemically limited responses that no answer to any discovery response provided by the Hornets to date can be considered true, complete, or accurate. [42]

B. **Information Under the Custody or Control of the Hornets Remains Unproduced**.

The federal rule of civil procedure requiring the Hornets' to produce documents under their "possession, custody, or control" notwithstanding, counsel for the Hornets confirmed to the Court on September 10, 2007 that documents under the custody or control of the Hornets were not produced.  **The depositions revealed that this information was never requested by any Hornets point of contact, including Mr. House, even though Magistrate Chasez ordered the Hornets to obtain and produce**

---

[41]    Because the Hornets told their counsel that all financials had been produced, entire categories of relevant financial information that were never requested by counsel or acknowledged by the Hornets.  Also, Russo first became aware of areas of alleged deficiency in Hornets discovery responses during a meeting with counsel in June of 2007, but took no action. Ex. H, 49-53.  All indicators suggest that Hornets counsel had already been told by the Hornets that the information did not exist.

[42]    Counsel for the Hornets do not know what sales and revenue reports the Hornets use. Consequently, requests omitted a number of categories of documents. For example, Crumb confirmed that Gate Receipt reports existed, but were never requested.

**this information immediately. To date, The Hornets have not yet produced this information.**

The Hornets placed their finances in question through their assertion of various defenses. The Hornets told counsel that all financial information had been produced, and continue to make that misrepresentation to this day. However, for over two years, and in direct violation of Magistrate Chasez' order, the Hornets have still not produced all relevant information from KPMG. Ex. G, 45; Ex. J, 20-21. In addition, another accounting firm in OKC audited the Hornets financials. Plaintiffs have yet to receive any documents from the OKC audit.

The Hornets 30(b) (6) representatives testified that neither the prior nor current point of contact has ever asked them for information in the possession of other law firms retained by the Hornets. Ex. D, 107-108; Ex. G, 45. Plaintiffs confirmed that responsive documents might be located with the following law firms or attorneys: Jones Walker; Phelps Dunbar; Wagner, Johnson & Rosenthal in Atlanta; a firm in Charlotte; and Jack Capella. In addition, Jack Capella farmed out some work for the Hornets to attorneys or firms. Ex. G, 41-45. Finally, the Hornets used Hartzog, Conger, Cason, & Neville to assist with Labor issues including the drafting of the Employee Manual that admitted liability to Plaintiffs. Ex. F, 65-66. **In direct violation of this Court's order, no records from any attorneys have been produced.**

Plaintiffs asked for copies of all reports from the NBA related to finances, revenues, and ticket sales. For over two years, the Hornets official response has been that no such documents existed. Russo confirmed, however, that these reports do exist, but and were not produced. Russo also testified that the Hornets hired industry leaders as

consultants at least once a year to assist the team with revenue and ticket sales issues. Ex. G, 47-48. He was never asked to identify these consultants prior to his deposition because no Hornets point of contact requested this information. In addition to these consultants, the Hornets had a designated NBA representative from "Team Business Operations." Ex. G, 48.[43] Any reports prepared by these TBO reps were never produced by the Hornets. Ex. G, 51-52.

Finally, the Hornets refuse to produce information from advertising firms or other consultants. However, the Hornets 30(b)(6) witnesses testified they have never been asked for this information from past or present points of contact. Ex. G, 45-46.

### C. **The Hornets Admitted That Entire Categories Of Documents Necessary For Their Defenses Do Not Exist**

The Hornets admitted that they have no ticket resale information. This is an essential element of their Retail Sales exemption. Sam Russo testified that ticket inventories would be sent to Ticketmaster. Ex. H, 33-34. The Hornets have never investigated Ticketmaster's resale of Hornets tickets. Ex. H, 35-36; Ex. J, 111-112. Russo had never conducted any investigation regarding the percentage of tickets resold on the open market. Ex. H, 37. Russo was not aware of anyone within the Hornets organization who might have this information. Ex. H, 37. The Hornets have no controls in place to address or track resale of Hornets tickets. Ex. H, 38.

### CONCLUSION

The Hornets have violated the orders of this Court for over two years. Plaintiffs have been grossly prejudiced by past and continuing acts of non-compliance. Their

---

[43] This NBA representative would evaluate and provide reports on the organization. Ex. G, 49. Three representatives were identified during the deposition, but Mr. Russo had never been asked to provide this information prior to his deposition. Ex. G, 50-51.

recent memorandum to the Court prove that the Hornets no longer believe that compliance with Court Orders is required in this matter. Severe sanctions are immediately warranted to dissuade this abhorrent behavior in this and future cases.

Respectfully submitted,

By: /s/ Daniel E. Buras, Jr.
HOWARD DAIGLE (#4454)
DANIEL E. BURAS, JR. (#26226) (T.A.)
ELVIGE CASSARD RICHARDS (#19386)
DAIGLE FISSE & KESSENICH, PLC
227 Highway 21
Madisonville, LA  70447
Telephone: 985.871.0800
Facsimile: 985.871.0899

**ATTORNEYS FOR PLAINTIFFS**

STEWART E. NILES, JR. (#10004)
BRYAN J. KNIGHT (#28640)
NILES, BOURQUE & FONTANA, L.C.
909 Poydras Street, 35th Floor
New Orleans, Louisiana 70112
Telephone (504) 310-8550
Facsimile (504) 310-8595
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above motion as been sent to opposing counsel by placing a copy of same in the U.S. mail, properly addressed, postage prepaid, or by any other means authorized by law, this 11th day of October 2007.

/s/ Daniel E. Buras, Jr.
DANIEL E. BURAS, JR.