

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF LOUISIANA
 3
 4
 5   EUGENE LIGER, ET AL      NO.  05-1969
 6
 7   VERSUS                   SECTION  "C"
 8
     NEW ORLEANS HORNETS NBA
 9   LIMITED PARTNERSHIP
10
11
12
13
14        30(b)(6) deposition (chain of
15   evidence) of DONNA PIERRE ROCHON, taken at
16   JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
17   DENEGRE, Attorneys at Law, 201 St. Charles
18   Avenue, 47th Floor, New Orleans, Louisiana
19   70170, taken on Wednesday, September 12,
20   2007.
21
22
23   REPORTED BY:
24        KIM A. PRESCOTT,
          Certified Court Reporter
25
```

**Page 3**

```
 1              I N D E X
 2
 3                        PAGE
 4
 5   CAPTION                   1
 6
 7   APPEARANCES               2
 8
 9   AGREEMENT OF COUNSEL      4
10
11   EXAMINATION BY:
12
13      MR. BURAS, ESQUIRE     5
14
15   REPORTER'S CERTIFICATE   243
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT
D-1

**Page 2**

```
 1   APPEARANCES:
 2
 3      Representing the Plaintiffs:
 4      DAIGLE, FISSE & KESSENICH
     BY: DANIEL E. BURAS, JR., ESQUIRE
 4      227 Highway 21
        Madisonville, Louisiana 70447
 5
             AND
 6
     NILES, BOURQUE & FONTANA
 7   BY: BRIAN KNIGHT, ESQUIRE
        909 Poydras Street
 8      Suite 3500
        New Orleans, Louisiana  70112
 9
10
11      Representing the Defendants:

     JONES, WALKER, WAECHETER,
12      POITEVENT, CARRERE & DENEGRE
     BY: JENNIFER L. ANDERSON, ESQUIRE
13           AND
        JANE HEIDINGSFELDER, ESQUIRE
14      8555 United Plaza Boulevard
        Four United Plaza
15      Baton Rouge, Louisiana  70809
16
17   ALSO PRESENT:
18      SAMUEL RUSSO
19
     REPORTED BY:
20      KIM A. PRESCOTT,
        CERTIFIED COURT REPORTER
21
22
23
24
25
```

**Page 4**

## S T I P U L A T I O N

It is stipulated and agreed by and
between counsel that the above-named witness
is hereby being taken under the Louisiana
Federal Rules of Civil Procedure in
accordance with the Code.

All formalities, including those of
sealing, certification and filing are hereby
waived. The witness reserves the right to
read and sign the deposition.

All objections, except those as
to the form of the questions and the
responsiveness of the answers, are reserved
until the time of the trial of this cause.

* * *

KIM A. PRESCOTT, Certified Court
Reporter, in and for the State of Louisiana,
officiated in administering the oath to the
witness.

Dockets.Justia.com

Page 5

1    DONNA PIERRE ROCHON,
2  1111 Lawrence Street, Lutcher, Louisiana
3  70071, who, after having been first duly
4  sworn by the Court Reporter, was examined
5  and testified on her oath as follows:
6    EXAMINATION
7  BY MR. BURAS:
8    Q  Ma'am, would you please state your
9  full name for the record?
10    A  Donna Pierre Rochon.
11    Q  Where are you currently employed,
12  Miss Rochon?
13    A  New Orleans Hornets.
14    Q  What's your current position?
15    A  Director of Human Resources.
16    Q  How long have you held that
17  position?
18    A  About two years.
19    Q  Do you remember when you were first
20  hired?
21    A  August 22nd.
22    Q  Were you hired specifically to be
23  the Director of Human Resources?
24    A  Yes.
25    Q  Did you hold any position with the

Page 6

1  Hornets before August of 2005?
2    A  As a temporary employee.
3    Q  What departments did you work in
4  with the Hornets as a temporary employee?
5    A  Human Resources.
6    Q  Who was your direct supervisor?
7    A  Kristy McKearn.
8    Q  Who is Miss McKearn?
9    A  Say it again, please.
10    Q  Who is Miss McKearn?
11    A  She was my supervisor.
12    Q  Was she the Director of Human
13  Resources before you?
14    A  No.  Her title was vice president
15  corporate affairs, strategic planning and
16  business operations.
17    Q  You indicated corporate affairs,
18  strategic planning and business operations.
19  All three or one of those three?
20    A  All three.
21    Q  When did you become a temporary
22  employee with the Hornets?
23    A  May 9.
24    Q  Did you have any supervisors other
25  than Miss McKearn?

Page 7

1    A  No.
2    Q  Are you aware that you've been
3  identified by the New Orleans Hornets to
4  testify on chain of evidence questions
5  related to the discovery in this case?
6    A  Yes.
7    Q  When did you first become aware
8  that you would be testifying in this case?
9    A  Yesterday.
10    Q  Are you aware that plaintiffs filed
11  a motion for contempt and sanctions against
12  the Hornets for failure to fully, timely and
13  accurately respond to the discovery requests
14  in this litigation?
15    A  Say it again, please.
16    Q  Are you aware that plaintiffs in
17  this case filed a motion for contempt and
18  sanctions against the Hornets for their
19  failure to timely, fully and accurately
20  respond to discovery requests in this
21  litigation?
22    MS. ANDERSON:
23    Just object to the form of the
24    question.  Assumes facts not in
25    evidence.

Page 8

1  BY MR. BURAS:
2    Q  Answer the question, ma'am.
3    MS. ANDERSON:
4    You can still answer the
5    question if you understand it.
6    THE WITNESS:
7    I don't understand the
8    question.  I'm sorry.
9  BY MR. BURAS:
10    Q  Do you know that there is currently
11  a motion pending before the court seeking
12  contempt and sanctions against the Hornets?
13    A  No.
14    Q  Are you aware or were you ever told
15  that the reason that we have a motion pending
16  before the court or that the reason you're
17  testifying today is because plaintiffs have
18  alleged that the Hornets failed to timely,
19  fully and accurately respond to discovery in
20  this litigation?
21    A  Repeat that question again, please.
22    Q  All right.  Are you aware that the
23  reason you're being presented as a deponent
24  to testify about chain of evidence questions
25  is because plaintiffs have alleged that the

Page 9

1 Hornets did not properly respond to questions
2 posed to them through discovery responses in
3 this case -- through discovery requests in
4 this case? Excuse me.
5    A No.
6    Q Were you made aware that in --
7 strike that. Are you aware that August 2nd,
8 2005, the district court in this litigation
9 ordered the Hornets to produce various
10 information related to certain questions that
11 were posed to the Hornets by plaintiffs?
12    A Say the question again, please.
13 I'm sorry.
14    Q Are you aware that on August 2nd,
15 2005, there's a court order -- that a court
16 order was handed down by the district court
17 in this case actually by the magistrate judge
18 ordering the Hornets to produce information
19 related to various questions that were
20 presented to the Hornets by plaintiffs?
21      MS. ANDERSON:
22        Objection to form. States
23        incorrect facts.
24      THE WITNESS:
25        No.

Page 10

1 BY MR. BURAS:
2    Q Are you aware that in August of
3 2005 the Hornets were supposed to respond
4 to various questions that were posed by
5 plaintiffs in this litigation?
6      MS. ANDERSON:
7        Objection to form.
8      THE WITNESS:
9        Can I ask for a clarification
10        on the question?
11 BY MR. BURAS:
12    Q If there is any part you don't
13 understand, please, I will be more than happy
14 to try to clarify it.
15    A Are you asking do I know now or do
16 I know then?
17    Q There is going to be two
18 questions. One is going to be do you know
19 now and the second question as soon as you
20 answer that one is when did you find that
21 out. I guess the first question: Are you
22 aware today in August of 2005 the Hornets
23 were supposed to respond to some information
24 regarding questions posed by plaintiffs to
25 the Hornets?

Page 11

1    A Yes.
2    Q When did you first learn this?
3    A June of this year.
4    Q Since you just learned of the
5 existence of this order in June of 2007, is
6 it fair to say you can play no role in the
7 investigation of any of the responses that
8 the Hornets provided to plaintiffs related
9 to the August 2nd, 2005, responses prepared
10 by the Hornets?
11      MS. ANDERSON:
12        Objection to form.
13      THE WITNESS:
14        Repeat that question or
15        clarify it, please.
16 BY MR. BURAS:
17    Q Sure. Is it fair to say since
18 you did not know about this order in June of
19 2007 you played no role in the investigation
20 of the facts requested or the information
21 requested by plaintiffs pursuant to that --
22 related to that order?
23      MS. ANDERSON:
24        Objection to form.
25      THE WITNESS:

Page 12

1        Repeat the question again.
2        I'm sorry. It's like it's got
3        two questions in it and that's
4        what's confusing to me.
5 BY MR. BURAS:
6    Q No problem. I will be more than
7 happy. Did you help the Hornets conduct
8 their investigation into the responses
9 provided to plaintiffs in August of 2005?
10    A When you say "pursuant," you mean
11 after August 2nd, 2005?
12    Q Yes, ma'am. In relation to the
13 order on August 2nd, 2005, that ordered the
14 Hornets to produce information, did you
15 participate in the investigation of the
16 responses that the Hornets gave to the
17 plaintiffs?
18      MS. ANDERSON:
19        Objection to the form.
20      THE WITNESS:
21        What does your question mean
22        to provide information or to
23        investigate?
24 BY MR. BURAS:
25    Q I was trying to shorten it up but

Page 13

1  I'll have to take the long way.
2      A  I'm sorry. I was trying to
3  understand your question.
4      Q  No. No. No.
5      MS. ANDERSON:
6          And I object to the comment.
7  BY MR. BURAS:
8      Q  Did you help the Hornets prepare
9  any responses to any discovery requests prior
10 to June of 2007?
11     A  No.
12     Q  Did you help the Hornets
13 investigate any discovery requests provided
14 to plaintiffs prior to June of 2007?
15     A  Can you clarify, please, what you
16 mean by investigate?
17     Q  That is a question I don't know the
18 answer to, ma'am. I'm trying to find out
19 what role you played in providing information
20 to your attorneys related to the responses
21 that they provided to plaintiffs in this
22 litigation.
23     A  Okay.
24     Q  What was your role and when did you
25 first conduct any investigation pursuant to

Page 14

1  that role in this litigation?
2      A  My role was to provide or produce
3  information as requested.
4      Q  When were you told that that was
5  your role in this investigation?
6      MS. ANDERSON:
7          Objection; form.
8      THE WITNESS:
9          Sometime around the hurricane
10         or right after the hurricane.
11 BY MR. BURAS:
12     Q  So around August of 2005 or was it
13 thereafter?
14     A  Probably thereafter.
15     Q  When the hurricane struck the city,
16 did you evacuate to Oklahoma City?
17     A  Yes, I did.
18     Q  When did you return to the city?
19     A  On a permanent basis?
20     Q  Yes.
21     A  Or temporary?
22     Q  We will do both.
23     A  June of this year.
24     Q  June of this year you permanently.
25 On a temporary, were you working for the

Page 15

1  Hornets in their offices between the time
2  of the hurricane and June of 2007?
3      A  I'm sorry. Repeat that question
4  again, please.
5      Q  Sure you. You indicated that you
6  permanently returned to New Orleans in June
7  of 2007.
8      A  Correct.
9      Q  Between the time the hurricane
10 struck the city and June of 2007 you
11 indicated -- and I don't want to -- did you
12 return to the city on a temporary basis
13 during that interim?
14     A  Yes.
15     Q  Was it for work purposes?
16     A  Yes.
17     Q  All right. Where did you perform
18 your work responsibilities between the
19 hurricane and June of 2007 on those temporary
20 returns to the city?
21     A  I was at the 1615 Poydras Street
22 office to locate documents.
23     Q  Have you ever seen a copy of the
24 complaint filed in Federal Court related to
25 this case?

Page 16

1      A  No.
2      Q  Have you ever seen a copy of the
3  petition for damages filed in State Court
4  related to this case?
5      A  No.
6      Q  Do you know what the allegations
7  raised by plaintiffs are in these cases?
8      A  No.
9      Q  When was the first time you were
10 asked to provide information on behalf of the
11 Hornets related to any discovery requests
12 sent by plaintiffs to the Hornets in this
13 case?
14     MS. ANDERSON:
15         Objection; form.
16     THE WITNESS:
17         Repeat the question, please,
18         or clarify.
19     MR. BURAS:
20         Read it back, please.
21     (Court reporter read back the last
22     question.)
23     THE WITNESS:
24         Right around the hurricane.
25 BY MR. BURAS:

Page 17

1    Q  Are you aware that the court
2  ordered the New Orleans Hornets to respond to
3  several discovery requests on an order dated
4  July 31st, 2007?
5    A  Repeat the question again, please.
6    Q  Are you aware that in August of
7  this year the court ordered the Hornets to
8  produce additional information related to
9  discovery requests that were propounded by
10  the plaintiffs to the Hornets?
11   A  Yes.
12   Q  Did you personally conduct the
13  investigation into the responses to those
14  discovery requests?
15   A  Again my question is in reference
16  to the word "investigate."  What are you
17  specifically asking in my reviewing documents
18  or what am I doing?
19   Q  Did you review documents?  Did you
20  look for documents?  Did you delegate other
21  people to find documents?  I want to know
22  everything you did related to investigating
23  any responses or information that was
24  provided to your attorneys to give to
25  plaintiffs in this case.

Page 18

1    A  Repeat the question one more time,
2  please.  I'm sorry.
3    MR. BURAS:
4        Could you please read it back?
5        (Court reporter read back the last
6        question.)
7    THE WITNESS:
8        Yes.
9  BY MR. BURAS:
10   Q  Are you aware that your attorney
11  volunteered to produce certain information
12  to the district court judge during a hearing
13  in August of 2005?
14   A  No.
15   Q  Were you ever provided copies of
16  any correspondence or letters or e-mails sent
17  by plaintiff attorneys in this case to the
18  Hornets' counsel regarding alleged
19  deficiencies in the Hornets' discovery
20  responses in this case?
21   A  Repeat the question.
22   Q  Did you ever see, read or receive
23  any copies of correspondence, e-mails or
24  other letters sent by plaintiff attorneys
25  in this case to Hornets' counsel discussing

Page 19

1  areas of prior responses given by the Hornets
2  that plaintiffs deemed incomplete or
3  inaccurate?
4    A  No.
5    Q  Are you aware that the court
6  instructed plaintiffs during this deposition
7  to find out when the Hornets actually
8  received the discovery requests in this case?
9    MS. ANDERSON:
10       Objection; form.
11  BY MR. BURAS:
12   Q  You can answer.
13   A  No.
14   Q  Are you aware that the court
15  instructed plaintiffs to find out who at the
16  Hornets personally received the actual
17  discovery responses sent to the Hornets by
18  plaintiffs in this case?
19   MS. ANDERSON:
20       Objection; form.
21   THE WITNESS:
22       No.
23  BY MR. BURAS:
24   Q  Are you aware the court instructed
25  plaintiffs to find out who at the Hornets

Page 20

1  actually looked for the information
2  responsive to each of the discovery requests
3  in this case?
4    MS. ANDERSON:
5        Objection; form.
6    THE WITNESS:
7        No.
8  BY MR. BURAS:
9    Q  Are you aware the court instructed
10  the plaintiffs to find out who at the Hornets
11  directed others to look for documents and
12  information responsive to discovery requests
13  sent by plaintiffs in this case?
14   MS. ANDERSON:
15       Objection; form.
16   THE WITNESS:
17       No.
18  BY MR. BURAS:
19   Q  Are you aware that the court
20  instructed plaintiffs to find out how the
21  Hornets received the discovery requests sent
22  by plaintiffs to the Hornets in this case?
23   MS. ANDERSON:
24       Objection; form.
25   THE WITNESS:

DONNA PIERRE ROCHON™ Condensed!

Page 21

1   No.
2 BY MR. BURAS:
3   Q  Are you aware the court instructed
4 the Hornets to find out the names of the
5 people who actually looked for documents and
6 responses sent by plaintiffs in this case?
7   MS. ANDERSON:
8   Objection; form.
9   THE WITNESS:
10   No.
11 BY MR. BURAS:
12   Q  Are you aware that the court
13 instructed plaintiffs to find out any
14 instructions the Hornets received from
15 counsel limiting any searches conducted
16 for documents responsive to discovery
17 requests?
18   MS. ANDERSON:
19   Objection; form.
20   THE WITNESS:
21   No.
22 BY MR. BURAS:
23   Q  What were you told your purpose
24 during this deposition is today?
25   A  Only the matter of how the

Page 22

1 documents were produced -- I mean -- yes.
2   Q  When you say "how the documents
3 were produced" --
4   A  If I was involved.
5   Q  Did you personally investigate each
6 of the discovery requests sent by plaintiffs
7 to the Hornets in this case?
8   MS. ANDERSON:
9   Objection; form.  And asked
10   and answered in part already.
11   THE WITNESS:
12   Please clarify your question.
13 BY MR. BURAS:
14   Q  Did you personally conduct an
15 investigation to find the information
16 responsive to any -- to all of the discovery
17 requests sent by plaintiffs to the Hornets
18 in this case?
19   A  No.
20   Q  Did you personally direct others to
21 conduct an investigation into the discovery
22 responses -- excuse me, into the discovery
23 requests propounded to the plaintiffs by the
24 Hornets?
25   MS. ANDERSON:

Page 23

1   Objection.  Asked and answered
2   in part.
3   THE WITNESS:
4   It sounds like you're assuming
5   that I did this.  That's what's
6   confusing.
7 BY MR. BURAS:
8   Q  If you didn't do it, your answer is
9 no, you didn't.  I don't want you to say you
10 did something.  I don't want to suggest you
11 did something.  What I'm trying to find out
12 today, in the event that you feel I'm trying
13 to put words in your mouth, please do like
14 you're doing and ask me to clarify.
15   What I'm trying to find out today
16 is exactly what you specifically did in this
17 case to investigate the discovery that was
18 sent by the plaintiffs to the Hornets.  When
19 I say "propound," it's a legal word that
20 means sent to.  So I'll try to say the words
21 "sent to" but sometimes I get caught up in
22 legalese.
23   A  Sorry.
24   Q  So all of my questions relate to
25 your personal knowledge in this case or what

Page 24

1 you directed other people to do specifically
2 in response to the discovery requests that
3 were sent by plaintiffs to the Hornets in
4 this case.  Okay?
5   A  Okay.
6   Q  All right.  Did you personally play
7 a role in the investigation of the responses
8 given by the Hornets to plaintiffs related to
9 the August 2005 order --
10   MS. ANDERSON:
11   Objection; form.
12 BY MR. BURAS:
13   Q  -- of the court?
14   MS. ANDERSON:
15   I'm sorry.  Objection; form.
16   THE WITNESS:
17   Yes.
18 BY MR. BURAS:
19   Q  Just to make sure I clarify.  You
20 have not been presented as a 30(B)(6) witness
21 on any topics for investigation that were
22 previously propounded by plaintiffs to the
23 Hornets in either 30(B)(6) or the 1442
24 deposition; correct?
25   MS. ANDERSON:

Page 25

```
1        I'm going to answer that one
2   for her because it's a complicated
3   question.
4        MR. BURAS:
5        Okay.
6        MS. ANDERSON:
7        I will refer you to our
8   September 11, 2007, letter which
9   I will attach as an exhibit --
10       MR. BURAS:
11       No objection.
12       MS. ANDERSON:
13       -- to this deposition as
14   Exhibit 1 indicating that Miss
15   Rochon is being only submitted
16   on the so-called chain of evidence
17   issues.  She has not been
18   designated yet as a substantive
19   witness and here's a copy of
20   Exhibit 1.
21 BY MR. BURAS:
22   Q  Let's start off with the initial
23 disclosure.
24       MS. ANDERSON:
25       The witness has in front of
```

Page 26

```
1   her the initial disclosure.
2        MR. BURAS:
3        Counsel, this is the one I'm
4   going to mark as Defendant's
5   Exhibit -- excuse me, Rochon
6   Exhibit 2.  This copy is for you.
7   This is the one we're actually
8   going to use.
9        MS. ANDERSON:
10       I will give you this one to
11   look at just so we're clear.
12 BY MR. BURAS:
13   Q  Ma'am, have you seen this document
14 before?  What I handed you is the Hornets
15 initial disclosure which is dated on the last
16 page July.  Have you ever seen this document
17 before?
18   A  No.
19   Q  When is the first time -- strike
20 that.  I believe you indicated the first time
21 you were asked to assist the Hornets
22 investigating any responses or assist the
23 Hornets in preparing any responses to
24 discovery to plaintiffs was in August of
25 2005?
```

Page 27

```
1        MS. ANDERSON:
2        Objection; form.
3        THE WITNESS:
4        No.
5 BY MR. BURAS:
6   Q  When is the first time you were
7 asked to assist the Hornets in investigating
8 any responses to plaintiffs' discovery
9 responses?
10       MS. ANDERSON:
11       Objection; form.
12       THE WITNESS:
13       It was around the hurricane.
14       Specific date, I don't remember.
15       I'm sorry.
16 BY MR. BURAS:
17   Q  That's fair enough.  Prior to
18 receiving -- excuse me.  Prior to plaintiffs
19 propounding any discovery responses to the
20 Hornets, the Hornets provided something
21 called initial disclosures which are set
22 forth here.  Were you asked to assist the
23 Hornets preparing any information that is
24 set forth in these initial disclosures?
25   A  It's possible.
```

Page 28

```
1   Q  But you don't remember as you sit
2 here today?
3   A  No.  I'm sorry.  I don't
4 specifically.
5   Q  I want you to take a look at
6 Section A. It identifies five individuals as
7 people likely to have discovery information
8 that defendants may use to support its
9 defenses.  Do you see that section, ma'am?
10   A  Yes.
11   Q  Your name is not identified as one
12 of these five people, is it?
13   A  Correct.
14   Q  You were employed by the Hornets at
15 the time that these initial disclosures were
16 sent on a temporary basis.  I believe that's
17 your previous testimony; correct?
18   A  That is correct.
19   Q  Did you meet with any attorneys
20 prior to July 21st, 2005, to discuss any
21 issues related to this litigation?
22   A  No.
23   Q  Were you aware of this litigation
24 in July of 2005?
25   A  Not specifically.
```

Page 29

1    Q  What do you mean not specifically?
2    A  I was not brought into any meeting
3  and informed about anything on that.
4    Q  But you were aware that the -- I
5  don't understand what you mean not
6  specifically.  Does this mean that you were
7  aware there was litigation ongoing against
8  the Hornets at that time?
9    A  There was something going on but I
10  didn't know what it was.
11    Q  Okay.  When is the first time you
12  found out what the litigation against the
13  Hornets involved?
14    A  It was after the hurricane.
15    Q  Okay.  So prior to -- at the time
16  these initial disclosures were prepared on
17  or around the 21st of July 2005 -- that's
18  when they were provided to plaintiffs --
19  you played no role whatsoever in the
20  investigation of any information set forth
21  in this document; is that correct?
22    MS. ANDERSON:
23        Objection; form.  Already
24        asked and answered.  The question
25        is incorrect.

Page 30

1  BY MR. BURAS:
2    Q  You can answer.
3    A  And your question is -- again,
4  please, for clarification.
5    Q  My question is:  Did you play any
6  role -- strike that.  My question is to
7  confirm that you did not play any role in
8  the provision of any information set forth
9  in these initial disclosures; is that
10  correct?
11    MS. ANDERSON:
12        Object; form.  And asked and
13        answered.
14    THE WITNESS:
15        No.
16  BY MR. BURAS:
17    Q  What was your role as a temporary
18  employee working under Miss McKearn?
19    A  To do the payroll for the staff and
20  to handle some of the H.R. responsibilities,
21  benefits, workers' compensation.
22    Q  Where did you work before May of
23  2005?
24    A  Ruth Chris Steakhouse.
25    Q  What did you do at Ruth Chris?

Page 31

1    A  Payroll supervisor.
2    Q  Ma'am, I'm finished with this
3  document.  All right.  I'm going to hand you
4  now a copy of this.  This is going to be
5  Judge Berrigan -- the transcript of Judge
6  Berrigan's hearing.
7    MS. ANDERSON:
8        This is in the stack?
9    MR. BURAS:
10        It should be in that stack.
11    MS. ANDERSON:
12        Give me a minute to find it.
13    MS. HEIDINGSFELDER:
14        Which hearing is this?
15    MS. ANDERSON:
16        Is this the partial summary
17        judgment hearing?
18    MR. BURAS:
19        Negative.  This is the August
20        17th, 2005, certification hearing.
21    MS. ANDERSON:
22        Okay.  All right.  I have it.
23  BY MR. BURAS:
24    Q  Ma'am, I'm going to give you a
25  document that's been marked as Rochon Exhibit

Page 32

1  3 which is the August 17th, 2005, transcript
2  related to certification hearing regarding
3  the overtime claims filed by plaintiffs in
4  this case.
5        I want you to take a look and turn
6  to the page which up at the upper left corner
7  is marked Page 13.  You can take a moment to
8  review the document, ma'am.
9    A  (Witness complies.)
10    MS. ANDERSON:
11        At this point I just want to
12        lodge an objection for the record
13        that the scope of the questions
14        being asked in this case do not
15        relate to the pending motion for
16        contempt and sanctions which does
17        not reference any prior discovery
18        responses or prior disclosures in
19        this case.  I just want to note
20        that for the record.  I'm not
21        limiting your ability to ask
22        questions or this witness' ability
23        to testify.
24    MR. BURAS:
25        I believe my motion papers

Page 33

1    encompass all of these issues as
2    well.
3 BY MR. BURAS:
4    Q  All right, ma'am.  Tell me when you
5 are ready.
6    MS. ANDERSON:
7       I'm sorry, Dan.  Which page
8    did you call her attention to?
9    MR. BURAS:
10      It's going to be actually
11   the bottom of Page 12 and then
12   through the middle part of Page
13   13.
14   MS. ANDERSON:
15      Okay.  So read it at least
16   that part, the bottom of 12 through
17   the middle of 13.
18 BY MR. BURAS:
19   Q  Ma'am, if you need more time to
20 read it, you tell me.
21   MS. ANDERSON:
22      That was going to be my note
23   exactly.  You read whatever you
24   need to read and let us know when
25   you're done.

Page 34

1    MR. BURAS:
2       Let's go off the record for
3    just one minute while she's reading
4    the document.
5    (WHEREUPON:  A brief discussion was
6    held off the record.)
7    THE WITNESS::
8       Are we starting on Page 12?
9 BY MR. BURAS:
10   Q  Yes.  Okay, ma'am.  On Page 12 Miss
11 Anderson responded to a question from the
12 court.  The court asks: "No matter what we
13 call all of these categories or how we rename
14 them, in fact, it's only going to involve
15 about ninety more people?"
16      And Miss Anderson responded, "I
17 don't have a precise take on the number, but
18 there's been a turnover in the last three
19 years.  My impression is that it's larger
20 than ninety, but I do have a couple of points
21 to make in response to Mr. Niles' concerns.
22 First of all, there is a solution to the
23 issue of job title change.  He makes the
24 point that someone who may be a Fan Relations
25 Representative in 2005 which is called a Fan

Page 35

1 Development in 2004.  The Hornets can produce
2 all of the prior job titles and names for a
3 particular position and thereby capturing
4 anybody who would have served in that role if
5 they are identified as a non-exempt position
6 that's at issue in this case now."  Do you
7 see that, ma'am?
8    A  Yes.
9    Q  At any point in time after August
10 17th of 2005, were you asked to provide a
11 list of all of the different job titles or
12 names of particular positions including all
13 of the job title name changes since the
14 Hornets -- that involved any of the non-
15 exempt categories in this litigation?
16   A  Yes.
17   Q  When were you first asked to
18 provide that information?
19   A  After the hurricane.
20   Q  How were you asked to provide this
21 information?
22   A  Please clarify that question.
23   Q  What I want to know:  Did you
24 receive a letter?  Was it an e-mail?  Was
25 it a personal phone call?  Was it a

Page 36

1 face-to-face visit?  How were you told and
2 in what form were you told to -- strike
3 that.  How were you asked to give this
4 information?  What was the manner in which
5 the communication was transmitted to you?
6    A  Telephone call from counsel.
7    Q  Do you remember as you sit here
8 today what you were asked to do; what
9 information you were asked to collect?
10   A  In reference to?
11   Q  In reference to that phone call
12 related to Pages 12 and 13 I just showed
13 you.
14   A  Just provide the job titles for
15 non-exempt positions.
16   Q  Were you asked to provide the
17 current job titles?
18   A  I don't recall.
19   Q  Do you know if you were asked to
20 go back and research all of the prior job
21 titles of these positions?
22   A  I don't recall that either.
23   Q  Do you know if you actually
24 investigated the prior job titles of any
25 of the categories of employees at issue

Page 37

1  in this litigation?
2    A  Yes.
3    Q  When did you conduct that
4  investigation?
5    A  Sometime after the hurricane.
6    Q  Do you remember when after the
7  hurricane?
8    A  No.
9    Q  Was it in 2005?
10   A  I don't remember.
11   Q  All right.  I just want to clarify
12 the record.  Do you remember -- was it more
13 likely to be in 2006 or was it more likely
14 to have occurred in the months after the
15 hurricane in 2005?
16    MS. ANDERSON:
17        Objection.  Asked and
18        answered.  She said she didn't
19        remember.
20    THE WITNESS:
21        I don't know.
22 BY MR. BURAS:
23   Q  How did you collect this
24 information?
25   A  Went back through the files.

Page 38

1    Q  What files?
2    A  The personnel files.
3    Q  How far back did the personnel
4  files go back in the Hornets' personnel
5  department?
6    A  At least 2002.
7    Q  Did you take the personnel files
8  with you when you moved to Oklahoma City?
9    A  Which ones, active or terms?
10   Q  That's my question to you.  If
11 it's limited, you tell me.
12   A  It was limited.
13   Q  Which personnel files did you take
14 with you?
15   A  I took active files with me.
16   Q  When you conducted your
17 investigation, did you only review active
18 files to determine the different job titles
19 handed to various types or categories of
20 employees involved in this litigation?
21   A  No.
22   Q  So you also conducted an
23 investigation into the inactive files or
24 the employees who were no longer with the
25 Hornets; correct?

Page 39

1    A  Yes.  And I did that by coming back
2  down here to do so.
3    Q  When is the first time you remember
4  coming back to New Orleans to investigate the
5  personnel files for the purpose of
6  identifying the job titles or names of
7  positions that may have changed in this case?
8    A  December of 2005.
9    Q  When you conducted your
10 investigation in December of 2005, which
11 files did you look for?
12   A  I believe I was provided a list and
13 I looked for those files that was on that
14 list.
15   Q  You were provided a list of what?
16   A  Names, plaintiffs.
17   Q  Who provided you with this list?
18   A  Legal counsel.
19   Q  So when you returned -- let me make
20 sure I understand.  In December of 2005 when
21 you returned to New Orleans, you investigated
22 or reviewed documents related to the list of
23 plaintiffs involved in this litigation?
24   A  Not reviewed but pulled, retrieved
25 files or pulled documents.

Page 40

1    Q  What documents did you pull or
2  retrieve?
3    A  Commission reports, payroll
4  records.
5    Q  Anything else?
6    A  Personnel files.  That's all I
7  remember.
8    Q  That's all that you remember?
9    A  Yes.
10   Q  Was there anything else or is that
11 all you remember?
12   A  That's all I remember at the
13 moment.  That was my Christmas vacation.
14 That's how I remember specifically.
15    MS. ANDERSON:
16        Make sure you speak up.  I
17        don't know if she's having any
18        trouble hearing you, but you're
19        pretty quiet.
20 BY MR. BURAS:
21   Q  In December of 2005, did you also
22 investigate the identities of any name
23 changes or category changes of classes of
24 employees; for example, if the Fan
25 Relation -- I believe the example in here

Page 41

1 is if a Fans Relation Representative in
2 2005 is called a Fan Development Person in
3 2004, did you go back through the file to
4 find out the different job title changes for
5 various classes of employees in December of
6 2005 or did you limit your search to the list
7 of plaintiffs involved in this litigation?
8    A  Only to the list that was involved.
9    Q  At any point in time since August
10 of 2003 (sic), have you gone back through the
11 personnel files of the New Orleans Hornets
12 to create a list or identify the different
13 names of positions of employees who worked
14 for the Hornets since the team came to New
15 Orleans?
16    A  2003?
17    Q  Since -- excuse me.  Since 2005,
18 August of 2005, have you gone through your
19 personnel records to determine the names of
20 all of the different categories of employees
21 or job titles of categories of employees
22 involved in this litigation?
23    A  No.
24    Q  Have you ever been asked to provide
25 this information to your counsel?

Page 42

1    A  Excuse me.  Specifically for the
2 plaintiffs?
3    Q  Have you been asked to give this
4 information to your attorney?
5    MS. ANDERSON:
6        Objection; form.  I'm just
7    not sure if you're clear about
8    what information.
9    MR. BURAS:
10       I'm sorry.
11    MS. ANDERSON:
12       You said this information and
13    I don't know if the record is clear
14    about that.
15    MR. BURAS:
16       Don't worry.  I'll clarify.
17 BY MR. BURAS:
18    Q  Have you ever been asked by your
19 attorneys to collect the different name
20 changes for the positions or titles or
21 classes of employees -- I don't know how
22 to make that any clearer.  The different
23 job titles for employees involved in this
24 litigation.  Have you ever been asked to
25 collect the information related to the

Page 43

1 name changes that were given to those job
2 titles?
3    A  For those plaintiffs?
4    Q  For --
5    A  For any?
6    Q  -- any classes of employees that
7 may be involved in this litigation.
8    MS. ANDERSON:
9        Objection; form.
10    THE WITNESS:
11       Yes.
12 BY MR. BURAS:
13    Q  When?
14    A  After -- around the December time
15 frame and any time after that but --
16    Q  It's my understanding, and I may be
17 in error here, but you told me you did not
18 review any files other than the specific
19 plaintiff files in this case related to job
20 title changes; is that correct?
21    MS. ANDERSON:
22       Objection; form.  I believe
23    that misstates prior testimony.
24    MR. BURAS:
25       That's why I asked if it's

Page 44

1    correct.
2    THE WITNESS:
3        I'm sorry.  You're confusing
4    me.
5 BY MR. BURAS:
6    Q  I'm trying to find out whether or
7 not you actually went through all of the
8 employee records both terminated and active
9 records for the New Orleans Hornets to
10 determine the different job titles given to
11 positions of employees that may or may not
12 have overtime claims against the Hornets?
13    A  No.
14    MS. ANDERSON:
15       Objection; form.
16 BY MR. BURAS:
17    Q  Have you ever gone through all of
18 the job files for both terminated and current
19 employees of the New Orleans Hornets in this
20 litigation since August of 2005?
21    A  No.  I have not had time.
22    Q  Do you know the different job
23 titles given to all of the sales employees
24 who worked for the Hornets since the team
25 came to New Orleans?

Page 45

1  A No.
2  Q Have you ever been asked to
3 investigate the names of the different job
4 titles of sales employees that worked for the
5 New Orleans Hornets?
6  A No.
7  Q Have you ever -- do you know all of
8 the names that were given to the job titles
9 of the employees who performed ticket
10 operation duties since the team first moved
11 to New Orleans?
12    MS. ANDERSON:
13      Objection; form.
14    THE WITNESS:
15      No.
16 BY MR. BURAS:
17  Q Have you ever been asked to
18 investigate the different job titles given
19 to the names of employees -- excuse me, the
20 different job titles given to employees who
21 performed ticket operation duties for the
22 Hornets since the team came to New Orleans?
23  A No.
24  Q Have you ever been asked to
25 investigate the different job titles of

Page 46

1 secretarial and administrative staff such as
2 secretaries who performed job duties for the
3 Hornets since the team first came to New
4 Orleans?
5  A No.
6  Q Have you ever directed anyone to
7 investigate the different job titles that
8 were given to sales employees, ticket
9 operations personnel or secretaries since
10 the team came to New Orleans in 2002?
11  A No.
12  Q When you investigated the personnel
13 records of the plaintiffs actually involved
14 in this litigation, you indicated that you
15 limited your search to the best of your
16 recollection to commission reports, payroll
17 records and personnel files; is that correct?
18    MS. ANDERSON:
19      Objection; form.
20    THE WITNESS:
21      Yes.
22 BY MR. BURAS:
23  Q Did you ever request that the IT
24 Department conduct an investigation by
25 e-mails sent by any of the named plaintiffs

Page 47

1 in this case?
2  A No.
3  Q To the best of your knowledge,
4 have you ever requested that anyone working
5 for you request that the e-mail information
6 or other electronic data that may or may not
7 be on the Hornets' server be provided in this
8 litigation?
9  A No.
10  Q All right, ma'am. I'm going to give
11 you three documents that relate to
12 Plaintiffs' First Requests for Production in
13 CDC case 05-10068. When I refer to that case
14 number, it's the number at the top left-hand
15 corner of the page. It's one of the State
16 Court lawsuits.
17    I'm going to mark Plaintiffs' First
18 Request for Production as Exhibit 4. The
19 Hornets answer to our Request for Production
20 as Exhibit 5 and the Hornets' First
21 Supplemental and Amending Responses as
22 Exhibit 6. I'm going to give these documents
23 to you at this time, ma'am.
24    MS. ANDERSON:
25      And I think what I'll do just

Page 48

1    to be efficient about this just
2    note a continuing objection. I'll
3    do it now so I don't have to do it
4    again --
5    MR. BURAS:
6      Okay.
7    MS. ANDERSON:
8      -- which is that some of the
9    questions that have already been
10    asked and I believe are about to
11    be asked are outside the scope of
12    the purpose of this deposition at
13    least on the chain of evidence
14    issues pursuant to the judge's
15    recent hearing and/or order, a
16    minute entry that may be coming
17    from that.
18      So to the extent that these
19    questions exceed that, I object
20    to them. I'm not going to stop
21    counsel from asking them or stop
22    the witness from answering them
23    but I want that noted as a
24    continuing objection on the
25    record.

Page 49

1 BY MR. BURAS:
2    Q  All right, ma'am.
3       MR. BURAS:
4          Tell me when you're with me,
5       counsel, and we'll start.
6       MS. ANDERSON:
7          I got them.  All right.
8 BY MR. BURAS:
9    Q  Ma'am, why don't you take a look
10 at the document that's marked as Exhibit 4
11 Plaintiffs' Request for Production of
12 Documents.  Do you have that in front of you?
13    A  Yes.
14    Q  I want you to turn to the last page
15 on this document.  I believe it says Page 6.
16 You'll see something that says Certificate of
17 Service on or about the upper middle portion
18 of the page.  Do you see that, ma'am?
19    A  Yes.
20    Q  All right.  The date that this
21 document indicates that it was served on
22 opposing counsel was December 26th, 2005.
23 Do you see that, ma'am?
24    A  Yes.
25    Q  Have you ever seen this document

Page 50

1 before?
2    A  No.
3    Q  All right, ma'am.  I want you to
4 take a look at Page 3 of this document.
5 There's a portion of this document in the
6 third full paragraph that states, "Demand
7 is hereby made for defendant to notify all
8 necessary employees, agents, consultants,
9 contractors and/or all other necessary
10 persons or entities to cease and desist all
11 document destruction, purges, computer dumps,
12 e-mail destruction, sale or destruction of
13 computer hard drives, modifications of saved
14 documentation, and all other actions that
15 will cause or may likely cause the
16 destruction or modification of information
17 relevant to this litigation."
18       Do you see that paragraph, ma'am?
19    A  Yes.
20    Q  Were you ever told by any of your
21 attorneys to cease and desist from all e-mail
22 destruction in this litigation?
23    A  No.
24    Q  Were you ever told to save any
25 e-mail that may be related to this

Page 51

1 litigation?
2    A  No.
3    Q  Did you ever personally send any
4 kind of a notification to the IT Department
5 instructing them not to destroy or get rid of
6 any computer hard drives in this case?
7    A  No.
8    Q  Did you ever tell the IT Department
9 not to purge any computer systems that may
10 have relevant information to this case?
11    A  No.
12    Q  Did you ever notify any consultants
13 not to purge, destroy or otherwise cause to
14 be modified any of the documents or
15 information that may be relevant to this
16 case?
17    A  No.
18    Q  Did you ever cause or notify --
19 strike that.  Did you ever notify or instruct
20 someone to notify any contractors and tell
21 them to cease and desist from all document
22 destruction related to any information that
23 may be relevant to this case?
24    A  No.
25    Q  All right.  I want you to take a

Page 52

1 look at number -- the Request for Production
2 section of this document which begins with #1
3 and runs through #26.  Do you see that,
4 ma'am?
5    A  Yes.
6    Q  Did you personally investigate any
7 of the requests for information set forth in
8 any of these 26 requests?
9       MS. ANDERSON:
10         Take your time and read them.
11      THE WITNESS:
12         (Witness complies.)  Would you
13      repeat the question?
14      MR. BURAS:
15         Would you please read it
16      back?
17      (Court reporter read back the last
18      question.)
19      THE WITNESS:
20         Again, as I mentioned earlier,
21      the word investigate, I'm not sure
22      what you mean by that but I did
23      pull records as requested for the
24      plaintiffs.
25 BY MR. BURAS:

## Page 53

1    Q  Who requested that you pull
2  records?
3    A  My supervisor and/or legal counsel.
4    Q  Who was your supervisor?
5    A  Kristy McKearn.
6    Q  When were you first requested to
7  pull records?
8    A  Somewhere around the hurricane.
9  There was lots going on at that time, too.
10    MR. BURAS:
11        I'm going to object to your
12    previous answer as unresponsive.
13  BY MR. BURAS:
14    Q  Which of the 26 Requests for
15  Production did you personally investigate
16  the location of documents and pull documents
17  responsive to these Requests for Production?
18    A  You want this listed by numbers?
19    Q  If you can tell me which numbers
20  you actually investigated, absolutely.
21    MR. BURAS:
22        Counsel, if you don't have
23    an objection, I'd like for her to
24    mark personal for the ones that
25    she personally investigated

## Page 54

1    next to each one of those.  That
2    way just for completion of the
3    record I can know who investigated
4    what, when and where.  If not,
5    I'll mark it myself on the
6    document.
7    MS. ANDERSON:
8        I'd prefer she give a verbal
9    response and if you want to make a
10    note and attach something, I have
11    no objection to you making a note
12    and attaching something, and I
13    object to the form of the
14    question.
15    MR. BURAS:
16        That's fine.
17  BY MR. BURAS:
18    Q  Let me -- let's just make this
19  easy.  Did you personally investigate and
20  provide information responsive to any of
21  these 26 Requests for Production?
22    MS. ANDERSON:
23        Objection.  Asked and
24    answered.
25    THE WITNESS:

## Page 55

1        The information that I pulled
2    were payroll records that included
3    earning records, commission
4    records.  Those were pulled.
5    MR. BURAS:
6        I'm going to object as
7    unresponsive.
8  BY MR. BURAS:
9    Q  As to #1, please produce copies
10  of all reports prepared with the Archtics
11  system that were provided to the defendant's
12  payroll department reflecting sales
13  commissions owed to any named plaintiff.
14        Did you personally look for
15  documents responsive to this Request for
16  Production?
17    A  No.
18    Q  As to #2, please produce a copy
19  of the employee files for each named
20  plaintiff.
21        Did you personally look for
22  information responsive to this Request for
23  Production?
24    A  Yes.
25    Q  When did you first look for this

## Page 56

1  information?
2    MS. ANDERSON:
3        Objection.  Asked and
4    answered.
5    THE WITNESS:
6        Somewhere around the
7    hurricane.
8  BY MR. BURAS:
9    Q  What type of records did you look
10  for in Response to Request for Production #2?
11    MS. ANDERSON:
12        Objection.  Asked and
13    answered.
14    THE WITNESS:
15        Personnel files is what I was
16    asked to pull so that's what I
17    pulled.  And, again, you know, in
18    reference to the investigation, I
19    didn't review the files.  I didn't
20    go through the files.  I was asked
21    to pull the files.  I pulled the
22    files.
23  BY MR. BURAS:
24    Q  You indicated that Kristy McKearn
25  and your legal counsel asked you to pull

Page 57

1 those files; correct?
2    A  Yes.
3    Q  Had you been provided with a list
4 or how were you instructed -- strike that.
5 How did you know what information you were
6 supposed to find?
7    A  I was asked to provide files, pull
8 files on certain plaintiffs or certain
9 people.
10    Q  Were you told this in person?
11 Was it via fax?  Via e-mail?  Via
12 correspondence?  Do you remember how you
13 were told to do this?
14    A  Telephone call.
15    Q  Telephone call.  You indicated
16 before you were told by Kristy McKearn and
17 legal counsel; correct?
18    A  Yes.
19    Q  Both of them via telephone call?
20    A  Well, Kristy was in the office at
21 that time.
22    Q  So she would have been a
23 face-to-face instruction?
24    A  Right, unless she was out-of-town,
25 then she would have called on the phone.

Page 58

1    Q  Do you have any specific
2 recollection as to how she told you to look
3 for this information?
4    A  No, not specifically.
5    Q  Were you given a list of documents
6 to know which person's records you were
7 supposed to pull?
8    A  If it was a phone call, I made a
9 list, I wrote it down so I would know what I
10 was looking for.
11    Q  Did you bring a copy of that list
12 you investigated with you to this deposition?
13    A  No.
14    Q  Did you retain a copy of that list?
15    A  I don't remember that.
16    Q  Did you conduct any type of
17 electronic search for any information
18 responsive to Request for Production #2?
19    A  No.
20    Q  Did you limit your search
21 specifically to the employee files, the hard
22 copy employee files that were in the Human
23 Resources Department?
24    A  That's all we have was hard copies.
25    Q  So no e-mail information would have

Page 59

1 been contained in those records?
2    A  I cannot say that I did not go
3 through the individual files.
4    Q  So you have no idea what was in the
5 file other than the file itself?
6       MS. ANDERSON:
7         Hang on.  Counsel, I think you
8       interrupted her.
9       MR. BURAS:
10        I apologize.
11       MS. ANDERSON:
12        For both people, really for
13       the court reporter, make sure you
14       don't talk over each other.  I
15       think she should be able to finish
16       her answer.
17       MR. BURAS:
18        Absolutely.
19 BY MR. BURAS:
20    Q  And I apologize for interrupting
21 you, ma'am.
22       MR. BURAS:
23        If you can read back her
24       answer so she can finish.
25       (Court Reporter read back the last

Page 60

1       answer.)
2       THE WITNESS:
3         I did not go through the
4       files.  I was asked to pull the
5       files and I did that and just
6       turned those over.
7 BY MR. BURAS:
8    Q  You were not asked to investigate
9 and provide a complete employee record for
10 each file -- excuse me -- a complete employee
11 record for each employee involved in this
12 litigation, were you?
13       MS. ANDERSON:
14        Objection to form.
15       THE WITNESS:
16        Would you clarify that a
17       little bit more?
18 BY MR. BURAS:
19    Q  Yes, ma'am.  Were you asked
20 specifically to pull the information
21 contained in the employee file or were you
22 asked to provide a complete record of that
23 employee's information including information
24 that was not in the file?
25    A  Whatever was in the file I turned

Page 61

1 over. I did not go through the file. I went
2 to the cabinet, took the file out and turned
3 that over. I did not go through the file.
4    Q  Did you ask anyone else within the
5 Hornets organization for any other
6 information that might be responsive to #2?
7    A  No. I would not have thought of
8 someone else handling a personnel file other
9 than what was in the H.R. Office.
10    Q  So, if there was other information
11 related to sales activities for these
12 employees, you didn't request that
13 information?
14       MS. ANDERSON:
15          Objection; form.
16       THE WITNESS:
17          No.
18 BY MR. BURAS:
19    Q  If there was other information
20 related to complaints that these employees
21 might have sent to their supervisors or to
22 the Human Resources Department via e-mail,
23 you didn't look for that information on the
24 computers?
25       MS. ANDERSON:

Page 62

1          Objection; form.
2       THE WITNESS:
3          No.
4 BY MR. BURAS:
5    Q  If there might have been other
6 documents that might have been stored on
7 these employees' and former employees'
8 computers on any of their hard drives that
9 might have had information responsive to
10 information in litigation, you didn't pull
11 any of that information?
12       MS. ANDERSON:
13          Objection; form.
14       THE WITNESS:
15          No. I would have not have
16 known any of that stuff existed.
17 BY MR. BURAS:
18    Q  You didn't investigate to find out
19 or look for that information?
20    A  I was not asked to do so. I was
21 only asked to pull the files. I pulled the
22 personnel files. If anything was contained
23 in that personnel file then whatever was
24 there was there. I did not go through those.
25    Q  What did you do with that

Page 63

1 information after you pulled those records?
2    A  In reference to?
3    Q  When you pulled the employee files
4 that you were requested to pull, what did you
5 then do with the information?
6    A  I turned it over to either my
7 supervisor or to legal counsel.
8    Q  Do you remember who?
9    A  Specifically who as far as --
10    Q  Do you remember if you turned
11 it over to your supervisor or legal counsel?
12    A  It depends. At one point I was
13 asked by my supervisor to give them the
14 files. I did. At a different time, sometime
15 later, between now and I guess December '05,
16 legal counsel asked for a file and I gave
17 them the file.
18       MS. ANDERSON:
19          Just for clarification, when
20       she said now -- when you said
21       "now," what date were you
22       referring to?
23       THE WITNESS:
24          I'm talking about today's date
25       going back, too.

Page 64

1       MS. ANDERSON:
2          That wasn't clear to me.
3       THE WITNESS:
4          I'm sorry.
5       MS. ANDERSON:
6          That's okay.
7 BY MR. BURAS:
8    Q  So you've conducted multiple
9 investigations to locate employee files in
10 this litigation; correct?
11    A  Files, commissions, whatever.
12    Q  So it's happened on more than one
13 occasion is what I'm trying to make sure?
14    A  Yes, as requested I pulled
15 information.
16    Q  And, on each of these days that
17 you looked for and requested information, you
18 limited your search to whatever information
19 was specifically contained in the employee
20 file that was in the Human Resources
21 Department; correct?
22    A  No. If I was looking for a
23 commission report, I went to the payroll
24 records, payroll register, the backups and
25 pulled commission reports from there.

Page 65

1    Q  Where is the payroll information
2  maintained?
3    A  In the H.R. office.
4    Q  And how would a payroll record be
5  maintained in the H.R. office?  How is it
6  physically maintained?  It is a computer file
7  or hard paper copy?
8    A  It's a hard paper copy.
9    Q  How is it broken down, by date or
10  by employee?
11    A  They are by dates and, of course,
12  the paper reports will be by either employee
13  or department.
14    Q  So it's broken down by date and
15  within each date breakdown there is an
16  employee and department breakdown?  I don't
17  understand.
18    A  It's paper reports.  The report is
19  sequenced, if you will, by departments and
20  then, of course, within that department you
21  have the employee name and whatever their
22  record is, their earnings, taxes, that sort
23  of thing.
24    Q  Just for each payroll period this
25  information would be set forth?

Page 66

1    A  Yes.
2    Q  Okay.  I understand.  Did you go
3  through each payroll period that the
4  employees were working for -- that plaintiffs
5  were working for the Hornets and pull this
6  information responsive to Request #2?
7    A  As records were available based
8  upon what I could find.
9    Q  Were there certain records that you
10  could not find?
11    A  It's possible.  Specifically I
12  can't answer because I don't recall those.
13    Q  As to any records, payroll records
14  that you couldn't find, what additional steps
15  did you take to locate them if, in fact, you
16  couldn't find any?
17    A  Went back as far as I could, looked
18  in old files, storage files, files off site.
19    Q  Where are the storage -- let me
20  make sure I'm understanding.  This is
21  specific to the payroll records, ma'am, or
22  is this for all of the employee records
23  where you went and looked at storage files
24  off site?
25    A  This would be for terminated

Page 67

1  employees.
2    Q  Where would the storage files be
3  kept for the Hornets related to terminated
4  employees?
5    A  They were in file cabinets on the
6  same floor that we worked but outside the
7  Human Resources office and they were locked.
8    Q  At all times since August of 2005,
9  did you have a key to those records?
10    A  Yes.
11    Q  All right.  Where would the
12  off-site storage -- excuse me.  Where was the
13  off-site storage?
14    A  Off-site storage in New Orleans
15  somewhere.  I think it's Annunciation Street.
16    Q  When did you first go to the
17  off-site-storage location to locate these
18  records?
19    A  A couple of weeks ago.
20    Q  A few weeks ago?
21    A  Yes.
22    Q  Do you remember specifically when?
23    A  It would have been last Tuesday.
24    Q  How long have the Hornets had an
25  off-site location on Annunciation Street?

Page 68

1    A  I don't know that.
2    Q  Did you know they had an off-site
3  location in August of 2005?
4    A  Yes.
5    Q  Was that off-site location flooded
6  in Katrina?
7    A  I don't know that.
8    Q  What floor is the off-site storage
9  located?  Is it a bottom-floor or top-floor
10  location?
11    A  I think it's on an upper floor.
12    Q  Have you ever asked -- how did you
13  come to find out that there might be
14  responsive documents at the off-site-storage
15  location?
16    A  There was a request that came
17  through from the plaintiffs indicating we
18  did not provide some documents for some time
19  frame.  I can't remember what the year was
20  so I went to -- something about accounting
21  records or something.  So we went there --
22  I went there to look to see if those records
23  were there.
24    Q  Who went with you?
25    A  Paralegal and we had to have a

Page 69

1 gentleman there to lift the boxes for us.
2 The boxes were stacked high.
3    Q  This took place last Tuesday, you
4 said?
5    A  Yes.
6    Q  Prior to last Tuesday, do you know
7 if anyone from the Hornets organization
8 looked for any information that might have
9 been responsive to any claim there in this
10 case at that off-site-storage location?
11    A  I don't know that.
12    Q  Prior to last Tuesday, had you
13 personally ever gone to that location or
14 instructed someone to go to that location
15 to look for information that might have
16 been responsive to any request in this
17 litigation?
18    A  No.
19    Q  How did you learn that you had an
20 off-site-storage location?
21    A  We had moved from the Oklahoma
22 office and needed to put some of those
23 documents or those boxes, if you will, stuff
24 in storage.
25    Q  And who told you you had an

Page 70

1 off-site-storage location?
2    A  I don't remember. It might have
3 been someone just mentioning it in comment.
4 I don't remember specifically. I'm sorry.
5    Q  When you indicated you had to put
6 information from Oklahoma City in the
7 off-site-storage location, when did you move
8 documents from Oklahoma City into the
9 off-site-storage location? Do you remember
10 when?
11       MS. ANDERSON:
12          Objection; form?
13    THE WITNESS:
14          Must have been somewhere in
15       July, August.
16 BY MR. BURAS:
17    Q  Of 2000 what?
18    A  Of this year.
19    Q  2007. Do you remember the name of
20 the paralegal that went with you?
21    A  I'm not positive. I'm sorry.
22    Q  Was it a paralegal with Miss
23 Anderson's firm?
24    A  With Jones, Walker, yes.
25    Q  How many records or boxes of

Page 71

1 documents did the Hornets maintain at this
2 off-site-storage location?
3    A  That I do not know. There's lots
4 of boxes.
5    Q  More than fifty?
6    A  Oh, yes.
7    Q  More than a hundred?
8    A  Probably. They're not labeled so
9 we have to go through each box.
10    Q  Did you go through each box at the
11 storage location?
12    A  I went through as many boxes as I
13 could. We're not finished. We have to go
14 back.
15    Q  How did you know what information
16 you were looking for when you went to the
17 off-site-storage location?
18    A  Legal counsel advised.
19    Q  Was this in a correspondence or was
20 this a verbal communication?
21    A  It was a verbal communication.
22    Q  When were you told to look for the
23 information at the off-site-storage location?
24    A  Like the day before.
25    Q  So Monday of last week?

Page 72

1    A  No, Monday would have been Labor
2 Day. It would have been the Friday evening.
3    Q  You were aware of the existence of
4 this off-site-storage location before Friday,
5 the Friday before Labor Day; correct?
6    A  Yeah, there were boxes there.
7    Q  When you said that you were
8 provided with a verbal communication to
9 look for documents at the off-site-storage
10 location, what specifically were you told
11 to look for?
12    A  Any documents, anything that could
13 be commissions, any payroll records, if any,
14 which shouldn't be there, any files,
15 personnel files, anything that we could find
16 pertaining to the case.
17    Q  You were not given a specific list
18 of documents or items that you were told to
19 look for other than what you were verbally
20 communicated to look for that you just now
21 said such as commissions, payroll records,
22 personnel files; is that correct?
23    A  Yes.
24       MS. ANDERSON:
25          I'm sorry. I just missed her

Page 73

1  answer.
2  MR. BURAS:
3      Please read it back.
4  MS. ANDERSON:
5      Yeah. I would really
6  appreciate that.
7  (Court reporter read back the last
8  question and answer.)
9  (WHEREUPON: A short break was
10  taken.)
11  MR. BURAS:
12      Counsel, if you can clarify.
13  MS. ANDERSON:
14      Sure.
15  BY MR. BURAS:
16      Q  While we were on break, you
17  clarified that one of the previous answers
18  may need clarification related to records
19  from Oklahoma City that may or may not have
20  been sent to the storage unit that we just
21  previously discussed.
22      Ma'am, am I correct in
23  understanding that records from Oklahoma
24  City were sent to the storage unit or is
25  it correct records from Oklahoma City were

Page 74

1  not sent to the storage unit?
2      A  Records were not sent from Oklahoma
3  to storage.
4      Q  So Oklahoma records were not sent
5  to storage?
6      A  Correct.
7      Q  Okay. You indicated before that
8  one of the Jones, Walker paralegals was with
9  you at the storage unit when you were looking
10  for documents; is that correct?
11      A  Yes.
12      Q  Do you recall whether or not that
13  Jones, Walker paralegal had a list of items
14  that they were looking for?
15      A  Yes.
16      Q  They did?
17      A  They did.
18      Q  Did you ever see a copy of the list
19  of items that the Jones, Walker paralegal was
20  looking for?
21      A  Prior to our arrival at the
22  storage?
23      Q  Prior to or after, ma'am.
24      A  No.. At the time we got there we
25  got the list and we looked through the

Page 75

1  list -- excuse me, saw the list at the
2  storage facility.
3      Q  Do you remember what the list
4  looked like? Was it an official legal
5  document or maybe a piece of correspondence
6  for items to be looked for?
7      A  That I do not remember. I did not
8  keep a copy.
9      Q  Do you remember how many pages this
10  list was?
11      A  Minimum was two pages.
12      Q  But you were actually given a copy
13  of this list while you were conducting your
14  search?
15      A  Correct.
16      Q  You were not specifically looking
17  only for the employee records, commission
18  records or payroll records or personnel files
19  once you arrived at the storage unit;
20  correct?
21      A  Correct.
22      Q  You were now also looking for the
23  expanded list that had been provided to you
24  by the Jones, Walker paralegal?
25      A  Correct.

Page 76

1      Q  You did not retain a copy of that
2  list?
3      A  No, I did not.
4      Q  You did not bring a copy of that
5  list to the deposition here today?
6      A  No, I don't have a copy.
7      Q  Okay. All right. On #3, please
8  produce a copy of all letters, memoranda of
9  understanding, correspondence, e-mails, or
10  other documents from Adrianna Johnston, Penny
11  Middleton and/or any personnel in the Hornets
12  payroll department to Brendon Donahue,
13  Barbara Booth, Chris Zaber, John Lee, Dave
14  Burke, or any other officer, director,
15  supervisor, manager or executive of the
16  Hornets. Your counsel objected to this
17  deposition -- excuse me, to this
18  interrogatory request.
19      Did you conduct any personal
20  investigations that may have been responsive
21  to this discovery request?
22  MS. ANDERSON:
23      Wait. Wait. Objection;
24  form. And if you give me one
25  moment, counsel, to look at the

Page 77

1    response.
2    MR. BURAS:
3        Take a look at either Exhibit
4    5 or 6. Your response is the same
5    for both.
6    MS. ANDERSON:
7        This is number --
8    MR. BURAS:
9        Three.
10   MS. ANDERSON:
11       Three?
12   MR. BURAS:
13       Yes.
14   MS. ANDERSON:
15       Okay. You marked that as
16   Exhibit 5?
17   MR. BURAS:
18       Exhibit 5.
19   MS. ANDERSON:
20       Is the Answers to the
21   Plaintiffs' First Request for
22   Production?
23   MR. BURAS:
24       Yes.
25   MS. ANDERSON:

Page 78

1        Thank you.
2    BY MR. BURAS:
3    Q  Did you personally conduct any
4    investigation for this Request for
5    Production?
6    A  No.
7    Q  #4, please produce a copy of all
8    letters, memoranda of understanding, e-mails
9    or other documents to Adrianna Johnston,
10   Penny Middleton and/or any personnel in the
11   Hornets payroll department from Brendon
12   Donahue, Barbara Booth, Chris Zaber, John
13   Lee, Dave Burke, or any other officer,
14   director, supervisor, manager or executive of
15   the Hornets regarding the pay and commissions
16   of any plaintiff.
17       Your counsel objected to this
18   response as overbroad and then said if you
19   take a look at #5, subject to and without
20   waiving this objection, defendant already has
21   produced documents responsive to this request
22   in plaintiffs' personnel files and payroll
23   files.
24       Do you know or did you personally
25   investigate any information requested in #4?

Page 79

1    A  No.
2    Q  All right. As you sit here today,
3    do you know whether or not you received any
4    letters, memoranda of understanding,
5    correspondence, e-mails or other documents
6    from any of the persons mentioned in this
7    interrogatory request regarding the pay or
8    commissions of any plaintiffs?
9    A  Can you clarify that question,
10   please?
11   Q  Yes. Take a look at #4, read it,
12   if you could. We don't have to repeat it for
13   the record. It's already on the record. Do
14   you have any information in your possession
15   that might be responsive to this request?
16   A  No.
17   Q  You don't have any correspondence
18   from any of the people that are identified in
19   this request regarding the pay or commissions
20   of any named plaintiffs?
21   A  No.
22   Q  Have you looked for it?
23   A  Have I looked for a letter or
24   document from any one of these people is
25   your question?

Page 80

1    Q  Yes.
2    A  No.
3    Q  Have you looked for any e-mails
4    from any of these people to the Human
5    Resources Department regarding the pay or
6    commissions of any plaintiff?
7    A  No.
8    Q  Did you personally direct anyone in
9    the Human Resources Department to look for
10   any information that might have been
11   responsive for this Request for Production?
12   A  No.
13   Q  Did you ever request that the IT
14   Department review any of the e-mail in boxes
15   and/or computer storage systems of Adrianna
16   Johnston, Penny Middleton or any other
17   personnel in the Hornets payroll department
18   to determine if there was any information
19   responsive to this Request for Production?
20   MS. ANDERSON:
21       Object to form.
22   THE WITNESS:
23       No.
24   BY MR. BURAS:
25   Q  Did you personally direct anyone

Page 81

1 under your control to take a look or to
2 contact the IT Department to look for any
3 e-mail or other documents that might be
4 responsive in electronic form for Adrianna
5 Johnston, Penny Middleton or any other
6 personnel in the Hornets payroll division
7 related to the pay or commissions of any
8 plaintiffs?
9    A No.
10   Q So this information to the best of
11 your knowledge -- as far as you're concerned,
12 you have never looked for information
13 responsive to this Request for Production;
14 correct?
15   A Correct.
16   Q #5, please produce a copy of the
17 Archtics sales records reflecting the
18 commissions paid to each named plaintiff
19 during that employment with the defendants.
20       Did you personally conduct any
21 investigation with regards to this Request
22 for Production?
23   A No.
24   Q Did you personally direct anyone to
25 look for information regarding this Request

Page 82

1 for Production?
2    A No.
3    Q Did anyone within the Hornets
4 organization or your counsel instruct you to
5 look for any information that might have been
6 responsive to #3, #4, #5 in these Requests
7 for Production?
8    MS. ANDERSON:
9        Can I have the question read
10       back, please?
11       (Court reporter read back the last
12       question.)
13    THE WITNESS:
14       No.
15 BY MR. BURAS:
16    Q #6, please produce a copy of all
17 commission payments made to each named
18 plaintiff for each pay period worked.
19       Did you personally investigate or
20 look for information that might have been
21 responsive for the information requested in
22 this Request for Production?
23    MS. ANDERSON:
24       This is #6?
25    MR. BURAS:

Page 83

1       Yes, #6.
2    THE WITNESS:
3       We produced documents, yes.
4 BY MR. BURAS:
5    Q What documents have you produced?
6    A All commission reports that were
7 requested.
8    Q Where were commission reports
9 physically located within the Hornets Human
10 Resources Department?
11   A With the payroll.
12   Q Okay.
13   A All of the supporting information
14 with payroll data entered into the system to
15 produce a check.
16   Q I don't understand what you mean by
17 backup. That's why I'm going to ask you.
18 Physically, how does the payroll department
19 know which commission information relates to
20 what plaintiff? How do you know whether or
21 not to pay a plaintiff commissions?
22   A The information is provided either
23 -- excuse me. Is provided in a hard copy to
24 the payroll department for data entry.
25   Q Who provides this hard copy to the

Page 84

1 payroll department?
2    A Sales department.
3    Q Anyone particular in the sales
4 department that gives you this information?
5    A Should be the manager.
6    Q Did you provide a copy of all of
7 the hard copies, records necessary for the
8 Human Resources Department to pay commissions
9 to any of the named plaintiffs?
10   A Did I provide them to?
11   Q Your counsel or to your supervisor
12 to provide to counsel ultimately to provide
13 to the plaintiffs in this litigation?
14   A Yes.
15   Q Have you located all commission
16 payments made to plaintiffs that are involved
17 in this litigation -- strike that.
18 Commission reports related to any plaintiff
19 in this litigation?
20   A To the best of my knowledge, yes.
21   Q When did you first look for this
22 information?
23   A December of '05.
24   Q Did you conduct any supplemental
25 searches of this information?

Page 85

1  A  Yes. As requested, yes.
2  Q  When were you next requested to
3 look for supplemental information responsive
4 to this request?
5  A  Would have been sometime in 2006.
6  Q  Who requested that you look for
7 additional information responsive to this
8 request?
9  A  Legal counsel.
10  Q  Was this in person or over the
11 telephone or through correspondence?
12  A  No, this was over the telephone.
13  Q  What were you instructed to look
14 for?
15  A  A commission report or commission
16 reports for any one of the named plaintiffs
17 or if something came up based upon the
18 information I had provided could have been
19 missing or looks like we needed more
20 information.
21  Q  Did you limit your search in
22 December of '05 and in your subsequent search
23 in December of '06 to the records in the
24 Human Resources Department?
25  A  Yes.

Page 86

1  Q  Did you look at any other location
2 elsewhere within the Hornets organization to
3 look for the information?
4  A  No. Because if it is going on the
5 payroll system, it should be in the payroll
6 department or the H.R. Department.
7  Q  Did you confirm with anyone in the
8 sales department that they do not maintain a
9 duplicate copy of the records sent to the
10 Human Resources Department regarding any
11 information that might be responsive to this
12 request?
13  A  No.
14  Q  So, to the best of your knowledge,
15 have you ever directed anyone to contact the
16 sales department to find out if duplicative
17 information might be available in the sales
18 department?
19  A  No.
20  Q  Do you know whether any of the
21 Human Resources or accounting personnel
22 may have maintained their own record of
23 information that may contain commission
24 information regarding any named plaintiff
25 in this case?

Page 87

1  A  No.
2  Q  Do you know whether or not Adrianna
3 Johnston maintained a commission report for
4 all sales persons employed by the New Orleans
5 Hornets?
6  A  No.
7  Q  Have you ever looked for a record
8 that might have been created by Adrianna
9 Johnston regarding sales commissions that
10 were owed to any employees -- any sales
11 employees of the New Orleans Hornets?
12  A  Say that again. You ran it too
13 fast.
14   MS. ANDERSON:
15      Hang on. Counsel, you are
16   talking really fast. I know I'm
17   catching I think most of it but --
18   MR. BURAS:
19      I'll slow it down.
20   MS. ANDERSON:
21      -- for the record I would ask
22   if -- it's probably your normal way
23   of talking but if you could slow it
24   down that would be great.
25   (Court reporter read back the last

Page 88

1   question.)
2   MS. ANDERSON:
3      I'm going to object to the
4   form.
5 BY MR. BURAS:
6  Q  I'm going to rephrase that
7 question, ma'am.
8  A  Thank you.
9  Q  Were you -- as you sit here today,
10 are you aware of plaintiffs' allegation that
11 Adrianna Johnston maintained a record of all
12 sales commissions that may be owed to
13 plaintiffs or other sales employees working
14 for the Hornets?
15  A  Let me make sure I understand your
16 question. You're asking if I am aware that
17 an allegation was made that Adrianna was
18 maintaining a record or something about
19 commission reports for sales staff?
20  Q  Correct.
21  A  Yes.
22  Q  Have you ever looked for those
23 records?
24  A  Yes.
25  Q  Have you ever located those

Page 89

1 records?
2    A  No.
3    Q  Where did you look for those
4 records?
5    A  In that storage.
6    Q  When is the first time you were
7 made aware of plaintiffs' allegations that
8 Adrianna Johnston may have maintained a
9 record such as we discussed?
10   A  That Friday before Labor Day
11 weekend.
12   Q  August, September of 2007?
13   A  Yes.
14   Q  Prior to that, you had never looked
15 for this document?
16   A  No.
17   Q  Prior to that, you had never been
18 asked to look for this document?
19   A  No, and I wouldn't have thought of
20 anything being for payroll in accounting.
21   Q  Since August 31st, 2007, other
22 than looking for records in the storage
23 department, have you gone to the other
24 departments within the Hornets to try to
25 find information related to the commissions

Page 90

1 that may be owed or commission reports
2 that might have been prepared for any sales
3 personnel working for the Hornets?
4    A  Can you repeat that question a
5 little slower this time? I'm sorry.
6    Q  Yes, ma'am. Since August 31st,
7 2007, have you gone to any other departments
8 within the Hornets organization to determine
9 whether or not they might have maintained
10 commission information relevant to plaintiffs
11 or any other sales employees that are
12 employed by the Hornets?
13   A  No.
14   Q  Have you ever requested that an
15 electronic search be conducted for records
16 in the Hornets IT or information computer
17 systems for information that may be
18 responsive to commission records maintained
19 by anyone other than yourself for commission
20 payments of any sales personnel working with
21 the Hornets?
22   A  And I apologize. I have to ask you
23 to repeat that.
24   Q  I'm going to rephrase that only
25 because the beep threw me off.

Page 91

1    A  It threw me off.
2    Q  Since August 31st, 2007, have you
3 requested the IT Department conduct a search
4 of the Hornets' computer systems to determine
5 if any other employee or department within
6 the Hornets organization has maintained a
7 record of commissions that may be owed to any
8 sales employees at any period of time since
9 the team moved to New Orleans?
10   A  No.
11   Q  To the best of your knowledge that
12 information may exist on a computer system
13 but it's never been looked for?
14   A  I have no idea.
15   Q  You don't know because it's never
16 been looked for; correct?
17   A  I don't know because I wouldn't
18 expect it to be there, nor do I know anything
19 about it.
20      MR. BURAS:
21         Object to being unresponsive.
22 BY MR. BURAS:
23   Q  Do you know if anyone from the
24 Hornets has ever looked for this information
25 on the computer systems?

Page 92

1    A  No.
2    Q  You don't know or it has not been
3 looked for?
4    A  I don't know.
5    Q  Have you ever requested that anyone
6 look for this information on the IT systems?
7      MS. ANDERSON:
8         Objection. Asked and answer.
9      THE WITNESS:
10         No.
11 BY MR. BURAS:
12   Q  Have you ever asked anyone to look
13 for this information or direct anyone from
14 the IT department to look for this
15 information?
16   A  I don't know why I would want to do
17 that or do that if all commissions are coming
18 to me in a hard copy.
19   Q  Did Adrianna Johnston work in the
20 payroll department?
21   A  Not that I know of.
22   Q  If Adrianna Johnston was
23 maintaining a record, it would have been a
24 record maintained outside of the resource
25 department and payroll department?

Page 93

1    A  I suppose if she did.  I don't
2  know.  I was not there at the time Adrianna
3  was there and, unfortunately, there wasn't
4  anyone to go to in accounting.  We did not
5  have a CFO.
6    Q  Do you know if the prior CFO,
7  Barbara Booth, maintained a copy of
8  commissions that were owed to employees?
9    A  I do not.
10    Q  Would you look for those records?
11    A  I would not expect payroll records
12  to be in accounting if, in fact, H.R. was.
13    Q  Did you personally look for any
14  such records that Miss Barbara Booth may have
15  maintained?
16    A  I was unaware any existed or did
17  exist.  I don't know.  I did not look.
18    Q  That is my question.  Did you
19  direct anyone to look for records that
20  Barbara Booth may or may not have maintained
21  related to commission sales -- commissions
22  that may have been owed to sales employees of
23  the Hornets?
24    A  No.
25    Q  So other than records that were

Page 94

1  physically maintained in the Hornets Human
2  Resources Department related to commissions,
3  you have not personally looked for, nor
4  instructed another person to look for
5  records that might relate to commissions
6  owed to sales employees; is that correct?
7    A  That is correct.  To the point that
8  once we were told or informed that plaintiffs
9  alleged Adrianna maintained some type of
10  record, we looked or went to the storage
11  facility to look for those documents.  Prior
12  to that, no.
13    Q  So until August -- the Human
14  Resources Department is the only department
15  you looked for these records until August
16  31st, 2007?
17    A  Correct.  I would not expect them
18  to be anyplace else.
19    MR. BURAS:
20        Move to strike that.  Object
21      as unresponsive.
22  BY MR. BURAS:
23    Q  #7, please produce a copy of the
24  Archtics sales records reflecting all work
25  performed by any plaintiff on any tickets

Page 95

1  sold, but not paid in full, during the
2  plaintiff's time of employment with
3  defendant.
4        Did you look for information
5  responsive to this Request for Production?
6    A  No.
7    Q  Did you direct anyone to look for
8  information responsive to this Request for
9  Production?
10    A  No.
11    Q  Do you know where this information
12  might be maintained?
13    A  No.
14    Q  #8, please produce a copy of any
15  documents reflecting commissions paid to any
16  plaintiff for any tickets sold by plaintiff
17  while employed by defendant, but where the
18  tickets were not paid in full until after
19  plaintiff stopped working for defendant.
20  I need you to read that one because
21  the wording is particular.
22    MS. ANDERSON:
23        Yeah.
24    THE WITNESS:
25        (Witness complies.)  Okay.

Page 96

1        And your question is?
2  BY MR. BURAS:
3    Q  Were you asked to look for
4  information responsive to this Request for
5  Production?
6    A  No.
7    Q  Did you ever direct anyone to look
8  for information with regards to this Request
9  for Production?
10    A  No.
11    Q  All right.  Are you aware that the
12  plaintiffs have made an allegation that they
13  would receive deposits on ticket purchases
14  from perspective -- excuse me, from ticket
15  holders; they would deposit money into the
16  account, but then before the tickets
17  were paid in full, they were either
18  terminated and/or stopped working for the
19  Hornets?  Are you aware that is one of the
20  factual allegations made in this case?
21    MS. ANDERSON:
22        Objection; form.
23    THE WITNESS:
24        No.
25  BY MR. BURAS:

Page 97

1    Q  Are you aware that the plaintiffs
2  have alleged in this case that if they were
3  terminated or stopped working, they were not
4  paid any commissions on tickets even if they
5  had done the work to secure the deposit for
6  the ticket purchase?
7    A  Repeat the question, please.
8    Q  Are you aware of the allegation
9  that the plaintiffs have alleged they were
10  not paid commissions on deposits for tickets
11  that they -- they were not paid commissions
12  on tickets sold for actions that they engaged
13  in, they procured the ticket sale, but they
14  were fired before the tickets were paid in
15  full or they stopped working for the Hornets
16  before the tickets were paid in full and,
17  therefore, they were not paid a commission?
18  Are you aware of that allegation?
19        MS. ANDERSON:
20            Object to form.
21        THE WITNESS:
22            No.
23  BY MR. BURAS:
24    Q  #9 on the Request for Production
25  states please produce a copy of any documents

Page 98

1  reflecting commissions paid to any other
2  Hornets employee for any account where any
3  plaintiff recorded a deposit for any ticket
4  sales, but where the tickets were not paid in
5  full until after the plaintiff stopped
6  working for the defendant.
7        Do you understand this Request for
8  Production?  Do you understand this question?
9    A  It's a long question.
10    Q  Were you ever asked to look for
11  information responsive to this request?
12    A  No.
13    Q  Did you ever direct anyone to look
14  for information responsive to this request?
15    A  No.
16    Q  Do you have any mechanism of
17  knowing whether any of plaintiffs recorded
18  or -- recorded a sale that was not paid in
19  full at the time of their termination?  Do
20  you have any way in the Human Resources
21  Department of knowing whether or not that
22  event has taken place?
23    A  No.
24    Q  How are you told when a plaintiff
25  has -- is entitled to a commission?

Page 99

1    A  When a plaintiff is entitled to a
2  commission?
3    Q  Strike that.  How do you know
4  whether a sales employee is entitled to a
5  commission?
6    A  I receive information from the
7  sales department that these employees are due
8  a commission and what that amount is.
9    Q  You say from the sales department.
10  That would be the sales manager?
11    A  Sales manager or sales director.
12    Q  It is one of those two?
13    A  Yes.
14    Q  Is it ever anyone else?
15    A  Not that I know of, no.
16    Q  Okay.  So if the sales director or
17  sales manager doesn't tell you to pay a
18  plaintiff or pay an employee for a
19  commission, you don't pay that commission; is
20  that correct?
21    A  Because I don't know -- correct.
22    Q  So the only person who would have
23  information responsive to this would be the
24  director of ticket sales or the ticket
25  manager; correct?

Page 100

1    A  Correct.
2    Q  And that's not you; correct?
3    A  Correct.
4    Q  All right.  #10, please produce a
5  copy of all Archtics notes and all other
6  documentation reflecting the work performed
7  by the Hornets employee who received the
8  commission for any account where any
9  plaintiff recorded a deposit for any tickets
10  sale, but where the tickets were not paid
11  in full until after plaintiff stopped working
12  for defendant.
13        Do you have any way of knowing who
14  received a commission sale for a ticket sale
15  where a plaintiff -- one of the plaintiffs
16  actually made the sale but the sale was
17  simply not paid in full?  I believe we talked
18  about this in #9.
19    A  You did.  It's the same question.
20        MS. ANDERSON:
21            Object.
22  BY MR. BURAS:
23    Q  Were you ever asked to investigate
24  any information responsive to #10?
25    A  No.