Liger et al v. New Orleans Hornets NBA Limited Partnership
Doc. 159 Att. 9
Case 2:05-cv-01969-HGB-ALC   Document 159-10   Filed 10/15/2007   Page 1 of 25
DONNA PIERRE ROCHON
Condense It!™
9/12/07

**Page 101**

1  Q  Did you request that anyone else
2  produce information that might be responsive
3  to #10?
4  A  Say it again, please.
5  Q  Did you ever request or direct
6  someone to look for information responsive to
7  #10?
8  A  No.
9  Q  Did your legal counsel or your
10  supervisor ever ask you to find any
11  information responsive to #10?
12  A  No.
13  Q  All right.  Were you ever asked as
14  to #11 to produce copies of all Archtics
15  reports and documents reflecting sales
16  credited to Joe Andrade, Mark Mouton, David
17  Burke, Brendon Donahue or Chris Zaber since
18  June of 2002?
19  A  No.
20  Q  You were not asked to produce this
21  information?
22  A  I don't have access to Archtics.
23  Q  It's fair to say you didn't
24  personally look for it, nor did you request
25  anyone else look for this information since

**Page 102**

1  you didn't have access to Archtics; correct?
2  A  Correct.
3  Q  All right.  #12, please produce
4  copies of employment contracts, compensation
5  agreements or other contracts between
6  defendant and any plaintiff.
7      Were you asked to produce this
8  information?
9  A  Yes, I was asked to produce
10  information.
11  Q  Were you specifically asked to
12  produce the information requested in #12?
13  A  Specifically for one plaintiff or
14  any plaintiff?
15  Q  For any plaintiff.
16  A  Yes.
17  Q  You've seen the language that's set
18  forth in #12 that says please produce?
19  A  No.  This is the first time I've
20  seen this language.
21  Q  How did you first learn that you
22  were to look for information related to
23  employment contracts, compensation agreements
24  or other contracts between defendant and any
25  plaintiff?

**Page 103**

1  A  I was asked by legal counsel to
2  pull the personnel files, if there were
3  anything in that file; if they had not
4  already seen the file to provide those
5  documents.
6  Q  When were you asked to do this?
7  A  Sometime in 2006.
8  Q  I'm sorry?
9  A  It was after the hurricane.
10  Q  Is that the only time that you've
11  gone through each of the employee files of
12  the named plaintiffs in this litigation?
13  A  Yes.
14  Q  So, prior to some period of time in
15  2006, you had produced the records but had
16  not reviewed the records; correct?
17  A  Correct.  That is correct.
18  Q  When you reviewed the records in
19  2006, do you remember if it was early 2006 or
20  late 2006?
21  A  No, I do not recall that.
22  Q  Do you know whether you determined
23  that any of the previous personnel records
24  that you had produced had incomplete
25  information at that time?

**Page 104**

1  A  No, I do not.
2  Q  Had you conducted any searches to
3  confirm that all of the information produced
4  in the previous production of the personnel
5  records contained all relevant information
6  requested by plaintiffs in this case?
7  A  Repeat your question again,
8  please --
9  Q  Sure.
10  A  -- a little slower.
11  Q  When you conducted your review of
12  the information actually in the employee
13  records sometime in 2006, did you confirm at
14  that time that all of the information that
15  had been requested by plaintiffs had actually
16  been produced by the Hornets?
17  A  Yes.
18  Q  All right.  Where did you look to
19  determine that all of the information had
20  been previously produced?
21  A  First in the personnel file.  If I
22  didn't find anything there, I went back into
23  the section where the rest of the terminated
24  files were to see if there was any paper
25  loose, not within a folder.  So physically,

EXHIBIT D-2

Dockets.Justia.com

Page 105

1 yes, I looked through all of the terminated
2 files to try to find any additional
3 information.
4    Q You did not include the off-site-
5 storage investigation at this time?
6    A No. I wasn't aware that there
7 would be -- all of the files were there, you
8 know, in the office here.
9    Q I believe your previous --
10    A We established that.
11    Q You had not conducted any e-mail
12 investigation or review of information or
13 computer systems of the Hornets to determine
14 if there was additional information
15 responsive to any of the requests?
16    A To other requests or --
17    Q Specific to this request.
18    A To this request?
19        MS. ANDERSON:
20            What item number?
21        THE WITNESS:
22            #12. I'm sorry. Yes -- no.
23        I'm sorry. I lost track. Would
24        you repeat the question?
25 BY MR. BURAS:

Page 106

1    Q Let's make this -- when you
2 investigated whether or not other contracts,
3 compensation agreements or other contracts
4 between the Hornets and any plaintiffs
5 existed sometime in 2006, did you limit
6 your search to those documents available in
7 the Human Resources Department?
8    A Yes. I --
9    Q If you have more information than
10 that, ma'am. I'm sorry to interrupt.
11    A Yes. Meaning I looked through the
12 personnel record. As far as the no part, if
13 it was not in the personnel folder for that
14 person, I looked through all of the other
15 folders in between the folders in the
16 personnel office, yes.
17    Q Did you contact Hornets' counsel to
18 determine if they had other records that
19 might be responsive?
20        MS. ANDERSON:
21            Did you say Hornets' counsel?
22        MR. BURAS:
23            Hornets' counsel.
24        THE WITNESS:
25            What do you mean Hornets'

Page 107

1        counsel, Jones, Walker? I'm not
2        sure who you --
3 BY MR. BURAS:
4    Q Yes, ma'am. Let's start with
5 Jones, Walker.
6    A That's the only counsel I had.
7 That's why I'm --
8    Q Let's a start with Jones, Walker.
9 Did you contact Jones, Walker to find out if
10 they had any information that might be
11 responsive to this Request for Production?
12    A Jones, Walker was asking me to
13 produce the information.
14        MS. ANDERSON:
15            That's the point.
16 BY MR. BURAS:
17    Q Exactly. I'm just asking you, did
18 you at any point in time ask Jones, Walker to
19 review their own files to determine if they
20 had any information that might be responsive?
21        MS. ANDERSON:
22            Object to the form.
23        THE WITNESS:
24            I guess it's confusing.
25        MR. BURAS:

Page 108

1            Object. It is unresponsive.
2 BY MR. BURAS:
3    Q It's a yes or no question. Did you
4 ever request your legal counsel review their
5 own files to see if they had any information
6 responsive to the request?
7        MS. ANDERSON:
8            Object to the form.
9        THE WITNESS:
10            I will have to say no.
11 BY MR. BURAS:
12    Q Did the Hornets use any attorneys
13 other than Jones, Walker?
14    A No.
15    Q Are you aware of any other
16 accounting firms or consultants that the
17 Hornets may have used since 2005?
18        MS. ANDERSON:
19            Objection; form.
20        THE WITNESS:
21            Can you clarify your
22        question? I'm not sure I follow
23        it. I'm not sure I understand.
24 BY MR. BURAS:
25    Q Do you know what accounting firms

Page 109

1  the Hornets have used since 2005?
2     A  Yes.
3     Q  Did you contact any of those
4  accounting firms to determine if they had
5  any information responsive to any of these
6  Requests for Production?
7     A  No, I did not.
8     Q  What accounting firms did the
9  Hornets use that you're aware of?
10    A  KPMG.
11    Q  Any others?
12    A  That's the only one I know of.
13    Q  Did the Hornets use any payroll
14  services for any company?
15    A  Yes.
16    Q  What payroll service did they use?
17    A  ADP.
18    Q  Did you contact ADP to determine
19  if they had any information that might be
20  responsive to any of these Requests for
21  Production?
22    A  No.
23       MS. ANDERSON:
24          Counsel, by these, are you
25       talking about the ones that are

Page 110

1          in front of her right now?
2       MR. BURAS:
3          At this point I'm only
4       relating the State Court
5       litigation.
6       MS. ANDERSON:
7          Got you.  Exhibits 4 and 5;
8       correct?
9       MR. BURAS:
10         Yes.  I think it's 4 through
11      6, though.
12  BY MR. BURAS:
13    Q  Did the Hornets payroll department
14  use any other outside services other than
15  KPMG and ADP?
16    A  For --
17    Q  For assisting them in the
18  production of the payroll or Human Resources
19  functions.
20       MS. ANDERSON:
21          Object to form.
22       THE WITNESS:
23          Not that I know of.
24  BY MR. BURAS:
25    Q  Did the Hornets use any specific

Page 111

1  accountants or accounting firms in Oklahoma
2  City other than KPMG and ADP?
3     A  No.
4       MS. ANDERSON:
5          Objection; form.
6  BY MR. BURAS:
7     Q  #13 says please produce copies of
8  all termination letters offered or presented
9  to the plaintiff by the Hornets.
10         Did you personally conduct an
11  investigation to see if the Hornets had any
12  response to #13?
13    A  Yes.
14    Q  When?
15    A  Similar -- at the same time I did
16  the items requested in #12.
17    Q  So sometime in 2006?
18    A  I'm sorry.  Yes.
19    Q  And you don't remember if it was
20  early, mid or late 2006; correct?
21    A  No.  I'm sorry.  I don't.
22    Q  Did you conduct this investigation
23  in Oklahoma City or New Orleans?
24    A  I had to come back to New Orleans.
25    Q  How many times did you come back to

Page 112

1  New Orleans in 2006 related to work
2  functions?
3     A  Well, let's see.  Three times.
4     Q  When?  When were those three times?
5     A  Once in December of 2005; it would
6  have been March of '06 and again in May of
7  '06.  So, yes, it would have been -- to go
8  back to your question earlier, I guess it
9  would have been the first half of '06.  How
10  I remember when you asked is because I had
11  personal business I was taking care of here
12  and I would receive a call and I would try to
13  find the files.
14    Q  Other than the information located
15  in the personnel records, did you look for
16  any other information regarding termination
17  letters at any location?
18    A  Please repeat.
19    Q  Other than the information located
20  in the personnel records, did you look at any
21  other spot or area of the Hornets
22  organization to find out if there were other
23  termination letters or information available
24  to you?
25    A  Yes.  Again, as I mentioned, going

## Page 113

1 back in between the folders to see if there
2 was something there.
3    Q  Again, you limited your search to
4 the Human Resources Department?
5    A  Yes.  I did not expect anyone else
6 to have those documents.
7    Q  Did you contact chief legal counsel
8 for the Hornets to determine whether or not
9 he might have had or she might have had any
10 responsive information?
11    A  Again, legal counsel was asking me
12 for the information so no.
13    Q  Did the Hornets have any internal
14 counsel --
15    A  No.
16    Q  -- after 2005 -- in August of
17 2005?
18    MS. ANDERSON:
19       Make sure you let him finish
20 his question before you answer.
21    THE WITNESS:
22       Yes.
23    MS. ANDERSON:
24       Answer his question.
25    THE WITNESS:

## Page 114

1       I apologize.
2 BY MR. BURAS:
3    Q  Did the Hornets have any internal
4 legal counsel in August of 2005?
5    A  No.
6    Q  Do you know who Jack Capella is?
7    A  I've heard the name.
8    Q  Was Jack Capella working for the
9 Hornets in August of 2005?
10    A  No.
11    Q  To the best of your knowledge, the
12 Hornets have not had any internal counsel
13 since August of 2005?
14    A  As far as securing legal counsel in
15 reference --
16    Q  I don't understand your
17 distinction.
18    A  I'm trying to understand your
19 question.  I apologize.
20    Q  I guess what I'm trying to find
21 out is:  Did the Hornets have -- we in the
22 legal profession deem legal counsel that work
23 internally with the Hornets after August of
24 2005 someone on the Hornets payroll who was
25 deemed general counsel.

## Page 115

1    A  During 2005 and during 2006?
2    Q  Any time since 2005.
3    A  Yes, we do have general counsel
4 now.
5    Q  Who is that general counsel?
6    A  Richard House.
7    Q  When did Mr. House begin working
8 for the Hornets?
9    A  August 1, 2007.
10    Q  Did you ever ask Mr. House if he
11 had records that reflect any information
12 responsive to Request for Production #13?
13    A  No.
14    Q  Do you know if Mr. House had access
15 to the records that were maintained
16 previously by Mr. Capella?
17    A  No, I do not.
18    Q  Did you ever ask him if he had
19 access to the records that might have been
20 maintained by Mr. Capella?
21    A  No, I did not.
22    Q  Do you know if any of the records
23 maintained by Mr. Capella were transmitted or
24 transferred to Jones, Walker?
25    A  No, I do not.

## Page 116

1    Q  #14, copies of all documents
2 presented to or reviewed with any plaintiff
3 during their exit interviews with defendant.
4 Do you understand what this request is
5 looking for?
6    A  No.  Please clarify.
7    Q  Do the Hornets -- when an employee
8 leaves his employment with the Hornets, does
9 that employee have to go through the Human
10 Resources Department?
11    A  Yes.
12    Q  When the employee goes to the Human
13 Resources Department, do you go over any
14 documents or do the Hornets go over any
15 documents with those employees?
16    A  Yes.
17    Q  Do you know what type of documents
18 are generally presented to a departing
19 employee when they leave the Hornets
20 employment?
21    A  Generally the employee is explained
22 when their benefits terminate and when their
23 last paycheck is paid.
24    Q  How is a terminated employee told
25 what their final paycheck is going to be?

Page 117

1    A  I don't know what that dollar
2  amount is.  So if they're told is your
3  question, how much that pay is going to be?
4    Q  Yes, ma'am.
5    A  No.
6    Q  Are they presented with documents
7  at the time that they leave the Hornets
8  employment saying you're entitled to X
9  dollars?
10    A  It's possible they could have.  I
11  don't recall that specifically.
12    Q  Did you personally investigate
13  information responsive to #14?
14    A  No -- yes, it was part of the
15  termination letters or the other files, yes.
16    Q  I guess my question is:  Other
17  than the termination letter and any
18  information that might have been contained
19  in the personnel records, did you look for
20  any other information that might be
21  responsive to this request?
22    A  Yes.
23    Q  Where did you look?
24    A  Again, through the terminated
25  files.

Page 118

1    Q  Okay.  Did you conduct any
2  electronic search for any information that
3  might have been transmitted by any plaintiff
4  regarding any of the issues in their
5  termination documents?
6    A  Say that again, please.
7    Q  Did you conduct an electronic
8  search to determine whether or not any of
9  the plaintiffs had sent any communications or
10  correspondence regarding their termination,
11  compensation or issues like that?
12    A  No.
13    Q  Do you know whether all of the
14  Human Resources personnel prior to you
15  attached copies of the correspondence or
16  e-mails they may have received from
17  plaintiffs regarding their termination or
18  the amounts they believe they were entitled
19  to, made copies of them and placed them in
20  their employee files?
21    A  No.
22    Q  Did you personally conduct any
23  investigation to find out if any such
24  documents existed on any of the Hornets
25  electronic computer systems?

Page 119

1    A  No.
2    Q  So if this information exists, it
3  has never been looked for; correct?
4    A  Not specifically by me.  If someone
5  else did, I do not know.
6    Q  You never directed that anyone else
7  look for this information?
8    A  No.
9    Q  I believe before you said you had
10  absolutely nothing to do with Archtics;
11  correct?
12    A  Correct.
13    Q  So as to #15, can you please take a
14  look at that and advise me whether or not you
15  received any information requested that
16  modifications or changes be made to Archtics?
17    A  No, I did not.
18    Q  You were not asked to look for this
19  information?
20    A  Correct.  I was not asked.
21    Q  #16, it says please produce copies
22  of policies, memoranda, procedures, or other
23  official documents of defendant establishing
24  the policy for paying sales commissions on
25  accounts that are not paid in full until

Page 120

1  after a sales employee stopped working for
2  the defendant.
3        Were you asked to look for
4  information responsive to this request?
5    A  No.
6    Q  Do the Hornets have any information
7  responsive to this request?
8    A  I do not know.
9    Q  You never looked for it?
10    A  I did not.
11    Q  Do you know if anyone that reports
12  to you looked for this?
13    A  I don't have anyone reporting to
14  me.
15    Q  Neither your counsel or either your
16  superiors ever asked you to look for this
17  information; correct?
18    A  No.
19    Q  No, that's not correct?
20    A  I'm sorry.  Correct.  No one asked
21  me to look for this.  I apologize.
22    Q  Again #17 -- when it relates to
23  requests for e-mails, correspondence,
24  memoranda, notes or other documents that
25  might have been sent regarding any plaintiff,

## Page 121

1 is it your testimony that if it was not in
2 the personnel files, you did not conduct an
3 electronic search to determine if there were
4 any other documents out there?
5    A  Outside of my computer, if you
6 will, is that what you're referring to?
7    Q  Did you search your own computer?
8    A  Yes.
9    Q  Other than your personnel computer,
10 yes, ma'am.
11    A  No.
12    Q  So where it says here all e-mails
13 sent by Tim McDougall, Brendon Donahue,
14 Barbara Booth, Adrianna Johnston, Dave
15 Felson, Russo, Penny Middleton, Chris Zaber,
16 Joe Andrade, or David Burke to or about the
17 sales or commissions of any plaintiff, is
18 it safe to say any information that might be
19 contacted in any e-mails, to the best of your
20 knowledge, has not been looked for by you or
21 anyone you instructed to look for this
22 information?
23    A  Correct.
24    Q  It may exist; it never was looked
25 for by you?

## Page 122

1    A  Correct.
2    Q  All right.  I think same series of
3 questions would go to #18 as it relates to
4 e-mails, correspondence, notes, memoranda, or
5 other documents describing, discussing or
6 defining the sales commission policies and
7 procedures of the Hornets.
8       Do you have any such documents that
9 you are aware of that you produced?
10    A  No.
11    Q  Were you ever asked to look for any
12 of the information in 17 or 18?
13    A  No.
14    Q  You never instructed anyone to look
15 for information responsive to #17 or 18?
16    A  No.
17    Q  Looks like #19 is a duplicate of
18 #12 so I'm going to strike that one.
19       #20 is blank.
20       #21 says please produce all time
21 and earnings cards or sheets, wage rate
22 tables, work time schedules or order,
23 shipping and billing records, and similar
24 records for each of the identified
25 plaintiffs.

## Page 123

1       Is this something that you were
2 asked to produce?
3    A  Possibly, yes.
4    Q  Do you specifically remember being
5 asked to produce information set forth in
6 #21?
7    A  Yes.
8    Q  When were you first asked to look
9 for this information?
10    A  After the hurricane.  Around --
11 excuse me.  Around the hurricane.
12    Q  Do you remember if it was before or
13 after the hurricane?
14    A  August was a very, very --
15    Q  Right.
16    A  -- challenging month.  I'll put it
17 that way.
18    Q  Is it fair to say it happened
19 closer to the beginning of the month than the
20 end of the month?
21    A  It's a possibility.
22    Q  You don't remember that?
23    A  I just really do not remember.
24    Q  Did you have anyone from your
25 office helping you look for this information?

## Page 124

1    A  No.
2    Q  Other than the time you looked for
3 it in August of 2005, have you ever conducted
4 any subsequent searches to locate any
5 information for this Request for Production?
6    A  Yes, I think so.  Either in '05
7 or -- December of '05.  Excuse me.  It would
8 have been then or in the first half of '06.
9    Q  And, again, these searches would
10 have been limited to the information that was
11 in the Human Resources Department?
12    A  Exactly.
13    Q  Did you ever ask any of the
14 different department heads whether they
15 maintained any information responsive to this
16 Request for Production?
17    A  No.  Excuse me.  May I say that for
18 shipping and billing records or orders, those
19 are not records that would be maintained in
20 Human Resources.
21       MR. BURAS:
22          It is my understanding in
23          subsequent conversations we
24          actually struck that because it
25          was inadvertently included in

Page 125

1  this request. I'm going to strike
2  that.
3      MS. ANDERSON:
4          Meaning that's not information
5  that the plaintiffs were seeking in
6  this case?
7      MR. BURAS:
8          Correct. Shipping and billing
9  records I believe was just an
10  inadvertent inconclusion into this
11  request.
12 BY MR. BURAS:
13     Q  Since August of 2005, have the
14 Hornets -- you began working for the Hornets
15 at least on a temporary basis in May of 2005;
16 correct?
17     A  Correct.
18     Q  Since August of 2005, have the
19 Hornets maintained time, earnings cards or
20 sheets, wage rate tables, work time schedules
21 or similar records for any of the identified
22 plaintiffs?
23     A  Depends upon who the plaintiffs
24 are. Who are the plaintiffs you are
25 referring to?

Page 126

1      Q  We can go through the list but I
2  will tell you there is one plaintiff in
3  particular who was with the Hornets through
4  October of 2005. His name was Ken Kleibert.
5  Did the Hornets begin maintaining time
6  records for any of -- for Mr. Kleibert at
7  any period of time since you began working
8  for the Hornets?
9      MS. ANDERSON:
10         Objection to the form of the
11 question and the statement prior
12 to the question.
13     THE WITNESS:
14         Yes.
15 BY MR. BURAS:
16     Q  Did the Hornets maintain time
17 records for Mr. Kleibert?
18     A  Yes.
19     Q  Have you produced those time
20 records in this litigation?
21     A  Yes.
22     MS. ANDERSON:
23         I'm just going to note for the
24 record counsel has those. They
25 have been provided. So my

Page 127

1  objection would be for time reasons
2  and so as not to make this drag
3  out, you've asked if the witness
4  has provided information that is
5  already in your possession and I
6  would ask you not to take up this
7  witness' time and our time in the
8  case asking if they have provided
9  information to you that you know
10 you already have.
11     MR. BURAS:
12         That information has not been
13 produced in this case and if it has
14 been, please give me the document
15 number because I do not have any
16 time records related to Ken
17 Kleibert and, as we discussed
18 previously, better communication
19 are better done outside the
20 presence of the witness. It
21 would be considered coaching the
22 witness.
23     MS. ANDERSON:
24         You can go on with your
25 questions. Since there are more

Page 128

1  than 6,500 documents produced, it
2  will take me a minute.
3  BY MR. BURAS:
4      Q  When did the Hornets start
5  maintaining time records for Mr. Kleibert?
6      A  I believe it was July 2005.
7      MS. ANDERSON:
8          I'm also going to object to
9  the line of questioning for this
10 witness about things that are
11 unrelated to chain of evidence
12 issues.
13         She has not been designated
14 to talk about any of the
15 substantive topics in the
16 30(b)(6). To the extent you are
17 going to go outside of that, I
18 will have to instruct her not
19 to answer.
20 BY MR. BURAS:
21     Q  At any period of time after July of
22 2005, did you look for the time records
23 related to Mr. Kleibert?
24     A  Yes.
25     Q  At any time after July of 2005, did

Page 129

1 you look for any time records that might have
2 been related to Natasha Brown?
3    A  I do not recall but it is possible.
4    Q  Who would have maintained these
5 records?  Would it have been you or would it
6 have been their department heads?
7    A  Those records would have been
8 maintained -- once they are completed and
9 turned in, it would be maintained in payroll
10 or H.R.
11    Q  Who would have actually recorded
12 the time?  Would it have been you or would it
13 have been the employee or the employee's
14 supervisor?
15    A  When you say record the time,
16 please clarify.
17    Q  We're talking about now time
18 sheets.  Who was responsible for creating
19 the time sheet; was it you or one of the
20 supervisors?
21    A  As far as documenting the time that
22 the employee came in, the employee came out?
23    Q  Yes, ma'am.
24    A  The employee documents their own
25 time on their time sheet.  They in turn

Page 130

1 submit it or turn it over to their supervisor
2 for signature or approval.  That time sheet
3 once it's approved would then go to the
4 payroll or H.R. Department and it would be
5 retained there as part of the payroll
6 records.
7    Q  Did you look for or I guess I
8 should say how did Mr. Kleibert receive the
9 time sheet that he was supposed to record his
10 time?  Did it come from you or did it come
11 from his supervisor?
12    A  When staff was initially informed
13 to do a time sheet, a blank time sheet was
14 provided to them.
15    Q  By your department?
16    A  No.
17    Q  By whom?
18    A  It was provided by my supervisor.
19    Q  Who was your supervisor at the
20 time?
21    A  Kristy McKearn.
22    Q  Was this handed to the employees or
23 was it transmitted electronically to the
24 employees?
25    A  I did not know that.  I was not in

Page 131

1 the office at that time.
2    Q  At any point in time from the first
3 filing of this litigation in May of 2005 to
4 the present, have you looked for any
5 information related to how the time sheet was
6 transmitted to Mr. Kleibert or any other
7 employee who was working for the Hornets at
8 the time the litigation was filed?
9    A  No.
10    Q  At any point in time, have you
11 looked for any computer e-mails or other
12 electronic records transmitted to Mr.
13 Kleibert or Miss Brown relating to the
14 maintenance or tracking of their time
15 records?
16    A  No.
17    Q  This information may exist but
18 it has not been looked for; correct?
19    A  Yes.
20    Q  #22.  Payroll or other records
21 setting forth or explaining the basis of pay
22 of each named plaintiff by indicating the
23 monetary amount paid on a per hour, per day,
24 per week, commission on sales or other
25 basis.

Page 132

1       How did you know what percentage
2 commission they were entitled to receive?
3    A  I only got a --
4       MS. ANDERSON:
5          Objection.  I think we are
6       going beyond the chain of
7       evidence.  You are now asking her
8       about things that are substantive
9       in nature.
10       MR. BURAS:
11          I will revise the question.
12       MS. ANDERSON:
13          Also note for the record to
14       the extent I have, again, out of
15       courtesy and patience allowed her
16       to give any answer that's
17       substantive, it was not designated
18       for the purpose of the 30(b)(6)
19       deposition.
20       MR. BURAS:
21          I understand the Human
22       Resources director is personal
23       testimony, not the 30(b)(6)
24       testimony.
25       MS. ANDERSON:

Page 133

1 And we're not putting her
2 up for the personal deposition. It
3 was not noticed or requested. She
4 is only being offered regarding
5 chain of evidence issues.
6 BY MR. BURAS:
7 Q Were you asked to look for the
8 information requested in Request #22 related
9 to all payroll and other records setting
10 forth the percentage commission each named
11 plaintiff was entitled to for each period of
12 employment with defendant?
13 A Excuse me. Your question is?
14 Q Were you asked to look for
15 information responsive to this request?
16 A No.
17 Q Did you ever ask anyone to look for
18 information responsive to this request?
19 A No.
20 Q Does your department maintain any
21 records set forth in this request?
22 A No.
23 Q Does your office maintain the
24 commission contracts that each employee
25 signs? The sales employee, I should say?

Page 134

1 A Yes.
2 Q That information would have been
3 located in the Human Resources Department;
4 correct?
5 A Yes.
6 Q It would have been in the personnel
7 files; correct?
8 A Correct.
9 Q So you would have had information
10 responsive to this and you would have
11 provided it to your counsel or your
12 supervisors in other requests; is that
13 correct?
14 A Yes.
15 Q But you were not specifically asked
16 to look for any information related to the
17 actual percentage of commissions each
18 plaintiff was entitled to receive; correct?
19 A It's possible I could have been
20 asked for that information. If it was in
21 their folder or their file, it would have
22 been provided. But to say I actually looked
23 for that -- I was asked to look for a lot of
24 information.
25 Q That's my question, ma'am, and

Page 135

1 that's why before when you said you were not
2 asked to look for it, you're saying you might
3 have looked for it. I just need the answer
4 yes, no or you don't remember.
5 A I don't remember. I'm sorry.
6 Q I believe we talked about earlier
7 in the deposition if you answer a question
8 and you respond, I'm going to assume that you
9 understood my question, and your response is
10 your response under oath. If you're going to
11 change your mind or if your information in
12 your answer is going to change. That's fine
13 if your earlier response was inaccurate, but
14 if you don't understand what I'm asking,
15 please let me know ahead of time because
16 there is no need to backtrack if we don't
17 have to. Okay?
18 #22 the question was: Were you
19 specifically asked to provide information
20 responsive to #22 and your previous response
21 was no. Have you changed your response to
22 yes at this time? I don't understand your
23 response.
24 MS. ANDERSON:
25 Object to form of the

Page 136

1 question.
2 THE WITNESS:
3 My answer is no but as I
4 indicated earlier if it was in
5 the employee file that I submitted
6 or turned over or produced again,
7 I don't know.
8 BY MR. BURAS:
9 Q So other than information that
10 might have been located in the employee
11 files, did you not look for any other
12 information responsive to #22?
13 A Correct.
14 Q What about 23 related to payroll or
15 other records setting forth or explaining the
16 basis of pay for each named plaintiff by
17 indicating the monetary amount paid on a per
18 hour, per day, per week or other basis?
19 Were you asked to provide
20 information responsive to this request?
21 A No.
22 Q #24. Payroll or other records
23 setting forth total wages paid to each named
24 plaintiff for each pay period, including in a
25 separate category any amounts paid in

Page 137

1 commission. Were you asked to look for
2 information relating to #24?
3   A  Yes.
4   Q  Who asked you to look for this
5 information?
6   A  My supervisor.
7   Q  Kristy McKearn?
8   A  Kristy McKearn.
9   Q  Did this take place around --
10   A  Somewhere around the hurricane.
11     MS. ANDERSON:
12       Let him finish his question
13     before you answer. If you talk at
14     the same time, it makes it
15     difficult for her to do her job.
16 BY MR. BURAS:
17   Q  And where did you look for
18 information responsive to #24?
19   A  It was in the payroll register and
20 all of the payroll records.
21   Q  To the best of your knowledge, was
22 all of the information related to plaintiffs
23 in this litigation found responsive to #24?
24   A  Yes.
25   Q  #25 I believe we answered

Page 138

1 accurately in the other ones. Archtics
2 reports, I'm not going to ask that. That's
3 going to include the first request.
4     Now, how are we doing on restroom
5 breaks? You are in charge of all bathroom
6 breaks. If you need to take one, let me
7 know.
8     MR. BURAS:
9       Off the record.
10     MS. ANDERSON:
11       We're done with Exhibits 4, 5
12     and 6 at this point?
13     MR. BURAS:
14       Yes, we're done with 4, 5 and
15     6 at this point.
16     MS. ANDERSON:
17       All right.
18     (WHEREUPON: A lunch break was
19     taken.)
20 BY MR. BURAS:
21   Q  Miss Rochon, I just handed you a
22 document I marked as Exhibit 7. The document
23 is a pleading entitled Plaintiffs' Request
24 for Expedited Production of Documents Related
25 to Emergency Protective Order and Plaintiffs'

Page 139

1 Motion to Certify a Collective Action. Did
2 you have that document?
3   A  Yes.
4   Q  Have you ever seen this document
5 before?
6   A  No.
7   Q  Why don't you take a look at the
8 various requests that are set forth in this
9 document. I believe it is -- there are 30 in
10 number beginning on Page 4 through Page 9.
11 I'm going to be asking you questions about
12 whether or not you were responsible or asked
13 to produce any information responsive to
14 these requests. Before I do that, please
15 turn to Page 10 and I'd like to verify the
16 Certificate of Service that indicates this
17 document was sent to your counsel July 25th,
18 2005; correct?
19   A  Correct.
20   Q  Take a moment. I believe earlier
21 we went over some State Court pleadings. To
22 the extent that any information we went over
23 earlier is duplicative of any information
24 requested in this document, I'm going to try
25 to narrow the scope and try to limit things.

Page 140

1     In addition, just to give you some
2 background, your counsel filed a motion and
3 we discussed this with the court and the
4 court actually limited the request that the
5 Hornets had to respond to pursuant to this
6 Request for Production of Documents.
7     There's a court order dated August
8 2nd, 2005, which specifically discusses which
9 numbers. So as it relates to those numbered
10 documents, I'm going to only ask you
11 questions as to the numbered documents that
12 the court ordered produced. Okay? So you
13 won't know that until I tell you is the
14 reason I'm telling you that.
15   A  Okay.
16     MS. ANDERSON:
17       Do you want her to read the
18     whole set?
19     MR. BURAS:
20       There's no need to unless she
21     wants to at this point.
22     MS. ANDERSON:
23       Just call her attention to a
24     particular number?
25     MR. BURAS:

Page 141

1    Sure thing.
2 BY MR. BURAS:
3    Q  What I was going to say is the
4 numbers if you want to circle it or however
5 you want to reference it, we're going to be
6 discussing #2, 3, 5, 15, 16, 20, 21, 22 --
7    A  Excuse me.  Are these page numbers
8 you're referring to?
9    Q  Request numbers.  I'm sorry.
10    A  Okay.
11    Q  And the --
12    A  The numbers again.
13    Q  #2, 3, 5, 15 --
14    A  One moment, please.  (Pause.)  15?
15    Q  Right.  16, 20, 21, 22, 24, 25, 28,
16 29, 30.  As to #18, if you can go back, we're
17 not going to include Item I, but we are going
18 to include A through H, and as it relates to
19 #19 and 27, we're going to discuss the
20 court's modification of this response.  So
21 when we get to those, the court has actually
22 limited further from what you see in these
23 documents.  I'm going to tell you what the
24 order says, show it to your counsel and she
25 can confirm and then I will ask you questions

Page 142

1 about that.
2    All right.  You just indicated that
3 you were never provided with a copy of this
4 document; is that correct?
5    A  Correct, until now.
6    Q  This is the first time you've seen
7 this document?
8    A  Yes.
9    Q  Have you ever received any
10 correspondence, e-mails, faxes or other types
11 of communications from your counsel or from
12 any of your superiors requesting the
13 information that's set forth in these
14 Requests for Production?
15    A  On the items that you had me
16 circle?
17    Q  Yes, ma'am.
18    MS. ANDERSON:
19      Just take your time and review
20    them.
21    THE WITNESS:
22      (Witness complies.)  Would you
23    repeat your question?
24    MR. BURAS:
25      Ma'am, if you can read it

Page 143

1    back.
2      (Court reporter read back the last
3      question.)
4 BY MR. BURAS:
5    Q  We further limited to the circled
6 numbers we were discussing.
7    A  Yes.
8    Q  When did you receive any written
9 communications of any kind?
10    A  Would have been somewhere during
11 late 2005 or early 2006.
12    A  Who sent you -- was it in writing
13 or was it a verbal request for this
14 information?
15    A  It may have been a verbal.  And
16 thank you very much.
17    Q  Was this verbal request from one of
18 your superiors or from your counsel?
19    A  It would have been from Kristy
20 McKearn and then sometime later would have
21 been legal counsel.
22    Q  Prior to late 2005 or early 2006
23 when you discussed -- in your testimony you
24 came back into the city after Katrina on or
25 about December 2005, again in March of 2006

Page 144

1 and a third time in May of 2006; is that
2 correct?
3    A  That's correct.
4    Q  This communication from Kristy
5 McKearn, would that have taken place during
6 December 2005 or one of the other visits to
7 New Orleans?
8    A  From Kristy McKearn it would not
9 have been in December of '05 or later or any
10 time in '06 because Kristy was no longer with
11 the company.
12    Q  When did Kristy stop working for
13 the company?
14    A  Just before November 1, '05.
15    Q  All right.  So if this document was
16 forwarded to Hornets' counsel on July 25th,
17 2005, and Miss McKearn stopped working for
18 the Hornets on November 1st, 2005, it's fair
19 to say the communication from Miss McKearn
20 came somewhere during that time period?
21    A  Yes.
22    Q  Do you remember specifically when
23 during that time period the communication
24 took place?
25    A  It would have been somewhere around

Page 145

1 the hurricane so somewhere maybe late August,
2 somewhere in September.
3    Q  Do you remember if that
4 communication came while you were living in
5 Oklahoma City or did it come while you were
6 in New Orleans?
7    A  In New Orleans.
8    Q  Did you immediately move to
9 Oklahoma after the storm?
10    A  No.
11    Q  How long did you stay in the city
12 after the storm before you moved to
13 Oklahoma?
14    A  I guess about maybe two or three
15 weeks because I left.  I can be specific on
16 that date.  It was September 22nd or 23rd.
17 Probably the 23rd.  Excuse me.
18    Q  September 23rd, 2005?
19    A  Yes.
20    Q  You moved to Oklahoma City?
21    A  Yes.
22    Q  When did you actually begin working
23 after the storm?  After the storm hit on
24 August 29th, I'm assuming there was a period
25 of time where you were focused on family and

Page 146

1 making sure that you understood what damage
2 the storm had caused; is that correct?
3    A  Yes.
4    Q  At what point in time did you
5 actually report back to the Hornets, begin
6 working for the Hornets?
7    A  It would have been on the 23rd
8 pretty much physically.  Other than that, we
9 had verbal communication of when we could get
10 through on the telephone lines in the time
11 before that between the 29th and the 23rd.
12    Q  Do you believe -- did the
13 communication from Miss McKearn come before
14 or after the 23rd?
15    A  Of September?
16    Q  Yes, ma'am.
17    A  It had to be before September
18 because I could not get in the office here.
19    Q  So it's fair to say since you
20 stopped working you didn't come back to your
21 office after August 29th?
22    A  Correct.
23    Q  The communication took place
24 between July 25th and August 28th, I guess?
25    A  It's a possibility, yes.

Page 147

1    Q  Is it possible the communication
2 took place after the 23rd?
3    A  Of September, yes.
4    Q  It could very well have taken place
5 after you were in Oklahoma City; you just
6 don't remember?
7    A  I don't remember specifically.
8    Q  That conversation was a verbal.
9 You were not actually given any --
10    A  Paper.
11    Q  -- copies of any of this
12 information, were you?
13    A  Correct.
14    Q  Let's go and refer specifically to
15 #2 and this is a multi-part question so let's
16 try to limit this as much as possible.  Do
17 you specifically remember being asked by Miss
18 McKearn or your labor counsel or any counsel
19 or any of your superiors to investigate the
20 paragraph of information requested in #2?
21       MS. ANDERSON:
22          Objection; form.
23       THE WITNESS:
24          In reference to -- what you
25          mean, by investigate?

Page 148

1 BY MR. BURAS:
2    Q  Yes, ma'am.
3    A  I was asked to provide, produce,
4 pull records.
5    Q  And is it your testimony that you
6 were not asked to do this most likely not
7 until after you left for Oklahoma City on
8 September 23rd, 2005, or when were you first
9 asked to produce this information?
10       MS. ANDERSON:
11          Objection; form.
12       THE WITNESS:
13          I was asked to pull
14          information sometime before the
15          hurricane or around the hurricane.
16          Specifically what date, I can't
17          remember.  What it was in reference
18          to, that part, I don't know.  I was
19          only asked to produce records.
20          Whether it was in reference to this
21          case, I don't know that.
22 BY MR. BURAS:
23    Q  And just to make sure I understand,
24 did that request come verbally from Miss
25 McKearn?

Page 149

1   A  That was a verbal request.
2   Q  Did it come from Miss McKearn?
3   A  From Miss McKearn, yes.
4   Q  Is this the event we discussed
5  previously where you took a list of certain
6  names and pulled records from the list that
7  you hand wrote during the telephone call?
8   A  With Miss McKearn, yes.
9   Q  And is it fair to say as you take a
10 look at #2 that what you were asked to do by
11 Miss McKearn did not set forth the
12 specificity set forth in paragraph #2?
13  A  Can you clarify your question?
14  Q  Yes, ma'am.  Did Miss McKearn tell
15 you to pull records for certain people or did
16 she come and tell you -- I'm not going to
17 read the whole paragraph -- please produce a
18 complete copy of the employee files for each
19 plaintiff including but not limited to
20 personnel records, employment contracts,
21 etcetera, all of the information requested in
22 #2 or did Miss McKearn simply tell you to
23 pull the employee files?
24  A  I do not recall her specific
25 words.  I was asked to pull documents

Page 150

1  pertaining to the list that she gave me or
2  the list that I wrote down.
3   Q  Was anyone else in the Human
4  Resources Department or Accounting Department
5  asked to pull information for Miss McKearn
6  responsive to #2?
7   A  I do not know that.  I was the only
8  person in the H.R. or payroll department.
9   Q  So you are the only person that
10 could have been asked to produce this
11 information; is that correct?
12  A  If it was in reference to payroll,
13 she would have asked me and, yes, I would be
14 the only one that she would have asked for
15 those records.
16  Q  Just to make sure as we go over
17 some of these issues we discussed as it
18 relates to the other Requests for Production
19 that we went over but let me just make sure.
20 We discussed personnel records.  You pulled
21 the records and produced them and I believe
22 your testimony previously was that you went
23 back and reviewed the information in those
24 records in December of '05 or one of the
25 other dates in 2006; is that correct?

Page 151

1   A  Based upon requests that were made
2  to me, yes.
3   Q  And those subsequent requests were
4  made to you by counsel; correct?
5   A  By legal counsel.
6   Q  And you did not have a writing
7  associated with those requests, do you?
8   A  No.
9   Q  Was it all verbal communications
10 from counsel?
11  A  Correct, because counsel already
12 had the files when I pulled this initially so
13 we were going back to verify.
14  Q  And I believe we discussed
15 employment contracts, compensation agreements
16 or other contracts between defendant and
17 plaintiff.  And we discussed that you looked
18 in your terminated employee files, your
19 active employee files and I believe you said
20 you looked in your Human Resources area but
21 you did not expand your area beyond the Human
22 Resources area; is that correct?
23  A  Correct.
24  Q  You did not conduct any computer
25 searches other than maybe the files that were

Page 152

1  located on your own personal computer; is
2  that correct?
3   A  That is correct.
4   Q  All right.  Termination letters, I
5  believe we previously discussed that.  If it
6  was in the employee file you produced it to
7  your counsel, but you did not conduct any
8  other investigation to find out if anyone
9  else in the Hornets might have had
10 information responsive to the termination
11 letters?
12  A  That's correct.  I would not expect
13 anyone else to have those records.
14  Q  Payroll register, payroll logs, we
15 discussed that you went to the payroll
16 register, payroll logs and you pulled that
17 information; is that correct?
18  A  Correct.
19  Q  Is that something normally kept
20 inside of the personnel records?
21  A  What record in specific?
22  Q  When you indicated you pulled
23 the employee records and gave them to your
24 attorney, would the payroll information
25 related to those employees have been located

Page 153

1 physically in the records or did you have to
2 go to another record to pull that
3 information?
4     A  Actual payroll records per se as in
5 reference to what went into their paychecks
6 that would not be contained within the
7 employee's personnel file.  That would be
8 with the payroll records itself or data
9 separate.
10    Q  So that would be additional
11 information you had to pull and produce;
12 correct?
13    A  That's correct.
14    Q  Do you have the first time you
15 reviewed the payroll registers and payroll
16 records to produce this information?
17    A  It would have been sometime in
18 2005.
19    Q  Was it before or after the storm?
20    A  It could have been before.  Just
21 around that time.
22    Q  As you sit here today, do you have
23 any specific memory of when you pulled those
24 records whether it was before or after
25 Hurricane Katrina?

Page 154

1     A  I don't recall specifically.  I
2 could have pulled them just before the
3 hurricane or sometime in August.  I just
4 cannot recall a specific date.
5     Q  All right.  I believe the issues
6 related to commission sales and rate of pay
7 we also previously discussed and we discussed
8 that you limited your search to the Human
9 Resources Department and the payroll records
10 that you had; is that correct?
11    A  That's correct.
12    Q  Commission records -- were the
13 commission reports we previously discussed
14 maintained as a separate file or part of
15 another?
16    A  Part of payroll records.
17    Q  It was part of the payroll records,
18 the commission reports?
19    A  Correct.
20    Q  Did you have anyone assist you be
21 it an intern or anyone else in helping you
22 pull these records?
23    A  The payroll records?
24    Q  Yes, ma'am.
25    A  No.

Page 155

1     Q  Anyone from the accounting
2 department, did they help you?
3     A  No.
4     Q  Did any paralegals or attorneys
5 from Jones, Walker help you pull these
6 records?
7     A  Yes, on one occasion.
8     Q  Do you remember that person's name?
9     A  That would have been December of
10 2005.
11    Q  Do you remember that person's
12 name?  Forgive me for interrupting you.
13    A  Excuse me.  It was legal counsel.
14 It wasn't a paralegal.
15    Q  Was it Miss Anderson or Miss
16 Heidingsfelder?
17    A  Miss Heidingsfelder.
18    Q  Do you remember if Miss
19 Heidingsfelder provided you with a document
20 identifying the specific categories and
21 information you were supposed to pull?
22    A  Not that I recall.
23    Q  How did you know what documents you
24 were supposed to pull in 2005?
25    A  Miss Heidingsfelder probably had

Page 156

1 her own document and we discussed what needed
2 to be pulled and we went to the files and
3 looked at each one.
4     Q  Were you given a copy of that
5 document?
6     A  No, not that I recall.
7     Q  With #5 it discusses time sheets,
8 sign-in sheets, etcetera.  I believe we
9 previously discussed this as it related to
10 the previous Request for Production that we
11 just went over.  Is it my understanding that
12 you have produced all time sheets?  It's your
13 understanding you produced all time sheets
14 for every plaintiff involved in this
15 litigation that are in the Hornets'
16 possession?
17    A  As far as I know.
18    Q  And I believe previously you
19 indicated that for any employees who maintain
20 or track their time sheets after July of 2005
21 they would have given those time sheets to
22 their supervisors; is that correct?
23    A  Yes.
24    Q  Have you gone to those supervisors
25 to determine whether or not those supervisors

Page 157

1 gave you all of the copies of time sheets
2 that may have been maintained by plaintiffs
3 in this litigation?
4    A  No, I have not.
5    Q  Do you know who those supervisors
6 are?
7    A  Not off the top of my head.
8    Q  If Ken Kleibert is a sales
9 representative, who would his supervisor have
10 been; do you know?  Is it Brendon Donahue?
11    A  I'm trying to remember who Ken
12 reported to.  Would have been either Chris
13 Zaber or maybe Brendon Donahue.  I don't
14 recall which.
15    Q  At any time since July of 2005 till
16 today's deposition, have you contacted Chris
17 Zaber or Brendon Donahue to confirm that you
18 produced the sign-in sheets that Ken Kleibert
19 may have submitted during his tenure with the
20 Hornets?
21    A  No, I did not.
22    Q  When is the last time you
23 communicated with Chris Zaber or Brendon
24 Donahue to ask them about time sheets related
25 to Ken Kleibert?

Page 158

1    A  I never discussed time sheets with
2 them.
3    Q  Miss Natasha Brown was in ticket
4 operations, I believe.  Does that sound
5 accurate to you?
6    A  Possibly.
7    Q  Do you know who Miss Brown reported
8 to?
9    A  Ticket operations, it would have
10 been John Laycamp (spelled phonetically).
11    Q  Did you check with Mr. Laycamp to
12 determine whether or not all of Miss Brown's
13 time sheets and sign-in records had been
14 produced in this litigation?
15    A  No, I did not.
16    Q  Are you aware that Miss Brown and
17 another plaintiff Miss Leslie Sumler were
18 actually paid overtime in October of 2004?
19    A  No, I do not.
20    Q  Do you know or have you checked
21 any of the employee records within the New
22 Orleans Hornets to determine how those
23 employees time records were tracked?
24    MS. ANDERSON:
25       I'm going to object.  I think

Page 159

1 this is going beyond the scope of
2 what she's here to testify about.
3 I don't think that it all relates
4 to whether she was asked to get
5 something responsive.
6    MR. BURAS:
7       She has to know it exists
8 before she can look for it.
9    MS. ANDERSON:
10       I disagree.  I'm not going to
11 instruct her not to answer but I
12 object.
13    THE WITNESS:
14       What I would like to say, if
15 possible, is if the question you
16 just asked is asking me to know
17 something that really I did not
18 know, I wasn't even employed near
19 the Hornets in 2004.
20       The only way I can actually
21 answer that question would be to
22 look at documents or research
23 documents.  I pulled several
24 documents, produced whatever was
25 requested.  And, as far as to tell

Page 160

1 you today without actually looking
2 at all of those documents whether
3 we did or didn't, I can't answer
4 that question.
5 BY MR. BURAS:
6    Q  So when you were asked to produce
7 all of the time records and time sheets for
8 employees, for all plaintiffs involved in
9 this litigation, including current employees,
10 is it my understanding that you didn't know
11 when you produced information responsive to
12 this request whether or not there even
13 existed time records for those employees
14 unless they were physically located in your
15 files?
16    A  Correct.
17    Q  Did you conduct any type of
18 investigation with any supervisors,
19 department heads, division chiefs, vice
20 presidents, executives of any kind to
21 determine whether or not any of the
22 plaintiffs in this case ever tracked their
23 time sheets?
24    A  No, I did not ask the question.
25    Q  Did you ever contact any of the

Page 161

1 supervisors, managers, directors, officers
2 or any other persons of supervisory capacity
3 within the Hornets to determine whether or
4 not any communications to plaintiffs or any
5 other currently employed employee related to
6 overtime or tracking their hours or limiting
7 their hours to forty hour work weeks were
8 contained in locations other than their
9 employee records?
10   A  Now, that was a long question.  I
11 need you to repeat part of that back.
12   Q  Yes, ma'am.  I will break it down
13 into pieces.  Did you ever contact any person
14 in a supervisory capacity be it vice
15 president of operations on down to determine
16 whether or not any of the plaintiffs in this
17 case may have information related to the
18 tracking of their time in locations other
19 than in their employee files?
20   A  No, and I would not because
21 anything pertaining to an employee's time or
22 pay would have and should have been reported
23 or turned into the payroll or H.R. Department
24 for pay purposes.
25   Q  Would the Human Resources

Page 162

1 Department have received to produce in
2 response to this interrogatory or this
3 Request for Production any e-mails that
4 might have been sent by supervisors to
5 their employees advising them to track
6 their time?
7   A  You want to rephrase -- paraphrase
8 your question?  You're asking whether or not
9 I would have received any communication that
10 was sent to the employees for them to track
11 their time?
12   Q  Yes, ma'am.
13   A  If one was sent, then I would think
14 I should have gotten a copy.  Whether I did,
15 whether one was sent, I do not recall that.
16     MR. BURAS:
17       I'm going to object as
18       unresponsive.
19 BY MR. BURAS:
20   Q  To the best of your knowledge, did
21 you actually receive any correspondence via
22 e-mail, internal memos or otherwise or any
23 supervisors or managers directed their
24 employees to track their time?
25   A  I don't recall.

Page 163

1   Q  You never looked for this
2 information either; is that correct?
3   A  Correct.
4     MS. ANDERSON:
5       Objection; form.
6 BY MR. BURAS:
7   Q  #15 relates to the draw system of
8 plaintiffs implemented by the Hornets.  Are
9 you aware of the draw system of payments
10 implemented?
11   A  I'm aware there were draws in
12 seasons prior to my arrival at the Hornets.
13   Q  For #15 were you asked to produce
14 information responsive to this discovery
15 request?
16   A  In reference to this particular
17 discovery I can't say whether the documents
18 that I produced were used for this discovery
19 or not.  I was asked for documents.
20   Q  Were you specifically asked to
21 produce documents relating to the draw system
22 implemented by the Hornets?
23   A  I don't know.
24   Q  As you sit here today, do you ever
25 remember or recall investigating specifically

Page 164

1 the question, any question or information
2 related to the draw system of payments
3 implemented by the Hornets?
4   A  I don't know a lot about the draw
5 system so I don't know what --
6     MR. BURAS:
7       I'm going to object to
8       unresponsive.
9 BY MR. BURAS:
10   Q  Specifically, has anyone used the
11 word draws, draw system of payments in any
12 request for information that they asked you
13 to provide?
14   A  No, based on that question.
15   Q  #16, do you know what a
16 select-a-seat event is?
17   A  Yes.
18   Q  If an employee was required to
19 attend a select-a-seat event, would
20 information related to the event they
21 attended, the select-a-seat event, be
22 located in their personnel files?
23   A  I do not know.
24   Q  Were you ever specifically asked to
25 produce any information requested in #16?

Page 165

1    A  No.
2    Q  Have you ever investigated any of
3  the information requested in #16?
4    A  No.
5    Q  All right.  #17 was modified by the
6  court and I'm going to read what the court's
7  order says.  It says as to Item 17 defendant
8  is to provide any policy which might exist
9  explaining why the Hornets failed to maintain
10  records of hours by non-exempt employees.
11        MS. ANDERSON:
12            May I see the order?
13        MR. BURAS:
14            Absolutely.
15        MS. ANDERSON:
16            Go ahead.
17        THE WITNESS:
18            My question was 17 was not one
19        of the questions you asked me to
20        circle.
21  BY MR. BURAS:
22    Q  It was a modification, ma'am.  I'm
23  going back to that.  I didn't want to circle
24  it because the court changed in its order the
25  information we were to look for.  That's what

Page 166

1  I'm trying to find out.
2        MR. BURAS:
3            If you want to show her #17 on
4        the court's order just so she can
5        have it in front of her so she can
6        see exactly what the order was.
7        MS. ANDERSON:
8            For the record, I'm showing
9        you a copy of the order dated
10        August 2, 2005, right here.
11        THE WITNESS:
12            Okay.
13  BY MR. BURAS:
14    Q  Were you ever asked to provide that
15  information by counsel or by one of your
16  supervisors?
17    A  No.
18    Q  Okay.  As to #18, this is one where
19  we have different categories of documents A
20  through I.  The court limited and said not to
21  respond to letter I in response to the order,
22  but it says produce a copy of all documents
23  reflecting overtime payments made to any
24  current or former personnel employed by the
25  Hornets since June of 2002 in any of the

Page 167

1  following categories.
2            Were you ever asked to provide
3  information responsive to this request?
4    A  Specifically to this?
5    Q  Yes, ma'am.
6    A  I would say no but documents I did
7  produce may have been used towards answering
8  this question.
9    Q  Just to make sure I'm clear, when
10  did you produce documents responsive to this
11  request?  And I want at this time, just as
12  good time as any, to use -- I'm going to give
13  you Exhibit 8 which is the Hornets' response
14  to these interrogatories and you can see on
15  #18.  You can verify that that's a document.
16        MR. BURAS:
17            Counsel, do you have a copy of
18        that?
19        MS. ANDERSON:
20            Yes, I do.  Let me know when
21        you're -- I'm not sure if you are
22        done with your question or asked it
23        so let me know when you are done.
24        MR. BURAS:
25            Go ahead.  She can read it

Page 168

1        back.  I don't even know where I
2        am.  I don't think I've asked a
3        question at this point.
4        (Court reporter read back the last
5        question.)
6        MS. ANDERSON:
7            Are you waiting for her to
8        answer or are you going to ask
9        another question?
10  BY MR. BURAS:
11    Q  This is a supplemental apparently.
12  That's what's throwing me off.  I also have
13  what appears to be a supplemental response.
14        MS. ANDERSON:
15            Is this what you are looking
16        for (indicating)?
17        MR. BURAS:
18            There is one smaller response
19        and if you check the date, I
20        believe the date should be in
21        August.
22        MS. ANDERSON:
23            That's August 5th.
24            Is that what you are looking
25        for?

Page 169

```
 1        MR. BURAS:
 2            There's two of them.  I also
 3    have another one here that's dated
 4    December 14th.  I want to make sure
 5    you have a copy of both of them.
 6  BY MR. BURAS:
 7    Q  Ma'am, what I've just handed to you
 8  are two responses provided by the Hornets in
 9  response to the July 25th, 2005, Request for
10  Production.  If you turn to the second --
11  excuse me, the last page on the document
12  that's been marked as Exhibit 8, it indicates
13  that these are responses provided on the 5th
14  day of August 2005.  If you take a look, do
15  you see that?
16    A  This one (indicating)?
17    Q  Yes, ma'am.  Take a look at the
18  certificate.  It shows they were provided to
19  plaintiff's counsel August 5th, 2005.
20    A  Yes.
21    Q  If you look at the thicker set of
22  documents on Page 30 --
23    A  (Witness complies.)
24        MR. BURAS:
25            Let's go off the record for
```

Page 170

```
 1    a second.
 2        (WHEREUPON:  A brief discussion was
 3    held off the record.)
 4        MR. BURAS:
 5            Just as a housekeeping
 6    matter, it was my error.  Exhibit 9
 7    we previously addressed doesn't
 8    exist at this point in time.  It
 9    was my error.  The only document
10    we're referring to is the August
11    5th, 2005, Defendants' Response for
12    Plaintiffs' Request for Documents
13    dated July 25th, 2005, and that has
14    been marked as Exhibit 8.
15        MS. ANDERSON:
16            That's this one (indicating).
17        MR. BURAS:
18            All requests are going to be
19    related to Exhibit 8 and Exhibit 7
20    as it relates to the official
21    request.
22  BY MR. BURAS:
23    Q  If you take a look, ma'am, at the
24  Hornets' response to #18, it indicates that
25  Leslie Sumler's personnel and payroll records
```

Page 171

```
 1  had information responsive to the information
 2  requested in #18.  Do you see that, ma'am?
 3        MS. ANDERSON:
 4            There's the request
 5    (indicating) and here's the
 6    response (indicating).
 7        THE WITNESS:
 8            Thank you.
 9        MS. ANDERSON:
10            Okay?
11        THE WITNESS:
12            Okay.  And your question?
13    I'm sorry.
14  BY MR. BURAS:
15    Q  My question is:  Did you provide
16  the information responsive to this request
17  to counsel?
18    A  Specifically to Leslie Sumler?
19    Q  Yes, ma'am.
20    A  I cannot answer that.  I do not
21  know.  I did provide information that was
22  requested.
23    Q  At any time after August 5th --
24  strike that.  Prior to August 5th, 2005, were
25  you asked to provide information related to
```

Page 172

```
 1  this case?
 2    A  I was asked to provide
 3  information.  I can't say specifically it was
 4  to this case or not or to Leslie.  I don't
 5  know that.
 6    Q  And, the reason, this is just more
 7  of a timing issue, not a matter of anything.
 8  Before you indicated that just prior to the
 9  hurricane or around the time of the hurricane
10  you were asked to provide information.
11    A  Correct.
12    Q  This document is dated August 5th,
13  2005, which is about a whole month earlier
14  than the hurricane.  Were you involved in
15  locating documents and investigating the
16  information requested back in early August
17  of 2005?
18    A  I don't remember.  Again, for a
19  specific date when I was asked to find
20  documents, I don't remember specifically,
21  because at that time in July and August and
22  June, it was a very, very busy time for me
23  just trying to come in and makes heads or
24  tails what was going on in the department.
25  We had new hires and people in and out.
```

Page 173

1    Q  Was anybody else working with
2  you --
3    A  No.
4    Q  -- in July or August of 2005?
5    A  I'm sorry.  No.
6    Q  At any point in time since August
7  5th, 2005, have you been asked to go back and
8  re-investigate whether any persons in any of
9  these categories have received overtime
10  payments?
11    A  Investigate you mean?
12    Q  Look in their records or look in
13  your records or whatever records exist to try
14  to find out if that information exists.
15    A  Yes.
16    Q  When were you asked to do this?
17    A  It would have been somewhere in
18  probably early 2006.
19    Q  Was it counsel who asked you to do
20  this?
21    A  General counsel, legal counsel.
22    Q  Do you remember specifically what
23  counsel asked you to do?
24    A  Specifically, no, but in generality
25  here's a list of plaintiffs we're looking for

Page 174

1  overtime on any of them or overtime in
2  general.
3    Q  Were you ever specifically asked to
4  review all of the former inside sales persons
5  that worked for the Hornets to determine if
6  they had ever been paid overtime?
7    A  Specifically, I don't recall that.
8    Q  Were you ever specifically asked to
9  review all personnel files of the New Orleans
10  Hornets to find out if any other sales
11  associates had been paid overtime?
12    A  Not specifically.
13    Q  All right.  I'm going to group
14  these next three in just for convenience.
15  Were you ever asked at any time to
16  specifically review all of the current and
17  former group account sales persons, regional
18  account sales persons or account executive
19  sales persons who worked previously or
20  currently worked for the Hornets to determine
21  whether or not any of those persons received
22  overtime?
23    A  Specifically is your question?
24    Q  Yes, ma'am.
25    A  Not that I recall.

Page 175

1    Q  Were you ever asked specifically to
2  determine whether or not any fan relations
3  personnel or ticket operations personnel had
4  been paid overtime for existing employees and
5  any previous employees for the New Orleans
6  Hornets?
7    A  No.
8    Q  Were you ever asked to go back
9  specifically and determine if any of the
10  receptionists working for the Hornets had
11  previously or currently ever received
12  overtime?
13    A  Not specifically.
14    Q  As you sit here today, have you
15  ever been asked to do that?
16    A  To go back and look at those
17  records is your question?
18    Q  Yes, ma'am.
19    A  Yes.
20    Q  When were you asked to do that?
21    A  Excuse me.  Let me clarify or
22  correct my answer, if you will.  Not
23  specifically for those positions but for any
24  position or any non-exempt employee.
25    Q  When were you asked to do that?

Page 176

1    A  Sometime in 2006.
2    Q  And counsel asked you to do that?
3    A  Yes.
4    Q  How did you know which employees
5  should have been investigated because they
6  were non-exempt?
7       MS. ANDERSON:
8           Objection; form.
9       THE WITNESS:
10          Clarify your question for me,
11       please.
12  BY MR. BURAS:
13    Q  You previously indicated you were
14  told to investigate whether overtime had
15  been paid to any of the non-exempt employee
16  positions.  How did you know which of those
17  positions were considered non-exempt?
18    A  Based upon those employees who were
19  completing a time sheet.
20    Q  How were you tracking which
21  employees were submitting time sheets?
22    A  What do you mean tracking?
23    Q  How did you know which employees
24  were submitting time sheets?
25       MS. ANDERSON:

Page 177

1 I'm going to object. This is
2 going beyond the scope of simply
3 what records she got and when she
4 provided them and, you know, what
5 she was asked to provide. This is
6 getting into a custody hearing and
7 she's not designated for that
8 purpose.
9 MR. BURAS:
10 I'm asking questions
11 specifically to what she looked
12 for and how she knew to look
13 and where. She produced time
14 sheets for employees who -- she
15 investigated whether overtime
16 payments were made to those
17 employees who produced time
18 sheets. I want to know how she
19 knew which employees were
20 producing time sheets.
21 MS. ANDERSON:
22 I don't think that was your
23 last question so your question
24 changed.
25 BY MR. BURAS:

Page 178

1 Q Then my question I just now asked
2 is: How did you know which employees were
3 completing time sheets?
4 A Based upon the employees turning in
5 a time sheet.
6 Q Forgive me for going back again but
7 it's my understanding previously you
8 indicated the employees turn their time
9 sheets into their supervisors; correct?
10 A Right.
11 Q Did you maintain a list or was
12 it just simply a matter of going back in
13 each employee's files? How did you know
14 which employees were actually turning in
15 their time sheets?
16 A Once the employee turns in their
17 time sheets to their supervisors for
18 approval, the supervisors gave the time
19 sheets to payroll and H.R. so we can look at
20 the time sheets to ensure that they were,
21 one, turned in; two, whatever information
22 needed to be entered to be paid that they
23 were paid and the time sheets remain with
24 the payroll records.
25 Q Any time sheet -- and I guess this

Page 179

1 goes back. I apologize. Did you have to go
2 back through each of the payroll records to
3 determine which employees with the Hornets
4 received overtime or was there a separate
5 record that you maintained of those employees
6 that received overtime?
7 A If employees had time sheets that
8 had overtime on it, the overtime was entered
9 into the system. So once, it was in the
10 system, I would go back to the system, the
11 ADP system or the payroll register, the
12 printed documents that would show the
13 overtime earnings that was paid.
14 So, if you looking for what places,
15 it's still all part of the payroll records.
16 I would use the ADP system to either run a
17 report or look at the employees, check
18 details that would show that information or
19 look in the printed payroll register for the
20 information there or look at the time sheet
21 with that particular payroll register for
22 that time frame.
23 Q Was the ADP -- is this an on-line
24 system or computer program?
25 A Computer program.

Page 180

1 Q Is it one that's installed on your
2 hard drive or is it like on a system wide
3 data base or how does that computer program
4 work?
5 A It's actually on the hard drive on
6 my computer.
7 Q Do you have to submit reports via
8 e-mail or other electronic reports to ADP for
9 them to process your payroll?
10 A It's a file we submit.
11 Q Is it something you transmit on a
12 weekly basis? Daily basis? How do you
13 transmit?
14 A We transmit when it is time for
15 payroll.
16 Q Do you know if this ADP system was
17 used only when you were employed or was it
18 used prior to your employment as well?
19 A Prior to my employment.
20 Q Do you know how far back the Human
21 Resources or payroll department used ADP?
22 A Yes.
23 Q How far back?
24 A 2004.
25 Q Do you know who the Hornets used

Page 181

1 prior to 2004 for payroll purposes?
2    A  Ceridian.
3    Q  Can you spell that?
4    A  C-E-R-I-D-I-A-N.
5    Q  Are you familiar with the Ceridian
6 system?
7    A  Yes.
8    Q  Were you able -- did the Hornets
9 maintain the records from Ceridian related to
10 employee payroll?
11    A  Yes, as far as I know.
12    Q  How were those records maintained
13 by the payroll department?
14    A  The printed reports are filed by
15 pay dates.
16    Q  When you conducted your search of
17 the payroll records, did you go back both
18 through the Ceridian and ADP reports?
19    A  Yes, I did.
20    Q  Could you do a computer search on
21 the Ceridian reports --
22    A  No.
23    Q  -- or no?  Could you do a computer
24 search on the ADP reports?
25    A  I believe, yes.

Page 182

1    Q  Could you do a computer search all
2 the way back to 2004 for the ADP reports?
3    A  Yes.
4    Q  If you took a look at the ADP
5 records on your computer search, would you be
6 able to determine whether an employee
7 submitted a time sheet or not?
8    A  No.
9    Q  How would you be able to determine
10 which employee submitted time sheets?
11    A  I would have to actually pull the
12 printed reports or the payroll time sheets.
13    Q  If an employee did not work more
14 than forty hours, would that information
15 still have been attached to their time
16 sheets?
17    A  For which system, Ceridian or ADP?
18    Q  I don't know either.  We will start
19 with ADP, then I will ask Ceridian next.
20    A  I'm sorry.  Repeat that question
21 one more time, please.
22    Q  I'm just saying, if an employee was
23 entitled to overtime, it's my understanding
24 you would attach the time sheet and submit it
25 to ADP?

Page 183

1    A  Yes.
2    Q  If the employee did not have the
3 time record being tracked, how would you know
4 to submit the ADP to pay that employee?
5 That's a terrible question.
6    A  Thank you.
7    Q  My apologies.  I withdraw it.  If
8 in the absence of a time sheet, how did you
9 calculate the amount of pay owed to an
10 employee through the ADP system?
11    A  I did not have that -- how would
12 you say? -- that issue.  I didn't have that
13 situation.
14    Q  I don't understand your answer.
15    A  I did not have -- if someone -- the
16 only way I can pay overtime is with that time
17 sheet; otherwise, I do not know if they
18 worked overtime.
19    Q  Are you aware that the Hornets have
20 stated in this case that they did not track
21 employee time records at least at this time
22 I'm guessing prior to June of 2000 -- excuse
23 me, July of 2005?
24        MS. ANDERSON:
25           I need to have the question

Page 184

1           read back if you don't mind.
2        (Court reporter read back the last
3           question.)
4 BY MR. BURAS:
5    Q  Let me rephrase that just because
6 it's awkward.  Are you aware that the Hornets
7 have stated in this litigation that prior to
8 July of 2005 they did not maintain time
9 records?
10        MS. ANDERSON:
11           Objection; form.
12        THE WITNESS:
13           Not until I saw these.
14 BY MR. BURAS:
15    Q  Did you -- when did you see these,
16 ma'am?
17    A  Today.
18    Q  Today.
19        MS. ANDERSON:
20           By "these" state which
21        exhibits you are referring to.
22        THE WITNESS:
23           I'm sorry.  Exhibit 7 and 8.
24        Excuse me.
25 BY MR. BURAS:

Page 185

1    Q  Okay.  Did you conduct an
2  examination of the employee records in
3  the Human Resources Department to confirm
4  whether or not the Hornets tracked employee
5  time at any time prior to your being hired
6  with the Hornets?
7    A  No.
8    Q  Did you tell counsel for the
9  Hornets or your supervisors that the Human
10  Resources Department did not track overtime
11  for its employees prior to July of 2005?
12    A  Not that I recall.
13    Q  As you sit here today, can you
14  confirm whether or not that statement is
15  true?
16    A  Which statement?
17    MS. ANDERSON:
18       Objection to form.
19  BY MR. BURAS:
20    Q  Based on all records that you
21  reviewed and produced to counsel in this
22  case, is that true or false?
23    MS. ANDERSON:
24       Objection.
25    MR. BURAS:

Page 186

1       Terrible question.
2    MS. ANDERSON:
3       I believe you are getting into
4    a substantive area.  You're asking
5    her to verify whether
6    representations about substantive
7    facts are true or false.  That is
8    not what this witness is here to
9    testify.
10  BY MR. BURAS:
11    Q  I'm going to rephrase my question.
12  It came out poorly worded because my lips are
13  sticking together.
14       Based on your investigation of
15  requests for time records and requests for
16  time sheets of employees, were you able to
17  confirm or deny that there existed payroll
18  and time records for the New Orleans Hornets
19  prior to July of 2007?
20    MS. ANDERSON:
21       I object to the question
22    again.  I think this is getting
23    outside of the area.  You're beyond
24    asking her what she was asked to
25    provide and what she provided.

Page 187

1    She's not tendered to testify on
2    the substantive elements in the
3    case.
4    MR. BURAS:
5       This witness can testify as
6    to whether she found any documents
7    indicating that payroll records
8    were being tracked prior to July
9    of 2005.
10    MS. ANDERSON:
11       She can answer that question.
12    That's different than the
13    question you just asked her.
14    MR. BURAS:
15       I thought they were the same.
16    Read back.
17    MS. ANDERSON:
18       Please read back the question.
19    (Court reporter read back the last
20    question.)
21  BY MR. BURAS:
22    Q  I should have said time records.
23  Did your investigation reveal whether or not
24  time records were tracked by the New Orleans
25  Hornets prior to July of 2005?

Page 188

1    MS. ANDERSON:
2       I'm going to allow her to
3    answer the question.  I think you
4    are still getting into a
5    substantive area.  As a courtesy,
6    I'm not going to instruct her not
7    to answer but I object to the
8    question.  I don't believe it is
9    within the scope she's here to
10    testify about.
11    THE WITNESS:
12       My response was going to be
13    it sounds like you're asking me to
14    speculate whether they did or did
15    not track time prior to my
16    arrival.
17    MR. BURAS:
18       Maybe that's the
19    clarification.
20  BY MR. BURAS:
21    Q  Did you find any time records prior
22  to July of 2005 related to various employees
23  other than what appears in Response for
24  Request of Production #18 those records of
25  Leslie Sumler?

Page 189

1  A Specifically on Leslie Sumler, I do
2 not recall. Whatever records I pulled which
3 was a lot of records at that time or in the
4 past year or two, I cannot specifically say
5 yes, I did pull a time sheet for a period
6 prior to July 2005. I don't remember.
7  Q I'm going to ask one more question,
8 I think. Nope. Let's move on. Let's go to
9 #20 and I believe this is produce all payroll
10 records setting forth and explaining the
11 basis for pay for each named plaintiff by
12 indicating the monetary amount paid on a per
13 hour, per day, per week, per piece,
14 commission on sales, or other basis.
15   We discussed this as well related
16 to the other one?
17  A Yes, we did.
18  Q Other than the information
19 contained in the personnel records or payroll
20 records, did you obtain any other information
21 responsive to this request?
22  A Not that I recall.
23  Q Did you look for information other
24 than in those locations or in the storage
25 unit last week?

Page 190

1  A No, I would not have looked for
2 that there.
3  Q When is the last time you looked
4 for information responsive to this request?
5  A To this particular request in item
6 number --
7  Q 20.
8  A 20? The only thing out of this
9 question, the items in this question 20 that
10 I looked for would have been commissions, not
11 anything pertaining to payroll or pay rates
12 or payroll records.
13  Q Have all records related to pay
14 rates been produced in this litigation as to
15 any named plaintiff?
16  A As far as the requests that I've
17 received to produce records, I have produced
18 every record that I know of. If there's
19 anything that is missing, I'm not aware of it
20 specifically.
21  Q Let's go back to that because maybe
22 that will help me out. Other than the verbal
23 communications that we've previously
24 discussed where your counsel asked you to
25 pull documents or one of your supervisors

Page 191

1 asked you to pull documents, have you ever
2 received a written request to pull or
3 retrieve any information related to any of
4 the Hornets cases that you were currently
5 being deposed about today?
6  A The only time I actually got a
7 sheet that asked for information is when we
8 were at the storage last week to pull
9 documents. We found what we could. We're
10 not finished going through those boxes to
11 pull whatever may be found. Other than that,
12 I'd have to say no.
13  Q And this is the two-page document I
14 believe that you described earlier?
15  A It was at least two pages that I
16 recall. How many other pages -- I had two
17 pages in my hand. Unfortunately, I did not
18 take those with me so I cannot produce that
19 for you.
20  Q Do you still have a copy of that?
21  A I do not have a copy.
22  Q Who is currently doing the
23 investigation of those records at the storage
24 unit right now?
25  A I'm sorry. Say that again.

Page 192

1  Q Who is currently conducting the
2 investigation of those documents right now at
3 the storage unit?
4  A Who was with me at the storage unit
5 is your question?
6  Q No, ma'am. My understanding of
7 what you just testified is that you were
8 currently still reviewing the information
9 obtained in the boxes that were located at
10 the storage unit; correct?
11  A Correct.
12  Q Who is currently reviewing those
13 documents?
14  A It would be myself and legal
15 counsel.
16  Q Where are those documents currently
17 located?
18  A They're still in storage.
19  Q Do you have a copy of the sheets
20 that you're looking for at the storage unit
21 or are they in your office at the Hornets or
22 where are those sheets located?
23  A I left those with the legal
24 counsel -- yeah, with the paralegal that was
25 with me that day.

## Page 193

1  Q  So the sheets that you had
2  regarding the information you were looking
3  for had been left with counsel?
4  A  Yes.
5  MR. BURAS:
6      Counsel, we request that you
7      produce those documents.
8  MS. ANDERSON:
9      Request denied on the basis of
10     privilege and work product.
11 MR. BURAS:
12     Understood.  I believe we'll
13     just let that one go to the judge.
14 MS. ANDERSON:
15     Or we can visit with that
16     later.  I don't want to take up the
17     witness' time with that.
18 MR. BURAS:
19     Absolutely.
20 BY MR. BURAS:
21 Q  Take a look at number -- I believe
22 we just talked about 20.  21, I believe we
23 are on now.  I believe this is similar, the
24 regular rate of pay.  Have you been asked to
25 produce any information regarding the amount

## Page 194

1  and nature of each payment to any named
2  plaintiff that is excluded from the regular
3  rate of pay?  Have you ever been specifically
4  asked to produce that information?
5  A  No.
6  Q  I'm going to mark this exhibit and
7  I'm only going to refer to a very few pages
8  in it.  Let's make this the real 9.  Let me
9  give you a document I marked as Exhibit 9.
10 Okay.  Ma'am, I'm going to ask you to turn
11 to --
12 A  Excuse me.  What about Exhibit 7
13 and 8?  Are we done with these?
14 Q  We have a couple more but I want
15 you to refer to that one before we go there.
16 If you take a look at the bottom they are
17 marked plaintiffs and numbers.  I want to try
18 to find the documents I specifically want you
19 to look at.  All right.  If you take a look
20 at Plaintiffs 0970.
21 A  Zero what?
22 Q  970.
23 MS. ANDERSON:
24     On what?
25 MR. BURAS:

## Page 195

1      This is an affidavit that
2      was executed by a name of Brice
3      Collier.
4  BY MR. BURAS:
5  Q  Have you ever seen this document
6  before?
7  A  Not the signed one.
8  Q  You've seen an unsigned version of
9  this document, ma'am?
10 A  Yes.
11 Q  Where did you last see an unsigned
12 version of this document?
13 A  I saw it in Oklahoma.  Whether it's
14 for this particular date or not is a
15 different -- I'm not sure, but I have seen
16 this form.
17 Q  Did you maintain this form in your
18 office?
19 MS. ANDERSON:
20     Just for clarification, the
21     unsigned one or the signed one?
22 MR. BURAS:
23     Either or.
24 THE WITNESS:
25     No.

## Page 196

1  BY MR. BURAS:
2  Q  Why don't you take a look at
3  Plaintiffs Pages 971 through 973 and this
4  appears to be a spread sheet that was
5  attached as Attachment A to the annual
6  certification related to the Louisiana
7  Quality Jobs Program.
8      Do you see those three pages,
9  ma'am?
10 A  Yes.
11 Q  In the far right-hand side of the
12 page -- you may have to take the clip off to
13 see it -- it indicates that for each of the
14 -- well, let me stop.  It's my understanding
15 that the names and Social Security numbers
16 related to each of the different lines of
17 information these are employees that were
18 working for the Hornets; is that correct?
19 A  There are no Socials or names on
20 here.
21 Q  Right.  I apologize.  That
22 information has been redacted by the State
23 before they gave us these documents.
24 A  Okay.
25 Q  Have you ever seen this spread

Page 197

1 sheet before or similar spread sheet, if not
2 the specific one?
3    A  Yes.
4    Q  Where have you seen this spread
5 sheet before?
6    A  I actually prepared one.
7    Q  If you take a look at the far right
8 side of the page, is this one of the
9 documents that you've actually prepared?
10   A  Yes.
11   Q  Okay.  It indicates on the
12 right-hand side of the page -- and we'll just
13 take the first one because there are no names
14 to refer to.  It says hire date 8/14/93, job
15 title broadcast.  Do you see that one?
16   A  Yes, sir.
17   Q  It indicates the person, whoever
18 this is, lives on Kilgore Court and it
19 indicates the quarter one hours at 520;
20 quarter two hours 520.  Do you see that,
21 ma'am?
22   A  Yes.
23   Q  How did you come up with that
24 information?
25   MS. ANDERSON:

Page 198

1      Objection.  This is beyond
2 the scope of this deposition.
3 MR. BURAS:
4      She indicated --
5 MS. ANDERSON:
6      You're asking her now what
7 she did to fill out the spread
8 sheet and how she came up with
9 the information, not about what
10 she did to search for documents
11 being produced in this case.
12 MR. BURAS:
13      This information was not
14 produced in this case yet.  It has
15 yet to be produced in this case by
16 the New Orleans Hornets.
17      This information relates
18 specifically to the hours worked by
19 employees.  This is the employee
20 who has just previously testified
21 that she produced the information
22 related to the hours worked by
23 employees.
24      I am entitled to request
25 information as to why the

Page 199

1 information that's indicated here
2 is being hours worked by employees
3 has not yet been produced in this
4 case?
5      If this information is
6 maintained in another data base,
7 if this information is maintained
8 in certain records she maintains,
9 I'm entitled to see that
10 information and that is the
11 question I'm asking.
12      I'm not going to go through
13 each single category.  I'm asking
14 a question about where did she
15 obtain this information and why
16 was it not produced in this
17 litigation is my question.
18 MS. ANDERSON:
19      First of all, the specific
20 charts that Miss Rochon prepared
21 have been produced in this
22 litigation.  They were produced
23 before you handed us the response
24 to the subpoena in court on
25 Monday.  So it was in the documents

Page 200

1 that were mailed to you and you can
2 ask her about her provision of
3 those charts if that's what you
4 want to do, but to ask her about
5 her substantive preparation of
6 these charts and what she did for
7 these charts for the submitting
8 them to the State of Louisiana that
9 doesn't have anything to do with
10 what she did to produce documents
11 in connection with this case and
12 her efforts to produce those
13 documents.
14 MR. BURAS:
15      Number one, this information
16 I have yet to see in any of the
17 documents you produced.  If you
18 have a specific document number, I
19 would be glad to confirm this.
20 MS. ANDERSON:
21      We can take a break for us to
22 do that.
23 MR. BURAS:
24      As I said during the hearing
25 -- we don't need to do that now,