

Page 1

1   CIVIL DISTRICT COURT
2   FOR THE PARISH OF ORLEANS
    STATE OF LOUISIANA

3

4   IVAN HINSON, JESSICA BERRY,  * NO. 05-10068
    EUGENE LIGER, ANTHONY "TONY" *
5   MARTIN, ADAM NASH, CHRIS     * DIVISION "L"
    CARTER, CHRIS STANT, AND     *
6   SAMUEL TOBIAS STEINMETZ      *
                                 *
7                                *
    versus                       *
8                                *
                                 *
9   NEW ORLEANS HORNETS NBA      *
    LIMITED PARTNERSHIP          *
10                               *
    * * * * * * * * * * *
11

12         VOLUME 3

13      Continuation of the 1442 Deposition
    of THE NEW ORLEANS HORNETS, through its
14  designated representative, DONNA P. ROCHON,
    1111 Lawrence Street, Lutcher, Louisiana
15  70071, taken in the offices of Jones Walker,
    201 St. Charles Avenue, New Orleans,
16  Louisiana 70170, on Thursday, the 20th day
    of September, 2007, commencing at 9:06 a.m.
17

18  APPEARANCES:

19  DAIGLE, FISSE & KESSENICH, PLC
      (By:  Daniel E. Buras, Jr., Esquire)
20    227 Highway 21
      Madisonville, Louisiana  70447
21
                    -and-
22
    NILES, BOURQUE & FONTANA
23    (By:  Bryan J. Knight, Esquire)
      909 Poydras Street, Suite 3500
24    New Orleans, Louisiana  70112

25          ATTORNEYS FOR THE PLAINTIFFS

---

Page 2

1   APPEARANCES (continued):

2   JONES, WALKER, WAECHTER, POITEVENT,
    CARRERE & DENEGRE
3     (By:  Jennifer L. Anderson, Esquire)
      201 St. Charles Avenue, Suite 4700
4     New Orleans, Louisiana 70170

5         ATTORNEYS FOR THE DEFENDANT

6

7

8   REPORTED BY:

9   LISA BODE, CSR
    Certified Shorthand Reporter

10

11

12

13       EXAMINATION INDEX
                          Page
14  EXAMINATION BY MS. ANDERSON:    9, 85

15  EXAMINATION BY MR. BURAS:    46

16

17           * * *

18       EXHIBIT INDEX

19  Exhibit No. 21 -
      Documents Bates numbered D6733 through
20    6751 entitled "New Orleans Hornets Time
      Sheet"
21

22  Exhibit No. 22 -
      Documents Bates numbered D6752 through
23    6804 entitled "New Orleans Hornets NBA
      Limited Partnership Employee Manual"
24    December 1, 2006

25           * * *

EXHIBIT
F-1

---

Page 3

1        S T I P U L A T I O N

2

3       IT IS STIPULATED AND AGREED by and

4   between counsel for the parties hereto that

5   the deposition of the aforementioned witness

6   is hereby being taken under Article 1421,

7   et. seq, of the Louisiana Code of Civil

8   Procedure for all purposes, in accordance

9   with law;

10      That the formality of reading and

11  signing is specifically not waived;

12      That the formalities of filing,

13  sealing, and certification are specifically

14  waived;

15      That all objections, save those as to

16  the form of the question and the

17  responsiveness of the answer, are hereby

18  reserved until such time as this deposition,

19  or any part thereof, may be used or sought

20  to be used in evidence at the time of the

21  trial of this matter.

22          *   *   *

23      LISA BODE, Certified Shorthand

24  Reporter, State of Louisiana, officiated in

25  administering the oath to the witness.

---

Page 4

1       DONNA P. ROCHON,

2   after having been first duly sworn by the

3   above-mentioned Certified Shorthand Reporter

4   was examined and testified as follows:

5      MR. BURAS:

6          Ms. Rochon, we're here for the

7   final part of your deposition today.

8          Before we get started, I just

9   want to lodge an objection only to the order

10  of witnesses as they are going forward

11  today.  For the reasons Ms. Anderson and I

12  discussed over e-mail, it was my desire that

13  we depose Rich Witmeyer and then Mr. Crumb

14  and then Ms. Rochon at the end of the day if

15  we had time.  Otherwise, we could have

16  conducted this deposition via telephone, as

17  I discussed last week.  Ms. Anderson has

18  insisted that Ms. Rochon be deposed today.

19  Just for the record, I want to state that

20  plaintiffs intend to complete all three

21  depositions today regardless of time

22  limitations, and we intend to go forward

23  with all depositions today until completion.

24          Subject to that, Ms. Anderson,

25  you and I discussed my request for a

Page 5

1  statement on the record regarding whether or
2  not Ms. Rochon has been contacted by any
3  Jones, Walker employee or attorney to
4  discuss any issue related to the chain of
5  custody since the conclusion of her last
6  deposition and whether or not she has been
7  provided with any documents other than those
8  documents provided during the deposition. I
9  asked if you would make a statement
10 confirming that no such steps have been
11 taken or that no contact has been made
12 between the time that her deposition was
13 concluded and this deposition. At this time
14 I'd like to know if you would be willing to
15 make that statement.
16    MS. ANDERSON:
17      I'm willing to allow you to
18 examine this witness within the scope of the
19 Federal Rules of Civil Procedure. But I'm
20 not going to make the representation that
21 you've requested on the record because I
22 don't think it's proper.
23    MR. BURAS:
24      Just making sure I understand.
25 It's your representation that you will not

Page 6

1  state on the record that you have not
2  contacted Ms. Rochon to discuss this
3  deposition with her between the conclusion
4  of her last deposition and this deposition?
5  Is that what you refuse to say?
6    MS. ANDERSON:
7      I don't do that in any
8  deposition. So I don't think it's a proper
9  request of me. I'm subject to the rules. I
10 comply with the rules. Likewise, you can
11 examine this witness within the scope of the
12 rules. That's my position.
13    MR. BURAS:
14      Subject to my objections, we may
15 proceed.
16    MS. ANDERSON:
17      I also do have another note to
18 make on the record, probably an objection.
19 We also discussed last Thursday when
20 scheduling the date to reconvene this
21 deposition and contacting all of the
22 witnesses, the fact that on this date Mr.
23 Russo would not be available. We also did
24 discuss on the record that I had follow-up
25 questions for Mr. Russo. I now understand

Page 7

1  from your e-mail that your position is that
2  if he is not present today to answer my part
3  of the questions for his deposition on the
4  chain of custody issues then you object to
5  that deposition being given. It's my
6  position that that's not reasonable,
7  particularly because we all discussed that
8  he would not be here on Thursday but since
9  he is a 30(b)(6) corporate representative he
10 would be present at other parts of the
11 deposition, specifically the substantive
12 parts, and that I could complete my
13 examination at that time.
14      So to the extent that your
15 position is that we don't have the right to
16 examine Mr. Russo in follow-up to your chain
17 of evidence questions, I don't agree with
18 that, and if I need to get the Court to
19 resolve that issue we'll do that.
20    MR. BURAS:
21      As to Mr. Russo, last Thursday
22 the depositions concluded at approximately
23 2:30 in the afternoon to accommodate your
24 travel schedule. I was available to
25 complete the deposition of both Ms. Rochon

Page 8

1  and Mr. Russo. You requested that
2  accommodation. I requested an accommodation
3  today regarding my schedule. You refused to
4  comply with such accommodation. Because of
5  that and because of the depositions of the
6  chain of custody witnesses were supposed to
7  have taken place on the 12th and 13th of
8  September, dragging that on past the 20th of
9  September is unreasonable at this point.
10      So at this point in time and
11 pending the conclusion of Mr. Crumb's
12 deposition at the time, if that deposition
13 is concluded within a reasonable time for
14 Mr. Russo's deposition to be conducted, I
15 would request that Mr. Russo be made
16 available this date to conclude his
17 deposition. If he's not available
18 plaintiffs reserve the right to object to
19 the deposition going forward at a later
20 date.
21    MS. ANDERSON:
22      I'm not going to respond to your
23 statements of what's occurred. Only I'll
24 say that they're inaccurate. I disagree
25 with them. There were no objections noted

Page 9

1  on the record last week when we all talked
2  to the witnesses about their availability
3  and our availability, but I don't want to
4  waste Ms. Rochon's time or our time debating
5  that. I'll address that with the Court at
6  the appropriate time. So we have a
7  disagreement with regard to Mr. Russo's
8  examination by me on the chain of custody
9  issues.
10  EXAMINATION BY MS. ANDERSON:
11  Q.  Ms. Rochon, can you please tell
12  me what your education history is?
13  By the way you're looking at me,
14  do you want me to be --
15  A.  I do not understand that
16  question.
17  Q.  -- more specific? Did you go to
18  high school?
19  A.  Yes, I did.
20  Q.  Where did you go to high school?
21  A.  Second Ward High School.
22  Q.  Did you graduate?
23  A.  Yes, I did.
24  Q.  Did you have any education
25  beyond high school?

Page 10

1  A.  Yes, I did.
2  Q.  What education do you have?
3  A.  I have a bachelor's degree in
4  management from Detroit College of Business.
5  I have a master's degree in management from
6  Troy State University.
7  Q.  Do you have any other
8  professional education?
9  A.  Yes, I do. I have a
10  certification for professional secretary and
11  I have a certification for payroll.
12  Q.  Have you had any legal training?
13  A.  No.
14  Q.  You haven't had any paralegal
15  training?
16  A.  No, I have not.
17  MR. BURAS:
18  Object to form.
19  EXAMINATION BY MS. ANDERSON:
20  Q.  Did you go to law school?
21  A.  No, I have not.
22  Q.  And to be clear, since I had a
23  form objection, did you go to paralegal
24  school?
25  A.  No, I did not.

Page 11

1  Q.  Do you know any of the
2  plaintiffs in this lawsuit?
3  A.  When you say do I know any of
4  the plaintiffs, can you be more specific?
5  Q.  Sure. Have you personally met
6  any of the plaintiffs in this lawsuit?
7  A.  Is there any way you can give me
8  a name of some of the plaintiffs to -- for
9  me to specifically identify whether I have
10  or have not met them.
11  Q.  Absolutely. Bear with me. I'm
12  looking for a list. I thought I had one in
13  here.
14  MR. BURAS:
15  Counsel, while you're looking
16  for the document with the plaintiffs' names,
17  let me just lodge an objection on the record
18  to any question that goes beyond the Court's
19  chain of custody issues. That's the sole
20  purpose that I was limited on my questions
21  with Ms. Rochon previously. We have
22  requested her deposition on substantive
23  issues. We have not yet been provided
24  dates. Just making sure I state an
25  objection to the record to any substantive

Page 12

1  questions that may be asked during this
2  deposition.
3  MS. ANDERSON:
4  That's fine. And I'll just note
5  that this witness was asked by you on your
6  examination a lot of questions about her
7  interpretation of legal documents, her
8  understanding of legal documents. And so
9  this question directly follows up on the
10  line of questioning that you opened.
11  EXAMINATION BY MS. ANDERSON:
12  Q.  Back to the list of the
13  plaintiffs. Do you know Chris Carter?
14  A.  No, I do not.
15  Q.  Anthony Martin?
16  A.  No, I do not.
17  Q.  Eugene Liger?
18  A.  No, I do not.
19  Q.  Adam Nash?
20  A.  No, I do not.
21  Q.  Jessica Berry?
22  A.  No, I do not.
23  Q.  Marcy Planter Murray -- or
24  Planer Murray?
25  A.  No.

Page 13

1   Q.  Samuel Tobias Steinmetz?
2   A.  No, I do not.
3   Q.  Leslie Sumler?
4   A.  No.
5   Q.  Chris Stant?
6   A.  Met him once.
7   Q.  Was that in connection with
8   employment at the Hornets?
9   A.  With connection, and I think it
10  was his last day.
11  Q.  Ivan Hinson?
12  A.  No.
13  Q.  Amy Nicole Smith?
14  A.  No.
15  Q.  Latousha Brown?
16  A.  Yes.
17  Q.  How do you know her?
18  A.  Through employment.
19  Q.  Through employment where?
20  A.  I'm sorry.  With the Hornets.
21  Latousha was one of the employees who worked
22  in ticket operations at the time I was
23  employed or engaged or at the Hornets.
24  Q.  How long were you and Ms. Brown
25  employed at the Hornets together or at the

Page 14

1   same time?
2   A.  At the same time --
3   MR. BURAS:
4       Object to form.  Object to
5   foundation.
6   A.  -- Ms. Brown was there when I
7   arrived at the Hornets as a temporary
8   employee, which would have been -- I think
9   it was May 9, 2005 until her last day, which
10  would have been sometime in either November
11  -- late November or early December 2005.
12  EXAMINATION BY MS. ANDERSON:
13  Q.  Okay.  Do you know Lynn Holmes?
14  A.  Only by name.
15  Q.  Dan Karlsberg?
16  A.  No, I do not.
17  Q.  Ken Kliebert or Kliebert?
18  A.  Ken Kliebert, yes.
19  Q.  How do you know him?
20  A.  He was an employee at the time
21  that I was with the Hornets.
22  Q.  How long were the two of you
23  employed at the Hornets together?
24  A.  He was there when I arrived,
25  which was about that May 9, 2005, until

Page 15

1   whatever his last day was, which
2   unfortunately, at this point, I don't
3   exactly recall.  Have to be somewhere maybe
4   2005, after the hurricane.
5   Q.  And do you know Kevin Buckle?
6   A.  No, I do not.
7   Q.  Do you know anything about the
8   claims that the plaintiffs have made in this
9   lawsuit?
10  A.  Other than what I have been
11  exposed to during this deposition and/or
12  information that was asked about them and
13  that's it.  I don't know specific claim
14  requests.
15  Q.  What is your understanding of
16  what the -- I'm saying the lawsuit.  I'm
17  referring to the federal court lawsuit and
18  the two state court lawsuits.
19      What is your understanding, if
20  any, of what those lawsuits are about?
21  A.  The only thing I know about the
22  lawsuits was in verbal communication from
23  either my supervisor or legal counsel
24  indicating that this was --
25  Q.  Stop.  I'm not asking you what

Page 16

1   discussions --
2   A.  I'm sorry.
3   Q.  -- you had with lawyers.  I'm
4   just asking you what's your understanding of
5   the lawsuit.  If you're asked to explain it,
6   what's your understanding?
7   A.  There was an overtime and
8   commission issue.
9   Q.  Beyond understanding that there
10  is an overtime and commission issue, do you
11  have any other knowledge of the details of
12  plaintiffs' claims?
13  A.  No.
14  Q.  Have you worked in any
15  department at the Hornets other than Human
16  Resources?
17  A.  No, I have not.
18  Q.  When you began working at the
19  Hornets who was working in the accounting
20  department, if anybody?
21  A.  When you ask who, do you want
22  names.
23  Q.  Yes.
24  A.  Or are you looking for a head
25  count?

Page 17

1    Q.   Let's start with names.
2    A.   Deana Artega, Shelly Ford,
3    Jonathan Toye.  I think it's T-O-Y-E.
4    That's it.
5    Q.   Were there any vacancies at the
6    time?
7    A.   There probably were.
8    Q.   Was there a CFO or a chief
9    financial officer?
10   A.   No.
11   Q.   Was there a vice-president of
12   finance?
13   A.   No.
14   Q.   Was there an accounting manager?
15   A.   Deana was listed as the
16   accounting manager.
17   Q.   What was her job title?
18   A.   I believe it was accounting
19   manager.
20   Q.   What was Ms. Ford's job title?
21   A.   Shelly was the accounts payable
22   specialist.
23   Q.   And what was Mr. Toye's job
24   title?
25   A.   That one I don't remember.  Had

Page 18

1    something to do with accounting.
2    Q.   Did you have any assistants in
3    Human Resources at the time?
4    A.   At the time when I first came
5    in --
6    Q.   Yes.
7    A.   -- is your question?
8    Q.   Yes.
9    A.   No.
10   Q.   Have you ever had any assistants
11   in Human Resources since the time you've
12   been employed with the Hornets?
13   A.   Yes.
14   Q.   When did you have an assistant?
15   A.   November of 2005 they hired a
16   payroll coordinator.
17   Q.   Who is that person?
18   A.   Annette Smith.
19   Q.   Is she still employed?
20   A.   No.
21   Q.   How long was she employed?
22   A.   Until -- Until May 1, 2007.
23   MS. ANDERSON:
24        Excuse me.
25        (Discussion off the record.)

Page 19

1    MS. ANDERSON:
2         I'm sorry.  I didn't get the
3    answer.
4         (Whereupon, the preceding answer
5    was read back by the reporter.)
6    EXAMINATION BY MS. ANDERSON:
7    Q.   Have you ever had any other
8    assistants during your employment at the
9    Hornets?
10   A.   Yes.
11   Q.   Who?
12   A.   Another payroll coordinator.
13   Q.   What was that individual's name?
14   A.   Her name is Danielle Daniels.
15   Q.   Is she currently employed?
16   A.   Currently employed, yes.
17   Q.   When did she join the Hornets?
18   A.   I believe it was July 30 or
19   August 1.
20   Q.   Of this year?
21   A.   Of this year.  I'm sorry.
22   Excuse me.  July 30, 2007.
23   Q.   You testified, correct me if I'm
24   wrong, during the last day or days that you
25   gave a deposition in this case that you have

Page 20

1    been asked to provide information for the
2    purpose of this litigation.
3    MR. BURAS:
4         Objection.
5    MR. KNIGHT:
6         Objection.  Form.
7    EXAMINATION BY MS. ANDERSON:
8    Q.   Do you recall that testimony?
9    A.   Would you repeat your question,
10   please.
11   Q.   Yes.  I'm trying to call your
12   attention to prior testimony that you have
13   been asked to provide information for the
14   purpose of this litigation.
15   MR. KNIGHT:
16        Same objection.
17   A.   Yes.
18   EXAMINATION BY MS. ANDERSON:
19   Q.   Did you ever withhold any
20   information that you were asked to provide?
21   MR. KNIGHT:
22        Objection.  Form.
23   A.   No.  I have no reason to do
24   that.
25   EXAMINATION BY MS. ANDERSON:

Page 21

1    Q.  Did you ever disregard a request
2  for information in connection with this
3  litigation?
4    A.  No.
5    Q.  Did you take the requests that
6  were made of you seriously?
7    A.  Yes, I did.
8  MR. KNIGHT:
9       Objection.  Form.
10   A.  Up to the point where I would
11  cut my personal leave time to pull or
12  retrieve information or look for information
13  pertaining to this case.
14  EXAMINATION BY MS. ANDERSON:
15   Q.  And when you were asked to
16  provide information, did you ask why,
17  question the purpose?
18   A.  No, I did not.
19   Q.  If e-mails are sent at the
20  Hornets about personnel matters where are
21  they to be maintained or kept?
22  MR. KNIGHT:
23       Objection.  Form and foundation.
24   A.  I need you to clarify your
25  question.

Page 22

1  EXAMINATION BY MS. ANDERSON:
2    Q.  Okay.  If an employee or manager
3  sends an e-mail about a personnel matter at
4  the Hornets is there any particular place
5  that such an e-mail is supposed to be kept,
6  maintained?
7    A.  I need you to clarify your
8  question more.  You're asking -- I'm trying
9  to understand your question.  You're asking
10  --
11   Q.  Okay.  Let me put it this way.
12  Are e-mails ever placed in personnel files?
13   A.  Probably.  Would depend upon the
14  nature of the e-mail.
15   Q.  You said probably.  Do you know
16  that e-mails are placed in personnel files?
17   A.  Again, that would depend upon
18  what the nature of the issue is.  If someone
19  -- And I'll give you an example.
20   Q.  Okay.
21   A.  If someone sent me an e-mail
22  asking about where do I go or who do I call
23  about a 401(k) issue, I would answer that
24  e-mail but I would not put that e-mail in
25  their file.

Page 23

1    Q.  Okay.  What type of an e-mail
2  would be an example of one that would be
3  kept in a file?
4    A.  I don't know what my
5  predecessors deemed necessary to retain in
6  the employee's file as far as e-mail or any
7  other documents for an issue or whatever.
8  But, for me, if it was a question, say,
9  about their benefits, there was an issue, a
10  claim didn't get processed on time, that
11  kind of e-mail would go in a separate
12  confidential medical file.  If there was an
13  issue about vacation, that e-mail would go
14  in their file.  If there was a situation
15  about their hours incorrect or a payroll
16  deduction that was incorrect on their
17  paycheck, that would go in their file.
18  Those are the kinds of things I would put in
19  an employee file if we corresponded via
20  e-mail or if we corresponded in person face
21  to face.
22   Q.  You testified previously that
23  you did provide some personnel files in
24  connection with this litigation.  Do you
25  remember that?

Page 24

1    A.  Yes.
2    Q.  Did you go through those
3  personnel files and take out any e-mails
4  that were in there?
5    A.  No.  I did not have time.
6    Q.  You were asked some questions
7  previously about the timing of certain
8  events that occurred around the time of
9  Hurricane Katrina in 2005.  Do you remember
10  that?
11   A.  I'm sorry.  Repeat your question
12  again, please.
13   Q.  You were asked some questions
14  about events that occurred, about the timing
15  of events that occurred around the time of
16  Hurricane Katrina in 2005.  Do you remember
17  questions relating to the timing of events
18  that occurred around Hurricane Katrina?
19   A.  Yes.
20   Q.  You stated that there was a lot
21  going on around the hurricane.  Do you
22  remember that?
23   A.  Yes.
24  MR. BURAS:
25       Object to form.

Page 25

EXAMINATION BY MS. ANDERSON:

Q. Can you explain what you were trying to say when you said there was a lot going on around the hurricane?

MR. KNIGHT:

Objection to form. And asked and answered two days ago, last week.

A. As far as for different things going on around the hurricane, we did not have access to the office. We did not have access to systems. I did payroll for the organization from my home, could not get Fed Ex to deliver, trying to deal with figure out where to put my child in school, trying to figure out where my supervisor was, trying to figure out how I was going to get paid since I was a temporary employee and I was not on their payroll, or the Hornets payroll, trying to ensure that my family, my parents who are up in age, I mean, that they were taken care of. My father has congestive heart failure. I mean there were many things going on, me personally.

When the situation cleared up as far as the Hornets were going to have to

Page 26

leave the city and pick up offices somewhere else, therein became another set of issues family-wise, what do I do, how do I handle this, one, being apart from my daughter or whether she goes with me, change her school so she could stay with my parents. Yes, there were many things going on, more personal type issues.

As far as work was concerned, when we got a chance to get into the office, I did go by and pretty much just picked up information that I needed immediately to set up the office, which in that kind of time frame we only had I think it was about maybe two hours that we could even be in the office or in the area. And all I picked up was the active files, the blank forms that I could find, get my hands on quickly to take those with me. And I can't remember what else I may have taken out of the office. I know I didn't take any terminated files with me. I didn't think about those. I didn't think it was necessary for those. I guess really with the anticipation that I'd come back but --

Page 27

EXAMINATION BY MS. ANDERSON:

Q. Did --

A. -- that didn't exactly happen.

Q. I'm sorry. Were you finished?

A. I'm done.

Q. Did the Hornets offices, the offices they had at the time of Hurricane Katrina I believe in the Freeport-McMoRan building, did those offices sustain any damage from the hurricane?

A. Not that I recall.

Q. Do you know if there was any leaking or water intrusion?

A. Not that I recall. I just don't remember all of those details. I know the building itself had sustained some damage, some flooding, some water. So that was another reason why we could not actually get into the office until the water receded in the area. And then we had to go through red tape, I understood, to obtain permission, authorizations to get into the area.

Q. I'm going to switch topics now.

Did you play any role in searching for the P drive that was used by

Page 28

Penny Middleton?

A. I need you to clarify your question, please. What do you mean by did I participate in the search of the P drive?

Q. Did you do anything at all in order to find it or provide it to counsel?

A. Is there like a time frame or something of when I was supposed to have done this?

Q. At any time. At any time did you do anything to provide that P drive to counsel or the information from that P drive to counsel?

A. I didn't specifically. IT would have.

MR. BURAS:

Object to form. Unresponsive.

EXAMINATION BY MS. ANDERSON:

Q. Do you have any knowledge of anybody else doing anything in order to locate and provide that P drive to counsel?

A. Not that I know of.

Q. Do you know where her P drive, "her" being Penny Middleton's P drive was located?

Page 29

1   A. It was on the server, the main
2 frame, whatever you want to call it. It was
3 a map drive that I had access to at some
4 point.
5   Q. Did you play any role in looking
6 for or providing information to counsel
7 about the Louisiana Quality Jobs Act or --
8 I'm sorry -- about the contract that the
9 Hornets signed relative to the Louisiana
10 Quality Jobs Act?
11   MR. KNIGHT:
12     I object to the form of the
13 question.
14   A. Can you clarify your question,
15 please?
16 EXAMINATION BY MS. ANDERSON:
17   Q. Are you familiar with the
18 Louisiana Quality Jobs Act?
19   A. I am familiar with the report
20 that is required. As far as the Act itself
21 is concerned, no, I have not read the Act.
22   Q. Let's talk about the report.
23     Did you at any time provide the
24 report filed by the Hornets to the Hornets'
25 counsel for the purpose of this case?

Page 30

1   MR. KNIGHT:
2     I object to the form. She can
3 respond.
4   A. If legal counsel asked me to
5 provide those reports, yes, I would have
6 provided those to them.
7 EXAMINATION BY MS. ANDERSON:
8   Q. Do you specifically recall
9 providing them?
10   A. Yes, I did.
11   Q. And do you remember when?
12   A. Specifically, no, I do not
13 recall. Time frame-wise would be sometimes
14 in 2007.
15   Q. Did you provide any information
16 to counsel about overtime payments to
17 Hornets employees?
18   A. Yes, I did.
19   Q. When did you do that?
20   A. It would have been after the
21 hurricane and sometime, I know, before I
22 returned to Louisiana in June of 2007.
23   Q. Did you provide any such
24 information about overtime payments to
25 employees at any other time to counsel?

Page 31

1   A. During that time frame?
2   Q. At any other time after 2005.
3   A. As I indicated earlier, I
4 provided that information, overtime
5 earnings, hours paid to an employee or if
6 there were any plaintiffs' request it was
7 sometime after the hurricane in 2005 but
8 before June 1 of 2007. I don't know
9 specifically.
10   Q. You testified previously about
11 going to a storage unit and looking through
12 some documents. Do you remember that?
13   A. Yes.
14   Q. You indicated in your testimony
15 that a paralegal from Jones, Walker was also
16 there, correct?
17   A. Yes.
18   Q. Did you have any verbal
19 discussions during the time you were at the
20 storage unit with the paralegal about what
21 to search for?
22   A. Yes.
23   Q. Did you ask any questions of the
24 paralegal about what to search for?
25   A. Specific questions? I do not

Page 32

1 recall what they were. I do know that the
2 paralegal did say we were looking for some
3 documents and it was kind of everything and
4 anything we could think of that may relate
5 to why they were questioned or asked for
6 specifically a binder, if you will, that
7 Adrianna supposedly kept.
8   Q. And did you get answers when you
9 asked questions of the paralegal?
10   A. Yes. Any questions that we did
11 not -- or if we ran across something that we
12 didn't understand and didn't know if it
13 would apply we did ask the paralegal and/or
14 contact legal counsel for direction.
15   Q. Do you recall testifying
16 previously that you did not expect
17 commission information to be in accounting
18 files?
19   A. That is correct.
20   Q. Why did you not expect
21 commission information to be in accounting
22 files?
23   A. Accounting did not do payroll.
24 Payroll was done by HR and/or my predecessor
25 who handled all the payroll. I was the only

Page 33

1  one that did the payroll, and any data entry
2  that needed to go to an employee's paycheck,
3  whether it was commissions or whatever, as
4  far as I know, they were coming through me.
5  There was no other way it was going in their
6  paycheck.
7     Q.  You testified previously that
8  you did search or retrieve copies of payroll
9  records for this litigation.  Do you
10 remember that?
11    A.  Yes.
12    Q.  When you provided copies of
13 payroll records did you find any commission
14 information in those payroll records?
15    A.  Yes.
16        (Discussion off the record.)
17 EXAMINATION BY MS. ANDERSON:
18    Q.  Is that where you expected to
19 find commission information?
20    A.  Your question is did I expect to
21 find commission reports in accounting or --
22    Q.  No.  In the payroll records.
23    A.  Yes.  I expected to find
24 commission reports in the payroll records.
25    Q.  Was Adrianna Johnston employed

Page 34

1  at the Hornets at the same time you were
2  employed?
3     A.  When I arrived at the Hornets
4  office Adrianna was not in the office.  I
5  understood she was out.
6     Q.  Did you ever have the
7  opportunity to work with her, to work
8  alongside her?
9     A.  No.  I never met her, not even
10 had a chance to work with her at the Hornets
11 or anywhere else.
12    Q.  Do you know if, in fact, she
13 kept a binder that contained commission
14 information?
15    A.  I have no idea.
16    Q.  Did you ever find such a binder?
17    A.  Unfortunately not.
18    Q.  Did you look for such a binder?
19    A.  Yes, I did.  Because I wanted to
20 know what was in there myself.
21    Q.  Did Penny Middleton work at the
22 Hornets during any time you have been
23 employed at the Hornets?
24    A.  Penny Middleton was there for
25 five days.

Page 35

1     Q.  Did Penny Middleton provide you
2  with any information about filing systems at
3  the Hornets?
4     A.  Specifically as to how to file
5  items or where to file them?  Is that your
6  question or --
7     Q.  Did she --
8     A.  Would you clarify, please.
9     Q.  Did she explain to you where
10 certain documents were located at the
11 Hornets?
12    MR. KNIGHT:
13        Objection.  Form.  She can
14 respond.
15    A.  Not specifically.  The only
16 thing Penny told me was how she filed her
17 payroll reports, which was the backups went
18 in one spot and then the printed reports,
19 when they came back from ADP, who is our
20 third-party administrator, to process our
21 payroll, they would go in a binder which sat
22 in a bookcase right in front of my desk.
23 EXAMINATION BY MS. ANDERSON:
24    Q.  Did Penny ever tell you that
25 commission reports were to be kept in

Page 36

1  accounting?
2     A.  No, she never did.  I took for
3  granted that anything related to payroll, as
4  a normal process, would be in payroll would
5  all -- having worked in payroll, excuse me,
6  they would all be together.  That's how I
7  file.  I don't know how Penny would file
8  commission reports, and she and I did not
9  have a discussion about commission reports.
10    Q.  Do you know how to use Archtics?
11    MR. BURAS:
12        Objection.  Asked and answered.
13    A.  No, I do not.
14 EXAMINATION BY MS. ANDERSON:
15    Q.  If that was, I apologize.  I
16 didn't recall that specific question.
17        Do you know how to run reports
18 in Archtics?
19    A.  No.  Because I have not -- I
20 don't have access and I don't know how to
21 use Archtics.
22    Q.  It's not part of your job to use
23 it?
24    A.  No, it's not.
25    Q.  Do you recall being asked

Case 2:05-cv-01969-HGB-ALC   Document 159-13   Filed 10/15/2007   Page 10 of 24

Page 37

1 previously if you searched for particular
2 documents responsive to plaintiffs'
3 discovery requests? When I say asked
4 before, I mean asked previously in this
5 deposition.
6     A. Yes, I was.
7     Q. Would you know what information
8 is responsive to a written discovery
9 request?
10     A. I'm sorry. You're going to have
11 to clarify your question.
12     MR. BURAS:
13         Object to form.
14     MR. KNIGHT:
15         Yeah. Object to the form.
16 EXAMINATION BY MS. ANDERSON:
17     Q. Would you know what information
18 is responsive to a discovery request?
19     MR. KNIGHT:
20         Same objection.
21     A. I'm sorry. I do not understand
22 your question.
23 EXAMINATION BY MS. ANDERSON:
24     Q. I'm going to go through it a
25 little more specifically. We can do it

Page 38

1 another way.
2     MS. ANDERSON:
3         I don't know if we attached our
4 response to your second RFPs. Do you
5 remember that? I've got a copy of it. I
6 just don't see it as a labeled exhibit.
7     MR. BURAS:
8         This is a copy of all of the
9 exhibits that were forwarded to me by the
10 last --
11     MS. ANDERSON:
12         Right. My copy was a little out
13 of order. Here we go.
14     MR. BURAS:
15         What number is it?
16     MS. ANDERSON:
17         I have Exhibit 20, which was the
18 second supplemental amending response. I
19 can use that one.
20 EXAMINATION BY MS. ANDERSON:
21     Q. I'm going to call your attention
22 to Exhibit 20.
23     MS. ANDERSON:
24         Do you have a copy, Dan?
25     MR. BURAS:

Page 39

1     Yes.
2 EXAMINATION BY MS. ANDERSON:
3     Q. Which was previously referred to
4 in the 30(b)(6) deposition, and specifically
5 I want you to take a look at Page 2 and
6 Request for Production No. 1. Read Request
7 for Production No. 1 and let me know when
8 you're done.
9     A. You want me to read that out
10 loud or --
11     Q. No. You can just read it to
12 yourself.
13     A. Okay. And your question is?
14     Q. If you were asked to go find
15 documents responsive to this request would
16 you know what to look for?
17     A. Based upon the Request for
18 Production No. 1, no, because I would ask
19 specifically what exhibits are you looking
20 for.
21     Q. Okay. Take a look at Request
22 for Production No. 2. Read it to yourself
23 and let me know when you're done.
24     A. Okay.
25     Q. I have the same question. If

Page 40

1 you had been given this request and asked to
2 provide or look for information responsive
3 to it would you have known what to look for?
4     A. No, I would not.
5     Q. Same question for No. 3, Request
6 for Production No. 3.
7     A. (Shakes head negatively). Okay.
8 And the answer is no.
9     Q. Take a look at Request for
10 Production No. 5. Read it to yourself.
11     A. Okay.
12     Q. I have the same question. Let
13 me know if you need me to repeat it.
14     MR. BURAS:
15         I do.
16 EXAMINATION BY MS. ANDERSON:
17     Q. If you had been given a copy of
18 Request for Production No. 5 and asked to
19 find information responsive to it would you
20 have known what to look for?
21     A. No, I would not.
22     MS. ANDERSON:
23         Do you need a break?
24     THE WITNESS:
25         He's getting me a drink.

Page 41

1      (Discussion off the record.)
2  EXAMINATION BY MS. ANDERSON:
3      Q.  I'm going to call your attention
4  to Request for Production No. 8.  Please
5  read that one.
6      A.  Okay.
7      Q.  I have the same question.
8      A.  No, I would not know what to
9  look for.
10     Q.  Bear with me.  I'm just going to
11 flip through these.  Ask you to take a look
12 at Request for Production No. 20.  It has a
13 number of subparts, if you would just review
14 subparts A through L.  Do you understand
15 those requests for production?
16     A.  No, I do not.
17     Q.  Is it fair to say if you had
18 been asked to look for documents responsive
19 you would not have known what to look for?
20     A.  No, I would not have known what
21 to look for on my own.  I would have had to
22 seek direction from someone.
23     Q.  That's all for those.
24     (Discussion off the record.)
25 EXAMINATION BY MS. ANDERSON:

Page 42

1      Q.  Are you aware of any documents
2  that have been requested of you in
3  connection with this litigation that you
4  have not provided to counsel?
5      A.  Would you repeat the question
6  again, please.
7      Q.  Yes.  Are you aware of any
8  documents that have been requested of you in
9  connection with this litigation that you've
10 not provided to counsel?
11     A.  None that I know of.
12     MS. ANDERSON:
13     All right.  I think I'm at the
14 end of my list.  I do want to take a quick
15 break.  I need to give you some additional
16 documents and give you some time to review
17 them.
18     MR. BURAS:
19     I do have a couple of
20 follow-ups.
21     MS. ANDERSON:
22     I'll need to question her after
23 I give you guys these documents.  I want you
24 to have them first.  This is some additional
25 production, supplemental production, and as

Page 43

1  we've noted, the search is continuing.  We
2  have a lot of boxes and documents that
3  haven't been gone through yet.
4      But I will tell you that the
5  documents I wish to question her about begin
6  at D6733 and run through D6751.  And
7  everything else is just supplemental
8  production.
9      MR. BURAS:
10     You want to ask questions on
11 documents you're giving me today?
12     MS. ANDERSON:
13     Well, take a look at them.  I
14 don't think that you're going to have any
15 problem.  It's just time sheets for two
16 employees.  If you want to note an objection
17 you can.  I don't believe that it's going to
18 be -- that there would be any reason that
19 you couldn't take a look at the time sheets,
20 but I'll give you all the time you need.
21     And I'm going to step outside
22 and just make a call while you're looking at
23 those.
24     (Following a brief recess, the
25 following proceedings were had.)

Page 44

1      MS. ANDERSON:
2      Did you have enough time to look
3  at those time sheets?
4      MR. BURAS:
5      Yes.  I was going to ask
6  questions about those --
7      MS. ANDERSON:
8      Yes.  Sure.  Of course.
9      MR. BURAS:
10     -- and then have you ask.  I was
11 going to ask some follow-up questions.
12     Bryan, why don't you say what
13 you wanted to say, and then I will go
14 forward with this.
15     Just for the record, I just want
16 to object to receiving these documents today
17 and being told that you're going to ask
18 questions about that and I'm reviewing these
19 documents and asking questions that are
20 produced today.  I do have a couple of
21 questions for Ms. Rochon that specifically
22 relate to why these documents were not
23 produced prior to today.
24     MS. ANDERSON:
25     Those were going to be my

Page 45

1  questions as well.  But if you're going to
2  ask them, that's great.
3      MR. BURAS:
4          That hopefully will --
5      MS. ANDERSON:
6          We're all going to ask the same
7  questions.
8      MR. BURAS:
9          Good deal.  That will keep
10  things going quickly.
11      MS. ANDERSON:
12          That's right.  That's the whole
13  point of asking her about these documents.
14  Let me give her a copy.
15      MR. BURAS:
16          Do you have a copy we can mark
17  as an exhibit here?
18      MS. ANDERSON:
19          Yeah.
20      MR. BURAS:
21          We can use just the time sheet
22  portion for now.
23      MS. ANDERSON:
24          So you just want to use the
25  documents labeled 6733 to 6751?

Page 46

1      MR. BURAS:
2          To start with, yes.
3      MS. ANDERSON:
4          This will be Exhibit 21?
5      MR. BURAS:
6          Yes.
7      MS. ANDERSON:
8          All right.
9      MR. BURAS:
10          Before we get started, though,
11  let me just ask my follow-ups while they're
12  fresh in my mind.
13  EXAMINATION BY MR. BURAS:
14      Q.   Ma'am, your attorney asked you
15  questions about when there was a lot of
16  stuff going on about the time of Hurricane
17  Katrina.  You related several facts about
18  not having access to your office, systems,
19  and having to do payroll from home.
20          Are these all events that took
21  place after the hurricane?  These are not
22  things that we were going on before the
23  hurricane struck, correct?  Let me just ask
24  that question first.  You had access to your
25  building before Hurricane Katrina struck,

Page 47

1  correct, ma'am?
2      A.   Yes.
3      Q.   You had access to all of your
4  systems before Hurricane Katrina struck,
5  correct?
6      A.   Yes, as far as I know.
7      Q.   You were not doing payroll from
8  home before Hurricane Katrina struck,
9  correct?
10      A.   That is correct.
11      Q.   And Fed Ex was delivering your
12  materials as you requested before Katrina
13  struck, correct?
14      A.   Yes.  That's correct.
15      Q.   And I understand that after
16  Katrina struck you were worried about your
17  family and you had various concerns related
18  to how you were going to take care of your
19  family.  This related to taking care of your
20  family after Katrina struck, correct?
21      A.   That's correct.
22      Q.   After the team went to Oklahoma
23  City how much time elapsed before you had
24  access to computer systems again?
25      A.   Let me make sure I understand

Page 48

1  your question.  This is the time that we had
2  after the hurricane or the time after we got
3  to Oklahoma City?
4      Q.   That's a good follow-up.  Thank
5  you for clarifying.  That's two questions.
6          After the hurricane struck when
7  did you first have access to any Hornets
8  computer system?
9      A.   I did not get access to computer
10  systems for the Hornets until about October
11  10th, if I'm not mistaken.
12      Q.   2005?
13      A.   2005.
14      Q.   Okay.
15      A.   And if you need a reason as to
16  why, I can provide that to you as well.
17      Q.   Please.
18      A.   We did not relocate to -- or
19  locate, whatever, to Oklahoma City until
20  late September, which would have been about
21  the 25th, 26th, somewhere in that area,
22  because I arrived on the 23rd or 24th.  And
23  we had to wait for offices to be set up for
24  us.  So I did what I could on my personal
25  laptop to try to work with ADP to do our

Page 49

1  payroll for September 30th. And I continued
2  to use my personal laptop to do the payroll
3  for the month of October. And the reason
4  that I did pass October 10 was because we
5  needed to -- I needed to have a desk, and my
6  desk wasn't set up until late October.
7     Q. All right. Do you specifically
8  remember being asked to provide any
9  information besides personnel files before
10  Hurricane Katrina struck?
11  MS. ANDERSON:
12     Objection. Form.
13     A. Specifically?
14  EXAMINATION BY MR. BURAS:
15     Q. Yes, ma'am.
16     A. I do not remember all of those
17  details. Any information that I would have
18  been asked for before the hurricane I would
19  have provided to the best of what I could
20  find. Okay?
21     Q. All right. And I believe
22  counsel asked you whether or not you
23  provided the report regarding the Louisiana
24  state Quality Jobs Program that you
25  prepared, and my understanding is you told

Page 50

1  her yes. Is that correct?
2     A. Yes. That is correct.
3     Q. At any point in time did your
4  counsel ask you for any of the backup
5  information that you used to prepare that
6  report?
7     A. Specifically, I don't recall
8  that.
9     Q. At any time prior to the
10  deposition today have you ever been asked
11  for the back up information that you used to
12  prepare that report?
13     A. No.
14     Q. At any point in time have you
15  ever been asked for any information related
16  to how you determined that each employee
17  worked 40 hours a week that you set forth in
18  that spreadsheet?
19     A. Specifically, no.
20     Q. Were you ever told by the
21  Hornets to just make up that number 40 and
22  put it in the spreadsheet, or did you have a
23  database of information that you relied
24  upon?
25     A. That's two questions.

Page 51

1     Q. Let me just rephrase that, then,
2  to make sure it's clear. Did you have a
3  database of information that you drew upon
4  to find out how many hours employees had
5  worked as was set forth in that database?
6     A. By database, do you mean --
7  MR. BURAS:
8     Read back my question, because I
9  think there's an extra word there.
10     (Whereupon, the preceding
11  question was read back by the reporter.)
12  EXAMINATION BY MR. BURAS:
13     Q. My mistake. Did you have a
14  database or a location of information that
15  you drew upon when you put information into
16  the spreadsheet that was provided to the
17  Quality Jobs Program?
18     A. No.
19     Q. Have you ever been asked for the
20  backup information related to the hours
21  marked on that form?
22  MS. ANDERSON:
23     Objection. Form.
24     A. No, not specifically. And what
25  I mean by that is there really isn't a

Page 52

1  backup for that -- for doing those hours.
2  EXAMINATION BY MR. BURAS:
3     Q. Explain that. I don't
4  understand what you mean.
5     A. I can explain. My predecessor
6  had put together a spreadsheet in
7  preparation of the filing for that Job
8  Qualities Act report. Not knowing what that
9  really was, I did kind of look through, see
10  what I could find in the files in reference
11  to it. I did find the old report, looked at
12  it, tried to figure out where they got those
13  hours and, of course, having been in
14  payroll, what I could see, it looked like it
15  was estimated that it was 40 hours a week.
16     So in a quarter, if it was 40
17  times four or 40 times 12 or 13, whatever it
18  was, when I did that calculation for what
19  was in the report, it made sense to me. So
20  I did the same thing.
21     Q. When is the first time you
22  prepared one of those spreadsheets?
23     A. Not specifically that I recall,
24  but it would have been sometime probably
25  after the hurricane, maybe November,

Page 53

1  December of 2005.
2      Q.  Prior to November or December of
3  2005 have you ever been asked from counsel
4  for copies of any records that the Hornets
5  had identifying the number of hours the
6  Hornets believed those employees worked?
7      A.  I don't specifically recall
8  being asked that back in 2005 or 2006.
9      Q.  What about 2007?
10     A.  And I don't recall 2007, but
11  it's a possibility I could have been asked.
12  I just don't remember that question
13  specifically.
14     Q.  We have been given copies of
15  documents a few minutes ago that relate to
16  Latousha Brown's and, it appears to be, Ken
17  Kliebert's time sheets, their time sheets
18  from working with the New Orleans Hornets.
19  It's documents D6733 through D6751.
20         Do you have copies of those in
21  front of you, ma'am?
22     A.  Yes, I do.
23     Q.  Did you provide copies of these
24  documents to counsel?
25     A.  Yes, I did.

Page 54

1      Q.  When did you provide copies of
2  these documents to counsel?
3      A.  This year.
4      Q.  Do you remember when?
5      A.  It was after we had gone through
6  those storage -- that storage unit.
7      Q.  All right.  Let me hopefully
8  narrow this down.  It's my understanding
9  that you went through the storage unit
10  sometime, I believe it was, the Tuesday and
11  Wednesday after Labor Day of this year; is
12  that correct?
13     A.  Correct.  So it would be
14  somewhere right after Labor Day.
15     Q.  Had you given these time sheets
16  to your attorney before your last
17  deposition?
18     A.  Actually, I would assume so.
19  But I found these, actually, by accident.
20  They were in a folder in a box that I had no
21  idea they were even there.  They were mixed
22  among other papers, binders from HR that I
23  don't even know how they got in that box,
24  other than the fact that when we packed up
25  stuff from New Orleans going to Oklahoma,

Page 55

1  from Oklahoma coming back to New Orleans, it
2  could have been packed in one of those
3  boxes.  Because I was looking for something
4  and I was not looking for this and found
5  these.  And I was like, "Ooh."
6      MS. ANDERSON:
7          Can we -- Can I talk to you
8  outside the presence of the witness?
9      MR. BURAS:
10         Let me finish this.
11     MS. ANDERSON:
12         Sure.
13     MR. BURAS:
14         Unless you have something
15  specifically related to this.
16     MS. ANDERSON:
17         Yeah, it is.  But that's --
18     MR. BURAS:
19         I'm not going to be asking that
20  many more questions.  I just have a couple.
21     MS. ANDERSON:
22         Okay.  That's fine.
23     MR. BURAS:
24         And we will follow up.
25  EXAMINATION BY MR. BURAS:

Page 56

1      Q.  Ma'am, the first record I have
2  for Latousha Brown indicates that her time
3  sheet is from 7/18/05 to 7/22/05.  See that
4  one?  I'm looking at D6733.
5      A.  Yes.
6      Q.  Are you aware of when this
7  litigation was first filed?
8      A.  From what I understand being
9  here at the depositions, it sounds like it
10  was done somewhere between May and July or
11  May and early August.
12     Q.  Of 2005, correct, ma'am?
13     A.  Of 2005.
14     Q.  And you were aware or you were
15  made aware by your attorney or your
16  superiors that this was an overtime suit,
17  correct, ma'am?
18     A.  That's what I understood.
19     Q.  When were you first asked for
20  copies of any time sheets that the Hornets
21  maintained on behalf of any of their
22  employees?
23     A.  I really don't remember that
24  specific.  I'm sorry.
25     Q.  When were you first asked to

Page 57

1  provide copies of time sheets for each
2  individual plaintiff in this case?
3      A.  I don't remember that either.
4  But whenever the request came in, I did find
5  whatever I could find to produce those.
6      Q.  I'm working off memory here, so
7  please correct me if I misstate something.
8  But it's my understanding from your last
9  deposition that you testified that the
10  individual departments where an employee
11  worked would track the time sheets and would
12  then give you copies of it or give you the
13  time sheets; is that correct?
14      A.  That is correct.
15      Q.  Where would the time sheets be
16  placed after you received them?
17      A.  Time sheets were to be
18  maintained with the payroll records, but as
19  I mentioned earlier today, these, for some
20  reason, for whatever reason, these time
21  sheets and other time sheets were all in one
22  folder separated.  And how they got
23  separated, again, I don't know.
24      Q.  You did not separate the time
25  sheet records?

Page 58

1      A.  Not that I recall.
2      Q.  Do you know whether or not you
3  ever directed Annette Smith to separate the
4  payroll time sheets from the record?
5      A.  No, I don't recall telling her
6  that.
7      Q.  Do you have any knowledge that
8  she did this?
9      A.  No, I do not.
10      Q.  Have you ever directed Danielle
11  Daniels to separate the time sheets from the
12  payroll records?
13      A.  No, I did not.
14      Q.  These time sheets indicate that
15  Ms. Brown was paid overtime, if you take a
16  look at 6738 on October 21st of 2005 of two
17  and a half hours of overtime.  Do you see
18  that?
19      A.  Yes.
20      Q.  Were you the person who
21  calculated the amount of overtime that was
22  owed to Ms. Brown?
23      A.  Yes, I did.
24      Q.  And you were aware in October of
25  2005 that Ms. Brown received overtime

Page 59

1  payments, correct?
2      A.  Without looking at the actual
3  payroll register at the moment, to say yes,
4  she received it, I cannot.  Based upon what
5  I see on this time sheet, I would say yes,
6  she did get paid for that.
7      Q.  Prior to October of 2005 had you
8  already pulled personnel records for Ms.
9  Brown in this case?  Do you remember?
10      A.  No, I do not remember, not off
11  the top of my head.
12      Q.  Were you aware that Ms. Brown
13  was a plaintiff in this litigation at that
14  time?
15      A.  I cannot answer that question.
16  I do not know.
17      Q.  At any point in time were you
18  told that the Hornets have an employee
19  working for them that was participating in
20  the overtime litigation?
21      A.  It is quite possible I could
22  have been told, but I can't tell you when I
23  was told and when I actually pulled her
24  files or when I got knowledge or received
25  knowledge.  I'm sorry.  I just cannot say

Page 60

1  specifically because I do not remember that.
2      Q.  Is this the time sheet that you
3  discussed with me the other day that has a
4  -- I believe what you said your policies and
5  procedures for tracking the time sheets on
6  the back of the page?
7      A.  In 2005 we had not put those
8  instructions on the back of the time sheets.
9  Instructions did not go on the back of the
10  time sheets until sometime in 2006.  The
11  time sheet you see before you is a time
12  sheet I created but has been revised since
13  then, and so it doesn't exactly -- it
14  doesn't look like this now nor does it look
15  this way throughout the entire year of 2006.
16      Q.  How did the employees know how
17  to fill out these time sheets?  Were they
18  given any e-mails or written instructions,
19  or how did the department heads know how to
20  fill out these time sheets?  Did they
21  receive any written instructions or e-mails?
22      MS. ANDERSON:
23          Object as asked and answered.
24      A.  The instructions in 2005 would
25  have come from Kristy McKearn at the time

Page 61

1  because she was the one who implemented that
2  policy, and also I was not an official
3  Hornets employee. So I wasn't giving
4  instructions at that time to staff on
5  completion of time sheets.
6  EXAMINATION BY MR. BURAS:
7      Q. All right. Ma'am, I know before
8  we talked about various requests for
9  production. Why don't you take a look at
10 Exhibit 20, specifically, Request for
11 Production No. 51. It's on Page 29.
12         Request for Production No. 51
13 says: Please produce copies of any and all
14 documents describing, discussing, or setting
15 forth Hornets policies, procedures,
16 practices and/or controls in place to track
17 the overtime worked by non-exempt employees.
18         Do you see that, ma'am?
19     A. Yes, I do.
20     Q. Were you ever asked to provide
21 information responsive to this request?
22     MS. ANDERSON:
23         Objection. Form.
24     A. I don't recall, but if I was, I
25 did provide that information.

Page 62

1  EXAMINATION BY MR. BURAS:
2      Q. Do you specifically remember
3  providing a copy of the policies and
4  procedures that were on the back of the time
5  sheets?
6      A. No, I don't specifically recall
7  that.
8      Q. Do you know to this day whether
9  or not that information has been produced to
10 plaintiffs?
11     A. No, I have no idea.
12     Q. Do you know specifically that
13 you've given this information to your
14 counsel?
15     A. I don't recall if I have done
16 that or not. I don't remember that.
17     Q. So you don't remember one way or
18 another?
19     A. No, I don't. I'm sorry.
20     Q. If your counsel had asked you to
21 confirm that you had provided copies of the
22 policies and procedures would you have been
23 able to pull a copy of those time sheets and
24 produce them in this litigation?
25     A. I'm sorry. Repeat your question

Page 63

1  a little slower.
2      Q. If your counsel had asked you to
3  provide copies of any policies and
4  procedures that the Hornets had related to
5  overtime or the tracking of time that the
6  Hornets have in place would you have been
7  able to provide a copy of the time sheet you
8  prepared with the policies and procedures on
9  the back?
10     A. Yes, I can or could have.
11     Q. All right. When is the first
12 time you could have provided that
13 information if you had been asked for it?
14     A. We put that in place sometime in
15 2006, so I could have provided it sometime
16 in 2006.
17     Q. So any time between 2006 and the
18 present if you had been asked for it you
19 could have provided it, correct?
20     MS. ANDERSON:
21         Objection. Form.
22     A. If I had been asked, yes, I
23 could have provided that information. I
24 just don't recall if I had been asked.
25 EXAMINATION BY MR. BURAS:

Page 64

1      Q. All right, ma'am. I want to
2  mark the next document, which is the New
3  Orleans Hornets NBA Limited Partnership
4  Employee Manual that's dated December 1st,
5  2006, as Exhibit 22, I believe, in this
6  case. Did you produce this document to
7  counsel?
8      MS. ANDERSON:
9         Let me get a copy of it for her.
10 Did you mark this one, Dan?
11     MR. BURAS:
12         It's going to be marked as 22.
13 EXAMINATION BY MR. BURAS:
14     Q. Did you provide a copy of this
15 document to counsel?
16     A. Yes, I did.
17     Q. When did you provide a copy of
18 this document to counsel?
19     A. I believe sometimes in 2007.
20     Q. Was it within the last couple of
21 weeks or was it early 2007?
22     A. It's a possibility I could have
23 provided it to counsel during the month of
24 September, but with the amount of
25 documentation that I provided, I'll be very

Case 2:05-cv-01969-HGB-ALC    Document 159-13    Filed 10/15/2007    Page 17 of 24

Page 65

1 honest with you. I can't tell you
2 specifically, and I know that sounds
3 ludicrous.
4     Q. Do you know where you maintain
5 this document?
6     A. Excuse me. Your question is
7 where do I maintain that document?
8     Q. Yes, ma'am.
9     A. Is that for my use or for the
10 employee's use, or can you be a little more
11 specific? I'm sorry.
12     Q. Where is this document kept by
13 you since you provided it?
14     A. It's in several places.
15     Q. Where?
16     A. I have a printed hard copy in a
17 binder on my credenza. I have a electronic
18 version on my computer. There is also an
19 electronic version available for the
20 employees on our in-house intranet, if you
21 will, or -- we moved from the intranet to
22 the folderless, so it's in Outlook.
23     Q. Did you draft this manual?
24     A. With the assistance of other
25 staff members and legal counsel.

Page 66

1     Q. What legal counsel, ma'am?
2     A. The legal counsel office that's
3 in Oklahoma City, Hartzog, Conger, Cason,
4 Neville.
5     Q. Hartzog --
6     A. Hartzog, Conger --
7     Q. Can you spell that, ma'am?
8     A. C-O-N-G-E-R, Cason, C-A-S-O-N,
9 Neville, N-E-V-I-L-L-E.
10     Q. I want you to take a look at
11 Page 17, which on this document is marked as
12 page number D6774.
13     MR. BURAS:
14       And, Court Reporter, for the
15 record Exhibit 21 is D6752 through D6804.
16 Exhibit 22. I'm sorry.
17 EXAMINATION BY MR. BURAS:
18     Q. Ma'am, do you see that portion
19 of this page that states "Maintaining Work
20 Schedules" and states "Full time salaried,
21 non-exempt employees are expected to work 40
22 hours per week unless otherwise directed by
23 their supervisor or management"?
24     A. Yes, sir.
25     Q. Ma'am, you provided me with time

Page 67

1 sheets for two different categories of
2 persons that are involved in this suit, Ms.
3 Latousha Brown, who was a ticket operations
4 person, and Mr. Ken Kliebert, who was a
5 salesperson.
6     A. Okay.
7     Q. Okay? Did you track these
8 employees time sheets because the Hornets
9 believed they were non-exempt personnel?
10     MS. ANDERSON:
11       Objection. This is going into a
12 substantive area.
13     MR. BURAS:
14       I'm just trying to find out how
15 these people's time records were tracked and
16 why, because these time records were not
17 produced before today's deposition nor was
18 this employee manual directing the Human
19 Resource department to track the time
20 records. I'm trying to find out when this
21 started.
22     MS. ANDERSON:
23       Okay. I don't believe your
24 question has anything to do with the reason
25 that you just stated. You need to ask her

Page 68

1 the question. She's explained why the time
2 sheets were produced when they were
3 produced; although, there is still an issue
4 that you and I -- as counsel outside her
5 presence, I would like to discuss with you
6 on that. So I'm going to leave that request
7 open.
8       But your questions as to why
9 people were classified as exempt and who was
10 exempt doesn't have anything to do with the
11 chain of evidence issue which you have
12 limited the first part of this deposition
13 to. So I object to it at this time.
14 EXAMINATION BY MR. BURAS:
15     Q. Ma'am, did you receive any
16 documents at any time identifying which
17 categories of employees were considered
18 non-exempt by the Hornets?
19     A. No, none that I recall.
20     Q. Did you receive any documents
21 from Hartzog, Conger, Cason & Neville
22 identifying which categories of employees
23 were to be considered non-exempt by the
24 Hornets?
25     MS. ANDERSON:

Page 69

1       Objection. Form. And I believe
2 that calls for privileged information. I'm
3 going to allow the witness to say yes or no
4 but not discuss the substance of the
5 communication from legal counsel.
6     A. Not that I know of.
7 EXAMINATION BY MR. BURAS:
8     Q. Since your deposition ended on
9 the 13th of September, have you gone back to
10 the storage unit to look for additional
11 documents?
12     A. No, I have not.
13     Q. Counsel asked you questions
14 specifically related to questions and
15 communications that you might have asked the
16 Jones, Walker paralegal who was with you at
17 the storage unit. Do you remember that?
18     A. Yes.
19     Q. Do you remember specifically
20 what the worker at the storage unit asked
21 you to look for?
22     MS. ANDERSON:
23       Objection. Form.
24     A. Specifically, I don't recall.
25 But I can tell you that questions that we

Page 70

1 had she was either able to address, she
2 looked at the documents, said either yes or
3 no or did not know and placed a phone call
4 to counsel, and counsel did come over to
5 look at those documents to see if that met
6 the specifications of what they were looking
7 for.
8 EXAMINATION BY MR. BURAS:
9     Q. Which counsel?
10     A. Jane.
11     Q. So Ms. Heidingsfelder --
12     A. Ms. Heidingsfelder.
13     Q. Ms. Heidingsfelder went to the
14 storage unit to determine whether or not
15 certain documents that you identified were
16 responsive; is this correct?
17     A. When you say responsive, you
18 mean if it was pertaining to or --
19     Q. Plaintiffs' request, yes, ma'am.
20 I'm sorry. I didn't use that word.
21     MS. ANDERSON:
22       Objection. Form.
23     A. Yes. And if -- Yes.
24 EXAMINATION BY MR. BURAS:
25     Q. Do you know whether counsel

Page 71

1 conducted any independent review of any of
2 the documents that were located at the
3 storage unit?
4     MS. ANDERSON:
5       Objection. Form.
6     A. She looked at the documents.
7 EXAMINATION BY MR. BURAS:
8     Q. Did she look only at the
9 documents that you identified or did she
10 independently review the boxes of documents
11 that maybe had not been looked at before?
12     MS. ANDERSON:
13       Objection. Form.
14     A. Not while I was there.
15 EXAMINATION BY MR. BURAS:
16     Q. Okay. Do you know if anyone
17 from Jones, Walker has gone to the storage
18 unit to look for documents without another
19 Hornets employee being present, you or
20 another Hornets employee? Excuse me.
21     MS. ANDERSON:
22       Objection. Form.
23     A. I am not positive, because I
24 left town.
25 EXAMINATION BY MR. BURAS:

Page 72

1     Q. When did you leave town, ma'am?
2     A. I left town to go to an NBA
3 meeting after the day after -- Same day or
4 next day? Same day. No, the next day.
5 Excuse me.
6     Q. I don't know what day we're
7 talking about.
8     A. The next day after I went to the
9 storage facility in September, the day after
10 Labor Day. I left that Wednesday.
11     Q. Do you recall whether or not
12 arrangements were made with any of the
13 Jones, Walker personnel or Ms.
14 Heidingsfelder to have another Hornets
15 employee go through any of the documents at
16 the storage facility outside of your
17 presence?
18     A. It's possible.
19     Q. Do you have any specific
20 recollection of that taking place?
21     A. It's possible it could have
22 taken place.
23     Q. Do you recall seeing these time
24 sheets during either September 4th or 5th
25 while you were at the storage facility?

Page 73

1    A.  No.
2    Q.  How many times have you been to
3  the storage facility since Labor Day?
4    A.  I have only been to the storage
5  facility once.
6    Q.  And what date was that?
7    A.  It was that one day, September
8  4.
9    Q.  So on September 4th, and correct
10  me if I'm wrong, but it was your testimony
11  that you found a folder containing all of
12  these time sheets when you were at the
13  storage facility; is that correct?
14    A.  No, that is not correct.
15    Q.  How did you find a folder
16  containing these time sheets?
17    A.  Those were in my office somehow.
18  And what I was saying is when we were
19  packing from Oklahoma coming back to New
20  Orleans during the month of May, they must
21  have gotten packed. I don't recall packing
22  those. I don't recall seeing those. But I
23  was not the only one trying to pack my
24  office in Oklahoma City to come back to New
25  Orleans in May.

Page 74

1    Q.  So these documents were found in
2  your office, not at the storage facility?
3    A.  That is correct. And I was
4  surprised when I found those.
5    Q.  Was there --
6    A.  And whether or not -- I'm sorry.
7  Excuse me.
8    Q.  Please.
9    A.  Whether or not I had given
10  copies to our legal counsel, again, I cannot
11  tell you. But I felt that once I found
12  those, I'll provide copies.
13    Q.  When did you find these?
14    A.  It was in the last couple of
15  weeks or so or around -- right after Labor
16  Day and I --
17    Q.  Was it before your deposition?
18  MS. ANDERSON:
19     This will be a good point for us
20  -- I don't want to interrupt what you're
21  doing, but I just think there's some
22  confusion. I can help tell you what it is
23  and you can do what you wish with the
24  witness, but just to keep from kind of
25  spinning wheels I think --

Page 75

1  MR. BURAS:
2     All right. I will do that in
3  one second. Read the question back and
4  then --
5  MS. ANDERSON:
6     I just want to make it clear.
7  MR. BURAS:
8     It's going to be clear. And
9  we'll take you up on that as soon as we
10  finish, but I'm going to finish everything
11  first.
12     (Whereupon, the preceding
13  question was read back by the reporter.)
14    A.  It was the week of the
15  deposition. I can tell you that.
16  EXAMINATION BY MR. BURAS:
17    Q.  Have you sent any documents to
18  Jones, Walker since your deposition last
19  week?
20    A.  Not that I know of specifically.
21    Q.  Have you received any documents
22  from Jones, Walker since your deposition
23  last week?
24    A.  No, I have not.
25    Q.  Have you had any discussions

Page 76

1  with counsel about this deposition since
2  September 13th, at the end of your
3  deposition last week?
4    A.  No, I have not.
5    Q.  Have you reviewed a copy of your
6  transcript of this deposition that you gave
7  last week?
8    A.  No, I have not.
9    Q.  Have you reviewed any additional
10  notes in preparation for this deposition
11  today?
12    A.  No, I have not.
13  MR. BURAS:
14     All right. Let's take a break
15  so you and I can talk about this.
16  MS. ANDERSON:
17     Yes.
18  MR. BURAS:
19     And then I'll talk with Bryan,
20  and we may be finished.
21     (Whereupon, the witness exited
22  the proceedings.)
23  MS. ANDERSON:
24     I wanted to tell you that I
25  don't believe -- she obviously does not

Page 77

1 remember the specific date that she
2 testified that she provided the time sheets
3 to us, but this came up after your
4 examination of her about Ken Kliebert and
5 his time sheets, and I can't remember if you
6 examined her, asked her questions about
7 Latousha Brown's time sheets. But we
8 reviewed the production and realized that
9 there were no time sheets, I think, for one
10 person. I can't recall which one, but that
11 prompted a request for her to please check
12 again to see if something got overlooked.
13   MR. BURAS:
14        When was that request made?
15   MS. ANDERSON:
16        Well, the same day you probably
17 -- that you questioned her. I mean, you can
18 look back at the transcript.
19   MR. KNIGHT:
20        On the day of the deposition?
21   MR. BURAS:
22        Counsel requested her to go back
23 and look for these documents during her
24 deposition or was it at the conclusion of
25 it? Do you remember?

Page 78

1   MS. ANDERSON:
2        I'm sure it was afterwards.
3   MR. BURAS:
4        Was it made in writing or a
5 verbal communication?
6   MS. ANDERSON:
7        Dan, I'm not going to answer a
8 lot of questions about this. I'm telling
9 you -- I'm telling you that it was the day
10 of the deposition. I don't believe it is
11 relevant whether it happened in the middle
12 of the deposition or after the deposition,
13 and frankly, I don't remember. But your
14 questioning about, I believe it was, Ken
15 Kliebert's time sheets and our review of the
16 prior production led us to ask her to look
17 again to see if these had been overlooked.
18 As she just testified, they were misfiled.
19 She found them and they've been produced.
20 So I believe her -- she last testified on
21 Thursday a week ago.
22   MR. BURAS:
23        And she just testified that she
24 has not sent anything to Jones, Walker since
25 her deposition.

Page 79

1   MS. ANDERSON:
2        That's right. And what I'm
3 trying to tell you is that I believe she
4 does not remember that. That's the
5 clarification that I was trying to -- She's
6 testified that she doesn't remember dates
7 precisely, so I think that's clear. But I
8 want you to know since these questions are
9 being asked that we did get these
10 specifically after -- it was after she had
11 already given some testimony because that --
12 the questions led us to ask her to please go
13 see if she could find anything else.
14   MR. BURAS:
15        Then I have one follow-up
16 question for you, which is when did she
17 actually provide these documents? Do you
18 recall since she does not?
19   MS. ANDERSON:
20        I don't remember. And it was
21 just done via hand. But, you know, within
22 the last -- within the last week. Now, I
23 was in Houston Friday. I was in -- I was at
24 the doctor's office Monday. I was in Baton
25 Rouge Tuesday and Wednesday, and I'm here

Page 80

1 today. So I don't believe that that, again,
2 is a relevant point. The point is they were
3 provided to us. They were produced, Bates
4 labeled and produced to you today, all
5 within the course of a week.
6   MR. BURAS:
7        Same question related to the
8 employee manual. Was this something that
9 she produced this week along with these
10 other documents?
11   MS. ANDERSON:
12        I don't know. I just don't
13 remember. I can't answer that. But yes, it
14 was recent. It was recent.
15   MR. BURAS:
16        We can bring her in to finish
17 up. Before we do that, we're going to go
18 off the record now.
19        (Following a brief recess, the
20 following proceedings were had.)
21 EXAMINATION BY MR. BURAS:
22   Q.  Ms. Rochon, just one follow-up
23 question. Do you recall producing a copy of
24 the Hornets Employee Manual that was dated
25 sometime in 2003?

Page 85

1  Q.  Do you have copies of these
2  drafts?
3  A.  It's a possibility I could.  Off
4  the top of my head, I can't say definitely
5  yes and I cannot say definitely no.  I would
6  have to look in the boxes that are still in
7  my office.
8  MR. BURAS:
9      Ma'am, I'm finished with my
10  questions.  Thank you very much.
11  EXAMINATION BY MS. ANDERSON:
12  Q.  I do have some follow-up.
13      Ms. Rochon, regarding Exhibit
14  No. 21, the time sheets, the two employees
15  who are referenced in the time sheets, Mr.
16  Kliebert and Ms. Brown, were they employed
17  by the Hornets in December of 2006?
18  A.  No.
19  Q.  Now, you were asked some
20  questions about the time sheets and why they
21  were produced only recently.  Do you recall
22  that?
23  A.  Yes.
24  Q.  Did you hide these time sheets
25  from anybody?

Page 86

1  A.  No.
2  Q.  I'm going to ask you some
3  questions now about the report that you
4  testified you prepared in connection with
5  the Louisiana Quality Jobs Act submission to
6  the State.  Is the report considered a time
7  sheet?
8  MR. KNIGHT:
9      Objection to form.
10  A.  I would not consider that report
11  as a time sheet.
12  EXAMINATION BY MS. ANDERSON:
13  Q.  Did you ask the employees to
14  provide you with the estimate, to use your
15  term, of hours that was put into the report?
16  A.  No.
17  Q.  Does the Hornets use the
18  estimate of hours on the report for the
19  purpose of calculating overtime due to any
20  employee?
21  A.  No.
22  Q.  What documents, if any, do the
23  Hornets use in order to calculate overtime
24  due to any employee?
25  A.  The time sheets would be used to

Page 87

1  calculate overtime.
2  Q.  And you testified that you
3  prepared the report based on one that your
4  predecessor had done.  Who do you mean by
5  predecessor?
6  A.  My predecessor was Penny
7  Middleton.
8  Q.  And the report that Ms.
9  Middleton prepared, did it have the same
10  estimate of hours for employees in it that
11  you used in the report?
12  MR. KNIGHT:
13      Objection to form.
14  MS. ANDERSON:
15      Actually, let me rephrase that.
16  You're right.  That was not a good question.
17  EXAMINATION BY MS. ANDERSON:
18  Q.  Did you use the same estimate of
19  hours that Ms. Middleton had used in her
20  form?
21  MR. KNIGHT:
22      Same objection.
23  A.  What I used was what I
24  calculated to determine how she got those
25  hours.

Page 88

1  EXAMINATION BY MS. ANDERSON:
2  Q.  How did you do that?
3  A.  If one of the columns indicated
4  that total number of hours in a particular
5  quarter were -- I think it's -- I'm going
6  off the top of my head without seeing the
7  report.  If that total hours was 520, I
8  would take that and divide it over the
9  number of weeks in that quarter by 40 to
10  come up with that estimate to see if that's
11  how she got that.  And if it matched, then I
12  used a similar type calculation.
13      If an employee, say, was hired
14  in that quarter but hired like the first
15  week or, say, the 1st of December, then
16  there's no way they're going to have 520
17  hours.  The calculation I used was based on
18  their hire date 'til the end of that month
19  or the end of that quarter using an estimate
20  of about 40 hours if they worked 40 -- you
21  know, thinking that they worked 40 in that
22  week.  But if they started, say, on a
23  Wednesday versus a Monday, then, of course,
24  it would be a different number for that week
25  and then use an estimate of 40 for the other

Page 89

```
 1   weeks.  And if they left or terminated from
 2   the company during that time frame, then I
 3   used those dates, you know, as a start and
 4   as an end.
 5       Q.  Are you aware of any other
 6   documents that you've been asked to provide
 7   in connection with this case that you have
 8   not yet provided?  And I'm excluding
 9   anything that might be in the boxes from
10   storage that you've already discussed.
11       MR. BURAS:
12           Object to form.
13       MR. KNIGHT:
14           Same objection.
15       A.  Off the top of my head,
16   specifically, I don't know.  I do know we
17   are still looking for additional documents,
18   and as I noted earlier, the one that's kind
19   of got me baffled is this binder that
20   Adrianna supposedly maintained.
21       MS. ANDERSON:
22           I don't have any other
23   questions.  So we're done with her, and I
24   understand Rich is downstairs.
25       MR. BURAS:
```

Page 90

```
 1           We're done.
 2           (Whereupon, the deposition was
 3   concluded at 10:57 a.m.)
 4
 5               *   *   *
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 91

```
 1       WITNESS' CERTIFICATE
 2
 3           I have read or have had the
 4   foregoing testimony read to me and hereby
 5   certify that it is a true and correct
 6   transcription of my testimony, with the
 7   exception of any attached corrections or
 8   changes.
 9
10
11
12
13
14
15           DONNA P. ROCHON
16
17
18
19
20
21
22
23
24
25
```

Page 92

```
 1       REPORTER'S CERTIFICATE
 2
 3
 4       I, Lisa Bode, Certified Shorthand
 5   Reporter, do hereby certify that the
 6   above-mentioned Witness, after having been
 7   first duly sworn to testify to the truth,
 8   did testify as hereinabove set forth;
 9       That the testimony was reported by me
10   in shorthand and transcribed under my
11   personal direction and supervision, and is a
12   true and correct transcript, to the best of
13   my ability and understanding;
14       That I am not of counsel, not related
15   to counsel or the parties hereto, and not in
16   any way interested in the outcome of this
17   matter.
18
19
20
21           LISA BODE, CSR
22           Certified Shorthand Reporter
23
24
25
```

'til [1] 88:18
-and [1] 1:21
05-10068 [1] 1:4
06 [1] 1:16
1 [7] 2:24 18:22
19:19 31:8 39:6
39:7 39:18
10 [2] 49:4 90:3
10th [1] 48:11
1111 [1] 1:14
12 [1] 52:17
12th [1] 8:7
13 [1] 52:17
13th [3] 8:7 69:9
76:2
1421 [1] 3:6
1442 [1] 1:13
17 [2] 66:11 84:11
1st [2] 64:4 88:15
2 [2] 7:23 39:5
39:22
20 [4] 38:17 38:22
41:12 61:10
2003 [1] 80:25
2005 [22] 14:9
14:11 14:25 15:4
18:15 24:9 24:16
31:2 31:7 48:12
48:13 53:1 53:3
53:8 56:12 56:13
58:16 58:25 59:7
60:7 60:24 81:5
2006 [13] 2:24
53:8 60:10 60:15
63:15 63:16 63:17
64:5 82:17 82:21
83:7 83:8 85:17
2007 [10] 1:16
18:22 19:22 30:14
30:22 31:8 53:9
53:10 64:19 64:21
201 [2] 1:15 2:3
20th [2] 1:16 8:8
21 [5] 1:20 2:19
46:4 66:15 85:14
21st [1] 58:16
22 [5] 2:22 64:5
64:12 66:16 81:10
227 [1] 1:20
23rd [1] 48:22
24th [1] 48:22
25th [1] 48:21
26th [1] 48:21
29 [1] 61:11
3 [3] 1:12 40:5
40:6
30 [5] 7:9 7:23
19:18 19:22 39:4
30th [1] 49:1
3500 [1] 1:23
4 [1] 73:8
40 [11] 50:17 50:21
52:15 52:16 52:17
66:21 88:9 88:20
88:20 88:21 88:25
401 [2] 22:23
46 [1] 2:15
4700 [1] 2:3
4th [2] 72:24 73:9
5 [2] 40:10 40:18
51 [2] 61:11 61:12
520 [2] 88:7 88:16
57 [1] 90:3
5th [1] 72:24
6 [2] 7:9 39:4
6733 [1] 45:25
6738 [1] 58:16
6751 [2] 2:20 45:25
6804 [2] 2:23
7/18/05 [1] 56:3
7/22/05 [1] 56:3
70071 [1] 1:15
70112 [1] 1:24
70170 [2] 1:16
2:4
70447 [1] 1:20
8 [1] 41:4
85 [1] 2:14
9 [4] 1:16 2:14
14:9 14:25
909 [1] 1:23
a.m [2] 1:16 90:3
ability [1] 92:13
able [3] 62:23 63:7
70:1
above-mentioned [2]
4:3 92:6
Absolutely [1] 11:11
access [10] 25:10
25:11 29:3 36:20
46:18 46:24 47:3
47:24 48:7 48:9
accident [1] 54:19
accommodate [1]
7:23
accommodation [3]
8:2 8:2 8:4
accordance [1] 3:8
accounting [10] 16:19
17:14 17:16 17:18
18:1 32:17 32:21
32:23 33:21 36:1
accounts [1] 17:21
Act [7] 29:7 29:10
29:18 29:20 29:21
52:8 86:5
active [1] 26:17
actual [1] 59:2
Adam [2] 1:5
12:19
additional [5] 42:15
42:24 69:10 76:9
89:17
address [2] 9:5
70:1
administering [1]
3:25
administrator [1]
35:20
ADP [2] 35:19 48:25
Adrianna [4] 32:7
33:25 34:4 89:20
aforementioned [1]
3:5
afternoon [1] 7:23
afterwards [1] 78:2
again [10] 22:11
24:12 42:6 47:24
57:23 74:10 77:12
78:17 80:1 82:16
age [1] 25:20
ago [3] 25:7 53:15
78:21
agree [1] 7:17
AGREED [1] 3:3
allow [2] 5:17
69:3
along [1] 80:9
alongside [1] 34:8
amending [1] 38:18
among [1] 54:22
amount [2] 58:21
64:24
Amy [1] 13:13
Anderson [93] 2:3
2:14 4:11 4:17
4:24 5:16 6:6
6:16 8:21 9:10
10:19 12:3 12:11
14:12 18:23 19:1
19:6 20:7 20:18
20:25 21:14 22:1
25:1 27:1 28:18
29:16 30:7 33:17
35:23 36:14 37:16
37:23 38:2 38:11
38:16 38:20 38:23
39:2 40:16 40:22
41:2 41:25 42:12
42:21 43:12 44:1
44:7 44:24 45:5
46:3 46:7 49:11
55:16 55:21 60:22
61:22 63:20 64:8
67:10 67:22 68:25
69:22 70:21 71:4
71:12 71:21 74:18
75:5 76:16 76:23
77:15 78:1 78:6
79:1 79:19 80:11
82:1 82:6 83:11
83:16 84:14 85:11
86:12 87:14 87:17
88:1 89:21
Annette [2] 18:18
58:3
answer [9] 3:17
7:2 19:3 19:4
22:23 40:8 59:15
78:7 80:13
answered [3] 25:7
36:12 60:23
answers [1] 32:8
Anthony [1] 1:4
12:15
anticipation [1] 26:24
apart [1] 26:4
apologize [1] 36:15
APPEARANCES [2]
1:18 2:1
apply [1] 32:13
appropriate [1] 9:6
Archtics [3] 36:10
36:18 36:21
area [5] 26:16 27:20
27:22 48:21 67:12
arrangements [1]
72:12
arrived [4] 14:7
14:24 34:3 48:22
Artega [1] 17:2
Article [1] 7:17
assistance [1] 65:24
assistant [1] 18:14
assistants [3] 18:2
18:10 19:8
assume [1] 54:18
Assumes [1] 84:15
attached [2] 38:3
91:7
attended [1] 83:1
attention [3] 20:12
38:21 41:3
attorney [4] 5:3
46:14 54:16 56:15
attorneys [4] 1:25
2:5 83:21 83:22
August [2] 19:19
56:11
authorizations [1]
27:22
availability [2] 9:2
9:3
available [5] 6:23
7:24 8:16 8:17
65:19
Avenue [1] 1:15
2:3
aware [8] 42:1
42:7 56:6 56:14
56:15 58:24 59:12
89:5
b [2] 7:9 39:4
bachelor's [1] 10:3
backup [3] 50:4
51:20 52:1
backups [1] 35:17
baffled [1] 89:19
based [4] 39:17
59:4 87:3 88:17
Bates [3] 2:19
2:22 80:3
Baton [1] 79:24
Bear [2] 11:11 41:10
became [1] 26:2
began [1] 16:18
begin [1] 43:5
behalf [1] 56:21
beneficial [1] 81:16
benefits [1] 23:9
Berry [2] 1:4
12:21
best [2] 49:19 92:12
between [6] 3:4
5:12 6:3 56:10
63:17 83:18
beyond [1] 9:25
11:18 16:9
binder [7] 32:6
34:13 34:16 34:18
35:21 65:17 89:19
binders [1] 54:22
blank [1] 26:17
board [1] 82:9
Bode [4] 2:9 3:23
92:4 92:21
bookcase [1] 35:22
BOURQUE [1] 1:22
box [5] 54:20 54:23
boxes [5] 43:2
55:3 71:10 85:6
break [4] 40:23
42:15 76:14 84:13
brief [2] 43:24 80:19
bring [1] 80:16
Brown [11] 13:15
13:24 14:6 56:2
58:15 58:22 58:25
59:9 59:12 67:3
85:16
Brown's [2] 53:16
77:7
Bryan [3] 1:23
44:12 76:19
Buckle [1] 15:5
building [3] 27:9
27:16 46:25
Buras [74] 1:19
2:15 4:5 5:23
6:13 7:20 10:17
11:14 14:3 20:3
24:24 28:16 36:11
37:12 38:7 38:14
38:25 40:14 42:18
43:9 44:4 44:9
45:3 45:8 45:15
45:20 46:1 46:5
46:9 46:13 49:14
51:7 51:12 52:2
55:9 55:13 55:18
55:23 55:25 61:6
62:1 63:25 64:11
64:13 66:13 66:17
67:13 68:14 69:7
70:8 70:24 71:7
71:15 71:25 75:1
75:7 75:16 76:13
76:18 77:13 77:21
78:3 78:22 79:14
80:6 80:15 80:21
82:4 82:22 84:2
84:18 85:8 89:11
89:25
Business [1] 10:4

C-A-S-O-N [1] 66:8
C-O-N-G-E-R [1]
66:8
calculate [2] 86:23
87:1
calculated [2] 58:21
87:24
calculating [1] 86:19
calculation [2] 52:18
88:12 88:17
calls [1] 69:2
cannot [5] 59:4
59:15 59:25 74:10
85:5
care [3] 25:21 47:18
47:19
Carolina [1] 81:15
CARRERE [1] 2:2
Carter [2] 1:5
12:13
case [7] 19:25 21:13
29:25 57:2 59:9
64:6 89:7
Cason [3] 66:3
66:8 68:21
categories [3] 67:1
68:17 68:22
certain [3] 24:7
35:10 70:15
CERTIFICATE [2]
91:1 92:1
certification [3]
3:13 10:10 10:11
Certified [5] 2:9
3:23 4:3 92:4
92:22
certify [2] 91:5
92:5
CFO [1] 17:8
chain [7] 5:4
7:4 7:16 8:6
9:8 11:19 68:11
chance [3] 26:10
34:10 82:13
change [1] 26:5
changes [1] 91:8
Charles [1] 1:15
2:3
Charlotte [1] 81:14
check [1] 77:11
chief [1] 17:8
child [1] 25:14
Chris [3] 1:5
1:5 12:13 13:5
city [8] 26:1 47:23
48:3 48:19 66:3
73:24 81:18 82:15
Civil [3] 1:1 3:7
5:19
claim [1] 15:13
23:10
claims [2] 15:8
16:12
clarification [1]
79:5

clarify [8] 21:24
22:7 28:2 29:14
35:8 37:11 81:22
82:5
clarifying [1] 48:5
classified [1] 68:9
clear [5] 10:22 51:2
75:6 75:8 79:7
cleared [1] 25:24
Code [1] 3:7
College [1] 10:4
columns [1] 88:3
coming [1] 33:4
55:1 73:19
commencing [1]
1:16
commission [12]
16:8 16:10 32:17
32:21 33:13 33:19
33:21 33:24 34:13
35:25 36:8 36:9
commissions [1]
33:3
communication [1]
15:22 69:5 78:5
communications [4]
69:15 83:18 83:20
83:25
company [1] 89:2
complete [3] 4:20
7:12 7:25
completion [1] 4:23
61:5
comply [1] 6:10
8:4
computer [4] 47:24
48:8 48:9 65:18
concerned [2] 26:9
29:21
concerns [1] 47:17
conclude [1] 8:16
concluded [4] 5:13
7:22 8:13 90:3
conclusion [4] 5:5
6:3 8:11 77:24
conducted [4] 4:16
8:14 71:1 81:20
confidential [1]
23:12
confirm [1] 62:21
confirming [1] 5:10
confusion [1] 74:22
Conger [3] 66:3
66:6 68:21
Conger's [1] 83:9
congestive [1] 25:22
connection [8] 13:7
13:9 21:2 23:20
42:3 42:9 86:4
89:7
consider [2] 81:12
86:10
considered [3] 68:17
68:23 86:6
contact [2] 5:11

32:14
contacted [2] 5:2
6:2
contacting [1] 6:21
contained [1] 34:13
containing [2] 73:11
73:16
Continuation [1]
1:13
continued [2] 2:1
49:1
continuing [1] 43:1
contract [1] 29:8
controls [1] 61:16
coordinator [1] 18:16
19:12
copies [16] 33:8
33:12 53:4 53:14
53:20 53:23 54:1
56:20 57:1 57:12
61:13 62:21 63:3
74:10 74:12 85:1
copy [16] 38:5
38:8 38:12 38:24
40:17 45:14 45:16
62:3 62:23 63:7
64:9 64:14 64:17
65:16 76:5 80:23
corporate [1] 7:9
correct [31] 19:23
31:16 32:19 46:23
47:1 47:5 47:9
47:10 47:13 47:14
47:20 47:21 50:1
50:2 54:12 54:13
56:12 56:17 57:7
57:13 57:14 59:1
63:19 70:16 73:9
73:13 73:14 74:3
81:5 91:5 92:12
corrections [1] 91:7
corresponded [2]
23:19 23:20
counsel [45] 3:4
11:15 15:23 28:6
28:12 28:13 28:21
29:6 29:25 30:4
30:16 30:25 32:14
42:4 42:10 49:22
50:4 53:3 53:24
54:2 62:14 62:20
63:2 64:7 64:15
64:18 64:23 65:25
66:1 66:2 68:9
69:5 69:13 70:4
70:4 70:9 70:25
74:10 76:1 77:22
81:2 83:18 83:19
92:14 92:15
count [1] 16:25
couple [5] 42:19
44:20 55:20 64:20
74:14
course [4] 44:8
52:13 80:5 88:23
court [6] 1:1 7:18
9:5 15:17 15:18
66:14

Court's [1] 11:18
covered [1] 83:10
created [1] 60:12
credenza [1] 65:17
Crumb [1] 4:13
Crumb's [1] 8:11
CSR [2] 2:9 92:21
custody [5] 5:5
7:4 8:6 9:8
11:19
cut [1] 21:11

D6733 [4] 2:19
43:6 53:19 56:4
D6751 [2] 43:6
53:19
D6752 [2] 2:22
66:15
D6774 [1] 66:12
D6804 [1] 66:15
DAIGLE [1] 1:19
damage [2] 27:10
27:16
Dan [4] 14:15 38:24
64:10 78:7
Daniel [1] 1:19
Danielle [2] 19:14
58:10
Daniels [2] 19:14
58:11
data [1] 33:1
database [5] 50:23
51:3 51:5 51:6
51:14
date [10] 6:20 6:22
8:16 8:20 73:6
77:1 81:12 81:14
82:20 88:18
dated [1] 64:4
80:24
dates [3] 11:24 79:6
89:3
daughter [1] 26:4
days [3] 19:24 25:7
34:25
deal [2] 25:13 45:9
Deana [1] 17:2
17:15
debating [1] 9:4
December [8] 2:24
14:11 53:1 53:2
64:4 82:21 85:17
88:15
deduction [1] 23:16
deemed [1] 23:5
DEFENDANT [1]
2:5
definitely [2] 85:4
85:5
degree [1] 10:3
10:5
deliver [1] 25:13
delivering [1] 47:11
DENEGRE [1] 2:2
department [4] 16:15

16:20 60:19 67:19
departments [1]
57:10
depend [2] 22:13
22:17
depose [1] 4:13
deposed [1] 4:18
deposition [50] 1:13
3:5 3:18 4:7
4:16 5:6 5:8
5:12 5:13 6:3
6:4 6:4 6:8
6:21 7:3 7:5
7:11 7:25 8:12
8:12 8:14 8:17
8:19 11:22 12:2
15:11 19:25 37:5
39:4 50:10 54:17
57:9 67:17 68:12
69:8 74:17 75:15
75:18 75:22 76:1
76:3 76:6 76:10
77:20 77:24 78:10
78:12 78:12 78:25
90:2
depositions [5] 4:21
4:23 7:22 8:5
56:9
describing [1] 61:14
designated [1] 1:14
desire [1] 4:12
desk [3] 35:22 49:5
49:6
details [3] 16:11
27:15 49:17
determine [2] 70:14
87:24
determined [1] 50:16
Detroit [1] 10:4
different [3] 25:8
67:1 88:24
directed [3] 58:3
58:10 66:22
directing [1] 67:18
direction [3] 32:14
41:22 92:11
directly [1] 12:9
disagree [1] 8:24
disagreement [1]
9:7
discovery [3] 37:3
37:8 37:18
discuss [5] 5:4
6:2 6:24 68:5
69:4
discussed [8] 4:12
4:17 4:25 6:19
7:7 60:3 82:25
89:10
discussing [1] 61:14
discussion [5] 18:25
33:16 36:9 41:1
41:24
discussions [1] 16:1
31:19 75:25
disregard [1] 21:1
DISTRICT [1] 1:1