**1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

EUGENE LIGER, ET AL,          CIVIL ACTION
    Plaintiffs in a           NO. 05-1969
    Collective Action

VERSUS

NEW ORLEANS HORNETS NBA         SECTION "C"
LIMITED PARTNERSHIP,
    Defendants

VOLUME 2

    Deposition of SAM RUSSO, taken on Thursday,
September 13, 2007, commencing at 9:12 a.m., and
adjourning at 12:15 a.m., in the offices of Jones,
Walker, Waechter, Poitevent, Carrere & Denegre, 201
St. Charles Avenue, 52nd Floor, New Orleans,
Louisiana.

APPEARANCES:

    DAIGLE, FISSE & KESSENICH
    (BY:  DANIEL E. BURAS, JR., ESQ.)
    227 Highway 21
    Madisonville, Louisiana 70447
        and
    NILES, BOURQUE & FONTANA
    (BY:  BRYAN KNIGHT, ESQ.)
    909 Poydras Street, 35th Floor
    New Orleans, Louisiana 70112
    (ATTORNEYS FOR PLAINTIFFS)

**2**

1 APPEARANCES (continued):

2   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE

3   (BY:  JENNIFER L. ANDERSON, ESQ., and
       JANE H. HEIDINGSFELDER, ESQ.)

4   201 St. Charles Avenue, 48th Floor
    New Orleans, Louisiana 70170

5   (ATTORNEYS FOR DEFENDANTS)

6

  REPORTED BY:

7

    ASTRA THIBODEAUX

8   Certified Court Reporter

9

10           I N D E X

11 DESCRIPTION                              PAGE

12

13 Examination by Mr. Buras                   4

14

15 Exhibit No. 12                            4

16 Exhibit No. 16                            8

17 Exhibit No. 18, 10, 11                   12

18 Exhibit No. 19                           20

19 Exhibit No. 17                           49

20 Exhibit No. 13, 14                       79

21

22 Witness' Certificate                     84

23

24

25



EXHIBIT
H-1
tabbies

**3**

1          S T I P U L A T I O N

2

3     It is stipulated and agreed by and between

4 counsel for the parties that the deposition of SAM

5 RUSSO is hereby taken for all purposes under the

6 Federal Rules of Civil Procedure, in accordance with

7 law, pursuant to notice, on Thursday, September 13,

8 2007, in the offices of Jones, Walker, Waechter,

9 Poitevent, Carrere & Denegre, 201 St. Charles Avenue,

10 52nd Floor, New Orleans, Louisiana;

11     That the formalities of sealing,

12 certification and filing are waived; the formality of

13 signing is not waived;

14     That all objections, save those as to the

15 form of the questions and the responsiveness of the

16 answers, are hereby reserved until such time as this

17 deposition, or any part thereof, may be used or

18 sought to be used in evidence.

19

20         * * * * *

21

22     ASTRA THIBODEAUX, Certified Court Reporter

23 in and for the State of Louisiana, officiated in

24 administering the oath to the witness.

25

**4**

1     SAM RUSSO, 67 Maryland Drive, New Orleans,

2 Louisiana 70124, who, after having been first duly

3 sworn, did testify as follows:

4 EXAMINATION BY MR. BURAS:

5   Q  Mr. Russo, good morning.  I'm going to hand

6 you a copy of a document that I've marked as Exhibit

7 12.  It's a copy of the 30(b)(6) notice in this case.

8 Counsel, you should have a copy of that.

9     MS. ANDERSON:

10       I do.

11 EXAMINATION BY MR. BURAS:

12   Q  Mr. Russo, your counsel has indicated in

13 Exhibit 1 that you have been identified as the

14 30(b)(6) representative who will testify as to the

15 following numbers:  Numbers 1 through 10 on the

16 request, No. 18 and 19, No. 20 through 25, and No. 25

17 Sections A through I, Numbers 26 through 33, Sections

18 A through I, No. 34, A through D, No. 35 through 40,

19 and Numbers 43 through 44 on the 30(b)(6) notice.

20     In addition to that, sir, there is a 1442

21 notice related to the state court cases, and I will

22 pull that deposition in a moment and mark it but I

23 don't have it in front of me right now, and you've

24 been identified as the corporate representative for

25 Numbers 2 through 3, 5, A through K, No. 6, No. 12,

Dockets.Justia.com

**5**

1 Numbers 14 through 20, No. 22, 24 through 25, 28
2 through 30, 32 through 33, 35, 36, Sections A through
3 G, 37 through 40, 42 through 47, and 49.  Is that
4 accurate, sir?
5    **A**  That's correct.
6    **Q**  Prior to coming to this deposition today,
7 have you seen a copy of this 30(b)(6) deposition
8 notice?
9    **A**  Yes.
10    **Q**  Have you had the opportunity to review the
11 numbers that you have been identified as the
12 corporate representative who will respond to these
13 numbered sections?
14    **A**  To some degree.
15    **Q**  During the course of your review and
16 preparation for this deposition, were you able to
17 identify any documents that you might have had that
18 were responsive to any of the areas set forth in any
19 of the numbers where you were designated as the
20 corporate representative?
21    MS. ANDERSON:
22        I'm going to object to the form of the
23 question.  He said are we doing the substantive
24 30(b)(6)?  We were told by Bryan that we are going
25 over the, not procedurals, just the chain of evidence

**6**

1 issues, and he has a question about that.
2 EXAMINATION BY MR. BURAS:
3    **Q**  Sir, we are not going over the substantive
4 content matters, but I am going to ask you if you
5 conducted any investigation of your materials to find
6 out if there were documents you might have found
7 responsive to any of these subparts in your
8 preparation for the subpart.  To the extent I'm going
9 to try to avoid substantive questions, I will.
10 Sometime it's unavoidable because the "where is it
11 located" question would be part of the substantive
12 question.  Do you understand what I'm looking for,
13 sir?
14    **A**  We are still looking for documents.
15    **Q**  Yes, sir.
16    MS. ANDERSON:
17        There's not a question on the table, is
18 there?
19    MR. BURAS:
20        Yes.
21    MS. ANDERSON:
22        I think I objected as to form and you
23 probably need to pick it back up.
24    MR. BURAS:
25        I'm just trying to verify, Mr. Russo.

**7**

1 The question on the table is, have you conducted an
2 investigation on your own in preparation for this
3 deposition wherein you located any documents that
4 might be responsive to any of the subparts for which
5 you've been designated to testify pursuant to the
6 30(b)(6) request issued by plaintiffs?
7    MS. ANDERSON:
8        And if you need to, look at this first.
9    THE WITNESS:
10        That's what I'm going through.  One
11 more time with the question, please.
12    (The court reporter complies.)
13    THE WITNESS:
14        I was not the corporate representative
15 and I did not produce any of these.
16 EXAMINATION BY MR. BURAS:
17    **Q**  Okay, sir.  I'm going to clarify briefly,
18 and you let me know.  For purposes of this deposition
19 the Hornets have designated you as the corporate
20 representative to answer questions regarding the
21 numbers that we previously discussed, do you
22 understand?
23    MS. ANDERSON:
24        As a corporate representative?
25    MR. BURAS:

**8**

1        As a corporate representative.
2 EXAMINATION BY MR. BURAS:
3    **Q**  My question to you was, since you've been
4 designated as the corporate representative, or in
5 preparation for this deposition, have you yourself
6 conducted an investigation to determine if you or
7 anyone that you delegated to conduct an investigation
8 can locate documents responsive to any of the areas
9 where you have been designated as the corporate
10 representative?
11    **A**  I have not.
12    **Q**  Okay.  I'm going to hand you a copy of a
13 document now that I marked as Exhibit 16, which is
14 the 1442 notice.  It should be in the stack that I
15 gave you yesterday, counsel.
16        All right, sir.  You should have in front of
17 you the document that's been marked as Exhibit 1,
18 which identifies the numbers that we have previously
19 discussed you've been identified to respond to.
20 Would you please review this 1442 notice to determine
21 whether or not you have conducted an investigation to
22 determine if you had any documents that might have
23 been responsive to any of the categories upon which
24 you've been designated as the 1442 representative?
25    MS. ANDERSON:

## 9

1 Dan, this was marked as Exhibit 16?
2 (Off the record discussion)
3 THE WITNESS:
4 I have not.
5 EXAMINATION BY MR. BURAS:
6 Q Just to clarify, you have not conducted a
7 search to locate documents, correct, sir?
8 A That's correct.
9 Q And, therefore, you've not located those
10 documents, correct, sir?
11 A Correct.
12 Q Sir, we were advised by your counsel in a
13 letter dated September 12 that there were 10 people
14 who have investigated this matter for the Hornets who
15 are no longer working for the Hornets.
16 A That's correct.
17 MS. ANDERSON:
18 I know he said correct. I object to
19 the form and refer to the letter for what the
20 representation is.
21 EXAMINATION BY MR. BURAS:
22 Q Did you contact Kristy McKearn to discuss
23 her investigation into this case for documents and
24 information responsive to plaintiffs' request?
25 A I have not.

## 11

1 A I have not.
2 Q Prior to this deposition, did you contact
3 Ms. Deana Artega to determine what investigation she
4 conducted to locate documents or information
5 responsive to plaintiffs' request in this case?
6 A I have not.
7 Q Prior to this deposition, did you contact
8 Mr. Tim Spero to determine what investigation he
9 conducted to locate documents or information
10 responsive to plaintiffs' request in this case?
11 A I have not.
12 Q Prior to this deposition, did you contact
13 Mr. Greg King to determine what investigation he
14 conducted to locate documents or information
15 responsive to plaintiffs' request in this case?
16 A I have not.
17 Q Prior to this deposition, did you contact
18 Mr. Brice Collier to determine what investigation he
19 conducted to find information or documents responsive
20 to plaintiffs' request in this case?
21 A I have not.
22 Q Is it fair to say that you don't know what
23 any of these people did to locate any information or
24 documents responsive to plaintiffs' request in this
25 case?

## 10

1 Q Prior to this deposition, did you contact
2 Brendan Donohue to discuss the investigation he
3 conducted to locate documents and information
4 responsive to plaintiffs' request in this case?
5 A I have not.
6 Q Prior to this deposition, did you contact
7 Chris Zaber to determine what investigation he
8 conducted to obtain information or documents
9 responsive to plaintiffs' request in this case?
10 A I have not.
11 Q Prior to this deposition, did you contact
12 Marie Parenti to determine what investigation she
13 conducted to locate documents or information
14 responsive to plaintiffs' request?
15 A I have not.
16 Q Prior to this deposition, did you contact
17 Mr. Jonathan Lakamp to determine what investigation
18 he conducted to locate documents or information
19 responsive to plaintiffs' request in this case?
20 A I have not.
21 Q Prior to this deposition, did you contact
22 Mr. Dave Burke to determine what investigation he
23 conducted to locate documents or information
24 responsive to plaintiffs' request for information in
25 this case?

## 12

1 A That is correct.
2 Q I'd like to mark counsel's letter
3 identifying these 10 persons as Exhibit 17 (Exhibit
4 18). Do you have a clean copy? This has my marks on
5 it?
6 MS. ANDERSON:
7 I don't have a clean copy and I'm okay
8 with your hash marks.
9 MR. BURAS:
10 Okay. Thank you.
11 EXAMINATION BY MR. BURAS:
12 Q All right, sir. I'm going to hand you a
13 copy of a document that's been marked as Exhibit 10
14 and Exhibit 11. It may actually be in this stack.
15 Plaintiffs' second set of requests for production of
16 documents and defendant's responses to plaintiffs'
17 second set of requests for production of documents.
18 Sir, I'm going to give you my copy which has a mark
19 of Exhibit 10 while I locate that one. Will you
20 please tell me if you have ever seen that document
21 before this deposition?
22 A Yes.
23 Q Sir, when is the first time that you saw
24 this document?
25 A Probably around sometime in August.

## 13

1  Q  August of what year, sir?
2  A  2007.
3  Q  Would you please turn to the last page of
4  that document for the certificate of service, sir?
5  You'll see an area that's marked, "Certificate of
6  service." What is the date that is represented on
7  that last page indicating the date that this request
8  for production of documents was first sent on to
9  Hornets' counsel in this matter?
10  A  August 3, 2005.
11  Q  Sir, I'm going to have you switch copies,
12  only because this copy has an ink version that says
13  Exhibit 10. All right, sir. Who gave you a copy of
14  this document in August of 2007?
15  A  Our legal counsel.
16  Q  Current legal counsel, Ms. Anderson, or the
17  Hornets' legal counsel?
18  A  Jones Walker.
19  Q  Were you asked at that time to conduct any
20  investigation to find documents responsive to any
21  information set forth in these requests for
22  production?
23  A  To conduct an investigation, no.
24  Q  Were you asked to locate any documents that
25  might be responsive to any of the requests for

## 14

1  production set forth in these requests for
2  productions?
3  A  One more time.
4  Q  Yes, sir. Were you asked whether you had
5  any documents that might respond to plaintiffs'
6  request for information set forth in this Exhibit 10?
7  A  Yes.
8  Q  All right, sir. Which of the numbered
9  requests for production of documents were you asked
10  to assist counsel in locating documents responsive?
11  A  I can't recall.
12  Q  Okay, sir. In response to counsel's
13  request, did you provide her with any documents
14  responsive to any of these categories of requests for
15  information?
16  A  No, I didn't.
17  Q  At the request of counsel, did you delegate
18  or designate any person to investigate on your behalf
19  any information that might be responsive to any of
20  these requests for production?
21  A  No, I didn't.
22  Q  Sir, what did you do in response to
23  counsel's request to obtain information that might be
24  responsive to these requests for production?
25  A  I had a phone conversation with counsel.

## 15

1      MS. ANDERSON:
2          I don't want you to disclose the
3  contents of a telephone conversation with counsel.
4  You can tell him if you produced something or told
5  somebody else to search, those sorts of things, but
6  don't disclose the substance of communications with
7  counsel.
8  EXAMINATION BY MR. BURAS:
9  Q  I'm just trying to be clear. You did not
10  produce any documents in response to counsel's
11  request, correct?
12  A  Correct.
13  Q  Did you look for any documents that you
14  might have had responsive to any of these requests
15  for production of documents?
16  A  No, I did not.
17  Q  And you did not delegate or designate anyone
18  else to be the person or point of contact to look for
19  information that might be responsive to any of
20  plaintiffs' request for production?
21  A  No.
22  Q  Prior to August of 2007, you did conduct any
23  investigation for any information on behalf of the
24  Hornets related to this litigation?
25  A  The question is did I conduct --

## 16

1  Q  I'll make it easier, sir. Prior to August
2  7, 2007, did you personally look for any documents
3  that might be responsive to any of the requests that
4  plaintiffs sent to the Hornets in this litigation?
5  A  No.
6  Q  Prior to August of 2007, did you personally
7  designate anyone to look for information that might
8  be responsive to any of the requests that plaintiff
9  sent in this litigation?
10  A  No.
11  Q  After August of 2007, did you personally
12  look for any information that might be responsive to
13  any of the requests submitted by plaintiffs in this
14  litigation?
15  A  No.
16  Q  Since August of 2007, did you delegate or
17  designate anyone to find out if there were any other
18  information that might be responsive to plaintiffs'
19  request in this litigation?
20  A  No.
21  Q  And I believe we previously confirmed that
22  prior to this deposition you have not conducted any
23  personal interviews or had conversations with any of
24  the people who conducted the investigation on behalf
25  of the Hornets to determine what investigation or

## 17

1 information they conducted to locate documents or
2 information, correct, sir?
3    **A** That is correct.
4    **Q** Sir, did there come a point in time within
5 the last few weeks where you learned that plaintiffs
6 believed that there was a contact management system
7 or additional sales computer information system that
8 might have information responsive to plaintiffs'
9 submission request?
10   **A** I'm aware of it.
11   **Q** At any point in time after you became aware
12 of that did you take any personal steps to locate or
13 find information that might be responsive to
14 plaintiffs' inquiry regarding that issue?
15   **A** Yes.
16   **Q** What steps did you take, sir?
17   **A** I tried to determine if we still had the
18 server that that system would have been located on.
19   **Q** What steps did you take to find out if you
20 still had the server, sir?
21   **A** I asked the person in our IT department.
22   **Q** What is his name, sir?
23   **A** Christian Green.
24   **Q** What is his position, sir?
25   **A** I'm not sure what his position is.  He is

## 18

1 not a director or a VP or anything.
2    **Q** When did you ask Mr. Green to find this
3 information on the server?
4    **A** I can't remember exact dates.  In the last
5 30 days.
6    **Q** Sir, is it fair to say this conversation
7 took place after August 30 of 2007?
8    **A** I can't say that.
9    **Q** Okay, sir.  Is it possible that this
10 conversation with Mr. Green and his investigation
11 took place prior to August 30, 2007?
12       MS. ANDERSON:
13       Objection, asked and answered.
14       THE WITNESS:
15       I didn't hear what you said.
16       MS. ANDERSON:
17       Oh, I said, "Objection, asked and
18 answered."  You can still answer the question if
19 you're able to do that.
20       THE WITNESS:
21       It's the same answer.  I can't be a
22 hundred percent sure.
23 EXAMINATION BY MR. BURAS:
24   **Q** The contact management system that we just
25 investigated that you requested information from Mr.

## 19

1 Green, what did Mr. Green tell you?
2    **A** He told me that the system was still there.
3    **Q** Did you personally supervise Mr. Green as he
4 looked for information regarding this contact
5 management system?
6    **A** Yeah, I guess, yes.
7    **Q** Did you verbally communicate this request to
8 investigate to Mr. Green, or did you send him a
9 letter, e-mail?
10   **A** Verbally.
11   **Q** How long did it take Mr. Green to locate
12 this information?
13   **A** Probably a day or two.
14   **Q** How long prior to August of 2007 had you
15 been aware that the Hornets used a contact management
16 system?
17   **A** It's one that we used in Charlotte.
18   **Q** You were aware of it at least since your
19 days in Charlotte, sir?
20   **A** Well, I was aware of it, but we discontinued
21 use of it.
22   **Q** When is your understanding of the date that
23 you discontinued using the contact management system?
24   **A** 2000 -- late 2004 or early 2005.
25   **Q** Sir, I'm going to hand you a copy of that

## 20

1 document that I previously marked as Exhibit 13 --
2 excuse me, I've now marked as Exhibit 13 (Exhibit
3 19).  Excuse me.  Counsel, this is a copy of one of
4 the documents that was recently produced on last
5 Friday.
6       Sir, I want you to take a look at the page
7 that's been identified as D-6055.  It's the first
8 page.  There is a legend at the bottom left-hand side
9 of each of these pages that indicates that this was
10 apparently a color coded matrix.  Everything I have
11 is black and white, so it's pretty hard for me to
12 understand this matrix.  Did you personally create
13 this Initial Ticket Sales Process document that I've
14 just placed in front of you?
15   **A** Have not.
16   **Q** Have you ever seen this document before,
17 sir?
18   **A** This is the first time I've seen it.
19   **Q** I want you to take a look at the area
20 underneath the chart that says, "Current."  Do you
21 see that, sir?
22   **A** Under the chart that says, "Current"?
23   **Q** Yes, sir.  Take a look.  There is a line
24 underneath the header that says it's the Initial
25 Ticket Sales Process.  If you take a look at the

## 21

1 first box, it says, "Take the order sales rep." Do
2 you see that, sir?
3    **A**  Uh-huh (affirmative expression).
4    **Q**  What steps did you personally conduct to
5 find out information related to documents that might
6 show which sales rep took an order?
7    **A**  Repeat, please.
8    **Q**  Yes, sir.  What steps or investigations did
9 you conduct to find out any documents or evidence
10 that would show which sales rep actually took order
11 from a customer?
12    **A**  Based on what?
13    **Q**  Based on this first block that says, "Take
14 the order sales rep."
15        MS. ANDERSON:
16            Objection, form.
17        THE WITNESS:
18            None.  No investigation.
19 EXAMINATION BY MR. BURAS:
20    **Q**  Do you know what steps the Hornets took to
21 identify the sales rep who actually took order from a
22 customer?
23        MS. ANDERSON:
24            Objection, form.
25        THE WITNESS:

## 22

1            Please repeat.
2 EXAMINATION BY MR. BURAS:
3    **Q**  Yes, sir.  Do you know what steps any
4 Hornets designee or investigator or person who was
5 designated to investigate or find facts responsive to
6 a request, what steps those persons took to identify
7 the sales representative who actually took order from
8 a customer?
9    **A**  I do not.
10        MS. ANDERSON:
11            Objection, form.
12 EXAMINATION BY MR. BURAS:
13    **Q**  The second box indicates, "Enter the order
14 on internal order form on contact management system."
15 Do you see that, sir?
16    **A**  Uh-huh (affirmative expression).
17    **Q**  Is it fair to say that there would be some
18 type of information entered on to an internal order
19 form, and I don't know whether it was done by the
20 account executive, ticket ops or accounting
21 department because of the black and white nature of
22 this colored chart, but is it fair to say that there
23 was information entered into an initial order form?
24        MS. ANDERSON:
25            Objection, form.

## 23

1        THE WITNESS:
2            I don't know.
3 EXAMINATION BY MR. BURAS:
4    **Q**  Okay, sir.  Did you personally conduct any
5 investigation to find out any internal order forms
6 that might have been entered for customer orders
7 related to any of the plaintiffs in this litigation?
8        MS. ANDERSON:
9            Objection, form.
10        THE WITNESS:
11            I did not.
12 EXAMINATION BY MR. BURAS:
13    **Q**  Do you know what steps any other Hornets
14 designee, investigator or person designated by the
15 Hornets to investigate these matters took to locate
16 any internal order forms that might have been entered
17 into the contact management system by any plaintiffs
18 in this litigation?
19        MS. ANDERSON:
20            Objection, form.
21        THE WITNESS:
22            I do not.
23 EXAMINATION BY MR. BURAS:
24    **Q**  Did you ask anyone for this information,
25 sir?

## 24

1        MS. ANDERSON:
2            Objection, asked and answered.
3        THE WITNESS:
4            I did not.
5 EXAMINATION BY MR. BURAS:
6    **Q**  Did you produce this form, sir?
7    **A**  I did not.
8    **Q**  Do you see the third box that says, "Order
9 is received by ticket operations rekeyed into
10 Archtics," sir?
11    **A**  I'm sorry, but somebody is going to have to
12 verify that for me.  I cannot read this.
13        MS. ANDERSON:
14            That's what it says.
15 EXAMINATION BY MR. BURAS:
16    **Q**  Did you personally conduct any investigation
17 to find out how the order was transmitted to the
18 ticket operations department for it to be rekeyed
19 into Archtics?
20        MS. ANDERSON:
21            Objection, form.
22        THE WITNESS:
23            I did not.
24 EXAMINATION BY MR. BURAS:
25    **Q**  Do you know what investigation or steps were

## 25

1 taken by any Hornets designee, investigator or person
2 designated by the Hornets to investigate this matter,
3 what steps they took to locate or find information
4 about how the order was received, actually received,
5 by the ticket operations department to be rekeyed
6 into Archtics?
7     MS. ANDERSON:
8         Objection, form.
9     THE WITNESS:
10        I did not.
11 EXAMINATION BY MR. BURAS:
12    **Q**  All right, sir. Do you see the block
13 underneath the one I just read to you that says,
14 "Provide customer with premium seat license
15 agreement"? Do you see the box, sir?
16    **A**  I see the box. I can't read what's in it.
17    **Q**  That is the one that's in the white.
18    **A**  Oh, "Provide customer."
19    **Q**  Yes, sir. Do the Hornets have any policies
20 and procedures related to how premium seat license
21 agreements are sent or submitted to customers?
22    **A**  Repeat the question, please.
23    **Q**  Yes, sir. Do the Hornets have any policies
24 or procedures regarding how and when premium seat
25 license agreements are sent to customers?

## 26

1    **A**  No, I don't.
2    **Q**  I believe yesterday you indicated you read
3 the complaints in both the state and federal court
4 cases?
5    **A**  Yes, sir.
6    **Q**  Are you aware that one of the complaints
7 made by the plaintiffs in this case is that they were
8 not paid commissions on all premium seat and license
9 agreements that they sold?
10    **A**  And the question is?
11    **Q**  Are you aware that that is one of the
12 allegations in this case, sir?
13    **A**  Yes.
14    **Q**  Do you know what investigations were
15 conducted by the Hornets to find out whether or not
16 customers were actually sent premium seat license
17 agreements for their signatures?
18    **A**  No.
19    **Q**  Do you know where that information would be
20 maintained?
21    **A**  Yes.
22    **Q**  Where, sir?
23    **A**  In our offices.
24    **Q**  Where in your offices, sir?
25    **A**  Most likely in our ticket sales area.

## 27

1    **Q**  Okay, sir. Is this information that someone
2 who worked in the ticket sales department would know
3 how to locate?
4    **A**  Maybe.
5    **Q**  Is this maintained in a large file cabinet,
6 or is it maintained by the individual sales account
7 reps?
8    **A**  A large file cabinet.
9    **Q**  Is this something that the director of
10 ticket sales and/or the sales manager had access to,
11 sir?
12    **A**  Can you be more specific?
13    **Q**  Is this a locked file cabinet to which entry
14 into or access to this file cabinet is limited?
15    **A**  Somewhat.
16    **Q**  Do the ticket sales director and/or sales
17 managers, whoever they may be, have access to this
18 file cabinet where the premium seat license
19 agreements sent to customers would be located?
20    **A**  Yes.
21    **Q**  Do you know whether or not anyone from the
22 Hornets or your counsel ever requested that premium
23 seat license agreements related to identified
24 customers that plaintiffs contend they should have
25 received commission sales for were ever produced in

## 28

1 this case?
2    **A**  I do not know.
3    **Q**  Do you know whether or not your counsel or
4 any representative of the Hornets has ever requested
5 that information be pulled and produced to
6 plaintiffs?
7    **A**  There were several people involved in that
8 and I do not know.
9    **Q**  Is that information that the Hornets could
10 easily produce if asked to do so?
11    **A**  They could produce.
12    **Q**  Is it something that the Hornets have ready
13 access to, sir?
14    **A**  Yes.
15    **Q**  All right, sir. When a premium seat license
16 agreement is sent to a customer, do you know who
17 within the Hornets organization sends that premium
18 seat license agreement to the customer?
19    **A**  I don't know.
20    **Q**  Okay, sir. Do you know if the premium seat
21 license agreement is sent with a cover letter to the
22 customer, or is it just a document that would be
23 sent?
24    **A**  I don't know.
25    **Q**  Do you know if that document is mailed or

## 29

1 e-mailed to the customer?
2    **A** I don't know.
3    **Q** Do you know if any investigation was
4 conducted by the Hornets to find out how these
5 premium seat license agreements were sent to
6 customers?
7    **A** I don't know.
8    **Q** Did you personally conduct any investigation
9 to find out how the premium seat license agreements
10 were sent to customers?
11    **A** I did not.
12    **Q** All right, sir. The box underneath this,
13 and I'm going to ask your counsel to verify it, says,
14 "Follow up on premium seat license agreements."
15 That's directly under the box we just read that's in
16 the white lettering. Do you see that, sir?
17       MS. ANDERSON:
18          That's what it says.
19       THE WITNESS:
20          Follow up?
21 EXAMINATION BY MR. BURAS:
22    **Q** "Follow up on premium seat license
23 agreements." Okay, sir?
24    **A** Okay.
25    **Q** Do you know how follow-ups on premium seat

## 30

1 license agreements were conducted by the New Orleans
2 Hornets?
3    **A** Not sure what follow up means.
4    **Q** I don't know either, sir. That's what this
5 box says. Do you know if someone did not -- I'm
6 going to make an assumption here that this means
7 contact the customer to find out if they have
8 submitted or signed premium seat license agreements.
9 Does that sound like what follow up means in this,
10 sir?
11    **A** It's speculation.
12    **Q** It is speculation. Do you know who prepared
13 this document, sir?
14    **A** I do not.
15    **Q** If a customer did not immediately sign a
16 premium seat license agreement, would the Hornets
17 contact that customer to try to see why they didn't
18 sign it?
19    **A** I would imagine we would, yes.
20    **Q** Would those contacts be recorded in written
21 form, sir?
22    **A** That would depend individually on the
23 specific agreement.
24    **Q** All right, sir. What factors would
25 determine whether or not there would exist a written

## 31

1 document evidencing the follow-up activity to obtain
2 a premium seat license agreement from a customer?
3    **A** In the fact that we are generalizing, the
4 individual sales rep might use different tactics.
5       MS. ANDERSON:
6          I'm just going to ask you don't
7 speculate or make assumptions. If you know, tell him
8 what you know. If you don't know, tell him you don't
9 know.
10       THE WITNESS:
11          I don't know.
12 EXAMINATION BY MR. BURAS:
13    **Q** Okay, sir. We will go back to my question
14 now that you've got that clarification. Do you know
15 whether or not there exists any written documents or
16 electronic documents that might evidence follow-up
17 actions that were taken to obtain premium seat
18 license agreements from customers?
19    **A** I don't.
20    **Q** Is it possible that those databases and/or
21 documents exist within the Hornets organization?
22    **A** I don't know.
23    **Q** Is it possible, sir?
24    **A** I don't know.
25    **Q** Do you know whether anyone within the

## 32

1 Hornets have ever looked for any of this information?
2    **A** I don't know.
3    **Q** You don't know whether it's been looked for,
4 sir?
5    **A** Yes.
6    **Q** Okay. All right, sir. I want you to take a
7 look at three pages into that document, D-6057. The
8 top of the page says, "Manifest Management." Do you
9 see that document, sir?
10    **A** Uh-huh (affirmative expression).
11    **Q** Do you know what a manifest management is,
12 sir?
13    **A** Not what they are asking here I don't know.
14    **Q** Did you create this document, sir?
15    **A** No, I did not.
16    **Q** Have you ever seen this document before?
17    **A** No, I haven't.
18    **Q** I'm going to ask you some questions, then
19 please give me answers if you know. Do you know what
20 it means in the first block under "Current" that
21 says, "Build and modify arena manifest"?
22    **A** Yes.
23    **Q** All right, sir. Are there any documents
24 that might relate to the block that says, "Build and
25 modify arena manifest"?

**33**

1    **A** I don't know.
2    **Q** This goes back -- do you know what an arena
3 manifest is, sir?
4    **A** Yes.
5    **Q** What is that, sir?
6    **A** It's the seats that are inventoried in the
7 arena. The system on the Archtics system.
8    **Q** Just to make sure I understand, sir, these
9 would be the seats sold that were in the Archtic
10 system, or are these all seats available?
11    **A** Total inventory.
12    **Q** When it says, "Assign respective seat
13 locations, seasons, minis, partials, and groups," do
14 you see that in the second box, sir?
15    **A** Uh-huh (affirmative expression).
16    **Q** Are there documents that would show what
17 respective seat locations were assigned to customers?
18    **A** I don't know.
19    **Q** I want you to take a look at the next block
20 that says, "Release of inventory to respective
21 outlets." What inventory is this referring to, sir?
22    **A** The inventory that would be passed on to
23 Ticketmaster for single game sales.
24    **Q** How would this inventory have been passed on
25 to Ticketmaster?

**34**

1    **A** I'm not sure.
2    **Q** Would there be any written documents showing
3 what inventory had been sent to Ticketmaster?
4    **A** Don't know.
5    **Q** Who would be the person who would have had
6 that information, sir?
7    **A** The director of ticket operations.
8    **Q** Do you know who the director of ticket
9 separations is right now, sir?
10    **A** It's a vacant position.
11    **Q** Prior to this position being vacant, is
12 the same position that would have been manned by
13 Jonathan Lakamp, sir?
14    **A** Yes.
15    **Q** Do you know as you sit here today how
16 Ticketmaster is notified as to which seats they can
17 sell?
18    **A** No.
19    **Q** Do you know whether or not anyone within the
20 Hornets organization or your counsel have ever
21 requested copies of any documents transmitted to
22 Ticketmaster regarding their inventory of seats
23 available?
24    **A** I don't know.
25    **Q** Do you know if anyone from the Hornets

**35**

1 organization has ever requested a copy of the
2 agreement with Ticketmaster to sell Hornets seats?
3    **A** I don't know.
4    **Q** Does such a document exist, sir?
5    **A** I don't know.
6    **Q** Do any outlets other than Ticketmaster sell
7 Hornets tickets, sir?
8    **A** What's an outlet?
9    **Q** I don't know, sir. That's the word that's
10 used on this document.
11    MS. ANDERSON:
12        Don't speculate. Tell him what you
13 know and what you don't know.
14    THE WITNESS:
15        I don't know.
16 EXAMINATION BY MR. BURAS:
17    **Q** Do the Hornets have any resale agreements
18 with any other businesses or individuals to sell
19 Hornets tickets?
20    **A** Not to my knowledge.
21    **Q** Do you know whether or not Ticketmaster
22 allows Hornets tickets to be resold through its
23 ticket resale company?
24    MS. ANDERSON:
25        Objection, form.

**36**

1        THE WITNESS:
2            One more time.
3    MR. BURAS:
4        Read that one back, please.
5    (The court reporter complies.)
6    THE WITNESS:
7        No.
8 EXAMINATION BY MR. BURAS:
9    **Q** Have you ever asked anyone at Ticketmaster
10 for this information, sir?
11    **A** No.
12    **Q** Do you know whether or not anyone working
13 for the Hornets has asked Ticketmaster for this
14 information?
15    **A** I don't know.
16    **Q** Do you know whether or not your legal
17 counsel has asked Ticketmaster for this information?
18    **A** I don't know.
19    **Q** Do you know whether anyone within the
20 Hornets organization has ever inquired into whether
21 or not Hornets tickets are resold by any individuals
22 or companies?
23    **A** I don't understand the question.
24    **Q** Yes, sir. Do you know whether or not the
25 Hornets have conducted any investigation to determine

## 37

1 what percentage of their tickets are resold on the
2 open market?
3    **A**  I have not conducted any investigation.
4    **Q**  Do you know the answer to that question,
5 sir?
6    **A**  I do not.
7    **Q**  Do you know if anyone within the Hornets
8 organization knows the answer to that question, sir?
9    **A**  I do not.
10    **Q**  Do you know who the best person to ask that
11 question to would be, sir?
12    **A**  I do not.
13    **Q**  Do you know whether or not any documents or
14 other information exists within the Hornets
15 organization tracking the amount or percentage of
16 Hornets tickets that are resold on the open market?
17    **A**  I don't.
18    **Q**  Has your counsel ever asked you for this
19 information, sir?
20    **A**  No.
21    **Q**  Has anyone within the Hornets organization
22 been asked by counsel for this information, to the
23 best of your knowledge?
24    **A**  Don't know.
25    **Q**  Are you aware of the identities of any

## 38

1 ticket resale companies that might be selling Hornets
2 tickets at this time?
3    **A**  No, I'm not.
4    **Q**  Are you aware of the percentage of tickets
5 sold by companies such as Stub Hub on the open
6 market?
7    **A**  No, I don't.
8    **Q**  Do the Hornets have any controls in place to
9 track the percentage of tickets that are sold to
10 companies such as Stub Hub that market tickets or
11 resell the tickets to the general public?
12    **A**  No.
13    **Q**  Do the Hornets have any policies and
14 procedures to track any resale of tickets on the open
15 market once it's sold to a customer?
16    **A**  That would be better answered by somebody
17 else.  I don't know.
18    **Q**  Do you know who the person I should ask that
19 question to would be, sir?
20    **A**  No, I don't.
21    **Q**  The Hornets have designated Rich Whitmeyer
22 as a 30(b)(6) representative in this case.  Would Mr.
23 Whitmeyer have this information, sir?
24    **A**  I don't know.
25    **Q**  Mr. Dan Crumb has also been identified as a

## 39

1 30(b)(6) witness.  Do you know whether or not he
2 would have this information, sir?
3    **A**  I don't know.
4    **Q**  Are those two people the best candidates to
5 have this information, sir?
6        MS. ANDERSON:
7            Objection, asked and answered.
8        MR. BURAS:
9            The question has never been asked
10 before.
11        MS. ANDERSON:
12            I thought he just said he didn't know
13 if they would have it.
14        MR. BURAS:
15            My question, if you read it back, is
16 are these the best persons to have this information.
17        MS. ANDERSON:
18            Right, but if he just said he didn't
19 know if they would have it, how does he know if they
20 are the best people to have it?
21        MR. BURAS:
22            It's a different question.  Let him
23 answer the question first.
24        MS. ANDERSON:
25            I still object, asked and answered.

## 40

1        THE WITNESS:
2            I don't think so.
3            (A short recess was taken.)
4 EXAMINATION BY MR. BURAS:
5    **Q**  All right, sir.  Block No. 4 says, "Tag
6 inventory for comps/holds/NBA/ownership/VIP/staff/
7 visiting teams."   Is there a document that would
8 explain what this even means?
9    **A**  I don't believe there is a document that
10 would explain that.  It just means to flag the seats
11 for those various areas.
12    **Q**  When it says comps, what does that mean?
13    **A**  Free tickets.
14    **Q**  If there was a ticket such as a suite sale
15 that was comped, would this information somehow be
16 tagged?  Would that be part of this tagged inventory
17 that you're talking about?
18    **A**  That's not what this is referring to, no.
19    **Q**  That's what I'm trying to find out.  Where
20 would information regarding a complimentary suite be
21 located or which suites were complimentary, given I
22 don't know the right lingo that you have in the
23 industry?
24    **A**  It would be filed with the game to game
25 information.

## 41

1   **Q**  Where would that be located?
2   **A**  Ticketmaster system.
3   **Q**  Would this be a Ticketmaster issue, or would
4 this be a ticket for a suite?
5   **A**  When you say Ticketmaster issue, what is a
6 Ticketmaster issue?
7   **Q**  I don't know. You just said it would be on
8 the Ticketmaster system, so I don't know what that
9 even means.
10   **A**  That means that the inventory -- remember,
11 we are talking about inventory, so the inventory are
12 on Ticketmaster for our tickets.
13   **Q**  So the inventory for the seats for a
14 particular game and which seats were complimentary or
15 which suites were complimentary would be located on a
16 Ticketmaster system?
17   **A**  Correct, on Archtics.
18   **Q**  Is Archtics the same as Ticketmaster?
19   **A**  It's an in-house portion of Ticketmaster,
20 yes. They are one and the same company.
21   **Q**  Okay. Is there a way for someone in the
22 Hornets to run a report to determine what suites were
23 deemed to be complimentary suites between the years
24 2002 and 2005?
25   **A**  I don't know.

## 42

1   **Q**  Did you ever look for that information?
2   **A**  No, I didn't.
3   **Q**  Were you ever asked to look for that
4 information?
5   **A**  No, I wasn't.
6   **Q**  Do you know if anyone else from the Hornets
7 ever looked for that information?
8   **A**  I don't know.
9   **Q**  Would information regarding which suites
10 were complimentary given to customers, would that
11 information have been reported to the NBA?
12   **A**  I don't know.
13   **Q**  Do you know the person who might be able to
14 answer that question, sir?
15   **A**  Whoever did the reports to the league.
16   **Q**  I believe yesterday we said that was Barbara
17 Booth at one time. Do you know who currently does
18 the reports?
19   **A**  I do not.
20   **Q**  Do you know what Barbara Booth's prior
21 position was with the Hornets?
22   **A**  No, I don't.
23   **Q**  Was she the CFO?
24   **A**  I need to go back to your last question.
25   **Q**  Yes, sir.

## 43

1   **A**  You asked me what her prior position was?
2   **Q**  Yes, sir. That was confusing. I apologize.
3   **A**  Yes, it was.
4   **Q**  Let me clarify just to make sure the record
5 is clear. When Ms. Barbara Booth was transmitting
6 the information to the NBA that we previously
7 discussed, what was her position with the Hornets?
8   **A**  She was CFO.
9   **Q**  Is that a position that would be specific to
10 a CFO -- is that a duty that is specific to a CFO, or
11 was that a duty that was specific to Ms. Booth?
12   **A**  How about asking them one at a time?
13   **Q**  Okay. Is transmission of this information a
14 duty of the CFO of the Hornets?
15   **A**  I can't answer that.
16   **Q**  Do you know in what form this information
17 would have been provided to Ms. Booth? Would it have
18 been electronic? Would it be a printout?
19   **A**  I don't know.
20   **Q**  All right, sir. I want you to turn to the
21 page D-6059 says, "Ticket Sales Reporting." I'm just
22 counting this list, and if you take a look at the
23 left-hand side under the area that says, "Current,"
24 it indicates that there are sales productivity
25 reports, commission reports, invoicing reports,

## 44

1 accounts receivable reports, game settlement reports
2 and gate receipt reports, NBA electronic; do you see
3 that, sir?
4   **A**  Okay.
5   **Q**  Do sales productivity reports relate to
6 individual sales of specific plaintiffs, or specific
7 sales employees? Let me change that from plaintiffs.
8   **A**  I don't know.
9   **Q**  Have you ever seen a sales productivity
10 report before?
11   **A**  No, I haven't.
12   **Q**  Did anyone from the Hornets ask you to
13 produce copies of productivity reports for this
14 litigation?
15   **A**  No, they haven't.
16   **Q**  Did your legal counsel ever request that you
17 produce sales productivity reports in this
18 litigation?
19   **A**  No.
20   **Q**  Do you know if anyone else from the Hornets
21 looked for and produced sales productivity reports in
22 this litigation?
23   **A**  I don't know.
24   **Q**  Has the commission reports -- do you know if
25 these commission reports are individual to each

PAUL RUSSO 9/13/07

**45**

1  plaintiff?

2  **A**  I don't know.

3  **Q**  Do you know if these commission reports are

4  imprinted or electronic form?

5  **A**  I don't know.

6  **Q**  Do you know whether or not these commission

7  reports have been produced in this litigation?

8  **A**  I don't know.

9  **Q**  Have you ever been asked by counsel or

10  anyone within the Hornets organization to produce

11  these commission reports?

12  **A**  No, I haven't.

13  **Q**  Do you know what invoicing reports are?

14  **A**  Don't know.

15  **Q**  Do you know if anything on an invoicing

16  report would indicate the specific salesperson that

17  may have sold a ticket?

18  **MS. ANDERSON:**

19  Objection, asked and answered.  He said

20  he didn't know what they are.  If he says he doesn't

21  know what they are, then you follow up about five

22  questions asking him about the details of something.

23  **MR. BURAS:**

24  Thank you, counsel.  I'll ask the

25  question.  You can object.

**46**

1  **MS. ANDERSON:**

2  At some point I'm going to have to stop

3  it, because it's dragging out the deposition, because

4  he will tell you he doesn't know something and you

5  ask five follow-up questions.

6  **THE WITNESS:**

7  I don't know.

8  EXAMINATION BY MR. BURAS:

9  **Q**  Were you ever asked to produce any legal

10  information by the Hornets related to invoice report?

11  **A**  No.

12  **Q**  Do you know where this information would be

13  located?

14  **A**  No, I don't.

15  **Q**  What about commission reports?  Do you know

16  where that information would be located?

17  **A**  No, I don't.

18  **Q**  What about sales productivity reports?  Do

19  you know where that information would be located?

20  **A**  No, I don't.

21  **Q**  Accounts receivable reports, were you ever

22  asked to produce this information?

23  **A**  No, I wasn't.

24  **Q**  Do you know where this information would be

25  located?

**47**

1  **A**  No, I don't.

2  **Q**  As to game settlement reports, do you know

3  what a game settlement report is?

4  **A**  Do I know what a game settlement report is?

5  No, I don't.

6  **Q**  Have you ever seen game settlement reports

7  before?

8  **A**  I don't know.

9  **Q**  Have you ever been specifically asked to

10  produce any game settlement reports?

11  **A**  No.

12  **Q**  The last box says, "Gate receipt reports -

13  NBA electronic."  What is a gate receipt report?

14  Have you ever seen one, sir?

15  **A**  No, not that I'm aware.

16  **Q**  Do you know who prepares or would have a

17  gate receipt report, copies of this?

18  **A**  I would imagine the accounting department.

19  **Q**  Have you ever been asked to produce these

20  gate receipt reports?

21  **A**  No, I haven't.

22  **Q**  That's all on this document, sir.  All

23  right, sir.  I want you to refer --

24  **A**  Could I ask you a question on this document?

25  **Q**  Yes, sir.

**48**

1  **A**  What did you say this document was?

2  **Q**  I don't know what it is, sir.  Your counsel

3  produced it to me.

4  **A**  Okay.

5  **Q**  Have you ever seen copies of any

6  correspondence, e-mails or other documents outlining

7  those issues upon which plaintiffs believe the

8  Hornets failed to produce information or fully

9  produce information in this case?

10  **A**  One more time.

11  **Q**  Have you ever received, been provided or

12  looked at copies of the actual letters or e-mails

13  that were sent by any plaintiff attorney to defense

14  counsel in this case outlining or detailing any

15  discovery deficiencies that plaintiffs allege the

16  Hornets have in their response to any questions posed

17  by plaintiffs in this case?

18  **A**  Other than Exhibit 10?

19  **Q**  Exhibit 10 is the original response.  What

20  I'm talking about is, after the Hornets made their

21  response, plaintiffs sent correspondence and e-mails

22  to your counsel advising them of areas where

23  plaintiffs believe the Hornets did not fully or

24  completely respond to the requests that were made.

25  My question to you is, have you ever seen or reviewed

| 49 | 51 |
|---|---|

**49**

1 copies of any letters that were sent by plaintiffs'
2 attorneys to your counsel outlining the areas of
3 deficiencies that plaintiffs allege?
4    **A** Not that I'm aware of.
5    **Q** I'm going to show you a series of letters
6 that I'm going to mark all as Exhibit 17, and it's
7 just going to be a group of letters, sir. First one
8 is -- this is a group letters that I gave you. First
9 one is a document dated June 12 regarding multiple
10 issues. I'll just give you the whole set, sir. Have
11 you seen any of these documents? I'm going to mark
12 this entire grouping of documents, with the exception
13 of August 28, as Exhibit 17. Sir, have you ever seen
14 any of these letters before, is what I want to know?
15    **A** I have not.
16    **Q** Sir, at any time prior to August of 2007
17 were you ever made aware by anyone within the Hornets
18 organization or your counsel that plaintiffs had
19 raised numerous inquiries regarding alleged
20 deficiencies in the Hornets' discovery responses?
21    **A** Yes.
22    **Q** When did you first become aware that
23 plaintiffs had alleged deficiencies in your discovery
24 responses?
25    **A** June of 2007.

**51**

1 that list?
2    **A** I did not.
3    **Q** Did you direct anyone to investigate or
4 produce documents in response to that list?
5    **A** I did not.
6    **Q** Did you provide any other information not in
7 the form of documents responsive to the list of
8 alleged deficiencies?
9    **A** I don't know.
10    **Q** How did you follow up with counsel regarding
11 your response to the June 2007 letter? Was it via
12 e-mail, or was it via correspondence, or was it in
13 person, or was it over the telephone?
14    **A** Over the telephone.
15    **Q** Did you call counsel or did counsel call
16 you?
17    **A** Can't remember.
18    **Q** When did your follow-up conversation take
19 place?
20    **A** I believe in a meeting.
21    **Q** You said a meeting?
22    **A** Yes.
23    **Q** A telephone conference meeting?
24    **A** No, no, telephone call, and then after that
25 there was a meeting set.

| 50 | 52 |
|---|---|

**50**

1    **Q** How did you become aware of this, sir?
2    **A** An e-mail from counsel.
3    **Q** Did that e-mail from counsel outline the
4 alleged areas of deficiency that plaintiffs had
5 identified?
6    **A** I don't know.
7    **Q** Were you asked to do anything in response to
8 the June 2007 e-mail you received from counsel
9 regarding plaintiffs' alleged deficiencies in your
10 discovery responses? By you, I mean the Hornets.
11    **A** One more time.
12    **Q** Were you asked to take any action in
13 response to the e-mail that you received in June of
14 2007 from your counsel?
15    **A** Yes, yes.
16    **Q** What action were you asked to take?
17    **A** Basically, if I knew anything about any of
18 the items.
19    **Q** Were you provided with a copy or a list of
20 any of the items that plaintiffs had identified as
21 alleged areas of deficiency?
22    **A** Yes.
23    **Q** Did you review that list?
24    **A** Yes.
25    **Q** Did you produce any documents in response to

**52**

1    **Q** There was a telephone call with counsel
2 followed up by a meeting?
3    **A** Right.
4    **Q** When did this meeting take place?
5    **A** Sometime in June, I believe.
6    **Q** Who attended this meeting, sir?
7    **A** Counsel, myself, Hugh Weber, Bill Bailey.
8    **Q** Anyone else?
9    **A** I don't believe so.
10    **Q** Who is Hugh Weber?
11    **A** He is the COO.
12    **Q** Who is Bill Bailey?
13    **A** VP of business development.
14    **Q** During this meeting, did Mr. Weber and Mr.
15 Bailey produce any documents to counsel?
16    **A** No.
17    **Q** During this meeting, did Mr. Weber or Mr.
18 Bailey instruct anyone to the best of your knowledge
19 or advise counsel that they were instructing someone
20 to locate other documents or information responsive
21 to plaintiffs' request?
22    **A** One more time.
23    **Q** During this meeting, did Mr. Weber or Mr.
24 Bailey advise counsel that they were instructing
25 people to look for additional documents and

## 53

1 information responsive to this request?

2   **A** I don't believe.

3   **Q** During this meeting, were you given any

4 instruction by counsel related to the discovery at

5 issue at that time?

6     MS. ANDERSON:

7       Will you read the question back,

8 please?

9     (The court reporter complies.)

10 EXAMINATION BY MR. BURAS:

11   **Q** Let me rephrase that to make it clear.

12 During this meeting, were you given any instructions

13 by your counsel directing you to investigate or

14 locate any other documents that might be responsive

15 to discovery requests in this litigation?

16   **A** I don't believe so.

17   **Q** During this meeting, were Mr. Weber and Mr.

18 Bailey instructed to look for additional documents or

19 information that might be responsive to plaintiffs'

20 discovery request?

21   **A** I don't believe.

22   **Q** In June of 2007, did you know that the

23 Hornets maintained an off-site storage location on

24 Annunciation Street?

25   **A** Yes.

## 54

1   **Q** At that time did you tell counsel?

2     MS. ANDERSON:

3       I'm sorry. Can I have her read the

4 question and the answer back?

5     (The court reporter complies.)

6 EXAMINATION BY MR. BURAS:

7   **Q** At any time prior to June of 2007, did

8 anyone within the Hornets organization or counsel ask

9 you whether or not the Hornets maintained any

10 documents or information at an off-site storage

11 location?

12   **A** I don't believe.

13   **Q** When is the first time that anyone in the

14 Hornets organization or legal counsel asked you

15 whether or not there might be any information

16 responsive to plaintiffs' request at the off-site

17 Annunciation Street location?

18   **A** Probably in August.

19   **Q** August of 2007?

20   **A** Correct.

21   **Q** When did the Hornets first rent this

22 off-site storage location on Annunciation Street?

23   **A** I believe it was when we moved from

24 Charlotte.

25   **Q** So, sometime in 2002, sir?

## 55

1   **A** Right.

2   **Q** If in August of 2005 you had been asked

3 whether or not the Hornets maintained any documents

4 at an off-site storage location, would you have been

5 able to direct counsel or the Hornets person

6 investigating these materials to go check the

7 Annunciation Street storage facility?

8   **A** It's got to be a little more specific than

9 that.

10   **Q** If you had been asked whether or not the

11 Hornets maintained any documents or information at

12 the off-site storage location on Annunciation Street,

13 could you have directed the person investigating

14 these responses to discovery that we have gone over

15 today to the Annunciation Street storage location?

16   **A** No.

17   **Q** Why not?

18   **A** All the records that were there were prior

19 to the move to New Orleans.

20   **Q** Are the documents that counsel has located

21 and produced in this case related to the storage

22 location on Annunciation Street records that were in

23 existence before the Hornets moved to New Orleans, or

24 are they records that have been created and are in

25 existence since the Hornets have moved to New

## 56

1 Orleans?

2     MS. ANDERSON:

3       Just for clarification, there have been

4 two moves to New Orleans.

5     MR. BURAS:

6       We are going to relate to the move from

7 Charlotte.

8     MS. ANDERSON:

9       Okay.

10     THE WITNESS:

11       Ask the question again, please.

12 EXAMINATION BY MR. BURAS:

13   **Q** Are the documents that are currently being

14 produced from the Annunciation Street storage

15 location documents that were prepared before the team

16 moved to New Orleans, or does the production include

17 documents that have been produced and prepared by the

18 Hornets since the team moved to New Orleans from

19 Charlotte?

20     MS. ANDERSON:

21       Object to the form.

22     THE WITNESS:

23       Yes.

24 EXAMINATION BY MR. BURAS:

25   **Q** Yes?

**57**

1   A   Yes.

2   Q   Are you trying to say that it contains both?

3   A   Yes.

4   Q   When did the Hornets first move documents
5 that were prepared and produced in New Orleans to the
6 storage location on Annunciation Street?

7   A   Approximately the first week in August 2007.

8   Q   That's when the documents were first sent to
9 the Annunciation Street location?

10   A   Yes.

11   Q   Where were they maintained and stored prior
12 to that?

13   A   In our offices.  The Freeport building.

14   Q   Where in your offices in the Freeport
15 building, sir?

16   A   On the 20th floor.

17   Q   What are the main offices for the Hornets?

18   A   Today?

19   Q   Yes, sir.

20   A   1250 Poydras Street.

21   Q   Is that on the 20th floor, sir?

22   A   19th.

23   Q   The 20th floor was a designated storage area
24 for the Hornets in the Freeport building, sir?

25   A   It was our business office.

**58**

1   Q   What I'm trying to find out, sir, was, prior
2 to the documents being moved to Annunciation Street,
3 where were they stored?  You said before on the 20th
4 floor.

5   A   Oh, 1615 Poydras.

6   Q   And what I'm trying to determine right now
7 is where the Hornets primary business office is, in
8 1615 Poydras on the 19th floor?

9   A   20th floor.

10   Q   So they were on the same floor as the floor
11 where the Hornets primary office was located in the
12 Freeport building?

13   A   Correct.

14   Q   At any time prior to August 2007 did anyone
15 within the Hornets organization direct counsel to
16 investigate these storage boxes that were located on
17 the 20th floor at 1615 Poydras Street?

18       MS. ANDERSON:

19           Objection, form.

20       THE WITNESS:

21           I don't know.

22 EXAMINATION BY MR. BURAS:

23   Q   At any point in time did you direct counsel
24 that there might be responsive information located in
25 the boxes on the 20th floor at the 1615 Poydras

**59**

1 Street location?

2   A   I didn't.

3   Q   You did?

4   A   I didn't.

5   Q   You did not?

6   A   No.

7   Q   If you had been asked in August of 2005
8 whether or not there might be responsive information
9 in these boxes, would you have referred counsel to
10 the boxes that were located in the storage area on
11 the 20th floor?

12       MS. ANDERSON:

13           Objection, form.

14       THE WITNESS:

15           I would not have known that they were
16 even there in July of 2005.

17 EXAMINATION BY MR. BURAS:

18   Q   When did you first learn that these boxes
19 were located on the 20th floor?

20   A   There were no boxes on the 20th floor.

21   Q   I thought you just said that this
22 information was stored in boxes on the 20th floor?

23       MS. ANDERSON:

24           Objection.

25       THE WITNESS:

**60**

1           You said that; I didn't.

2 EXAMINATION BY MR. BURAS:

3   Q   How was this information stored on the 20th
4 floor, sir?

5   A   In our filing cabinets as general accounting
6 records for the years -- I don't even know what
7 records are all there.

8   Q   I'm going to refer you back to Exhibit 13
9 that we just went over.  That was the document with
10 the matrix.  Looks like a Power Point matrix.  This
11 was information that was allegedly produced from the
12 storage location on Annunciation Street.  Was this
13 the type of information that was maintained in the
14 filing cabinets for accounting purposes?

15   A   I don't know.

16   Q   Is it safe to say that if this was
17 information that was found at Annunciation Street,
18 that this is the type of information that would have
19 been maintained in the filing cabinets on the 20th
20 floor?

21       MS. ANDERSON:

22           Objection, form, calls for speculation.

23       MR. BURAS:

24           If he knows.

25       THE WITNESS:

## 61

1        I don't know.
2 EXAMINATION BY MR. BURAS:
3    **Q**  Do you know what was located in those filing
4 cabinets?
5    **A**  I do not.
6        MS. ANDERSON:
7            Objection, asked and answered.  Give me
8 a minute.
9        THE WITNESS:
10            I'm sorry.
11        MS. ANDERSON:
12            That's okay.
13 EXAMINATION BY MR. BURAS:
14    **Q**  Your answer was, sir?
15    **A**  I don't know.
16    **Q**  So you don't know that it was limited to
17 accounting records then, sir?
18        MS. ANDERSON:
19            Objection, asked and answered.
20        THE WITNESS:
21            I don't know.
22 EXAMINATION BY MR. BURAS:
23    **Q**  Were these locked filing cabinets where this
24 information was stored, sir?
25    **A**  Yes.

## 62

1    **Q**  Did you have a key?
2    **A**  Yes.
3    **Q**  Who else had a key?
4    **A**  I don't know.
5    **Q**  At any point in time prior to the move of
6 these materials to Annunciation Street, did your
7 counsel ever ask you for a key so that they can get
8 access to the documents that were located in those
9 filing cabinets?
10    **A**  No.
11    **Q**  At any point in time prior to the documents
12 being moved to Annunciation Street, did anyone within
13 the Hornets organization ask for your key so that
14 they could access the documents in those filing
15 cabinets?
16    **A**  No.
17    **Q**  How many filing cabinets are we talking
18 about?
19    **A**  30 to 40.
20    **Q**  This is a very large room then, I'm
21 assuming, if it held 30 to 40 filing cabinets?
22        MS. ANDERSON:
23            Objection to form.
24        THE WITNESS:
25            It wasn't a room.

## 63

1 EXAMINATION BY MR. BURAS:
2    **Q**  Where was it located, sir?
3    **A**  They were built-in filing cabinets, built-in
4 system in the hallways.
5    **Q**  And they were in the hallways, sir?
6    **A**  Yes.
7    **Q**  So people had to walk by these filing
8 cabinets to go into the different offices?
9    **A**  Not really, no.
10    **Q**  Which hallways were they located in, sir?
11    **A**  They were at the end of a triangle hallway
12 like this.  They were built into the end of the wall.
13    **Q**  Were these hidden filing cabinets?
14    **A**  Yes, they were hidden.
15    **Q**  You knew that these filing cabinets existed?
16    **A**  Yes.
17    **Q**  Who else within the Hornets knew these
18 filing cabinets existed?
19    **A**  Anyone that worked in our accounting
20 department.
21    **Q**  When you say they were hidden filing
22 cabinets, was it some type of camouflage on these
23 cabinets so you wouldn't know?
24        MS. ANDERSON:
25            Objection, form.

## 64

1        THE WITNESS:
2            You said they were hidden.
3        MR. BURAS:
4            I asked you and you agreed with me,
5 sir.
6        MS. ANDERSON:
7            Objection, argumentative.  Please don't
8 argue with my witness.  It's disrespectful, counsel.
9        THE WITNESS:
10            Hidden in the respect that they weren't
11 sitting out in the middle of the floor.
12 EXAMINATION BY MR. BURAS:
13    **Q**  There was no camouflage on these filing
14 cabinets though, were there, sir?
15    **A**  No, there wasn't.
16    **Q**  So if someone wanted to find information and
17 they were working in the accounting department and
18 they were asked for information, would people in the
19 accounting department know how to look for documents
20 potentially responsive to this litigation by going
21 through some filing cabinets?
22        MS. ANDERSON:
23            Objection to form and calls for
24 speculation.  Make sure you give me a chance to
25 object.

**65**

1        THE WITNESS:
2        I don't know.
3    EXAMINATION BY MR. BURAS:
4    **Q** Sir, if you had been asked in May of 2005
5    for information responsive to requests for production
6    in this case. Would you have known to direct people
7    to these filing cabinets located in your offices?
8        MS. ANDERSON:
9        Objection, form.
10        THE WITNESS:
11        No.
12    EXAMINATION BY MR. BURAS:
13    **Q** Were you ever asked whether or not the
14    Hornets had any other accounting information other
15    than that located specifically in the accounting
16    offices?
17        MS. ANDERSON:
18        Objection, form. Assumes facts not in
19    evidence.
20        THE WITNESS:
21        No.
22    EXAMINATION BY MR. BURAS:
23    **Q** Do you know whether anyone within the
24    Hornets who investigated the discovery in this case
25    looked in those filing cabinets for responsive

**66**

1    information?
2    **A** I don't know.
3    **Q** You said there were 30 to 40 filing
4    cabinets, sir?
5    **A** I can't remember.
6    **Q** Were these filing cabinets filled, or were
7    some of them empty, some of them partially filled?
8    **A** I would say they were pretty much filled.
9    **Q** Did you oversee the moving of these filing
10    cabinets to the Annunciation Street storage location?
11    **A** The question again?
12    **Q** Did you oversee the move of these filing
13    cabinets or the information in these filing cabinets
14    to the Annunciation Street storage location?
15    **A** Along with the move of the rest of the stuff
16    on the floor, yes.
17    **Q** So, you were in charge of the move of all
18    documents from the 1615 Poydras Street location to
19    the new location?
20    **A** Uh-huh (affirmative expression).
21        MS. ANDERSON:
22        Objection to form.
23    EXAMINATION BY MR. BURAS:
24    **Q** What is the new location again, sir?
25    **A** 1250 Poydras.

**67**

1    **Q** Did you also oversee the move of the
2    computer systems to the 1250 Poydras location?
3        MS. ANDERSON:
4        Objection, form.
5        THE WITNESS:
6        Their normal computer systems here.
7    EXAMINATION BY MR. BURAS:
8    **Q** There were no computer systems at the
9    Freeport building?
10    **A** Uh-uh (negative expression).
11    **Q** When were the computer systems moved to the
12    Freeport building?
13    **A** I can't be specific. Sometime after the
14    hurricane.
15    **Q** After the hurricane, sir, did you remain in
16    New Orleans for any length of time to maintain or
17    manage the operations of the Hornets in this area?
18        MS. ANDERSON:
19        Objection, form. Assumes facts not in
20    evidence.
21        THE WITNESS:
22        Yes.
23    EXAMINATION BY MR. BURAS:
24    **Q** What was your role in the New Orleans area
25    after the storm, sir?

**68**

1    **A** I was responsible for the six games that we
2    played each year.
3    **Q** Where were your offices located while you
4    were in New Orleans, sir, after the storm?
5    **A** The Sheraton Hotel in Baton Rouge for a
6    while, then the Riverfront Arena.
7    **Q** Could you access the Freeport building if
8    you needed to, sir?
9    **A** The building had quite a bit of damage, and
10    we were restricted for quite some time to get in it.
11    **Q** Do you know when any restrictions were
12    lifted, sir?
13    **A** Probably sometime in December.
14    **Q** December of what year, sir?
15    **A** 2005.
16    **Q** Did people within the Hornets organization
17    know that you were in the New Orleans area, New
18    Orleans/Baton Rouge area, sir?
19    **A** One more time.
20    **Q** Did people within the Hornets organization
21    in Oklahoma City know that you were in the New
22    Orleans and Baton Rouge area, sir?
23    **A** Some people.
24    **Q** At any point in time, did anyone within the
25    Hornets organization or legal counsel contact you to

## 69

1  be their local area representative to help identify
2  documents in this case?
3    **A**  No.
4    **Q**  So, while the team was in Oklahoma City and
5  you were located in the New Orleans/Baton Rouge area,
6  you were never asked to help them find documents that
7  might be located in New Orleans?
8    **A**  You have a list of all the people that were
9  designated.  I wasn't on that list.
10    **Q**  Were any of the people on that list that I
11  previously read to you, were they also located in New
12  Orleans?
13    **A**  I'd have to look at the list again.
14    **Q**  It's been marked as an exhibit.  Could you
15  identify the exhibit number at the bottom left side
16  of the page, sir?
17    **A**  Exhibit 17.
18    **Q**  Any of the people identified in Exhibit 17
19  in the New Orleans area with you, sir?  By New
20  Orleans I mean New Orleans/Baton Rouge, sir.
21    **A**  Marie Parenti.
22    **Q**  Do you know whether or not Ms. Parenti was
23  asked to look for and identify documents responsive
24  to any of the requests for this litigation while she
25  was in the New Orleans/Baton Rouge area after the

## 70

1  storm, sir?
2    **A**  I don't know.
3    **Q**  Where was Ms. Parenti's office physically
4  located while she was in New Orleans and the team had
5  moved to Oklahoma City after the team had moved to
6  Oklahoma City?
7    **A**  One more time.
8    **Q**  Where was Ms. Parenti's office physically
9  located after the team moved from Oklahoma City?
10    **A**  At first at Riverfront Arena, the Riverfront
11  Center in Baton Rouge, and then in the Freeport
12  building, 1650.
13    **Q**  So Ms. Parenti moved back to the Freeport
14  building at some point in time, is that correct, sir?
15    **A**  Correct.
16    **Q**  Do you remember what month she moved back to
17  the Freeport building?
18    **A**  January/February.
19    **Q**  Of 2006, sir?
20    **A**  Correct.
21    **Q**  Were these 30 to 40 filing cabinets that we
22  previously discussed still located in the Freeport
23  building at that time, sir?
24    **A**  Yes.
25    **Q**  What was Ms. Parenti's title at that time,

## 71

1  sir?  You can take a look on the page.  I believe
2  there is a title next to her name on it.  That
3  exhibit we discussed/?
4    MS. ANDERSON:
5        Objection as to form.
6  EXAMINATION BY MR. BURAS:
7    **Q**  It says she was director of guest relations
8  and seating services.  Does that sound accurate, sir?
9    **A**  I guess it sounds accurate.
10    **Q**  Do you know whether or not Ms. Parenti ever
11  asked you for access to any of those filing cabinets
12  we previously discussed?
13    **A**  She did not.
14    **Q**  Do you know whether or not Ms. Parenti had
15  access to any of those filing cabinets, sir?
16    **A**  She did not.
17    **Q**  She did not?  Other than yourself, can you
18  identify anyone else who might have had access to
19  those filing cabinets?
20    **A**  I have to answer that with a question:
21  When?
22    **Q**  Let's start in August of 2005.
23    **A**  I didn't have keys in August of 2005.
24    **Q**  Who did, sir?
25    **A**  People in the accounting department.

## 72

1    **Q**  When did you become the person holding the
2  keys to those filing --
3    **A**  When there was no longer anyone left in our
4  employment that was in our accounting department when
5  the hurricane hit.
6    **Q**  Okay, sir.  Can you give me an estimate as
7  to when that date was?
8    **A**  I don't know when that date was.
9    **Q**  Do you remember when you received those
10  keys?
11    **A**  Probably not until about January or February
12  of 2006.
13    **Q**  Who gave you the keys?
14    **A**  Nobody gave them to me.  I got them out of a
15  desk drawer.
16    **Q**  Whose desk, sir?
17    **A**  I can't remember which desk they were in.
18    **Q**  One of the desks in the accounting
19  department, sir?
20    **A**  Right.
21    **Q**  How many people were in your accounting
22  department prior to the storm?
23    **A**  Four or five.
24    **Q**  Who was, for lack of a better term, who was
25  in charge of the accounting department prior to the

## 73

1  storm?
2   **A**  I believe prior to the storm we were doing a
3  search for the CFO.
4   **Q**  Was there a senior person in the accounting
5  department that the other ones discussed issues with?
6   **A**  I don't think there was a real senior person
7  there.
8   **Q**  Would a junior person have been entrusted
9  with these keys?
10  **A**  Senior, junior, I don't get it.
11  **Q**  I don't either, sir. I'm trying to find
12  out, since there was no person who was designated as
13  the boss of that section at that time, who was the
14  person who had the keys, is what I'm trying to find
15  out.
16  **A**  It could have been that each one of them had
17  keys to certain filing cabinets.
18     MS. ANDERSON:
19         Don't speculate. Answer what you know
20  or don't know.
21     THE WITNESS:
22         I don't know.
23  EXAMINATION BY MR. BURAS:
24  **Q**  Was there one key or 40 keys to these 30 to
25  40 filing cabinets?

## 74

1   **A**  I'm speculating, so I don't know.
2   **Q**  When you say that you have a key to these
3  filing cabinets, is it a single key that opens all of
4  them, or do you need multiple keys to open?
5   **A**  Multiple keys.
6   **Q**  Is it more than five keys?
7   **A**  No.
8   **Q**  Somewhere between two and five keys opens
9  all of them?
10  **A**  Right.
11  **Q**  When is the first time you actually opened
12  these filing cabinets to see what was in them?
13  **A**  When I had to move the stuff from the
14  building. When we had to get out of the building.
15  **Q**  All right, and when was that, sir?
16  **A**  Probably the beginning of July.
17  **Q**  Of?
18  **A**  2007.
19  **Q**  I'm going to hand you a document I've marked
20  as Exhibit 11, which are defendant's responses to
21  plaintiffs' first set of interrogatories.
22  Plaintiffs' questions are subsumed within these
23  interrogatories, sir, and I think actually I have a
24  copy that I put over there for you. This is one of
25  the additional documents.

## 75

1     MS. ANDERSON:
2         We haven't attached this one yet?
3     MR. BURAS:
4         No, this has not been attached
5  previously. It all may be in this stack here though.
6     MS. ANDERSON:
7         Just tell me which one it is.
8     MR. BURAS:
9         It is your responses to our first set
10  of interrogatories.
11     MS. ANDERSON:
12         What's the date on it? Is that the
13  August 5, 2005?
14     MR. BURAS:
15         No, I don't believe it's going to be
16  August 5. This is December 14, 2005.
17     MS. ANDERSON:
18         I got it.
19     MR. BURAS:
20         It has one that says 11, one that says
21  15. I'm going to use this one as 11.
22     MS. ANDERSON:
23         I don't have Exhibit 11.
24     MR. BURAS:
25         Let's make this one 11 then.

## 76

1     MS. ANDERSON:
2         Now, these are interrogatories, right?
3     MR. BURAS:
4         Yes, that's interrogatories.
5     MS. ANDERSON:
6         I'm going to object. Not going to stop
7  the witness from answering, but I think this is
8  beyond the scope of the deposition at issue.
9  EXAMINATION BY MR. BURAS:
10  **Q**  All right, sir. At any point in time since
11  August of 2005 to the present, have you ever been
12  provided with a copy of a document that's called an
13  interrogatory request from plaintiffs? Just to
14  clarify, sir, the document that you have in front of
15  you includes both plaintiffs' request and the
16  Hornets' responses to our inquiry.
17  **A**  I don't believe I've seen this.
18  **Q**  Just to make sure I'm understanding, at any
19  point in time prior to August of 2007, were you
20  specifically asked to provide responses to
21  interrogatory requests made by the plaintiffs in this
22  case?
23  **A**  One more time.
24  **Q**  At any time prior to August of 2007 were you
25  asked to provide responses to interrogatories sent to

## 77

1 the Hornets by plaintiffs?

2 **A** No.

3 **Q** Did you ever direct anyone to provide

4 responses to the interrogatories sent by plaintiffs

5 to the Hornets?

6 **A** No.

7 **Q** I'm going to hand you a document related to

8 the state court matter. I want you to take a look at

9 a document previously marked as plaintiffs' first

10 request for production of documents in Civil District

11 Court case 05-10068 previously marked as Exhibit 4.

12 Sir, have you ever seen that document?

13 **A** I can't remember.

14 **Q** As you sit here today, is this the first

15 time that you've seen this document, or you can't say

16 one way or another?

17 MS. ANDERSON:

18 Objection, asked and answered.

19 THE WITNESS:

20 I can't remember.

21 EXAMINATION BY MR. BURAS:

22 **Q** I want you to take a look at the information

23 requested and determine whether or not the Hornets or

24 your counsel asked you specifically to respond to any

25 of the areas of inquiry set forth in that document.

## 78

1 Sir, for expedience purposes, what I'm going

2 to give you is a copy of requests for admissions in

3 federal court case, requests for admissions in state

4 court case 05-10068, request for documents in Civil

5 Court case 05-10069, and what I want you to do is

6 take a look at all of these. We are going to go off

7 record as you review these documents, and tell me

8 whether or not you have specifically seen any of

9 these documents and whether or not you have

10 specifically been asked to provide information to

11 counsel or the Hornets' designee investigating these

12 matters so that plaintiffs can have proper and

13 accurate answers to these interrogatories and

14 requests for admission and requests for production.

15 MS. ANDERSON:

16 Objection to form.

17 MR. BURAS:

18 We are going to go off record right now

19 while you review.

20 MS. ANDERSON:

21 Objection to form and to the

22 instructions given.

23 (Off the record discussion)

24 MR. BURAS:

25 Just a quick housekeeping matter. The

## 79

1 letter dated September 12, 2007 we previously marked

2 as Exhibit 17. We are going to change that to

3 Exhibit 18, only because there was already a 17, so

4 I'm going to do that now.

5 MS. HEIDINGSFELDER:

6 Okay.

7 EXAMINATION BY MR. BURAS:

8 **Q** All right, sir. I've given you copies of

9 documents of Exhibit 13, 14 and Exhibit 11. Are

10 there any other documents under there, sir?

11 **A** 11 and 14.

12 **Q** 11 and 14. Sir, have you personally

13 investigated responses to these discovery requests

14 before the year 2007?

15 **A** I have not.

16 **Q** When is the first time that you personally

17 investigated discovery responses, personally

18 investigated information that might be responsive to

19 those requests, sir?

20 **A** I don't know that I've ever investigated.

21 **Q** At any point in time since this litigation

22 was first filed, did you ever specifically designate

23 someone to investigate, someone that might be

24 responsive to those requests?

25 **A** No, I didn't.

## 80

1 **Q** One final document I want you to take a look

2 at, and it is Exhibit 3, which is the motion for

3 Judge Berrigan -- excuse me. This is the August 17,

4 2005 hearing before Judge Berrigan, and I want to

5 specifically refer you, sir, to the bottom of page 12

6 and the top of page 13, sir; and I want to represent

7 to counsel I hand to the witness that this is a

8 conversation during the hearing that's taking place

9 between the Court and Ms. Anderson. If you could

10 please read the Court's question and Ms. Anderson's

11 response into the record, sir, or I could do so if

12 you like?

13 **A** What am I reading? What line number?

14 **Q** Beginning on line 20.

15 **A** "No matter what we call these categories or

16 how we name them but, in fact, it's only going to

17 involve about 90 more people."

18 **Q** That was the Court that says that, correct,

19 sir?

20 **A** The Court.

21 **Q** And what is Ms. Anderson's response?

22 **A** Ms. Anderson: "I don't have a precise take

23 on the number, but there has been a turnover in the

24 last three years. My impression is that it's larger

25 than 90, but I do have a couple of points to make in

## 81

1 response to Mr. Niles's concerns."

2  **Q** And the next paragraph, sir?

3  **A** "First of all, there was a solution to the

4 issue of the job title change.  He makes the point

5 that someone who may be fan relations representative

6 in 2005, which is called a fan development in 2004,

7 the Hornets can produce all the prior job files or

8 names for a particular position, and thereby

9 capturing anybody who would have served in that role

10 if they are identified as a nonexempt position that's

11 at issue in this case now."

12  **Q** Okay, sir.  At any point in time since

13 August 17, 2005 have you been asked by the Hornets or

14 by legal counsel to produce a list with all of the

15 different job titles that have been given to ticket

16 sales people, ticket operations personnel or

17 receptionists working for the Hornets?

18  **A** No, I have not.

19  **Q** At any point in time since August 17, 2005,

20 have you ever directed anyone to obtain a list with

21 this information, sir?

22  **A** No, I have not.

23  **Q** Give me one moment to confer with counsel

24 and I believe we may be complete, sir.  Sir, thank

25 you for your time.  We have no more questions

## 82

1 regarding the chain of custody questions for Mr.

2 Russo.

3      MS. HEIDINGSFELDER:

4          I know we are going to have some

5 follow-up ones, but I think we are going to take a

6 break first for lunch and then take Ms. Rochon at 1.

7 I know she can be here from 1 to 3.

8      MR. BURAS:

9          So we are going to take a break for

10 lunch, finish deposing Ms. Rochon, then Mr. Russo is

11 coming back on?

12      MS. HEIDINGSFELDER:

13          I know we have some follow-up questions

14 for you.

15      MR. BURAS:

16          I also want to do another housekeeping

17 matter.  The document D-6055 to D-6060 that

18 previously has been marked as Exhibit 13 needs to be

19 changed to Exhibit 19.  Exhibit 13 was a document

20 previously identified as plaintiffs' first request

21 for admissions in case number 05-10068 in CDC.  This

22 document "Initial Ticket Sales Process" as the first

23 title on this document, will be Exhibit 19.

24      MS. ANDERSON:

25          I have follow-up questions for Mr.

## 83

1 Russo and I may be a little while, so because we have

2 Ms. Rochon scheduled to come in at 1, unless you have

3 some sort of objection, I need to let him go.  I'll

4 have to pull him back in to do my follow-up.

5      MR. BURAS:

6          Jane already told us.

7      MS. ANDERSON:

8          I just wanted to make sure.

9                * * * * * *

## 84

1                WITNESS' CERTIFICATE

2

3      I, SAM RUSSO, pursuant to Rule 30(e) of

4 the Federal Rules of Civil Procedure and/or

5 Article 1445 of the Louisiana Code of Civil

6 Procedure, have read or have had the foregoing

7 testimony read to me and do hereby certify that

8 the testimony is true and correct to the best of

9 my ability and understanding.

10      I do hereby certify that I have not

11 marked on, written on or in any way altered the

12 foregoing transcript pages.

13      I do hereby tender to the Certified Court

14 Reporter, the lawful officer before whom my sworn

15 testimony was reported, transcribed and thereafter

16 certified, the foregoing transcript:

17    ( )  Without corrections

      ( )  With corrections as reflected on the

18 errata sheet(s) prepared by me and made a part

   hereof.

19

20

21 DATED:_____    SIGNED:_____

22                SAM RUSSO

23

24

25

85

C E R T I F I C A T E

1

2

3        This certificate is valid only for a
4  transcript accompanied by my original signature
5  and original stamp on this page.
6        I, ASTRA THIBODEAUX, Certified Court
7  Reporter in and for the State of Louisiana, as the
8  officer before whom this testimony was taken, do
9  hereby certify that SAM RUSSO, to whom oath was
10  administered, after having been first duly sworn
11  by me upon authority of R.S. 37:2554, did testify
12  as hereinbefore set forth in the foregoing 84
13  pages; that this testimony was reported by me in
14  the stenotype reporting method, was prepared and
15  transcribed by me or under my personal
16  supervision, and is a true and correct transcript
17  to the best of my ability and understanding; that
18  I am not related to counsel or the parties herein,
19  nor am I otherwise interested in the outcome of
20  this matter.

21

22                    OFFICIAL SEAL
                   ASTRA THIBODEAUX
23                 Certified Court Reporter
              in and for State of Louisiana

      ASTRA THIBODEAUX (#84091)
24     Certified Court Reporter
          Dated: _9-18-07_

25

**0**

05-10068
[3] 77:11 78:4 82:21
05-10069
[1] 78:5
05-1969
[1] 1:4

**1**

1
[6] 4:13 4:15 8:17 82:6 82:7 83:2
10
[10] 2:17 4:15 9:13 12:3 12:13 12:19 13:13 14:6 48:18 48:19
11
[10] 2:17 12:14 74:20 75:20 75:21 75:23 75:25 79:9 79:11 79:12
12
[8] 2:15 2:17 4:7 4:25 9:13 49:9 79:1 80:5
1250
[3] 57:20 66:25 67:2
12:15
[1] 1:15
13
[10] 1:14 2:20 3:7 20:1 20:2 60:8 79:9 80:6 82:18 82:19
14
[6] 2:20 5:1 75:16 79:9 79:11 79:12
1442
[4] 4:20 8:14 8:20 8:24
1445
[1] 84:5
15
[1] 75:21
16
[3] 2:16 8:13 9:1
1615
[5] 58:5 58:8 58:17 58:25 66:18
1650
[1] 70:12
17
[11] 2:19 12:3 49:6 49:13 69:17 69:18 79:2 79:3 80:3 81:13 81:19
18
[4] 2:17 4:16 12:4 79:3
19
[5] 2:18 4:16 20:3 82:19 82:23
19th
[1] 57:22 58:8

**2**

2
[2] 1:10 4:25
20
[4] 2:18 4:16 5:1 80:14
2000
[1] 19:24
2002
[2] 41:24 54:25
2004
[2] 19:24 81:6
2005
[17] 13:10 19:24 41:24 55:2 59:7 59:16 65:4 68:15 71:22 71:23 75:13 75:16 76:11 80:4 81:6 81:13 81:19
2006

[2] 70:19 72:12
2007
[27] 1:14 3:8 13:2 13:14 15:22 16:2 16:6 16:11 16:16 18:7 18:11 19:14 49:16 49:25 50:8 50:14 51:11 53:22 54:7 54:19 57:7 58:14 74:18 76:19 76:24 79:1 79:14
201
[3] 1:16 2:4 3:9
20th
[13] 57:16 57:21 57:23 58:3 58:9 58:17 58:25 59:11 59:19 59:20 59:22 60:3 60:19
21
[1] 1:22
22
[1] 5:1
227
[1] 1:22
24
[1] 5:1
25
[3] 4:16 4:16 5:1
26
[1] 4:17
28
[2] 5:1 49:13

**3**

3
[4] 4:25 13:10 80:2 82:7
30
[9] 5:2 18:5 18:7 18:11 62:19 62:21 66:3 70:21 73:24
30(b)(6
[8] 4:7 4:14 4:19 5:7 5:24 7:6 38:22 39:1
32
[1] 5:2
33
[2] 4:17 5:2
34
[1] 4:18
35
[2] 4:18 5:2
35th
[1] 1:24
36
[1] 5:2
37
[1] 5:3
37:2554
[1] 85:11

**4**

4
[4] 2:13 2:15 40:5 77:11
40
[8] 4:18 5:3 62:19 62:21 66:3 70:21 73:24 73:25
42
[1] 5:3
43
[1] 4:19
44
[1] 4:19
47
[1] 5:3
48th
[1] 2:4
49
[2] 2:19 5:3

**5**

5
[3] 4:25 75:13 75:16
52nd
[2] 1:17 3:10

**6**

6
[1] 4:25
67
[1] 4:1

**7**

7
[1] 16:2
70112
[1] 1:25
70124
[1] 4:2
70170
[1] 2:4
70447
[1] 1:22
79
[1] 2:20

**8**

8
[1] 2:16
84
[2] 2:22 85:12

**9**

90
[2] 80:17 80:25
909
[1] 1:24
9:12
[1] 1:14

**A**

Ability
[2] 84:9 85:17
Able
[4] 5:16 18:19 42:13 55:5
Access
[10] 27:10 27:14 27:17 28:13 62:8 62:14 68:7 71:11 71:15 71:18
Accompanied
[1] 85:4
Accordance
[1] 3:6
Account
[2] 22:20 27:6
Accounting
[16] 22:20 47:18 60:5 60:14 61:17 63:19 64:17 64:19 65:14 65:15 71:25 72:4 72:18 72:21 72:25 73:4
Accounts
[2] 44:1 46:21
Accurate
[4] 5:4 71:8 71:9 78:13
Action
[4] 1:4 1:5 50:12 50:16
Actions
[1] 31:17
Activity
[1] 31:1
Actual
[1] 48:12
Addition

[1] 4:20
Additional
[4] 17:7 52:25 53:18 74:25
Adjourning
[1] 1:15
Administered
[1] 85:10
Administering
[1] 3:24
Admission
[1] 78:14
Admissions
[3] 78:2 78:3 82:21
Advise
[2] 52:19 52:24
Advised
[1] 9:12
Advising
[1] 48:22
Agreed
[2] 3:3 64:4
Agreement
[8] 25:15 28:16 28:18 28:21 30:16 30:23 31:2 35:2
Agreements
[14] 25:21 25:25 26:9 26:17 27:19 27:23 29:5 29:9 29:14 29:23 30:1 30:8 31:18 35:17
AL
[1] 1:4
Allegations
[1] 26:12
Allege
[2] 48:15 49:3
Alleged
[6] 49:19 49:23 50:4 50:9 50:21 51:8
Allegedly
[1] 60:11
Allows
[1] 35:22
Altered
[1] 84:11
Amount
[1] 37:15
Anderson
[71] 2:3 4:9 5:21 6:16 6:21 7:7 7:23 8:25 9:17 12:6 13:16 15:1 18:12 18:16 21:15 21:23 22:10 22:24 23:8 23:19 24:1 24:13 24:20 25:7 29:17 31:5 35:11 35:24 39:6 39:11 39:17 39:24 45:18 46:1 53:6 54:2 56:2 56:8 56:20 58:18 59:12 59:23 60:21 61:6 61:11 61:18 62:22 63:24 64:6 64:22 65:8 65:17 66:21 67:3 67:18 71:4 73:18 75:1 75:6 75:11 75:17 75:22 76:1 76:5 77:17 78:15 78:20 80:9 80:22 82:24 83:7
Anderson's
[2] 80:10 80:21
Annunciation
[17] 53:24 54:17 54:22 55:7 55:12 55:15 55:22 56:14 57:6 57:9 58:2 60:12 60:17 62:6 62:12 66:10 66:14
Answer
[12] 7:20 18:18 18:21 37:4 37:8 39:23 42:14 43:15 54:4 61:14 71:20 73:19
Answered
[10] 18:13 18:18 24:2 38:16 39:

7 39:25 45:19 61:7 61:19 77:18
**Answering**
[1] 76:7
**Answers**
[3] 3:16 32:19 78:13
**Apologize**
[1] 43:2
**APPEARANCES**
[2] 1:20 2:1
**Archtic**
[1] 33:9
**Archtics**
[6] 24:10 24:19 25:6 33:7 41:17 41:18
**Area**
[15] 13:5 20:19 26:25 43:23 57: 23 59:10 67:17 67:24 68:17 68: 18 68:22 69:1 69:5 69:19 69:25
**Areas**
[8] 5:18 8:40:11 48:22 49:2 50:4 50:21 77:25
**Arena**
[6] 32:21 32:25 33:2 33:7 68:6 70:10
**Argue**
[1] 64:8
**Argumentative**
[1] 64:7
**Artega**
[1] 11:3
**Article**
[1] 84:5
**As**
[57] 3:14 3:16 4:3 4:6 4:13 4:14 4:24 5:11 5:19 6:22 7:19 7:24 8: 1 8:4 8:9 8:13 8:17 8:24 9:1 12: 3 12:13 19:3 20:1 20:2 20:7 34: 15 34:16 38:5 38:10 38:22 38: 25 40:14 41:18 47:2 49:6 49:13 50:20 58:10 60:5 69:14 71:5 72: 6 73:12 74:20 75:21 77:7 77:11 77:14 78:7 79:2 81:10 82:18 82: 20 82:22 84:17 85:7 85:12
**Assign**
[1] 33:12
**Assigned**
[1] 33:17
**Assist**
[1] 14:10
**Assumes**
[2] 65:18 67:19
**Assuming**
[1] 62:21
**Assumption**
[1] 30:6
**Assumptions**
[1] 31:7
**Attached**
[2] 75:2 75:4
**Attended**
[1] 52:6
**Attorney**
[1] 48:13
**Attorneys**
[3] 1:25 2:5 49:2
**August**
[30] 12:25 13:1 13:10 13:14 15: 22 16:1 16:6 16:11 16:16 18:7 18:11 19:14 49:13 49:16 54:18 54:19 55:2 57:7 58:14 59:7 71: 22 71:23 75:13 75:16 76:11 76: 19 76:24 80:3 81:13 81:19

**Authority**
[1] 85:11
**Available**
[2] 33:10 34:23
**Avenue**
[3] 1:17 2:4 3:9
**Avoid**
[1] 6:9
**Aware**
[14] 17:10 17:11 19:15 19:18 19:20 26:6 26:11 37:25 38:4 47: 15 49:4 49:17 49:22 50:1

### B

**Bailey**
[6] 52:7 52:12 52:15 52:18 52: 24 53:18
**Barbara**
[3] 42:16 42:20 43:5
**Based**
[2] 21:12 21:13
**Baton**
[3] 68:5 68:22 70:11
**Became**
[1] 17:11
**Become**
[3] 49:22 50:1 72:1
**Beginning**
[2] 74:16 80:14
**Behalf**
[3] 14:18 15:23 16:24
**Berrigan**
[2] 80:3 80:4
**Best**
[8] 37:10 37:23 39:4 39:16 39: 20 52:18 84:8 85:17
**Better**
[2] 38:16 72:24
**Between**
[4] 3:3 41:23 74:8 80:9
**Beyond**
[1] 76:8
**Bill**
[2] 52:7 52:12
**Bit**
[1] 68:9
**Black**
[2] 20:11 22:21
**Block**
[6] 21:13 25:12 32:20 32:24 33: 19 40:5
**Booth**
[4] 42:17 43:5 43:11 43:17
**Booth's**
[1] 42:20
**Boss**
[1] 73:13
**Bottom**
[3] 20:8 69:15 80:5
**BOURQUE**
[1] 1:23
**Box**
[10] 21:1 22:13 24:8 25:15 25: 16 29:12 29:15 30:5 33:14 47: 12
**Boxes**
[7] 58:16 58:25 59:9 59:10 59: 18 59:20 59:22
**Break**
[2] 82:6 82:9
**Brendan**
[1] 10:2

**Brice**
[1] 11:18
**Briefly**
[1] 7:17
**Bryan**
[2] 1:24 5:24
**Build**
[2] 32:21 32:24
**Building**
[14] 57:13 57:15 57:24 58:12 67:9 67:12 68:7 68:9 70:12 70: 14 70:17 70:23 74:14 74:14
**Built**
[3] 63:3 63:3 63:12
**Built-in**
[2] 63:3 63:3
**Buras**
[74] 1:21 2:13 4:4 4:11 6:2 6:19 6:24 7:16 7:25 8:2 9:5 9:21 12: 9 12:11 15:8 18:23 21:19 22:2 22:12 23:3 23:12 23:23 24:5 24: 15 24:24 25:11 29:21 31:12 35: 16 36:3 36:8 39:8 39:14 39:21 40:4 45:23 46:8 53:10 54:6 56: 5 56:12 56:24 58:22 59:17 60:2 60:23 61:2 61:13 61:22 63:1 64: 3 64:12 65:3 65:12 65:22 66:23 67:7 67:23 71:6 73:23 75:3 75: 8 75:14 75:19 75:24 76:3 76:9 77:21 78:17 78:24 79:7 82:8 82: 15 83:5
**Burke**
[1] 10:22
**Business**
[3] 52:13 57:25 58:7
**Businesses**
[1] 35:18

### C

**Cabinet**
[5] 27:5 27:8 27:13 27:14 27:18
**Cabinets**
[33] 60:5 60:14 60:19 61:4 61: 23 62:9 62:15 62:17 62:21 63:3 63:8 63:13 63:15 63:18 63:22 63:23 64:14 64:21 65:7 65:25 66:4 66:6 66:10 66:13 66:13 70: 21 71:11 71:15 71:19 73:17 73: 25 74:3 74:12
**Camouflage**
[2] 63:22 64:13
**Candidates**
[1] 39:4
**Cannot**
[1] 24:12
**Capturing**
[1] 81:9
**Carrere**
[3] 1:16 2:2 3:9
**Case**
[29] 4:7 9:23 10:4 10:9 10:19 10:25 11:5 11:10 11:15 11:20 11:25 26:7 26:12 28:1 38:22 48: 9 48:14 48:17 55:21 65:6 65:24 69:2 76:22 77:11 78:3 78:4 78: 5 81:11 82:21
**Cases**
[2] 4:21 26:4
**Categories**
[3] 8:23 14:14 80:15
**CDC**
[1] 82:21

**Center**
[1] 70:11
**Certain**
[1] 73:17
**Certificate**
[5] 2:22 13:4 13:5 84:1 85:3
**Certification**
[1] 3:12
**Certified**
[6] 2:8 3:22 84:13 84:16 85:6 85:24
**Certify**
[3] 84:7 84:10 85:9
**CFO**
[6] 42:23 43:8 43:10 43:10 43: 14 73:3
**Chain**
[2] 5:25 82:1
**Chance**
[1] 64:24
**Change**
[3] 44:7 79:2 81:4
**Changed**
[1] 82:19
**Charge**
[2] 66:17 72:25
**Charles**
[3] 1:17 2:4 3:9
**Charlotte**
[5] 19:17 19:19 54:24 56:7 56: 19
**Chart**
[3] 20:20 20:22 22:22
**Check**
[1] 55:6
**Chris**
[1] 10:7
**Christian**
[1] 17:23
**City**
[5] 68:21 69:4 70:5 70:6 70:9
**Civil**
[6] 1:4 3:6 77:10 78:4 84:4 84:5
**Clarification**
[2] 31:14 56:3
**Clarify**
[4] 7:17 9:6 43:4 76:14
**Clean**
[2] 12:4 12:7
**Clear**
[3] 15:9 43:5 53:11
**Code**
[1] 84:5
**Coded**
[1] 20:10
**Collective**
[1] 1:5
**Collier**
[1] 11:18
**Color**
[1] 20:10
**Colored**
[1] 22:22
**Coming**
[2] 5:6 82:11
**Commencing**
[1] 1:14
**Commission**
[8] 27:25 43:25 44:24 44:25 45: 3 45:6 45:11 46:15
**Commissions**
[1] 26:8

Communicate
[1] 19:7
Communications
[1] 15:6
Companies
[4] 36:22 38:1 38:5 38:10
Company
[2] 35:23 41:20
Comped
[1] 40:15
Complaints
[2] 26:3 26:6
Complete
[1] 81:24
Completely
[1] 48:24
Complies
[4] 7:12 36:5 53:9 54:5
Complimentary
[6] 40:20 40:21 41:14 41:15 41:23 42:10
Comps
[1] 40:12
Comps/holds/NBA/ownership/VIP/staff
[1] 40:6
Computer
[5] 17:7 67:2 67:6 67:8 67:11
Concerns
[1] 81:1
Conduct
[10] 8:7 13:19 13:23 15:22 15:25 21:4 21:9 23:4 24:16 29:8
Conducted
[22] 6:5 7:1 8:6 8:21 9:6 10:3 10:8 10:13 10:18 10:23 11:4 11:9 11:14 11:19 16:22 16:24 17:1 26:15 29:4 30:1 36:25 37:3
Confer
[1] 81:23
Conference
[1] 51:23
Confirmed
[1] 16:21
Confusing
[1] 43:2
Contact
[21] 9:22 10:1 10:6 10:11 10:16 10:21 11:2 11:7 11:12 11:17 11:5:18 17:6 18:24 19:4 19:15 19:23 22:14 23:17 30:7 30:17 68:25
Contacts
[1] 30:20
Contains
[1] 57:2
Contend
[1] 27:24
Content
[1] 6:4
Contents
[1] 15:3
Continued
[1] 2:1
Controls
[1] 38:8
Conversation
[6] 14:25 15:3 18:6 18:10 51:18 80:8
Conversations
[1] 16:23
COO
[1] 52:11
Copies

[8] 13:11 34:21 44:13 47:17 48:5 48:12 49:1 79:8
Copy
[18] 4:6 4:7 4:8 5:7 8:12 12:4 12:7 12:13 12:18 13:12 13:13 19:25 20:3 35:1 50:19 74:24 76:12 78:2
Corporate
[9] 4:24 5:12 5:20 7:14 7:19 7:24 8:1 8:4 8:9
Correct
[21] 5:5 9:7 9:8 9:10 9:11 9:16 9:18 12:1 15:11 15:12 17:2 17:3 41:17 54:20 58:13 70:14 70:15 70:20 80:14 84:8 85:16
Corrections
[2] 84:17 84:17
Correspondence
[3] 48:6 48:21 51:12
Counsel
[61] 3:4 4:8 4:12 8:15 9:12 13:9 13:15 13:16 13:17 14:10 14:17 14:25 15:3 15:7 20:3 27:22 28:3 29:13 34:20 36:17 37:18 37:22 44:16 45:9 46:5:24 48:2 48:14 48:22 49:2 49:18 50:2 50:3 50:8 50:14 51:10 51:15 51:15 52:1 52:7 52:15 52:19 52:24 53:4 53:13 54:1 54:8 54:14 55:5 55:20 58:15 58:23 59:9 62:7 64:8 68:25 77:24 78:11 80:7 81:14 81:23 85:18
Counsel's
[2] 12:2 14:12 14:23 15:10
Counting
[1] 43:22
Couple
[1] 80:25
Course
[1] 5:15
Court
[20] 1:1 2:8 3:22 4:21 7:12 26:3 36:5 53:9 54:5 77:8 77:17 78:3 78:4 78:5 80:9 80:18 80:20 84:13 85:6 85:24
Court's
[1] 80:10
Cover
[1] 28:21
Create
[2] 20:12 32:14
Created
[1] 55:24
Crumb
[1] 38:25
Current
[5] 13:16 20:20 20:22 32:20 43:23
Custody
[1] 82:1
Customer
[15] 21:11 21:22 22:8 23:6 25:14 25:18 28:16 28:18 28:22 29:1 30:7 30:15 30:17 31:2 38:15
Customers
[10] 25:21 25:25 26:16 27:19 27:24 29:6 29:10 31:18 33:17 42:10

D

D-6055
[2] 20:7 82:17

D-6057
[1] 32:7
D-6059
[1] 43:21
D-6060
[1] 82:17
DAIGLE
[1] 1:21
Damage
[1] 68:9
Dan
[2] 9:1 38:25
DANIEL
[1] 1:21
Databases
[1] 31:20
Date
[6] 13:6 13:7 19:22 72:7 72:8 75:12
Dates
[1] 18:4
Dave
[1] 10:22
Days
[2] 18:5 19:19
Deana
[1] 11:3
December
[3] 68:13 68:14 75:16
Deemed
[1] 41:23
Defendant's
[2] 12:16 74:20
Defendants
[2] 1:8 2:5
Defense
[1] 48:13
Deficiencies
[6] 48:15 49:3 49:20 49:23 50:9 51:8
Deficiency
[2] 50:4 50:21
Degree
[1] 5:14
Delegate
[3] 14:17 15:17 16:16
Delegated
[1] 8:7
Denegre
[3] 1:16 2:2 3:9
Department
[15] 17:21 22:21 24:18 25:5 27:2 47:18 63:20 64:17 64:19 71:25 72:4 72:19 72:22 72:25 73:5
Deposing
[1] 82:10
Deposition
[23] 1:13 3:4 3:17 4:22 5:6 5:7 5:16 7:3 7:18 8:5 10:1 10:6 10:11 10:16 10:21 11:2 11:7 11:12 11:17 12:21 16:22 46:3 76:8
DESCRIPTION
[1] 2:1
Designate
[5] 14:18 15:17 16:7 16:17 79:22
Designated
[13] 5:19 7:5 7:19 8:4 8:9 8:24 22:5 23:14 25:2 38:21 57:23 69:9 73:12
Designee
[2] 44:23 14:25:1 78:11

Desk
[3] 72:15 72:16 72:17
Desks
[1] 72:18
Detailing
[1] 48:14
Details
[1] 45:22
Determine
[18] 8:6 8:20 8:22 10:7 10:12 10:17 10:22 11:3 11:8 11:13 11:18 16:25 17:17 30:25 36:25 41:22 58:6 77:23
Development
[2] 52:13 81:6
Different
[4] 31:4 39:22 63:8 81:15
Direct
[6] 51:3 55:5 58:15 58:23 65:6 77:3
Directed
[2] 55:13 81:20
Directing
[1] 53:13
Directly
[1] 29:15
Director
[6] 18:1 27:9 27:16 34:7 34:8 71:7
Disclose
[2] 15:2 15:6
Discontinued
[2] 19:20 19:23
Discovery
[11] 48:15 49:20 49:23 50:10 53:4 53:15 53:20 55:14 65:24 79:13 79:17
Discuss
[2] 9:22 10:2
Discussed
[7] 7:21 8:19 43:7 70:22 71:3 71:12 73:5
Discussion
[2] 9:2 78:23
Disrespectful
[1] 64:8
District
[3] 1:1 2:7 7:10
Document
[41] 4:6 8:13 8:17 12:13 12:20 12:24 13:4 13:14 20:1 20:13 20:16 28:22 28:25 30:13 31:1 32:7 32:9 32:14 32:16 35:4 35:10 40:7 40:9 47:22 47:24 48:1 49:9 60:9 74:19 76:12 76:14 77:7 77:9 77:12 77:15 77:25 80:1 82:17 82:19 82:22 82:23
Documents
[80] 5:17 6:6 6:14 7:3 8:8 8:22 9:7 9:10 9:23 10:3 10:8 10:13 10:18 10:23 11:4 11:9 11:14 11:19 11:24 12:16 12:17 13:8 13:20 13:24 14:5 14:9 14:10 14:13 15:10 15:13 15:15 16:2 17:1 20:4 21:5 21:9 31:15 31:16 31:21 32:23 33:16 34:2 34:21 37:13 48:6 49:11 49:12 50:25 51:4 51:7 52:15 52:20 52:24 53:14 53:18 54:10 55:3 55:11 55:20 56:2 56:15 56:17 57:4 57:8 58:2 62:8 62:11 62:14 64:19 66:18 69:2 69:6 69:23 74:25 77:10 78: