RICHARD L. WITMEYER      CondenseIt™      September 20, 2007



Page 1

```
 1        CIVIL DISTRICT COURT
          FOR THE PARISH OF ORLEANS
 2          STATE OF LOUISIANA

 3

 4   IVAN HINSON, JESSICA BERRY,  * NO. 05-10068
     EUGENE LIGER, ANTHONY "TONY" *
 5   MARTIN, ADAM NASH, CHRIS     * DIVISION "L"
     CARTER, CHRIS STANT, AND     *
 6   SAMUEL TOBIAS STEINMETZ      *
                                  *
 7                                *
                                  *
 8      versus                    *
                                  *
 9   NEW ORLEANS HORNETS NBA      *
     LIMITED PARTNERSHIP          *
10                                *
     * * * * * * * * * *

11

12

13      1442 Deposition of THE NEW ORLEANS
     HORNETS, through its designated
14   representative, RICHARD L. WITMEYER, 344 St.
     Joseph Street, Apartment 339, New Orleans,
15   Louisiana 70130, taken in the offices of
     Jones Walker, 201 St. Charles Avenue, New
16   Orleans, Louisiana 70170, on Thursday, the
     20th day of September, 2007, commencing at
17   11:17 a.m.

18   APPEARANCES:

19   DAIGLE, FISSE & KESSENICH, PLC
       (By: Daniel E. Buras, Jr., Esquire)
20       227 Highway 21
         Madisonville, Louisiana  70447
21
               -and-
22
     NILES, BOURQUE & FONTANA
23     (By:  Bryan J. Knight, Esquire)
         909 Poydras Street, Suite 3500
24       New Orleans, Louisiana  70112

25          ATTORNEYS FOR THE PLAINTIFFS
```

Page 2

```
 1   APPEARANCES (continued):

 2   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE
 3     (By: Jennifer L. Anderson, Esquire)
         Place St. Charles - 50th Floor
 4       201 St. Charles Avenue
         New Orleans, Louisiana 70170
 5
            ATTORNEYS FOR THE DEFENDANT
 6

 7

 8   REPORTED BY:

 9     LISA BODE, CSR
       Certified Shorthand Reporter
10

11

12

13          EXAMINATION INDEX
                            Page
14   EXAMINATION BY MR. BURAS:     6

15   EXAMINATION BY MS. ANDERSON:    108

16

17          * * *

18

19

20

21

22

23

24

25
```

**EXHIBIT I-1**

COPY

Page 3

```
 1        S T I P U L A T I O N

 2

 3      IT IS STIPULATED AND AGREED by and

 4   between counsel for the parties hereto that

 5   the deposition of the aforementioned witness

 6   is hereby being taken under Article 1421,

 7   et. seq, of the Louisiana Code of Civil

 8   Procedure for all purposes, in accordance

 9   with law;

10      That the formality of reading and

11   signing is specifically not waived;

12      That the formalities of filing,

13   sealing, and certification are specifically

14   waived;

15      That all objections, save those as to

16   the form of the question and the

17   responsiveness of the answer, are hereby

18   reserved until such time as this deposition,

19   or any part thereof, may be used or sought

20   to be used in evidence at the time of the

21   trial of this matter.
                * * * *
22

23      LISA BODE, Certified Shorthand

24   Reporter, State of Louisiana, officiated in

25   administering the oath to the witness.
```

Page 4

```
 1   MS. ANDERSON:

 2      I'm happy to help narrow this by

 3   giving you some idea as to what his role was

 4   on the chain of evidence issues.  If you

 5   would like --

 6   MR. BURAS:

 7      Yes.

 8   MS. ANDERSON:

 9      -- me to do that, just let me

10   know.  I can do it outside of his presence,

11   if you would prefer that.

12   MR. BURAS:

13      Let's do it outside of his

14   presence and we can narrow it down.

15   MS. ANDERSON:

16      I think it will help narrow it a

17   little bit.

18   MR. BURAS:

19      Absolutely.

20   MS. ANDERSON:

21      Will you step out for just a

22   second.

23

24   THE WITNESS:

25      Sure.
```

Dockets.Justia.com

Page 5

1    (Discussion off the record.)
2    MS. ANDERSON:
3        His role -- Well, as you know,
4    he was a putative collective action member
5    at some point and then later moved into
6    management. His role recently has been to
7    get additional Archtics information, all of
8    which was produced, I believe, with the
9    August 17 production. That's all I can
10   remember. Certainly ask him more, but I
11   believe that's the area regarding chain of
12   evidence where he'll have some knowledge.
13   MR. BURAS:
14       Then just to give you a heads
15   up, what I'm going to do is ask him when he
16   moved into management, ask him if he
17   maintained any type of records such as this,
18   and who maintained them in his office to the
19   best of his knowledge, specifically, the
20   time sheets that you have in front of you
21   and ask him when he was first asked for
22   information how it was asked then. So if he
23   narrows the scope to August of 2007 the
24   deposition is going to go quickly.
25   MS. ANDERSON:

Page 6

1        Right. And I think, again, he
2    would have helped generate all the Archtics
3    stuff that we produced recently, which I
4    think was produced in like an Excel -- it
5    was all the notes in the Excel format.
6    MR. BURAS:
7        Okay.
8    MS. ANDERSON:
9        And there may have been
10   something else, but that's the main thing.
11   MR. BURAS:
12       I'll find that out. That's not
13   a problem. But if that's what it's limited
14   to it will be quick.
15       (Whereupon, Mr. Witmeyer
16   rejoined the proceedings.)
17       RICHARD L. WITMEYER,
18   after having been first duly sworn by the
19   above-mentioned Certified Shorthand Reporter
20   was examined and testified as follows:
21   EXAMINATION BY MR. BURAS:
22   Q.  Hi, Rich. My name is Dan Buras.
23   I represent some plaintiffs in the overtime
24   and commission cases filed against the New
25   Orleans Hornets. This is Bryan Knight. He

Page 7

1    also represents some additional plaintiffs
2    in this case.
3    Q.  What is your full name, Mr.
4    Witmeyer?
5    A.  Richard Leslie Witmeyer.
6    Q.  How long have you been employed
7    by the Hornets?
8    A.  Five years.
9    Q.  When did you first get hired by
10   the Hornets?
11   A.  2002.
12   Q.  When in 2002?
13   A.  January 28th, I believe.
14   Q.  Where did you work before
15   January 28th, 2002?
16   A.  The Orlando Magic.
17   Q.  What did you do for the Magic?
18   A.  Most recently, I sold tickets.
19   Q.  Were you a manager or were you a
20   ticket sales employee?
21   A.  Ticket sales employee.
22   Q.  When you were hired in January
23   28th, 2002, did you work in New Orleans or
24   in Charlotte?
25   A.  New Orleans.

Page 8

1    Q.  What did you do in New Orleans?
2    A.  Helped with the relocation of
3    the team, mostly ticket sales.
4    Q.  Were you one of the four
5    individuals who came to New Orleans to help
6    sell tickets to meet the NBA's goal?
7    A.  Yes.
8    Q.  Who were the other three people?
9    A.  Eric Hodges -- Different people
10   came in at different times. Then Chris
11   Zaber came in and Chase Jones -- I'm sorry
12   -- Chase Gardner.
13   Q.  Do you know who Peter Thomas is?
14   A.  Yes. Peter came in later on.
15   And there was actually another gentleman, Ed
16   Minniger (phonetic).
17   Q.  Ed Minniger?
18   A.  Ed Minniger.
19   MS. ANDERSON:
20       Were there five originally or
21   four? I'm confused.
22   THE WITNESS:
23       There were actually up to --
24   depending on the time frame, up to six. I
25   started in January. Chase and Ed came in

Page 9

1  February, mid to late February. Chris Zaber
2  came in March. Peter Thomas came early
3  April. And Eric Hodges came with me, early
4  January.
5  EXAMINATION BY MR. BURAS:
6      Q.  Who is -- Is his last name
7  Herzog, John Herzog?
8      A.  Herzog.
9      Q.  Was he in part of this group or
10  no?
11      A.  He was hired, I believe, in July
12  that summer, after the relocation was
13  approved.
14      Q.  What was your position you were
15  hired for?
16      A.  Initially, I was a consultant.
17      Q.  You were not an employee
18  initially?
19      A.  Correct.
20      Q.  Who were you a consultant with,
21  an independent company or --
22      A.  Yes. I was a self-employed --
23  it was -- the way it was set up at the time.
24      Q.  When did you become a Hornets
25  employee?

Page 10

1      A.  July of '02.
2      Q.  What were you hired to do when
3  you became an employee?
4      A.  Ticket sales account executive.
5      Q.  Say again.
6      A.  Ticket sales account executive.
7      Q.  At any point in time did you
8  receive any promotions?
9      A.  Yes.
10      Q.  What was the first promotion you
11  received?
12      A.  Senior account executive.
13      Q.  When did you get that?
14      A.  Probably would have been
15  December of '02.
16      Q.  It's my understanding you're now
17  a manager for the Hornets; is that correct?
18      A.  A director.
19      Q.  Director?
20      A.  (Nods head affirmatively).
21      Q.  What is you current position?
22      A.  Director of suite sales and
23  services.
24      Q.  When did you receive that
25  promotion?

Page 11

1      A.  March of this year.
2      Q.  Between December of 2002 and
3  March of 2006 did you receive any other
4  promotions with the Hornets?
5      A.  Yes.
6      Q.  When?
7      A.  2005.
8      Q.  All right.
9      A.  Fan experience manager.
10      Q.  Was that a full-time position?
11      A.  Yes.
12      Q.  When in 2005?
13      A.  In November.
14      Q.  Did you have any direct reports?
15      A.  Yes.
16      Q.  How many?
17      A.  Fluctuated anywhere from four to
18  eight.
19      Q.  Were any sales personnel
20  directly reporting to you in November of
21  2005?
22      A.  No.
23      Q.  When is the first time a sales
24  employee directly reported to you?
25      A.  In March.

Page 12

1      Q.  Is Will Bryant one of your
2  direct reports?
3      A.  Yes.
4      Q.  When you worked for the Orlando
5  Magic did you receive overtime?
6      A.  No.
7  MS. ANDERSON:
8          I'm just going to object. I
9  think you're going beyond the scope of the
10  chain of evidence issues at this point.
11  MR. BURAS:
12          Okay. I'll pull it back.
13  MS. ANDERSON:
14          It's okay. You can go forward.
15  I just wanted to get us back on track, if we
16  were getting off track.
17  EXAMINATION BY MR. BURAS:
18      Q.  When is the first time you
19  learned of this lawsuit?
20      A.  I don't recall a specific date.
21  It would have been 2005.
22      Q.  How did you learn about the
23  lawsuit?
24      A.  Just sort of talk among sales
25  reps.

Page 13

1    Q.  Did there come a point in time
2  in 2005 when you began tracking your time?
3    MS. ANDERSON:
4        Objection.  I'm going to go
5  ahead and allow it.
6    A.  Yes.
7  EXAMINATION BY MR. BURAS:
8    Q.  Were you tracking your time
9  before this lawsuit was filed?
10    A.  I don't recall the exact date.
11    Q.  Who told you to start tracking
12  your time?
13    MS. ANDERSON:
14        Objection.  Form.
15    A.  Chris Zaber.
16  EXAMINATION BY MR. BURAS:
17    Q.  Did he communicate this verbally
18  or in an e-mail or in writing, other type of
19  writing, I should say?
20    A.  Verbally, from what I recall.
21    Q.  Did he provide you with a time
22  sheet to start tracking your time?
23    A.  I don't recall if it was him or
24  somebody else.
25    Q.  Do you recall how you received

Page 14

1  the time sheet?  Was it a physical time
2  sheet or did you receive an e-mail with a
3  time sheet attached to it?
4    A.  There was a link on an intranet
5  site where we printed up and filled out and
6  turned it in.  So just a templet, I guess.
7    Q.  Do you know when that link on
8  the intranet site was first made available?
9    A.  I do not.
10    Q.  Do you recall if Chris Zaber
11  told you to go to that link?
12    A.  I don't recall.
13    Q.  Do you know whether or not you
14  received an e-mail directing maybe
15  specifically to you or to all Hornets
16  employees directing them to go to the
17  intranet site to start tracking their time?
18    A.  I don't recall ever receiving
19  one.
20    Q.  When is the first time you were
21  asked to look for any documents in this
22  litigation?
23    A.  August of this year.
24    Q.  Do you remember when in August?
25    A.  Early.  First week.  I don't

Page 15

1  remember an exact date.
2    Q.  Did you direct Will Bryant to
3  call Chris Stant to ask him questions about
4  the Toys for Tots?
5    A.  No.
6    Q.  At any point in time did you
7  contact any plaintiffs to ask specific
8  questions about this case?
9    A.  No.
10    Q.  Are you aware that Will Bryant
11  contacted Chris Stant to ask him questions
12  specifically about the investigation you
13  were conducting to obtain information
14  regarding the Toys for Tots program?
15    MS. ANDERSON:
16        Objection.  Form.  Assumes facts
17  not in evidence.
18    A.  Can you repeat the question?
19  EXAMINATION BY MR. BURAS:
20    Q.  Yes.  Are you aware that Will
21  Bryant contacted Chris Stant to ask for
22  information directly related to the Toys for
23  Tots investigation that you were conducting?
24    A.  No.
25    MS. ANDERSON:

Page 16

1        Same objection.
2  EXAMINATION BY MR. BURAS:
3    Q.  At any point in time has Will
4  Bryant reported any information about his
5  communication with Chris Stant?
6    MS. ANDERSON:
7        Objection.  Form.  Assumes facts
8  not in evidence.
9    MR. BURAS:
10        Let me clarify.
11  EXAMINATION BY MR. BURAS:
12    Q.  At any point in time since you
13  were first asked to produce documents in
14  this case in August of this year has Will
15  Bryant ever told you that he contacted Chris
16  Stant --
17    MS. ANDERSON:
18        Objection.
19  EXAMINATION BY MR. BURAS:
20    Q.  -- about any issues related to
21  this case?
22    MS. ANDERSON:
23        Sorry.  Objection.  Asked and
24  answered.  Form.
25    A.  No.

Page 17

1 EXAMINATION BY MR. BURAS:
2    Q.  Just for procedure, when I ask a
3 question, counsel is going to object
4 usually.  And when that happens, unless she
5 tells you not to answer the question, she's
6 noting an objection for the record.  You can
7 go ahead and continue to answer the question
8 if you understand what I'm asking.  If at
9 any point in time my questions get garbled
10 or you don't understand what I'm asking for,
11 please let me know and I'll try to rephrase
12 the question.  If at any point in time you
13 need to take a break for any reason, you're
14 in charge of the deposition.  You tell me
15 when you need to take a break.  That's when
16 we take a break.  We'll go as long as we
17 have to, but if you need to take a break for
18 the restroom, by all means, please do that.
19    MS. ANDERSON:
20        I may assert objections from
21 time to time.  Unless I tell you not to
22 answer a question, you should go ahead and
23 answer it if you understand it.  If you
24 don't, make sure you ask him for
25 clarification.  Okay?

Page 18

1    THE WITNESS:
2        Great.
3 EXAMINATION BY MR. BURAS:
4    Q.  How did you become involved with
5 the investigation of any issues related to
6 this case?
7    MS. ANDERSON:
8        Objection.  Form.
9    A.  Our director of ticket
10 operations had resigned, and I was the one
11 most familiar to try to produce the reports
12 that had been asked.
13 EXAMINATION BY MR. BURAS:
14    Q.  Who specifically asked you to
15 look for anything in this case?
16    A.  Our attorneys.
17    Q.  Was it Ms. Anderson or Ms.
18 Heidingsfelder?
19    A.  Ms. Heidingsfelder.
20    Q.  What did --
21    MS. ANDERSON:
22        I just want to go ahead and put
23 a cautionary note out.  I'm instructing you
24 not to reveal the substance of any
25 communications between you and attorneys for

Page 19

1 the Hornets.  You can answer yes/no
2 questions and things about dates, but I just
3 want to make sure you don't volunteer
4 anything that's the substance of a
5 privileged attorney-client communication.
6 EXAMINATION BY MR. BURAS:
7    Q.  To the extent my next question
8 is directly going to seek that information,
9 what did Ms. Heidingsfelder tell you to look
10 for?
11    MR. BURAS:
12        That information, I believe, is
13 specifically covered by the Court's order.
14    MS. ANDERSON:
15        Yes.  I think he can answer what
16 he was asked to look for.
17 EXAMINATION BY MR. BURAS:
18    Q.  What did Ms. Heidingsfelder ask
19 you to look for?
20    A.  To see if it was possible to
21 determine who was paid commission on
22 specific accounts.
23    Q.  Is that all she asked you to
24 look for?
25    A.  That I recall, yes.

Page 20

1    Q.  Were you given a list of the
2 accounts, of the specific accounts in
3 question?
4    A.  Yes.
5    Q.  Was it customer accounts or
6 former sales employee accounts?
7    A.  I don't understand.
8    Q.  Were you given a list of
9 specific customers and told to find out who
10 received commissions on those accounts?
11    A.  Yes.
12    Q.  At any point in time were you
13 asked to provide information related to
14 account activity?
15    A.  Yes.
16    Q.  When were you first asked to
17 provide information related to sales
18 personnel account activities?
19    A.  They were the same time.
20    Q.  Same time?
21    A.  (Nods head affirmatively).
22    Q.  So you were asked to provide two
23 things, then?
24    A.  Yes.
25    Q.  Other than the specific customer

Page 21

1  accounts and sales activity, were you asked
2  to look for any other information?
3      A.  Yes.
4      Q.  What?
5      A.  Information regarding the Toys
6  for Tots program.
7      Q.  What specifically were you asked
8  to look for related to the Toys for Tots
9  program?
10     A.  Just general any information we
11 had on it in general.
12     Q.  No limitations were placed on
13 your search?
14     A.  No.
15     Q.  All right.  As to the request to
16 determine who was paid commissions on
17 specific accounts, do you have a copy of the
18 list of customer accounts that you were
19 provided, you were asked to look for?
20 Excuse me.
21     A.  Not with me, no.
22     Q.  Do you remember how many names
23 were on that list?
24     A.  Not exactly.  A couple --
25     Q.  Was it more than five?

Page 22

1      A.  Yes.
2      Q.  More than ten?
3      A.  Yes.
4      Q.  One page, two pages?
5      A.  It was maybe 20, maybe.
6      Q.  Were you given a list of
7  specific plaintiffs to determine their
8  account activity?
9      A.  Yes.
10     Q.  Was this on the same document
11 with the list of the customer accounts or a
12 separate document?
13     A.  Same document.
14     Q.  Were you given this document in
15 person or was it sent via e-mail?
16     A.  In person.
17     Q.  Did you retain a copy of this
18 document?
19     A.  Yes.
20     Q.  Was the request for information
21 regarding Toys for Tots contained in the
22 same request?
23     A.  Yes.
24     Q.  I want you to take a look --
25 MR. BURAS:

Page 23

1          Are those documents in order,
2  Counsel?
3      MS. ANDERSON:
4          Yes.  Well, no, they're not, but
5  I can get them.  Just tell me what you want
6  to look at.
7      MR. BURAS:
8          We're just going to go with
9  number one.  I'm just going to verify that
10 he was notified about chain of evidence.
11 And I'll show him my document.  I'm going to
12 attach all documents 1 through 20 to this
13 record.  We'll go through this, but just to
14 give you a heads up as to where I'm going.
15     MS. ANDERSON:
16         So you're putting a full set of
17 exhibits on each --
18     MR. BURAS:
19         Each one, correct.
20     MS. ANDERSON:
21         -- corporate rep's transcript?
22     MR. BURAS:
23         Correct.
24 EXAMINATION BY MR. BURAS:
25     Q.  This is a copy of a letter

Page 24

1  submitted by your counsel dated September
2  11, 2007.  It identifies that you have been
3  identified to answer questions regarding
4  chain of evidence questions.  Do you see
5  that?
6      MS. ANDERSON:
7          Take your time and review it.
8      A.  Yes.
9  EXAMINATION BY MR. BURAS:
10     Q.  Other than August of 2007, do
11 you have any information related to searches
12 for documents or information requested by
13 plaintiffs prior to August of 2007?
14     A.  Can you repeat the --
15     Q.  Yes.  Other than the actions
16 that you took after August of 2007, do you
17 have any information related to the
18 investigations conducted by any other
19 Hornets personnel or counsel prior to August
20 of 2007?
21     A.  I don't remember August of --
22 Oh, August, yes.  I'm sorry.  Repeat the
23 question one more time.
24     Q.  I'll break it up because it
25 apparently is confusing.  You did not

RICHARD L. WITMEYER                    Condenselt™                    September 20, 2007

Page 25

1  participate in the production of any
2  information prior to August of 2007,
3  correct?
4      A.  Correct.
5      Q.  You were never asked to provide
6  information prior to August of 2007,
7  correct?
8      A.  No, I was not.
9      Q.  None of your supervisors asked
10  you to produce information responsive to any
11  issues in this litigation prior to August of
12  2007, correct?
13      A.  No.
14      Q.  Since August of 2007 have you
15  contacted any of the persons that you work
16  with who may have conducted earlier
17  investigations on behalf of the Hornets to
18  find out what they did to find documents or
19  information?
20      MS. ANDERSON:
21          Objection.  Form.
22      A.  Can you repeat the question,
23  please?
24  EXAMINATION BY MR. BURAS:
25      Q.  Yes.  When Ms. Heidingsfelder

Page 26

1  asked you to look for these three categories
2  of information did you contact -- Strike
3  that.  Let me go through thsi the easy way.
4          (Discussion off the record.)
5  EXAMINATION BY MR. BURAS:
6      Q.  Did you ever contact Chris Zaber
7  to ask him where he looked for documents
8  that might have been responsive to
9  information in this case?
10      A.  No.
11      Q.  All right.  Did you ever contact
12  Kristy McKearn to find out where she looked
13  for information responsive to Ms.
14  Heidingsfelder's request?
15      A.  No.
16      Q.  What about Brendan Donohue?
17      A.  No.
18      MS. ANDERSON:
19          I'm going to object to the form
20  of the question, sort of a continuing
21  objection.
22  EXAMINATION BY MR. BURAS:
23      Q.  I'm going to read the names of
24  the remaining seven people on this list just
25  for expedience purposes.  I'm going to hand

Page 27

1  you a copy of a document that was provided
2  by your counsel on September 12th, 2007,
3  identifying ten individuals who previously
4  worked for the Hornets who assisted Hornets
5  counsel in finding documents responsive to
6  plaintiffs' discovery requests in this case.
7          Take a look at that letter and
8  tell me when you're finished reading it.
9      A.  Okay.
10      Q.  Of those ten individuals named
11  in that document, have you contacted any of
12  those individuals since August 1st of 2007
13  to find out the extent of any investigation
14  they conducted to find documents or
15  information that might be relevant to this
16  litigation?
17      A.  No.
18      MR. BURAS:
19          Is there any way I can get a
20  copy of that to attach it as Exhibit 23?
21      MS. ANDERSON:
22          You can use that one.
23      MR. BURAS:
24          Can we use that one?
25      MS. ANDERSON:

Page 28

1          Yes, we'll just use that one.
2  We'll make that Exhibit 23.
3  EXAMINATION BY MR. BURAS:
4      Q.  Related to Ms. Heidingsfelder's
5  request to find information to determine who
6  was paid commissions on specific accounts
7  what investigation did you conduct?  Where
8  did you look for that information, I should
9  say?
10      A.  Archtics.
11      Q.  Was your search limited to
12  Archtics?
13      A.  Yes.
14      Q.  What did you look for in the
15  Archtics system?
16      A.  To see if there was a history of
17  an association, like a journal history of
18  what rep would have handled an account at a
19  different time.
20      Q.  Counsel in this case has
21  produced something called a change journal.
22  Are you aware of what a change journal is?
23      A.  No, I'm not.
24      Q.  Is it correct that when an
25  employee stopped working for the Hornets the

RICHARD L. WITMEYER    Condenseit™    September 20, 2007

Page 29

1 sales account that that employee managed
2 would be redistributed or given to other
3 members of the sales staff?
4    MS. ANDERSON:
5      Objection. Form.
6    A. At certain times, that's
7 correct.
8 EXAMINATION BY MR. BURAS:
9    Q. Is this limited in time or place
10 or has this policy changed?
11    A. The job description of reps has
12 changed.
13    Q. When did the job description of
14 representatives change?
15    A. November of 2005.
16    Q. Is this when sales reps were no
17 longer allowed to do renewals?
18    A. Sales reps were no longer
19 responsible for renewals. Right.
20    Q. Is that the change that you're
21 discussing?
22    A. Correct.
23    Q. On preexisting accounts, prior
24 to November of 2005, if an employee stopped
25 working for the Hornets, would the Hornets

Page 30

1 change the designated account representative
2 on that account in the Archtics system?
3    A. Can you repeat the question,
4 please?
5    Q. Yes. I'm not aware of the
6 Archtics system and I've never seen the
7 Archtics system, so let me lay that
8 groundwork for you ahead of time.
9      It's my understanding that, for
10 example, if you were to sell tickets to
11 Stewart Niles that in the Archtics system
12 you would be designated as the sales
13 representative on Stewart Niles' account; is
14 that correct?
15    A. Correct.
16    Q. You would have an initial or
17 something somewhere designating Richard
18 Witmeyer as the account representative; is
19 that correct?
20    A. Correct.
21    Q. If you stopped working for the
22 Hornets but Mr. Niles continued to purchase
23 tickets for the Hornets, prior to November
24 of 2005, would his account have been
25 assigned to another sales representative?

Page 31

1    MS. ANDERSON:
2      Objection. Form.
3    A. Yes.
4 EXAMINATION BY MR. BURAS:
5    Q. Would the account representative
6 handling the account reflect the change from
7 Rich Witmeyer to Bryan Knight, for example?
8    A. Yes.
9    Q. So the identity of the
10 representative would change in Archtics,
11 correct?
12    A. Correct.
13    Q. Would there be a record that
14 would exist to show who different accounts
15 were provided to that previously were
16 associated with, for example, Rich Witmeyer
17 --
18    MS. ANDERSON:
19      Objection. Form.
20 EXAMINATION BY MR. BURAS:
21    Q. -- if you stopped working for
22 the Hornets?
23    MS. ANDERSON:
24      Objection. Form.
25    A. Would there be that record?

Page 32

1 EXAMINATION BY MR. BURAS:
2    Q. Yes.
3    A. I don't believe so. That's what
4 I was looking for.
5    Q. Okay. Who had the authority to
6 change the designated account representative
7 in Archtics?
8    A. At what period?
9    Q. Prior to November of 2005.
10    A. Probably several people.
11    Q. Were you one of those people?
12    A. No, I was not.
13    Q. Were any of the sales
14 representatives persons who had authority to
15 change the designated account
16 representative?
17    A. No, they did not.
18    Q. This had to come from someone in
19 Hornets management or a director, correct?
20    A. To my knowledge, yes.
21    Q. Do you know if there's any
22 e-mails that may have been directed, for
23 example, to Jonathan Lakamp directing him to
24 change the designated Archtics
25 representative for various accounts?

Borrello Court Reporters (504) 301-9631      Page 29 - Page 32

Page 33

1    A.  I wouldn't have any knowledge.
2  There would be no reason for me to have
3  knowledge of those.
4    Q.  So you have no idea about how
5  account reps would have been changed at any
6  time, correct?
7  MS. ANDERSON:
8      Objection.  Form.  Misstates
9  prior testimony.
10  MR. BURAS:
11      I just want clarification.
12  MS. ANDERSON:
13      Well, misstating his prior
14  testimony.  So I object.
15    A.  Could you rephrase the question?
16  EXAMINATION BY MR. BURAS:
17    Q.  Sure.  Do you know how account
18  representatives were changed in the Archtics
19  system prior to November of 2005?
20    A.  To a degree, yes.
21    Q.  To the degree that you're aware
22  of, would there exist any documents,
23  e-mails, papers, or any other record that
24  would define or explain how one terminated
25  or departed sales employee's accounts were

Page 34

1  distributed to other sales employees?
2    A.  Was that two questions?
3    Q.  No.
4  MR. BURAS:
5      Read it back, please.
6  MS. ANDERSON:
7      I'll object on the basis of
8  form, then.
9      (Whereupon, the preceding
10  question was read back by the reporter.)
11    A.  Can I ask for clarification?
12  EXAMINATION BY MR. BURAS:
13    Q.  Sure.
14    A.  When you say how, can you -- I
15  don't want to sound like -- say define it--
16    Q.  No.  Let me --
17    A.  -- but would you define "how."
18    Q.  Excuse me.  I don't mean to
19  overtalk you --
20    A.  No.  It's --
21    Q.  -- and I apologize to the court
22  reporter.  It's just from a procedural
23  matter, when you're in conversation, it's
24  common to overspeak, you know, speak over
25  one another.  But the court reporter, she

Page 35

1  will absolutely pistol whip me if I continue
2  to do that, so I'm going to stop doing that
3  now.  My apologies for overtalking.
4    A.  No.
5    Q.  Were there any policies or
6  procedures that you're aware of that Hornets
7  directors or sales managers must follow when
8  redistributing accounts to other sales
9  employees for any departed employee?
10    A.  Generally speaking, they would
11  -- they would divide the accounts up among
12  the reps to give everyone sort of equal
13  accounts to manage.
14    Q.  Were there any written policies
15  or procedures explaining this?
16    A.  Not to my knowledge.
17    Q.  Were there ever any e-mails that
18  were distributed by any manager or director
19  from the time you were first hired by the
20  Hornets until November of 2005 where they
21  wrote anything to the effect of, you know,
22  Bob Smith stopped working for the Hornets.
23  We're going to distribute his accounts this
24  way:  Rich, you get 10.  John Doe, you get
25  20, anything along those lines?  Do you ever

Page 36

1  remember receiving any type of written
2  communication, e-mail, or other document to
3  that effect?
4    A.  There's not a --
5  MS. ANDERSON:
6      Objection to form.  We need to
7  not talk over each other too.  If you'd
8  pause, give me one breath to assert an
9  objection, and then give your answer.
10      Sorry about that.
11  EXAMINATION BY MR. BURAS:
12    Q.  What was your answer, sir?
13    A.  None that I'd ever seen.
14    Q.  If an employee, a sales
15  employee, stopped working for the Hornets
16  and his accounts were distributed amongst
17  the other remaining account representatives,
18  how would you, as an account representative,
19  learn which accounts you were now
20  responsible for?
21    A.  You'd run a report that shows
22  all the accounts that you manage.
23    Q.  Okay.  Would you run this report
24  daily or weekly?
25    A.  Would I?

Page 37

1    Q.  Yes.
2    A.  No.
3    Q.  Would you be alerted by your
4   management or was it common knowledge that
5   when one of your sales employees departed
6   that you may have been given additional
7   accounts?
8    A.  It was common knowledge.  It was
9   -- We would be told.
10    Q.  You would be told by your sales
11   manager or director?
12    A.  Manager, yes.
13    Q.  You would be told this verbally
14   or would it be in an e-mail communication?
15    A.  Verbally.  And not specific
16   accounts, just that they had been
17   redistributed so then you could go look and
18   see what --
19    Q.  So if you ran a report on July
20   31st for all of Rich Witmeyer's accounts, at
21   the beginning of July 31st, and at the end
22   of July 31st another sales employee stopped
23   working for the Hornets and on August 1st
24   you ran another sales report, assuming that
25   the information was changed simultaneously,

Page 38

1   would the report on July 31st and August 1st
2   be different?
3    MS. ANDERSON:
4        Objection.  Form.
5    A.  Yes.
6   EXAMINATION BY MR. BURAS:
7    Q.  You would be able to tell on
8   August 1st which accounts you had that you
9   did not have on July 31st, correct?
10    A.  Correct.
11    Q.  Is there any way today to look
12   at the Archtics system before an employee
13   left, stopped working for the Hornets, to
14   determine what accounts that employee had on
15   the last day he worked for the Hornets?
16    A.  None that we've been able to
17   find.
18    Q.  Is there any record in Archtics
19   that would define the date a sales
20   representative was assigned to manage a
21   particular account?
22    A.  None that we've been able to
23   find.
24    Q.  Have you ever contacted Archtics
25   or ticket master to find out if you can

Page 39

1   obtain this information?
2    A.  The organization has.
3    Q.  Who within the organization has
4   requested that?
5    A.  Steve.  I'm not even sure of his
6   last name.  He just started working with us.
7    Q.  What department does Steve work
8   in?
9    A.  Ticket operations.
10    Q.  How do you know Steve contacted
11   someone about this information?
12    A.  He told me.
13    Q.  When did he tell you this?
14    A.  Mid August.
15    Q.  Do you know whether or not Steve
16   received any written communications from any
17   of these third parties regarding these
18   Archtics searches you were performing?
19    MS. ANDERSON:
20        Objection.  Form.
21    A.  He told me he had called.
22   EXAMINATION BY MR. BURAS:
23    Q.  He said it was a telephone call?
24    A.  Yes.
25    Q.  Did you ask him if he had any

Page 40

1   documents or was directed to any Web sites
2   or other potential source of information
3   that might help you with your searches?
4    A.  He didn't say he had.
5    Q.  Did you ask him those questions?
6    A.  No.
7    Q.  Are there any Web sites that you
8   referred to that would explain different
9   types of Archtics searches you could perform
10   to find the information plaintiffs have
11   requested?
12    A.  There's none that I'm aware of.
13    Q.  In or around March to May 2003
14   time period do you recall a time that Joe
15   Andrade redistributed all of the renewal
16   accounts the various sales employees were
17   managing at that time?
18    MS. ANDERSON:
19        Objection.  Form.
20    A.  I remember there was a
21   redistribution of house accounts at that
22   time.
23   EXAMINATION BY MR. BURAS:
24    Q.  And you were one of the four
25   people who received the majority of those

Page 41

1  accounts, correct?
2     MS. ANDERSON:
3       Objection. Form.
4     A. The four of us received equal
5  amounts of the accounts.
6  EXAMINATION BY MR. BURAS:
7     Q. Who were the four people?
8     A. Myself, John Herzog, Peter
9  Thomas, and Marcus Naylon (phonetic).
10    Q. Of those four people, some of
11  the accounts that you considered house
12  accounts had been previously managed by
13  other Hornets sales employees prior to
14  redistribution, correct?
15    A. Not to my knowledge.
16    Q. Do you know whether any of the
17  renewals on tickets that were considered
18  house accounts had already been sold by
19  other Hornets employees at the time they
20  were redistributed?
21     MS. ANDERSON:
22       I'm sorry. Can I have the court
23  reporter read that one back?
24       (Whereupon, the preceding
25  question was read back by the reporter.)

Page 42

1     MS. ANDERSON:
2       Objection. Form.
3     A. To my recollection, the renewal
4  process hadn't begun yet that year.
5  EXAMINATION BY MR. BURAS:
6     Q. Was there any writing or
7  communication that you received related to
8  this redistribution of house accounts?
9     A. Any writing? No.
10    Q. How did the Hornets know what
11  was a house account and what was not a house
12  account?
13    A. They took deposits that had been
14  sold prior to the team relocating, and they
15  were the house accounts that were
16  redistributed.
17    Q. When you conducted your Archtics
18  search did you do any specific search to
19  find out if any of those house accounts had
20  sales activity on sales sold by any of the
21  plaintiffs in this litigation to determine
22  whether or not they had conducted any sales
23  or made any sales on those house accounts
24  prior to the redistribution?
25     MS. ANDERSON:

Page 43

1       Objection. Form.
2     A. There would be no way that I
3  know of to note that.
4  EXAMINATION BY MR. BURAS:
5     Q. So if that information existed
6  the Hornets could not provide it?
7     MS. ANDERSON:
8       Objection. Form.
9     A. I would not be able to provide
10  it.
11  EXAMINATION BY MR. BURAS:
12    Q. I believe it was about two or
13  three weeks ago that the Hornets first
14  disclosed the identity of a contact
15  management system that the Hornets sales
16  employees used. Are you aware of that
17  system?
18     MS. ANDERSON:
19       I'm going to object to the form.
20  I know that the plaintiffs themselves
21  claimed to have used that system. So they
22  certainly didn't need to have it disclosed
23  to them.
24     A. Yes, I'm aware of that.
25  EXAMINATION BY MR. BURAS:

Page 44

1     Q. How was information maintained
2  in the CMS system?
3     A. By the reps.
4     Q. Isn't it correct that the
5  information in the CMS system can be
6  manipulated?
7     MS. ANDERSON:
8       Objection. Form.
9     A. Yes.
10  EXAMINATION BY MR. BURAS:
11    Q. There's no controls in place in
12  the CMS system to prevent anyone from
13  deleting information on activity that may
14  have been conducted by another sales
15  employee, is there?
16    A. Can you repeat the question?
17    Q. Yes. Are there any controls in
18  place in the CMS system to prevent the
19  deletion of information that one sales
20  employee may have entered into the CMS
21  system?
22     MS. ANDERSON:
23       Objection. Form.
24     A. Depends on the information.
25  EXAMINATION BY MR. BURAS:

Page 45

1    Q.  Explain your answer.
2    A.  You could change someone's name,
3  address, something to that extent, but you
4  couldn't change notes that somebody had made
5  on an account.
6    Q.  Could you change the dates on
7  notes?
8    A.  Not to my knowledge.
9    Q.  Could you create a new account
10  and change the date on the new account for
11  the first contact?
12    A.  No.  All dates were
13  automatically put in.
14    Q.  So if you contacted an employee
15  on August 1st but you forgot to enter it
16  into the CMS system until August 30th, what
17  date would show in the CMS system?
18    A.  August 30th.
19    Q.  Is there any way to change or
20  manipulate that date at all?
21    A.  Not to my knowledge.
22    Q.  But do you know if it's
23  possible?
24    A.  It's a computer program, so I'll
25  assume anything is possible.  But it wasn't

Page 46

1  -- there was no standard application to do
2  that.
3    Q.  When you were asked by Ms.
4  Heidingsfelder to find out who was paid
5  commissions on various accounts did you
6  conduct a search of the CMS system to
7  determine whether or not any of the
8  plaintiffs in these cases had entered
9  information into the CMS system on those
10  specific accounts?
11    A.  No.  I have no access to that
12  CMS system and --
13    Q.  Why don't you have access to it?
14    A.  We don't use it anymore.
15    Q.  When did you stop using the CMS
16  system?
17    A.  I don't recall the exact date.
18  Late 2004, early 2005 somewhere.
19    Q.  When you ran a list of sales
20  activity on various plaintiffs, on the
21  various accounts in Archtics, how did you do
22  that report?  How did you run that report?
23  Excuse me.
24    A.  Can you explain what you mean by
25  sales activity?

Page 47

1    Q.  Yes.  When you were asked to
2  find out -- I'll just give some background.
3  I received a disk with, I think, 1,000,
4  1,500 pages of documents in PDF format that
5  purportedly came from the Archtics system on
6  the individual sales employees in this case.
7    MS. ANDERSON:
8      Are you sure you're not
9  referring to the contact management CMS
10  system?
11    MR. BURAS:
12      Yes.  I'm referring to the other
13  system, the Archtics system.
14    MS. ANDERSON:
15      All right.  Just making sure.
16  Because we did produce some printed Archtics
17  documents and then some electronic.
18    MR. BURAS:
19      The printed ones, I believe,
20  were produced prior to August of 2007.  So
21  I'm assuming that since he said he didn't do
22  anything with those he wouldn't know
23  anything about those.
24  EXAMINATION BY MR. BURAS:
25    Q.  Is that correct, sir?

Page 48

1    A.  That's correct.
2    Q.  As it relates to the computer
3  Archtics records that were produced on a
4  disk, they were PDF documents, have you ever
5  seen that disk?
6    A.  I've not seen the disk.
7    Q.  Do you know what documents I'm
8  talking about?
9    A.  Yes, I believe.
10    Q.  What information do you believe
11  those documents respond or provide
12  information on?
13    A.  Notes that the plaintiffs would
14  have made on accounts.
15    Q.  This is all of the notes in the
16  Archtics system, correct?
17    A.  Correct.
18    Q.  Now, please correct me if I'm
19  wrong, but prior to an account actually
20  being sold all the notes would have been
21  entered into the CMS system, correct?
22    MS. ANDERSON:
23      Objection.  Form.
24    A.  I can't speak to what reps would
25  do, but that was our central -- that was our

Page 49

1  contact management system, our lead
2  management system.
3      MR. BURAS:
4          Object as unresponsive.
5  EXAMINATION BY MR. BURAS:
6      Q.  Is the answer yes, it would have
7  been placed in CMS if a ticket was not sold
8  or no, it would have been placed in the
9  Archtics system?  I don't understand your
10 answer.
11     MS. ANDERSON:
12         Objection.  Argumentative.  If
13 you need clarification ask for
14 clarification, but I believe he asked and
15 answered your question.
16     MR. BURAS:
17         He did not and the record will
18 show that.  However, I'll rephrase my
19 question.
20 EXAMINATION BY MR. BURAS:
21     Q.  Before a potential customer
22 actually purchased an account would the
23 information regarding sales activity by one
24 of the sales employees have been entered
25 into the Archtics system or into the CMS

Page 50

1  system?
2      MS. ANDERSON:
3          I'm going to object to the form
4  of the question.
5      A.  Procedure would have been to put
6  it in the contact management system.
7  EXAMINATION BY MR. BURAS:
8      Q.  Okay.  So once an account was
9  actually sold would an Archtics account be
10 created or would the information be
11 continued to be inserted into the CMS
12 system?
13     A.  An Archtics account was created.
14 Some reps still would use the other system
15 even though we were supposed to use
16 Archtics.  Some reps use the Excel
17 spreadsheets.  Some reps use post-it notes.
18     Q.  All right.  Do you know all of
19 the different plaintiffs in this case --
20     A.  Yes.
21     Q.  -- that are sales employees?
22     A.  Yes.
23     Q.  Of the sales employees that are
24 in this case, which ones used Excel
25 spreadsheets?

Page 51

1      A.  I couldn't tell you.  I don't
2  know.
3      Q.  Would those Excel spreadsheets
4  be maintained on the individual computers
5  used by those persons?
6      A.  Yes.
7      Q.  At any point in time after
8  August of 2007 when Ms. Heidingsfelder asked
9  you to provide information regarding
10 accounts or activities of these sales
11 employees did you ask or conduct a search of
12 the hard drives of computers used by those
13 individuals to determine whether or not
14 those Excel spreadsheets might exist?
15     A.  I did not, no.
16     Q.  Were you ever asked to expand
17 your search beyond the Archtics system?
18     A.  Not that I recall, no.
19     Q.  If you had been asked to find
20 all information potentially responsive to
21 requests regarding specific sales activity
22 by the identified plaintiffs in this case
23 would you have known at that time that it
24 was possible that they maintained Excel
25 spreadsheets to track their account

Page 52

1  activity?
2      MS. ANDERSON:
3          Objection.  Form.  Calls for
4  speculation.
5      A.  Can you repeat the question?
6  EXAMINATION BY MR. BURAS:
7      Q.  Sure.  When Ms. Heidingsfelder
8  asked you to look for the specific account
9  activity of the individual plaintiffs in
10 this case to try to determine whether or not
11 they received all commissions, did you know
12 at that time that it was possible some of
13 the plaintiffs in this case might have
14 maintained Excel spreadsheets on their
15 individual computers that might contain
16 information not set forth in the Archtics
17 system?
18     MS. ANDERSON:
19         Objection.  Form.
20     A.  There would be nothing that
21 would have to do with commissions in the
22 Excel spreadsheets.
23 EXAMINATION BY MR. BURAS:
24     Q.  What would the Excel
25 spreadsheets contain information about?

Page 53

1    A.   There was no format.  So
2  whatever the rep would put in.
3    Q.   So if the representative had
4  information saying "have 12 accounts, money
5  is being deposited, commissions not yet
6  paid," that information could have been
7  located in these Excel spreadsheets,
8  correct?
9    MS. ANDERSON:
10      Objection.  Calls for
11  speculation.  Form.
12    A.   It's possible.
13  EXAMINATION BY MR. BURAS:
14    Q.   Have you ever been told by your
15  counsel in this case that Sam Steinmetz has
16  testified that he maintained an Excel
17  spreadsheet or other type of document on his
18  hard drive tracking his sales activities?
19    A.   Not that I recall.
20    Q.   Based on that answer, is it safe
21  to assume that you've never been asked to
22  look for this information regarding Sam
23  Steinmetz's sales activities?
24    A.   I never have been.
25    Q.   Do you know whether anyone

Page 54

1  working for you or any other person in the
2  ticket sales department has been asked to
3  look for this information?
4    A.   Not that I'm aware of, but it
5  doesn't seem to be a ticket sales function.
6    Q.   What doesn't seem to be a ticket
7  sales function?
8    A.   To retrieve past IT information.
9    Q.   Was each individual employee
10  assigned a specific location to store
11  information on the central server?
12    A.   Yes.
13    Q.   Did those employees also have a
14  separate hard drive located on the computers
15  that they used?
16    A.   Yes.
17    Q.   Did each computer used by these
18  different employees have specific
19  identification codes on them to let them
20  know this is, for example, Rich Witmeyer's
21  computer?
22    A.   Not that I'm aware of.  We had
23  network log-in capabilities.
24    Q.   Did you log in from the same
25  computer every time when you worked?

Page 55

1    A.   No.
2    Q.   You could move to any different
3  computer that was in the sales room and use
4  any computer; is that correct?
5    A.   Depending on what you were
6  trying to do.  (Nods head affirmatively).
7    Q.   What I'm trying to find out is
8  were you assigned a specific location or
9  specific computer to use when you were
10  performing your sales functions?
11    A.   Yes.  I had a desk with a
12  computer at it.
13    Q.   Of the sales employees who are
14  plaintiffs in this case, were those sales
15  employees also assigned to a specific desk
16  with a specific computer to perform their
17  sales duties?
18    A.   Yes.
19    Q.   Do you know whether or not the
20  IT department or the Hornets maintained a
21  log that would have tracked which computers
22  were used by which employees?  If you don't
23  know, you don't know.
24    A.   Yeah.  There's nothing -- I
25  don't know.  Not to my knowledge.

Page 56

1    Q.   How were the e-mails for the
2  sales employees stored?  Are they stored on
3  the individual hard drives or on the
4  servers?
5    A.   I don't know.
6    Q.   At any point in time have you
7  ever been asked to find information
8  regarding e-mails that various sales
9  employee plaintiffs in this case may have
10  sent or received related to any commission-
11  related issues?
12    MS. ANDERSON:
13      Objection.  Form.
14    A.   I have not.
15  EXAMINATION BY MR. BURAS:
16    Q.   At any point in time have you
17  ever requested the IT department look for
18  any information related to changes in
19  account rep activity on Archtics?
20    A.   No, I did not.
21    Q.   Let's go to your Toys for Tots
22  issue.  What information did you investigate
23  regarding the Toys for Tots program?
24    A.   To see if there was an event in
25  Archtics built to reflect Toys for Tots.

Page 57

1    Q.  Was there an event in Archtics
2  built to reflect Toys for Tots?
3    A.  Not that I could find.
4    Q.  There was a Toys for Tots
5  solicitation campaign, though, correct?
6    MS. ANDERSON:
7       Objection.  Form.
8    A.  Actually, I believe it was the
9  Mayor's Toy Drive, but it was referred --
10 would have been referred to, probably, as
11 Toys for Tots, generic.
12 EXAMINATION BY MR. BURAS:
13   Q.  Did you produce any information
14 accounts related to Toys for Tots and/or the
15 Mayor's Toy Drive that you just identified?
16   A.  Did I produce any information?
17   Q.  Yes.
18   A.  No.
19   Q.  You didn't produce any records?
20   A.  No.  I was unable to find any.
21   Q.  Did you take a look at any
22 e-mails that you might have personally
23 received at any point in time since you
24 began working for the Hornets to determine
25 if you ever received an e-mail with

Page 58

1  information related to the Toys for Tots/
2  Mayor's Toy Drive programs?
3    A.  I could not find any.  I looked
4  and I couldn't find any.
5    Q.  Did you request the IT
6  department search for any information
7  related to the Toys for Tots program and/or
8  the Mayor's Toy Drive?
9    A.  I asked the IT department how
10 far back our e-mail records went.
11   Q.  And what did they tell you?
12   A.  They couldn't find anything
13 pre-Katrina.
14   Q.  So you have no information
15 pre-Katrina?
16   A.  That I could find.
17   Q.  Who at the IT department told
18 you this?
19   A.  Christian Green.
20   Q.  When did Christian Green begin
21 working in the IT department?
22   A.  September of '05.
23   Q.  Who is Tim Spero?
24   A.  Our former director of IT.
25   Q.  When did Tim Spero stop working

Page 59

1  for the Hornets?
2    A.  I don't recall the exact date.
3    Q.  Was it after Hurricane Katrina?
4    A.  Yes.  He was briefly in Oklahoma
5  City.
6    Q.  Do you know what investigation,
7  if any, Tim Spero conducted to find any
8  information responsive to Toys for Tots,
9  sales activity, or who was paid commissions?
10   A.  I do not know.
11   Q.  Let me just run through some
12 documents just to confirm what I believe
13 you've already said.  I'm going to hand you
14 a copy of a document that's identified as
15 Exhibit 2, the Initial Disclosures.  The
16 Hornets identified five persons who were
17 likely to have discoverable information
18 defendant may use to support its defenses.
19       You were not identified as one
20 of these five individuals, are you?
21   MS. ANDERSON:
22       Take your time.  Read the
23 document.
24   A.  I don't see myself identified,
25 no.

Page 60

1  EXAMINATION BY MR. BURAS:
2    Q.  Have you ever seen this document
3  before today?
4    A.  I don't recognize this document.
5    Q.  Have you contacted any of the
6  identified five individuals to determine
7  what investigation, if any, they conducted
8  to find any information responsive to any
9  request made by plaintiffs for information
10 in this case?
11   A.  Can you repeat that question,
12 please?
13   Q.  Yes.  Have you contacted any of
14 these individuals at any time since this
15 case was first filed to determine what
16 investigation, if any, they conducted to
17 find or produce any information at all
18 related to this case in response to any
19 request made by plaintiffs?
20   A.  No.
21   Q.  Exhibit 3, we're not going to
22 use Exhibit 3 on this deposition.
23       Exhibit 4, Plaintiffs' First
24 Request for Production in the state court
25 matter, have you ever seen this document

Page 61

1    before today?
2        A.   I don't recognize it.  They all
3    look similar.
4        Q.   Just to let you know, this is
5    called a pleading.  Have you received copies
6    of any pleadings in this litigation?
7        A.   Again, I don't know the
8    difference between a pleading and something
9    like this or a request for discovery or --
10       Q.   Understand.  And this is a
11   lawyer issue.  Have you ever seen a case
12   with -- this is called a caption, where it
13   indicates any plaintiffs were suing the
14   Hornets -- a document with this caption on
15   it, have you ever seen that?
16       A.   I believe I've seen it before,
17   but, again, I -- You mean, like the caption
18   at the top?  I probably wouldn't have paid
19   attention to the caption at the top.  I
20   would have looked for meat.
21       Q.   I'm actually trying to shorten
22   this right now.
23       A.   Okay.
24       Q.   Take a look at this document.
25   And I'm assuming that you were never asked

Page 62

1    to produce the specific information
2    requested in what's identified as Exhibit 4,
3    request for production of documents?
4        MS. ANDERSON:
5            Objection.  Form.  Take your
6    time and review it if you need to.
7        A.   I don't believe I've ever seen
8    this, no.
9        MR. BURAS:
10           I'm not going to use 5 and 6.
11   EXAMINATION BY MR. BURAS:
12       Q.   Have you ever reviewed any
13   responses that the Hornets have produced to
14   plaintiffs in this case?
15       A.   Can I see an example?
16       Q.   Yes.  I'm going to show you a
17   copy of Exhibit 5 and Exhibit 6, which are
18   Defendant's Answer to Plaintiffs' First
19   Requests for Production in Civil District
20   Court, Case 05-10068, and Defendant's First
21   Supplemental and Amending Response, which is
22   Exhibit 6.  Have you ever seen any of these
23   type of documents?
24       A.   Yes.
25       Q.   You have.  Have you seen Exhibit

Page 63

1    5 before today?
2        A.   Again, I don't believe so.
3        Q.   Take a look at Exhibit 6.  Have
4    you seen Exhibit 6 before today?
5        A.   I don't believe so.
6        Q.   Have you read a copy of the
7    complaint filed in federal court in this
8    case, in the overtime case?
9        A.   Can I see it?  Do you have a
10   copy?
11       Q.   I don't have a copy with me.
12       MS. ANDERSON:
13           Answer it if you can.
14       A.   I don't remember.
15   EXAMINATION BY MR. BURAS:
16       Q.   Have you been provided with any
17   documents in preparation for this
18   deposition?
19       A.   For this one, no.
20       Q.   Have you been provided with any
21   documents by counsel in preparation for any
22   other deposition?
23       A.   Yes.
24       Q.   What documents have you been
25   provided?

Page 64

1        A.   Ones similar to this in form.
2        MS. ANDERSON:
3            By this, the witness is pointing
4    to Exhibit 6.
5        THE WITNESS:
6            Yeah.
7    EXAMINATION BY MR. BURAS:
8        Q.   Have you been asked by counsel
9    to review the Hornets responses and
10   determine whether or not you had any
11   additional information or documents
12   responsive to the information and requests
13   already provided by the Hornets to
14   plaintiffs in this case?
15       A.   Yes.
16       Q.   When were you asked to do this?
17       A.   Early August.
18       Q.   I want you to take a look at
19   document Exhibit 7.  Have you ever seen
20   Exhibit 7 before?  And while you're at it,
21   take a look at Exhibit 8, which are
22   defendant's responses to No. 7, Exhibit 7.
23       MS. ANDERSON:
24           Why don't you just look at the
25   responses, which have the requests

Page 65

1  reproduced.
2  MR. BURAS:
3      I'm just trying to find out,
4  first, has he seen a copy of the actual and
5  then has he seen a copy of the responses.
6  A.  Yes.
7  EXAMINATION BY MR. BURAS:
8  Q.  You have seen Exhibit 7?
9  A.  Yes.
10  Q.  When did you first see Exhibit
11  7?
12  A.  Mid to late August.
13  Q.  Were you asked to investigate
14  and provide information responsive to any of
15  these requests for production of documents?
16  A.  I'm sorry.  Repeat the question.
17  Q.  Were you asked by counsel to
18  investigate and provide information
19  responsive to any of those requests for
20  production of documents identified in
21  Exhibit No. 7?
22  (Discussion off the record.)
23  MS. ANDERSON:
24      Go ahead.  Answer the question.
25  MR. BURAS:

Page 66

1      What was the question?
2  (Whereupon, the preceding
3  question was read back by the reporter.)
4  A.  No.
5  MS. ANDERSON:
6      And I can tell you something off
7  the record or outside of his presence, if
8  you want, that will shorten this.
9  MR. BURAS:
10      Yes, please.
11  MS. ANDERSON:
12      Can you just step outside for a
13  minute?
14  THE WITNESS:
15      Sure.
16  (Whereupon, the witness exited
17  the proceedings.)
18  MS. ANDERSON:
19      I think he's told you about
20  everything he was asked to provide.  So, I
21  mean, if you want to go through each request
22  -- I mean, obviously, to the extent there's
23  a request that asks for information about
24  Archtics, obviously he provided some
25  information from Archtics.  But he may have

Page 67

1  seen some of these, but I don't believe he's
2  going to tell you that he was asked to
3  provide anything other than what he's told
4  you he did already.
5  MR. BURAS:
6      That's what I'm hoping, but I'm
7  just going to confirm that.  He --
8  MS. ANDERSON:
9      If you want to do it that way
10  it's going to be laborious.
11  MR. BURAS:
12      Well, I'm trying for it not to
13  be.
14  MS. ANDERSON:
15      That's not how it happened.  I
16  mean, it ought to be clear from the
17  depositions.  We didn't give them documents
18  that they can't even understand because of
19  the way they're written and say, "Go get
20  it."
21  MR. BURAS:
22      Well, he just said he did
23  receive it, though.
24  MS. ANDERSON:
25      No.  He received it.

Page 68

1  MR. BURAS:
2      That's what I'm trying to
3  confirm.  He's the first guy to ever admit
4  that he received a copy of this.
5  MS. ANDERSON:
6      No, I don't believe that's
7  accurate.  But my point is -- I'm not going
8  to tell you what questions to ask, but this
9  is a lot longer than it needs to be.  If
10  that's how you want to do it, it's your
11  deposition.
12  MR. BURAS:
13      Before we start asking
14  additional questions and to the extent he
15  looks at a document and says, hey, I've
16  never seen this document or if he says I've
17  seen it and was never asked to produce
18  information specifically related to this
19  document, I'm fine with that as well.  But to
20  the extent that he's going to say he
21  received documents and then he needs to go
22  through the document --
23  MS. ANDERSON:
24      If there's another way to do it.
25  MR. BURAS:

Page 69

1    -- it's going to take as long as
2 it takes.
3    MS. ANDERSON:
4       But I can't tell you what
5 questions to ask.
6    MR. BURAS:
7       Right.  Let's take a two-minute
8 break.
9       (Following a brief recess, the
10 following proceedings were had.)
11    MR. BURAS:
12       Back on the record.  I'm going
13 to skip Exhibit 9, not attach that.
14 EXAMINATION BY MR. BURAS:
15    Q.  Going to Exhibit 10, which is a
16 copy of Plaintiffs' Second Set of Request
17 for Production of Documents, have you seen
18 this document before?
19    A.  Honestly, it looks like 7.
20    MS. ANDERSON:
21       Answer it if you can.  Don't
22 guess or speculate.
23    A.  Yeah.  Not that I recall.
24 EXAMINATION BY MR. BURAS:
25    Q.  I want you to turn to Page 12 of

Page 70

1 this exhibit.  It identifies approximately
2 28 names of prospective customers that might
3 be at issue in this litigation.  Are these
4 the same names that you were asked to
5 investigate by Ms. Heidingsfelder?
6    MS. ANDERSON:
7       Object to the form.
8    A.  Yes.
9 EXAMINATION BY MR. BURAS:
10    Q.  Did you receive duplicates or
11 photocopies of these pages or is the
12 document you received from Ms.
13 Heidingsfelder a separate letter or document
14 all together?
15    A.  It was copies of these pages, I
16 believe.
17    Q.  They actually had the 12 on
18 there and the No. 42?
19    A.  I don't recall the numbers, but
20 it looked the same, same information.
21    Q.  I want you to take a look at
22 Page 14 and look at No. 43.  When Ms.
23 Heidingsfelder asked you to produce the
24 information related to the Hornets Toys for
25 Tots fundraising campaign did she

Page 71

1 specifically ask you for all of the
2 different information contained in Sections
3 A through G?
4    A.  I don't believe so.  I don't
5 recall specifically.
6    Q.  As you sit here today, have you
7 ever looked for all of the information set
8 forth in Sections A through G?  And to the
9 extent that you looked for the information
10 in one but not another, please just identify
11 which of the letters you've actually looked
12 for information responsive to.
13    MS. ANDERSON:
14       Objection.  Form.
15    A.  Can you repeat the question?
16 EXAMINATION BY MR. BURAS:
17    Q.  Yes.  If you have looked for any
18 of the Subsections A through G, which
19 sections have you looked for information
20 responsive to and which sections have you
21 never looked for prior to this deposition?
22    MS. ANDERSON:
23       Objection.  Form.
24    A.  I was --
25 EXAMINATION BY MR. BURAS:

Page 72

1    Q.  Let's do this -- Go ahead.
2    A.  I was asked to look for G.
3    Q.  Exclusively G?
4    A.  I'm going back and looking
5 through them.  And if E refers to
6 contributed as ticket sales, then yes, I was
7 asked to look for E.
8    Q.  As to sections A, B, C, D, and
9 F, you were not asked to look for any
10 information responsive to those topics,
11 correct?
12    A.  Correct.
13    Q.  Please read No. 44.  Were you
14 ever asked to look for any information
15 responsive to the Hornets' Pepsi Four Pack
16 campaigns?
17    A.  Yes.
18    Q.  When?
19    A.  The same, mid August.
20    Q.  So that's the fourth issue that
21 Ms. Heidingsfelder asked you to look for,
22 included Pepsi Four Pack campaign
23 information?
24    A.  Uh-huh (Indicating
25 affirmatively).

Page 73

1  Q.  What search did you conduct to
2  determine whether or not the Hornets had any
3  information responsive to the Hornets' Pepsi
4  Four Pack ad campaigns?
5  A.  Well, I didn't do anything in
6  regard to the ad campaign. Ticket sales
7  campaign, I searched to see if we could find
8  record of sales on --
9  Q.  All right. And to the extent I
10  said ad campaign, I meant ticket sales
11  related to that ad campaign. You did
12  conduct searches in Archtics?
13  A.  On Archtics.
14  Q.  Was it limited to the Archtics
15  searches?
16  A.  Yes.
17  Q.  You didn't search any other
18  documents, e-mails, or other possible
19  locations where responsive information might
20  be contained, correct?
21  A.  Correct.
22  Q.  Were you ever asked to produce
23  commission reports?
24  A.  Can you explain?
25  Q.  Yes. Were you ever asked by Ms.

Page 74

1  Heidingsfelder to produce commission reports
2  for any of the plaintiffs in this case?
3  A.  No.
4  Q.  Do you know whether or not the
5  sales department maintains any separate
6  copies of commissions earned by various
7  employees?
8  A.  There's none to my knowledge.
9  Q.  I believe prior testimony
10  indicated that the director of ticket sales
11  or the sales manager would notify others
12  within the Hornets organization when a sales
13  employee was entitled to a commission.
14      Do you know how the director of
15  ticket sales or the sales manager would
16  communicate with other members of the
17  Hornets organization to alert them about
18  which sales employee was entitled to a
19  commission on what sale?
20  MS. ANDERSON:
21      Objection. Form.
22  A.  It's been different at different
23  times.
24  EXAMINATION BY MR. BURAS:
25  Q.  All right. Has it ever been in

Page 75

1  writing?
2  A.  Yes.
3  Q.  What periods of time was this
4  information set forth in writing?
5  A.  I was -- Well, I don't want to
6  assume. It is currently and prior -- at
7  different points -- it was probably always
8  in writing but not always from the sales
9  manager to payroll or whoever. For a while
10  it was reversed.
11  Q.  When you say it was reversed,
12  what does that mean?
13  A.  The accounting department would
14  notify what accounts -- would notify the
15  sales rep individually what accounts they
16  were being paid on.
17  Q.  Is that something Adrianna
18  Johnson would routinely do?
19  A.  Yes.
20  Q.  I'm just trying to make sure I
21  understand. Adrianna Johnson would contact
22  the sales employees and let them know that
23  they were entitled to commissions on various
24  accounts?
25  A.  She would -- She would run a

Page 76

1  report from Archtics and generate a list of
2  accounts that you were -- this was versus a
3  draw. So say you were due commission, it
4  might be -- but that you were receiving
5  credit towards your draw.
6  Q.  I don't know how long Adrianna
7  Johnson worked for the Hornets. When did
8  she first begin to do this type of report?
9  A.  When we went on the draw, well,
10  at the first quarter draw. So it would have
11  been probably around April of -- second
12  season here -- of '03.
13  Q.  So these reports that you
14  received, would it come in the form of a
15  verbal telephone call or would it be a paper
16  document?
17  A.  It would be paper.
18  Q.  How would you receive these
19  reports?
20  A.  They would be dropped off at our
21  desks.
22  Q.  Did everyone in the sales
23  department know that Adrianna Johnson was
24  submitting these reports to the various
25  sales employees?

Page 77

1    A.  Yes.  It was common knowledge.
2    Q.  Common knowledge?
3    A.  Uh-huh (Indicating
4 affirmatively).
5    Q.  So if you were the director of
6 ticket sales you would know that Adrianna
7 Johnson was providing these reports to the
8 sales employees?
9    MS. ANDERSON:
10        Objection.  Form.  Calls for
11 speculation.
12    A.  I would think he would -- they
13 would -- that person would know.
14 EXAMINATION BY MR. BURAS:
15    Q.  Were you ever asked whether or
16 not Adrianna Johnson provided you with any
17 reports related to your sales commissions
18 prior to this deposition?
19    A.  I don't recall being asked that
20 specifically.
21    Q.  Have you ever been advised by
22 your attorneys that plaintiffs in this case
23 have been looking for a commission sales
24 report that has been maintained by Adrianna
25 Johnson but that has not yet been produced

Page 78

1 in this case by the Hornets?
2    MS. ANDERSON:
3        Objection.  Form.  Misstates
4 facts.
5    MR. BURAS:
6        My question to him is has he
7 ever been told what we've alleged.
8    A.  No, not that I recall.
9 EXAMINATION BY MR. BURAS:
10    Q.  Do you know whether or not
11 Adrianna Johnson maintained a commission
12 report for the various sales employees?
13    A.  Not that I know of.
14    Q.  But you know that she provided
15 you with copies of reports, correct?
16    A.  Correct.
17    Q.  You said at some point in time
18 that trend reversed --
19    A.  And, well --
20    Q.  -- and the sales director began
21 to report the information to the accounting
22 department; is that correct?  Or sales
23 director, sales manager.  I don't understand
24 the distinction yet.
25    A.  Sales manager would produce a

Page 79

1 list of accounts that accounting would then
2 verify they were paid, they had been sold,
3 and then pay commissions.
4    Q.  When did that start?
5    A.  When we went off the draw.
6    Q.  When was that?
7    A.  Probably around April of '04.
8    Q.  How would these reports be given
9 to the accounting department?  Would it be
10 via e-mail, hand delivered?  Do you have any
11 idea?
12    A.  I don't know.
13    Q.  Who prepared these reports?  Do
14 you know?
15    A.  Depended on the department that
16 was being paid commission.
17    Q.  Are there different sales
18 departments?
19    A.  Yes.
20    Q.  How many sales departments are
21 there?
22    A.  Currently, there's three.
23    Q.  What are those three?
24    A.  Group sales, season ticket
25 sales, and inside sales.  Well, sorry.

Page 80

1 Four.  Suite sales.  I forgot my own.
2    Q.  Since the Hornets first came to
3 New Orleans has there always been this four
4 different --
5    A.  No.
6    Q.  -- four groups of different
7 types of sales employees?
8    A.  No, there have not.
9    Q.  Has the number varied from year
10 or year or has it --
11    A.  Yes.  The number of departments?
12    Q.  Yes.
13    A.  Yes.  Yes.
14    Q.  All right.  You indicated that
15 in 2004 the different department heads began
16 to report who was entitled to commissions to
17 the accounting department, correct?
18    A.  Correct.
19    MS. ANDERSON:
20        Objection.  Form.
21 EXAMINATION BY MR. BURAS:
22    Q.  Do you remember how many sales
23 departments the Hornets had in 2004?
24    A.  If I recall, that's when we
25 started the group sales.  So it would have

RICHARD L. WITMEYER                CondenseIt™

---

**Page 81**

1   been four.
2       Q.  Do you know the identities of
3   the four sales managers in charge of each of
4   these departments?
5       A.  It varied at different times.
6       Q.  All right.  Can you tell me who
7   they were?
8       A.  Different times it would have
9   been Chris Zaber, David Burke, Flavel
10  Hampstead (phonetic).
11      Q.  Ham --
12      A.  Ham -- I think H-A-M-P-S-T-E-A-D
13  and -- Well, sorry.  It would have been
14  three.  There was no suite sales department.
15      Q.  This would be department heads?
16      A.  Managers.
17      Q.  Any of the various departments,
18  these were the four department managers,
19  correct?
20      A.  Well, three.
21      Q.  Not director of suite sales?
22      A.  Yes.
23      Q.  Where did Brendan Donohue fit in
24  this mix?
25      A.  He oversaw -- He was the

---

**Page 82**

1   director.  He oversaw those three managers.
2       Q.  Do you know if Brendan Donohue
3   submitted any of these reports regarding who
4   was entitled to commissions to the
5   accounting department?
6       A.  Not to my knowledge.
7       Q.  Do you know how Chris Zaber
8   submitted reports to the accounting
9   department regarding who was entitled to
10  commissions owed?
11      MS. ANDERSON:
12          Objection.  Form.
13      A.  No, I do not.
14  EXAMINATION BY MR. BURAS:
15      Q.  Same question as to Dave Burke?
16      A.  No, I do not.
17      Q.  Same question as to Flavel?
18      A.  No, I do not.
19      Q.  And same question as to
20  Hampstead?
21      A.  Flavel is Hampstead.
22      Q.  Flavel Hampstead is his name?
23      A.  Yeah.
24      Q.  Oh, my mistake.  Sorry about
25  that.

---

**Page 83**

1       A.  That's why I was saying, there
2   were only three.
3       Q.  My mistake.  At any point in
4   time prior to this deposition have you ever
5   been asked to produce information related to
6   the commission reports prepared by any of
7   these three individuals and produced to the
8   accounting department?
9       MS. ANDERSON:
10          Objection.  Form.
11      A.  No.
12  EXAMINATION BY MR. BURAS:
13      Q.  Do you know whether or not there
14  exists a file or any other type of record
15  storage in the sales department that would
16  contain the information transmitted by any
17  of these three individuals to the accounting
18  department regarding who was entitled to
19  commissions?
20      MS. ANDERSON:
21          Objection.  Form.
22      A.  I don't know.
23  EXAMINATION BY MR. BURAS:
24      Q.  Have you ever looked for that
25  information?

---

**Page 84**

1       A.  No, I have not.
2       Q.  Have you ever been asked to look
3   for that information?
4       A.  No, I have not.
5       Q.  Were there any policies or
6   procedures in place to determine which
7   commissions an employee was entitled to, a
8   sales employee was entitled to, when he
9   stopped working for the Hornets?
10      A.  Not that I'm aware of
11  specifically.
12      Q.  Exhibit 11 are defendant's
13  responses.  Do you recall if you've seen
14  Exhibit 11 before?  And by that I mean
15  defendant's responses to Exhibit 10.
16      A.  I don't recall ever seeing this.
17      Q.  Take a look at Exhibit 20, which
18  is the second supplemental and amending
19  response to this same Exhibit 10.  These are
20  the responses submitted by the Hornets on
21  the 17th day of August, 2007.  I'll let you
22  take a look at my copy.
23      MS. ANDERSON:
24          What number is it again?
25      MR. BURAS:

---

RICHARD L. WITMEYER                    Condenselt™                              September 20, 2007

Page 85

1    No. 20.
2    MS. ANDERSON:
3        And what was the question?
4    MR. BURAS:
5        Please read it back.
6        (Whereupon, the preceding
7    question was read back by the reporter.)
8    MR. BURAS:
9        A procedural note, while he's
10   reviewing that document, I just found --
11   Exhibit 18 is the document with the ten
12   names. So we'll withdraw 23 and turn that
13   into 18.
14   A.    I believe I've seen this before,
15   but it's similar to the others.
16   EXAMINATION BY MR. BURAS:
17   Q.    Say that again.
18   A.    But it's similar to the other
19   ones.
20   Q.    Do you recall whether you
21   approved and/or provided information
22   responsive to any of those requests?
23   MS. ANDERSON:
24       Objection.
25   EXAMINATION BY MR. BURAS.

Page 86

1    Q.    Excuse me -- specific to any of
2    those requests?
3    MS. ANDERSON:
4        Objection. Form.
5    A.    Could you ask the question
6    again?
7    EXAMINATION BY MR. BURAS:
8    Q.    Do you recall whether or not you
9    specifically provided counsel with any
10   information specifically responsive to any
11   of those requests?
12       And by that let me just shorten
13   this. Were you ever told, "I have
14   information on Archtics. Use this for
15   No. 50"?
16   MS. ANDERSON:
17       Objection. Form.
18   EXAMINATION BY MR. BURAS:
19   Q.    And, again, whether No. 50 is
20   Archtics or not is just an example.
21   A.    I didn't see any Archtics
22   question, which would be the only one that I
23   would have answered.
24   Q.    And I believe we already went
25   over the information related to Toys for

Page 87

1    Tots, and you specified which issues you
2    looked for, correct?
3    A.    Yes.
4    MS. ANDERSON:
5        And Pepsi Four Pack.
6    EXAMINATION BY MR. BURAS:
7    Q.    And the Pepsi Four Pack?
8    A.    Yes. Like 44 was Pepsi Four
9    Pack.
10   Q.    Okay. Take a look at No. 15 and
11   please tell me if you've ever seen this.
12   This is --
13   MS. ANDERSON:
14       Exhibit 15 or Request No. 15?
15   MR. BURAS:
16       I'm sorry. Exhibit 15. My
17   mistake.
18   EXAMINATION BY MR. BURAS:
19   Q.    This is another request for
20   production of documents. It's another one
21   of the state court documents related to the
22   inside sales employees who filed suit in
23   this case.
24       Are you aware of the allegations
25   that have been raised by the inside sales

Page 88

1    employees against the Hornets?
2    A.    Yes.
3    Q.    What do you understand those
4    allegations to be?
5    A.    That they were due overtime.
6    Q.    Are you aware of any other
7    allegations that the inside sales employees
8    have made against the Hornets?
9    A.    Yes.
10   Q.    What is your understanding of
11   any other allegations?
12   A.    That they were due a higher base
13   salary.
14   Q.    Have you ever been asked to
15   investigate or provide any documents or
16   information responsive to any allegations
17   related to the claims made by the inside
18   sales employees against the Hornets?
19   A.    No.
20   Q.    Have you ever been asked to
21   provide any information related to suite
22   sales that might have been comped by the
23   Hornets on suites that were actually sold by
24   sales employees?
25   MS. ANDERSON:

Page 89

1    Objection. Form.
2    A. Can you repeat the question?
3    EXAMINATION BY MR. BURAS:
4    Q. Yes. Are you aware of the
5    Hornets' practice requesting that the sales
6    employees alert Chris Zaber or Brendan
7    Donohue if they have a suite sale that was
8    made so that the suite sale ticket could be
9    converted to a block ticket sale?
10    MS. ANDERSON:
11    Objection. Form.
12    A. I'm trying to remember the
13    beginning part of the question now.
14    EXAMINATION BY MR. BURAS:
15    Q. I don't understand this exactly,
16    so I'll go slow just so we both make sure
17    that we're getting this clear.
18    Are you aware of any instances
19    where Brendan Donohue or Chris Zaber asked
20    the sales staff if they had any suite sales
21    made on any games? This would have taken
22    place, I believe, in the 2004-2005 season.
23    A. We would have been frequently
24    asked if we sold suites for games.
25    Q. At any point in time during any

Page 90

1    of those requests were you ever asked to
2    comp a suite and then convert the sale of
3    the suite -- excuse me -- convert the money
4    received from the sale of the suite into a
5    block ticket sale?
6    A. I would have never been asked to
7    do that. It wouldn't have been a function
8    of my job.
9    Q. Are you aware of Brendan Donohue
10    or Chris Zaber asking any of the other sales
11    employees whether or not they had suite
12    sales so that similar actions could be made
13    regarding the block ticket purchases for the
14    suite sales purchases?
15    A. No, I'm not aware.
16    Q. Do you know whether or not a
17    person got paid less money for a block
18    ticket sale of, say, $2,000 worth of tickets
19    versus a suite sale?
20    A. They would have been paid the
21    same.
22    Q. They would have been paid the
23    same?
24    A. (Nods head affirmatively).
25    Q. So if commission reports

Page 91

1    indicate they received between 60 and $100
2    less, do you have any explanation for that?
3    MS. ANDERSON:
4    Objection. Form. Asked and
5    answered.
6    A. Less than, I guess, what, like?
7    EXAMINATION BY MR. BURAS:
8    Q. Do you have any idea why a
9    person would have been paid -- Well, I'm
10    going to save that for the 30(b)(6). I
11    think it's --
12    MS. ANDERSON:
13    I think you're going that way,
14    but I'm not --
15    MR. BURAS:
16    All right. I'll save that one
17    for later, next time we get to meet.
18    THE WITNESS:
19    Good.
20    EXAMINATION BY MR. BURAS:
21    Q. Take a look at Exhibits 12 and
22    16, which are the 30(b)(6) notice and the
23    1442 notice. Have you seen copies of these
24    notices? This is the deposition notices for
25    the corporate depositions.

Page 92

1    MS. ANDERSON:
2    This is one. You're going to
3    have to come up with that one, Counselor?
4    MR. BURAS:
5    I've got them right here. Take
6    a look at my two copies.
7    A. Yes, I have seen this.
8    EXAMINATION BY MR. BURAS:
9    Q. Have you ever been asked by
10    counsel to produce any documents that you
11    might have responsive to any of these areas
12    of inquiry?
13    MS. ANDERSON:
14    I'm just going to object as
15    asked and answered to the extent they're
16    repetitive to the other requests he's been
17    shown today and already answered questions
18    about.
19    MR. BURAS:
20    While he's reviewing that
21    document, Counsel, Exhibits 13 and 14 are
22    requests for admissions. Have you provided
23    copies of these to the deponent?
24    MS. ANDERSON:
25    I'm sorry. What are they?

Page 93

MR. BURAS:

Exhibit 13 and 14 are requests
for admissions. Have you provided copies of
these to Mr. Witmeyer? If not, I'll avoid
questions on those issues.

MS. ANDERSON:

I do not know if they have been
provided to him, so I can't tell you no or
yes.

A. Have I been asked to -- Can you
repeat your question?

EXAMINATION BY MR. BURAS:

Q. Yes. After you received this
document were you asked to provide any
additional documents or information that you
might have responsive to any areas where
you've been designated as the 30(b)(6)
representative?

A. Yes.

Q. Have you provided any documents,
additional documents, responsive to any of
these requests to your counsel?

MS. ANDERSON:

And, again, I reiterate the
objection of asked and answered to the

Page 94

extent these are repetitive of the other
requests that have been presented to him.
He's answered the same question.

EXAMINATION BY MR. BURAS:

Q. Let me clarify this. Aside from
the Archtics information that you provided
regarding specific accounts, the Archtics
information you provided regarding the
individual sales plaintiffs, and the
information that you could not find relating
to the Toys for Tots program, have you
provided any other documents to counsel
responsive to any other information in this
case?

MS. ANDERSON:

Objection. Form.

A. No.

EXAMINATION BY MR. BURAS:

Q. My question, aside from those
categories of documents that I just
mentioned, have you been asked to provide
documents responsive to any other category
in the 30(b)(6) notice?

A. No.

Q. The 1442 notice is the state

Page 95

court notice. There's a lot of overlap.
You can briefly scan that document.

Same questions. Have you seen
this document before? This is Exhibit 16
we're referring to.

A. Yes.

Q. You have seen Exhibit 16?

A. (Nods head affirmatively).

Q. Other than the documents we just
discussed, have you reviewed this list of
inquiry and on any areas where you were
designated as a 30(b)(6) rep have you
identified any other documents responsive to
any topics upon which you might testify?

A. No.

Q. Exhibits 13 and 14 are requests
for admissions. Briefly take a look at
these documents and tell me if you've ever
seen these documents, to start with.

A. Yes.

Q. You have seen the request for
admissions?

A. Well, 13 I have. I haven't
looked at 14.

Q. 13 (sic) are the Hornets'

Page 96

responses to the requests for admission.

A. Okay. 14 is the response?

Q. 14. I'm sorry. Yes.

A. Yes, I've seen them.

Q. You saw both documents or just
14?

A. Both.

Q. Have you ever been asked to
verify any of the information in Exhibits 13
or 14?

A. No.

Q. Have you ever received copies of
any correspondence sent by myself or any
other plaintiff counsel identifying
documents or categories of documents that
plaintiffs believe have not been produced by
the Hornets?

A. Not that I recall seeing.

Q. I want to show you one last
document which is Exhibit 19. It's a
document produced by your attorneys in this
case. The first page of it is the Initial
Ticket Sales Process.

MR. BURAS:

Do you have a copy of that

Page 97

1  document in that stack?
2      MS. ANDERSON:
3          Yes.
4  EXAMINATION BY MR. BURAS:
5      Q.  Have you ever seen this document
6  before?
7      A.  I don't recognize it, no.
8      Q.  Briefly take a look at the
9  section that says "Current" on Page D6055.
10  That's the first page. I don't know what
11  this document is, but underneath the section
12  that says "Current" is this the process
13  through which Hornets' sale representatives
14  took initial ticket orders?
15      A.  I can't read some of the --
16      Q.  Let's just start with the first
17  one. Sales reps take the order. Is that
18  accurate?
19      A.  Well, for the processing
20  process, they would take the order.
21  Correct.
22      Q.  Are there any written policies
23  or procedures related to how sales take
24  place within the Hornets organization?
25      A.  Not that I'm aware of.

Page 98

1      Q.  The second leg of this, or
2  second block, says: Enter the order on the
3  internal order form on contact management
4  system. What is an internal order form?
5      A.  That would have been the CRM we
6  talked about where you would just say what
7  they were purchasing and --
8      Q.  Okay. When it says order form,
9  was there a paper form that was generated by
10  a sales employee who entered this
11  information into the CMS?
12      A.  It would have been on line. It
13  would have been an intranet.
14      Q.  And would that on line form be
15  stored anywhere?
16      A.  Not that I'm aware of.
17      Q.  Do you know or you just --
18      A.  I don't --
19      Q.  Have you ever asked anyone if
20  that information would have been stored
21  anywhere?
22      A.  I have not.
23      Q.  When you looked for information
24  responsive to the CMS server, did you ask
25  anyone whether or not these internal order

Page 99

1  forms might have been located with the
2  information you found or in a separate
3  location?
4      MS. ANDERSON:
5          Objection. Form.
6      A.  I did not ask.
7  EXAMINATION BY MR. BURAS:
8      Q.  Do you know who might have this
9  information?
10      MS. ANDERSON:
11          Objection. Form.
12      A.  No, I don't.
13      MS. ANDERSON:
14          If you know.
15      THE WITNESS:
16          (Shakes head negatively).
17  EXAMINATION BY MR. BURAS:
18      Q.  All right. You can take a look
19  -- skip a box and then the section where it
20  becomes two boxes, there's a box with white
21  letters and it says: Provide customer with
22  premium seat license agreement.
23          The bottom legend on the bottom
24  left-hand side of the page indicates that --
25  This was supposed to be a color-coded chart.

Page 100

1  Obviously the one that we're looking at is
2  black and white. The requirement to provide
3  a customer with a premium seat license, do
4  you know whose responsibility that was?
5      A.  It varied.
6      Q.  Where would these premium seat
7  licenses be generated from -- excuse me --
8  premium seat license agreements? Who
9  generated them?
10      A.  It depends on the time frame.
11      Q.  All right. Let's start in 2002,
12  when you first started.
13      A.  Well, our attorneys obviously
14  drew them up. And then we had a premium
15  seat department that would service those.
16  So they would be the ones, once they were
17  sold, that would administer getting the
18  signatures.
19      Q.  Because there's an entirely
20  separate premium seat department?
21      A.  Services, service department,
22  premium seat services, not sales.
23      Q.  Is this within the ticket sales
24  department?
25      A.  It was sort of a crossover