Liger et al v. New Orleans Hornets NBA Limited Partnership
Doc. 159 Att. 18
Case 2:05-cv-01969-HGB-ALC   Document 159-19   Filed 10/15/2007   Page 1 of 25

**DANIEL L. CRUMB**   Condenseit   September 20, 2007

---

**Page 1**

```
 1        CIVIL DISTRICT COURT
          FOR THE PARISH OF ORLEANS
 2        STATE OF LOUISIANA

 3

 4   IVAN HINSON, JESSICA BERRY,  * NO. 05-10068
     EUGENE LIGER, ANTHONY "TONY" *
 5   MARTIN, ADAM NASH, CHRIS     * DIVISION "L"
     CARTER, CHRIS STANT, AND     *
 6   SAMUEL TOBIAS STEINMETZ      *
                                  *
 7                                *
         versus                   *
 8                                *
                                  *
 9   NEW ORLEANS HORNETS NBA      *
     LIMITED PARTNERSHIP          *
10                                *
11   * * * * * * * * * *

12

13        1442 Deposition of THE NEW ORLEANS
     HORNETS, through its designated
14   representative, DANIEL L. CRUMB, 5104 Toby
     Lane, Kenner, Louisiana 70065, taken in the
15   offices of Jones Walker, 201 St. Charles
     Avenue, New Orleans, Louisiana 70170, on
16   Thursday, the 20th day of September, 2007,
     commencing at 2:09 p.m.
17

18   APPEARANCES:

19   DAIGLE, FISSE & KESSENICH, PLC
        (By:  Daniel E. Buras, Jr., Esquire)
20      227 Highway 21
        Madisonville, Louisiana 70447
21
              -and-
22
     NILES, BOURQUE & FONTANA
23      (By:  Bryan J. Knight, Esquire)
        909 Poydras Street, Suite 3500
24      New Orleans, Louisiana 70112

25      ATTORNEYS FOR THE PLAINTIFFS
```

COPY

**Page 2**

```
 1   APPEARANCES (continued):

 2   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE
 3      (By:  Jennifer L. Anderson, Esquire)
        Place St. Charles - 50th Floor
 4      201 St. Charles Avenue
        New Orleans, Louisiana 70170
 5
        ATTORNEYS FOR THE DEFENDANT
 6

 7

 8   REPORTED BY:

 9   LISA BODE, CSR
     Certified Shorthand Reporter
10

11

12

13        EXAMINATION INDEX
                             Page
14   EXAMINATION BY MR. BURAS:   4, 148, 175

15   EXAMINATION BY MS. ANDERSON:  139, 171, 175

16

17        * * *

18        EXHIBIT INDEX

19   Exhibit No. 23 -
        Documents Bates numbered D6700 through
20      D6732 entitled "Consolidated Detail
        Income Statement by Month" and BRI
21      reports

22        * * *

23

24

25
```

EXHIBIT
J-1

**Page 3**

```
 1        S T I P U L A T I O N

 2

 3        IT IS STIPULATED AND AGREED by and

 4   between counsel for the parties hereto that

 5   the deposition of the aforementioned witness

 6   is hereby being taken under Article 1421,

 7   et. seq, of the Louisiana Code of Civil

 8   Procedure for all purposes, in accordance

 9   with law;

10        That the formality of reading and

11   signing is specifically not waived;

12        That the formalities of filing,

13   sealing, and certification are specifically

14   waived;

15        That all objections, save those as to

16   the form of the question and the

17   responsiveness of the answer, are hereby

18   reserved until such time as this deposition,

19   or any part thereof, may be used or sought

20   to be used in evidence at the time of the

21   trial of this matter.

22        *    *    *    *

23        LISA BODE, Certified Shorthand

24   Reporter, State of Louisiana, officiated in

25   administering the oath to the witness.
```

**Page 4**

```
 1        DANIEL L. CRUMB,

 2   after having been first duly sworn by the

 3   above-mentioned Certified Shorthand Reporter

 4   was examined and testified as follows:

 5   EXAMINATION BY MR. BURAS:

 6        Q.  Good afternoon, Mr. Crumb.

 7        A.  Good afternoon.

 8        Q.  Are you aware that you have been

 9   designated as a chain of custody witness to

10   testify on the investigations conducted by

11   the Hornets into various discovery requests

12   propounded by plaintiffs or sent by

13   plaintiffs to the Hornets in this case?

14        A.  Yes.  Now, can I ask you what

15   you mean by investigations?

16        Q.  Yes, sir, you can.  What I would

17   like to know and the purpose of this

18   deposition is going to be to find out what

19   topics or information you were asked to

20   provide and what steps you took to

21   personally investigate this information or

22   what steps you took in directing others to

23   investigate these matters.

24        A.  Okay.

25        Q.  And so with that groundwork
```

Page 5

1  being said, there are just some basic rules.
2  I don't know if you've ever been deposed
3  before.
4      A.  I have.
5      Q.  If you don't understand
6  something that I'm asking, by all means,
7  please tell me and I'll try to restate the
8  question.  If I can't, sometimes the
9  questions are just hard, and I'll do my
10  best.  However, if you answer a question
11  that I've asked, I'm going to assume you
12  understood my question.
13      A.  Uh-huh (Indicating
14  affirmatively).
15      Q.  Counsel is going to object
16  occasionally throughout this deposition.
17  Unless she tells you not to answer the
18  question, go ahead and answer my question
19  after she makes the objection.
20          With that groundwork, I'm going
21  to show you a series of exhibits during this
22  deposition, as well, that have been
23  previously marked.  It's some of the
24  discovery requests that have been submitted
25  in this case.  I'm going to ask you basic

Page 6

1  groundwork questions, have you seen them,
2  when did you see them, issues like that.
3  Hopefully, that won't take very long.
4          It's my understanding based on
5  what Ms. Anderson told me that you were not
6  hired by the Hornets until June of 2007; is
7  that correct?
8      A.  Correct.  It was June 25th, I
9  think was my start date, of 2007.
10      Q.  Where were you working before
11  June 25th?
12      A.  Abita Springs Water Company.
13      Q.  What were you doing with Abita
14  Springs?
15      A.  I was the chief financial
16  officer.
17      Q.  Were you specifically hired to
18  be the CFO of the Hornets?
19      A.  That's correct.  Vice-president
20  of finance is my official title.
21      Q.  Any job duty distinction between
22  vice-president of finance and CFO?
23      A.  No.
24      Q.  Who was the previous VP of
25  finance with the Hornets?

Page 7

1      A.  Brice Collier.
2      Q.  All right, sir.  When did you
3  first learn about this litigation?
4      A.  I learned -- It would have been
5  probably the first week of July, shortly
6  after I started.
7      Q.  Who told you about this
8  litigation?
9      A.  We had a meeting which Jennifer
10  Anderson and Jane Heidingsfelder were with
11  us.
12      MS. ANDERSON:
13          I just want to caution the
14  witness not to reveal the substance of any
15  communications between counsel.  There are
16  certain things that you can say, and we'll
17  tell you that, but I just want to make sure
18  you don't disclose the substance of
19  conversations between you and counsel.
20      THE WITNESS:
21          Okay.
22  EXAMINATION BY MR. BURAS:
23      Q.  During the course of depositions
24  earlier today, we received a series of
25  documents marked as D6700 through D6732.

Page 8

1      MR. BURAS:
2          Counsel, if you have a copy of
3  these to give to him, we're going to mark
4  this as Exhibit 23.
5  EXAMINATION BY MR. BURAS:
6      Q.  Mr. Crumb, have you ever seen
7  this document before?
8      A.  Yes, I have.
9      Q.  What is that document?
10      A.  It's a monthly detail income
11  statement.
12      Q.  Did you produce this document to
13  counsel?
14      A.  Yes, I did.
15      Q.  When did you first produce this
16  document to counsel?
17      MS. ANDERSON:
18          Read it all, if you need to.
19      A.  It was early September of 2007.
20  The date that this was actually produced was
21  September 11th, is what it says that it was
22  generated.
23  EXAMINATION BY MR. BURAS:
24      Q.  Where does it say it was
25  generated on September 11th, sir?

DANIEL L. CRUMB                    Condenselt™                    September 20, 2007

Page 9

1    A.  Bottom right-hand corner, very
2  bottom right-hand corner.
3    Q.  Where it says 09/11/07, 10:02
4  a.m.?
5    A.  Correct.
6    Q.  Sir, where was this information
7  retained?
8    A.  This was in the Solomon
9  accounting system on our computer servers.
10    Q.  Is the Solomon accounting system
11  like a Microsoft-type system or is it a
12  different type of computer?  I don't know
13  anything about it.
14    A.  Correct.  Solomon is a Microsoft
15  accounting software.  That's the general
16  ledger system we use is Solomon.
17    Q.  Is this the same software that's
18  been used by the Hornets since 2002?
19    A.  Correct.
20    Q.  Has the information that you
21  produced in Exhibit 23 been available in the
22  Solomon account server since before
23  Hurricane Katrina?
24    A.  I can't answer before me.  I
25  just know that I retrieved it, you know,

Page 10

1  when I was asked -- you know, when I had to
2  produce this, I retrieved it out of the
3  Solomon system.
4    Q.  When were you first asked to
5  produce this information?
6    A.  It would have been probably
7  sometime August, September, I guess.
8    Q.  Are you aware that the Hornets
9  have alleged various financial related
10  defenses to the overtime claims that have
11  been presented by plaintiffs in this case?
12    A.  Am I aware that we've alleged?
13    Q.  Yes.  You've made various
14  financial related defenses in this case.
15  MS. ANDERSON:
16      Objection.  Form.
17  EXAMINATION BY MR. BURAS:
18    Q.  Are you aware of this?
19    A.  What am I -- Am I aware of what?
20    Q.  Are you aware that the Hornets
21  have made or raised an amusement recreation
22  defense in this case?
23    A.  Yes.
24    Q.  Are you aware that part of that
25  defense relates to the financial receipts of

Page 11

1  the New Orleans Hornets?
2    A.  Yes.
3    Q.  When did you first become aware
4  of this?
5    A.  I became aware of this back in
6  -- It would have probably been the first
7  week of July.
8    Q.  When you were first made aware
9  of this, were you told that plaintiffs had
10  presented various documents in the form of
11  correspondence to Hornets' counsel advising
12  Hornets' counsel that plaintiffs did not
13  believe all the financial information had
14  been produced in this case?
15    A.  I'm not aware of that.
16    Q.  I'm going to show you a document
17  or a series of correspondence that was
18  previously marked as Plaintiffs' Exhibit
19  No. 17.  I think counsel may have a copy of
20  that.
21      I want you to take a look at
22  Exhibit 17 and tell me if you've ever seen
23  -- first question is have you ever seen any
24  of the correspondence that has been set
25  forth or attached as Exhibit 17?  And I'm

Page 12

1  going to represent to you at this time that
2  these are communications sent by plaintiffs'
3  counsel to Hornets' counsel in this case.
4    A.  This is the first time I've seen
5  these.  I haven't seen these.
6    Q.  Keep those documents in front of
7  you, sir.  Have you ever been made aware,
8  and I'm going to refer you to -- Well, let
9  me just ask this question.  Have you ever
10  been advised that plaintiffs alleged in this
11  case that specific categories and entire
12  categories of financial information have not
13  been produced in this case?
14    A.  Yes.
15    Q.  Were you ever provided with any
16  type of a written report detailing the areas
17  that plaintiffs believed the Hornets'
18  responses were deficient?
19    A.  I don't recall any.
20    Q.  At any point in time since you
21  first were hired as vice-president of
22  finance with the Hornets have you received
23  any documents from the New Orleans Hornets
24  detailing the type of information that
25  plaintiffs have requested in this case?

DANIEL L. CRUMB                    Condenselt™                    September 20, 2007

Page 13

1    A.   What do you mean?  Do you mean
2  have I been asked to provide certain
3  information?  Can you rephrase?
4    Q.   Yes, sir.  I'm asking at any
5  time since you were first hired have you
6  ever been provided with a document, be it in
7  the form of a correspondence, a letter,
8  memo, or a list of information that Hornets'
9  counsel advised you plaintiffs need this
10  information from the Hornets?
11    A.   I'm sure I would have -- I'm
12  sure there may have been an e-mail.  I know
13  that our accounts are requested certain
14  information.  I don't remember right off the
15  top of my head what form, whether it was an
16  e-mail or what it was, but I know I've been
17  requested to provide information.
18    Q.   And that's my question.  When
19  you were requested to provide information by
20  counsel was it specific requests for
21  specific types of information?
22    A.   There were -- There were
23  requests for financial statements and things
24  of that nature, bank statements, that kind
25  of thing.

Page 14

1    Q.   Do the Hornets maintain copies
2  of their bank statements?
3    A.   We do have copies of our bank
4  statements, yes.
5    Q.   Did you produce the Hornets'
6  copies of those bank statements?
7    A.   No.
8    Q.   What copies of bank statements
9  have the Hornets produced in this case?
10    A.   I got them from Capital One.
11    Q.   When did you first request a
12  copy of those documents?
13    A.   It was early July of 2007.
14    Q.   What parameters placed on
15  you regarding the documents that needed to
16  be produced when you requested those
17  documents from Capital One?
18    MS. ANDERSON:
19         Objection.  Form.  Assumes facts
20  not in evidence.
21    A.   Could you -- I'm not clear as to
22  what you're asking for.
23  EXAMINATION BY MR. BURAS:
24    Q.   Sure.  When you requested
25  documents from Capital One, how did you know

Page 15

1  what type of documents or accounts to
2  request information from?
3    A.   I requested information from a
4  certain point to, I believe it was, 2005,
5  2002 to 2005, I believe is what I requested
6  monthly bank statements.
7    Q.   It's my understanding from
8  statements made by not Ms. Anderson but
9  other Hornets' counsel in this case that the
10  Hornets have approximately six different
11  bank accounts; is that correct?
12    A.   Correct.
13    Q.   Records have only been produced
14  for two of those bank accounts.  Are you
15  aware of that, sir?
16    A.   Yes.
17    Q.   What type of records have not
18  been produced by the Hornets as far as bank
19  accounts go?
20    A.   We have a 401(k) bank account.
21  We have an aviation payroll bank account.
22  We have, I believe, a cafeteria plan bank
23  account.  I don't know off the top of my
24  head what the fourth one is.
25    Q.   I'm going to refer you to a

Page 16

1  document that's been previously marked as
2  Exhibit 18.  I'm going to represent to you
3  that the document that's been marked as
4  Exhibit 18 is a list of ten names of
5  individuals who previously assisted the
6  Hornets with their investigation of
7  plaintiffs' request in this matter.  I want
8  you to take a look at this document and tell
9  me if you have contacted any of the
10  individuals on that list to discuss their
11  investigation of this matter with them.
12    A.   Yes.
13    Q.   Who have you contacted?
14    A.   Greg King.
15    Q.   When did you contact him?
16    A.   It would have been various times
17  in July, August, probably September.
18    Q.   Do you remember what you
19  discussed with Mr. King and when you had
20  those discussions?
21    A.   The most recent, I had asked him
22  as far as what information was provided to
23  the City of Oklahoma, you know, what was
24  requested or provided to them.  And that was
25  in September.

DANIEL L. CRUMB    Condenselt™    September 20, 2007

Page 17

1    Q.  Do you remember when in
2    September, sir?
3    A.  I don't remember the exact date,
4    but I know it was recently.  It was sometime
5    in September.
6    Q.  Did he tell you what information
7    they produced to Oklahoma City?
8    A.  Yes.
9    Q.  Do you have copies of the
10   information that was produced to Oklahoma
11   City?
12   A.  I don't.  I don't have it with
13   me.
14   Q.  Have you looked for copies of
15   that information?
16   A.  As I recall, we have -- we have
17   the information.  As I recall, it was
18   basically BRI reports.  The City of Oklahoma
19   had basically requested to -- at the end of
20   each -- at the end of the -- they wanted to
21   have that information, and I believe the
22   only thing we provided to them was BRI
23   reports.  And then they also did an audit.
24   They sent Grant Thornton to do an audit
25   after each season.  I believe it was 30 days

Page 18

1    after the season they would go in and do an
2    audit to obtain or verify the local revenue
3    number.
4    Q.  Who's Grant Thornton?
5    A.  It's a CPA firm.
6    Q.  Is it located in Oklahoma City
7    area?
8    A.  I think they're a national firm.
9    Q.  Did the Hornets get a copy of
10   the audit report conducted by Grant
11   Thornton?
12   A.  I'm not aware.  I don't know.
13   Q.  Have you ever asked Grant
14   Thornton for a copy of this report?
15   A.  No, I haven't.
16   Q.  Was a copy of the Grant Thornton
17   report submitted to Oklahoma City?
18   A.  I'm not aware if it was or not.
19   Q.  Have you provided any documents
20   that were submitted to Oklahoma City to
21   counsel in this case?
22   A.  The BRI reports are the only
23   ones that I recall.
24   Q.  You've produced those to
25   counsel?

Page 19

1    A.  No.  I gave them to counsel.
2    Q.  That's what I mean.  When I say
3    "produced," I'm sorry for using legal
4    jargon.  And please, if I ask a question
5    like that, please correct me.  It's just old
6    habits sometimes.
7        Have you given copies of the BRI
8    information that you produced to Oklahoma
9    City to counsel?
10   A.  Yeah.  I've given copies of BRI
11   reports to our counsel.
12   Q.  Do you know when you gave this
13   information to counsel?
14   A.  Probably August, September time
15   frame.
16   Q.  Counsel has produced in this
17   case a series of reports from the NBA.  Are
18   these BRI reports produced to Oklahoma City
19   different from the reports that were
20   provided to counsel by the NBA?
21   A.  No.  They're the same.
22   Q.  Do the Hornets have copies of
23   any documents they specifically produced to
24   Oklahoma City?
25   A.  I'm not aware of anything that

Page 20

1    was specific -- I don't know.  I can't
2    answer that question as to what was
3    specifically produced, if they -- if we have
4    copies of that.
5    Q.  Have you ever been asked to look
6    for this information?
7    A.  Yes.
8    Q.  Where have you looked?
9    A.  Basically, I've looked on our
10   computers, and the quickest way for me to
11   find it was to just request it from the NBA.
12   Q.  So the information that the NBA
13   has submitted is -- I'm just trying to make
14   sure I understand.  The information that the
15   Hornets received from the NBA has what
16   relationship to the Oklahoma City report?
17   A.  As far as the BRI report?
18   Q.  Yes, sir.
19   A.  It's the same thing.  Yeah.
20   It's the same thing.
21   Q.  What CPA firm did the Hornets
22   use while they were in New Orleans?
23   A.  KPMG.
24   Q.  Do you have copies of the
25   various financial audits conducted by KPMG

Page 21

1    on the Hornets organization since 2002?
2        A.  Yes.
3        Q.  How long have the Hornets had
4    possession of the KPMG audits?
5        A.  I don't know.
6        Q.  Are they stored in file folders
7    in the Hornets' offices, sir?
8        A.  We have some -- We have some
9    audit reports in our folders.  Some I had to
10   request from them.
11       Q.  Have all audits reports from
12   2002 to the present been produced in this
13   case, sir?
14       A.  Yes.
15       Q.  When were those documents
16   produced?
17       A.  Again, probably would have been
18   in July, September, July through September
19   time frame, at various times.
20       Q.  Whether or not it happened in
21   July, August, or September may be relevant
22   in this situation.  I'd like you to take a
23   moment.  If you can recall, please let me
24   know when.  But when were these documents
25   specifically produced to counsel?

Page 22

1        MS. ANDERSON:
2            Objection.  Form.
3        A.  Again, I really -- with the
4    various information requests and the fact
5    that I was brand-new and I had just started,
6    there was a lot of things that, you know, I
7    do on a daily basis, and I just -- you know,
8    I can't pin down the exact time when those
9    documents came in.  I could certainly look
10   to find out.
11   EXAMINATION BY MR. BURAS:
12       Q.  I'm going to make a
13   representation to you and see if maybe this
14   jogs your memory.  On or about August 30th
15   of this year I sent correspondence to
16   counsel advising her that it did not look
17   like we had received information from any
18   third parties who might have information
19   regarding Hornets' financials such as
20   accounting firms.
21           Do you recall whether or not at
22   any point in time in the Labor Day time
23   period you were requested by counsel to
24   provide copies of your KPMG reports?
25       A.  I really don't remember.

Page 23

1        Q.  Do you have any idea why the
2    KPMG reports have not been produced prior to
3    your production of these documents in 2007?
4        A.  No.
5    MS. ANDERSON:
6            Objection.  Form.
7    EXAMINATION BY MR. BURAS:
8        Q.  Other than Mr. King -- Let's go
9    back to Mr. -- was it King?
10       A.  Uh-huh (Indicating
11   affirmatively).  Yes.
12       Q.  You said you spoke with him
13   several times.  Last time was in September
14   regarding the Oklahoma City documents.  What
15   did Mr. King tell you about the Oklahoma
16   City documents specifically?
17       A.  Well, he said that we would have
18   provided the BRI reports, and then he also
19   discussed at the end of the season that we
20   had -- that they had an audit that was
21   performed in Oklahoma City.  You know, I
22   don't know what scope of audit, but they
23   basically came in and audited the revenue,
24   local revenue number, and that's -- and it
25   was basically 30 days or so after the season

Page 24

1    ended, and that it was.  They were in for a
2    couple of days, and that was the extent of
3    it.
4        Q.  And just to make sure, I don't
5    mean to repeat myself, but have you ever
6    requested or have the Hornets ever requested
7    a copy of any of the Grant Thornton audits
8    that were conducted while the team was in
9    Oklahoma City?
10       A.  I'm not aware of that.
11       Q.  You're not aware of it or it
12   hasn't happened?
13       A.  I'm not aware of anybody -- I
14   know I haven't requested any documents from
15   Grant Thornton.
16       Q.  Have you ever directed anyone
17   working for you to --
18       A.  No.
19       Q.  -- produce any documents?
20       A.  (Shakes head negatively).
21       Q.  Other than your conversation
22   with Mr. King in September, have you had any
23   other conversation with him about his
24   investigation?
25       A.  Again, what do you mean by

DANIEL L. CRUMB                    Condenselt™                    September 20, 2007

Page 25

1  investigation?
2      Q.  What steps did Mr. King take to
3  provide information relevant to the defenses
4  asserted by the Hornets in this case or
5  plaintiffs' request for production of
6  documents in this case?
7      MS. ANDERSON:
8          Objection.  Form.
9      A.  The only questions I asked were
10  in relation to, you know, anything supplied
11  to Oklahoma City.
12  EXAMINATION BY MR. BURAS:
13      Q.  Other than Oklahoma City
14  questions that took place in September, had
15  you had any previous conversations with Mr.
16  King about Oklahoma City documents?
17      A.  Can you repeat the question
18  again?
19      Q.  Sure.  I believe you indicated
20  that the conversation with Mr. King took
21  place in September related to the documents
22  provided to Oklahoma City.  You indicated
23  that you had conversations with Mr. King
24  between July, August, and September.
25          Did you have more than one

Page 26

1  conversation or just one conversation?
2      A.  I've had probably a couple of
3  conversations with Mr. King.
4      Q.  Other than the conversation in
5  September regarding the Oklahoma City
6  documents, what was the content and subject
7  matter of the other conversations you had
8  with Mr. King?
9      A.  I -- From time to time I've
10  asked him for various -- where various
11  financial information would have been kept
12  on the servers or, you know, in various --
13  you know, the office would have them.
14      Q.  Would this information have been
15  communicated in electronic format or over
16  the telephone?
17      A.  Typically, I would talk to him
18  over the phone.
19      Q.  Do you remember any specific
20  category of documents you were looking for
21  on the server?
22      A.  The BRI reports.
23      Q.  Anything else?
24      A.  Financial statements.  That
25  probably would have been the extent of it

Page 27

1  that I can remember.
2      Q.  All right, sir.  Are you aware
3  that the New Orleans Hornets previously were
4  located in Charlotte before the team moved
5  to New Orleans?
6      A.  Yes.
7      Q.  Do you have access to any of the
8  Charlotte team financial records?
9      A.  I -- I have not been able to I
10  have not gotten any Charlotte financial
11  records.
12      Q.  When you say you have not gotten
13  those, does that mean you've never looked
14  for them?
15      A.  No.  I have.  But I have not --
16  I have not been able to get Charlotte
17  financial records other than the financial
18  statements themselves.
19      Q.  Where were the financial
20  statements from Charlotte located in the
21  Hornets?
22      A.  They were on a server.
23      Q.  Were these KPMG statements?
24      A.  No.  These were internal Solomon
25  statements, internally prepared.

Page 28

1      Q.  Do you know who the Hornets
2  accounting firm was in Charlotte?
3      A.  KPMG.
4      Q.  Do you know whether Mr. Brice
5  Collier knew that the Hornets used KPMG as
6  their accounting firm?
7      A.  At what time?
8      Q.  When Mr. Collier was serving as
9  the CFO.
10      A.  Yes.
11      Q.  Have you ever asked Mr. Collier
12  why he did not produce any of the KPMG
13  audited financials?
14      A.  No.
15      Q.  Have you had any conversations
16  with Mr. Collier about his investigation
17  conducted on behalf of the Hornets?
18      A.  His investigation, again, when
19  you're saying investigation --
20      Q.  Sir, all I'm trying to find out
21  is what documents he looked for and where he
22  looked for them.
23      A.  No, I haven't had any
24  discussions with Mr. Collier on that.
25      Q.  Have you reviewed any documents

Page 29

1  or correspondence that he prepared detailing
2  any investigations that he might have
3  conducted?
4      A.  No.
5      Q.  Have you reviewed any e-mails or
6  letters prepared by Mr. Collier identifying
7  what documents he produced or where he
8  looked for various categories of
9  information?
10     A.  No.
11     Q.  Have you ever had any
12 conversations with Barbara Booth about any
13 investigation she conducted?
14     A.  No.
15     Q.  I'm just going to ask you
16 various names.  Other than Mr. King and
17 Brice Collier, I'm going to run through
18 various names.  You tell me if you've had
19 any discussions with them about the
20 investigations that they conducted on behalf
21 of the Hornets to find information about
22 this case.
23          Kristy McKearn?
24     A.  No.
25     Q.  Brendan Donohue?

Page 30

1      A.  No.
2      Q.  Chris Zaber?
3      A.  No.
4      Q.  Marie Parenti?
5      A.  No.
6      Q.  Jonathan Lakamp?
7      A.  No.
8      Q.  Dave Burke?
9      A.  No.
10     Q.  Deana Artega?
11     A.  No.
12     Q.  Tim Spero?
13     A.  No.
14     Q.  I believe the last two names on
15 the list are Greg King and Brice Collier.
16     A.  (Nods head affirmatively).
17     Q.  I'm going to show you Exhibit 1,
18 a copy of Exhibit 1, which is simply the
19 correspondence identifying you as the
20 30(b)(6) witness to testify about various
21 issues, including the chain of evidence.
22          Were you aware that you were
23 identified as the chain of evidence witness
24 in this matter?
25     A.  Yes.

Page 31

1      Q.  Prior to coming here today, were
2  you told that you were going to be asked
3  about the investigations conducted by the
4  Hornets to locate all financial information
5  in this case?
6      A.  Yes.
7      Q.  Were you told that part of the
8  reason that we're conducting this
9  investigation is that financial information
10 has not been produced despite requests for
11 that information for over two years?
12     MS. ANDERSON:
13          Objection.  Form.
14     A.  No.
15 EXAMINATION BY MR. BURAS:
16     Q.  All right, sir.  I want you to
17 take a look at the initial disclosures filed
18 by the Hornets.  You can just gloss over
19 this document.  I understand that you were
20 not identified as a witness likely to have
21 discoverable information.  That's because
22 you did not begin working for the Hornets
23 until 2007, and I believe this document is
24 dated in 2005, if I'm correct.  Yes, 21st of
25 July, 2005.  That was a statement.

Page 32

1          Please take a look at --
2      MS. ANDERSON:
3          I was waiting for the question.
4  EXAMINATION BY MR. BURAS:
5      Q.  -- the names of the people on
6  Exhibit A and tell me if you've spoken with
7  any of these people, who I believe all five
8  of them are on the previous list, to find
9  out any information they might have related
10 to any of the financial defenses that have
11 been asserted by the Hornets.
12     MS. ANDERSON:
13          Objection.  Asked and answer.
14          And don't gloss over it.  Take
15 your time and look at it so you can answer
16 his question again.
17     A.  No, I have not had any
18 discussions with those people.
19 EXAMINATION BY MR. BURAS:
20     Q.  Sir, have you seen copies of any
21 of the specific pleadings submitted by
22 plaintiffs to the Hornets in this case
23 requesting various categories of
24 information?
25     A.  Yes.

Page 33

1  Q.  I'm going to show you a series
2 of documents prepared by counsel for
3 plaintiffs and submitted to the Hornets in
4 this case, and I want you to tell me, first,
5 if you've ever seen these documents before.
6      First exhibit is Exhibit 4,
7 which is a request for production of
8 documents in the civil suit in Civil
9 District Court, 05-10068.  It's Exhibit 4,
10 sir.
11  MR. BURAS:
12      Counsel, I'm going to go in
13 order of the numbers from here on out.
14  A.  I don't remember seeing this
15 document.
16 EXAMINATION BY MR. BURAS:
17  Q.  Okay.  I want you to take a look
18 at Exhibits 5 and 6, which are the Hornets'
19 responses to Exhibit 4.  I want you to tell
20 me if you've seen any copies of the Hornets'
21 responses to Exhibit 4.
22  MS. ANDERSON:
23      Actually, Dan -- Oh, okay.  I
24 see what you're saying.
25  A.  I don't remember seeing either

Page 34

1 one of these.
2 EXAMINATION BY MR. BURAS:
3  Q.  Okay.  Sir, do you have access
4 to Barbara Booth's records?
5  MS. ANDERSON:
6      Objection.  Form.
7  A.  Do I have access to Barbara
8 Booth's records?
9 EXAMINATION BY MR. BURAS:
10  Q.  Yes, sir.
11  A.  What records?
12  Q.  Any financial records that she
13 might have had access to when she served as
14 the vice-president of finance.
15  MS. ANDERSON:
16      Objection.  Form.
17  A.  What -- I don't -- I don't know
18 whatever is on the system that she would
19 have been in custody of at the time.  I
20 don't know what time she was -- what time
21 frame she was vice-president of finance.
22 EXAMINATION BY MR. BURAS:
23  Q.  Do you know who Barbara Booth
24 is?
25  A.  I know she was the CFO of the

Page 35

1 Hornets at some point before they moved to
2 Oklahoma City.
3  Q.  Do you have access to any of the
4 ticket reporting records, either ticket or
5 revenue reporting information that she
6 submitted to the NBA following each home
7 game?
8  MS. ANDERSON:
9      Objection.  Form.
10  A.  I haven't seen it.
11 EXAMINATION BY MR. BURAS:
12  Q.  Have you ever looked for it?
13  A.  It's -- We've got a system that
14 produces reports, ticket sales reports.  We
15 do have a system that does that.
16  Q.  As far as the specific
17 information that was actually transmitted by
18 Barbara Booth after each game, have you ever
19 been asked to look for that information?
20  A.  I haven't -- I haven't been
21 asked to look for information that she
22 submitted after each game.  I don't remember
23 being asked for that.
24  Q.  Are you aware that the Hornets
25 submitted revenue and ticket sales

Page 36

1 information to the NBA following each home
2 game pursuant to NBA league rules?
3  A.  Correct.  I'm aware that we're
4 required to do that.
5  Q.  How has that information been
6 transmitted since the team came to New
7 Orleans?
8  A.  Electronically, as far as I
9 know.
10  Q.  When you say electronically,
11 does that mean via e-mail?
12  A.  I would believe it's via e-mail.
13 It's -- There's a form that -- There's a
14 templet that the information is put in, and
15 I would believe it's e-mailed to the league.
16  MS. ANDERSON:
17      Answer -- Don't guess or assume.
18 Answer with what you know.
19  THE WITNESS:
20      Okay.  Well, it's -- We send a
21 -- Since I have been there, we send a weekly
22 report to the league on our ticket sales.
23 And I know that is sent by e-mail.
24 EXAMINATION BY MR. BURAS:
25  Q.  Do you know whether Mr. Collier

Page 37

1    sent similar reports via e-mail?
2        A.   Weekly report or --
3        Q.   Weekly or after each game, sir.
4        A.   I don't know if Mr. Collier did
5    it.
6        Q.   What about Mr. King?
7        A.   I don't know if he did it or
8    not.  I remember when I first came on board
9    I asked what reporting requirements there
10   were, and I was told that there's a gate
11   receipt report that's provided to the league
12   after each home game.
13       Q.   Do the Hornets maintain copies
14   of these gate receipt reports in hard copy
15   form anywhere?
16       A.   I have not seen any.
17       Q.   Do the Hornets have a specific
18   location on their server where they retain
19   copies of the gate receipt reports that are
20   submitted to the NBA?
21       A.   I don't -- I haven't seen it.
22       Q.   Have you ever looked for it?
23       A.   I haven't.
24       Q.   So you don't know if it's there
25   or not?

Page 38

1        A.   I can't tell you if it's there
2    or not.
3        Q.   Do you know whether or not
4    provision of this report is a CFO function
5    or is it possible that it was a ticket sales
6    function as well at some point in time?
7        A.   I don't -- I don't know whose
8    function, if it was a ticket or a CFO
9    function.  I just know that when I had
10   discussions with Brice Collier they -- the
11   finance department sent this report to the
12   league.
13       Q.   Do you know whether or not Chris
14   Zaber ever submitted similar types of
15   reports to the league related to group
16   sales?
17       A.   I don't know.
18       Q.   Have you ever been asked to look
19   for that information?
20       A.   No.
21       Q.   To the best of your knowledge,
22   have the Hornets ever conducted a computer
23   system search or any type of an electronic
24   search to determine if the information we
25   previously discussed related to the

Page 39

1    individual and specific transmission of
2    information to the NBA can be located on the
3    Hornets' servers?
4        A.   Could you repeat the question?
5    You asked a lot in one sentence.
6        MS. ANDERSON:
7             And I'll object on the basis of
8    form.
9    EXAMINATION BY MR. BURAS:
10       Q.   Do you have any knowledge
11   regarding whether or not the Hornets have
12   conducted an IT search to determine if any
13   of the aforementioned information that may
14   have been submitted by any prior
15   vice-president of finance or CFO and/or
16   Chris Zaber to the NBA related to, I think
17   you said, gate receipts is still located on
18   any of the Hornets' servers or computer
19   systems?
20       MS. ANDERSON:
21            Objection.  Form.
22       A.   I'm not aware if an IT search
23   has been done.
24   EXAMINATION BY MR. BURAS:
25       Q.   Have you ever ordered that one

Page 40

1    be conducted?
2        A.   No, I haven't.
3        Q.   All right, sir.  I'm going to
4    hand you a copy of a document now that has
5    been marked as Exhibit 7, which is
6    plaintiffs' request for expedited production
7    of documents related to the emergency
8    protective order and plaintiffs' motion.  It
9    should be previously marked as Exhibit 7.
10            This document was submitted in
11   2005 by plaintiffs to the Hornets.  Have you
12   ever seen this document before?
13       A.   I have not seen this document
14   before.
15       Q.   Based on that, I'm just going to
16   ask you to verify -- Exhibit 8 are the
17   responses to that document.  If you could
18   just verify that you have not seen that
19   document either for the record.
20       A.   No, I have not seen these.
21       Q.   Sir, I want you to take a look
22   at a document which has been marked as
23   Exhibit 9, which is information plaintiffs
24   obtained from the State of Louisiana
25   regarding the Quality Jobs Program.

**Page 41**

1    Are you aware that the Hornets
2  have received money from the State of
3  Louisiana through the Quality Jobs Program?
4    A.  Yes.
5    Q.  Do you have any records or files
6  in your office related to the Quality Jobs
7  Program?
8    A.  Yes.
9    Q.  How are those records maintained
10  by the Hornets?
11    A.  I have them electronically and I
12  have a hard copy.
13    Q.  All right, sir.  Are there any
14  other programs with the State of Louisiana
15  from which the Hornets receive money?
16  MS. ANDERSON:
17    Objection.  Form.
18    A.  Do you want me to answer -- Did
19  you have a question pending about this
20  document?
21  EXAMINATION BY MR. BURAS:
22    Q.  Yes.  Let's go back to this
23  I'll withdraw my previous questions.
24    My question on that is have you
25  ever seen the documents related to the

**Page 42**

1  Quality Jobs Program that I've given to you
2  marked as Exhibit 9?
3    Sir, it may help speed things
4  up.  I'm going to specifically refer you to
5  Plaintiffs 000921.  Is that your signature
6  at the top of the page, sir?
7    A.  Yes, it is.
8    Q.  Is it fair to say that you've at
9  least seen one of the contracts between the
10  Hornets and the Louisiana Quality Jobs
11  Program?
12    A.  Yes, I have.
13    Q.  Do you have copies of all of the
14  contracts that have been signed by the
15  Hornets in the State of Louisiana on behalf
16  of the Quality Jobs Program?
17    A.  I have the original, a copy of
18  the original one that was filed back in
19  2002.  That's the only one I'm aware of
20  other than the one we just renewed.
21    Q.  Do you have copies of any of the
22  affidavits that were submitted by the
23  Hornets to the State of Louisiana to obtain
24  the monies under the Quality Jobs Program?
25    And, for example, I'd like you

**Page 43**

1  to take a look at Plaintiffs 0970 and the
2  records that are attached to that affidavit.
3  This is an example of the document I'm
4  talking about.
5  MS. ANDERSON:
6    What number again?
7  MR. BURAS:
8    0970.  And then the --
9  MS. ANDERSON:
10    Okay.
11    A.  I haven't seen this document.
12  EXAMINATION BY MR. BURAS:
13    Q.  Have you ever executed one of
14  the affidavits of annual certification on
15  behalf of the Hornets that were submitted to
16  the state?
17    A.  Is that the same as this
18  document here?
19    Q.  Yes, sir.  I'm reading the title
20  on the top of Page 0970.
21    A.  No, I have not.
22    Q.  Do your records contain copies
23  of any of the affidavits for annual
24  certification and the attached exhibits
25  thereto --

**Page 44**

1    A.  I haven't -- I'm sorry.
2    Q.  -- referenced in these pages?
3    Go ahead now, sir.
4    A.  I haven't seen -- haven't seen
5    --
6    Q.  Have you looked for these
7  documents to see if you have similar
8  documents in your files?
9    A.  I have not looked for these
10  documents.
11    Q.  How big is your file related to
12  the Quality Jobs Program that you maintain
13  at the Hornets, with the Hornets?
14    A.  I have the original contract,
15  and I have the renewal contract and an
16  affidavit that I executed with the renewal
17  contract.
18    Q.  What type of an affidavit did
19  you execute?
20    A.  It was just an affidavit that
21  was a couple of paragraphs that went with
22  the renewal.
23    Q.  All right.  On the document that
24  I just showed you, which is 0970, it
25  indicates at the top of that that Brice

Page 45

1  Collier, the CFO, executed this affidavit.
2       Do you have access to all of Mr.
3  Collier's records?
4     A.  Which records?
5     Q.  Any records that he has at the
6  Hornets.  Is there a location where Mr.
7  Collier might have stored records to which
8  you don't have access?
9     MS. ANDERSON:
10         Objection.  Form.
11    A.  I have access to various
12  records, whatever is on the computer or
13  server, whatever is -- you know, whatever
14  the Hornets' server contains.
15  EXAMINATION BY MR. BURAS:
16    Q.  Before seeing Plaintiffs 0970
17  were you aware that the former CFO executed
18  an affidavit and submitted it to the
19  Louisiana state Quality Jobs Program?
20    A.  No.
21    Q.  Are you aware of how many times
22  any of your predecessors have submitted
23  affidavits to Louisiana Quality Jobs
24  Program?
25    A.  No.

Page 46

1     Q.  Do you have access to all of the
2  communications and correspondence that have
3  been exchanged between either KPMG or any of
4  your predecessors and any persons working on
5  behalf or for Louisiana Quality Jobs
6  Program?
7     MS. ANDERSON:
8         Objection.  Form.
9     A.  Could you do me a favor and
10  split that into -- ask me one question at a
11  time?
12  EXAMINATION BY MR. BURAS:
13    Q.  Sure.  No worries.  Do you know
14  if you have access to -- and I'll just pick
15  out a copy of a document at random --
16  Plaintiffs 0949?  If you see that, there is
17  a gentleman by the name of Mr. Wayne J.
18  DeBlander, senior vice-president of finance
19  for the New Orleans Hornets, who this letter
20  is addressed to on November 25th, 2002.
21       Do you see that, sir?
22    A.  Yes, I do.
23    Q.  Do you have access to any of the
24  documents that Mr. DeBlander may have
25  received or submitted to the State of

Page 47

1  Louisiana to obtain monies under the Quality
2  Jobs Program?
3     A.  I don't know.
4     Q.  Have you ever looked for that
5  information?
6     A.  No, I haven't.
7     Q.  All right.  Do you know if the
8  Hornets have conducted any computer searches
9  for any of your predecessors' e-mails to
10  determine whether or not they had any
11  documents responsive to information
12  submitted to or received from the State of
13  Louisiana to obtain monies on behalf of the
14  Quality Jobs Program, obtain monies from the
15  Louisiana Quality Jobs Program?
16    MS. ANDERSON:
17         Objection.  Form.
18    A.  Okay.  So let me get this -- let
19  me try and phrase it.  Are you asking me
20  whether we've searched our computers to see
21  if any correspondence existed in regards to
22  getting money from the Quality Jobs Program?
23  EXAMINATION BY MR. BURAS:
24    Q.  Correspondence or e-mails,
25  correct, sir.

Page 48

1     A.  No.
2     Q.  What about any other type of
3  documents such as the affidavit such as the
4  one I just showed you?
5     A.  No.
6     Q.  Have you ever requested this
7  information from your accountants?
8     A.  Yes.
9     Q.  Have your accountants provided
10  you with this information?
11    A.  Yes.  They provided me with
12  this, the original, which is 899, the
13  original contract.
14    Q.  All right, sir.  What other
15  information have your accountants provided
16  you with respect to the Quality Jobs
17  Program?
18    A.  This is it.  This is all I've
19  gotten from them.
20    Q.  What accountants did you receive
21  this from, sir?
22    A.  KPMG.
23    Q.  All right.  Who was your KPMG
24  representative handling these issues for
25  you, sir?

Page 49

1    A.   The issues that I --
2    Q.   Related to the --
3    A.   -- requested information?
4    Q.   -- Quality Jobs Program.
5    A.   Oh, Quality Jobs?
6    Ms. ANDERSON:
7         Just make sure you don't talk
8    over each other.
9    EXAMINATION BY MR. BURAS:
10   Q.   I'm sorry about that.  When you
11   do depositions it's not like conversation,
12   where you can kind of talk back and forth,
13   and that's my apologies for doing that, sir.
14   A.   I understand.  Randy Serpas.
15   Q.   Do you know who Mr. Gary
16   Dressler is?
17   A.   I know who he is.
18   Q.   Is he one of the representatives
19   who also handles these matters for KPMG on
20   behalf of the Hornets?
21   A.   I'm not aware of whether he does
22   or not.  The only person I've dealt with
23   regarding this is Randy Serpas.
24   Q.   All right, sir.  Have you ever
25   calculated how much money the New Orleans

Page 50

1    Hornets have received from the Quality Jobs
2    Program since the team came to New Orleans?
3    A.   No, I haven't calculated the
4    total amount.
5    Q.   Do you know whether or not the
6    Hornets have produced documents from which
7    plaintiffs can calculate the amount of money
8    that the Hornets have received from the
9    Quality Jobs Program since the team came to
10   New Orleans?
11   A.   I'm -- I'm not aware of what's
12   been produced in regards to how you can
13   calculate that.
14   Q.   Do you know or are you able to
15   testify as to all of the financial
16   information that has been produced by the
17   Hornets to date in this case?
18   MS. ANDERSON:
19        Objection.  Form.  That's a
20   vague question.
21   A.   Yeah.  I don't understand
22   exactly --
23   EXAMINATION BY MR. BURAS:
24   Q.   Do you know what financial
25   information the Hornets have produced and

Page 51

1    have not produced in this case?
2    A.   No.
3    Q.   As we sit here today, are you
4    certain that all financial information for
5    the Hornets has been produced in this
6    litigation?
7    MS. ANDERSON:
8         I just have to lodge an
9    objection and note that we have an ongoing
10   review and production of documents in
11   storage.  So to the extent that there's
12   something in there that has not been
13   provided that you all haven't looked at --
14   A.   I'm not aware.  I've just been
15   here for three months.  I don't know what's
16   been requested before me, what's been
17   supplied as far as -- And I know there was a
18   lot of document requests.  I really can't
19   answer what's been -- if there are things
20   that haven't been provided.
21   EXAMINATION BY MR. BURAS:
22   Q.   All right, sir.  Are you aware
23   that one of the reasons you were produced as
24   a witness was to testify as the Hornets'
25   representative to discuss the chain of

Page 52

1    custody of all the documents that have been
2    produced by the Hornets?  And I've limited
3    your request to financial issues.
4    MS. ANDERSON:
5         Objection.  Form.  And that's
6    not an accurate statement.
7         Subject to that, if you can
8    answer that question, go ahead.
9    A.   Can you split it into -- ask me
10   just one question at a time?
11   EXAMINATION BY MR. BURAS:
12   Q.   Yes, sir.  Have all of the
13   requests for information that you've
14   received since you joined the Hornets, have
15   those requests been limited to financial
16   information requests by counsel?
17   A.   Yes.
18   Q.   Have you investigated any other
19   matters such as any Human Resources related
20   matter?
21   A.   What do you mean by Human
22   Resources related matter?
23   Q.   Personnel records.
24   A.   I have not looked at personnel
25   records.

Page 53

1    Q.  Have you reviewed the payroll
2  records that have been produced in this
3  case?
4    A.  I have not reviewed the payroll
5  records.
6    Q.  Have you reviewed any other
7  accounting records that have been produced
8  in this case to verify that they've all been
9  produced?
10    A.  What do you mean by other
11  accounting records?  Is there anything
12  specific?
13    Q.  No, sir.  I don't know what
14  accounting records the Hornets have, which
15  may be a good time to get into this.  What
16  accounting records do the Hornets maintain?
17    A.  We maintain financial
18  statements.
19    Q.  All right.  Have all financial
20  statements been produced?
21    A.  Yes.
22    Q.  Do you know when those financial
23  statements were produced?
24    A.  Various times from July through
25  September.

Page 54

1    Q.  Do you have any idea why those
2  documents might not have been produced prior
3  to July?
4    MS. ANDERSON:
5        Objection.  Form.  And
6  misleading.
7    A.  I can't answer that question.  I
8  don't know.
9  EXAMINATION BY MR. BURAS:
10    Q.  Other than financial documents,
11  what other type of accounting records do the
12  Hornets have?
13    MS. ANDERSON:
14        You mean statements.
15    MR. BURAS:
16        Statements.  Sorry about that.
17    A.  Financial statements as far as
18  financial -- as far as accounting records,
19  there's various reports, budgets, cash
20  reports.
21  EXAMINATION BY MR. BURAS:
22    Q.  All right.  Other than budgets
23  and cash reports, are there any other type
24  of reports?
25    A.  That's primarily it.  Various --

Page 55

1  You know, from time to time there's various
2  analysis that we perform.  But as far as
3  just limited to the finance department's
4  accounting records, you know, it would be
5  financial statements, budgets, cash reports,
6  analysis, you know, as requested.
7    Q.  All right.  Let's talk about
8  something specific like ticket sales.  Did
9  the Hornets produce all reports related to
10  the amount of revenue generated from ticket
11  sales?
12    MS. ANDERSON:
13        Objection.  Form.
14    A.  Did we produce all reports?
15  EXAMINATION BY MR. BURAS:
16    Q.  Yes, sir.
17    A.  Now, what reports specifically?
18    Q.  Sir, I don't know what reports
19  you have.  That's the problem in this case.
20  So when you tell me you have reports, I'm
21  going to have to let you explain what
22  reports you have in this case because I
23  simply don't know the answer to these
24  questions.
25    MS. ANDERSON:

Page 56

1        Objection to the statement.
2  EXAMINATION BY MR. BURAS:
3    Q.  Do the Hornets have ticket
4  revenue reports?
5    A.  Yes.
6    Q.  Have those ticket revenue
7  reports been produced in this litigation?
8    A.  I'm -- I don't know.  I don't
9  know if they have or not.
10    Q.  Have you ever been requested to
11  provide any ticket revenue reports?
12    A.  No.  That's -- That comes from
13  the Archtics system, the revenue reports.
14    Q.  Does that mean you don't have
15  access to that system, sir?
16    A.  I know what the Archtics system
17  is.  I don't have -- I can go to a ticket
18  account executive or supervisor and look at
19  reports and get reports that way.  I've
20  never gone in and accessed the system.  I
21  don't have a password or anything into it.
22    Q.  Do you know whether or not
23  you've ever directed anyone who did have
24  access to Archtics to generate a ticket
25  revenue report?

Page 57

1    A.  We generate the weekly reports
2  that are submitted to the NBA.
3    Q.  Do you know whether or not those
4  weekly reports have been produced in this
5  case?
6    A.  I don't know.
7    Q.  Do you have access to those
8  weekly reports?
9    A.  Yes.
10    Q.  Are they in hard copy or
11  electronic format?
12    A.  Electronic.
13    Q.  Has your counsel ever asked you
14  for copies of those reports?
15    A.  I don't recall being asked for
16  it.
17    Q.  Could you have provided those
18  documents if you had been asked for them?
19    A.  From the point when I started,
20  yes.
21    Q.  How about from the point prior
22  to the time when you started with the
23  Hornets?
24    A.  I don't know.  I'd have to look
25  and see what was saved, if it was saved in

Page 58

1  the system or not.
2    Q.  Do you know if there's a file
3  folder with a hard copy backup of these
4  ticket revenue reports?
5    A.  That would be with the ticket
6  department, ticket operations department.
7    Q.  They are the ones who would have
8  to answer that, sir?
9    A.  They generate those reports.
10    Q.  Did you receive an electronic
11  version of these reports or a hard copy
12  version of these reports?
13    A.  Electronic.
14    Q.  Did you regularly print out a
15  hard copy version of these reports?
16    A.  No.
17    Q.  Were these reports stored on any
18  servers?
19    A.  As far as where they're
20  generated or with me?
21    Q.  By you, sir.
22    A.  Yeah.  I stored it on the
23  server.
24    Q.  Did you have access to any of
25  your predecessors' storage drives where they

Page 59

1  might have stored this information?
2    A.  Yes, I did have access.
3    Q.  But it's my understanding you've
4  never looked for this information because
5  you've never been asked for it?
6    A.  Correct.
7    Q.  Other than ticket revenue
8  reports, you indicated you have cash
9  reports.
10    A.  Yes.
11    Q.  What type of cash reports?
12  What's a cash report?
13    MS. ANDERSON:
14        Objection.  Form.
15  EXAMINATION BY MR. BURAS:
16    Q.  Did you indicate that you had
17  cash reports, sir?
18    A.  Yes.
19    Q.  What kind of information would
20  be contained in a cash report?
21    A.  It's a spreadsheet that we keep
22  a daily record of what cash has been
23  deposited into our bank account and what
24  checks have cleared, what amount --
25  Basically, it's a source -- it's a funds in

Page 60

1  and funds that have been dispersed.
2    Q.  So this report would show when
3  the Hornets received money and from what
4  source?
5    A.  Correct.
6    Q.  Has this cash report been
7  produced in this case?
8    A.  Yes.
9    Q.  When was that cash report
10  produced?
11    A.  It probably would have been
12  around September, August, September of 2007.
13    Q.  How was this cash report
14  identified?  How did you know to look for
15  this cash report?
16    A.  I was asked.
17    Q.  Specifically for the cash
18  report, sir?
19    A.  Yes.
20    Q.  Prior to August, September 2007,
21  had you previously been asked for
22  information related to cash reports or daily
23  record of the cash received by the Hornets?
24    A.  Okay.  Could you -- Again,
25  what's your --

Page 61

1    Q.  Prior to the production of this
2  report in August or September of 2007, had
3  you previously been asked for a copy of this
4  cash report?
5    A.  No.
6    Q.  Do you remember specifically who
7  asked you for a copy of this cash report?
8    A.  Our counsel.
9    Q.  Which counsel?
10    A.  Would have been either Jennifer
11  Anderson or Jane Heidingsfelder.
12    Q.  Is this cash report a report
13  that all CFOs would have had access to?
14    A.  I don't know if Brice had access
15  to it when he was there.  I can't answer for
16  him.  I know I do.  I have access to it.
17    Q.  Is this a report that is
18  maintained in electronic or hard copy
19  format?
20    A.  Electronic.
21    Q.  Do you know whether or not any
22  of your predecessors had been asked for a
23  copy of the cash report?
24    A.  No, I don't know.
25    Q.  Do you know what the cash report

Page 62

1  looks like?
2    A.  Yes.
3    Q.  Can you describe it for me, just
4  to make sure that we've actually received
5  it?
6    A.  It's a spreadsheet --
7  MS. ANDERSON:
8      I can give you a number, if you
9  want.
10  MR. BURAS:
11      Yes.  That would be great, if
12  you could do that just to save time.
13  MS. ANDERSON:
14      Why don't you go on with your
15  questions.
16    A.  It's a spreadsheet that has the
17  by date.  It's got what's been deposited,
18  whether it's a ticket deposit or other
19  deposit.  It's got cash disbursements.  It's
20  got book balance, bank balance, and it just
21  basically details by date, you know, what
22  cash is in, what cash is out, and what the
23  net balance booked and what the net balance
24  per the bank is.
25  EXAMINATION BY MR. BURAS:

Page 63

1    Q.  Other than the cash reports,
2  what other type of reports do the Hornets
3  have?
4    A.  As far as accounting?
5  MS. ANDERSON:
6      Objection.  Form.
7  EXAMINATION BY MR. BURAS:
8    Q.  Accounting or financial
9  purposes, sir.
10    A.  Basically, what I've seen -- I
11  mean what I've said, budgets, cash reports,
12  financial statements, just various analysis
13  that we're required or asked to produce from
14  time to time.
15    Q.  All right, sir.  Do you also
16  maintain copies of information related to
17  sites that are leased by the Hornets, such
18  as office space?
19    A.  That would be in our accounts
20  payable system.
21    Q.  Have you ever been asked by the
22  Hornets or by counsel to produce information
23  related to various locations where the
24  Hornets have rented office space?
25    A.  Rented office space?

Page 64

1    Q.  Yes.
2    A.  Specifically?  We have one
3  office on 1250 Poydras.
4    Q.  Prior to you joining the
5  Hornets, sir, I'd like to represent that the
6  Hornets maintained offices at various
7  different locations.
8    A.  Correct.
9    Q.  Do you know if your predecessors
10  maintained copies of the leases or other
11  documents reflecting other locations where
12  the Hornets maintained offices in the New
13  Orleans or Gulf South area?
14    A.  It would be in the accounts
15  payable system, you know, if we paid rent to
16  another facility.
17    Q.  Have you ever been asked to
18  produce that information, sir?
19    A.  No.
20    Q.  At any point in time have you
21  ever been asked to produce copies of leases
22  that the Hornets might have related to any
23  other locations that they operated?
24    A.  I don't remember being asked
25  that.

Page 65

1    Q.  I'd like for you to take a look,
2  sir, at a document that has been marked as
3  Exhibit 10.  It should be the next one on
4  that list.  I'm trying to go in order.
5        Have you ever seen a copy of
6  plaintiffs' second set of requests for
7  production of documents?
8    MR. BURAS:
9        Sir, while you're reviewing
10  that, just to save time, if you could get
11  him a copy of Exhibit 20.  That's the
12  Hornets' latest response to this request for
13  production of documents.
14    MS. ANDERSON:
15        I'm going to have to ask him.  I
16  don't know which one it is.  I'm not
17  positive.
18  EXAMINATION BY MR. BURAS:
19    Q.  Sir, before you start looking at
20  Exhibit 20, have you ever seen a copy of
21  Exhibit 10 before?
22    A.  I don't remember seeing this.
23    Q.  Okay.
24    A.  I don't recall -- I don't
25  remember seeing this.

Page 66

1    Q.  Okay, sir.  I want you to take a
2  look on Exhibit 20, take a look at number --
3    MS. ANDERSON:
4        The one he said he hadn't seen?
5    MR. BURAS:
6        Yes.
7  EXAMINATION BY MR. BURAS:
8    Q.  Take a look at Request for
9  Production No. 5, copies of all financial,
10  revenue, or ticket sales information
11  provided to the National Basketball
12  Association since 2002.  I believe you've
13  already testified that there exists reports
14  that were provided on a weekly basis to the
15  NBA related to ticket sales, correct?
16    A.  Yes.
17    Q.  You've also indicated that there
18  were -- I've suggested and you cannot verify
19  or deny the existence of postgame reports
20  that were provided to the NBA related to the
21  same financial and ticket revenue
22  information, correct?
23    A.  Yes.
24    Q.  And that no searches have been
25  conducted to find any information related to

Page 67

1  e-mails or other documents that might
2  confirm other information that might have
3  been submitted to the NBA regarding the
4  ticket, financial, or revenue data, correct?
5    MS. ANDERSON:
6        By him.
7    A.  Yeah.  I have not.
8  EXAMINATION BY MR. BURAS:
9    Q.  You have not verified and you
10  cannot verify that any e-mail searches have
11  been conducted to find out if any of your
12  predecessors might have submitted similar
13  information, correct?
14    A.  Yes.
15    Q.  And to date you've never looked
16  for that information, correct?
17    A.  Yes.
18    Q.  Do you know if all memos or
19  other information that might have been
20  submitted to the NBA along with any BRI
21  reports, such as documents, cover letters,
22  other information or follow-up requests from
23  the NBA regarding any of the BRI reports or
24  information submitted to the NBA have been
25  produced in this case?

Page 68

1    A.  I'm not aware.  Could you be
2  more specific in the question?
3    Q.  Sure.  None of the information
4  specifically transmitted by the Hornets has
5  been produced in this case.  That's my
6  statement.
7    MS. ANDERSON:
8        Objection.  Form.
9  EXAMINATION BY MR. BURAS:
10    Q.  What you've told me and what my
11  understanding is from counsel is that the
12  information related to the BRI reports has
13  been obtained by the Hornets from the NBA;
14  is that correct, sir?
15    A.  Yes.
16    Q.  No correspondence, documents,
17  e-mails, or other information that may have
18  been transmitted by the Hornets to the NBA
19  has been produced other than copies of the
20  actual reports.  Would you agree with that,
21  sir?
22    A.  The only thing I'm aware of is
23  the BRI reports being produced.
24    Q.  To date have you discussed or
25  looked for any correspondence, e-mails, or

Page 69

1 other type of documents that may have been
2 submitted to the Hornets by the NBA or by
3 the Hornets to the NBA related to any
4 financial, ticket, or revenue information
5 since the team first came to New Orleans?
6    A.  No.
7    Q.  You never looked for this
8 information?
9    A.  I've looked for it, but I
10 haven't -- I haven't seen any information.
11    Q.  No cover letters that might have
12 been submitted with any documents to the
13 NBA?
14    A.  I haven't seen any cover letters
15 that we've submitted.
16    Q.  Have you looked for them, sir?
17    A.  I've looked at various reports.
18 You know, I've looked in searching for
19 various things on the computer, but I
20 haven't seen any cover letters or anything
21 like that.
22    Q.  And my specific question is have
23 you searched your predecessors' electronic
24 data and/or hard copies to determine if this
25 information exists?

Page 70

1    A.  No, I haven't.
2    Q.  Do you know if the Hornets have
3 ever conducted a search to see if any of
4 this information exists?
5    A.  I don't know.
6    Q.  Have you ever specifically
7 requested that such a search be conducted?
8    A.  No.
9    Q.  Do you know whether or not the
10 NBA has ever submitted a request for
11 additional information to the New Orleans
12 Hornets?
13    A.  I don't know.  You --
14    Q.  Are you aware that the NBA
15 conducted an audit of the Hornets' ticket
16 process in 2005?
17    A.  No, I'm not aware of that.
18    Q.  Do you have any documents or
19 evidence regarding or related to the
20 investigation conducted by the NBA of the
21 Hornets' ticket processes?
22    A.  No.
23    Q.  Have you ever looked for that
24 information?
25    A.  No.

Page 71

1    Q.  Is this the first time you're
2 hearing about this today, sir?
3    A.  Yes.
4    Q.  Have you ever asked any other
5 member of the Hornets organization whether
6 or not there's any additional information
7 that they had in their possession from the
8 NBA related to any ticket or financial data?
9    MS. ANDERSON:
10       Objection.  Form.
11    A.  All right.  Could you repeat
12 that question?
13 EXAMINATION BY MR. BURAS:
14    Q.  Yes, sir.  To date have you
15 asked any other member of the New Orleans
16 Hornets organization whether or not they
17 have any information that might be
18 responsive to plaintiffs' request for any
19 other documents, memos, or any other type of
20 document, such as an e-mail, relating,
21 discussing, or describing revenue, ticket,
22 or financial information requested by the
23 NBA to the Hornets or provided from the
24 Hornets to the NBA?
25    A.  No.

Page 72

1    Q.  I know you've indicated that
2 you've produced the BRI reports in this
3 case.  Request No. 7 says produce copies of
4 all supporting financial documentation.
5       What supporting financial
6 documentation would back up the BRI data
7 that was provided to the NBA?
8    A.  That comes from financial
9 statements.
10    Q.  The ones found in the Solomon
11 system?
12    A.  Yes.
13    Q.  Any other information that might
14 have been used to provide this information?
15    A.  That's all that I'm aware of.
16    Q.  Have you looked into the
17 production of BRI reports to determine if
18 there's any other type of information that
19 might be submitted to the NBA or used to
20 prepare the BRI reports?
21    A.  No.
22    Q.  So you don't know whether or not
23 there is any information; is that correct?
24    A.  I don't know what information
25 other than from the financial statements

Page 73

1  would be used to prepare those BRI reports.
2  The only thing I'm aware of is it comes from
3  our financial statement system, the Solomon
4  system.
5      Q.  So as you sit here today, you
6  cannot state definitively that all such
7  information has been produced in this case?
8      MS. ANDERSON:
9          Objection.  Asked and answered.
10 He just gave his testimony on that point.
11 EXAMINATION BY MR. BURAS:
12     Q.  Correct, sir?
13     MS. ANDERSON:
14         Objection.  Asked and answered.
15     A.  I -- I'm a little confused at
16 what you're asking.
17 EXAMINATION BY MR. BURAS:
18     Q.  I'm just trying to verify that
19 as the Hornets' 30(b)(6) rep testifying
20 about financial issues and documents
21 produced in this case, as you sit here
22 today, you cannot verify that all of the
23 financial information backing up the BRI
24 data has been produced to plaintiffs in this
25 case?

Page 74

1      MS. ANDERSON:
2          Objection.  Form.  And asked and
3  answered.
4      A.  All I know is what comes out of
5  the Solomon financial system.  That's all
6  I'm aware of that is used to generate the
7  BRI reports, the data that's used to
8  generate the BRI reports.
9  EXAMINATION BY MR. BURAS:
10     Q.  And I believe I've previously
11 asked you if there is any other information
12 that went into those BRI reports, and you
13 told me you don't know.
14     A.  I don't know.
15     Q.  So my question remains, can you
16 verify that all backup data used to prepare
17 the BRI reports has been produced to
18 plaintiffs in this litigation?
19     A.  No.
20     Q.  No. 8 specifically asks for
21 copies of all financial, revenue, or ticket
22 sales information provided to the State of
23 Louisiana since 2002.  We've already gone
24 over Exhibit 9 which reflects various
25 financial information provided to the State

Page 75

1  of Louisiana by the New Orleans Hornets.
2      MS. ANDERSON:
3          Object to the statement.
4  EXAMINATION BY MR. BURAS:
5      Q.  If you take a look at the
6  response to Production No. 8, it says:
7  Subject to and without waiving this
8  objection, Defendant does not have any
9  documents responsive to this request.
10         Is it my understanding from your
11 earlier testimony that you had copies of the
12 Louisiana Quality Jobs contract that was
13 executed between the Hornets and the State
14 of Louisiana?
15     MS. ANDERSON:
16         I need to note an objection
17 because, as we've discussed and as you know,
18 there's an ongoing document search and
19 production, and these have not been updated
20 to reflect the things that have been
21 produced since then.
22     MR. BURAS:
23         This is the document that's the
24 subject for the motion for contempt and
25 sanctions and this is the document that I'm

Page 76

1  going to ask questions from.
2      MS. ANDERSON:
3          I understand.
4      MR. BURAS:
5          It's the only document that I
6  have.
7      MS. ANDERSON:
8          I'm not precluding you from
9  asking questions about it.  I'm simply
10 noting my objection to the extent you're
11 implying that this is a final response when
12 we've told you there is an ongoing
13 production and these are being updated as
14 the documents are being produced.
15 EXAMINATION BY MR. BURAS:
16     Q.  Sir, do you understand my
17 question?
18     A.  No.  Can you repeat it?
19     Q.  Sure.
20     MR. BURAS:
21         Ma'am, what was my last
22 question?
23         (Whereupon, the question was
24 read back by the reporter.)
25 EXAMINATION BY MR. BURAS:

Page 77

1    Q.   Is that correct, sir, you had
2  copies of those contracts?
3    A.   I obtained a copy from KPMG.
4    Q.   Could the Hornets have obtained
5  copies of this contract from KPMG prior to
6  August 17, 2007 had they requested this
7  information?
8    MS. ANDERSON:
9        Objection.  Calls for
10 speculation.
11   A.   I don't know.  I don't know if
12 we could or couldn't.
13 EXAMINATION BY MR. BURAS:
14   Q.   Had you previously requested
15 this information from KPMG?
16   A.   Previous to when?
17   Q.   Previous to August 17th, 2007.
18   A.   I don't remember.  I just
19 remember we requesting -- I requested this
20 information at some point around that time
21 frame.
22   Q.   Did KPMG give you any trouble in
23 producing this information to you?
24   A.   No.
25   Q.   Did KPMG respond in a timely

Page 78

1  fashion to your request for this
2  information?
3    A.   Yes.
4    Q.   Do you have any reason to
5  believe as you sit here today that if any of
6  your predecessors had requested copies of
7  this information from KPMG at any time
8  between 2005 and the present this
9  information could have been produced in a
10 more timely fashion?
11   MS. ANDERSON:
12       Objection.  Form.
13   A.   I don't know.  To be totally
14 honest, I don't know what the circumstances
15 surrounding, you know, Katrina and
16 everything.  You know, if this was around
17 the time frame of Katrina that you're
18 talking about, you know, certainly things
19 were very difficult to do in this city.
20 EXAMINATION BY MR. BURAS:
21   Q.   I'm well aware of that, sir.
22 I'm from here.
23       In addition to the damage that
24 might --
25   MS. ANDERSON:

Page 79

1        But you didn't live here during
2  Hurricane Katrina, right?
3    MR. BURAS:
4        Pardon me?
5    MS. ANDERSON:
6        You actually didn't live in the
7  city at the time of Hurricane Katrina.
8    MR. BURAS:
9        Actually, I have multiple family
10 members who lost houses both in New Orleans
11 and the city of Chalmette.  Counsel, let's
12 not go into our personal family issues
13 related to Hurricane Katrina.
14   MS. ANDERSON:
15       You brought it up.
16   MR. BURAS:
17       Let's take a break.
18   MS. ANDERSON:
19       That's probably a good idea.
20       (Following a brief recess, the
21 following proceedings were had.)
22 EXAMINATION BY MR. BURAS:
23   Q.   Sir, it's my understanding from
24 press reports -- and I have no documents
25 provided by the Hornets -- that indicate

Page 80

1  that the State of Louisiana and the Hornets
2  engaged in additional negotiations following
3  Hurricane Katrina for the team to stay in
4  the City of New Orleans; is that correct?
5    A.   Yes.
6    Q.   Were financial documents or
7  ticket sales information or other types of
8  revenue information provided to the State of
9  Louisiana as part of these negotiations?
10   A.   At what time?  Because there's
11 been ongoing negotiations.
12   Q.   My request on No. 8 says at any
13 time since 2002.
14   A.   I can't answer what was --
15   Q.   Have you ever looked for
16 information responsive to that question?
17   A.   Yes.
18   Q.   Do you know whether or not the
19 Hornets have provided financial, revenue,
20 and/or ticket sales information to the State
21 of Louisiana since 2002?
22   A.   I can only answer what I've
23 provided.
24   Q.   I understand that.  Have you
25 ever asked Mr. Shinn whether or not the

Page 81

1  Hornets have provided any other information
2  to the State of Louisiana?
3      A.  No.
4      Q.  What information have you
5  provided to the State of Louisiana?
6      A.  I provided -- Actually, it was
7  provided through our -- Hugh Weber, our
8  president, had asked for information that he
9  wanted to share with the state.
10     Q.  So Mr. Weber was the person who
11 might have provided information to the
12 state?
13     A.  Yes.
14 MS. ANDERSON:
15         I'm sorry.  Did you include a
16 time frame in your question or did he in his
17 answer?
18 MR. BURAS:
19         I'm assuming this is since July
20 of 2007, because he said it was information
21 that he provided.
22     A.  Since July of 2007, it was one
23 request that I provided.
24 EXAMINATION BY MR. BURAS:
25     Q.  And that request came from Mr.

Page 82

1  Weber?
2      A.  Yes.
3      Q.  Do you know whether or not Mr.
4  Weber made similar requests to any of your
5  predecessors to provide information?
6      A.  No.
7      Q.  No, he did not or --
8      A.  No, I don't know.
9      Q.  Have you ever conducted any
10 investigation to find out if Mr. Weber or
11 any of his predecessors requested
12 information from any of your predecessors?
13     A.  No, I did not.
14     Q.  As you sit here today, can you
15 verify that the New Orleans Hornets have not
16 produced any other information to the State
17 of Louisiana other than that which you gave
18 to Mr. Weber?
19     A.  No, I cannot verify that that's
20 the only piece of financial information that
21 was supplied to the state.
22     Q.  Do you know if this information
23 was supplied to the State of Louisiana
24 directly by Mr. Weber or was it supplied to
25 another law firm and then to the State of

Page 83

1  Louisiana?  Do you know how the information
2  was transmitted?
3      A.  I do not know how it was
4  transmitted.  I just know what I supplied
5  Mr. Weber.
6      Q.  What specifically did you supply
7  to Mr. Weber?
8      A.  The amount of lease payments
9  that we made for, I believe it was -- I
10 don't remember exactly, but I believe it was
11 2003, 2004, the seasons we were here, the
12 seasons that the Hornets played in New
13 Orleans.
14     Q.  Have you produced that
15 information to counsel to produce to
16 plaintiffs in this case?
17     A.  I'm sorry.  I didn't --
18     Q.  Have you produced that
19 information to your attorneys to provide to
20 plaintiffs in this case?
21     A.  No, I have not.
22     Q.  Were you aware that plaintiffs
23 had requested that the Hornets produce
24 copies of all financial, revenue, and ticket
25 sales information provided to the State of

Page 84

1  Louisiana since 2002?
2      A.  No, I was not aware.
3      Q.  When is the first time you
4  became aware of this request?
5      A.  To produce all copies of
6  financial, revenue, and ticket?
7      Q.  That was provided to the State
8  of Louisiana since 2002.  Yes, sir.
9      A.  I know I've been asked to
10 provide whatever, you know, information
11 probably either from July through August or
12 September.
13     Q.  So you've limited your search to
14 the information you specifically provided to
15 the State of Louisiana through Mr. Weber; is
16 that correct?
17     A.  No.  No.  I've supplied
18 information to counsel, to her counsel, as
19 far as financial information.  Well, I'm
20 getting confused.
21     Q.  Let me clarify.
22     A.  Yeah.
23     Q.  I think the question is getting
24 muddled.
25     A.  Yeah.

Page 85

1    Q. My specific question relates to
2  financial, revenue, or ticket sales
3  information actually provided to the State
4  of Louisiana by the New Orleans Hornets,
5  their attorneys, accountants, or other
6  agents. Has all information that has been
7  produced to the State of Louisiana since
8  2002 been provided to plaintiffs in this
9  case?
10    A. I don't know. I can't answer.
11    Q. Do you know whether or not
12  defendants, the Hornets, might have any
13  information related to documents related to
14  tickets, financial, or revenue information
15  submitted to the state?
16    A. Do I know if we have --
17    Q. Do you know if this information
18  even exists?
19    A. As far as what's been asked or
20  what we produced and provided to the State
21  of Louisiana?
22    Q. Correct.
23    A. I'd have to go back and look in
24  the records. I'd have to do a search.
25    Q. Prior to today have you ever

Page 86

1  been asked to conduct such a search?
2    A. As far as financial records
3  produced to the State of Louisiana?
4    Q. Correct, sir.
5    A. I'm -- I don't remember.
6    Q. What about revenue information
7  produced to the State of Louisiana? Same
8  answer?
9    A. I don't remember.
10    Q. And as far as ticket sales
11  information, same answer?
12    A. I have not been asked to produce
13  ticket sales.
14    Q. All right. When the team first
15  arrived in New Orleans in 2002 they entered
16  into negotiations with the City of New
17  Orleans for a practice facility; is that
18  correct?
19    A. I believe it was part of the
20  package for the Hornets to come into New
21  Orleans, was the city would provide or the
22  state would provide a practice facility.
23    Q. Before I get into that, you just
24  indicated that was part of the package for
25  the team to come to New Orleans. What

Page 87

1  package are you talking about?
2    A. That's all I'm aware of is that
3  the city or the state would provide a
4  practice facility. It was an inducement for
5  them to come into town to play in New
6  Orleans and --
7    Q. How did you know -- I'm sorry,
8  sir, if you're not finished.
9    A. And it was also the city -- I
10  believe there was a payment that the city
11  was going to make as well for relocation to
12  get them to come to New Orleans.
13    Q. Okay. You talked about
14  inducements the Hornets received. How did
15  you find out about these inducements?
16    A. About the practice facility?
17    Q. And any other inducements that
18  the Hornets received to come to New Orleans.
19    A. Well, the practice facility I
20  actually found out through the newspaper. I
21  read the paper. It's been kind of a
22  paramount issue in the papers off and on
23  throughout the years.
24    Q. Do the Hornets have any other
25  documents reflecting any other inducements

Page 88

1  that they received from the State of
2  Louisiana or the City of New Orleans for the
3  team to come to New Orleans?
4    A. I haven't seen any. I haven't
5  --
6    Q. Have you ever looked for any?
7    A. No.
8    Q. Do you know if those documents
9  might exist with any of your attorneys?
10    A. I don't know. I haven't looked
11  for them.
12    Q. As it relates to any payments
13  that the City of New Orleans was supposed to
14  make for the team to relocate to New
15  Orleans, do you know how much of a payment
16  that was?
17    A. Well, they never received it.
18    Q. Okay. Do you know whether or
19  not the Hornets provided any financial,
20  revenue, or ticket sales information to the
21  City of New Orleans or any of the council
22  members or mayor's office or any of their
23  agents during the process of negotiations
24  for any practice facilities?
25    A. No, I'm not aware. I don't

Page 89

1  know.
2      Q.  Have you ever looked for the
3  information?
4      A.  No, I haven't.
5      Q.  Do you know if there's a certain
6  person at the Hornets who conducted
7  negotiations with the city?
8      A.  At what time frame?
9      Q.  Any time frame you're aware of.
10     A.  Right now I'm not aware of us
11  conducting any currently, any negotiations
12  with the city.  I --
13     Q.  Do you -- Excuse me for
14  interrupting.
15     A.  No, I'm just -- I'm not aware of
16  it right now, currently.
17     Q.  Do you know whether or not the
18  Hornets designated a specific person within
19  the organization, a law firm, an accounting
20  firm, or any other agent or representative
21  to conduct negotiations with the City of New
22  Orleans?
23     A.  Right now, no, I'm not aware of
24  any -- anybody that they've -- that we have
25  -- that we've appointed or contracted with

Page 90

1  or anything to do negotiations with the
2  city.
3      Q.  All right.  Do you know about
4  before you came on with the Hornets?  Are
5  you aware of any specific person within the
6  Hornets organization, law firm, attorney,
7  accountant, or any other agent that the
8  Hornets used to conduct these negotiations
9  with the city?
10     A.  No.
11     Q.  You've never asked for any
12  information either since you joined the team
13  or before you joined the team related to
14  these issues, correct?
15     A.  Correct.
16     Q.  Have you ever been asked to
17  provide this information?
18     A.  No.
19     Q.  I want you to take a look at
20  Request for Production No. 11 that says:
21  Please produce copies of all financial,
22  revenue, or ticket sales information
23  provided to the City of New Orleans since
24  2002.
25         As you sit here today, can you

Page 91

1  verify that the Hornets do not have any
2  documents responsive to this request?
3      MS. ANDERSON:
4          I'm going to note, again, my
5  ongoing --
6      MR. BURAS:
7          Understood.
8      MS. ANDERSON:
9          -- objection.  The issue is the
10  documents that are currently being reviewed
11  that were recently located in storage.
12     A.  Can you ask your question again?
13  EXAMINATION BY MR. BURAS:
14     Q.  Sure.  As you sit here today,
15  can you verify that the Hornets do not have
16  any documents responsive to this request?
17     A.  No, I cannot verify that.
18     Q.  Has your counsel or any of your
19  superiors within the Hornets organization
20  asked you to produce or locate any
21  information related to financial, revenue,
22  or ticket sales information provided to the
23  City of New Orleans since 2002?
24     A.  No.
25     Q.  Has anyone ever told you who

Page 92

1  might have this information?
2      A.  No.
3      Q.  Have you ever asked anyone where
4  this information might be located?
5      A.  No.
6      Q.  It's my understanding you don't
7  have access to Archtics and do not know how
8  the system works; is that correct?
9      A.  I don't have access to it and I
10  really don't have an understanding of how it
11  works.  I don't -- It's just not something
12  that I work with on a daily basis.
13     Q.  All right, sir.  I want you to
14  take a look at Request for Production
15  No. 21.  It begins on Page 12.  And there's
16  subparts A through I.  For each month since
17  2002 please produce copies of, and we'll
18  start at A, all sources of revenue received
19  by the New Orleans Hornets for each month
20  since 2002.
21         Have the Hornets provided this
22  information to plaintiffs?
23     A.  Yes.
24     Q.  What documents or categories of
25  documents have this information?

Page 93

1    A.   The monthly financial statement.
2    Q.   That's the only document, sir?
3    A.   That's the only document I'm
4  aware of that we produced -- that I produced
5  was monthly financial statements.
6    Q.   What sources of revenue do the
7  Hornets have?  What are the Hornets' sources
8  of revenue?
9    A.   We've got ticket sales, suite
10 sales, sponsorships.  You have NBA revenue
11 assistance.  You have NBA merchandise,
12 whatever licensed merchandise they sell.
13 Those are the primary -- The main sources
14 are tickets, suites, and sponsorships, you
15 know, sponsor revenue, and then you have --
16 in New Orleans you have concession revenue,
17 concession and parking.
18   MS. ANDERSON:
19        I'm not sure where this is --
20 I'm sorry.  Were you done, Dan?
21   THE WITNESS:
22        Just off the top of my head,
23 that's all I can think of.  I mean, I can
24 look at the statement and tell you.
25   MR. BURAS:

Page 94

1        I haven't had a chance to look
2  at that yet.
3    MS. ANDERSON:
4        I'm not sure where this is
5  going.  But to the extent it's getting
6  substantive, I would object and ask that we
7  get back on track with the chain of evidence
8  issues.
9  EXAMINATION BY MR. BURAS:
10   Q.   Other than the financial
11 statements, are there any other documents
12 such as contracts or agreements that have
13 been in place and/or summaries of sources of
14 information that would identify the sources
15 of revenue for the Hornets other than the
16 financial statement?
17   MS. ANDERSON:
18        Objection.  Form.
19   A.   Okay.  Again, could you break
20 that down for me, just one question at a
21 time?
22 EXAMINATION BY MR. BURAS:
23   Q.   Sure.  You've indicated that the
24 Hornets might have ticket revenue and that
25 would be a source of information.  I believe

Page 95

1  before you indicated that there were ticket
2  reports --
3    A.   Correct.
4    Q.   -- that would detail the revenue
5  received.
6    A.   Correct.
7    Q.   And that information has not
8  been produced, correct?
9    MS. ANDERSON:
10        Objection.  Objection.
11 EXAMINATION BY MR. BURAS:
12   Q.   I'm just trying to make sure I
13 understand.  If I'm incorrect --
14   A.   I haven't produced it.  I
15 produced monthly financial statements.
16   Q.   All right.  You indicated that
17 there's advertising revenue.  Is there an
18 advertising report detailing the amount of
19 advertising revenue and the sources of
20 advertising revenue that the Hornets have
21 received?
22   A.   Well, there's sponsorship
23 revenue.
24   Q.   Sponsorship revenue?
25   A.   Sponsorship revenue.  We do have

Page 96

1  reports.
2    Q.   Related to sponsorship revenue?
3    A.   Yes.
4    Q.   Have you provided information
5  related to sponsorship revenue reports?
6    A.   I have not produced any.
7    Q.   Have you ever been asked to
8  provide that information?
9    A.   No, I don't remember being asked
10 to provide that.
11   Q.   Other than ticket revenue and
12 sponsorship, what other sources of revenue
13 did you say they have?
14   A.   You have parking and
15 concessions.
16   Q.   How is that information provided
17 to the Hornets to let them know how much
18 revenue they were entitled to for parking
19 and concessions?
20   A.   That's provided by SMG.  They
21 have a settlement statement for each game,
22 and they provide us with how much revenue
23 from parking, concessions.
24   Q.   Has that information been
25 provided to plaintiffs in this case?

**Page 97**

1    A.  I'm not aware of it.
2    Q.  What other sources of revenue?
3    A.  We have television revenue, the
4  national T.V. and the local T.V.
5    Q.  My understanding is that Cox
6  Network has a contract or at least at some
7  point in time had a contract with the New
8  Orleans Hornets to air their games; is that
9  correct?
10    A.  That is correct.
11    Q.  Cox's agreement with the
12  Hornets, has it been reduced to writing?
13    A.  Yes.
14    Q.  Has a copy of the contract with
15  Cox been produced in this litigation?
16    A.  I don't know if it has or not.
17    Q.  Have you ever been asked to
18  produce this information?
19    A.  I haven't been asked to produce
20  the Cox contract.
21    Q.  The sources of revenue that the
22  team receives from ESPN, AOL Time Warner,
23  any other sources related to national T.V.
24  broadcast, how do the Hornets know how much
25  information they're going to receive from

**Page 98**

1  each source?
2    A.  As far as the national, anything
3  the NBA has the contract, because those
4  contracts are with the NBA, AOL Time Warner,
5  ESPN -- actually, it's Turner right now.
6  It's not Time Warner anymore. Those
7  contracts are directly with the NBA. The
8  NBA provides to us this is what the contract
9  is and this is how much each team is going
10  to receive.
11    Q.  How is that information
12  transmitted from the NBA to each team or to
13  the Hornets specifically?
14    A.  It's circulated through a memo,
15  through a letter.
16    Q.  Has that memo been produced in
17  this litigation?
18    A.  I haven't produced it.
19    Q.  Have you ever been asked to
20  produce it by counsel?
21    A.  No.
22    Q.  Do you have access to those
23  memos?
24    A.  Yes.
25    Q.  All right. Related to the

**Page 99**

1  amount of revenue received from each revenue
2  source for each month since 2002, have the
3  Hornets produced all of the information
4  responsive to the request set forth in
5  letter B?
6    A.  Yes.
7    Q.  All right. What type of
8  document would contain this information?
9    A.  The monthly financial statement,
10  monthly income statement.
11    Q.  Monthly income statement?
12    A.  Income statement, yes.
13    Q.  I noticed there was a
14  consolidated income statement and then a net
15  operating statement based on the operating
16  account. Which statement are you referring
17  to that would reflect this information?
18    A.  Consolidated income statement.
19    Q.  Is that the consolidated summary
20  income statement?
21    A.  There's a consolidated summary
22  and consolidated detail, and the
23  consolidated detail statement just provides
24  for detail; whereas, the summary is a higher
25  level view.

**Page 100**

1    Q.  The consolidated summary income
2  statement, it's my understanding, is based
3  on an accrual accounting basis; is that
4  correct?
5    A.  That is correct.
6    Q.  Is the consolidated detail
7  statement also based on accrual-based
8  accounting?
9    A.  Yes. That's correct.
10    Q.  What reports other than the net
11  operating account statements do the Hornets
12  have that are based on cash-basis
13  accounting?
14    A.  That's -- Just the cash report.
15  We report everything on accrual basis.
16    Q.  Date of receipt for each source
17  of revenue, are you saying that's also
18  located on the consolidated detail reports?
19    A.  It's not going to have the date
20  of each receipt. It's going to have the
21  revenue for that month, each month. It will
22  have a total number of revenue for each
23  month.
24    Q.  But it's my understanding that
25  on the accrual-based accounting method if