Page 101

1  you received $100 on May 1st it might not be
2  reported until August 1st based on the
3  accounting method; is that correct?
4      A.  Correct.
5      Q.  So as far as the actual date of
6  receipt for each source of revenue since
7  2002, what documents have the Hornets
8  provided that would tell us the actual date
9  of receipt of those sources of revenue?
10     A.  The cash report.
11     Q.  The cash report?
12     A.  Yeah.  The daily cash report,
13 that spreadsheet that I referred to earlier.
14     Q.  And I know that counsel was
15 looking for the Bates numbers of the
16 documents identifying the cash report
17 because I don't remember seeing those.
18     MR. BURAS:
19         Counsel, have you been able to
20 identify which documents are the cash
21 reports?
22     MS. ANDERSON:
23         I don't know if I can from this
24 index that we prepared, but I'm going to ask
25 him real quickly to look at some numbers and

EXHIBIT J-2 peebles.

Page 102

1  tell me if this is right.
2          This is off the record.
3          (Discussion off the record.)
4      MS. ANDERSON:
5          I don't know.  I know it when I
6  see it.  I know from the actual documents we
7  produced.  I can't tell from the description
8  on this.  So I can't tell without looking at
9  it.
10     MR. BURAS:
11         Let's go back on the record.
12         At this time, Mr. Crumb, we're
13 unable to confirm the Bates numbers of the
14 documents identifying the cash reports that
15 you've indicated were produced to counsel.
16 At this time I'm going to ask counsel if you
17 could just please identify which documents
18 are those cash reports after this deposition
19 so that we can verify we have received those
20 documents.
21 EXAMINATION BY MR. BURAS:
22     Q.  Letter D indicates that
23 plaintiffs (sic) produce copies of the
24 amount, date of receipt, and source of
25 revenue from each home game played at the

Page 103

1  arena since 2002.  Would you be able to
2  determine the amount, date of receipt, and
3  source of revenue from the cash reports that
4  we just discussed?
5      A.  The -- It's going to give an
6  aggregate amount of cash received from
7  tickets.  In order to get from each home
8  game you'd have to get the settlement
9  statement from SMG to get the exact
10 breakdown of here's concessions and here's
11 parking and here's ticket sales.
12     Q.  All right.  So --
13     A.  Because you have walk-up ticket
14 sales the night of the game.
15     Q.  And you've indicated we don't
16 have those SMG breakouts yet, correct?
17     A.  Right.
18     Q.  So prior to this deposition
19 there's no way that plaintiffs would have
20 been able to determine the amount, date of
21 receipt, source of revenue derived from home
22 games played at the arena for each month
23 since 2002; is that correct?
24     A.  Well, no.  With those reports,
25 we can.  And plus we know our ticket sales.

Page 104

1  You know, we know that.  But we get those
2  settlement reports from SMG.
3      Q.  My question wasn't clear.  Since
4  I don't have copies of those reports from
5  SMG, there's no way I could have determined
6  this information based on the information
7  the Hornets have produced to date; is that
8  correct?
9      A.  Well, you can -- you would not
10 have been able to tell from each home game
11 the exact breakdown of each type of revenue
12 source.
13     Q.  Same question on letter E
14 related to road games played by the Hornets.
15 Do the Hornets receive revenue from the home
16 teams when the Hornets play away games?
17     A.  Not that I'm aware of.
18     Q.  Are you sure of this or have you
19 not looked into this information?
20     A.  No, I just -- I'm not aware of
21 it.  But based on what I've done, you know,
22 what we've looked at and, you know, talked,
23 you know, to various people, I'm not aware
24 of any revenue received when we play on the
25 road, you know, from the home team on the

Dockets.Justia.com

Page 105

1 road. I'm not aware of any kind of sharing
2 or anything, any monies that they give us.
3     Q. I don't remember what your
4 answer was, but on Request for Production
5 No. 21, have you ever seen this Request for
6 Production No. 21 in any form such as
7 correspondence, e-mails, or other breakouts
8 from this document that may have been
9 submitted to you by your counsel?
10     And just to clarify, by
11 breakout, I mean maybe counsel submitted you
12 an e-mail specifically requesting this
13 information although maybe not identifying
14 it as Request for Production No. 21.
15     A. Counsel has requested --
16     Q. Each category of information?
17     A. No, not each category.
18     Q. Well, maybe we can expedite
19 things. Which categories of information has
20 counsel specifically requested?
21     A. A and B.
22     MS. ANDERSON:
23     Did you say B or D?
24     THE WITNESS:
25     B, as in boy. A and B are the

Page 106

1 ones that I'm aware of.
2     EXAMINATION BY MR. BURAS:
3     Q. C through I, have you ever been
4 specifically asked for that information
5 before?
6     A. I haven't been specifically
7 asked in this form.
8     Q. Do the Hornets receive any money
9 for radio broadcasts?
10     A. We receive television revenue,
11 local television revenue. I'm not aware of
12 whether it's -- radio is lumped into that or
13 not.
14     Q. Have you ever investigated to
15 find this information out?
16     A. No.
17     Q. I think we've already discussed
18 as it relates to letter F. There are
19 sponsorship reports that have not yet been
20 provided to plaintiffs in this case as well;
21 is that correct?
22     A. That I'm aware of.
23     Q. Request No. 22 requests copies
24 of documents identifying the amount of
25 revenue from the State of Louisiana or City

Page 107

1 of New Orleans received by the Hornets for
2 each year since 2002, including date of
3 receipt for each payment. Have the Hornets
4 produced this information to plaintiffs?
5     A. I'm not aware if we've produced
6 it to the plaintiffs.
7     Q. Have you ever been asked to look
8 for that information?
9     A. Yes.
10     Q. When was the first time you were
11 asked to look for this?
12     A. I really don't remember whether
13 it was July or August, September. All I was
14 asked was what type of revenue did we
15 receive from the state.
16     Q. Do you remember what your
17 response was?
18     A. Yeah. We -- What I said was we
19 had the naming rights' revenue. We get 1.9
20 million a year. As long as we don't get a
21 naming rights' sponsor we get 1.9 million a
22 year.
23     Q. Is that information set forth in
24 any type of a document, the names rights'
25 revenue that the Hornets receives?

Page 108

1     A. I'm not aware. I don't know.
2     Q. Have you ever looked for that
3 information?
4     A. No.
5     Q. Do the Hornets have a contract
6 with SMG?
7     A. Yes.
8     Q. Has a copy of that contract ever
9 been produced in this litigation?
10     A. I don't know.
11     Q. Have you ever been asked to
12 produce a copy of it?
13     A. No, I haven't.
14     Q. Do you have a copy of it?
15     A. I don't.
16     Q. Do you know who within the
17 Hornets organization might have a copy of
18 it?
19     A. Yes.
20     Q. Who?
21     A. Sam Russo.
22     Q. Do you know if Mr. Russo was
23 ever asked to produce a copy of it?
24     A. No, I don't know.
25     Q. Asked about Quality Jobs Program

Page 109

1 documents. I know we just discussed this.
2 Is there someone specific at the Hornets who
3 is designated to be their point of contact
4 with the State of Louisiana related to
5 Quality Jobs Program issues?
6     A. I handle that now.
7     Q. Prior to you who would that
8 point person have been?
9     A. I don't know. The only person
10 I've seen on the original form was Barbara
11 Booth, I believe.
12     Q. Previously I believe we
13 discussed that there were affidavits with
14 attachments like Excel tables attached, but
15 you indicated you'd never seen that before;
16 is that correct?
17     A. That's correct.
18     Q. Do you know who, if anyone,
19 within the Hornets organization might also
20 be submitting information to the State of
21 Louisiana besides yourself to the Quality
22 Jobs Program?
23     A. No.
24     Q. Is there anyone else at the
25 Hornets organization who should be producing

Page 110

1 this information?
2     MS. ANDERSON:
3         Objection. Form. Calls for
4 speculation.
5     A. I don't -- I don't know. I
6 can't answer that question.
7 EXAMINATION BY MR. BURAS:
8     Q. Have you ever authorized anyone
9 else to produce information to the state of
10 Louisiana?
11     A. No, not since I've been there.
12 I'm sorry. As far as the Quality Jobs
13 Credit Program?
14     Q. Yes, sir.
15     A. No. The only thing that I'm
16 aware of that we have provided was that
17 renewal form and the affidavit that I signed
18 along with it.
19     Q. Have you ever been asked to
20 produce a copy of any reports related to the
21 retail sales produced by the Hornets?
22     A. By whom? Retail, what do you
23 mean by "retail sales"?
24     Q. I don't know, sir. That's a
25 defense the Hornets have asserted in this

Page 111

1 litigation. The Hornets have alleged a
2 retail sales exemption to their requirement
3 to pay overtime in this litigation. What
4 documents reflect the amount of retail sales
5 that the Hornets have?
6     MS. ANDERSON:
7         Objection. Form.
8     A. Okay. Basically, I think I can
9 answer this question. Monthly financial
10 statement provides that because generally
11 everything we do is retail. Ticket sales,
12 they can't be resold. I mean, it's a final
13 sale to the consumer. You know, you can't
14 reproduce the broadcast, the television, the
15 local television. Everything that we do is
16 retail. We have some minor retail
17 merchandise sales and all the things that we
18 derive revenue from are retail are included
19 in this, in this statement.
20 EXAMINATION BY MR. BURAS:
21     Q. Are you aware of what percentage
22 of Hornets' tickets have been sold in the
23 retail market -- have been resold on the
24 retail market --
25     A. Have been resold?

Page 112

1     Q. -- since 2002? Yes.
2     MS. ANDERSON:
3         Objection. Form.
4     A. No.
5 EXAMINATION BY MR. BURAS:
6     Q. Are you aware of any reports
7 that have been conducted or prepared by the
8 Hornets related to the percentage of tickets
9 resold on the open market?
10     A. No, I'm not.
11     Q. Are you aware of the activities
12 of any of the sales managers or sales
13 directors wherein they authorized the resale
14 of tickets previously purchased by customers
15 in the Hornets' sales department?
16     MS. ANDERSON:
17         Objection. Form.
18     A. No, I'm not aware of any.
19 EXAMINATION BY MR. BURAS:
20     Q. Have you ever investigated any
21 of these issues?
22     MS. ANDERSON:
23         Objection. Form. And asked and
24 answered.
25     A. No, I have not.

Page 113

1  EXAMINATION BY MR. BURAS:
2      Q.  Sir, are you a member of the
3  Commission Compensation Committee?
4      A.  No.
5      Q.  Are you aware of whether or not
6  any of your predecessors were members of the
7  Commission Compensation Committee?
8      A.  No, I'm not aware of that.
9      Q.  Have you ever investigated
10  whether or not any of your predecessors
11  might have documents responsive to any
12  actions they took as members of the
13  Commission Compensation Committee?
14      A.  No.
15      Q.  Do you know what the Commission
16  Compensation Committee is?
17      A.  No.
18      Q.  Have you ever heard the term
19  before this deposition?
20      A.  I have not heard and I don't
21  remember hearing of it.  I don't know the --
22  I'm not involved in it, if we have one right
23  now.
24      Q.  Do you possess any documents
25  wherein you've made any determinations

Page 114

1  regarding the amount of commissions that
2  might be owed to any sales employees of the
3  New Orleans Hornets?
4      MS. ANDERSON:
5          Objection.  Form.
6      A.  Could you repeat the question?
7  EXAMINATION BY MR. BURAS:
8      Q.  Sure.  Do you have any documents
9  either prepared by you or any of your
10  predecessors related to the amount of
11  commissions that any plaintiff in this case
12  might have been entitled to receive?
13      MS. ANDERSON:
14          Objection.  Form.
15      A.  I'm not aware of any.
16  EXAMINATION BY MR. BURAS:
17      Q.  Do you have any documents,
18  notes, memos, e-mails, or any other type of
19  documents reflecting any job
20  responsibilities or duties that any of your
21  predecessors had in playing a role or any
22  part in determining the amount of
23  commissions owed by any of the plaintiffs in
24  this litigation?
25      MS. ANDERSON:

Page 115

1          Objection.  Form.
2      A.  No, I'm not aware.
3  EXAMINATION BY MR. BURAS:
4      Q.  Do you have any information in
5  your possession related to the offers of
6  employment that were made to Eugene Liger,
7  Tony Martin, or Adam Nash by the New Orleans
8  Hornets?
9      A.  No.
10      Q.  Have you ever looked for any
11  information related to the offers made by
12  the Hornets?
13      A.  No, I have not.
14      Q.  Have you ever asked that the IT
15  department conduct any searches for any
16  e-mails, memos, or other documents that
17  might be located on Hornets' computers or
18  servers that any of your predecessors might
19  have related to the offers of employment
20  made to Adam Nash, Tony Martin, or Eugene
21  Liger?
22      A.  No, I have not.
23      Q.  Have you ever heard those three
24  names before today?
25      A.  I've heard Eugene Liger.

Page 116

1      Q.  Have you personally conducted
2  any searches to determine whether or not you
3  or any of your predecessors have received
4  any e-mails, memoranda, correspondence,
5  notes, or other documents related to
6  overtime compensation?
7      A.  No.
8      Q.  Do you know whether or not
9  Barbara Booth had any e-mails,
10  correspondence, or memos in her computer
11  systems or servers that might have addressed
12  overtime compensation?
13      A.  No, I'm not aware of any.
14      Q.  Do you know whether or not
15  information has ever been looked for in this
16  litigation by the Hornets?
17      A.  I don't know.
18      Q.  I want you to take a look at
19  Page 21, Request for Production No. 40.
20  There are persons identified A through Q. I
21  don't know which of these persons might be
22  financial and which are not.
23          Would you please take a look and
24  tell me whether or not you have ever been
25  asked and whether or not you have ever

DANIEL L. CRUMB                    Condenselt™                    September 20, 2007

Page 117

1  looked for any information related to
2  e-mails, memoranda, correspondence, notes,
3  or other documents that might be located in
4  the Hornets' servers and/or computers
5  regarding overtime compensation for any of
6  these persons.
7      A.  No, I have not.
8      Q.  Take a look at No. 42. Have you
9  ever looked at the information available to
10 you in any of your predecessors' files, be
11 they electronic or physical, related to
12 determinations on who was owed commissions
13 for any of the customers identified in
14 letters A through BB on Pages 23 and 24?
15     A.  Could you repeat the question
16 just one more time?
17     MR. BURAS:
18         Would you read it back.
19         (Whereupon, the preceding
20 question was read back by the reporter.)
21     A.  No, I have not.
22 EXAMINATION BY MR. BURAS:
23     Q.  Have you ever been asked to look
24 for this information?
25     A.  No.

Page 118

1      Q.  Do you know whether or not the
2  Hornets have looked for this information?
3      A.  No, I don't know.
4      Q.  No. 46 requests copies of all
5  communications or documents between the
6  Hornets and any representative, executive,
7  or employee of the NBA regarding overtime
8  paid for employees. Without revealing any
9  attorney-client privileged information, have
10 you ever been directed to look for any of
11 this information in any of your files or any
12 of your predecessors' files?
13     A.  No, I have not.
14     Q.  Have you ever personally
15 conducted a search for this information?
16     A.  No, I have not.
17     Q.  Have you ever directed anyone to
18 conduct a search for this information?
19     A.  No, I have not.
20     Q.  Do you know whether or not this
21 information has ever been looked for?
22     A.  No, I don't know.
23     Q.  Do you know anything about NBA
24 policies and procedures for payment of
25 premium seat commissions?

Page 119

1      A.  No.
2      MS. ANDERSON:
3          I'm just going to kind of note
4  an objection. It's fine if you want to ask
5  him these questions, but his knowledge is
6  really limited to financial information, not
7  the ticket sales type information. It's
8  fine if you want to go through it. I'm just
9  trying to tell you that that's probably
10 going to make this longer than it needs to
11 be.
12 EXAMINATION BY MR. BURAS:
13     Q.  Do you know who a person named
14 Chris Zaber is?
15     A.  I don't know him. I've heard
16 his name, and I don't know who he is.
17     Q.  Do you know how the Hornets
18 track sales of their commissioned employees?
19     A.  Yes.
20     Q.  All right. Is this information
21 contained in any policies or procedures or
22 manuals?
23     A.  Not that I know of. I don't
24 know. It might be.
25     Q.  Have you ever looked for any

Page 120

1  such policies, procedures, or manuals?
2      A.  No, I have not.
3      Q.  You indicate that you do know
4  how the Hornets track sales of commission
5  salesmen. How is this done?
6      A.  It's done through Archtics.
7      Q.  Do you know specifically what
8  documents might exist that show how these
9  commissions are tracked?
10     A.  Other than Archtics and that
11 report is sent to payroll department for
12 inclusion on their paycheck.
13     Q.  Are you aware that we've had
14 testimony that in years prior the accounting
15 department actually tracked this information
16 and provided it to the individual
17 salespersons?
18     A.  I'm not -- I'm not aware of
19 that.
20     Q.  Have you ever looked for
21 information related to any changes in the
22 way commission sales were tracked by the New
23 Orleans Hornets from 2002 through the end of
24 2005?
25     A.  No.

DANIEL L. CRUMB                    Condenselt™                    September 20, 2007

Page 121

1    Q.  Have you ever been asked to look
2  for that information?
3    A.  I don't recall being asked for
4  it.
5    Q.  Who is the best person who might
6  have that information?
7    A.  In the organization as far as
8  how commissions are tracked?
9    Q.  Yes.
10    A.  At what time period?
11    Q.  2002 until 2005.
12    MS. ANDERSON:
13      If you know.
14    A.  I really don't know.
15  EXAMINATION BY MR. BURAS:
16    Q.  Do you know if you or any of
17  your predecessors maintained any documents
18  related to how commissions were tracked by
19  the Hornets from 2002 to 2005?
20    A.  I don't know.
21    Q.  Are you aware of any involvement
22  that Barbara Booth might have had in
23  determining the amount of commissions owed
24  to sales employees during any point of her
25  tenure?

Page 122

1    A.  No.
2    Q.  Do you have any documents in
3  your possession that Barbara Booth may have
4  maintained regarding how she might have
5  tracked the information related to
6  commissions of sales employees?
7    MS. ANDERSON:
8      Objection.  Asked and answered
9  already.
10    A.  I'm not aware of any documents.
11  EXAMINATION BY MR. BURAS:
12    Q.  Take a look at Document No. 11,
13  which are responses to interrogatories that
14  have been prepared by the Hornets.  The date
15  of this document is December 14th, 2005.
16      Have you ever seen this document
17  before, sir?
18    A.  No, I haven't seen this
19  document.
20    Q.  I'll show you a copy of
21  Documents 12 and 16, which are the 30(b)(6)
22  notice and the 1442 notice in this case.
23  That's the corporate representative
24  deposition notices.
25    MS. ANDERSON:

Page 123

1      Do you want me to get my copies?
2    MR. BURAS:
3      I can show him mine, if you'd
4  like.  It will make things quicker.
5  EXAMINATION BY MR. BURAS:
6    Q.  Have you ever seen either of
7  those two documents, sir?
8    MS. ANDERSON:
9      Do you remember the question?
10    THE WITNESS:
11      Yeah.  Have I seen these
12  documents.
13    A.  I've either seen this document
14  or something very similar to it.  I can't
15  remember.
16  EXAMINATION BY MR. BURAS:
17    Q.  I'll represent to you that that
18  is the corporate deposition notice that
19  we've submitted to the Hornets in this case,
20  plaintiffs have submitted to the Hornets, I
21  should say.  I don't know if we've already
22  shown you a copy of this, but this is
23  Exhibit 1, which is a copy of the Hornets'
24  designation of you as a witness to testify
25  on chain of evidence questions and

Page 124

1  designating you to testify on certain topics
2  in the 30(b)(6) and 1442 deposition notices.
3      You are aware that you have been
4  designated by the Hornets?
5    A.  Oh, yes.  Yeah.  Like I said,
6  I've either seen these documents or
7  something very similar.
8    Q.  My question to you is are you
9  aware of which areas you've been designated
10  to testify?
11    A.  Yes.
12    Q.  Have you been asked by counsel
13  in response to the specific areas that
14  you've been designated to testify whether or
15  not you have any additional documents that
16  might be responsive to the topics upon which
17  you were going to testify other than those
18  which have been already produced in this
19  litigation?
20    A.  Okay.  Can you repeat that?
21  It's a lot for one question.
22    MR. BURAS:
23      Would you read that one back.  I
24  actually liked that question.
25      (Whereupon, the preceding

Page 125

1  question was read back by the reporter.)
2      A.  I don't remember if I was asked
3  that or not.
4  EXAMINATION BY MR. BURAS:
5      Q.  Other than documents that you
6  have already produced in this case or that
7  you have been made aware that the Hornets
8  previously produced, are there any other
9  documents that you will rely upon to testify
10  as to any other areas upon which you have
11  been designated as a 30(b)(6) witness?
12      A.  I don't know.  I believe we've
13  supplied everything that we requested, I
14  mean, at least that I know of.
15      Q.  Everything that counsel has
16  asked you to provide, is that what you mean?
17      A.  Correct.
18  MS. ANDERSON:
19          Objection.  Form.
20  EXAMINATION BY MR. BURAS:
21      Q.  I believe you've previously
22  indicated you've not actually seen the
23  actual request for production that
24  plaintiffs have submitted in this case; is
25  that correct?

Page 126

1      MS. ANDERSON:
2          Objection.  Asked and answered
3  and to the extent it misstates previous
4  testimony.
5      A.  Which document -- Now, what are
6  you --
7  EXAMINATION BY MR. BURAS:
8      Q.  I was talking about Exhibit 10.
9  You indicated you've never seen Exhibit 10
10  before and you also indicated you've never
11  seen Exhibit 20 before; is that correct?
12      A.  Can I see those exhibits again?
13      Q.  Sure.  I'll be more than happy to
14  do that.
15  MS. ANDERSON:
16          It would be quicker if you could
17  just allow him to rely on his prior
18  testimony as to Exhibits 20 and 10 instead
19  of trying to ask it again.
20          Which one do you have?
21  THE WITNESS:
22          This is 20.  Yeah.  I haven't
23  seen this one.
24  EXAMINATION BY MR. BURAS:
25      Q.  So when I ask you if you've

Page 127

1  provided all documents that might have been
2  responsive, my question was you've not
3  actually seen the requests that were made.
4  You've responded to all requests for
5  information that were made to you by your
6  counsel; is that correct?
7      MS. ANDERSON:
8          Objection.  Form.
9      A.  Yes.
10  EXAMINATION BY MR. BURAS:
11      Q.  Let me show you copies of two
12  documents, Exhibits 13 and 14.  These are
13  documents called Request for Admissions that
14  were submitted by plaintiffs to the Hornets
15  in this case.  These documents were executed
16  prior to your employment with the Hornets.
17          Have you ever seen copies of
18  these documents before?
19      A.  I have not seen Exhibit 13.
20      Q.  Okay.  Take a look at Exhibit
21  14.
22      A.  I haven't seen this Exhibit 14
23  either.
24      Q.  Okay.  Exhibit 15 are requests
25  for production that were -- Let me just ask

Page 128

1  you a question.  Are you aware of the
2  different lawsuits that have been filed by
3  plaintiffs in this case?
4      A.  Yes.
5      Q.  How many lawsuits are you aware
6  that have been filed?
7      A.  I'm aware of the Liger
8  litigation, that suit.  There's another,
9  Patrick Spear (phonetic).
10          Was that involved with this?
11      Q.  Don't know who Patrick Spear is.
12      A.  Okay.  Well, then I'm aware of
13  this Liger case.
14      Q.  The Liger case being the
15  overtime suit?
16      A.  Yes.
17      Q.  Are you aware that there's also
18  been a suit for unpaid commissions filed in
19  the state court?
20      A.  Yes.
21      Q.  Are you also aware that there's
22  been a third lawsuit filed by three inside
23  sale employees for failure to pay the proper
24  wages?
25      A.  Who's involved in that?

Page 129

1    Q.   That's the Eugene Liger, Tony
2 Martin, and Adam Nash suit.
3    A.   Okay.  I believe I've heard it.
4    Q.   I'm going to show you a copy of
5 the request for production in this case, if
6 you can briefly take a look at this and tell
7 me whether or not you've ever seen a copy of
8 that.  That's Document 15.
9    A.   I haven't seen this document.
10    Q.   All right, sir.  Have you ever
11 seen copies of any correspondence that was
12 submitted by any plaintiffs' counsel to the
13 Hornets identifying any areas where
14 plaintiffs believe the Hornets had not
15 properly responded to the discovery
16 submitted to the Hornets by plaintiffs?
17    A.   Okay.  What are you asking
18 again?  Am I --
19    Q.   I'm asking have you ever seen
20 copies of letters sent by me to Ms.
21 Anderson?
22    A.   No.
23    Q.   Letters sent Mr. Knight's firm,
24 the Niles law firm?
25    A.   No.

Page 130

1    Q.   Any documents sent by the Daigle
2 Fisse law firm to Ms. Anderson?
3    A.   No.
4    Q.   Any e-mails that might have been
5 sent by Ms. Elvige Cassard to Ms. Anderson
6 related to alleged deficiencies in the
7 Hornets' discovery responses?
8    A.   No.
9    Q.   Have you ever been made aware
10 that plaintiffs have alleged that there were
11 deficiencies made in the Hornets' discovery
12 responses?
13    A.   Yes.
14    Q.   Have you ever specifically asked
15 counsel what those alleged deficiencies are?
16    A.   No.
17    Q.   Has counsel told you what those
18 alleged deficiencies are?
19    A.   I don't remember what -- I don't
20 remember.
21    Q.   For clarification of the record,
22 I just want to show you Document 17, which I
23 believe these are the correspondence and
24 e-mails and letters that we previously
25 discussed, if you could just confirm you've

Page 131

1 never seen copies of any of those documents.
2    A.   I have not seen these.
3    Q.   Sir, I'm going to show you a
4 document we previously marked as Exhibit 19.
5 It's a spreadsheet of various types of
6 reports.  Do the ticket sales managers
7 report to you, sir?
8    A.   No.
9    Q.   Who do they report to?
10    A.   The ticket sales managers would
11 report to the vice-president of ticket
12 operations.
13    Q.   Who is that?
14    A.   Currently?
15    Q.   Yes, sir.
16    A.   Kevin Terry.
17    Q.   Who does Mr. Terry report to?
18    A.   He reports to Hugh Weber.
19    Q.   I want to show you a copy of
20 Pages D6059 in Exhibit No. 19.  In this it
21 indicates -- This is ticket sales reporting.
22 There's a current and a proposed section
23 here I'm going to let you see.  It's hard to
24 read because apparently it was a color
25 document and we got a black-and-white

Page 132

1 version of it.
2        First one discussed is sales
3 productivity reports.  To the extent that
4 you can actually read the information in
5 those boxes, can you tell me which of those
6 reports you might have access to and which
7 of those reports you do not have access to?
8 I only want you to take a look at the
9 section that's marked current because I
10 don't know unless you can confirm that the
11 proposed changes have been implemented by
12 the Hornets.
13    MS. ANDERSON:
14        Objection.  Form.
15    A.   Okay.  So you want to know what
16 we -- what the finance department would have
17 access to?
18 EXAMINATION BY MR. BURAS:
19    Q.   Yes, sir.
20    A.   Okay.  Well, the gate receipt
21 reports.
22    Q.   We previously discussed that in
23 detail.
24    A.   Uh-huh (Indicating
25 affirmatively).  The game settlement

Page 133

1  reports.
2     Q.   We discussed the SMG report; is
3  that correct?
4     A.   Correct.  Accounts receivable
5  reports, we could -- we can get those.
6     Q.   What are accounts receivable
7  reports?  Is that a cash basis or an accrual
8  basis report?
9     A.   That's an accrual basis.
10  Basically, what happens is if something is
11  sold on account and we haven't received the
12  cash yet, it would show what the unpaid
13  balance is so that we can expect to receive
14  from the customer or, you know, from the
15  entity.
16     Q.   With this report could you
17  identify specific customers when they made
18  payments to the Hornets through these
19  accounts receivable reports?
20     A.   Yes.
21     Q.   How far back do those documents
22  go, the accounts receivable reports?
23     A.   I don't know.
24     Q.   Have you ever looked for that --
25     A.   No.

Page 134

1     Q.   -- information?
2     A.   No, not that.
3     Q.   Have you ever been asked to
4  provide specific information on -- I think
5  we already talked about this -- those 28
6  identified names of customers whose
7  commissions are at issue?  Did we go over
8  that?  I don't remember if we did or we
9  didn't.
10     MS. ANDERSON:
11        I thought we did and he said
12  that that came from Archtics.
13     MR. BURAS:
14        That's what I thought he said
15  too.
16  EXAMINATION BY MR. BURAS:
17     Q.   Just to make sure I understand,
18  if, for example, Bryan Knight purchased a
19  ticket January 1st and made -- $1200 worth
20  of tickets and he made $100 of payments a
21  month throughout the entire year, would the
22  accounts receivable report indicate each
23  month Bryan Knight, first month paid 100,
24  1,100 remaining; second month paid 100,
25  1,000 remaining; third month paid 100, 900

Page 135

1  remaining?
2     A.   Yes, it would.
3     Q.   And those reports have not been
4  provided as to any of the specific customers
5  whose commissions are at issue in this case;
6  is that correct?
7     A.   I don't -- I don't -- I don't
8  know if they've been produced or not.
9     Q.   You never --
10     A.   I haven't produced them.
11     Q.   Do you know if any accounts
12  receivable reports have been produced in
13  this case?
14     A.   I have not.
15     Q.   You have not produced them.  Do
16  you know whether the Hornets have produced
17  them?
18     A.   I don't know.
19     Q.   Have you ever been asked to
20  produce these reports?
21     A.   No.
22     Q.   What is a batch report?
23     A.   What type of batch report?  A
24  batch report is just basically, say, a daily
25  -- all the transactions of a day would be

Page 136

1  put into a batch and then that would be
2  posted.
3     Q.   So if a customer made a payment
4  on Day 1, if you compared that to the
5  accounts receivable report, you'd be able to
6  tell how much they owed total from the
7  accounts receivable report and compare that
8  to the batch report as to how much they
9  actually paid on what day; is that correct?
10     A.   Right.  You should be able to
11  see when they paid.
12     Q.   And would the accounts
13  receivable report reflect if, for example,
14  there was a change in the ticket?  Let's say
15  you bought upper-level tickets for $1,000
16  and you changed that to lower-level tickets
17  for $2,000.  Would the accounts receivable
18  report indicate there was now more money
19  owed on the account at a certain period of
20  time?
21     A.   Yes.
22     Q.   And if the amount of $1,000
23  stayed the same throughout, would that
24  pretty much indicate that the amount of the
25  original ticket sale had not changed?

Page 137

1    A. Correct. If the -- If let's say
2 in your example you bought $1200 worth of
3 tickets and 1200 stayed on the books and you
4 received payment each month of $100, then
5 that would indicate that that person did not
6 change plans or do anything different; that
7 the transaction was in its original form.
8    Q. Okay. And the batch reports
9 would actually show the day a payment was
10 made and the accounts receivable report
11 would show the monthly summary of when the
12 payment was made; is that correct? So if
13 you made one payment on the 10th of $100 and
14 one payment on the 20th of $100, would the
15 accounts receivable report show two $100
16 payments or would it show one $200 payment?
17    A. Okay. Go back. Let's --
18    Q. Yes. I'm just trying to
19 understand conceptually, and I apologize. I
20 have no accounting still whatsoever.
21    A. That's all right.
22    Q. If someone made two payments in
23 one month, the batch reports would reflect
24 each payment; is that correct?
25    A. Correct. You would see the

Page 138

1 payment, each payment, in the batch report.
2    Q. The accounts receivable report,
3 is that a report prepared on a monthly basis
4 or a weekly basis, a daily basis? I don't
5 know how it's --
6    A. Well, through Archtics you can
7 see on a daily basis what the balance is.
8 You can pull up a customer's balance on a
9 daily basis and see.
10    Q. Okay. Who updated the Archtics
11 information related to accounts receivable
12 information?
13    A. Who updates --
14    Q. Is that a finance department
15 function?
16    A. No. That's ticket operations
17 handles all the Archtics.
18    Q. Who receives the money first?
19 Would it be the accounting department or the
20 ticket operations department that would
21 actually receive payment?
22    A. As far as on ticket sales?
23    Q. Yes, sir.
24    A. The ticket operations department
25 normally gets the checks in.

Page 139

1    Q. Okay.
2    A. Because they have to -- you
3 know, they have to post the checks into the
4 system.
5    Q. Okay. Do you know whether or
6 not the ticket operation system had a period
7 where they didn't have anybody available to
8 do that?
9    A. I'm not aware of it.
10    MR. BURAS:
11      I'm going to reserve all
12 specific questions until your actual
13 30(b)(6) deposition.
14      Bryan, do you have any follow-up
15 questions?
16    MR. KNIGHT:
17      No, not on chain of evidence.
18 We'll pass on to your substantive
19 deposition.
20    MS. ANDERSON:
21      I have a couple. Not too many,
22 though.
23 EXAMINATION BY MS. ANDERSON:
24    Q. Mr. Crumb, you were asked
25 questions about six different bank accounts

Page 140

1 that the Hornets have. And you identified
2 four accounts, one of which you said you
3 weren't sure exactly what it is, but you
4 identified 401(k), aviation, cafeteria plan
5 accounts, and then a fourth one that you
6 couldn't remember what it was.
7      Are any of those considered
8 income or revenue accounts?
9    A. No.
10    Q. You were asked some questions
11 about local revenue numbers reported at the
12 end of the season when the team was located
13 in Oklahoma. Would the local revenue
14 numbers be reflected in the revenue data
15 that shows up in the KPMG audited financial
16 statements?
17    A. Yes.
18    Q. If the Hornets provided revenue
19 or ticket sales data to the State of
20 Louisiana would that be the same data that's
21 reflected in either the KPMG audited
22 financial statements or the BRI reports?
23    MR. BURAS:
24      Object to form. Leading.
25    MR. KNIGHT:

Page 141

1      Same objection.
2      A.  Okay.  Could you repeat the
3  question?
4  EXAMINATION BY MS. ANDERSON:
5      Q.  Sure.  If the Hornets provided
6  revenue or ticket sales data to the State of
7  Louisiana would that data be reflected in
8  the KPMG audited financial statements or the
9  BRI reports?
10      MR. BURAS:
11          Object to form.  Leading.  Calls
12  for speculation based on earlier testimony.
13      MR. KNIGHT:
14          Join in the objection.
15      MS. ANDERSON:
16          You can answer the question if
17  you understand it.  And if don't, tell me
18  and I'll rephrase it.
19      A.  Yeah.  It would be.
20  EXAMINATION BY MS. ANDERSON:
21      Q.  I believe you testified that you
22  produced or provided to counsel for this
23  case some bank statements, Capital One bank
24  statements, correct?
25      A.  Yes.

Page 142

1      Q.  Do the bank statements show the
2  actual date of receipt of revenues?
3      A.  It shows the actual date of
4  receipt of cash.
5      Q.  Of cash.
6      MR. BURAS:
7          Object.
8  EXAMINATION BY MS. ANDERSON:
9      Q.  Does the daily cash report also
10  show the actual receipt of cash -- I'm sorry
11  -- the actual date of receipt of cash?
12      A.  Yes.
13      Q.  You were asked about gate
14  receipt reports.
15      MR. BURAS:
16          Object to form.
17  EXAMINATION BY MS. ANDERSON:
18      Q.  Were you asked about gate
19  receipt reports in this deposition?
20      A.  Yes.
21      Q.  You know what a gate receipt
22  report is?
23      A.  Yes.
24      Q.  Does a gate receipt report
25  reflect game revenues?

Page 143

1      A.  It shows the ticket revenue.
2      Q.  Okay.  And is the ticket revenue
3  that's reflected in a game (sic) receipt
4  report reflected in any other monthly or
5  annual report prepared by the organization?
6      MR. BURAS:
7          Objection.  Form.
8      MR. KNIGHT:
9          Objection.  Form.
10      A.  Well, that information would be
11  included in the monthly financial
12  statements, the detail monthly income
13  statements.
14  EXAMINATION BY MS. ANDERSON:
15      Q.  Is the revenue information
16  that's reflected in gate receipt reports
17  contained in any other type of report that's
18  been produced in this case?
19      A.  It would be in the BRI reports,
20  the combined financial statements as well.
21      Q.  Do you remember being asked
22  questions about game settlement reports?
23      A.  Yes.
24      Q.  Do game settlement reports
25  reflect revenues?

Page 144

1      A.  Yes.
2      Q.  Are those revenues reflected in
3  any other documents that have been produced
4  in this litigation so far?
5      MR. KNIGHT:
6          Objection.  Form.
7      A.  Revenues are going to be on the
8  monthly financial statements, income
9  statements.
10  EXAMINATION BY MS. ANDERSON:
11      Q.  You may have made this clear,
12  but I want to make sure that it is for the
13  record.  You were asked some questions about
14  accounts receivable reports.  Do you
15  remember that?
16      A.  Yes.
17      Q.  Okay.  And specifically you were
18  asked questions about payments made by
19  customers for ticket sales and where those
20  payments would be reflected.  Do you
21  remember that?
22      A.  Yes.
23      Q.  Does Archtics reflect that
24  information?
25      A.  Yes.

Page 145

1    Q.   So if someone printed out a
2  report of a customer's activity, ticket
3  sales activity from Archtics, would that
4  reflect payment information?
5        MR. KNIGHT:
6            Object to form.  Foundation.
7        MR. BURAS:
8            Object to form.  Calls for
9  speculation.
10       A.   Yes.
11  EXAMINATION BY MS. ANDERSON:
12       Q.   If you know.
13       A.   Yes.
14       Q.   Don't speculate.  Tell me if you
15  know.
16       A.   No.  It would.
17       Q.   Are you certain?
18       A.   Yes.
19       Q.   Would an accounts receivable
20  report identify a sales representative
21  responsible for any particular sale?
22       A.   There are Archtics reports that
23  do link the sales representative to the
24  customer.
25       Q.   Okay.  But I'm asking about an

Page 146

1  accounts receivable report.
2       A.   I would have to look and see.
3       Q.   Okay.  But as you sit here, you
4  don't know that that --
5       A.   I don't know for certain.
6       Q.   Have you ever seen a printout of
7  an Archtics report reflecting a customer's
8  sales activity data?
9       A.   I've seen Archtics reports on
10  the computer.  I've seen them on the screen.
11       Q.   Is it possible to print out an
12  Archtics report from the screen?
13       A.   Yes.
14       Q.   And the screens that you've seen
15  on Archtics reports does it reflect -- Let
16  me back up.  That was about to be really
17  convoluted.
18            Have you seen Archtics screens
19  that reflect sales activity for particular
20  customers?
21       A.   Yes.
22       Q.   And the screens that you've
23  seen, does it identify payments made by
24  those customers?
25       A.   Yes.

Page 147

1       Q.   And that's information that can
2  be printed out in an Archtics report?
3       A.   Yes.
4       Q.   And that's the same sort of --
5  Am I correct in understanding that's the
6  same sort of information that would be shown
7  in an accounts receivable report?
8        MR. KNIGHT:
9            Objection to form.
10       A.   Yes.
11  EXAMINATION BY MS. ANDERSON:
12       Q.   Okay.  Except that you don't
13  know that an accounts receivable report
14  would reflect the sales representative; is
15  that correct?
16       A.   Correct.
17       Q.   You were asked some questions
18  about specific types of revenues for the
19  Hornets.  Do you remember that?
20       A.   Yes.
21       Q.   Do any of the financial reports
22  produced by the Hornets in this litigation
23  break down the Hornets revenues by type?
24       A.   Yes.
25       Q.   Which reports?

Page 148

1       A.   Monthly financial statements,
2  income statement, BRI reports, CFS, combined
3  financial statements.
4       Q.   Okay.  And would the revenue
5  information broken down by type in those
6  reports be duplicative of specific revenue
7  reports, for example, like sponsorship
8  revenue reports?
9        MR. KNIGHT:
10            Objection.  Form.
11       A.   Yes.  It would -- The
12  sponsorship revenue report would contain the
13  same information that's in the financial --
14  those statements.
15       MS. ANDERSON:
16            I don't have anything else.
17  EXAMINATION BY MR. BURAS:
18       Q.   Sir, you previously indicated
19  that the consolidated statements are
20  accrual-based statements, correct?
21       A.   Correct.
22       Q.   So would the SMG statements
23  regarding the actual game day reports
24  reflect the actual money received during
25  that particular game?

Page 149

1    A.   That is correct.
2    Q.   So the information on the
3  consolidated income statements could be
4  different from the information actually
5  contained in the SMG reports as far as when
6  that money is allocated as received by the
7  Hornets?
8    A.   Well, no, because what happens
9  is on the settlement statement it would be
10  booked at the time of the event, of that
11  game, and it would be booked -- If a game
12  was November 1st, it would be booked in the
13  month of November from that settlement
14  statement.
15    Q.   So if ticket sales had been
16  made, $50,000 worth of tickets were sold in
17  July and $50,000 worth of tickets were sold
18  in August and the game was played November
19  1st, the consolidated income statements
20  would show that the Hornets received no
21  money for those tickets until November 1st;
22  is that correct?
23    A.   Well, what would happen is
24  whatever -- whatever ticket -- yeah, the
25  ticket revenue would be recognized during

Page 150

1  the season.  And, now, the settlement
2  statement is only going to reflect ticket
3  revenue that's generated from walk-up, you
4  know, people that go to the arena and they
5  buy it right there.
6    Q.   So that report would indicate
7  the money that was actually received on game
8  day; it would not reflect the amount of
9  money received for, perhaps, season ticket
10  sales that were made during the month of
11  July?
12    A.   Correct.
13    Q.   So we would be able to
14  distinguish -- the consolidated report would
15  add all the numbers; whether or not the
16  money was actually received in June, July,
17  or August, the consolidated monthly income
18  statement, am I correct in understanding,
19  would add those numbers together and then
20  would add that with the SMG report to come
21  up with one number as to when the Hornets
22  recognized that they received that income?
23    A.   Correct.  Right.  The settlement
24  statement is going to have only what
25  occurred that night.

Page 151

1    Q.   Okay.  So if we were trying to
2  determine when the Hornets actually received
3  money, on the week or the date or whatever
4  that depended, we cannot determine when the
5  Hornets actually received the money based on
6  the consolidated income statements, correct?
7    A.   Correct.
8    Q.   And before when you testified
9  that the bank statements showed the actual
10  date of receipt of cash, it's actually
11  showing the actual date that the cash was
12  deposited by the Hornets, correct?
13    A.   Correct.
14    Q.   So if the money was not
15  deposited -- money received July 31st may
16  not have been deposited until August 2nd,
17  the bank statements wouldn't show the money
18  received until August 2nd, correct?
19    A.   Correct.  It's when it's
20  deposited.
21    Q.   The ticket reports show the
22  actual dates revenue was received as well,
23  correct?
24    A.   What ticket reports?
25    Q.   The ticket reports that we

Page 152

1  discussed previously.  That would show the
2  date that the Hornets actually received
3  payment on tickets, correct?
4    A.   Correct.
5    Q.   Which would be different from
6  the consolidated income statements which
7  show the date the Hornets recognize that
8  they received that money, correct?
9    A.   Correct.
10    Q.   Before you indicated that you
11  didn't know what information may have been
12  provided to the State of Louisiana other
13  than one set of information you provided to
14  Hugh Weber.  Do you remember saying that?
15    A.   Yes.
16    Q.   You just testified that you now
17  definitively know that the same information
18  contained in the BRI and consolidated income
19  statements would have been provided to the
20  State of Louisiana and other governmental
21  agencies.  How do you know that it was
22  definitely the same as the information
23  contained in the BRI or the other financial
24  statements provided to plaintiffs in this
25  case since you've never seen it?

Page 153

1  MS. ANDERSON:
2      Objection to form. But go
3  ahead.
4      A.  No, I don't understand your
5  question.
6  EXAMINATION BY MR. BURAS:
7      Q.  Sure.  You just testified to
8  counsel that information, financial revenue
9  and ticket data provided to the State of
10  Louisiana, City of New Orleans, or other
11  governmental agencies would have definitely
12  been the same as the information provided to
13  plaintiffs in this case and in the BRI
14  reports.
15      Since you've admitted in
16  previous testimony that you've only been
17  aware of one set of data that was provided
18  to Mr. Hugh Weber, how can you now
19  definitively state that the information
20  provided to the State of Louisiana and the
21  City of New Orleans was the same as the
22  information contained in the financials and
23  in the consolidated income statement that
24  you previously produced?
25  MS. ANDERSON:

Page 154

1      Objection.  Form.  Misleading
2  and argumentative.
3      A.  I don't understand what
4  information you're talking about that was
5  submitted to the city and the state.
6  MR. BURAS:
7      Ma'am, I'd like for you to go
8  back and read Ms. Anderson's question so
9  that I make sure that we get this crystal
10  clear on the record.
11  MS. ANDERSON:
12      While she goes back, do you mind
13  if I take a quick restroom break?
14  MR. BURAS:
15      Sure.
16      (Following a brief recess, the
17  following proceedings were had.)
18  MR. BURAS:
19      I had asked the court reporter
20  to read back the question that was posed by
21  Ms. Anderson related to Mr. Crumb's
22  knowledge of other documents that may have
23  been submitted to the State of Louisiana or
24  the City of New Orleans other than the
25  document he gave to Mr. Weber.

Page 155

1      Can you please read back that
2  question, ma'am?
3      (Whereupon, the requested
4  question and answer were read back by the
5  reporter.)
6  EXAMINATION BY MR. BURAS:
7      Q.  All right, sir.  My question to
8  you is, it's my understanding from your
9  previous testimony that the only document
10  you're aware of that was provided to the
11  State of Louisiana was the information you
12  specifically gave to Hugh Weber; is that
13  correct?
14      A.  That's correct.
15      Q.  Other than that document, you
16  don't know what other information, if any,
17  was given to the State of Louisiana by the
18  New Orleans Hornets; is that correct?
19      A.  That's correct.
20      Q.  So when Ms. Anderson asked you
21  if the information provided to the State of
22  Louisiana was the same as the information
23  contained in the KPMG or the BRI report,
24  other than that information provided to Mr.
25  Weber, you don't actually know that

Page 156

1  information, correct?
2  MS. ANDERSON:
3      Objection.  Form.
4  Argumentative.  Asked and answered.
5      A.  Well, I believe the question
6  that she asked was would it have been.  And
7  if we would have -- hypothetically, if that
8  would have been produced, it would have been
9  contained in those monthly -- it would have
10  been the same information.
11  EXAMINATION BY MR. BURAS:
12      Q.  Well, I can ask the court
13  reporter to read it back, but I believe Ms.
14  Anderson's question was "was the information
15  ..."  It was not a possibility question.  It
16  was an actuality question.
17      A.  Okay.  Could you read it back?
18  MR. BURAS:
19      Please, ma'am.
20      (Whereupon, the requested
21  question was read back by the reporter.)
22  EXAMINATION BY MR. BURAS:
23      Q.  Again, sir, my original question
24  stands.  You actually don't know if it would
25  be or wouldn't be; you're assuming this

Page 157

1  right now, aren't you, sir?
2      MS. ANDERSON:
3          Objection. Argumentative and
4  asked and answered.
5      A. If we were requested to provide
6  that information it would be the same
7  information just like I answered before.
8  EXAMINATION BY MR. BURAS:
9      Q. I agree with that, sir. But
10  since you actually don't have any -- I don't
11  mean to argue with you, sir, but --
12      MS. ANDERSON:
13          But you are.
14  EXAMINATION BY MR. BURAS:
15      Q. -- your previous testimony to me
16  was you don't know what actual information
17  was provided to the state, is that correct,
18  other than the information you gave to Mr.
19  Weber?
20      A. Yes.
21      MS. ANDERSON:
22          Objection. Asked and answered.
23  Argumentative.
24  EXAMINATION BY MR. BURAS:
25      Q. You answered yes just now; is

Page 158

1  that correct, sir?
2      A. Yes.
3      Q. My question is very simple. You
4  don't have any actual knowledge of any
5  information other than that information you
6  provided to Mr. Weber that the Hornets
7  provided to the State of Louisiana; is that
8  correct?
9      A. Yes.
10      Q. So when Ms. Anderson asked you
11  if it would have been the same and you
12  answered yes, it would have been, you're
13  speculating that it would have been; is that
14  correct, sir? Because you don't actually
15  know; is that correct?
16      MS. ANDERSON:
17          Objection. Argumentative.
18  Asked and answered. You can answer that
19  question.
20      A. Well, I've already answered it.
21  And her question was would it be the same,
22  would it be this information contained in
23  the financials. And the information that's
24  contained in the financial statements would
25  have been the same information if there was

Page 159

1  a request for information.
2  EXAMINATION BY MR. BURAS:
3      Q. As you sit here today, do you
4  know whether or not your predecessors would
5  have interpreted a request the same way as
6  you apparently do?
7      A. No, I don't know.
8      Q. So do you know, as you sit here
9  today, whether or not your predecessors in
10  response to a request for information
11  related to ticket or revenue data would have
12  provided the information set forth in the
13  KPMG or BRI data?
14      A. I don't know. I don't know what
15  they would have done.
16      Q. Okay. That was my question to
17  you, sir. All right, sir. You previously
18  indicated that you do not know -- During
19  questioning from me you indicated that you
20  do not have a password in Archtics and only
21  had a vague working knowledge of how
22  Archtics worked; is that correct?
23      A. I don't have a password. I
24  don't have access, and I don't have a very
25  detailed knowledge of how the system works.

Page 160

1      Q. All right. You just previously
2  indicated during questioning from Ms.
3  Anderson that the information contained in
4  the accounts receivable reports was all set
5  forth in the Archtics report.
6      MS. ANDERSON:
7          Objection. Form. And I'm not
8  sure that's precisely what his testimony
9  was.
10      A. Can I have the question again?
11  EXAMINATION BY MR. BURAS:
12      Q. I'll ask you a new question
13  entirely. Do you know, as you sit here
14  today, whether or not the information set
15  forth in the accounts receivable reports is
16  identical to the reports regarding account
17  information that can be printed up in the
18  Archtics?
19      A. Well, that information comes
20  from Archtics.
21      Q. I thought you told me before,
22  and correct me if I'm wrong, that the
23  accounting department entered information
24  and the ticket operations department entered
25  information. It was my understanding that

Page 161

1  the information was entered in two different
2  sources; is that correct or not correct?
3      A.  No.  I don't -- I don't -- I
4  don't understand exactly what you're getting
5  at.
6      Q.  I don't understand either.
7  Maybe I'm just confused here.
8      A.  Yeah.
9      Q.  And that's fine.
10     A.  I don't understand.
11     Q.  The accounts receivable
12 information, where does that data come from?
13     A.  It comes from -- the ticket
14 sales comes from Archtics.
15     Q.  All ticket sales information
16 related to customer accounts is entered into
17 the accounts receivable information from
18 Archtics?
19     A.  (Nods head affirmatively).
20 Archtics.
21     Q.  Okay.  And you indicated you're
22 not aware of whether or not there was a
23 period of time where there was no one
24 available to enter this information in the
25 Archtics system; you don't have any personal

Page 162

1  information, right?
2      A.  No, I don't know.
3      Q.  In the event -- and assuming
4  facts that obviously no one here is going to
5  agree to -- Assuming there was a period of
6  time where the ticket operations department
7  was not entering information regarding
8  ticket information received, how would that
9  information have been entered into the
10 accounts receivable system?
11     MS. ANDERSON:
12         Objection.  Form.
13     A.  I don't know.  I don't know.
14 EXAMINATION BY MR. BURAS:
15     Q.  All right.  The BRI report, is
16 it an annual report of income?
17     A.  Yes.
18     Q.  It's not a monthly report, is
19 it?
20     A.  No.  It's annual.
21     Q.  So based on the BRI report, you
22 have no way of knowing how much money the
23 Hornets actually receive during any one
24 month of the year?
25     A.  No.

Page 163

1      Q.  It's a summary report of the
2  entire year's activities, correct?
3      A.  Yes.
4      Q.  And that's also based on the
5  accrual-based accounting method?
6      A.  Yes.
7      Q.  Suite sales information, is
8  there any information in the accounts
9  receivable that would determine when a
10 customer purchased a suite for an individual
11 game basis?
12     A.  Are you asking when -- how would
13 we tell when a person -- Could you rephrase
14 the question?
15     Q.  Yes.  Let me rephrase that.  It
16 kind of goes back to the Archtics question,
17 so let me just jump to that.
18         If information was entered into
19 Archtics on Day 1, how long would it take
20 for that information to get to the accounts
21 receivable report?
22     A.  I don't know how long it would
23 take to get to the accounts receivable
24 report.
25     Q.  Is the accounts receivable

Page 164

1  report run monthly, daily, or do you know
2  how frequently it's run?
3      A.  I don't know how frequently it's
4  run.  I know we get a monthly report that we
5  put into the financials.
6      Q.  Okay.  If information -- And I
7  guess your question is this, and I apologize
8  for asking it, but I just need you to tell
9  me you don't know if you don't know.
10         If information is entered into
11 Archtics on Day 1 and assuming that at some
12 period of time that information entered into
13 Archtics is somehow pulled into the accounts
14 receivable system and then the information
15 in Archtics is modified somehow, would a
16 subsequent change or modification be
17 reflected in the accounts receivable section
18 as well?
19     MS. ANDERSON:
20         Objection.  Form.
21     A.  Yes.  I -- It should be.
22 EXAMINATION BY MR. BURAS:
23     Q.  So if a customer deposited
24 $2,500 for a suite --
25     A.  Yes.

Page 165

1    Q.  -- on Day 1 and the next month
2  that suite is deemed to be a comped suite by
3  the Hornets and it is now shown to be a zero
4  balance suite or a zero amount paid for that
5  suite, would the information in the accounts
6  receivable show $2,500 received on Day 1 and
7  then, let's say, Day 32 how would that
8  information in accounts receivable show that
9  that suite had now been comped?
10    A.  I don't know.  I can't answer
11  that.
12    Q.  But if the information showed
13  that the amount of the suite was changed to
14  zero, is that a way of showing that the
15  suite had been comped?
16    A.  I can't answer that.  We haven't
17  had any instances like that since I've been
18  there.
19    Q.  Do you monitor any changes or
20  modifications made to the accounts
21  receivable section of Archtics?
22    A.  No, I don't.
23    Q.  Do you have someone on your
24  staff who modifies any changes to the
25  accounts receivable -- excuse me -- any

Page 166

1  changes to the amounts or accounts received
2  in Archtics?
3    MS. ANDERSON:
4      Objection.  Form.
5    A.  Okay.  Could you rephrase the
6  question?
7  EXAMINATION BY MR. BURAS:
8    Q.  Sure.  Do you have anyone
9  designated to oversee or is there anyone in
10  the Hornets organization who oversees
11  modifications made to customer account
12  payments in the Archtics system?
13    A.  Well, the ticket supervisors or
14  ticket managers would be in charge of that.
15    Q.  Does the finance department have
16  at this time any oversight duties to ensure
17  that the information entered by the ticket
18  supervisors would be accurate?
19    A.  Yes.
20    Q.  What oversights does the
21  financial department have now and are there
22  any written policies evidencing those
23  oversight responsibilities?
24    MS. ANDERSON:
25      Objection.  Form.  And, in part,

Page 167

1  asked and answered.  Two questions.
2    A.  I don't -- I'm -- I don't -- I'm
3  not aware of any written policies, and I
4  would have to get with, you know, my
5  controller.
6  EXAMINATION BY MR. BURAS:
7    Q.  Who is the controller?
8    A.  Amy Arceneaux.
9    Q.  Are you aware of what the word
10  "super-user rights" -- excuse me -- the
11  phrase "super-user rights" means in relation
12  to Archtics?
13    A.  No.
14    Q.  Are you aware that if a person
15  has super-user rights in Archtics they can
16  modify the financial information related to
17  customer accounts?
18    A.  No, I'm not aware of that.
19    Q.  Do you know whether or not the
20  Hornets had any policies or procedures in
21  place to ensure that modifications were not
22  improperly made to customer accounts or
23  customer accounts prior to your arrival at
24  the Hornets?
25    A.  I don't know.

Page 168

1    Q.  Have you ever looked for any
2  such policies or procedures?
3    A.  No, I have not.
4    Q.  Do the Hornets have any written
5  controls in place that would prevent a
6  ticket supervisor from changing a sale from
7  a suite to a block sale of tickets?
8    A.  I don't know.
9    Q.  You don't know if those policies
10  exist?
11    A.  I don't know if they exist.
12    Q.  Are you aware that that is one
13  of the allegations made by plaintiffs in
14  this case?
15    A.  No.
16    MS. ANDERSON:
17      And I'm just going to object.
18  I'm not sure if we're still on chain of
19  evidence issues.  It sounds like we're going
20  into substantive issues.
21    MR. BURAS:
22      It's not.  I'm asking what
23  policies and procedures exist.
24  EXAMINATION BY MR. BURAS:
25    Q.  Have you ever conducted any

Page 169

1 searches or instructed anyone else to
2 conduct any searches to determine what
3 suites were comped during the years 2004 and
4 2005?
5    MS. ANDERSON:
6       Objection. Form.
7    A. No.
8 EXAMINATION BY MR. BURAS:
9    Q. Are you aware, as you sit here
10 today, that plaintiffs have alleged that the
11 Hornets modified suite sales to reflect
12 increased ticket sales that resulted in
13 lower commissions paid to plaintiffs in this
14 case?
15    A. No, I'm not aware of that.
16    Q. Have you ever been asked at any
17 time to investigate any issues related to
18 the comping of suites or tickets by the New
19 Orleans Hornets at any time between 2002 and
20 the present?
21    MS. ANDERSON:
22       Objection. Asked and answered.
23 This is going beyond his designated area of
24 testimony on the chain of evidence issues.
25    MR. BURAS:

Page 170

1       To the extent of the objection,
2 he just testified that the finance
3 department has some oversight controls over
4 the Archtics system. And I'm simply trying
5 to find out what control --
6    MS. ANDERSON:
7       I'm not going to stop him from
8 answering it, and I'm not going to argue
9 with you about it. I don't want to waste
10 time. I'm just lodging the objection.
11    A. No.
12 EXAMINATION BY MR. BURAS:
13    Q. Do you know who Adrianna Johnson
14 is?
15    A. No.
16    Q. Do you know who Penny Middleton
17 is?
18    A. I've heard the name.
19    Q. Who do you understand her to be?
20    A. She was in Human Resources
21 previously.
22    Q. Have you ever reviewed any of
23 the records in your possession or Barbara
24 Booth's possession or control, be they in
25 physical or electronic form, to determine

Page 171

1 whether or not Ms. Booth had any documents
2 or memos from Penny Middleton related to the
3 issues of overtime or unpaid commissions?
4    A. No.
5    Q. No, you've not conducted any
6 such search?
7    A. No, I haven't conducted a
8 search.
9    MR. BURAS:
10       All right. No further
11 questions.
12    MS. ANDERSON:
13       Okay. I have a couple.
14 EXAMINATION BY MS. ANDERSON:
15    Q. What is the basis of your
16 testimony that revenue information that may
17 have been provided by the Hornets to the
18 State of Louisiana would be reflected in the
19 KPMG audited financial statements?
20    MR. BURAS:
21       Object to form.
22    MR. KNIGHT:
23       Same objection.
24    A. Repeat the question.
25 EXAMINATION BY MS. ANDERSON:

Page 172

1    Q. Sure. What is the basis of your
2 testimony or the basis of your belief or
3 your statement that if the Hornets had
4 provided revenue information to the State of
5 Louisiana that that information would have
6 been reflected -- that revenue information
7 or revenue data would have been reflected in
8 the KPMG audited financial statements?
9    A. Well, that's --
10    MR. KNIGHT:
11       Same objection.
12 EXAMINATION BY MS. ANDERSON:
13    Q. Go ahead.
14    A. That's the data from our system.
15 That's revenue data from our system that's
16 audited. It comes out of the Solomon
17 system. It's the same information that
18 we've been talking about as far as revenue.
19    Q. Do the Hornets maintain two
20 different sets of revenue data or revenue
21 systems?
22    A. No. It's all by the same
23 system. It's out of Solomon.
24    Q. What reports or documents have
25 been produced by the Hornets in this case

Page 173

1 that would show revenue received on a cash
2 basis?
3 MR. BURAS:
4 Object to form. Asked and
5 answered.
6 A. What reports would show that we
7 received revenue on a cash basis?
8 EXAMINATION BY MS. ANDERSON:
9 Q. What reports that have been
10 produced by the Hornets in this litigation
11 would show revenue on a cash basis?
12 A. Well, we don't -- monthly income
13 statements, the BRI, the CFS are all
14 accrual-basis statements.
15 Q. Have the Hornets produced any
16 documents that show cash receipts?
17 A. Yes.
18 Q. Okay. What documents?
19 A. Well, the cash spreadsheet.
20 Q. Okay. What about the --
21 A. The bank statements.
22 Q. That was going to be my
23 question. What about the bank statements?
24 Would they show that?
25 A. They would show what cash was

Page 174

1 received, deposited.
2 Q. In what frequency do the Hornets
3 deposit revenues or cash that's received?
4 MR. BURAS:
5 Object to the form.
6 MR. KNIGHT:
7 Objection to form.
8 MR. BURAS:
9 That's a substantive question.
10 MS. ANDERSON:
11 You opened the door. You asked
12 the question about if somebody received
13 money on July the 31st and it wasn't
14 deposited until August the 1st, then what
15 month is it going to be reported in. So you
16 opened the door. I'm entitled to cover
17 that.
18 MR. BURAS:
19 That's fine.
20 MS. ANDERSON:
21 It also explains documents that
22 have been produced in the case.
23 EXAMINATION BY MS. ANDERSON:
24 Q. So how often do the Hornets
25 deposit the cash that's received?

Page 175

1 A. We deposit daily.
2 Q. Do you know if that was the
3 practice before you arrived at the Hornets?
4 A. I don't know.
5 Q. But since you've been with the
6 Hornets, that's the practice?
7 A. Absolutely.
8 MS. ANDERSON:
9 That's all I have.
10 EXAMINATION BY MR. BURAS:
11 Q. One question. Mr. Crumb, there
12 is no way to determine the source of any
13 income deposited on the bank statements, is
14 there?
15 A. It doesn't -- It doesn't detail,
16 you know, what the deposit is. And it's a
17 -- it's a lump sum cash. You know, we have
18 a deposit ticket and we go in, we fill out
19 the deposit ticket, and then we deposit cash
20 just like a normal cash deposit system.
21 MR. BURAS:
22 No other questions.
23 MS. ANDERSON:
24 I have another one.
25 EXAMINATION BY MS. ANDERSON:

Page 176

1 Q. Is there any way that you can
2 determine whether by looking at the bank
3 statements or anything else what the deposit
4 -- what type of revenue or what the source
5 of the revenue is for the deposits?
6 A. Well, there's a ticket operating
7 -- a ticket deposit account that is strictly
8 for ticket deposits, which would be ticket
9 sales.
10 Q. What about other types of
11 revenues or other sources of revenue?
12 A. Well, on the cash statement, on
13 that cash sheet, that spreadsheet that we
14 fill out, we have like the Cox broadcast
15 revenues, and we have it denoted, and you
16 have a column for ticket revenue, which is
17 all the ticket receipts. Then you have it
18 delineated as far as the other items, like
19 the T.V. revenue or if a sponsorship payment
20 is made, what have you.
21 Q. Are the bank statements used to
22 generate the -- You're saying cash
23 spreadsheet. Is that the cash report?
24 A. Yes.
25 Q. Okay. Are the bank statements

Page 177

1  used to generate that report?

2      A.  Yes.

3      MS. ANDERSON:

4          I don't have any further

5  questions.

6      MR. BURAS:

7          One moment.  No further

8  questions.

9          (Whereupon, the deposition was

10  concluded at 5:20 p.m.)

11

12              *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 178

1      WITNESS' CERTIFICATE

2

3      I have read or have had the

4  foregoing testimony read to me and hereby

5  certify that it is a true and correct

6  transcription of my testimony, with the

7  exception of any attached corrections or

8  changes.

9

10

11

12

13

14

15      DANIEL L. CRUMB

16

17

18

19

20

21

22

23

24

25

Page 179

1      REPORTER'S CERTIFICATE

2

3

4      I, Lisa Bode, Certified Shorthand

5  Reporter, do hereby certify that the

6  above-mentioned Witness, after having been

7  first duly sworn to testify to the truth,

8  did testify as hereinabove set forth;

9      That the testimony was reported by me

10  in shorthand and transcribed under my

11  personal direction and supervision, and is a

12  true and correct transcript, to the best of

13  my ability and understanding;

14      That I am not of counsel, not related

15  to counsel or the parties hereto, and not in

16  any way interested in the outcome of this

17  matter.

18

19

20

21          LISA BODE, CSR

22          Certified Shorthand Reporter

23

24

25

DANIEL L. CRUMB    Condenselt™    Anderson

| | | | | |
|---|---|---|---|---|

**$1,000** [2]    136:15
136:22

**$100** [6] 101:1    134:20
137:4    137:13    137:14
137:15

**$1200** [2]    134:19
137:2

**$2,000** [1]    136:17

**$2,500** [2]    164:24
165:6

**$200** [1] 137:16

**$50,000** [2]    149:16
149:17

**-and** [1] 1:21

**000921** [1]    42:5

**02** [1]    9:3

**05-10068** [2]    1:4
33:9

**09** [1]    1:16

**09/11/07** [1]    9:3

**0949** [1] 46:16

**0970** [5] 43:1    43:8
43:20    44:24    45:16

**1** [8]    30:17    30:18
123:23    136:4    163:19
164:11    165:1    165:6

**1,000** [1]    134:25

**1,100** [1]    134:24

**1.9** [2] 107:19    107:21

**10** [6]    9:3    65:3
65:21    126:8    126:9
126:18

**100** [3]    134:23    134:24
134:25

**10th** [1] 137:13

**11** [2]    90:20    122:12

**11th** [2] 8:21    8:25

**12** [2]    92:15    122:21

**1200** [1] 137:3

**1250** [1] 64:3

**13** [2]    127:12    127:19

**139** [1]    2:15

**14** [3]    127:12    127:21
127:22

**1421** [1] 3:6

**1442** [3] 1:13    122:22
124:2

**148** [1]    2:14

**14th** [1] 122:15

**15** [2]    127:24    129:8

**16** [1]    122:21

**17** [5]    11:19    11:22
11:25    77:6    130:22

**171** [1]    2:15

**175** [2]    2:14    2:15

**17th** [1] 77:17

**18** [2]    16:2    16:4

**19** [2]    131:4    131:20

**1st** [7]    101:1    101:2
134:19    149:12    149:19
149:21    174:14

**2** [1]    1:16

**20** [7]    65:11    65:20

**66:2**    126:11    126:18
126:22    177:10

**2002** [28]    9:18
15:5    21:1    21:12
42:19    46:20    66:12
74:23    80:13    80:21
84:1    84:8    85:8
86:15    90:24    91:23
92:17    92:20    99:2
101:7    103:1    103:23
107:2    112:1    120:23
121:11    121:19    169:19

**2003** [1] 83:11

**2004** [2] 83:11    169:3

**2005** [12]    15:4
15:5    31:24    31:25
40:11    70:16    78:8
120:24    121:11    121:19
122:15    169:4

**2007** [14]    1:16
6:6    6:9    8:19
14:13    23:3    31:23
60:12    60:20    61:2
77:6    77:17    81:20
81:22

**201** [2]    1:15    2:4

**20th** [2] 1:16    137:14

**21** [6]    1:20    92:15
105:5    105:6    105:14
116:19

**21st** [1] 31:24

**22** [1]    106:23

**227** [1]    1:20

**23** [4]    2:19    8:4
9:21    117:14

**24** [1]    117:14

**25th** [3] 6:8    6:11
46:20

**28** [1]    134:5

**2nd** [2] 151:16    151:18

**30** [8]    17:25    23:25
30:20    73:19    122:21
124:2    125:11    139:13

**30th** [1] 22:14

**31st** [2] 151:15    174:13

**32** [1]    165:7

**3500** [1] 1:23

**4** [5]    2:14    33:6
33:9    33:19    33:21

**40** [1]    116:19

**401** [2]    15:20    140:4

**42** [1]    117:8

**46** [1]    118:4

**5** [3]    33:18    66:9
177:10

**50th** [1] 2:3

**5104** [1] 1:14

**6** [7]    30:20    33:18
73:19    122:21    124:2
125:11    139:13

**7** [3]    40:5    40:9
72:3

**70065** [1]    1:14

**70112** [1]    1:24

**70170** [2]    1:15

**2:4**

**70447** [1]    1:20

**8** [4]    40:16    74:20
75:6    80:12

**899** [1]    48:12

**9** [3]    40:23    42:2
74:24

**900** [1]    134:25

**909** [1]    1:23

**a.m.** [1]    9:4

**ability** [1]    179:13

**Abita** [2]    6:12
6:13

**able** [10] 27:9    27:16
50:14    101:19    103:1
103:20    104:10    136:5
136:10    150:13

**above-mentioned** [2]
4:3    179:6

**Absolutely** [1] 175:7

**access** [26]    27:7
34:3    34:7    34:11
35:3    45:2    45:8
45:11    46:1    46:14
46:23    56:15    56:24
57:7    58:24    59:2
61:13    61:14    61:16
92:7    92:9    98:22
132:6    132:7    132:17
159:24

**accessed** [1]    56:20

**accordance** [1]    3:8

**account** [13]    9:22
15:20    15:21    15:23
56:18    59:23    99:16
100:11    133:11    136:19
160:16    166:11    176:7

**accountant** [1] 90:7

**accountants** [5] 48:7
48:9    48:15    48:20
85:5

**accounting** [26] 9:9
9:10    9:15    22:20
28:2    28:6    53:7
53:11    53:14    53:16
54:11    54:18    55:4
63:4    63:8    89:19
100:3    100:8    100:13
100:25    101:3    120:14
137:20    138:19    160:23
163:5

**accounts** [50]    13:13
15:1    15:11    15:14
15:19    63:19    64:14
133:4    133:6    133:19
133:22    134:22    135:11
136:5    136:7    136:12
136:17    137:10    137:15
138:2    138:11    139:25
140:2    140:5    140:8
144:14    145:19    146:1
147:7    147:13    160:4
160:15    161:11    161:16
161:17    162:10    163:8
163:20    163:23    163:25
164:13    164:17    165:5
165:8    165:20    165:25
166:17    167:17    167:22
167:23

**accrual** [2]    100:3
100:15    133:7    133:9

**accrual-based** [4]
100:7    100:25    148:20
163:5

**accrual-basis** [1]
173:14

**accurate** [2]    52:6
166:18

**actions** [1]    113:12

**activities** [2]    112:11
163:2

**activity** [4]    145:2
145:3    146:8    146:19

**actual** [17]    68:20
101:5    101:8    102:6
125:23    139:12    142:2
142:3    142:10    142:11
148:23    148:24    151:9
151:11    151:22    157:16
158:4

**actuality** [1]    156:16

**Adam** [4]    1:5
115:7    115:20    129:2

**add** [3]    150:15    150:19
150:20

**addition** [1]    78:23

**additional** [4]    70:11
71:6    80:2    124:15

**addressed** [2]    46:20
116:11

**administering** [1]
3:25

**Admissions** [1] 127:13

**admitted** [1]    153:15

**Adrianna** [1]    170:13

**advertising** [4]    95:17
95:18    95:19    95:20

**advised** [2]    12:10
13:9

**advising** [2]    11:11
22:16

**affidavit** [8]    43:2
44:16    44:18    44:20
45:1    45:18    48:3
110:17

**affidavits** [5]    42:22
43:14    43:23    45:23
109:13

**affirmatively** [5]
5:14    23:11    30:16
132:25    161:19

**aforementioned** [2]
3:5    39:13

**afternoon** [2]    4:6
4:7

**again** [16]    21:17
22:3    24:25    25:18
28:18    32:16    43:6
60:24    91:4    91:12
94:19    126:12    126:19
129:18    156:23    160:10

**agencies** [2]    152:21
153:11

**agent** [2]    89:20
90:7

**agents** [2]    85:6

**$1,000**    88:23

**aggregate** [1]    103:6

**agree** [2] 68:20    157:9
162:5

**AGREED** [1]    3:3

**agreement** [1]    97:11

**agreements** [1]    94:12

**ahead** [5]    5:18
44:3    52:8    153:3
172:13

**air** [1]    97:8

**allegations** [1]    168:13

**alleged** [9]    10:9
10:12    12:10    111:1
130:6    130:10    130:15
130:18    169:10

**allocated** [1]    149:6

**allow** [1]    126:17

**along** [2]    67:20
110:18

**amount** [22]    50:4
50:7    55:10    59:24
83:8    95:18    99:1
102:24    103:2    103:6
103:20    106:24    111:4
114:1    114:10    114:22
121:23    136:22    136:24
150:8    165:4    165:13

**amounts** [1]    166:1

**amusement** [1]    10:21

**Amy** [1] 167:8

**analysis** [3]    55:2
55:6    63:12

**Anderson** [136]    2:3
2:15    6:5    7:10
7:12    8:17    10:15
14:18    15:8    22:1
23:5    25:7    31:12
32:2    32:12    33:2
34:5    34:15    35:8
36:16    39:6    39:20
41:16    43:5    43:9
45:9    46:7    47:16
49:6    50:18    51:7
52:4    54:4    54:13
55:12    55:25    59:13
61:11    62:7    62:13
63:5    65:14    66:3
67:5    68:7    71:9
73:8    73:13    74:1
75:2    75:15    76:2
76:7    77:8    78:11
78:25    79:5    79:14
79:18    81:14    91:3
91:8    93:18    94:3
94:17    95:9    101:22
102:4    105:22    110:2
111:6    112:2    112:16
112:22    114:4    114:13
114:25    119:2    121:12
122:7    122:25    123:8
125:18    126:1    126:15
127:7    129:21    130:2
130:5    132:13    134:10
139:20    139:23    141:4
141:15    141:20    142:8
142:17    143:14    144:10
145:11    147:11    148:15
153:1    153:25    154:11

DANIEL L. CRUMB   CondenseIt™   Anderson's - Capital

154:21  155:20  156:2
157:21  157:12  157:21
158:10  158:16  160:3
160:6  162:11  164:19
166:3  166:24  168:16
169:5  169:21  170:6
171:12  171:14  171:25
172:12  173:8  174:10
174:20  174:23  175:8
175:23  175:25  177:3
**Anderson's** [2] 154:8
156:14
**annual** [5]  43:14
43:23  143:5  162:16
162:20
**answer** [31]  3:17
5:10  5:17  5:18
9:24  20:2  32:13
32:15  36:17  36:18
41:18  51:19  52:8
54:7  55:23  58:8
61:15  80:14  80:22
81:17  85:10  86:8
86:11  105:4  110:6
111:9  141:16  155:4
158:18  165:10  165:16
**answered** [17]  73:9
73:14  74:3  112:24
122:8  126:2  156:4
157:4  157:7  157:22
157:25  158:12  158:18
158:20  167:1  169:22
173:5
**answering** [1] 170:8
**ANTHONY** [1] 1:4
**AOL** [2] 97:22  98:4
**apologies** [1] 49:13
**apologize** [2] 137:19
164:7
**APPEARANCES** [2]
1:18  2:1
**appointed** [1] 89:25
**Arceneaux** [1] 167:8
**Archtics** [39]  56:13
56:16  56:24  92:7
120:6  120:10  134:12
138:6  138:10  138:17
144:23  145:3  145:22
146:7  146:9  146:12
146:15  146:18  147:2
159:20  159:22  160:5
160:18  160:20  161:14
161:18  161:20  161:25
163:16  163:19  164:11
164:13  164:15  165:21
166:2  166:12  167:12
167:15  170:4
**area** [3]  18:7  64:13
169:23
**areas** [5] 12:16  124:9
124:13  125:10  129:13
**arena** [3]  103:1
103:22  150:4
**argue** [2]  157:11
170:8
**argumentative** [5]
154:2  156:4  157:3
157:23  158:17
**arrival** [1]  167:23

**arrived** [2]  86:15
175:3
**Artega** [1]  30:10
**Article** [1]  3:6
**asks** [1] 74:20
**asserted** [3]  25:4
32:11  110:25
**assistance** [1] 93:11
**assisted** [1]  16:5
**Association** [1] 66:12
**assume** [2]  5:11
36:17
**Assumes** [1]  14:19
**assuming** [5]  81:19
156:25  162:3  162:5
164:11
**attached** [5]  11:25
43:2  43:24  109:14
178:7
**attachments** [1] 109:14
**attorney** [1]  90:6
**attorney-client** [1]
118:9
**attorneys** [5]  1:25
2:5  83:19  85:5
88:9
**audit** [8] 17:23  17:24
18:2  18:10  21:9
23:20  23:22  70:15
**audited** [8]  23:23
28:13  140:15  140:21
141:8  171:19  172:8
172:16
**audits** [4]  20:25
21:4  21:11  24:7
**August** [19]  10:7
16:17  19:14  21:21
22:14  25:24  60:12
60:20  61:2  77:6
77:17  84:11  101:2
107:13  149:18  150:17
151:16  151:18  174:14
**authorized** [2]  110:8
112:13
**available** [4]  9:21
117:9  139:7  161:24
**Avenue** [2]  1:15
2:4
**aviation** [2]  15:21
140:4
**aware** [96]  4:8
10:8  10:12  10:18
10:19  10:20  10:24
11:3  11:5  11:8
11:15  12:7  15:15
18:12  18:18  19:25
24:10  24:11  24:13
27:2  30:22  35:24
36:3  39:22  41:1
42:19  45:17  45:21
49:21  50:11  51:14
51:22  68:1  68:22
70:14  70:17  72:15
73:2  74:6  78:21
83:22  84:2  84:4
87:2  88:25  89:9
89:10  89:15  89:23
90:5  93:4  97:1

104:17  104:20  104:23
105:1  106:1  106:11
106:22  107:5  108:1
110:16  111:21  112:6
112:11  112:18  113:5
113:8  114:15  115:2
116:13  120:13  120:18
121:21  122:10  124:3
124:9  125:7  128:1
128:5  128:7  128:12
128:17  128:21  130:9
139:9  153:17  155:10
161:22  167:3  167:9
167:14  167:18  168:12
169:9  169:15
**away** [1] 104:16
**b** [11]  30:20  73:19
99:5  105:21  105:23
105:25  105:25  122:21
124:2  125:11  139:13
**backing** [1]  73:23
**backup** [2]  58:3
74:16
**balance** [8]  62:20
62:20  62:23  62:23
133:13  138:7  138:8
165:4
**bank** [27]  13:24
14:2  14:3  14:6
14:8  15:6  15:11
15:14  15:18  15:20
15:21  15:22  59:23
62:20  62:24  139:25
141:23  141:23  142:1
151:9  151:17  173:21
173:23  175:13  176:2
176:21  176:25
**Barbara** [10]  29:12
34:4  34:7  34:23
35:18  109:10  116:9
121:22  122:3  170:23
**based** [13]  6:4
40:15  99:15  100:2
100:7  100:12  101:2
104:6  104:21  141:12
151:5  162:21  163:4
**basic** [2] 5:1  5:25
**basis** [21]  22:7
39:7  66:14  92:12
100:3  100:15  133:7
133:8  133:9  138:3
138:4  138:4  138:7
138:9  163:11  171:15
172:1  172:2  173:2
173:7  173:11
**Basketball** [1]  66:11
**batch** [8]  135:22
135:23  135:24  136:1
136:8  137:8  137:23
138:1
**Bates** [3]  2:19
101:15  102:13
**BB** [1]  117:14
**became** [2]  11:5
84:4
**become** [1]  11:3
**begin** [1]  31:22
**begins** [1]  92:15
**behalf** [7]  28:17

29:20  42:15  43:15
46:5  47:13  49:20
**belief** [1]  172:2
**BERRY** [1]  1:4
**best** [4]  5:10  38:21
121:5  179:12
**between** [11]  3:4
6:21  7:15  7:19
25:24  42:9  46:3
75:13  78:8  118:5
169:19
**beyond** [1]  169:23
**big** [1]  44:11
**black-and-white** [1]
131:25
**block** [1]  168:7
**board** [1]  37:8
**Bode** [4] 2:9  3:23
179:4  179:21
**book** [1] 62:20
**booked** [4]  62:23
149:10  149:11  149:12
**books** [1]  137:3
**Booth** [8]  29:12
34:23  35:18  109:11
116:9  121:22  122:3
171:1
**Booth's** [3]  34:4
34:8  170:24
**bottom** [1]  9:1
9:2
**bought** [2]  136:15
137:2
**BOURQUE** [1] 1:22
**boxes** [1]  132:5
**boy** [1] 105:25
**brand-new** [1]  22:5
**break** [2]  79:17
94:19  147:23  154:13
**breakdown** [2] 103:10
104:11
**breakout** [1]  105:11
**breakouts** [2] 103:16
105:7
**Brendan** [1]  29:25
**BRI** [36]  2:20  17:18
17:22  18:22  19:7
19:10  19:18  20:17
23:18  26:22  67:20
67:23  68:12  68:23
72:2  72:6  72:17
72:20  73:1  73:23
74:7  74:8  74:12
74:17  140:22  141:9
143:19  148:2  152:18
152:23  153:13  155:23
159:13  162:15  162:21
173:13
**Brice** [7]  7:1
28:4  29:17  30:15
38:10  44:25  61:14
**brief** [2] 79:20  154:16
**briefly** [1]  129:6
**broadcast** [2] 97:24
111:14  176:14
**broadcasts** [1] 106:9

**broken** [1]  148:5
**brought** [1]  79:15
**Bryan** [4]  1:23
134:18  134:23  139:14
**budgets** [2]  54:19
54:22  55:5  63:11
**Buras** [141]  1:19
2:14  4:5  7:22
8:1  8:5  8:23
10:17  14:23  22:11
23:7  25:12  31:15
32:4  32:19  33:11
33:16  34:2  34:9
34:22  35:11  36:24
39:9  39:24  41:21
43:7  43:12  45:15
46:12  47:23  49:9
50:23  51:21  52:11
54:9  54:15  54:21
55:15  56:2  59:15
62:10  62:25  63:7
65:8  65:18  66:5
66:7  67:8  68:9
71:13  73:11  73:17
74:9  75:4  75:22
76:4  76:15  76:20
76:25  77:13  78:20
79:3  79:8  79:16
79:22  81:18  81:24
94:9  91:13  93:25
94:9  94:22  95:11
101:18  102:10  102:21
106:2  110:7  111:20
112:5  112:19  113:1
114:7  114:16  115:3
117:17  117:22  119:12
121:15  122:11  123:2
123:5  123:16  124:22
125:4  125:20  126:7
126:24  127:10  132:18
134:13  134:16  139:10
140:23  141:10  142:6
142:15  143:6  145:7
148:17  153:6  154:6
154:14  154:18  155:6
156:11  156:18  156:22
157:8  157:14  157:24
159:2  160:11  162:14
164:22  166:7  167:6
168:21  168:24  169:8
169:25  170:12  171:9
171:20  173:3  174:4
174:8  174:18  175:10
175:21  177:6
**Burke** [1]  30:8
**buy** [1]  150:5
**C** [1]  106:3
**cafeteria** [1]  15:22
140:4
**calculate** [2]  50:7
50:13
**calculated** [2] 49:25
50:3
**Calls** [4] 77:9  110:3
141:11  145:8
**cannot** [7]  66:18
67:10  73:6  73:22
82:19  91:17  151:4
**Capital** [4]  14:10
14:17  14:25  141:23

DANIEL L. CRUMB                          Condenselt                          CARRERE — counsel

CARRERE [1] 2:2
CARTER [1]        1:5
case [60] 4:13        5:25
  10:11   10:14   10:21
  11:14   12:3    12:11
  12:13   12:25   14:9
  15:9    18:21   19:17
  21:13   25:4    25:6
  29:22   31:5    32:22
  33:4    50:17   51:1
  53:3    53:8    55:19
  55:22   57:5    60:7
  67:25   68:5    72:3
  73:7    73:21   73:25
  83:16   83:20   85:9
  96:25   106:20  114:11
  122:22  123:19  125:6
  125:24  127:15  128:3
  128:13  128:14  129:5
  135:5   135:13  141:23
  143:18  152:25  153:13
  168:14  169:14  172:25
  174:22
cash [60] 54:19       54:23
  55:5    59:8    59:11
  59:12   59:17   59:20
  59:22   60:6    60:9
  60:13   60:15   60:17
  60:22   60:23   61:4
  61:7    61:12   61:23
  61:25   62:19   62:22
  62:22   63:1    63:11
  100:14  101:10  101:11
  101:12  101:16  101:20
  102:14  102:18  103:3
  103:6   133:7   133:12
  142:4   142:5   142:9
  142:10  142:11  151:10
  151:11  173:1   173:7
  173:11  173:16  173:19
  173:25  174:3   174:25
  175:17  175:19  175:20
  176:12  176:13  176:22
  176:23
cash-basis [1] 100:12
Cassard [1]      130:5
categories [6]        12:11
  12:12   29:8    32:23
  92:24   105:19
category [3]     26:20
  105:16  105:17
caution [1]      7:13
certain [10]     7:16
  13:2    13:13   15:4
  51:4    89:5    124:1
  136:19  145:17  146:5
certainly [2]    22:9
  78:18
CERTIFICATE [2]
  178:1   179:1
certification [3]
  3:13    43:14   43:24
Certified [5]    2:9
  3:23    4:3     179:4
  179:22
certify [2]      178:5
  179:5
CFO [9] 6:18         6:22
  28:9    34:25   38:4
  38:8    39:15   45:1

45:17
CFOs [1]         61:13
CFS [2] 148:2        173:13
chain [9]        4:9
  30:21   30:23   51:25
  94:7    123:25  139:17
  168:18  169:24
Chalmette [1]    79:11
chance [1]       94:1
change [3]       136:14
  137:6   164:16
changed [3]      136:16
  136:25  165:13
changes [6]      120:21
  132:11  165:19  165:24
  166:1   178:8
changing [1]     168:6
charge [1]       166:14
Charles [3]      1:15
  2:3     2:4
Charlotte [6]    27:4
  27:8    27:10   27:16
  27:20   28:2
checks [3]       59:24
  138:25  139:3
chief [1] 6:15
Chris [6]        1:5
  1:5     30:2    38:13
  39:16   119:14
circulated [1]   98:14
circumstances [1]
  78:14
city [45] 16:23      17:7
  17:11   17:18   18:6
  18:17   18:20   19:9
  19:18   19:24   20:16
  23:14   23:16   23:21
  24:9    25:11   25:13
  25:16   25:22   26:5
  35:2    78:19   79:7
  79:11   80:4    86:16
  86:21   87:3    87:9
  87:10   88:2    88:13
  88:21   89:7    89:12
  89:21   90:2    90:9
  90:23   91:23   106:25
  153:10  153:21  154:5
  154:24
civil [4] 1:1        3:7
  33:8    33:8
claims [1]       10:10
clarification [1]
  130:21
clarify [2]      84:21
  105:10
clear [4] 14:21      104:3
  144:11  154:10
cleared [1]      59:24
Code [1] 3:7
Collier [14]     7:1
  28:5    28:8    28:11
  28:16   28:24   29:6
  29:17   30:15   36:25
  37:4    38:10   45:1
  45:7
Collier's [1]    45:3
color [1] 131:24

column [1]       176:16
combined [2]     143:20
  148:2
coming [1]       31:1
commencing [1]
  1:16
commission [6] 113:3
  113:7   113:13  113:15
  120:4   120:22
commissioned [1]
  119:18
commissions [15]
  114:1   114:11  114:23
  117:12  118:25  120:9
  121:8   121:18  121:23
  122:6   128:18  134:7
  135:5   169:13  171:3
Committee [4]    113:3
  113:7   113:13  113:16
communicated [1]
  26:15
communications [4]
  7:15    12:2    46:2
  118:5
Company [1]      6:12
compare [1]      136:7
compared [1]     136:4
comped [4]       165:2
  165:9   165:15  169:3
compensation [7]
  113:3   113:7   113:13
  113:16  116:6   116:12
  117:5
comping [1]      169:18
computer [9]     9:9
  9:12    38:22   39:18
  45:12   47:8    69:19
  116:10  146:10
computers [4]    20:10
  47:20   115:17  117:4
conceptually [1]
  137:19
concession [2]   93:16
  93:17
concessions [4] 96:15
  96:19   96:23   103:10
concluded [1]    177:10
conduct [1]      86:1
  89:21   90:8    115:15
  118:18  169:2
conducted [27]   4:10
  18:10   20:25   24:8
  28:17   29:3    29:13
  29:20   31:3    38:22
  39:12   40:1    47:8
  66:25   67:11   70:3
  70:7    70:15   70:20
  82:9    89:6    112:7
  116:1   118:15  168:25
  171:5   171:7
conducting [2]   31:8
  89:11
confirm [4]      67:2
  102:13  130:25  132:10
confused [3]     73:15
  84:20   161:7
considered [1]   140:7

consolidated [19]
  2:20    99:14   99:18
  99:19   99:21   99:22
  99:23   100:1   100:6
  100:18  148:19  149:3
  149:19  150:14  150:17
  151:6   152:6   152:18
  153:23
consumer [1]     111:13
contact [2]      16:15
  109:3
contacted [2]    16:9
contain [3]      43:22
  99:8    148:12
contained [12]   59:20
  119:21  143:17  149:5
  152:18  152:23  153:22
  155:23  156:9   158:22
  158:24  160:3
contains [1]     45:14
contempt [1]     75:24
content [1]      26:6
continued [2]    2:1
contract [14]    44:14
  44:15   44:17   48:13
  75:12   77:5    97:6
  97:7    97:14   97:20
  98:3    98:8    108:5
  108:8
contracted [1]   89:25
contracts [6]    42:9
  42:14   77:2    94:12
  98:4    98:7
control [2]      170:5
  170:24
controller [2]   167:5
  167:7
controls [2]     168:5
  170:3
conversation [7]
  24:21   24:23   25:20
  26:1    26:1    26:4
  49:11
conversations [7]
  7:19    25:15   25:23
  26:3    26:7    28:15
  29:12
convoluted [1]   146:17
copies [46]      14:1
  14:3    14:6    14:8
  17:9    17:14   19:7
  19:10   19:22   20:4
  20:24   22:24   32:20
  33:20   37:13   37:19
  42:13   42:21   43:22
  57:14   63:16   64:10
  64:21   66:9   68:19
  69:24   72:3    74:21
  75:11   77:2    77:5
  78:6    83:24   84:5
  90:21   92:17   102:23
  104:4   106:23  118:4
  123:1   127:11  127:17
  128:21  129:20  131:1
copy [38]        8:2
  1:19    14:12   18:9
  18:14   18:16   24:7
  30:18   37:14   40:4

41:12    42:17   46:15
  57:10   58:3    58:11
  58:15   61:3    61:7
  61:18   61:23   65:5
  65:11   65:20   77:3
  97:14   108:9   108:12
  108:14  108:17  108:23
  110:20  122:20  123:22
  123:23  129:4   129:7
  131:19
corner [2]       9:1
  9:2
corporate [2]    122:23
  123:18
correct [99]     6:7
  6:8     6:19    9:5
  9:14    9:19    15:11
  15:12   19:5    31:24
  36:3    47:25   59:6
  60:5    64:8    66:15
  66:22   67:4    67:13
  67:16   68:14   72:23
  73:12   77:1    80:4
  84:16   85:22   86:4
  86:18   90:14   90:15
  92:8    95:3    95:6
  95:8    97:9    97:10
  100:4   100:5   100:9
  101:3   101:4   103:16
  103:23  104:8   106:21
  109:16  109:17  125:17
  125:25  126:11  127:6
  133:3   133:4   135:6
  136:9   137:1   137:12
  137:24  137:25  141:24
  147:5   147:15  147:16
  148:20  148:21  149:1
  149:22  150:12  150:18
  150:23  151:6   151:7
  151:12  151:13  151:18
  151:19  151:23  152:3
  152:4   152:8   152:9
  155:13  155:14  155:18
  155:19  156:1   157:17
  158:1   158:8   158:14
  158:15  159:22  160:22
  161:2   161:2   163:2
  178:5   179:12
corrections [1]  178:7
correspondence [7]
  11:11   11:17   11:24
  13:7    22:15   29:1
  30:19   46:2    47:21
  47:24   68:16   68:25
  105:7   116:4   116:10
  117:2   129:11  130:23
council [1]      88:21
counsel [58]     3:4
  5:15    7:15    7:19
  8:2     8:13    8:16
  11:11   11:12   11:19
  12:3    12:3    13:9
  13:20   15:9    18:21
  18:25   19:1    19:9
  19:11   19:13   19:16
  19:20   21:25   22:16
  22:23   33:2    33:12
  52:16   57:13   61:8
  61:9    63:22   68:11
  79:11   83:15   84:18
  84:18   91:18   98:20
  101:14  101:19  102:15

102:16   105:9    105:11
105:15   105:20   124:12
125:15   127:6    129:12
130:15   130:17   141:22
153:8    179:14   179:15
couple [5]        24:2
26:2     44:21    139:21
171:13
course [1]        7:23
court [5] 1:1     33:9
128:19   154:19   156:12
cover [5]         67:21
69:11    69:14    69:20
174:16
Cox [4]  97:5     97:15
97:20    176:14
Cox's [1]         97:11
CPA [2]  18:5     20:21
Credit [1]        110:13
Crumb [8]         1:14
4:1      4:6      8:6
102:12   139:24   175:11
178:15
Crumb's [1]       154:21
crystal [1]       154:9
CSR [2]  2:9      179:21
current [2]       131:22
132:9
custody [3]       4:9
34:19    52:1
customer [10]     133:14
136:3    145:24   161:16
163:10   164:23   166:11
167:17   167:22   167:23
customer's [3]    138:8
145:2    146:7
customers [8]     112:14
117:13   133:17   134:6
135:4    144:19   146:20
146:24
D [2]    102:22   105:23
D6059 [1]         131:20
D6700 [2]         2:19
7:25
D6732 [2]         2:20
7:25
Daigle [1]        1:19
130:1
daily [12]        22:7
59:22    60:22    92:12
101:12   135:24   138:4
138:7    138:9    142:9
164:1    175:1
damage [1]        78:23
Dan [2]  33:23    93:20
Daniel [4]        1:14
1:19     4:1      150:6
data [22] 67:4    69:24
71:8     72:6     73:24
74:7     74:16    140:14
140:19   140:20   141:6
141:7    146:8    153:9
153:17   159:11   159:13
161:12   172:7    172:14
172:15   172:20
date [27] 6:9     8:20
17:3     50:17    62:17

62:21    67:15    68:24
71:14    100:16   100:19
101:5    101:8    102:24
103:2    103:20   104:7
107:2    122:14   142:2
142:3    142:11   151:3
151:10   151:11   152:2
152:7
dated [1]         31:24
dates [1] 151:22
Dave [1] 130:8
days [3] 17:25    23:25
24:2
dealt [1] 49:22
Deana [1]         30:10
DeBlander [2]     46:18
46:24
December [1]      122:15
deemed [1]        165:2
Defendant [2]     2:5
75:8
defendants [1]    85:12
defense [3]       10:22
10:25    110:25
defenses [4]      10:10
10:14    32:13    32:10
deficiencies [4] 130:6
130:11   130:15   130:18
deficient [1]     12:18
definitely [2]    152:22
153:11
definitively [3] 73:6
152:17   153:19
delineated [1]    176:18
DENEGRE [1]       2:2
denoted [1]       176:15
deny [1] 66:19
department [18] 38:11
58:6     58:6     112:15
115:15   120:11   120:15
132:16   138:14   138:19
138:20   138:24   160:23
160:24   162:6    166:15
166:21   170:3
department's [1]
55:3
depended [1]      151:4
deposed [1]       5:2
deposit [12]      62:18
62:19    174:3    174:25
175:1    175:16   175:18
175:19   175:19   175:20
176:3    176:7
deposited [10]    59:23
62:17    151:12   151:15
151:16   151:20   164:23
174:1    174:14   175:13
deposition [16]   1:13
3:5      3:18     4:18
5:16     5:22     102:18
103:18   113:19   122:24
123:18   124:2    139:13
139:19   142:19   177:9
depositions [2] 7:23
49:11
deposits [1]      176:5

176:8
derive [1]        111:18
derived [1]       103:21
describe [1]      62:3
describing [1]    71:21
description [1]   102:7
designated [10]   1:13
4:9      89:18    109:3
124:4    124:9    124:14
125:11   166:9    169:23
designating [1]   124:1
designation [1]   123:24
despite [1]       31:10
detail [11]       2:20
8:10     95:4     99:22
99:23    99:24    100:6
100:18   132:23   143:12
175:15
detailed [1]      159:25
detailing [4]     12:16
12:24    29:1     95:18
details [1]       62:21
determinations [1]
113:25   117:12
determine [15]    38:24
39:12    47:10    69:24
72:17    103:2    103:20
116:2    151:2    151:4
163:9    169:2    170:25
175:12   176:2
determined [1]    104:5
determining [1] 114:22
121:23
different [11]    9:12
15:10    19:19    64:7
128:2    137:6    139:25
149:4    152:5    161:1
172:20
difficult [1]     78:19
directed [4]      24:16
56:23    118:10   118:17
directing [1]     4:22
direction [1]     179:11
directly [2]      82:24
98:7
directors [1]     112:13
disbursements [1]
62:19
disclose [1]      7:18
disclosures [1]  31:17
discoverable [1]
31:21
discovery [5]     4:11
5:24     129:15   130:7
130:11
discuss [2]       16:10
51:25
discussed [14]    16:19
23:19    38:25    68:24
75:17    103:4    106:17
109:1    109:13   130:25
132:2    132:22   133:2
152:1
discussing [1]    71:21
Discussion [1]   102:3

discussions [5] 16:20
28:24    29:19    32:18
38:10
dispersed [1]     60:1
distinction [1]   6:21
distinguish [1]  150:14
District [1]
33:9
DIVISION [1]      1:5
document [51]     8:7
8:9      8:12     8:16
11:16    13:6     16:1
16:3     16:8     31:19
31:23    33:15    40:4
40:10    40:12    40:13
40:17    40:19    40:22
41:20    43:3     43:11
43:18    44:23    46:15
51:18    65:2     71:20
75:18    75:23    75:25
76:5     93:2     93:3
99:8     105:8    107:24
122:12   122:15   122:16
122:19   123:13   126:5
129:8    129:9    130:22
131:4    131:25   154:25
155:9    155:15
documentation [1]
72:4     72:6
documents [114]
2:19     7:25     11:10
12:6     12:23    14:12
14:15    14:17    14:25
15:1     18:19    19:23
21:15    21:24    22:9
22:3     23:14    23:16
24:14    24:19    25:6
25:16    25:21    26:6
26:20    28:21    28:25
29:7     33:2     33:5
33:8     40:7     41:25
44:7     44:8     44:10
46:24    47:11    48:3
50:6     51:10    52:1
54:2     54:10    57:18
64:11    65:7     65:13
67:1     67:21    68:16
69:1     69:12    70:18
71:19    73:20    75:9
76:14    79:24    80:6
85:13    87:25    88:8
91:2     91:10    91:16
92:24    92:25    94:11
101:7    101:16   101:20
102:6    102:14   102:17
102:20   106:24   109:1
111:4    113:11   113:24
114:8    114:17   114:19
115:16   116:5    117:3
118:5    120:8    121:17
122:2    122:10   122:21
123:7    123:12   124:6
124:15   125:5    125:9
127:1    127:12   127:13
127:15   127:18   130:1
131:1    133:21   144:3
154:22   171:1    172:24
173:16   173:18   174:21
doesn't [2]       175:15
175:15
done [6] 39:23    93:20

104:21   120:5    120:6
159:15
Donohue [1]       29:25
door [2] 174:11   174:16
down [4]          22:8
94:20    147:23   148:5
Dressler [1]      49:16
drives [1]        58:25
duly [2] 4:2      179:7
duplicative [1]  148:6
during [12]       5:21
7:23     79:1     88:23
121:24   148:24   149:25
150:10   159:18   160:2
162:23   169:3
duties [2]        114:20
166:16
duty [1] 6:21
E [2]    1:19     104:13
e-mail [9]        13:12
13:16    36:11    36:12
36:23    37:1     67:10
71:20    105:12
e-mailed [1]      36:15
e-mails [14]      29:5
47:9     47:24    67:1
68:17    68:25    105:7
114:18   115:16   116:4
116:9    117:2    130:4
130:24
early [2] 8:19    14:13
either [14]       33:25
35:4     40:19    46:3
61:10    84:11    90:12
114:9    123:6    123:13
124:6    127:23   140:21
161:6
electronic [11]  26:15
38:23    57:11    57:12
58:10    58:13    61:18
61:20    69:23    117:11
170:25
electronically [1]
36:8     36:10    41:11
Elvige [1]        130:5
emergency [1]     40:7
employee [1]      118:7
employees [1]     114:2
118:8    119:18   121:24
122:6    128:23
employment [3]
115:6    115:19   127:16
end [5]  17:19    17:20
23:19    120:23   140:12
ended [1]         24:1
engaged [1]       80:2
ensure [2]        166:16
167:21
enter [1] 161:24
entered [10]      86:15
160:23   160:24   161:1
161:16   162:9    163:18
164:10   164:12   166:17
entering [1]      162:7
entire [3]        12:11
134:21   163:2

**entirely** [1]    160:13
**entitled** [4]    2:20
96:18    114:12    174:16
**entity** [1]    133:15
**ESPN** [2]    97:22
98:5
**Esquire** [3]    1:19
1:23    2:3
**et** [1]    3:7
**Eugene** [5]    1:4
115:6    115:20    115:25
129:1
**event** [2]    149:10
162:3
**evidence** [10]    3:20
14:20    30:21    30:23
70:19    94:7    123:25
139:17    168:19    169:24
**evidencing** [1]    166:22
**exact** [4] 17:3    22:8
103:9    104:11
**exactly** [4]    50:22
83:10    140:3    161:4
**EXAMINATION**
[114]    2:13    2:14
2:15    4:5    7:22
8:5    8:23    10:17
14:23    22:11    23:7
25:12    31:15    32:4
32:19    33:16    34:2
34:9    34:22    35:11
36:24    39:9    39:24
41:21    43:12    45:15
46:12    47:23    49:9
50:23    51:21    52:11
54:9    54:21    55:15
56:2    59:15    62:25
63:7    65:18    66:7
67:8    68:9    71:13
73:11    73:17    74:9
75:4    76:15    76:25
77:13    78:20    79:22
81:24    91:13    94:9
94:22    95:11    102:21
106:2    110:7    111:20
112:5    112:19    113:1
114:7    114:16    115:3
117:22    119:12    121:15
122:11    123:5    123:16
125:4    125:20    126:7
126:24    127:10    132:18
134:16    139:23    141:4
141:20    142:8    142:17
143:14    144:10    145:11
147:11    148:17    153:6
155:6    156:11    156:22
157:8    157:14    157:24
159:2    160:11    162:14
164:22    166:7    167:6
168:24    169:8    170:12
171:14    171:25    172:12
173:8    174:23    175:10
175:25
**examined** [1]    4:4
**example** [6]    42:25
43:3    134:18    136:13
137:2    148:7
**Excel** [1]    109:14
**Except** [1]    147:12
**exception** [1]    178:7

**exchanged** [1]    46:3
**excuse** [3]    89:13
165:25    167:10
**execute** [1]    44:19
**executed** [6]    43:13
44:16    45:1    45:17
75:13    127:15
**executive** [2]    56:18
118:6
**exemption** [1]    111:2
**exhibit** [38]    2:19
2:19    8:4    9:21
11:18    11:22    11:25
16:2    16:4    30:17
30:18    32:6    33:6
33:6    33:9    33:19
33:21    40:5    40:9
40:16    40:23    42:2
65:3    65:11    65:20
65:21    66:2    74:24
123:23    126:8    126:9
126:11    127:19    127:20
127:22    127:24    131:4
131:20
**exhibits** [6]    5:21
33:18    43:24    126:12
126:18    127:12
**exist** [5] 88:9    120:8
168:10    168:11    168:23
**existed** [1]    47:21
**existence** [1]    66:19
**exists** [4]    66:13
69:25    70:4    85:18
**expect** [1]    133:13
**expedite** [1]    105:18
**expedited** [1]    40:6
**explain** [1]    55:21
**explains** [1]    174:21
**extent** [8]    24:2
26:25    51:11    76:10
94:5    126:3    132:3
170:1
**F** [1]    108:18
**facilities** [1]    88:24
**facility** [6]    64:16
86:17    86:22    87:4
87:16    87:19
**fact** [1]    22:4
**facts** [2] 14:19    162:4
**failure** [1]    128:23
**fair** [1]    42:8
**family** [1]    79:9
79:12
**far** [25]    15:18    16:22
20:17    35:16    36:8
51:17    54:17    54:18
55:2    58:19    63:4
84:19    85:19    86:2
86:10    98:2    101:5
110:12    121:7    133:21
138:22    144:4    149:5
172:18    176:18
**fashion** [1]    78:1
78:10
**favor** [1]    46:9
**file** [3]    21:6    44:11
58:2

**filed** [6] 31:17    42:18
128:2    128:6    128:18
128:22
**files** [5] 41:5    44:8
117:10    118:11    118:12
**filing** [1]    3:12
**fill** [2]    175:18    176:14
**final** [2] 76:11    111:12
**finance** [14]    6:10
6:22    6:25    12:22
34:14    34:21    38:11
39:15    46:18    55:3
132:16    138:14    166:15
170:2
**financial** [87]    6:15
10:9    10:14    10:25
11:13    12:12    13:23
20:25    26:11    26:24
27:8    27:10    27:17
27:17    27:19    31:4
31:9    32:10    34:12
50:15    50:24    51:4
52:3    52:15    53:17
53:19    53:22    54:10
54:17    54:18    55:5
63:8    63:12    66:9
66:21    67:4    69:4
71:8    71:22    72:4
72:5    72:8    72:25
73:3    73:20    73:23
74:5    74:21    74:25
80:6    80:19    82:20
83:24    84:6    84:19
85:2    85:14    86:2
88:19    90:21    91:21
93:1    93:5    94:10
94:16    95:15    99:9
111:9    116:22    119:6
140:15    140:22    141:8
143:11    143:20    144:8
147:21    148:1    148:3
148:13    152:23    153:8
158:24    166:21    167:16
171:19    172:8
**financials** [5]    22:19
28:13    153:22    158:23
164:5
**fine** [4] 119:4    119:8
161:9    174:19
**finished** [1]    87:8
**firm** [12] 18:5    18:8
20:21    28:2    28:6
82:25    89:19    89:20
90:6    129:23    129:24
130:2
**firms** [1]    22:20
**first** [25] 4:2    7:3
7:5    8:15    10:4
11:3    11:6    11:8
11:23    12:4    12:21
13:5    14:11    33:4
33:6    37:8    69:5
71:1    84:3    86:14
107:10    132:2    134:23
138:18    179:7
**Fisse** [2] 1:19    130:2
**five** [1]    32:7
**Floor** [1]    2:3
**folder** [1]    58:3
**folders** [2]    21:6

21:9
**follow-up** [2]    67:22
139:14
**following** [7]    35:6
36:1    79:20    79:21
80:2    154:16    154:17
**follows** [1]    4:4
**FONTANA** [1]    1:22
**foregoing** [1]    178:4
**form** [72]    3:16
10:16    11:10    13:7
13:15    14:19    22:2
23:6    25:8    31:13
34:6    34:16    35:9
36:13    37:15    39:8
39:21    41:17    45:10
46:8    47:17    50:19
52:5    54:5    55:13
59:14    63:6    68:8
71:10    74:2    78:12
94:18    105:6    106:7
109:10    110:3    110:17
111:7    112:3    112:17
112:23    114:5    114:14
115:1    125:19    127:8
132:14    137:7    140:24
141:11    142:16    143:7
143:9    144:6    145:6
145:8    147:9    148:10
153:2    154:1    156:3
160:7    162:12    164:20
166:4    166:25    169:6
170:25    171:21    173:4
174:5    174:7
**formalities** [1]    3:12
**formality** [1]    10:19
**format** [3]    26:15
57:11    61:19
**former** [1]    45:17
**forth** [8] 11:25    49:12
99:4    107:23    159:12
160:5    160:15    179:8
**found** [2]    72:10
87:20
**Foundation** [1] 145:6
**four** [1]    140:2
**fourth** [2]    15:24
140:5
**frame** [8]    19:15
21:19    34:21    77:21
78:17    81:16    89:8
89:9
**frequency** [1]    174:2
**frequently** [1]    164:2
164:3
**front** [1]    12:6
**function** [5]    38:4
38:6    38:8    38:9
138:15
**funds** [2]    59:25
60:1
**game** [23]    35:7
35:18    35:22    36:2
37:3    37:12    96:21
102:25    103:8    103:14
104:10    132:25    142:25
143:3    143:22    143:24
148:23    148:25    149:11

149:11    149:18    150:7
163:11
**games** [4]    102:22
103:22    104:14    104:16
**Gary** [1]    49:15
**gate** [10] 37:10    37:14
37:19    39:17    132:20
142:13    142:18    142:21
142:24    143:16
**general** [1]    9:15
**generally** [1]    111:10
**generate** [1]    56:24
57:1    58:9    74:6
74:8    176:22    177:1
**generated** [5]    8:22
8:25    55:10    58:20
150:3
**gentleman** [1]    46:17
**given** [4]    19:7
19:10    42:1    155:17
**gloss** [2] 31:18    32:14
**goes** [2] 154:12    163:16
**gone** [2] 56:20    74:23
**good** [4] 4:6    4:7
53:15    79:19
**governmental** [2]
152:20    153:11
**Grant** [7]    17:24
18:4    18:10    18:13
18:16    24:7    24:15
**great** [1] 62:11
**Greg** [2] 16:14    30:15
**groundwork** [3] 4:25
5:20    6:1
**group** [1]    38:15
**guess** [3]    10:7
36:17    164:7
**Gulf** [1] 64:13
**habits** [1]    19:6
**hand** [1] 40:4
**handle** [1]    109:6
**handles** [2]    49:19
138:17
**handling** [1]    48:24
**happy** [1]    126:13
**hard** [10] 5:9    37:14
41:12    57:10    58:3
58:11    58:15    61:18
69:24    131:23
**head** [6] 13:15    15:24
24:20    30:16    93:22
161:19
**heard** [7]    113:18
113:20    115:23    115:25
119:15    129:3    170:18
**hearing** [1]    71:2
113:21
**Heidingsfelder** [2]
7:10    61:11
**help** [1] 42:3
**hereby** [4]    3:6
3:17    178:4    179:5
**hereinabove** [1] 179:8
**hereto** [3]    3:4
179:15