UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EUGENE LIGER, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-1969** |
| **NEW ORLEANS HORNETS NBA LIMITED PARTNERSHIP** | **SECTION: "C" (5)** |

**ORDER AND REASONS**[1]

Before the Court are cross motions for summary judgment, filed by the plaintiffs, Eugene Liger et al ("Plaintiffs") (Rec. Doc. 284), and the defendant, New Orleans Hornets NBA Limited Partnership ("Hornets") (Rec. Doc. 297). Oral argument was held on June 25, 2008, at which time the motions were taken under advisement. Having considered the record, the memoranda and argument of counsel and the law, the Court has determined that summary judgment should be granted in favor of the Plaintiffs.

**I. BACKGROUND**

The Plaintiffs filed this action on May 27, 2005. Plaintiffs are former employees of the

---

[1] Aaron Reuter, a second year student at Tulane University Law School, assisted with the research and preparation of this decision.

1

Hornets and are seeking compensation for allegedly unpaid overtime.  The Plaintiffs motion was filed on June 3, 2008 and seeks to exclude two bases on which Defendant rests its defense.

### 1. Seasonal Amusement and Recreation Exemption

The Hornets argue that it is not liable to the Plaintiffs because it is exempt under the Seasonal Amusement and Recreation Exemption of the Fair Labor Standards Act ("FLSA").  *Id.*; 29 U.S.C. § 213(a)(3).  The statute provides two elements under which an amusement or recreational establishment may be found exempt from minimum wage and maximum hour requirements: "if (A) it does not operate for more than seven months in any calender year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33 1/3 per centum of its average receipts for the other six months of such year[.]"[2]  29 U.S.C. § 213(a)(3).  Additionally, part (B) is further explicated in the "Field Operations Handbook" produced by the Department of Labor.  (Rec. Doc. 297-3, Ex. 1, p. 1-2).  The handbook directs that the 33 1/3 per centum test be conducted by comparing the six months showing the lowest average receipts with the six months showing the highest average receipts.  *Id.*

### 2. Retail or Service Establishment Exemption

The Hornets also contend that the FLSA's "retail or service establishment" exemption shields them from liability.  The second part of the Plaintiffs' summary judgment motion moves to dismiss this defense.  Regarding the "retail or service establishment," the Plaintiffs first assert that the Hornets do not meet the definition of a "retail establishment."  In addition, the Plaintiffs

---

[2] In their motion, Plaintiffs do not challenge the classification of Defendant as an "amusement or recreational establishment."  As such, this classification is not currently at issue.

aver that the Hornets fail the 75% revenue test to qualify as a "retail or service establishment."

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is only proper when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A genuine issue of fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247-48 (1986); *see also, Taita Chem. Co. v. Westlake Styrene Corp*., 246 F.3d 377, 385 (5th Cir. 2001). When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations." *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l. Wildlife Fed'n*., 497 U.S. 871, 871-73 (1990); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).

The "initial burden" imposed on the moving party has two parts: the burden of production and the ultimate burden of persuasion. *Celotex Corp.*, 477 U.S. at 330. The manner in which the moving party may satisfy the burden of production "depends upon which party will bear the burden of persuasion on the challenged claim at trial." *Id.* at 331. The Supreme Court identified two methods for a moving party to meet its burden of production when the burden of persuasion belongs to the non-moving party at trial. "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim." *Id.* Alternatively, "the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* In this case, the Hornets (the non-moving party) will have the burden of persuasion at trial to show that the "amusement or recreational" exemption and the "retail sales" exemption are viable defenses.[3] Thus, the Plaintiffs (the moving party) must either (1) submit affirmative evidence that negates an essential element of the Hornets claim, or (2) demonstrate that the Hornets evidence is insufficient to establish an essential element of their claim to satisfy the burden of production. *Celotex Corp.*, 477 U.S. at 331.

---

[3] The employer bears the burden of proving the existence of conditions essential for exemption from coverage of the Fair Labor Standards Act as a retail establishment. *Acme Tire & Battery Co. v. Wirtz*, 330 F.2d 116, 118 (5th Cir. 1964) (stating, "[t]he burden of proving the existence of the three conditions of 13(a)(2) of the Act is upon the employer."); *see also, Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006) (noting, "[w]e construe FLSA exemptions narrowly; and the burden of proof lies with the employer.").

### III. LAW & ANALYSIS

**1. Seasonal Amusement and Recreation Exemption**

    **A.  29 U.S.C § 213(a)(3)(A) - Seven Months of Operation**

On October 4, 2006, this Court stated, "[r]egardless of the actual length of the basketball season, the Hornets are clearly a year round operation.  Therefore to qualify for the exemption, the Hornets must meet the average receipts test." (Rec. Doc. 82, p. 4).  The Plaintiffs suggest that the Court should adopt its previous decision as law of the case.  The Hornets argue that the Court should not adopt its previous determination because it regarded a different Motion for Partial Summary Judgment.[4]  (Rec. Doc. 297-2, p. 15).  Moreover, the Hornets assert that the Plaintiffs have not properly supported their Motion for Partial Summary Judgment.  (Rec. Doc. 314, p. 4).  Finally, the Hornets contend that the Court has not held a hearing on the merits of this issue and, as such, the previous determination can not be considered the law of the case.

    The FLSA exempts "amusement or recreational establishments that operate for fewer than eight months per year from its requirements." *Bridewell v. The Cincinnati Reds*, 68 F.3d 136 (6th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996).  Following oral argument on this issue, the Court adopts its previous determination: the Hornets operate for at least eight months each year.   The Hornets rely on *Jeffery v. Sarasota White Sox, Inc.*, to argue that they only operate for seven months of the year.  64 F.3d 590 (11th Cir. 1995).  Reliance upon *Jeffery*, however, is insufficient to find in favor of the Hornets.  In *Jeffery*, the Eleventh Circuit found that a minor league baseball team did not operate for seven months out of the year, although some employees were employed year-round.  *Id.* at 596.  In that case there was no dispute regarding the length of

---

[4] That Motion decided whether or not the Hornets constituted a single establishment.

the operating season. *Id.* The Court is not convinced that the operative scale of a minor league baseball team is analogous to that of a NBA franchise.

The Plaintiffs' reliance on *Bridewell* is more appropriate. In *Bridewell*, the Sixth Circuit found that a major league baseball team was a year-round operation, despite the fact that they did not provide "amusement and recreation" year-round. *Id*. at 138-139. Additionally, the court opined that "the fact that the Reds employ 120 year-round workers compels the conclusion that they 'operate' year-round." *Id.* (stating, "[w]hile a truly seasonal business that employs an insignificant number of workers year-round could conceivably qualify for the exemption, the fact that the Reds employ 120 year-round workers compels the conclusion that they 'operate' year-round."). The Hornets admit that they employ over 100 personnel in year round positions. (Exhibit 2, Declaration of Pat McKinney). In addition, the NBA regular season typically begins in October and ends in April; in combination with pre-season and post-season games, the Hornets have the opportunity to participate in games for nine months each year. Finally, the NBA draft occurs each June; thus, the Hornets operate in the summer even when they do not make the playoffs.[5] Therefore, the Court finds the reasoning and holding of *Bridewell* to be more analogous to this matter than *Jeffery*. Consequently, the Court finds that the Hornets are a year-round operation, and thus, cannot qualify for the exemption under 29 U.S.C. § 213 (a)(3)(A).

**B.  29 U.S.C § 213(a)(3)(B) - Average Receipts**

Plaintiffs aver that the Hornets cannot prove it satisfies the average receipts test for any

---

[5] The Court's findings of year-round activity did not consider the possibility of off-season workouts or training camps, off-season charity work, or off-season marketing and ticket sales.

year at issue. (Rec. Doc. 284-3, p.7). Furthermore, Plaintiffs contend that the only financial documents produced by the Hornets that reflect "receipts" were cash reports and bank account records. *Id.* at 8. The Plaintiffs claim that no cash reports or bank records were produced for 2001, incomplete cash reports and bank records were produced for 2002, incomplete cash reports and complete bank records for 2003, and complete cash reports and bank records for 2004. *Id.* at 8-10. For the years in which receipt data was available, the Plaintiffs' expert performed calculations that found that the Hornets failed the test by a large margin. (Doc 284-7, Ex. A, p.6-8).

Additionally, the Plaintiffs submit that accrual based financial information cannot be used to show "receipts" for the test of 29 U.S.C § 213(a)(3)(B). The Plaintiffs rely on *Bridewell II,* 155 F.3d 828 (5th Cir. 1998), in support of this conclusion. *Id.* at 10-13. *Bridewell II* involved a continuation of the dispute between employees and the Cincinnati Reds, regarding the team's refusal to pay overtime for hours worked in excess of 40 hours per week. 155 F.3d at 829. The Cincinnati Reds argued that it was exempt from the FLSA requirements because of the exemptions contained in 29 U.S.C § 213(a)(3)(B). *Id*. In *Bridewell II*, the Sixth Circuit specifically answered the "narrow question" as to whether, for the purposes of the statute, "receipts" referred to money when it was actually received versus when the money was recorded as income. *Id*. The court noted that the statute was plain on its face and that the word "receipts" referred "to money which is actually received at the time it is actually received." *Id*. at 830. While observing that the accrual method of accounting (which records income at the time of sale or delivery, not payment) best reflected the operation of the team, the Sixth Circuit held that the district court had been correct in finding that the language of the statute "instructs the courts to

look at an establishment's receipts, and not its income or its method of accounting" and that "the statute speaks in terms, not of *income*, but in terms of *receipts*." *Id*. (emphasis in original).

The Hornets lament that *Bridewell II* found "no authority in the text of the statute, the regulations, the WHD's Handbook, or the majority of cases (*Jeffery* and *Adams*)[.]" (Rec. Doc. 297-2, p. 22). On the contrary, the Sixth Circuit thoroughly examined the text of the statute in coming to its ultimate conclusion that "receipts," not revenues should be used for the test. Furthermore, the *Bridewell II* court recognized *Jeffery* and *Adams,* similarly finding that they were not helpful with respect to the "receipt" issue.[6]

The majority of the court stated that the FLSA's "receipt" mandate was "illogical" and "counterintuitive." However, the Court agrees with Judge Cole's concurrence that the result is not illogical at all:

> I respectfully disagree, however, that holding the Reds to this plain meaning interpretation of § 213(a)(3)(B) leads to an illogical or counterintuitive result. Although the accrual method of accounting more accurately matches up the Reds' revenues with its expenses, I would find it problematic to insulate the Reds from the FLSA's overtime requirements merely because it does not record its off-season revenue as income until its actual games are played from April through October. The majority emphasizes that the Reds keep season ticket revenues paid by its ticket holders in a separate bank account, and that the Reds must refund the money to the ticket holder if the game is not played (e.g., during a player strike). However, I have no doubt that the Reds receive substantial interest or similar revenue on those season ticket revenues while those funds are held in a separate bank account. Thus, I believe that it is quite logical that Congress chose not to exempt an organization like the Reds from paying an employee like Daisy S.

---

[6] The Hornets rely on *Jeffery* and *Adams v. Detroit Tigers, Inc.*, 961 F.Supp. 176 (E.D.Mich. 1997), in support of its conclusions that revenues may be used in the place of receipts. *Jeffery*, however, did not examine whether receipts or revenues should be used in calculations for the test. 64 F.3d at 595-596. Moreover, the *Jeffery* court recognized that under either calculation, the test would have been met. Therefore, *Jeffery* is not instructive on this issue. Additionally, in *Adams*, the calculations were made on receipts, as required by the statute, and the plaintiffs did not challenge those figures.

> Pearl an additional $2.75 per hour above her regular rate of $5.50 per hour for overtime hours, because the Reds clearly benefit financially by receiving significant amounts of its revenue in the off-season. Accordingly, the "receipts" test of § 213(a)(3)(B) does not need to be "corrected" or "perfected" by this court because I believe Congress meant what it said and said what it meant: a business operation like the Reds cannot insulate itself from the FLSA's overtime requirements if it enjoys the benefit of receiving substantial amounts of revenue during the off-season months.

*Bridewell II,* 155 F3d at 832-33. The FLSA's "receipt" test is logical, fair and an accurate assessment of the year round activity of an organization.

The Hornets argue that it satisfied the average receipts test for every relevant year, based solely on the Declaration of Daniel Crumb. (Rec. Doc. 297-2, p.22). Mr. Crumb, however, testified that he compared the average "revenues," not the average receipts. (Rec. Doc. 297-14, Ex. 12, p.2). Moreover, his calculations also show the use of revenues and not receipts. (Rec. Doc. 297-17, Ex. A). Under *Bridewell II*, this type of calculation based on *revenue* is not sufficient for showing that the FLSA exemption applies.

Finally, the Hornet's claim that it must use the accrual based accounting method as a NBA franchise is not relevant. The Hornets did not have to change its accounting methods to produce the proper figures for the statutory test. The plain language of 29 U.S.C. § 213(a)(3)(B) instructs the Court to look at a defendant's receipts, not its income or its method of accounting. *Bridewell II*, 155 F.3d at 832. The Hornets have not offered any calculations of *receipts*. In contrast, the Plaintiffs have shown that, for the years in which the receipt data is available, the Hornets fail the average receipt test by a large margin because the average receipts for the lowest six months were greater than 33-1/3% of the average receipts for the other six months. (Doc 284-7, Ex. A, p.6-8).

The party seeking the exemption carries the burden to demonstrate that it applies. *See*

*e.g., Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974); *Arnold v. Ben Kanowsky, Inc*. 361 U.S. 388, 393 (1960). The Hornets have not shown "that they are plainly and unmistakably within [the] terms and spirit of the exemption." *Bridewell*, 68 F.3d at 138. The Court finds that the Hornets have not met their burden, nor have they rebutted, with sufficient evidence, the Plaintiffs' showing that the exceptions do not apply. Accordingly, there is no genuine issue of material fact; the Hornets are not entitled to the Seasonal Amusement and Recreation Exemption.

**2. Retail or Service Establishment Exemption**

"The overtime provisions of the FLSA entitle hourly workers to overtime pay, at a rate of 1.5 times their normal wage, when they accrue more than 40 worked hours in one week. *Reich v. Delcorp, Inc*., 3 F.3d 1181, 1182 (8th Cir. 1993). Yet, employees of "retail or service establishments" are not entitled to the over-time pay increase if their "regular rate of pay is more than 1.5 times the minimum wage and if more than half [their] compensation for a representative period (not less than one month) represents commissions on goods or services." *Id.* (quoting 29 U.S.C. § 207(i)). As discussed in *Reich*, Congress repealed Section 213(a)(2) of the FLSA, the "retail or service establishment," exemption in 1989.[7] "Congress did not, however, repeal § 207(i) nor change its dependence on the definition of "retail or service establishment." *Id.*

---

[7] Pub.L. 101-157 struck out paragraph (a)(2) and (a)(4) of 29 U.S.C. § 213. 29 U.S.C. § 213 (amending 29 U.S.C. § 213(a)(2) and (a)(4)); *see also Reich v. Delcorp, Inc*., 3 F.3d 1181, 1183 (8th Cir. 1993). "Pub.L. 101-157, § 3(c)(1), struck out par. (4) which related to employees employed by an establishment which qualified as an exempt retail establishment under clause (2) of this subsection and was recognized as a retail establishment in the particular industry notwithstanding that such establishment made or processed at the retail establishment the goods that it sold." 29 U.S.C. § 213 (amending 29 U.S.C. § 213(a)(2) and (a)(4)).

Section 207(i) states:

> Employment by retail or service establishment
>
> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if: (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title; and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i). The *Reich* court found that the repealed definition in Section 213(a)(2) is still necessary to interpret Section 207(i) because Congress explicitly stated that the definition of "retail or service establishment" was to be given the same meaning for both sections of the statute. *Reich*, 3 F.3d at 1183. Thus, the Hornet's claim that the "retail or service establishment" exemption shields them from liability must be subjected to the statutory definitions regarding Section 207(i) and the Department of Labor regulations discussing Sections 207(i) and 213(a)(2).[8]

The statute defines "retail or service establishment" as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." *Reich*, F.3d at 1183 (quoting 29 U.S.C. § 213(a)(2); 29 C.F.R. § 779.411)). The Department of Labor regulations note, "not

---

[8] The Fifth Circuit has noted that *Chevron* deference applies to the Department of Labor's interpretation of FLSA. *Belt v. EmCare, Inc*., 444 F.3d 403, 407-08 (5th Cir. 2006) (stating, "[w]hen confronted with a statute administered by an executive agency, we defer to the agency's interpretation of the statute if (a) the statute is silent as to the precise question at issue and (b) the agency's interpretation is reasonable.").

every establishment which engages in retail selling of goods or services will constitute a 'retail or service establishment' within the meaning of the Act." 29 C.F.R. § 779.24.

The Department of Labor regulations provide excellent guidance for determining whether a particular employer may claim the "retail or service establishment" exemption. First, the regulations note that some establishments operate outside of the "retail concept" considered by the FLSA. 29 C.F.R. § 779.316. These establishments lack the first requirement to qualify for the exemption. *Id.* (stating, "The term 'retail' is alien to some businesses or operations. For example, transactions of an insurance company are not ordinarily thought of as retail transactions. The same is true of an electric power company selling electrical energy to private consumers. As to establishments of such businesses, therefore, a concept of retail selling or servicing does not exist.").[9] Additionally, the Tenth Circuit ruled that "'retail' means to sell commodities in small quantities directly to ultimate consumers to meet personal rather than commercial and industrial needs, and it is correspondingly accurate to restrict the word 'services' to ultimate users of them for personal rather than commercial purposes." *Shultz v. Adair's Cafeterias, Inc*., 420 F.2d 390, 395 (10th Cir. 1969).

Furthermore, 29 C.F.R. § 779.317 lists businesses lacking a "retail concept." The list does not specifically mention professional sports teams. However, 29 C.F.R. § 779.318 describes the characteristics and examples of retail or service establishments:

---

[9] The Department of Labor regulations continue: "establishments not having been traditionally regarded as retail or service establishments cannot under any circumstances qualify as a 'retail or service establishment' within the statutory definition of the Act, since they fail to meet the first requirement of the statutory definition. Industry usage of the term 'retail' is not in itself controlling in determining when business transactions are retail sales under the Act. Judicial authority is quite clear that there are certain goods and services which can never be sold at retail." 29 C.F.R. § 779.316.

12

> Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process . . . Illustrative of such establishments are: Grocery stores, hardware stores, clothing stores, coal dealers, furniture stores, restaurants, hotels, watch repair establishments, barber shops, and other such local establishments.

29 C.F.R. § 779.318(a).

During oral argument, counsel for the Hornets argued that the distinction between "retail" and "service" establishments was critical to the application of the exemption in this case. Counsel asserted that the Hornets could qualify for the exemption as a "service" establishment as opposed to qualifying as a "retail" establishment. Counsel's argument is not grounded in the FLSA's jurisprudence. Specifically, cases have found that the word "retail" affects the interpretation of entities that qualify as "service establishments." *Bogash v. Baltimore Cigarette Service*, 100 F.Supp. 250, 252 (D.C. Md. 1951) (stating, "[t]he word 'retail' as used in the Act obviously is intended to modify the word 'service' regardless of the use of the word 'or' between them,- in other words, the provision is to be interpreted as though it read 'retail selling or retail servicing establishment.'"). Accordingly, the Court finds that the Hornets must demonstrate a "retail" nature, whether it attempts to establish itself as a "retail" or "service" establishment.

The Hornets rely on *Reich v. Cruises Only, Inc*., 1997 U.S. Dist. LEXIS, *10 (M.D. Fla. 1997) to argue that the "retail establishment" exemption should apply because the Hornets sell services to the general public at the end of the stream of distribution. Yet, the Hornets, unlike Cruises Only, Inc., also manufacture the product they sell. Indeed, as one of the teams in the National Basketball Association, the Hornets are in the business of both producing and selling

entertainment to the public.[10]  Accordingly, the Court is not convinced that the Hornets operate within the retail or service establishment "concept" considered by the FLSA because the Hornets have the dual characteristics of a manufacturer and a retailer, and thus, cannot meet the Department of Labor requirements.  *See* 29 C.F.R. §§ 779.315-779.321.  Specifically, an organization must be "at the very end of the stream of distribution" and cannot "take part in the manufacturing process" to qualify for the "retail or service establishment" exemption.  29 C.F.R. § 779.318(a).

"[T]he second requirement for qualifying as a 'retail or service establishment' within that term's statutory definition is that 75 percent of the establishment's annual dollar volume must be derived from sales of goods or services in the particular industry."  29 C.F.R. § 779.322.  The Plaintiffs have provided sufficient evidence to demonstrate that the majority of the Hornet's income is derived from NBA broadcast revenue.[11]  Rec. Doc. 284, Report of John W. Theriot, p. 6. Yet, during oral argument, the parties disagreed about the "retail" nature of the Hornet's broadcast revenue.

At the hearing on these motions, the parties discussed whether broadcast revenue could be considered a "retail" sale.  Specifically, the parties disagreed regarding the characterization of the "end consumers" of the broadcast sales.  The Hornets asserted that the companies buying

---

[10] The Court notes that the Hornets select the players and coaches to form the team; the players and coaches subsequently perform the work required to compete in the National Basketball Association.  Thus, the Hornets operate both at the fount and delta of the stream of distribution for professional basketball.  Stated another way, the Court finds that the Hornets both manufacture and sell entertainment (professional basketball) to the public.

[11] The fact that the Hornets sell broadcast rights to networks for commercial purposes also weighs against finding that the "retail or service establishment" exemption applies in this matter.

advertising during the broadcasts were the end consumers; the Plaintiffs maintained that the individuals tuning into the games were the end consumers of the broadcast sales.  Given either scenario, the Court finds that broadcast sales are not "retail" sales in the same fashion as selling game tickets.  Regarding broadcast revenue, the Hornets, as co-manufacturers of the games, actually create the product being sold: broadcast rights.  The Hornets either sell the rights to a broadcasting network who then re-sells airtime during the broadcasts to advertisers, or the network sells the right to view the broadcasts to individual subscribers, or both.  Clearly, the selling of broadcast rights involves a greater number of re-sales to reach the end consumers than the selling game tickets from the box office window.  In this case, the Hornets have not carried their burden to demonstrate that the broadcast sales are "retail" in nature pursuant to the FLSA's exemption.  *Acme Tire & Battery Co. v. Wirtz*, 330 F.2d 116, 118 (5th Cir. 1964) (finding that the employer bears the burden of proof regarding FLSA exemptions).

Ultimately, the Court need not address the 75% test because of the Court's previous finding.  Again, the Hornets do not fall within the retail or service establishment "concept" contemplated by the FLSA because they manufacture professional basketball games, and thus, "lack the first requirement to qualify for the exemption." 29 C.F.R. § 779.316.  Therefore, the Plaintiffs have sufficiently demonstrated that the Hornets are not entitled to claim the "retail or services establishment" exemption.  Stated another way, there is no genuine issue of material fact regarding the Hornet's "retail or services establishment" exemption.  Simply, the Hornets do not qualify for the exemption.

## IV. CONCLUSION

For the reasons stated above,

IT IS ORDERED that the Hornet's Motion for Summary Judgment is DENIED (Rec. Doc. 297).

IT IS FURTHER ORDERED that the Plaintiffs' Motion for Summary Judgment is GRANTED (Rec. Doc. 284).

New Orleans, Louisiana, this 10th day of July, 2008.

                          HELEN G. BERRIGAN
                          UNITED STATES DISTRICT JUDGE