UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

EUGENE LIGER, ET AL.                    CIVIL ACTION

VERSUS                                  NUMBER: 05-01969

NEW ORLEANS HORNETS NBA                 SECTION: "C"(5)
LIMITED PARTNERSHIP


**REPORT AND RECOMMENDATION**


Presently before the Court are the following contested matters:

1.  Attorney fee application of Daigle, Fisse & Kessenich. (Rec. doc. 417);

2.  Attorney fee application of Niles, Bourque & Fontana. (Rec. doc. 427);

3.  Defendant's motion to dismiss the fee application of Daigle, Fisse & Kessenich. (Rec. doc. 421); and

4.  Request for sanctions by Daigle, Fisse & Kessenich which was raised via a response to defendant's supplemental memorandum in support of motion to dismiss. (Rec. doc. 463).

5.  Supplemental motion for fees by Daigle, Fisse & Kessenich. (Rec. doc. 494).

The Court will first address the motion to dismiss (Rec. doc.

421) filed by the New Orleans Hornets NBA Limited Partnership referenced above and the request for sanctions filed by Daigle, Fisse & Kessenich ("DFK"). (Rec. doc. 463). In connection therewith, a brief recitation of salient facts is in order.

The underlying action herein principally involved overtime claims by all plaintiffs under the Fair Labor Standards Act ("FSLA"), 29 U.S.C. §201, et. seq., and claims by some of the plaintiffs for wages, commissions and other relief under the Louisiana Wage Payment Law, LSA-R.S. 23:631, et. seq. On September 29, 2008, the Court issued an order of dismissal, which was amended the following day, recognizing that the parties had agreed upon a compromise of claims and allowing sixty days for the settlement to be consummated, absent which the matter could be re-opened. (Rec. docs. 370, 371). In both orders, the Court specifically recognized the right of plaintiffs' counsel to pursue attorneys' fees.

On November 20, 2008, plaintiffs filed a motion to enforce settlement. (Rec. doc. 379). Defendant filed a similar motion on the same date. (Rec. doc. 382). Subsequently, on December 10, 2008, the parties filed a joint motion for approval of confidential settlement (Rec. doc. 405) which was granted by the Court on December 22, 2008. (Rec. docs. 406, 408). A joint motion for partial dismissal of claims (Rec. doc. 410) was filed herein on December 31, 2008 and an order was signed by the Court granting

that motion on January 20, 2009. (Rec. doc. 411). A formal application for attorneys' fees was filed by DFK on March 19, 2009. (Rec. doc. 417). Defendant's motion to dismiss followed on March 31, 2009. (Rec. doc. 421).

Niles, Bourque & Fontana ("NBF") filed an intervention for attorneys' fees herein on December 14, 2006. (Rec. doc. 89). A formal motion for attorneys fees by NBF was ultimately filed on April 14, 2009. (Rec. doc. 427).

Defendant's motion to dismiss initially argued that the fee petition of DFK was untimely filed pursuant to Rule 54(d)(2), Fed.R.Civ.Pro., in that it was not filed within fourteen days of the Court's January 20, 2009 dismissal order noted above. As a result, defendant contended that the Court had lost jurisdiction to consider the fee claims asserted by DFK.

Addressing first the issue of jurisdiction, defendant argues that, while the Court retained jurisdiction pursuant to its January 20, 2009 order to determine attorneys' fees, it did so only if the motion for fees was timely filed pursuant to Rule 54(d)(2)(B)(i). Defendant claims that the Court did not, in fact, retain jurisdiction to enforce the agreement of settlement itself and that, unless plaintiffs can allege an independent basis for jurisdiction or establish that Rule 54(d)(2) has been complied with, the current requests for fees must be dismissed. (Rec. docs.

421, 449). Defendant contends that, in order for the Court to retain jurisdiction to enforce settlement, the Court must clearly indicate its intention to do so by incorporating a reference to the settlement in its dismissal order. Kokkenen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 114 S.Ct. 1673 (1994); Hospitality House, Inc. v. Gilbert, 298 F.3d 424, 430 (5th Cir. 2002). Defendant argues that such intention was not set forth in the order of dismissal.

The Court disagrees that jurisdiction to address the issue of fees was not expressly retained in the dismissal order executed on January 20, 2009. That document specifically provides, in pertinent part, as follows:

> IT IS ORDERED that Plaintiffs' claims are dismissed with prejudice, including claims for legal costs, with the exception of Plaintiff's (sic) Attorney Fee Claims, which claims shall be determined by the Court in accordance with applicable law, **as set forth in Paragraphs 1 and 5 of the Confidential Settlement Agreement between the parties**, subject to all appeal rights of all parties, as agreed to by the parties in the Confidential Settlement Agreement.
>
> (Rec. doc. 411)(emphasis added).

A settlement agreement is a contract that, when incorporated into an order or judgment of dismissal, becomes a court decree. White Farm Equip. Co. V. Kupcho, 792 F.2d 526, 529 (5th Cir. 1986). If a court has retained jurisdiction over a settled lawsuit, it possesses the inherent power to enforce the agreements entered into

in settlement of the matter.  <u>Kokkenen</u>, 511 U.S. at 381-82, 114 S.Ct. at 1677.

Where the substantive rights and liabilities of the parties derive from federal law, the enforceability or validity of a settlement agreement is determined by federal law.  <u>Mid-South Towing Co. v. Har-Win, Inc.</u>, 733 F.2d 386, 389 (5th Cir. 1984).  In this case, the parties' rights and liabilities clearly arose from various federal statutes.  Federal law thus governs the enforceability of the settlement agreement in question.  Under federal law, settlement agreements and compromises are contracts.  <u>Guidry v. Haliburton Geographical Services, Inc.</u>, 976 F.2d 938, 940 (5th Cir. 1992).  A binding agreement exists where there is a manifestation of mutual assent which ordinarily takes the form of an offer and acceptance.  <u>Turner Marine Fleeting, Inc. V. Quality Fab and Mechanical, Inc.</u>, 2002 WL 31819199 at *4 (E.D. La. Dec. 13, 2002).  Here, settlement documents were executed by the parties and there was a valid contract of settlement, as a matter of law.  And, as instructed by the Fifth Circuit, the Court has incorporated the portions of the settlement agreement which still required enforcement into the terms of its dismissal order.  Accordingly, the Court retained jurisdiction to deal with the issue at hand.

Furthermore, in the joint motion for partial dismissal presented to the Court by all counsel, which resulted in the

execution of the aforementioned order of dismissal, all parties agreed that the Court would retain jurisdiction as evidenced by the following language:

> [t]he parties respectfully request that the Court dismiss with prejudice all of Plaintiffs' claims in this action, including claims for legal costs, with the exception of Plaintiffs' Attorney Fee Claims, as set forth in Paragraphs 1 and 5 of the Confidential Settlement Agreement between the parties, subject to all rights of appeal for all parties. In exchange for Plaintiffs' agreement to dismiss their claims in this action with prejudice, **the Hornets have agreed to pay Plaintiffs' reasonable attorneys' fees to be determined by this Court in accordance with applicable law, as set forth in Paragraphs 1 and 5 of the Confidential Settlement Agreement between the parties.** Plaintiffs may be considered a prevailing party for that limited purpose only and without any admission of liability by the Hornets and subject to the Hornets' right to contest and oppose the amount and reasonableness of any attorneys' fees awarded. **The parties intend and request that this Court retain jurisdiction for the limited purpose of that determination subject to all appeal rights for all parties.**

> (Rec. doc. 410)(emphasis added).

Additionally, since the dismissal order signed by the Court was attached to the foregoing motion, thereby indicating that it was drafted by counsel, it is obvious that the order should be interpreted *in pari materia* with the joint motion, itself, which clearly requests that the Court maintain jurisdiction to determine attorneys fees according to the terms set forth in the confidential settlement agreement which the order specifically references.

The Court feels constrained to point out that this matter could not have settled were it not for the fact that attorneys' fees were segregated from the amounts to be tendered to the plaintiffs themselves. The claims of the individual plaintiffs were, in some instances, meager in comparison with the time expended by counsel in bringing those claims to fruition. Because of the amount of fees which plaintiffs' counsel were seeking, it became impossible to settle the case on any other basis than allowing the Court to adjudicate counsel's fees. And, indeed, settlement would never have been consummated but for the bifurcation of the value of plaintiffs' individual losses from the amount of the fees incurred.

Lastly, addressing the issue of whether Rule 54(d)(2) was complied with, the Court notes that plaintiffs' counsel argue that the Rule is inapplicable to the present situation since the Court is basically enforcing the settlement agreement rather than simply assessing fees as provided for by statute. The Court agrees that it is the enforcement of the settlement agreement, rather than a statutory adjudication of fees, which is at issue. Nevertheless, the Court is constrained to note that, even if the Court were adjudicating statutory fees, a party is not automatically disqualified from pursuing fees when the exact letter of Rule 54(d)(2) is not met. The Rule is not meant to be a preemptory

statute that deprives someone of his or her claim for fees. There is jurisprudence recognizing that claims filed past the fourteen-day period prescribed by Rule 54(d)(2)(B)(i) are, nevertheless, viable. <u>Romaguera v. Gegenheimer</u>, 162 F.3d 893, 895 (5th Cir. 1998), <u>clarified</u> <u>on</u> <u>denial</u> <u>of</u> <u>reh'g</u>, 169 F.3d 223 (5th Cir. 1999). Here, as in <u>Romaguera</u>, the defendant was well aware that plaintiffs were seeking attorneys' fees. The Court's dismissal order recognizes that fact. To deprive plaintiffs of the opportunity to collect fees would gut a settlement agreement reached between the parties and render meaningless the *quid pro quo* that the parties agreed upon.

The Court will not sanction a reading of the parties' agreement in the manner suggested by defendant. In fact, the Court finds it totally disingenuous that defendant currently makes this argument. Plaintiffs have sought sanctions in connection with having to defend this motion and the Court herewith grants that request. To the extent that plaintiffs' counsel have incurred attorneys' fees in connection with defending against the motion to dismiss which have not otherwise formed a portion of the pending request for fees, plaintiffs are instructed to file an itemized fee statement for time expended in connection with defending the motion to dismiss within thirty days. Defendants may respond thereto within fourteen days thereafter. The Court will then assess fees

without further oral argument.

In addition, the Court currently has before it the motion for attorneys' fees filed by DFK, wherein counsel seek a lodestar payment of $ 829,827.25 with a further upward adjustment $80,554.00 as sanctions. The latter amount represents 25% of the $322,216.00 in fees incurred in connection with allegations of discovery abuse engaged in by the Hornets. The fee petition of NBF additionally seeks fees totaling $ 431,206.00 for 1,649.8 hours of work performed[1] together with an upward adjustment of 20% for services rendered herein. Itemized billing statements have been supplied by both firms.

The parties were given the opportunity to engage in discovery prior to submitting this matter. All parties determined that the Court could decide this matter based upon the billing statements, affidavits and memoranda filed by all sides.

Initially, the Hornets oppose the request for fees by plaintiffs' counsel, arguing that the amount sought "shocks the conscience" and that, therefore, all fees should be denied. Citing Scham v. District Courts Trying Criminal Cases, 148 F.3d 554 (5th

---

[1] / The itemized bills submitted by NBF do not contain a summary sheet. However, in the affidavit of Bridget Duxworth, the office manager of NBF, attached as Exhibit 4, paragraph 5 to Rec. Doc. 480, the outstanding fees of NBF are stated to total $431,206.00 and the hours in question are stated to be 1,649.8 for handling the Hornets litigation.

Cir. 1998), the Hornets argue that the fees sought are unreasonable because counsel are requesting fees that are nearly 2.5 times the total amount of the settlement reached herein, that the hourly rates sought by counsel are not in line with those charged by other employment law specialists in this area and that the fees are grossly disproportionate to the degree of success which plaintiffs' counsel achieved.

The Court declines to adopt the Hornets' argument in this regard. As all parties are aware, settlement of this matter was bifurcated, so to speak, leaving the issue of adjudication of fees to the Court. The matter would not have settled and plaintiffs would not currently have funds in their hands had this methodology not been employed. Counsel always asserted a significant claim for fees, which accounts for why the settlement demands which included fees were initially so high. A significant amount of work was performed by counsel to achieve the settlement of plaintiffs' claims and, to say the least, it would be patently unjust to preclude counsel from being reasonably compensated for their time and effort.

Alternatively, the Hornets have argued that the fee claims should be substantially reduced, if not completely rejected, for the following reasons:

1.   plaintiffs have failed to properly detail their time

records;

2. plaintiffs have failed to prove the reasonableness of their claimed hourly rates and the hours they claim to have expended;

3. plaintiffs' counsel claim unreasonable fees for work which is a) duplicative; b) excessive in light of the case overall and tasks performed; c) unnecessary; d) for transition time and inefficiency due to plaintiffs changing law firms/counsel; e) unsupported by any adequate description of time expended; f) recorded in blocks of time reflecting various other tasks; g) non-chargeable or more appropriately performed by lower-billing professionals and h) unsupported by or in conflict with other time entries or record evidence;

4. plaintiffs have failed to carry their burden to justify an enhancement of the lodestar for any fees claimed or awarded.

Defendant suggests that, should the Court be inclined to award any fees, the maximum amount adjudicated should be 25% of plaintiffs collective recovery for their claims or $150,000.00.

The Court has no intention of adjudicating fees based upon a percentage of the recovered amount. This is not a "common fund" case. As noted by plaintiffs' counsel, the Supreme Court has rejected a percentage-based limitation under a fee-shifting statute such as the FSLA. <u>Blanchard v. Bergeron</u>, 489 U.S. 87, 109 S.Ct. 939 (1989). The reasons for so doing are that:

1. the goal of such fee-shifting provisions are to ensure "effective access to the judicial process" for persons who might otherwise have difficulty obtaining counsel for what might be relatively small damage awards; and

2. legislative history states that in computing the fee,

11

> counsel for prevailing parties should be paid, as is
> traditional with attorneys compensated by a fee-paying client,
> "for all time reasonably expended on a matter."

> <u>Id</u>. at 91, 95.

To adjudicate fees based upon a percentage of actual recovery in a case such as this one simply encourages a defendant to engage in obstructionist tactics, causing plaintiff's counsel to expend time in excess of what would ordinarily be compensable. The effect of this is to dilute the representation which plaintiffs, themselves, receive and to gut the purpose of the underlying remedial legislation and fee-shifting statute. The Fifth Circuit has emphasized the underlying purpose of such fee-shifting statutes as follows:

> to enable litigants to obtain competent counsel worthy of a
> contest with the caliber of counsel available to their
> opposition and to fairly place the economical burden of ...
> litigation. Adequate compensation is necessary, however, to
> enable an attorney to serve his client effectively and to
> preserve the integrity and independence of the profession.

> <u>Johnson v. Georgia
> Highway Exp., Inc.</u>, 488
> F.2d 714, 719-20 (5th Cir.
> 1974).

Pursuant to the confidential settlement agreement between the parties, the Court was vested with the discretion to award reasonable attorneys' fees to plaintiffs as prevailing parties. It is well-settled that the party seeking attorneys' fees bears the burden of proving the reasonableness of his requested fee award.

Counsel may not be compensated for time that is excessive, duplicative or inadequately documented. <u>Scham</u>, 148 F.3d at 558.

The law is well-settled that the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939 (1983). This exercise provides a lodestar figure. <u>Fender v. Zapata Partnership, Ltd.</u>, 12 F.3d 480, 487 (5th Cir.), <u>cert</u>. <u>denied</u>, 511 U.S. 1143, 114 S.Ct. 2165 (1994). The party requesting fees must submit sufficient evidence supporting the hours worked and rates claimed, and where such evidence is lacking or inadequate the Court should reduce or deny the award. Likewise, the Court should exclude from the lodestar calculation any hours that were not "reasonably expended." In this vein, counsel seeking fees is required to exercise billing judgment to "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary" because hours not properly billed to one's client are not properly billed to one's adversary. <u>Hensley</u>, 461 U.S. at 433-34, 103 S.Ct. at 1939-40.

The Supreme Court has emphasized that the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. <u>Farrar v. Hobby</u>, 506 U.S. 103, 114, 113 S.Ct. 566, 574 (1992). Special circumstances justifying the denial or

steep reduction of a prevailing plaintiff's fee request exist where the fee application reflects "(1) no 'good faith' effort to exclude excessive, redundant, or otherwise unnecessary hours, (2) no reduction for time spent on unsuccessful claims, and (3) no allowance for the limited 'degree of success' achieved by the plaintiff." Domegan v. Ponte, 972 F.2d 401, 419 (1st Cir. 1992), vacated and remanded on other grounds, 507 U.S. 956, 113 S.Ct. 1378 (1993).

Even if counsel establish "reasonable" hours and a "reasonable" hourly rate, the product of those two figures does not end the inquiry. Other considerations may lead the court to adjust the fee upward or downward. Such factors include whether the party was unsuccessful on some of his claims and whether he achieved a level of success sufficient to justify the lodestar calculation. A court may also consider the twelve factors enumerated in Johnson, supra, to the extent they are not duplicative of or subsumed in the lodestar calculation. Hensley, 460 U.S. at 434. The Johnson factors include the time and labor required; the novelty and difficulty of the questions presented; the skill required to perform the legal service properly; the preclusion of other employment by the attorneys due to acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount

of time involved and the results obtained; the experience, reputation and ability of the attorneys; the undesirability of the case; the nature and length of the professional relationship with the clients; and awards in similar cases.  <u>Johnson</u>, 488 F.2d at 717-19.

Initially, defendant contends that plaintiffs' fees should be negated in the entirety because they did not achieve "complete success" in this litigation and because the amount sought constitutes a "prohibited opening gambit in negotiations to reach an ultimate result."  In support of this position, defendant argues that plaintiffs have made excessive settlement demands throughout the litigation and have grossly overvalued their clients' claims from the onset.  Ultimately, the fees currently sought exceed the amount of the actual settlement obtained by 2.5 times, which defendant characterizes as unreasonable and evidence of bad faith.

The Court notes that, while defendant complains that plaintiffs have made excessive settlement demands at various times in this case, it is equally valid to argue that defendant has been excessively low in settlement negotiations.  The Court, therefore, will not consider this argument for purposes of determining fees. Indeed, at any given time defendant could have tendered an offer of judgment to plaintiffs under Rule 68 yet this was not done.

Defendant argues that the Court should focus primarily on the

degree of success that counsel obtained which, it is argued, was limited. While admitting that plaintiffs obtained partial summary judgment on the two exemption defenses which defendant proffered as to the FLSA overtime claims, defendant claims that the predominant claim asserted in the litigation was the FLSA mis-classification claim which would have entitled plaintiffs to overtime. On this issue, defendant notes that plaintiffs had the burden of demonstrating that they worked in excess of 40 hours each week, the number of overtime hours worked and the method of computing overtime, i.e., whether on a time-and-a-half basis or on a fluctuating workweek basis.

Plaintiffs were forced by defendant to litigate, via summary judgment, the two asserted defenses raised by the Hornets, i.e., the amusement and recreational exemption and the retail sales exemption. Once the applicability of these defenses was decided by the Court in plaintiffs' favor, the litigation was in a posture for settlement to be considered and to be reached. Whether there were other issues which plaintiffs would have had to prove at trial does not eliminate the fact that winning on these points constituted a high degree of success in this litigation and set the stage for ultimate settlement of the claims. As the Court understands it, some teams in the NBA followed the Hornets' approach in calculating overtime while others did not. A final judgment in this case,

recognizing the inapplicability of the Hornets two major defenses, would have had an impact both on the Hornets and other teams in the NBA. Settlement of these claims, which precluded a final court opinion with precedential impact, constitutes significant success on plaintiffs' part, particularly when one also takes into account that a change in the way the Hornets now calculate overtime was also achieved.

Suffice it to say, the Court disagrees with defendant's argument that plaintiffs failed to achieve significant success herein and certainly disagrees with the characterization of plaintiffs' conduct as "outrageous" and "inexcusable" and therefore subject to rejection of all fees. <u>Lewis v. Kendrick</u>, 944 F.2d 949 (1st Cir. 1991). In <u>Lewis</u>, plaintiff received only $1,000 in damages for a claim of wrongful arrest. Thereafter, $300,000 in attorneys' fees were sought. That case is hardly comparable with the scope and issues in the present litigation. Furthermore, the Court notes that, even if the fees sought by plaintiffs are for work which is excludable or reducible for some reason, the defendant does not, for the most part, contend that the work was not performed. This case was handled with significant acrimony, in large part due to defendant's conduct, and the Court will not punish plaintiffs' counsel for vigorously representing their

clients.[2]/  Furthermore, the "outrageous" and "inexcusable" conduct attributable to plaintiffs' counsel referenced above has not been outlined with particularity and the Court can only assume that counsel refers to the breadth of the fee petition itself as opposed to any other behavior that plaintiffs' counsel may have engaged in. The Court considers it disingenuous for defendant to characterize plaintiffs' counsel as having engaged in any type of "outrageous, "inexcusable" or "unprofessional" conduct in this litigation and is more than somewhat dismayed that these adjectives have been interjected into defendant's opposition to fees.

Accordingly, the Court will proceed to the remainder of defendant's arguments in sequence:

     1.    PLAINTIFFS FAILED TO PROVIDE CONTEMPORANEOUS TIME
          RECORDS AND TO OTHERWISE ESTABLISH THE
          REASONABLENESS OF THE HOURS CLAIMED.

The Hornets argue that plaintiffs have failed to comply with Local Rule 54.2 which provides, in pertinent part, as follows:

> [i]n all cases where attorney's fees are
> sought, the party desiring to be awarded such
> fees shall submit to the court a
> contemporaneous time report reflecting the
> date, time involved, and nature of the
> services performed.  The report shall be in
> both narrative and statistical form and
> provide hours spent and justification thereof.

---

[2]/ The affidavits of Messrs. Niles and Knight, attached to rec. doc. 476, set forth relevant facts pertaining to the problems in this case which the Court finds to be an accurate recitation.

18

Specifically, the Hornets argue that the only time records provided by NBF are invoices that bear no indication that they were sent to their clients on a monthly basis or at any other regular intervals. (Rec. doc. 427). Nor, it is argued, do the invoices reflect or indicate in any way that the time entries are contemporaneous with the work they purportedly represent, such as could be shown from dated invoices and/or dated cover letters transmitting the invoices to clients at monthly or other timely intervals.

The Court notes that the parties were given an opportunity to engage in traditional discovery in order to question the time entries, work performed and hourly charges attendant to the application for fees. Defendant advised that a period of discovery and an evidentiary hearing on these issues was unnecessary. Any questions which defendant might have had concerning billing by NBF could have been answered or developed through utilizing discovery. Having failed to avail itself of that opportunity defendant's objections to the form of the invoices, whether they were contemporaneous or not and whether they were sent on a monthly basis, simply become non-issues.

In addition, via reply memoranda filed on July 27, 2009, Mr. Niles has attached an affidavit to his submission stating among other things as follows:

> 1. prior to his employment as managing partner with

NBF (Niles, Bourque & Fontana), he was employed as a senior partner at the law firm of Jones Walker [current counsel for the Hornets.]

2.  pursuant to his employment at Jones Walker, he has personal knowledge of and is familiar with the billing practices, protocols and policies of Jones Walker.

3.  based on his personal knowledge of the billing practices employed by Jones Walker and NBF, he affirms that all plaintiff counsel exercised appropriate billing judgment and complied with all billing practices, requirements, policies, and protocols employed by Jones Walker and NBF.

4.  to assist NBF in tracking, logging, billing, and collecting NBF's outstanding professional fees and tracking, logging, billing, and collecting costs incurred by NBF in the representation of all clients, and to ensure that NBF complies with all of its legal and professional responsibilities, all NBF attorneys **contemporaneously log all professional time** devoted to any NBF matter into NBF's Amicus Attorney software program pursuant to ethical standards.

5.  at NBF, Amicus Attorney is intergraded with PC Law, an accounting software system, which allows NBF attorneys to contemporaneously log, post, and track all professional time expended on any NBF matter.

6.  he has reviewed the accounting ledgers submitted to the Court and affirms that they are an accurate representation of the minimum time he devoted to the Hornets litigation and that he devoted significant additional time to the litigation for which recovery has not been sought.

> (Rec. doc. 476, ex. 1, pp. 26-27)(emphasis added).

Affidavits from Messrs. Buras and Knight who performed work on this

litigation while employed with NBF were also attached to said submission as was the affidavit of Bridget Duxworth, the office manager at NBF, which confirm the information provided by Mr. Niles and address time logged by others working on the case.

The Court finds that the information presented by NBF establishes the existence of contemporaneous times records sufficient to satisfy the requirements of Local Rule 54.2. Furthermore, there is nothing in the Local Rule to require that a client be billed on a monthly basis during the pendency of litigation. Indeed, many such litigations are handled on a contingency fee basis and monthly billing clearly is not contemplated under such circumstances. Lastly, the affidavit of Bridget Duxworth, NBF's office manager, confirms that

1. pursuant to NBF's Tort Employment Contracts with plaintiffs, NBF had the option of billing The Hornets Litigation as either contingency fee or hourly rate files.

2. to minimize the economic impact on plaintiffs, NBF agreed to carry all costs and attorneys' fees during the pendency of the Hornets Litigation, with no plaintiff bearing any out-of-pocket expense for NBF's costs and/or fees.

3. since NBF agreed to carry all cost and attorneys' fees, The Hornets Litigation was classified as a contingency fee file and was not billed to the clients on a regular basis.

4. NBF was not required to, nor did NBF submit regular bills to its clients since NBF had agreed that none of its clients would pay any sums on this matter

until final resolution.

(Rec. doc. 476, ex. 4).

As to the submission by DFK, defendant complains that the time records consist of a single Microsoft Excel spreadsheet purportedly created from invoices that DFK did not provide to the Court. (Rec. doc. 417). Defendant argues that DFK claims to have taken data from its timekeeping system and placed it into a spreadsheet and then manipulated the data into a different, categorical format. Defendant further takes issue with the fact that invoices were not transmitted to plaintiffs contemporaneously or otherwise and that original invoices were not produced to the Court. Again an argument is made that Local Rule 54.2 has not been complied with.

As noted hereinabove, defendant had an opportunity to engage in discovery to flesh out any such issues as are being argued here. They chose not to. Mr. Buras has filed an affidavit annexed to a memorandum dated July 27, 2009 which attests that, while at DFK, he employed the same time tracking methods as he did while at Jones Walker and that each of his submitted times entries describe actions that were, in fact, taken. (Rec. doc. 476, ex. 2).

The Court is satisfied that the requirements of Local Rule 54.2 have been met by all plaintiffs' counsel. The Court does not either need or want individual time sheets or electronic data entries that counsel generate in billing their files. An

opportunity was given to defense counsel to view those data and counsel opted not to do so. Therefore, the Court declines to give further consideration to this argument. Submission of itemized time records, coupled with counsel's affidavits that the work was performed, is certainly a _prima_ _facie_ showing that the work and hours referenced in the fee petitions are accurate.

2. PLAINTIFFS FAILED TO PROVE REASONABLE HOURS OR THE EXERCISE OF BILLING JUDGMENT TO APPROPRIATELY REDUCE THEIR UNREASONABLE HOURS.

Defendant argues that all time that is excessive, duplicative or inadequately documented must be excluded from an award of attorneys' fees, a maxim with which the Court can easily agree. Further, attorneys must exercise "billing judgment" by writing off unproductive, excessive or redundant hours when seeking fee awards, a further maxim which is in accord with jurisprudence.

Initially, defendant argues that DFK has been inconsistent and/or so sparing in its exercise of billing judgment as to make the effort nearly meaningless. The Court notes that the fee petition of DFK reveals that $ 132,350.25 worth of time was written off before the current petition was submitted, either through a reduction of hours or a reduction of rate. This is not an insignificant reduction.

As to NBF, defendant claims that no effort has been made to exercise billing judgment. How defendant has come to this

conclusion is not readily apparent to the Court. And, indeed, NBF has billed significantly fewer hours than has Jones Walker as will be discussed hereinafter. Mr. Niles has furnished the Court with his affidavit which states that "[b]ased on [his] personal knowledge of the billing practices employed by Jones Walker, NBF, and DFK, [he] affirms that all plaintiff counsels exercised appropriate billing judgment and complied with all billing practices, requirements, policies and protocols employed by Jones Walker, NBF, and/or DFK." (Rec. doc. 476, ex. 1, p. 26). The Court notes that defendant has repeatedly stated that "the time records provided are overwhelming and make it impossible to ascertain and identify every single defect in the fees claimed." Therefore, as it is not obvious that billing judgment has not been exercised by NBF, the Court disregards further consideration of this argument.

Defendant acknowledges that the Court charged the Hornets with identifying on a line-item by line-item basis every time entry with which the Hornets took exception. (Rec. doc. 435, p. 2). For, if it is impossible for counsel who are most familiar with the litigation to suggest what is improperly charged time and why that is, in fact, the case, the Court is in no better position to second-guess what counsel are seeking in fees.

Accordingly, the Hornets have identified nine categories with which exception is taken, although as noted above the Hornets still

argue that "it is impossible to ascertain and identify every single defect in the fees claimed" because the "time records provided are overwhelming." And, as the Court understands defendant's position, "the overwhelming majority of plaintiffs' attorneys' time entries are so defective that they must be rejected entirely."

Before examining all of the categories of time entries which defendant has identified, the Court notes that this is exactly the position the Court had hoped to avoid being placed in. The use of a period of discovery, coupled with the use of expert testimony, would have solved a large part of these issues. But defense counsel falls back on taking "pot shots" at time billed without providing a logical basis for taking that position. For this reason, the Court ordered the Hornets' counsel to furnish, for in camera inspection, their bills presented to the Hornets for payment during the defense of the case. As the Hornets have argued that the case was overstaffed and that the bills rendered were insufficiently descriptive or duplicative, similar information pertaining to Jones Walker's billing becomes relevant, as does the hourly rate of defense counsel.

The Court additionally notes defendant's argument that quantification of attorneys' fees should not result in a satellite litigation, therefore suggesting that discovery was not utilized because tangential litigation would be the end result. However,

when two separate law firms seek total fees in excess of one million dollars and when one has to complain that the "time records provided are overwhelming", it is unproductive to the Court and to defendant's position not to have obtained, through discovery, answers as to the necessity for why activity was billed. Particularly is this the case when defense counsel's own fees are quite substantial. As noted earlier, it is counsel who are most familiar with this litigation. And it is for counsel resisting the award of fees to make it clear why time expended is unreasonable where, as here, plaintiffs' counsel have proven a <u>prima facie</u> case that fees were incurred and that they were necessary. It is surely less than helpful to identify, as defendant has without further explanation, time items which defendant believes should be excluded with no further explanation of why that is the case. Discovery would have provided those answers.

The first category which the Hornets have identified is alleged duplicative and/or excessive time expended by plaintiffs' counsel. However, only limited examples of same are commented upon in defendant's memorandum and are as follows:

1. a total of 175 hours was spent drafting, revising and communicating about the corporate deposition notice of the Hornets.[3] It is argued that it is

---

[3] The Hornets fail to reference for the Court which specific line items are objectionable, noting only that they appear

objectively unreasonable for counsel to claim they spent more time drafting a deposition notice for a single corporate deposition in a wage and hour case than they should have spent actually taking the deposition itself.

2. plaintiffs' counsel claim to have spent 144 hours preparing repetitive subpoenas seeking only a few categories of information from each NBA basketball team and 23.5 hours researching the names of the NBA teams to serve the subpoenas.[4] As the Court held these subpoenas in abeyance and, because plaintiffs never used any of the information provided by any of the teams, defendant should not be charged for this time.

3. as many as five attorneys appeared on behalf of the plaintiffs for court status conferences and hearings.[5]

4. plaintiffs hired no less than 13 lawyers[6] and four

---

somewhere in pp. 19-78 of rec. doc. 417, ex. 1. As the Court cannot divine what counsel references and, therefore, has no basis to verify the accuracy of the underlying facts, no further consideration will be given to this argument.

[4] The Hornets fail to reference for the Court which specific line items are objectionable, noting only that they appear somewhere in pp. 34-54 of rec. doc. 417, ex. 1. While the Court is not satisfied that its order to identify objectionable fee entries has been complied with, DFK has offered further information pertinent hereto in its opposition which answers most reasonable objections to these items, as noted hereinafter.

[5] NBF has stated that generally one attorney appeared at Court hearings while defendant usually had two. Further, since multiple firms were involved as different firms represented different clients, each had a right to have counsel present to represent their individual clients at all proceedings.

[6] Staffing by defendant will be discussed in detail hereinafter. However, at least this many attorneys were working on the case at various times at Jones Walker.

law firms to represent them over the course of the litigation. Defendant argues that, while Mr. Buras has been lead counsel for the course of the litigation, he logged a total of 1,633.45 hours during his tenure at DFK. Yet Ms. Cassard, also at DFK, logged 1,661.70 hours, even though she did not attend any depositions and other counsel primarily handled Court hearings and conferences. In toto, Mr. Buras and Ms. Cassard logged over 3,000 hours on the case which defendant argues is excessive.

5.    DFK seeks $75,000 in fees related to discovery matters then seeks an additional $322,000 in fees related to alleged "discovery abuses". In light of the fact that there was only one finding of a discovery violation, i.e., that financial records were not produced as ordered, such sums are unreasonable. Further, defendant argues that only a handful of the documents which plaintiffs obtained were used in support of their motion for summary judgment. Accordingly, the Hornets argue that plaintiffs have grossly exaggerated their discovery efforts and that any fees based on same are a windfall and unreasonable.

6.    multiple attorneys appeared at depositions and hearings, worked pleadings, did document review and took part in strategy sessions and inter-communicating. The switching of law firms in mid-stream contributed to further hours being expended.

Specific line items with which defendant takes issue as examples of duplicative and/or excessive work are as follows, together with plaintiffs' rejoinder:

a)    Mr. Buras communicating with Mr. Kansas regarding his withdrawal from the case (Rec. doc. 417, ex. 1, p. 3, line item 5).

In response, it is stated that Mr. Kansas was transferring his client to Mr. Buras and that the time was necessary.

> b)   Ms. Cassard's conference with Mr. Centola regarding
>       "status". (Rec. doc. 417, ex. 1, p. 3, line item
>       82).

In response, it is argued that the fourth amended complaint had

recently been filed; there were outstanding notices to putative

plaintiffs and ongoing discussions with potential new plaintiffs;

and Mr. Buras' mobilization was imminent.  Therefore, discussion of

the case was reasonable and prudent.

> c)   Ms. Cassard's communication with unidentified "co-
>       counsel" regarding an unidentified potential
>       plaintiff. (Rec. doc. 417, ex. 1, p. 7, line item
>       121).

In response, plaintiffs argue that the Hornets do not explain what

is duplicative or excessive about facially reasonable collaborative

communications with co-counsel regarding a potential plaintiff, her

information and the events and implications of her decision not to

join the suit.

> d)   a DFK paralegal's review of correspondence from Ms.
>       Cassard to a plaintiff. (Rec. doc. 417, ex. 1, p.
>       9, line item 151, 178, 187).

In response, plaintiffs argue that the line item entry which is

cited is inaccurate and further that over 50% of all paralegal time

originally billed by DFK was cut in the exercise of reasonable

billing discretion before the petition was filed.  Additionally,

DFK paralegals performed many functions in this litigation and

copying them on communications was crucial to their ability to act

efficiently.

> e)   Mr. Buras' review of a letter from an unspecified attorney or paralegal to a plaintiff regarding documents. (No reference provided).

As no reference was provided, neither plaintiffs nor the Court can comment further on this objection and it will not be considered.

> f)   a DFK paralegal's review of correspondence from "E Cassard/K Buckel" regarding withdrawal from the case. (No reference provided).

As no reference is provided, neither plaintiffs nor the Court can comment further on this objection and it will not be considered.

> g)   Ms. Cassard's and Mr. Buras' separate and multiple reviews of discovery responses. (Rec. doc. 417, ex. 1, pp. 27-28, lines 456, 466, 471, 473).

In response, plaintiffs argue that the four reviews span a period of six months and involve DFK's review of the Hornets' inadequate discovery responses served on 12/14/05 (line item 456); 1/26/06 (line item 466, state court); 4/05/06 (line item 471, state court); and Ms. Cassard's 5/23/06 consideration of the Hornets' continued non-production despite the 3/31/06 protective order, leading up to the 6/08/07 meeting with the Hornets' counsel (line item 473). Time expended was necessitated by the Hornets' inertia on discovery matters.

> h)   Ms. Cassard's and Mr. Daigle's preparing for and attending a meeting with Mr. Niles regarding discovery matters. (Rec. doc. 417, ex. 1, p. 28, lines 482 and 483).

In response, plaintiffs state that the meeting addressed notices to potential class members, the length of the notice period and the Hornet's purportedly filing a motion for summary judgment. The meeting was precipitated by the Hornets continuing non-responsiveness to discovery requests. Since DFK and NBF represented different clients, it was reasonable for counsel from both firms to consult before DFK met with counsel for the Hornets on issues which affected all plaintiffs.

i)   Mr. Knight's communications with Ms. Cassard and Mr. Buras regarding "strategy" for deposition, supplementation of discovery. (Rec. doc. 427, ex. A,7/23/07).

j)   Mr. Niles' strategy session and communications with Mr. Knight and Mr. Buras. (Rec. doc. 427, ex. A, 7/24/07).

k)   Mr. Knight's email/phone call about unspecified matters with Ms. Cassard and Mr. Buras. (Rec. doc. 427, ex. A, 8/13/07).

l)   Mr. Knight's communications with Mr. Buras about revisions to the "reply brief". (Rec. doc. 427, ex. A, 8/1/07).

m)   Mr. Knight's phone call with Mr. Buras about corporate deposition. (Rec. doc. 427, ex. A, 8/15/07).

n)   Mr. Knight's phone calls with Ms. Cassard and Mr. Buras to get update on depositions. (Rec. doc. 427, ex. A, 9/7/07) and

o)   Mr. Knight's and Mr. Nile's conferences with Mr. Buras regarding motion strategy. (No reference provided).

In response, NBF has noted that, in <u>Feinberg v. Hibernia Corp.</u>, 966 F. Supp. 442, 448 (E.D. La. 1997), the Court found that "sound-boarding" among counsel is valuable to effective litigation. The question, therefore, is whether the conferences are excessive. Here, it is argued, such inter-firm consultation allowed NBF and DFK to share resources and divide labor, greatly reducing the professional time expended by plaintiffs' counsel.

Although not in any way commenting further in its memorandum, defendant also takes issue with time entries listed on exhibit 3 as being duplicative or excessive. No reason is given as to why this time is duplicative or excessive; nor is the Court told what other time entries to reference in support of any duplication. No suggestion is made as to how much it should be cut.

Lastly, on this issue defendant argues that one law firm was more than adequate to represent the plaintiffs' interest and that the hiring of multiple attorneys caused duplication of effort and excessive expenditures of time. The Court notes, initially, that this argument is not on point under the circumstances.

As defendant knows, Mr. Buras was lead counsel for all plaintiffs during the time that he was affiliated with NBF. When he departed from there and affiliated with DFK, most of the clients went with him but at least one remained with NBF, thereby necessitating that firm's continued involvement in this litigation.

Each plaintiff surely had the right to utilize the attorney of his or her choice. In fact, each of the individual plaintiffs could rightly have employed a different law firm at any stage of these proceedings, resulting in some ten or twelve firms being involved. Had this occurred, it would have no bearing on the fees which the attorneys incurred in representing their clients. Accordingly, the fact that two firms were incurring fees at the same time is of no moment in determining the fees owed to plaintiffs' counsel.

As noted above, the Court does not intend to further address the argument pertaining to the deposition notice because the line entries for fees billed have not been identified.

As to the argument pertaining to the subpoenas, DFK advises that same were not idle, repetitive requests to multiple NBA teams. The subpoenas were issued in May, 2007 after repeated, unanswered requests for information had been directed to the Hornets. (Rec. doc. 94, 96, ex. 4 & 5). The subpoenas were meant to obtain information which the Hornets had failed to provide and which would have cost significantly less if the Hornets had, in fact, been forthcoming. Indeed, DFK has stated that information from other NBA teams would not have been subpoenaed if the Hornets had answered the discovery requests that sought the basis for defendant's claims as a retail operation and that it did not act willfully or in bad faith. (Rec. docs. 96, 99). Lastly, the Court

did not quash those subpoenas but held them in abeyance pending the Hornets' Rule 30(b)(6) deposition. (Rec. doc. 109).

Plaintiffs further argue that significant information was obtained from those subpoenas as some teams did, in fact, respond to them. Those responding teams indicated that they did not claim the exemptions which the Hornets relied upon in this litigation, a fact which was of significance to plaintiffs' argument in the motion for summary judgment. (Rec. doc. 284-3, ex. C). Additionally, information subpoenaed from the New Orleans Arena rebutted the Hornets' contention that the sales offices were part of the basketball court and that certain services, business activities and receipts were not seasonal. Further information also demonstrated that receipt-related data had not been produced by the Hornets.

As to items 3, 4 and 6 listed above, plaintiffs have responded that the DFK plaintiffs were at all times represented by Mr. Daigle, Mr. Buras and Ms. Cassard, with Mr. Daigle's involvement being one of oversight and strategy which constituted 3.6% of DFK's total time billed. Therefore, the case was not excessively staffed. Furthermore, the reason that Ms. Cassard has significant hours in the case, approximating those of Mr. Buras, is that Mr. Buras, as all associated with the case know, was mobilized into active military duty for over a year during 2006-2007 and from

August, 2008 until some time in 2009. It was she who mainly handled the matter in his absence. Lastly, DFK contends that Ms. Cassard's hours were reduced to below those of Mr. Buras in the fee petition.

As to item 5, plaintiffs have responded that defendant has mischaracterized the discovery disputes and abuses in the case. A discovery violation was found (rec. doc. 221) and monetary sanctions were imposed, indicating abuse. (Rec. doc. 171). Plaintiffs argue that the discovery abuse affected their ability to prove their case and/or disprove the Hornets' defenses. Specifically, it is stated that the Hornets relied on defenses for which they knew they had no evidentiary support and refused to produce back-up data until forced to do so at the end of the case.

The Court does not view counsel's hours as duplicative or excessive and makes no reduction based upon the arguments advanced herein.

Second, defendant argues that time was spent on unnecessary tasks. For example, defendant takes issue with communications with and work related to unidentified "potential plaintiffs" who never joined in the litigation. (Rec. doc. 417, ex. 1, pp. 1,3,4, lines 21, 22, 61, 86). Plaintiffs have countered that each potential plaintiff was also a witness to the conduct of the Hornets and provided information regarding the facts of the case. As a result,

some of these people were included in plaintiffs' witness list. Therefore, time billed in connection with interacting with these people developed the case and was necessary to the proper representation of the named clients.

It is also argued that counsel recorded time for work on claims that were never asserted, such as an alleged FLSA retaliation claim on behalf of Latousha Brown. (Rec. doc. 417, ex. 1, p. 2, line 40). Time logged investigating and preparing for the deposition of former Hornets' executive, Jack Capella, which was not taken is also the subject of objection. (Rec. doc. 417, ex. 1, pp. 18, 21, line items 304, 305, 307, 348).

As to the deposition of Mr. Capella, plaintiffs have countered that he was the Hornets' corporate counsel and later became one of the upper level business executives. Plaintiffs intended to question Mr. Capella regarding the Hornets' misconduct, their knowledge and bad faith, the Hornets' handling of the internal complaint by the then-Human Resources Manager, P. Middleton, regarding the Hornets' FLSA violations and other admissions against interest. According to plaintiffs that deposition ultimately did not go forward when, in connection with another litigation by the Hornets against Mr. Capella, it was suggested that his testimony would subject him to attorney ethics violations. Plaintiffs argue that simply because a particular course of action is ultimately

abandoned or a motion is lost does not mean that the associated fees should be excluded.  <u>White v. Imperial Adjustment Corp.</u>, 2005 WL 1578810 at * 11. (E.D. La. June 28, 2005).

In addition, defendant argues that time entries related to expert witnesses should be discounted, although defendant does not suggest by how much.  For example, plaintiffs withdrew Brian Farrington as an expert shortly before his deposition was to have been taken and never relied on any expert testimony in connection with the motion for partial summary judgment on the Hornets' exemption defenses.  Defendant further argues that plaintiffs' expert CPA, Mr. Theriot, was used to perform overtime calculations that "any literate person with a computer can obtain from the U.S. Department of Labor's online overtime calculator and to perform simple addition with respect to the Hornets' revenues and receipts for the purpose of its defenses."  (Rec. doc. 454, p. 21).

Plaintiffs have countered this argument in that the reports of both Farrington and Theriot were used in connection with the plaintiffs' successful motion for summary judgment.  (Rec. doc. 476, p. 16).  Further, plaintiffs note that the Hornets had engaged their own expert comparable to Farrington and fully expected to use him until he was stricken on plaintiffs' motion.  When the Hornets then objected to the use of Farrington, plaintiffs agreed to withdraw him only in exchange for the Hornets' not supplying a

replacement to their stricken expert. (Id.). As to the objections pertaining to Mr. Theriot, plaintiffs argue, citing the affidavit of Mr. Buras, that he provided detailed advice and opinions on the nature and type of financial documents that were provided and/or not provided, an analysis of the accrual based information that was provided and extensive advice regarding the type of information needed to complete the financial review that was expressly relied upon by the Court in rejecting the financial aspect of the Hornets' defenses. (Id., ex. A, ¶30). As a result, Mr. Theriot was most instrumental in plaintiffs' obtaining summary judgment.

Defendant has also attached exhibit 4 to its memorandum with lists of other times entries viewed as memorializing unnecessarily performed tasks. However, a reason why those tasks were not needed is not provided and no suggestion is made as to how those entries should be reduced. Accordingly, the Court has no basis to give further consideration to same.

Based upon the arguments advanced, the Court does not view counsel's time entries as unnecessary and declines to reduce them based upon this premise.

Third, it is argued that transition time and inefficiencies caused by the changing of law firms should also be deleted, according to defendant. On this point, defendant identifies Mr. Kansas' withdrawal from the case. (Rec. doc. 417, ex. 1, p. 3,

line item 51). Further, the Hornets have also noted as objectionable Ms. Cassard's time for introducing herself to clients and transitioning into the case (rec. doc. 417, ex. 1, p. 4, line 83); Ms. Cassard's time for "handling transition" (rec. doc. 417, ex. 1, p. 28, line item 482); Ms. Cassard's time for transition into the case (rec. doc. 417, ex. 1, p. 28, line item 483). Additionally, Mr. Niles' time negotiating joint representation of clients following Mr. Buras' departure (rec. doc. 427, ex. A, line item 172333); NBF's time for drafting and filing its fee lien following Mr. Buras' departure (rec. doc. 427, ex. A, line item 191713); NBF's e-mails to Ms. Cassard in an effort to clear up why documents she requested took so long to be delivered to her (rec. doc. 427, ex. A, line item 191703); NBF's continued drafting of the fee lien to be filed into this case and locating original signed contracts with all plaintiffs (rec. doc. 427, ex. A, line item 191706) are all disputed.

In response, DFK basically addresses the time pertinent to the transition of Ms. Cassard into the case when Mr. Buras was mobilized for military service. DFK notes that plaintiffs were not to blame for this situation and that this was not a voluntary change of counsel. Rather, it occurred due to forces beyond anyone's control. In addition, counsel further note that there is no basis in law to reduce attorney time expended in meetings

involving all parties and counsel, addressing case handling, procedural agreements and efforts to regroup after repeatedly frustrated efforts to obtain discovery responses.

NBF further argues that no case law is cited by the Hornets for the argument against it. Additionally, NBF opines that, had it not drafted a fee lien, the Hornets would undoubtedly have argued the firm was entitled to no fees as a result of not having timely filed a claim. As has DFK, NBF also reiterates that joint strategy sessions benefitted all claimants in the litigation but were certainly necessary to the proper representation of their own client(s).

On exhibit 5 attached to defendant's memorandum, other entries of transition time are listed which defendant wishes to have gutted. However, no reason for the disallowance is given and plaintiffs' counsel have been unable to respond with specificity to same because no further explanation was provided. Again, no suggestion is made as to how much of this time should be cut.

Transition time is one area where a potential cut is appropriate.

Fourth, defendant argues that there are inadequate descriptions of time that must be removed from the fee petition. In support thereof, defendant cites the Court to various cases where a percentage reduction of fees was sanctioned because of

vague and general descriptions of work performed. <u>See</u> <u>Saizan v.</u> <u>Delta Concrete Products Co., Inc.</u>, 448 F.3d 795 (5th Cir. 2006); <u>White</u>, 2005 WL 1578810 at *16.

Defendant argues that DFK has acknowledged the vagueness of the following entries, all part of rec. doc. 417, ex. 1: p. 11, line item 184; p. 21, line item 358; p. 21, line item 360; p. 26, line item 449. DFK, according to defendant, made deductions because of that vagueness. However, defendant argues that there are equally vague entries for which DFK made no deductions. These include, from rec. doc. 417, ex. 1, the following: line items 112, 57 and 186.

As to NBF, vague entries with which defendant takes issue are as follows:

191395 Receipt and review of e-mails from Elvige Cassard (5/8/07).

188853 HELD-Drafting various pleadings for next week (12/10/07)

191453 HELD-E-mails to and from co-counsel (2/18/08)

191490 HELD-miscellaneous (3/13/08)

191530 HELD-Drafting various motions; strategy with Stewart (4/13/08)

191363 Telephone conference with DB and BK- various (5/16/08)

218968 miscellaneous (7/15/08)

Defendant argues that there is no way the Court can determine the

reasonableness of these entries and that plaintiffs have not carried their burden of proof as to same.

Plaintiffs have countered that they believe their time entries are overly detailed descriptions and that no reductions should be made. They note that they voluntarily eliminated certain time entries but that the remaining ones are sufficiently described for someone to determine that the work performed was reasonable. Plaintiffs further note that time entries need not be so specific as to disclose privileged information or to require excessive preparation time. Where billing records show the date, the number of hours spent and a short but thorough description of the services rendered, such is sufficient for the purposes at hand. <u>Freiler v. Tangipahoa Parish Bd. of Educ.</u>, 185 F.3d 337, 349 (5TH Cir. 1999), <u>cert</u>. <u>denied</u>, 530 U.S. 1251, 120 S.Ct. 2706 (2000).

Exhibit 6 to defendant's memorandum list other examples of inadequate time descriptions. However, the Court again notes that had defendant availed itself of the opportunity for discovery, this issue could have been fleshed out. The Court has no basis to find that this time was not expended and no reason to think it was excessive.

No reduction will be made for inadequate descriptions of time.

Fifth, defendant takes issue with "block-billed time" which, it is argued, lacks the specificity to permit the Court to conduct

the sort of detailed review needed to determine reasonableness and to award fees.  Defendant invites the Court to further engage in a percentage reduction of plaintiffs' fees as a result.  <u>Harris v. Allstate Ins. Co.</u>, 2009 WL 86673 at *3 (E.D. La. Jan. 12, 2009).

Examples of "block-billed time" with which defendant takes exception include, but are not limited to, the following:

> 191458 HELD-Phone call with D. Buras; receipt and review of supplemental report to Court; strategy for ongoing settlement negotiation; mediation versus court assigned settlement conference; review documents produced and working on discovery to the Hornets (2/22/08).

> 188432 HELD-Review of preliminary report; conference to include judicial interest; two conferences with expert regarding completion of report; logistics (4/17/08).

> 191611 Revision of Memorandum in Support of Motion for Summary Judgment; conference with Buras (6/02/08).

> 219065 Lengthy phone call from March Planer Murray; separate phone call from Elvige Cassard; work with Stewart Niles to finalize settlement documents and transmit all to Elvige for approval prior to submission to Jones Walker; receipt and review of Elvige's comments; multiple additional phone calls with Elvige and exchange revisions; phone call with Dan Buras regarding status; further revise documents and forward to Hornets counsel; (10/29/08)
>
> (Rec. doc. 427)

> 391 Prepare for/attend deposition of L Sumler/post deposition discussions regarding damages. (23 of 157)

> 516 Develop information in connection with discovery documents; telephone conference with co-counsel regarding proposed protective orders. (32 of 157).

> 552 Telephone conference with J. Capella; communique to L. Centola; directions regarding subpoenas; related matters (35 of 157).

1118 Prepare for deposition of S Russo; evaluation of claims
and defenses; evaluation of prior declarations; review of
prior 30b6 testimony. (78 of 157).

(Rec. doc. 417)

Defendant invites the Court to remove or drastically reduce all such items.

Plaintiffs have countered that this is not a case where one must parse through successful versus unsuccessful claims. Here, all the claims were successful and all of the tasks in the various entries are compensable. Plaintiffs believe that performance of all of the tasks listed was reasonable and most are the types of entries that are normally included together or cannot be easily segregated.

Further examples of block-billed time are listed on exhibit 7 of defendant's memorandum. That block-billed time is not unlike similar entries on Jones Walker's own bills to the Hornets. Again, no suggestion is made as to how this time should be reduced.

The Court will not consider reduction based upon this argument.

Sixth, defendant identifies time spent on non-chargeable or reduced rate work. Specifically, defendant identifies tasks that should have been billed at the rate for a paralegal or office staff rather than at an attorneys' hourly rate. However, rather than reduce the rate for these items, defendant asks that they be

excluded from the fee request entirely. These include, but are not limited to, the following:

187370 HELD-Transmittal of original and amended complaints (Niles) (4/12/08)

191545 update calendar (Knight)(5/03/08).

191573 confirmation of deposition date for Leslie Sumler and update calendar (Knight) (5/22/08)

218983 Phone call with Lisa at John Perry's office regarding mediation scheduling (Knight) (7/25/08)

(Rec. doc. 427)

1229 Forward P Middleton affidavit to expert (Cassard) (86 of 157)

1551 Run total plaintiff damage spreadsheets with a ll individualized information input to date (Cassard) (108 of 157)

1496 Review of Arena Use Agreement; forward same to co-counsel (Buras) (105 of 157)

(Rec. doc. 417)

While DFK has not specifically addressed the above argument, NBF has responded by stating that the questioned time entries are for tasks necessary for proper file management and to meet pending deadlines.

Further examples by defendant of such time entries are listed on exhibit 6 of the memorandum without further argument. No suggestion is made as to how much said hours should be reduced.

This is an area where some reduction may be appropriate.

Seventh, unsupported time entries within the firm are

contested by the defense. It is contended that, throughout their bills, plaintiffs' counsel charged for items such as "meetings", "strategy sessions" and "conferences" with other attorneys within their firms, but those other counsel with whom they claim to have met do not have corresponding entries in their bills. For example:

> 191600 Strategy session with D. Buras and S. Niles (no corresponding entry for Niles or Buras)(1/17/05)
>
> 188841 Strategy sessions with Niles and Buras (no corresponding entry for Niles)(11/28/07)
>
> 191462 HELD-Strategy with S. Niles regarding settlement; expert retention; discovery scheduling; drafting discovery relative to settlement (no corresponding entry for Niles)(2/27/08)
>
> (Rec. doc. 427)
>
> 188365 HELD-Conferences with Dan Buras and Bryan Knight regarding strategy (no corresponding entry for Knight)(4/10/08)
>
> 191361 Conference with BK regarding plaintiff and 30(b)(6) depositions (no corresponding entry for Knight)(5/12/08).
>
> 1758 lengthy conference with E. Cassard (no corresponding entry for Cassard)(127 of 157)
>
> 1334 lengthy meeting with D. Buras to discuss status of litigation/plan strategy (no corresponding entry for Buras)(92 of 157)
>
> 553 Planning conference with E Cassard regarding Capella deposition, subpoenas for documents and other discovery (no corresponding entry for Cassard)(35 of 157).
>
> (Rec. doc. 417)

As the Court understand the argument, defendant contends that, because counsel with whom the meeting occurred do not corroborate

same through their billing entries, plaintiffs' counsel have not sufficiently documented that this work was performed. Further examples of same are listed on exhibit 9 of defendant's memorandum, without further argument.

Eighth, unsupported time entries between firms should be discounted. This is the same argument as set forth in the seventh area of dispute except that it pertains to interaction with counsel outside of a specific firm rather than a co-employee of the firm with which counsel is associated. The items specifically listed as to this argument are as follows:

> 191660 Telephone conference with H. Daigle and D. Buras and S. Niles regarding status and strategy. (No corresponding entry for Daigle or Buras) (4/20/06)

> 191592 Telephone call with D. Buras to discuss how to proceed with obtaining list of names to whom the notice can be sent. (No corresponding entry for Buras)(11/14/05)

> (Rec. doc. 427)

> 1839 Communicate with counsel for J. Berry regarding court hearings. (No corresponding entry from Niles firm)(133 of 157)

> 1956 Various telephone conferences to S. Niles regarding strategy. (No corresponding entry for Niles)(140 of 157)

> (Rec. doc. 417)

Further examples of same are listed on exhibit 10 of defendant's memorandum without further argument.

As to arguments seven and eight, plaintiffs take umbrage with

the fact that they are being charged with "billing fraud". Instead, counsel state that the fact that a second attorney's file does not corroborate what is in another attorney's time sheets merely reflects that one of the two did not charge for the same activity, a form of billing judgment. Plaintiffs again reiterate the accuracy of their stated time records presented to the Court.

No reduction of time will be considered as to either argument seven or eight. The Court has no reason to believe that counsel have committed billing fraud and, indeed, defendant, in urging what amounts to fraud, would have the responsibility to establish it. Such a burden of proof has not been met.

Ninth, travel time is disputed. Defendant argues that travel time should not be compensable at all. However, failing this, the Hornets seek to have travel time compensated at a lower rate than that for legal work. Again, a percentage reduction pertaining thereto is argued for and it is suggested that the percentage reduction should be at least 50% and possibly as high as 80%. Watkins v. Fordice, 7 F.3d 453 (5th Cir. 1993); Tasby v Wright, 550 F. Supp. 262, 281 (N.D. Tex. 1982).

Examples of such items are noted as follows:

218518 travel to and from Slidell meeting (5/20/05)

213 travel to/from FedEx office for forwarding of check packages to out of town plaintiffs (17 of 157)

(Rec. doc. 454, p. 31).

DFK has reiterated that this time should not be further reduced as they have already voluntarily cut the time by 50% themselves before submitting their fee application to the Court. NBF has noted that only minimal travel time was billed by the firm and that it was directly related to necessary activities, such as client meetings. All travel was local, except for a trip which NBF made to Slidell for a meeting. Consequently, NBF argues that this is not the excessive travel time which case law has routinely reduced.

No reduction will be allowed here.

The Court has also reviewed _in_ _camera_ the time records of Jones Walker. Despite presenting various arguments, defendant has also argued that "time records provided [by plaintiffs' counsel] are overwhelming and make it impossible to ascertain and identify every single defect in the fees claimed." Defendant has isolated a handful of fee entries in its memorandum with which exception is taken to which plaintiffs have adequately responded. As to the other entries identified as objectionable, defendant has listed them on various exhibits with no explanation as to why they should be rejected. This gives very little basis for the Court to articulate a reason for excluding them. And, indeed, some of the

bases for which defendant wants fee items excluded are present in Jones Walker's own bills. Specifically, defense counsel has engaged in "block billing", has so-called "vague" time entries similar to those that plaintiffs are criticized for and has billed the client for inter-office attorney consultation. If it is appropriate for the Hornets' counsel to bill in this fashion, plaintiffs' counsel may also do so.

The Court notes that both DFK and NBF are traditional defense firms in southeast Louisiana. Certain counsel for both firms have, at a prior time, worked for Jones Walker and are familiar with the billing practices of that firm. Being a well respected defense firm itself, the protocols with which plaintiffs' counsel were familiar while working at Jones Walker have been incorporated into the billing systems of the firms with which they are now associated. Affidavits to that effect are part of the pending motions.

Over the course of this litigation, Jones Walker has utilized at different times no less than eleven partners, nine associates, thirteen paralegals, two law clerks and two legal assistants to staff the case. Based upon that information, and taking into account the maxim that defendant should not be asked to pay bills to plaintiffs' counsel that it would not pay to its own attorney, the Court cannot say that this matter has been overstaffed by the

plaintiffs.

The time of Jones Walker partners working on this matter has been billed to the client at anywhere from $240.00 per hour to $350.00 per hour. The main partner dealing with the case has been Ms. Jennifer Anderson whose hourly rate for the duration of this matter has been between $240.00 and $290.00 per hour. Associates' time has been billed at between $130.00 and $195.00 per hour. Ms. Jane Heidingsfelder has been the main associate on the file and her hours have been billed at between $140.00 and $195.00 per hour. Paralegal time has been billed to the Hornets at between $80.00 and $145.00 per hour. The time of the principal paralegal working on the matter, Ms. Rhonda Betbeze, was billed to the Hornets at between $120.00 and $145.00 per hour.

Referencing the bills of NBF, the Court notes that from April 22, 2005 through October 18, 2005 all professional work performed on this case was done by that firm. NBF has stated in its memorandum that a total of 582.2 hours was devoted to plaintiffs' representation during that time. Of that total, counsel has advised that 128.9 hours were devoted to meeting with potential plaintiffs, investigating the factual basis and supporting evidence for plaintiffs' claims and performing an assessment of each plaintiff's potential recovery. Some 120.8 hours were expended in researching the legal validity of plaintiffs' potential claims,

investigating and reviewing supporting evidence, collaborating with attorneys handling similar claims around the country and evaluating the chances of the success of the Hornets' anticipated "seasonal and amusement" and "retail sales" defenses. Another 197 hours were expended for drafting, editing and revising multiple state and federal pleadings; 47.6 hours were expended in ongoing contact with sixteen clients; 26.5 hours were expended in investigating and meeting with potential witnesses; 39.9 hours were expended attending Court-mandated status conferences and hearings and conferring with the Court or counsel in person or via teleconference; and 11.1 hours were expended on ongoing strategy for discovery completion, witness identification, pleading composition and trial preparation.

For the same time period of April 22, 2005 through October 18, 2005, Jones Walker performed slightly more than 500 hours work. The Court does not find that the time devoted by NBF for the aforementioned time period was unreasonable. Indeed, it is in keeping with the time devoted by Jones Walker to the same matter, especially when NBF dealt with multiple clients while Jones Walker dealt with only one.

From October 18, 2005, when Mr. Buras departed NBF, through September 13, 2006, i.e., the first summary judgment motion, NBF has stated that it incurred a total of 57.5 hours. Counsel have

advised that 2.2 of those hours involved communicating with the client, keeping the client apprised of her claim's status and advising of pertinent developments with the claim. It also included NBF's meeting with a client jointly represented by NBF and DFK to discuss that person's termination by the Hornets and other aspects of his claim.

Another 0.8 hours were spent conducting limited research prior to the preparation and filing of plaintiffs' motion for partial summary judgment; 9.5 hours were expended drafting, editing and revising multiple pleadings, including the motion for summary judgment itself and the revised notice to all plaintiffs; 17.5 hours were expended conferring with counsel in person or by phone, reviewing pleadings filed by opposing and/or co-counsel and attending Court mandated conferences and hearings.; and 22.7 hours were expended in ongoing strategy sessions as to all aspects of the litigation.

During this same time period between October 18, 2005 and September 13, 2006, Jones Walker expended over 422 hours which were billed to the Hornets. In light of the overwhelming additional hours expended by Jones Walker during this same period, the Court does not find that NBF's submission is unreasonable. Even though NBF had fewer clients during that time period, their involvement was still necessary to the proper representation of

those who remained with them.

From September 14, 2006 through the Court's granting of the plaintiff's motion for summary judgment on July 10, 2008, NBF devoted 510 hours of non-contempt-related time to the prosecution of the plaintiffs' claims. An additional 263 hours of time were expended because of what is termed the "Hornets pattern of discovery violations and contemptuous conduct." As to the non-contempt time, 50.9 hours were devoted to ongoing contact with multiple collective action plaintiffs in person and/or by phone. Another 146.2 hours of time were expended on conducting research, investigation, review and collaboration with other attorneys on multiple issues, including claims involving spoliation of evidence. Counsel note that "chain of custody" depositions revealed that all electronic evidence requested by plaintiffs was intentionally destroyed by the Hornets after litigation had commenced and after they had been requested in discovery. Some 150.8 hours were incurred drafting, editing, revising and preparing exhibits to numerous pleadings, including subpoena duces tecums and notice or records depositions to all NBA teams, pre-status conference memorandums, proposed findings of fact, exhibit lists, witness lists, motion in limine for adverse presumption, motion for summary judgement, pre-settlement conference memorandum, opposition to motion in limine, post-hearing memorandum and inserts for the pre-

trial order.  Another 120.8 hours were spent reviewing pleadings and correspondence filed by opposing counsel and co-counsel, engaging in conferences and multiple unproductive meetings with opposing counsel, together with conferences and hearings with the Court.  During this period, counsel attended two status/settlement conferences with the Court, discovery telephone conferences with all counsel, a final hearing on the motion for contempt, a hearing on a successful motion to strike the Hornets' expert, a hearing on competing motions in limine and a hearing on the successful motion for summary judgment.  Additionally, 40.5 hours were spent in ongoing strategy between NBF and DFK regarding all aspects of the prosecution of the claims, including discovery, settlement positions, pre-trial preparations and strategy for motions in limine and dispositive motions.

During this same time period, from September 14, 2006 until July 10, 2008, Jones Walker expended and billed the Hornets for over 2,000 hours of attorney time.  Again, the Court cannot find the time spent by NBF during this time was unreasonable.

From July 11, 2008 through December 15, 2008, NBF incurred 237.1 hours of attorney time.  Of that amount, 5 hours were spent engaging in ongoing discussion with the clients as to all aspects of trial preparation, discovery completion, mediation and settlement versus trial; 15.8 hours were spent on research; 61.9

hours were spent by NBF drafting, editing and revising various pleadings, including the pre-trial order, mediation statements and settlement documents. Counsel note that the most significant amount of drafting time involved a battle over the final form of the settlement agreement. 83.4 hours of time involved conferring with counsel, reviewing pleadings and correspondence of the parties, attending Court hearings and participating in lengthy mediations. 18.5 hours were expended in ongoing strategy between NBF and DFK.

During this same time period between July 11, 2008 and December 15, 2008, Jones Walker expended a total of almost 430 hours. Again, the Court cannot say that the time expended by NBF is unreasonable. Overall, NBF has devoted considerably less time to the handling of this matter than has the defense. And, not having been given a cogent reason to reduce NBF's time in the matter, the Court declines to do so.

Looking to the hourly rate which NBF seeks to receive, counsel have noted that plaintiffs contracted with NBF to perform professional services at the following rates:

1.  Stewart E. Niles, Jr.            $ 450.00/hr.

2.  Karen M. Fontana                   300.00/hr.

3.  Daniel E. Buras, Jr.              250.00/hr.

4.  Bryan J. Knight                    200.00/hr.

5.   Emilio A. Arias (paralegal)              100.00.hr.

With the exception of the rate sought by Mr. Niles, the rates charged by other counsel and Mr. Arias, the paralegal, are in keeping with the rates charged to the Hornets by Jones Walker. The Court accepts the rates sought by Ms. Fontana, Mr. Buras, Mr. Knight and Mr. Arias. While the Court acknowledges the expertise and experience of Mr. Niles and finds him to be an exceptionally effective advocate in all matters in which the Court has dealt with him over the years, the Court nonetheless reduces Mr. Niles' hourly rate to $400.00 per hour. This rate is still higher than that charged by any partner at Jones Walker. However, as there is nothing in the record to reflect what other senior partners are currently charging to their corporate clients, the Court feels that such an adjustment is in order. And Mr. Daigle has substantially reduced his hourly fee in his petition to $350.00 per hour.

        As to DFK, the following are the hourly fees requested by counsel:

        1.   Howard Daigle              $ 350.00/hr.

        2.   Daniel Buras                250.00/hr.

        3.   Elvige Cassard              250.00/hr.

        4.   D. Stephen Brouillette      200.00/hr.

        5.   Jon Van Stennis             200.00/hr.

        6.   Paralegal time               75.00/hr.

The Court notes that by contract with the plaintiffs, Mr. Daigle's agreed upon rate was $450.00/hr. and the paralegal rate was $100.00 per hour. These rates have been reduced as noted above, a form of billing judgment. The Court notes initially that it has no problem with the amount of the rates charged hereinabove. They are in keeping with the rates which the defendant has billed to its own client.

Billing from DFK began on November 2, 2005, when Messr. Buras affiliated with that firm. Between November 2, 2005 and July 10, 2008 the following billable hours for which compensation was sought have been logged to this matter:

1. Daniel Buras                   1,591.00 hours

2. Elvige Cassard                 1,445.50 hours

3. Howard Daigle                    130.75 hours

4. Paralegal time                   352.00 hours

5. Jim Bradford                       2.00 hours[7]/

6. D. Stephen Brouillette            15.55 hours

7. Jon Van Steenis                    2.00 hours

As can be seen, between Mr. Buras and Ms. Cassard some 2,934.55 hours were accrued on this case during the above-mentioned time frame. By comparison, between October 18, 2005 and July 10, 2008,

---

[7]/ DFK has since deleted Mr. Bradford's time from its fee application. (Rec. doc. 476, pp. 8-9).

Jones Walker logged a total of some 2,510.50 hours on the matter. The Court recognizes that DFK was dealing with multiple clients during this time while defendant dealt with only one and that plaintiffs were dealing with issues of discovery abuse as well.

In addition, plaintiffs had time expended to "bring people up to speed" when Mr. Buras joined DFK and further time was expended to make sure Ms. Cassard was able to handle the clients while Mr. Buras was on active duty in the military. These are areas for which defendant should not have to pay. While it is not plaintiffs' fault that this work had to be done, it is nevertheless not work for which defendant is responsible. The Court has determined that an across-the-board cut to the hours of Mr. Buras in the amount of 100 hours and to the hours of Ms. Cassard in the amount of 150 hours is sufficient to compensate for these items. The Court notes that, on defendant's exhibit 5 wherein items of transition time with which the Hornets took issue are listed, all items do not appear to deal with transition time. The Court has, therefore, arbitrarily reduced counsel's time for defendant's arguments made pertaining to exhibit 5 and exhibit 8, the latter of which dealt with alleged reduced rate work.

With these adjustments, although plaintiffs' counsel still has more hours in the case than does the defendant, the Court believes that equities have been accounted for. It is the opinion of the

59

Court that this matter was far more drawn out than it otherwise would have been because of the conduct of the Hornets. No action on the part of plaintiffs' counsel has been articulated to make the Court believe that plaintiffs' counsel was churning the file. And, indeed, there would be no reason for plaintiffs' counsel to do so. Counsel's main objective as plaintiffs' representative is to obtain the best result as quickly as possible so that money may be presented to the client. For five years now, plaintiffs' counsel has represented numerous individuals and received no compensation for their efforts.

The Court declines to apply a multiplier to the reasonable sums determined to be appropriate as set forth hereinabove. But, because no multiplier has been awarded, the Court is loathe to make any further cuts to the sums sought by counsel. This case took a significant amount of time on the part of Mr. Buras and Ms. Cassard. An excellent result was obtained. As this matter appears to have been a largely full-time effort by both of these attorneys, it is not hard to imagine that they could not have earned much money from sources other than this file during the given time period. And, as noted, they have waited a significant period of time to realize any money from their victory. The Court is of the opinion that the Hornets were excessively contentious in their position, there being a significant problem not only with discovery

and/or spoliation of evidence but also when the Court believed the case had been settled. The Court cannot help but note that it is highly unusual to have problems with settlement as occurred in this litigation and the Court is of the opinion that the issue represented an attempt by defendant to delay a timely resolution of this matter. Additionally, there was a further ill-conceived and frivolous motion to dismiss which the Court has addressed earlier.

Lastly, the Court has before it the supplemental motion by DFK for attorneys' fees incurred in connection with defending against the motion to dismiss filed by the Hornets and in pursuing its claim for attorneys' fees on the main demand. (Rec. doc. 494).

Initially, the Court notes the jurisprudence with regard to fees incurred while pursuing a claim for fees. First, the case law is clear that reasonable fees incurred while seeking fees which have accrued in the process of pursuing a claim under the FLSA are, in fact, recoverable. Batt v. Micro Warehouse, Inc., 241 F.3d 891, 894 (7th Cir. 2001); 29 U.S.C. § 216(b). In addition, as the Court has determined that the motion to dismiss was frivolous and dilatory, attorneys' fees will be awarded, independently, for the time counsel spent dealing with this issue.

The standard for determining a reasonable fee for counsel's work on the main demand has already been set forth earlier in this opinion. As to the time spent on the fee petition itself,

reasonability is still the key to what will be awarded.  However, case law has indicated that one factor to be considered in making that determination involves a comparison between the hours spent on the merits and the hours spent on the fee petition. In other words, "... the relevant inquiry is whether the hours claimed to have been expended on the fee request bear a rational relation to the number of hours spent litigating the merits of the case." Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 554 (7th Cir. 1999).

Once the Court has determined the appropriate number of attorney hours involved with handling the fee petition, the Court must then determine a reasonable hourly rate.  A reasonable hourly rate should reflect the "market rate" for the attorneys' services and is the "rate that lawyers of similar ability and experience in the community normally charge their paying clients for the **type of work** in question." Spegon, 175 F.3d at 555 (emphasis added).

The initial burden of proving the "market rate" is on the fee applicant; however, once the attorney provides evidence establishing his market rate, the burden shifts to the defendant to demonstrate why a lower rate should be awarded.  The fee applicant can meet his initial burden either by submitting affidavits from similarly experienced attorneys attesting to the rates they charge paying clients **for similar work** or by submitting evidence of fee awards the attorney has received in similar cases. Spegon, 175

F.3d at 554-56 (emphasis added).

The Court notes that pursuing fees on fees does not require the expertise or experience that litigating the main demand does. It is, in essence, a collection suit and does not merit hourly rates such as counsel might charge in litigating the major issues on behalf of the client. Here, counsel are seeking a total of roughly $31,000 for defending against the motion to dismiss and another $114,000 for prosecuting the motion for fees for a grand total of $145,943.75. Succinctly stated, this sum is simply too much.

A significant amount of time has been expended by the Court in an effort to deal with the initial adjudication of fees. And, indeed, the Court has awarded a significant sum to plaintiffs' counsel, being of the opinion that the time expended and the result achieved merited a significant award. However, as to this phase of the litigation, which is basically a collection suit, an across-the-board cut to the fees sought is appropriate. In connection with the pending motion for supplemental fees incurred in defending against the motion to dismiss and in prosecuting the motion for fees, the Court awards DFK a total fee of $40,000.00.

Accordingly, it will be recommended that, as to the initial requests for fees, the sums sought by plaintiffs' counsel with the adjustments noted are appropriate, that is,

1. As to Niles, Bourque & Fontana, the Court will recommend an award of fees for the hours sought, without deduction, at the hourly rate sought by all counsel and support staff except Mr. Niles. The Court recommends that Mr. Niles' hourly rate be reduced to $400.00/per hour but that he be compensated for all hours sought. NBF is instructed to re-calculate its initial submission of fees, originally stated to be $431,206.00, to reflect a diminution based upon a reduction in Mr. Niles' hourly rate and to present same to all counsel and the Court within seven days.

2. As to Daigle, Fisse & Kessenich, the Court will recommend an award of fees for all counsel for the hours sought, without deduction, at the hourly rate sought by all counsel and support staff except Mr. Buras and Ms. Cassard. The Court recommends that the hours of Mr. Buras be reduced by 100 hours and the hours of Ms. Cassard be reduced by 150 hours but that their respective hourly rates be acknowledged and allowed. This will result in total fees of $767,327.25.

It will be further recommended that, as to the supplemental request for fees lodged by Daigle, Fisse & Kessenich, the firm be allowed an additional $40,000.00 in defending against defendant's motion to dismiss and in prosecuting its application for fees.

## RECOMMENDATION

For the foregoing reasons, it is recommended that, as to the initial request for fees, the sums sought by plaintiffs' counsel

with the adjustments noted are appropriate, that is:

1.  As to Niles, Bourque & Fontana, the Court recommends an award of fees for the hours sought, without deduction, at the hourly rate sought by all counsel and support staff except Mr. Niles. The Court recommends that Mr. Niles' hourly rate be reduced to $400.00/per hour but that he be compensated for all hours sought. NBF is instructed to re-calculate its initial submission of fees, originally stated to be $431,206.00, to reflect a diminution based upon a reduction of Mr. Niles' hourly rate and to present same to all counsel and the Court within seven days.

2.  As to Daigle, Fisse & Kessenich, the Court recommends an award of fees for all counsel and support staff for the hours sought, without deduction, at the hourly rate sought by all counsel and support staff except Mr. Buras and Ms. Cassard. The Court recommends that the hours of Mr. Buras be reduced by 100 hours and the hours of Ms. Cassard be reduced by 150 hours but that their respective hourly rates be acknowledged and allowed, thereby resulting in total fees of $767,327.25.

It is further recommended that, as to the supplemental request for fees lodged by Daigle, Fisse & Kessenich, the firm be allowed an additional $40,000.00 in defending against defendant's motion to dismiss and in prosecuting its application for fees.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate

judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass</u> <u>v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this __3rd__ day of ____August____, 2010.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE